```
                IN THE UNITED STATES DISTRICT COURT
                      FOR THE DISTRICT OF ALASKA
```

RONALD E. ZUBER,              )
                              )
    Plaintiff,               )
                              )
vs.                           )          **ORIGINAL**
                              )
APC NATCHIQ, INC.,            )
                              )
    Defendant.               )
_____)

Case No. A03-0052 CV (RRB)

<u>DEPOSITION OF MARK C. NELSON</u>

APPEARANCES:

For the Plaintiff:          Kenneth L. Covell, Esq.
                            712 Eighth Avenue
                            Fairbanks, Alaska  99701

For the Defendant:          Gregory L. Youngmun, Esq.
                            DeLisio, Moran, Geraghty & Zobel
                            943 West Sixth Avenue, Suite 110
                            Anchorage, Alaska  99501

Also Present:               Ronald E. Zuber

                                           * * * * *

    Pursuant to Notice, the Deposition of <u>MARK C. NELSON</u> was taken on behalf of the Plaintiff before Teresa E. Mielke, Notary Public in and for the State of Alaska and Reporter for Gemini Reporting Services, at the Offices of Gemini Reporting Services, 943 West Sixth Avenue, Suite 110, Anchorage, Alaska, on the 26th day of August, 2003, commencing at the hour of 1:50 p.m.

                                           * * * * *

GEMINI Reporting Services
943 West 6th, Suite 110
Anchorage, Alaska 99501
277-8591

EXHIBIT 4
PAGE 1 OF 6

June 15, DATE 2006 EX. N-2
WITNESS Nelson
METRO COURT REPORTING
(907) 276-3876

### Page 10

1 talking about today as president or are you talking about
2 when I was operations manager in Kuparuk?
3 Q For the time frame '96 forward, regardless of what your
4  job was, were there -- was there a person or a position
5  that the safety supervisors reported to, and that person
6  or job was the overall head of the safety department?
7 A For APC, no.
8 Q Okay, was it -- do you remember a Mr. Heffler or Heffley
9  or Heffer -- Heffner having a job like that?
10 A Keith Heffner, yes.
11 Q And did he have a job like that?
12 A Keith Heffner was -- I'm not sure what period of time he
13  was employed with the company, but I believe always with
14  the parent company Natchiq.
15 Q Okay, and what was his title, or is or was his title, if
16  you know?
17 A Somewhat -- something along the line of a corporate --
18  corporate HSE manager.
19 Q Okay, Mr. Buchanan called him the corporate safety guy, I
20  think, is that.....
21 A Okay.
22 Q .....reasonable.....
23 A Sure.
24 Q .....name for him? All right, and prior to become AES was
25  Mr. Heffler -- Heffler, is that the right name? Heff.....

### Page 11

1 A You're going to get me saying this now. Heffner.
2 Q Mr. Heffner in that same position as corporate safety guy?
3 A At the -- in which time frame?
4 Q Well, recently you changed from APC Natchiq to AES,
5  right.....
6 A Okay.
7 Q .....within a year or so?
8 A Today Keith Heffner is -- wait. Keith, yeah, today is not
9  our corporate safety man with AES. Today our corporate
10  safety man, 2003, is Doug Smith. So help me from there,
11  I'm not sure I under.....
12 Q All right, well, the -- we can go to either spot with
13  this. So Doug Smith is the corporate safety man. Today
14  do the specialists report to a safety supervisor and then
15  do the safety supervisors report to -- not exclusively but
16  to Mr. Smith?
17 A Do they have a channel of communication, a line of
18  reporting to the corporate safety man?
19 Q Yes.
20 A Sure.
21 Q Okay, and they might -- the safety supervisors might as
22  well -- might also report to operations manager at
23  Kuparuk, right?
24 A Yes.
25 Q All right. From the time frame in 1996 forward was there

### Page 12

1  always a position, whether it be at Natchiq or APC, that
2  was comparable to Mr. Smith's and Mr. Heffner's job?
3 A With some gaps, maybe. I can't recall. Yeah.
4 Q Generally that would be the.....
5 A Company philosophy would have a corporate safety officer
6  or corporate safety man on the -- yes.
7 Q Okay, all right. Would it be reasonable to call that
8  position a corporate safety director or a safety director?
9 A I'm sure -- I don't know the distinction, director versus
10  manager versus officer but.....
11 Q I'm not trying to.....
12 A .....senior -- senior safety resource to management, yes.
13 Q Okay, all right.
14   MR. COVELL: That's too early, isn't it?
15   MR. YOUNGMUN: It's 2:10.
16   MR. COVELL: Yes, it's too early.
17 Q Do you have -- or, when you were APC did you have a legal
18  department?
19 A What year?
20 Q 1996 forward.
21 A The -- I did not have access to a legal department in '96.
22  The legal in-house counsel we currently have today was
23  hired, I'm going to say, '99, 2000.
24 Q Okay, if -- prior to that time if you had need for legal
25  resource would the company obtain them for you?

### Page 13

1 A We would've made a decision as to need and -- sure, of
2  course, right.
3 Q Okay. In 1996 you had occasion to -- or, did you have
4  occasion to evaluate various positions with APC for their
5  categorization as exempt or nonexempt for purposes of
6  overtime under state and federal law?
7 A I started '96, I think the time frame '97 is when I really
8  -- was really more -- did more of an evaluation.
9 Q Okay, and what precipitated you to do that, if you recall?
10 A Concerns that I had just in the -- in the media and
11  whatnot regarding exempt versus nonexempt.
12 Q Let me show you Exhibits 1 and 2 here, I represent to you
13  Exhibit 1 is what was supplied to us in discovery as a job
14  description for safety specialist, and Exhibit 2 is a job
15  announcement for a safety specialist job. Are you
16  familiar with Exhibit 1 there?
17 A Want me to read it, or.....
18 Q No, I'm just asking if that's.....
19 A I recognize the general outline, yes.
20 Q Okay. All right, do you recollect using that back in '96
21  or '97 in connection with evaluating whether or not a
22  safety specialist position was exempt or nonexempt?
23 A This particular job description?
24 Q Or one similar to it. This one -- we looked at these
25  earlier today, and we have potentially three of them.

Page 14

1  There's Exhibit 1, there's this job advertisement, I
2  guess, and then there was.....
3  MR. YOUNGMUN: 145.
4 Q And this is -- I'm showing you Exhibit 4 that's designated
5  APC 145. We came to the -- or, we came to the possible
6  conclusion that this APC 145 is an older version of this
7  Exhibit 1, and that they're apparently similar but there's
8  some minor differences in them. And it's just to
9  hopefully save us some time. In doing a review of the
10  exempt status as a safety specialist did you use a job
11  description -- this job description or one like it in
12  doing a review, to your recollection?
13 A It could have been a partial review that I did at the time
14  by using this material.
15 Q All right, can you take a minute, and we'll go off record
16  if you need to, and read these and see if in your opinion
17  these fairly describe the position of safety specialist
18  with APC from 1996 to date?
19 A Okay, you're -- you're asking me are these basically the
20  same position evolving over the last.....
21 Q Sure.
22 A .....X years or something?
23 Q Yes, yes.
24 A Well, you want -- if you want me to read them verbatim I
25  can. I can probably look at.....

Page 15

1 Q No, I.....
2 A .....them structurally and say they're probably the
3  evaluation of -- you know, this was probably an old one,
4  that's dated something last year, and this is probably
5  this year. So, yeah, I would say it's probably an
6  evaluation of time over -- without reading it verbatim.
7 Q From '96 to date have there been any dramatic changes in
8  the duties of the safety specialist?
9 A In the day to day duties?
10 Q Yes.
11 A No.
12 Q All right. Why don't you take a look at what's -- that's
13  Exhibit 4, right? No, that's your copy, I have a copy
14  right here. I just kind of -- In the course of evaluating
15  the position was there some paperwork generated? When you
16  examined the position of safety specialist and other
17  positions concerning their exempt or nonexempt status was
18  there some paperwork generated in that regard?
19 A Yes.
20 Q Okay, and -- okay. In Exhibit 4 I have these papers that
21  were produced by your company to me, and I'd like to go
22  through them with you and discuss them, so if you could
23  turn to Page 137, which is the first page following the
24  legal pleadings there.
25 A This article?

Page 16

1 Q Yes.
2 A Okay.
3 Q Okay, is that article, which I understand to be a Forbes
4  magazine article, what precipitated your interest in
5  reviewing exempt versus nonexempt positions?
6 A I think so, primarily.
7 Q Looking at the second page of that in the next to last
8  paragraph, about four lines down they talk about a case,
9  Auer, A-U-E-R v. Robbins, do you see that right down in
10  here?
11 A Yes, um-hm.
12 Q Okay, did you read that case?
13 A No.
14 Q Are you familiar with that case at all?
15 A No.
16 Q All right, and did you set some -- something in motion to
17  track the progress of that case?
18 A No.
19 Q Looking at the next page, which is 139, this seems to be -
20  - does this have much to do with the classification of
21  exempt/nonexempt?
22 A Doesn't appear to.
23  MR. COVELL: Okay, do you want these, Greg? That's the
24  other copy there, sure.
25 Q Okay, let's go to the next page here. This is 140, this

Page 17

1  appears to be a memo from you to Anne Hippe and Toby
2  Osborn, do you -- I guess is that what it is?
3 A Yes.
4 Q Do you recollect generating this.....
5 A Yes.
6 Q .....today?
7 A It looks like one of mine.
8 Q All right, and who's Anne Hippe and Toby Osborn?
9 A Anne Hippe at the time was the comptroller, Toby Osborn
10  was the CFO.
11 Q Okay, and CFO is chief financial officer?
12 A Yes.
13 Q Okay, so these are money people, is that.....
14 A Money people, yes.
15 Q Okay, all right. And does that essentially say you're
16  concerned about people being exempt or nonexempt and you
17  wanted to look into that matter and explore it?
18 A Right, at that time I was concerned and looking for -- I
19  don't think I had much exposure at the time to exempt
20  versus nonexempt and were looking for how do you classify,
21  were we correct, were we not correct, looking for answers.
22 Q Okay, and also in conjunction with looking at the exempt,
23  nonexempt, did you also have a concern about whether or
24  not paying people a daily salary was something you ought
25  or ought not to be doing?

EXHIBIT A
PAGE 3 OF 4

Case 3:03-cv-00174-RRB   Document 30-2   Filed 08/01/2006   Page 4 of 6

Case No. A03-0052 CV (RRB)   CondenseIt!™   Zuber v. APC Natchiq, Inc.

### Page 18

1  A   Is that what my memo says?
2  Q   Yes, I'd suggest to you that in these further papers.....
3  A   Suggest it? Sure, if that's what I was suggesting.
4  Q   Okay, all right. We already discussed -- let's go through
5      these. 145 appearing to be the job description that more
6      or less describes the job of safety specialist.
7  A   Oh, so, okay, project superintendent on 141.....
8  Q   Right.
9  A   .....and engineers, super -- materials supervisors, 145,
10     yes, safety specialists.
11 Q   Okay, and those pages you just went through before are
12     other job descriptions for the company, is that right?
13 A   Yes.
14 Q   Did you review not only the safety specialists but those
15     other job descriptions back in this time frame, '96, '97?
16 A   Yes.
17 Q   Okay, turning to 147, is that your handwriting?
18 A   Yes, it is.
19 Q   Okay, much better than mine, believe me. What's this
20     paper represent, or what's it all about, if you can tell
21     us?
22 A   I don't know all of what was going through my -- what was
23     going through my mind at this time. There were -- there's
24     a distinction in Alaska law between exempt/nonexempt,
25     three categories. The ones that I would be concerned

### Page 19

1      with, administrative, professional, executive. I believe
2      it was -- in fact, I'm almost -- can almost remember the
3      conversation with Randy Carr was around supervisors. I
4      was unaware at the time supervisors was a whole separate
5      classification and how it was classed in state law, but it
6      was something that should be set aside and we -- something
7      we should be concerned about, that you could classify them
8      as exempt. But it's really exempt, they should be paid
9      for all hours worked, but they could be paid at the
10     straight time rate, and it was something I had never heard
11     before. It was a note I made. This is some of those
12     chicken scratches that I was making, maybe at the time I
13     was even talking to him, for all I know. These are --
14     these are -- these people listed below are maybe notes in
15     my mind at the time of people that were paid exempt, could
16     -- that could be -- maybe they were improperly -- I didn't
17     know at the time, I was making notes to check them out. I
18     suspect that's what it was.
19 Q   All right, and then turning to Pages -- well, as a group,
20     148 through 157.
21 A   Okay.
22 Q   Can you tell us what those are, in general?
23 A   Yeah, they're some kind of a -- a test that you walk
24     through and check whether they meet the criteria of exempt
25     or nonexempt, basically.

### Page 20

1  Q   Did you want to call them a cheat sheet?
2  A   Yeah, I don't -- whatever you.....
3  Q   A checklist for.....
4  A   .....for a layman, to --
5  Q   .....more formal.....
6  A   Sure.
7  Q   .....sounding?
8  A   More or less, yeah.
9  Q   All right, do you know where these -- the blanks came
10     from, as far as these checklists go?
11 A   Don't know today, yeah.
12 Q   All right, do you know if maybe you got them from -- well,
13     never mind, okay. All right, do you know what 158 and 159
14     are and why they might be included here as being relevant
15     to this case?
16 A   158?
17 Q   And 159.
18 A   One fifty -- They -- they are printouts, I'm not sure out
19     of what system, if it was the data base we used at the
20     time on the Slope. Appear to be employees who were paid
21     on a day rate.
22 Q   Okay, do you know what was under the black-outs on those
23     pages?
24 A   No.
25 Q   Do you know why the black-outs are there?

### Page 21

1  A   I don't recall. They may have been non -- nonexempt, I
2      don't know.
3  Q   All right, and then Page 160, do you know why this is
4      here? Might that be additional day rate people?
5  A   Additional people, right.
6  Q   All right. Looking at Page 161, that looks like that's
7      perhaps an e-mail from you to Harvill/Price, and I believe
8      we were told they were some type of managers, perhaps.
9      Well, who are Harvill/Price?
10 A   Well, let me familiarize myself with this for a second
11     here.
12 Q   Any time you want to do that, just say so, I don't mean to
13     rush you.
14 A   Well, I can walk you through. Harvill and Price were
15     super -- they were ARCO supervisors at the time, it was
16     John Harvill, Mike Price, just used the last names. Bill
17     Hurley at the time was -- was ARCO's HR manager in
18     Anchorage. He may have been on the Slope periodically,
19     but he was their HR manager. This would've been sent
20     from, looks like Mike Price to Bill Hurley, the initial e-
21     mail, asking the question -- well, it says, he writes,
22     Mark Nelson is reviewing the APC positions, "he was
23     curious as to how ARCO determined this. They would like
24     to use our input as benchmarking information on" the
25     issue. I -- I probably went to him at the time and said,

Case 3:03-cv-00174-RRB   Document 30-2   Filed 08/01/2006   Page 5 of 6

Case No. A03-0052 CV (RRB)   CondenseIt!™   Zuber v. APC Natchiq, Inc.

### Page 22

1  hey, how do you guys do it. You know, this is in December
2  of '96, it was early on, I was -- I had concerns. I went
3  to these guys and said what's the -- in fact, I think the
4  article, the Forbes article, referenced a case against
5  ARCO. I probably assumed at the time ARCO had -- was very
6  fluent in this subject and could help me.
7  Q  Okay. I believe it does reference an article.
8  A  They in turn referred me to their compensation specialist
9  or analyst here, Nancy Williams, gave me her number.
10 Q  Okay, did you ever talk to Nancy Williams?
11 A  Talked to somebody, don't recall the name.
12 Q  Concerning classification of positions as exempt or
13    nonexempt?
14 A  Yes.
15 Q  Okay, do you recollect anything from the conversation?
16 A  Is that -- do you have a fax they sent me? It was in the
17    file when I turned it over. Is that coming up here?
18 Q  I -- look at the next page.
19 A  Bingo. Okay, yes, I spoke with Nancy Williams, there is
20    it. She -- I spoke with her about -- actually I was
21    trying to get information about the case, she was not very
22    forthcoming about the case, and she said something to the
23    effect of we use a -- I don't know, I'll share with you
24    some information, and she shared, I think, that fax right
25    there it, basically.

### Page 23

1  Q  All right, and that's got a cover sheet, it says cover
2     plus eight, so let's just count, one, two, three, four,
3     five, six, seven, eight takes you through what's labeled
4     APC.....
5  A  Yeah.
6  Q  .....170. So is it your recollection that those
7     subsequent eight pages were the fax that you.....
8  A  Yeah.
9  Q  .....received from -- Okay, all right. So you had this
10    conversation, she wasn't forthcoming about the case, but
11    she said I'll share these materials with you and she sent
12    those subsequent eight pages. Did the conversation --
13    what else do you recollect about the conversation, if
14    anything, or is that.....
15 A  She said they'd made changes in some of their positions,
16    some of them they hadn't -- I don't really recall at the
17    time. I -- I should say I recall at the time they were --
18    there was an issue around engineers, field engineers, I
19    don't remember how they ended up classifying -- I think
20    that's what their suit -- the original suit was brought
21    against. I may have asked, I think I did, about the
22    supervisory people, how they were classifying maybe the --
23    The positions I was concerned about at the time were
24    warehouseman, safety specialist, engineers and whatnot,
25    and I think that she told me, I'm going to say

### Page 24

1     recollection is that she told me that they still
2     classified safety as exempt, that they had maybe made
3     changes in their engineering, but they weren't at liberty
4     really to disclose too much information around that.
5  Q  Okay, is it fair to say, and correct me if I'm wrong
6     because I'm not trying to testify here, that the
7     conversation with her was somewhat guarded as to what they
8     did or what they were doing?
9  A  Yes.
10 Q  Okay, and she said well, here is -- not to put this
11    rudely, but she sort of said here is some materials, try
12    to work it out with these?
13 A  Yeah, she -- and you're dating me, this is six or seven
14    years ago, so I don't remember the verbatim conversation.
15    It was something that, you know, we had the suit, we're
16    not -- we don't want to talk about it. I think it had
17    been settled out of court, I don't know that it was made
18    public. She said, I'll -- you know, I could tell you some
19    here -- but I don't think at the time it helped me, it's
20    not -- I wasn't going to rely solely on her -- her
21    opinions or what she told me to make a final judgment. So
22    I -- it was just -- that was just early in the game.
23 Q  Step in the process?
24 A  Yes.
25 Q  Okay, all right. Let's go ahead and turn over to Page 171

### Page 25

1     because it might be answering some of our questions.
2     There appears to be an e-mail there from you to Chris
3     Boyle, indicates you talked with Nancy Williams, she faxed
4     you a guideline, refer you to Rose Garcia or LouAnn in
5     their payroll. Do you remember talking to Rose or LouAnn
6     in payroll?
7  A  Well, I -- I said here it was LouAnn I talked with, so I
8     -- I must've. You know, I don't -- I don't really recall
9     the conversation, though.
10 Q  Okay. Was it.....
11 A  If I read this -- if you want me to read this, it would --
12    looks like one of my e-mails, so I can read it if you like
13    and.....
14 Q  No, we've got it in the record I'm just as much trying to
15    jog your memory as we have this -- we have this
16    information essentially -- well, you're establishing it
17    for us as your e-mail that was made contemporaneous with
18    you going through this classification procedure. All
19    right, and that second half of that first paragraph starts
20    to address the day rate issue, as you can see. Does that
21    refresh your recollection that that was a matter that was
22    of concern to you, along with the exemption status?
23 A  Yes. Or partial. I think at the time my concern was as
24    much partial payment of a day rate.
25 Q  Okay. Let's see here. What -- well, let's just put this

### Page 38

1  you to put it in writing because these guys do not believe
2  that they don't fit the -- into the exempt category.
3  Which subsequently came out this letter that he sent me.
4  Q  All right, but you -- in regard to safety specialists you
5  don't recollect what you told Mr. Carr the safety
6  specialists did?
7  A  Well, I would -- I would've describe their -- their day to
8  day duties to Mr. Carr and had a conversation back and
9  forth, which he offered the -- he actually offered a
10  verbal opinion about every one. It was really only the
11  warehousemen that I said, look, I got a problem here with
12  the morale and the issue of my employees, I need you to
13  put it in writing because they don't believe it.
14  Q  Let me draw your attention here to -- why don't we look at
15  Page 163, we see the third or fourth paragraph, depending
16  on what you do with the bullets, it says, "One of the more
17  complex areas of", could you read that paragraph for us?
18  A  Want me to read it out loud?
19  Q  Yes, please.
20  A  "One of the more complex areas of the FLSA is its
21  classification of certain employees as exempt or excluded
22  from coverage by the overtime requirements of the law. An
23  employee is presumed to be nonexempt", parentheses,
24  "covered by the law and entitled to receive overtime pay",
25  comma, "unless the employee (sic) can show that the

### Page 39

1  employee's job duties and pay meet certain criteria".
2  Q  Did you review that material when you were doing this
3  review back in '96, '97? Did you read this paper, 163?
4  A  I -- I'm sure I did, sure.
5  Q  Okay. And you -- and you did read the Forbes article,
6  which is perhaps -- would you agree, to paraphrase it it
7  sort of says this area is a quagmire? That a fair way to
8  characterize that article?
9  A  Don't really recall, I haven't read it recently, but.....
10  Q  Okay, well, it's kind of like a watch-out article, isn't
11  it?
12  A  Oh, sure, that was my -- set my alarm bells off, yes.
13  Q  All right. And then I draw your attention to Page -- I
14  think it's -- I've probably gone by it here -- 154 and
15  155. Is that your handwriting on 154?
16  A  Yes.
17  Q  All right, and did you use this checklist to make your
18  determination concerning -- or, what did you use this
19  checklist for?
20  A  Checklist was the basis that I went through, I don't know
21  that I ever truly completed it per se, it's not obviously
22  formal by any means in the sense that I formalized it or
23  signed it. It is my handwriting and I did use it to
24  formulate the basis for classification of our employees.
25  Q  Okay, do you know if you filled this out when you were

### Page 40

1  talking to Mr. Carr or if you did it at another time, if
2  you know?
3  A  I don't recall, it was part of the file and it was
4  something that would've been part of the overall
5  determination.
6  Q  Okay, you checked off there under administrative test
7  "performs office or nonmanual work directly related to
8  management policies or general business operations", and
9  you checked that. I take it that that means that you felt
10  that a safety specialist does that, is that so?
11  A  Yes.
12  Q  All right, let me draw your attention to the other set of
13  checklists, which is Page 166, and up towards the binding
14  there there's some notations -- well, out here. Is that
15  your handwriting on the right-hand side of that paper?
16  A  Yes.
17  Q  All right, and that says "directly related to management
18  policies, this means to affect" with an A "these
19  policies", slant, "change the".....
20  A  Change them.
21  Q  "Change them, not work with (sic) . . . policies", and
22  that's to the right of an arrow that comes off of "primary
23  duty is office or nonmanual work directly related to
24  management policies or general business operations of the
25  employer or" the "employer's customers". Do you recollect

### Page 41

1  making that note?
2  A  It's my writing, so I -- I'm sure I did, yes.
3  Q  And do you know where you got that information from in the
4  note?
5  A  I can't say verbatim, it -- it could have been from my
6  discussions with Randy Carr. At the time I viewed him as
7  the chief specialist, if you will, but I -- I can't say
8  that.
9  Q  Okay, what duties does a safety specialist have that
10  affects or changes policy?
11  A  What duties?
12  Q  What does a safety specialist do that fulfills that
13  requirement as it was to be exempt?
14  A  You mean beyond the -- okay, you're at what does a safety
15  specialist did that affects policy?
16  Q  Sure, affects policy, yeah.
17  A  Well, the safety specialist is one who -- who actually --
18  in the oilfield a big piece of our work is safety, right?
19  So it's a little bit hard to imagine, maybe, if you don't
20  work, there's a policy for everything, especially back in
21  '96 when -- when maybe this was going -- but in '96 we
22  were very light on policy, if you will. Safety
23  specialists at that time were -- were formulating,
24  writing, coaching, everything to do with those -- those
25  policies and procedures that were being formulated at the