# Broker

(continued from page 4)

Schenck was a real estate broker and found possible tenants for HJI's property. The tenants said they would lease the property if they first got financing and municipal approval to build.

Schenck wanted to collect a commission on the lease. HJI claimed it could not pay until it received rent from the tenant. Schenck and HJI signed an agreement that made commission conditional on HJI getting continued financing. The agreement also made the commission payable according to a schedule that coincided with the expected lease payments. And if HJI became insolvent, the agreement stated the entire commission became immediately payable. When the agreement was signed, both HJI and Schenck knew HJI was already insolvent.

The tenants never got the proper financing and municipal approval. The bank foreclosed and Schenck was not paid.

Schenck sued HJI. He argued his commission was immediately payable under the agreement because HJI was insolvent. An arbitrator dismissed Schenck's claim, and the court agreed.

Both the court and the arbitrator found HJI owed no commission because the possible tenants never got the financing, and a building was never erected. Also, because no rents had been collected, the payment schedule could not be met. Both HJI and Schenck had signed the agreement, they knew its terms and intended to be bound by it.

Schenck appealed, arguing that despite their intentions, the agreement stated the entire payment was due if HJI became insolvent. He argued HJI was insolvent, so the commission was payable.

DECISION: Affirmed.

Schenck and HJI showed their joint intent, by signing the agreement, that no commission would be paid unless the construction moved forward and rents were paid. Although Schenck focused on one part of the agreement about commission, the entire spirit and language of the agreement as a whole showed what the parties intended. He could not claim that one clause in the agreement was more important than the contract as a whole.

Schenck knew by the terms of the agreement that he would not be paid unless the tenants received financing. Therefore, the conditions of the agreement were not met, and Schenck was not entitled to the commission.

see also: Temple v. Clinton Trust Co., 62 A.2d 690 (1948).

see also: Marchak v. Claridge Commons Inc., 633 A.2d 531 (1993).

**Action plan:**
- If a commission is conditioned on several different factors, all those factors must be met before the commission agreement will be enforced. If you feel one factor carries more weight than others, make that clear from the outset in the commission agreement.

---

*Overtime Exemptions — State Employees*

# Federal court refuses to hear state employees' FLSA claim

*Citation: Rehberg v. Department of Public Safety, 946 F.Supp. 741 (Iowa) 1996*

Several employees of the Iowa Department of Public Safety worked overtime. They complained they did not get paid for their overtime work.

The employees sued the department in federal court. They claimed the department's refusal to pay overtime wages violated the Fair Labor Standards Act (FLSA).

The employees asked for overtime compensation plus interest.

The department claimed federal court was not the proper place for the employees to file suit. It argued the 11th Amendment of the federal Constitution prevented individuals from suing a state that had not agreed to be sued in federal court. The department asked the court to dismiss the employees' claims because the federal court did not have the authority to hear the case.

The employees argued their case should not be dismissed. They claimed the 11th Amendment prevented the federal court only

(see FLSA Claim, next page)


# FLSA Claim

(continued from page 5)

from hearing citizens' claims against *other* states, and thus did not prevent the court from hearing claims against their own state. They also argued the FLSA rule preventing state employees from suing their state employers in federal court violated the 14th Amendment's Equal Protection Clause. They claimed the FLSA treated state employees differently than private employees by allowing private workers to sue in either state or federal court.

**DECISION: Case dismissed.**

The federal court did not have the authority to hear the employees' claims against their state.

The employees' argument that the 11th Amendment did not prevent the federal court from hearing their case was incorrect based on a prior Supreme Court decision. The Court had previously interpreted the 11th Amendment to prevent state citizens from suing *even their own state* in federal court without their state's consent, though this was not expressly written in the amendment itself.

The FLSA rule stating state employees could not sue under its provisions in federal court did not violate the Equal Protection Clause. To succeed on this claim, the employees had to show Congress passed the FLSA under the 14th Amendment. Federal laws passed under this amendment related to only race or gender discrimination. The FLSA was not one of these laws because Congress passed it under the Interstate Commerce Clause. As a result, the federal court could not hear the case without the state's consent.

The employees' claims were dismissed from federal court, but the employees could bring their FLSA claim to state court. Though the employees had to bring this federal claim to their own state court, that court still had to enforce the FLSA because of the U.S. Constitution's Supremacy Clause.

see also: *Seminole Tribe of Florida v. Florida*, __ U. S. __, 116 S.Ct. 1114, 134 L.Ed.2d 252 (1996).

see also: *Wilson-Jones v. Caviness*, 99 F.3d 203 (1996).

> **Action plan:**
> • Before spending a fortune on legal fees trying to defend against employees' claims, determine whether you'll need to defend yourself at all. If the employees' lawyers haven't filed their claims in the correct court, you may be (temporarily) off the hook.

*Salary Schedules*

# Officers claim city misrepresented starting salary

Citation: *Williams v. City of Midland*, 932 S.W.2d 679 (Texas) 1996

The city of Midland, Texas, recruited Miller and Williams (officers) to work as police officers. The city sent them brochures outlining, among other things, job qualifications and a step scale. The brochure stated recruits would start at $1,743 per month and, upon completed training and promotion to police officers, would be paid $2,578 per month.

The officers were hired and began the training. About halfway through the course, Sergeant Nicks informed the recruits the salary information in the brochure was wrong, and that it would take recruits 10 to 12 years to reach a salary of $2,578. Nicks noted part of the brochure was "sort of misleading."

After the department sent out 1,000 brochures to recruit applicants, Nicks decided there was a "significant chance" applicants would misinterpret the salary provisions. Chief of Police Czech told Nicks to send out the erroneous brochures anyway but to

> **Action plan:**
> • Potential employees will pay particular attention to any information you give about starting salaries and pay schedules, so be careful what you promise. Unless you're certain before hiring someone that you can follow through on a specified amount, don't set one at all.

(see Starting Salary, next page)


Case 3:03-cv-00174-RRB   Document 30-8   Filed 08/01/2006   Page 3 of 6

## Starting Salary

(continued from page 6)

correct the next group.

The two officers didn't challenge the reduced salary until after they graduated from the training program, when they submitted a claim for the $2,578 salary contained in the brochure. Czech denied the claim. The department changed the brochure's incorrect salary information after the officers filed their claim.

After Czech's denial, the officers sued the city, alleging it breached its contract by not paying the salary stated in the brochure. They also claimed the city's failure to correct the brochure, or notify them of the true salary before they joined the training program, was negligent misrepresentation.

A jury found the city negligently misrepresented the officers' starting salary, and awarded each officer $17,500. The city asked the judge to overrule the jury's award. The judge granted the city's request, and revoked the jury's damage award without comment.

The officers appealed. They claimed sovereign immunity didn't protect the city from a negligent misrepresentation claim, and that they had proved a negligent misrepresentation claim against the city. Finally, they argued they had not been awarded sufficient damages.

**DECISION: Affirmed.**

The officers weren't entitled to damages for the misrepresentations regarding their salary in the brochure.

The officers correctly argued the city wasn't immune, because the city's actions in recruiting police officers involved local citizens, rather than the public in general. Therefore, the city wasn't entitled to governmental immunity.

The officers properly stated a claim for negligent misrepresentation. The city, in the course of its business, made an error regarding the salary. It supplied the false information to potential applicants. By not making corrections, the city failed to use reasonable care in communicating the information. The officers lost money by justifiably relying on the incorrect information.

However, the officers waived their right to sue the city when they completed the training course before suing. They should have immediately filed suit to protect their rights.

By continuing the training after they learned of the error, the officers in effect accepted the city's fraudulent act and couldn't complain later. Having accepted the benefits of the agreement after finding out about the incorrect information, they couldn't then sue.

This waiver was enough to overrule the jury's decision.

*see also: Dillard v. Austin Independent School District, 806 S.W.2d 589 (1991).*

*see also: Caldwell v. Callender Lake Property Owners Improvement Association, 888 S.W.2d 903 (1994).*

---

*Premium Pay*

## City claims union 'disguised' proposals as mandatory bargaining subjects

*Citation: Iowa City Association of Fire Fighters, IAFF Local 610 v. Iowa Public Employment Relations Board, 554 N.W.2d 707 (Iowa) 1996*

The Iowa City (Iowa) Association of Fire Fighters, IAFF Local 610, was the bargaining representative for all Iowa City firefighters ranked captain or below. The union asked the city to include what it called an "hours proposal" in its contract with the city.

The union proposed dividing firefighters' workdays, excluding breaks and lunch, into scheduled "active" and "ready" work time. During active time, firefighters would be on duty and ready for routine jobs such as station duties, apparatus checks, inspections, training and equipment maintenance. Ready time would be the normal workday hours not included in active time, during which firefighters would remain on duty, in uniform and ready to respond to emergencies. Ready duties would include emergency response and other duties needed

(see Bargaining, next page)

# Bargaining

(continued from page 7)

to immediately return a fire company to ready status, including reloading hoses, refilling tanks and replacing equipment.

The city asked the Iowa Public Employment Relations Board to declare the city did not have to bargain over the union's proposal. It argued that under state law the hours proposal was a *permissive,* not *mandatory,* subject of collective bargaining. The board found the hours proposal was a permissive bargaining subject, and the union appealed to court.

Meanwhile, the union again gave the city the hours proposal, this time including a new "premium pay" proposal. The premium pay clause stated the city would pay firefighters a 25% premium for ready time hours when the department exercised its right to assign active time duties during ready time.

The city rejected the union's premium pay proposal and argued it also was a permissible subject of collective bargaining.

The city asked the board to declare this proposal as a permissive subject, arguing it would infringe on its exclusive managerial rights under state law, as did the hours proposal. The board declared the premium pay proposal was permissive.

The union again appealed, and the court heard both appeals. The union argued both proposals were mandatory bargaining subjects because one dealt with hours and the other dealt with pay.

The union claimed the premium pay clause was a mandatory subject of negotiation because it concerned wages, shift differentials or overtime pay.

The city, however, argued the union's proposals infringed on its exclusive managerial rights. The city admitted that though hours and pay issues were usually mandatory bargaining subjects, the union's proposals were not because the union had merely disguised them only to get city approval.

The court ruled the hours proposal was a permissible bargaining subject, concluding it infringed on the city's management rights. However, the court reversed the board's ruling on the premium pay proposal, concluding it was a mandatory bargaining subject.

The union and the city appealed.

**DECISION: Reversed in part; returned with an order.**

The lower court should have concluded *both* proposals were permissive bargaining subjects. The case was returned for the lower court to affirm the board's decision in favor of the city.

The union's "hours proposal" could not be a mandatory bargaining subject because it limited the duties firefighters could perform during each period, which infringed on the city's right to direct the work of its firefighters. Allowing the union's hours proposal would have taken away from the city's exclusive managerial powers.

The union's "premium pay" proposal was also not a mandatory subject of collective bargaining. Although the proposal appeared to uphold the city's exclusive right to assign work, it too could not be considered a mandatory bargaining subject. Making the city pay a 25 percent premium when it assigned firefighters active duty work during ready time had the effect of designating what duties would normally be done during the workday. Thus, this proposal also infringed on the city's management rights.

The union's pay proposal was also not a shift differential because it applied to work within a single shift. Nor did the proposal provide for overtime because it covered only regular work hours.

*see also: Charles City Community School District v. PERB,* 275 N.W.2d 766 (1979).

*see also: State v. PERB,* 508 N.W.2d 668 (1993).

---

**Action plan:**
- Don't jump immediately into union negotiations without first determining whether you are required to do so.

Some states differentiate between mandatory and permissive bargaining subjects. In this case, a union proposal to create "types" of duties infringed on the employer's right to manage its employees, so it was not a mandatory bargaining subject. If a subject could infringe on employers' managerial rights, it is deemed permissive and therefore need not be addressed in negotiations.

# Alaska EMPLOYMENT Law Letter

A monthly newsletter designed exclusively for Alaska employers

Thomas M. Daniel, Katherine C. Tank, Helena L. Hall, Editors

Vol. 2, No. 12
December 1997

## WAGE AND HOUR

## Ninth Circuit approves overtime pay for exempt employees

*In the last few years, employers have been confronted with various rulings that underline how carefully they must administer pay practices to avoid jeopardizing the overtime exemption applicable to salaried professional, administrative, and technical employees.*

In a recent decision that will be reassuring to many employers, the United States Court of Appeals for the Ninth Circuit (which includes Alaska) has clarified that employees who are exempt from overtime requirements under the Fair Labor Standards Act (FLSA) may be paid hourly overtime pay in addition to a fixed salary without destroying their exempt status. The court rejected as "dictum" (non-binding) language from an earlier case, *Abshire v. County of Kern*, 908 F.2d 483 (9th Cir. 1990), that had previously cast doubt on the practice of paying hourly overtime compensation to exempt employees.

### Facts of the case

Five current and former Boeing employees claimed that they were entitled to full one and one-half time overtime compensation for all hours worked in excess of 40 in a workweek. The employees included professional engineers and managers who were paid a fixed salary and also received overtime pay in some, but not all, circumstances when they worked over 40 hours in a week. The overtime pay rate was not one and one-half times the straight time rate, but rather their straight time rate plus $6.50 per hour.

In order for employees to be deemed exempt from overtime under the FLSA, they must satisfy both a "duties test" *and* a "salary basis test." Because the employees were professionals and managers, there was never a question that their work duties met the requirements for exemption. The employees argued, however, that the hourly overtime compensation paid to them by Boeing in certain circumstances violated the salary basis test and rendered them nonexempt employees. Nonexempt employees would be entitled to time and one-half for all hours worked in excess of 40 hours per week.

A Department of Labor (DOL) regulation provides that "a salary may consist of a predetermined amount constituting all or part of the employee's compensation. In other words, additional compensation besides a salary is not inconsistent with the salary basis of payment." 29 C.F.R. § 541.118(b) In a series of opinion letters, the DOL has interpreted this regulation to mean that hourly overtime compensation does not violate the salary basis test and, accordingly, does not destroy exempt status.

### Court's decision

The court deferred to the DOL's interpretation of 29 C.F.R. § 541.118(b) in holding that hourly overtime pay does not violate the salary basis test or convert an otherwise exempt employee into a nonexempt employee. The court also observed that "[t]he plain language of the regulation . . . supports the Secretary [of Labor]'s conclusion that overtime compensation, by itself, does not spoil exempt status."

## In this issue

- Ninth Circuit approves overtime pay for exempt employees — 1
- Officers not entitled to overtime for off-duty physical training — 2
- Employer may enforce neutral application guidelines — 3
- Court expands liability for derogatory remarks — 4
- Court expands liability for derogatory remarks even further — 4
- FMLA advisory opinions — 5
- What's an employer to do? — 7

The employees also brought a claim under the Washington Minimum Wage Act (MWA). In response to a Washington Court of Appeals decision, the Washington Legislature amended the MWA in 1995 to make clear that hourly overtime pay did not destroy exempt status. The legislation specifically applied the amendment to all lawsuits filed on or after February 1, 1995.

The Boeing employees had filed their suit after February 1, 1995, and thus the only question under state law was whether the Legislature had exceeded its authority in amending the MWA. The court held that the Washington Legislature had not violated the constitutional rights of the employees by amending the MWA. Hence, the amendment was valid and extinguished the employees' claims under the MWA. *Boykin v. Boeing Co.*, ___ F.3d ___, 1997 U.S. App. LEXIS 22,277 (9th Cir. Oct. 23, 1997).

### Tips for employers

There is not a similar statutory provision under the Alaska Wage and Hour Act (AWHA) with regard to paying exempt employees overtime pay. However, because the AWHA is based on the FLSA, Alaska courts look to federal case law in interpreting the AWHA. Therefore, an Alaska court may follow this case in construing the AWHA.

Nevertheless, there are many common misunderstandings about the validity of certain pay practices for exempt employees (e.g., treatment of partial day/partial week absences, informal systems of "comp time"). You should obtain good advice before establishing pay practices for exempt employees that vary from standard payment of salary.

## WAGE AND HOUR

# Officers not entitled to overtime for off-duty physical training

*Is off-duty physical fitness training conducted by police officers in order to maintain physical fitness standards required by their employer "work" such that the employer is required to pay them overtime for the time spent so engaged? The federal Fair Labor Standards Act (FLSA) requires covered employees to work no more than 40 hours per week without receiving one and one-half times their regular rate of pay for the overtime hours.*

*The key question, then, is what counts as "work." Although the question may seem simple, it can become complex when the activity is not performance of traditional on-the-job tasks, but is related to, or required for, performance of the job.*

### Facts of the case

The United States Court of Appeals for the Eleventh Circuit attempted to answer this question with respect to the off-duty physical fitness training performed by members of Florida's Metro-Dade Police Department's Special Response Team (SRT). The SRT is a specialized unit of the police department whose officers are highly trained in the use of special weapons, equipment, and techniques designed to minimize the risk of harm to officers and civilians in situations involving barricaded subjects, snipers, hostages, and high-risk search and arrest warrants.

Because SRT call-outs often require extreme physical exertion, involve serious risk to human life, and can last as long as 24 hours, the SRT's standard operating procedures provide that "good physical fitness is recognized as a vital and necessary quality for individuals assigned to SRT."

Prospective SRT personnel must pass a physical fitness examination, after which they undergo rigorous cardiovascular and strength training in the SRT training school. Once they are members of the SRT, individuals are monitored to ensure that they are physically capable of performing SRT functions; individuals who fail fitness exams are subject to reassignment outside the SRT.

SRT officers rotate between two weeks on primary status, during which they train in SRT tactics and respond to calls for SRT assistance, and two weeks on warrant status, in which they serve felony arrest warrants on high-risk individuals. When on primary status, SRT officers are allotted two hours of on-duty physical fitness training each day, which they use for long-distance runs, weight training, and calisthenics.

Prior to 1990, SRT members also were permitted to train twice a week while on duty during the warrant cycle. Since 1990, however, the SRT has not allotted any on-duty physical training time for officers on warrant status.

### District court decision

Several current and former SRT officers filed a lawsuit in federal court, claiming that they were entitled under the FLSA to overtime pay for off-duty hours spent performing physical fitness training. The district court concluded that the off-duty training was compensable work after the jury made the following factual determinations:

(1) The off-duty physical training or exercise is required or controlled by their employer.

(2) The off-duty physical training or exercise is performed predominantly for the benefit of the employer.

(3) The off-duty physical training is an integral and indispensable part of their principal activities as SRT officers.

### Judicial and statutory guidance on what equals 'work'

The Eleventh Circuit reviewed and reversed the district court's conclusion. The court first observed that because Congress did not define "work" or "employment" in the FLSA, it has been left to the courts to determine which employment-related activities are compensable. The court then reviewed the guidelines that have emerged from court opinions.