Generally, courts have construed work to mean all activities "controlled or required by the employer and pursued necessarily and primarily for the benefit of his employer and his business." Whether an off-duty activity is conducted predominantly for the benefit of the employer depends on the degree to which an employee's freedom is undermined by the work-related activity. One court said that "[i]t is clear that an employee's free time must be severely restricted for off-time to be construed as work time for purposes of the FLSA."

The Eleventh Circuit also pointed out that the Portal-to-Portal Act provides that employers are not liable under the FLSA for activities that are "preliminary to or postliminary to" the principal activities the employee is employed to perform. As a result, activities performed before or after a shift are compensable work only if they "are an integral and indispensable part of the principal activities for which covered workmen are employed."

### Department of Labor's viewpoint

After reviewing these judicial guidelines, the Eleventh Circuit looked to regulations issued by the Department of Labor (DOL) with respect to employment-related training activities. These regulations provide that training programs need not be counted as work if:

(1) attendance is outside the employee's regular working hours;

(2) the employee does not perform productive work during the program;

(3) attendance is voluntary; and

(4) the program is not directly related to the employee's job.

The court also discussed an opinion letter issued by the former DOL wage and hour administrator in which she applied these regulations to a similar case and concluded that officers' off-duty training was not compensable work because it was not required for, or directly related to, the officers' jobs.

### Off-duty training is not work

Applying these factors to the SRT training situation, the court concluded that the off-duty time spent by the SRT officers maintaining physical fitness standards mandated by their job is not compensable work under the FLSA. First, the off-duty training was conducted outside of regular work hours. Second, the officers did not perform any productive work (e.g., responding to life-threatening situations) while they were exercising. Third, the off-duty training was voluntary. The court reasoned that the supervisors required only that the officers pass fitness exams; the officers were given the freedom to select their off-duty activities and to train at any location, at any time, and for any duration.

Finally, the court concluded that the officers' off-duty training was not directly related to their SRT employment. Although they were required to maintain a certain level of fitness, they were not required to develop a skill unique to the SRT job. Also, the training provided benefits to the individual officers that extended beyond their employment position. *Dade County v. Alvarez*, 1997 U.S. App. LEXIS 28604 (11th Cir. Oct. 16, 1997).

### Practical advice

The case of the SRT officers demonstrates that a fact-specific analysis is required to determine whether off-duty activities performed by employees should be considered "work," for which you must compensate them. If the nature of a particular job is such that employees engage in off-duty training (whether physical or another type of training) in order to perform job duties, you should carefully consider the guidelines developed by the courts and DOL to determine whether you are required to pay employees for that training time.

> The officers did not perform any productive work (e.g., responding to life-threatening situations) while they were exercising.

## LABOR RELATIONS

### Employer may enforce neutral application guidelines

During 1996, we reported on cases involving an employer's duty not to discriminate against union organizers, or "salts," who are applying for jobs to attempt to organize from within. A recent case from the U.S. Court of Appeals for the District of Columbia indicates that if you reject such applicants based on neutral guidelines, uniformly applied, you will not be liable for anti-"salt" discrimination. The decision is likely to be given weight because it was authored by Chief D.C. Circuit Judge Harry T. Edwards, an acknowledged expert in issues of labor law.

### Facts

The case involved the court's review of an order by the National Labor Relations Board (NLRB) that an employer had violated the National Labor Relations Act by failing to consider the applications of individuals who had written "union organizer" on the forms they submitted. The court declined to enforce the NLRB order, finding that there was no substantial evidence that the employer's reason for rejecting the applications was anti-union sentiment.

The employer had written application guidelines on file with the state employment office. Under the guidelines, applicants were to fill in applications in ink on special application forms at the state employment offices. Applicants were instructed to refrain from adding extraneous notations such as "vet," "boy scout," or "union organizer."

The union organizers whose forms had been rejected by the employer were filled out on photocopies, were not completed at the state employment office, and contained the specific notation "union organizer." The employer's refusal to consider these nonconforming applications was held consistent with its neutral and uniformly applied procedure. *TIC-The Industrial Companies Southeast, Inc. v. NLRB*, ___ F.3d ___, 1997 U.S. App. LEXIS 27284 (D.C. Cir. Oct. 7, 1997).

## Lesson

This case does not change the general proposition that employers covered by the National Labor Relations Act or the Public Employees' Collective Bargaining Act may not discriminate against applicants for employment because of their status as union organizers. However, the case does permit use of neutral application guidelines, uniformly applied, even if avowed union organizers are thereby screened out of the process.

## DISCRIMINATION

# Court expands liability for derogatory remarks

*In a recent case, the Ninth Circuit Court of Appeals (which hears appeals from Alaska cases) held that an employee could bring a lawsuit against her employer based on a supervisor's derogatory remark about a member of her protected class, even though the derogatory remark was not directed at her.*

## Facts of the case

Cordova, a Mexican American woman, was employed by an insurance company as a claims representative off and on for five years. She applied for a position as a trainee agent and was one of four finalists. All of the four were either minorities or women, protected classes under the Idaho Human Rights Act and Title VII of the Civil Rights Act.

The agency manager first offered the job to a Native American male, who turned it down. He then offered the job to a woman, who accepted. Neither of these candidates had ever worked for the company and had no insurance experience.

Cordova attempted to find out why she was not hired. She was told that the male had sales experience and educational qualifications and the female who was ultimately selected was a single mother who had worked her way through college.

## Dumb remark

Cordova did not believe these were the true reasons and filed a suit alleging that she had been a victim of discrimination on the basis of her sex and national origin. The woman who had been hired gave a sworn statement that she had heard the manager refer to a male Mexican American agent as a "dumb Mexican." She also said that this same supervisor had said he was required to hire the male agent because of his minority status.

Note that there was no evidence that the supervisor had made derogatory remarks *about Cordova and her minority status*. The district court found, based on this evidence, that Cordova had not met the threshold test which would allow her to go forward with her lawsuit. The Ninth Circuit disagreed.

## Threshold test

Most readers will recall that an employee who asserts a discrimination claim under federal law has to show at the outset that:

(1) she belongs to a protected class; (2) she applied for and was qualified for a job for which the employer was seeking applicants; (3) she was rejected despite her qualifications; and (4) after her rejection, the position remained open and the employer continued to seek applications from persons with comparable qualifications.

> There was no evidence that the supervisor had made derogatory remarks about Cordova and her minority status.

If the employee can provide some evidence on each of these elements, the employer then has to come forward with a nondiscriminatory reason for its actions. Once the employer does this, the burden shifts to the employee to provide evidence that the employer's reasons were a pretext for a discriminatory reason.

In Cordova's case, the Ninth Circuit found that the supervisor's comments about another agent created an inference that the employer had rejected Cordova for discriminatory reasons. Although the employer argued that a "stray remark" should not be evidence of discrimination, the Ninth Circuit found that since the one who allegedly made the remark decided who got the job, Cordova was entitled to go forward with her suit. *Cordova v. State Farm Insurance Companies*, ___ F.3d ___ 1997 WL 546185 (9th Cir. September 8, 1997).

## DISCRIMINATION

# Court expands liability for derogatory remarks even further

*Another court has expanded the liability for derogatory remarks even beyond that of the protected class which is the subject of the remark. In one recent case, the court held that white male employees can bring a lawsuit against their employer for its discrimination against female and black employees.*

## Conduct

In the case, seven white male police officers brought a lawsuit against their employer, the city of Richmond, Virginia, claiming the existence of both a sexually and racially hostile work environment in violation of Title VII of the Civil Rights Act. The white males had not been subject to discrimination in the traditional sense — they did not claim to be the object of discriminatory conduct. Rather, they challenged the conduct of their immediate supervisor, Lt. Carroll, toward black and female police officers with whom they worked.

Over a period of approximately two months, Lt. Carroll made several very profane, disparaging, and angry remarks to and about the female and black members of the police force. These statements were vulgar and obviously directed at females and blacks. They could not be construed in any manner to be directed at the white males. Some of these profane comments were made only in the presence of the white male officers, some were made in the presence of all officers, including black and female officers, and some were merely overheard by non-employees.

In response to these disparaging remarks, several officers, including white male officers, submitted a letter to their employer complaining about Lt. Carroll's profanity and outbursts of temper. Although the employer did investigate the complaints, it unfortunately failed to take action against Lt. Carroll.

To make matters worse, several officers believed they were subjected to a series of retaliatory actions by their employer for complaining about Lt. Carroll. These actions included unfavorable shift changes, transfers, and performance evaluations.

After receiving right-to-sue letters from the Equal Employment Opportunity Commission, the white male officers filed a lawsuit against their employer based on Lt. Carroll's disparaging remarks about women and blacks. Even though they were not within any protected class, the white male officers claimed they had been subjected to both a racially and sexually hostile work environment. They claimed the hostile environment acted to destroy the precinct's "teamwork" mentality between officers of different sexes and races.

## Consequences

Predictably, the trial court summarily dismissed the white male officers' claims of a sexually and racially hostile work environment. It held that the white male officers could not assert the rights of female and black officers. The core of its reasoning was that the employer was discriminating against blacks and females *in favor* of the white male officers, so they had no basis to bring a lawsuit.

Unpredictably, however, the appellate court overturned the trial court's ruling and held that white male officers could assert hostile work environment claims even though the discriminatory conduct was not directed at them and was instead directed at blacks and females. It reasoned that despite the fact that the white male officers were not the subject of discrimination, they could still be "aggrieved" within the meaning of Title VII. As a result of this decision, the case was sent back to the trial court, where it will either be tried or, perhaps, settled. *Childress v. City of Richmond, Virginia*, ___ F.3d ___, 1997 WL 434878 (4th Cir. August 5, 1997).

## Practical application — do we have to say it again?

There is no place in the work environment for derogatory remarks. And the assumptions that there is no right to assert the civil rights of another person and that the individual seeking relief must allege that he himself suffered harassment or discrimination are no longer safe.

To avoid the ever-expanding liability for discriminatory or harassing conduct, employers must take steps to educate supervisors because the courts will not overlook derogatory comments made by individuals who are in positions of power. Taking steps to avoid discrimination in the workplace is essential and includes the following:

> There is no place in the work environment for derogatory remarks.

- ✓ Have a strong, well-drafted policy against harassment or discrimination of any kind.
- ✓ Publish that policy and have employees acknowledge their receipt and understanding of the policy.
- ✓ Conduct employee training about recognizing and avoiding discriminatory or harassing conduct.
- ✓ Provide employees with more than one non-threatening means of reporting the offensive conduct.
- ✓ Assure employees that they will not be retaliated against for reporting any conduct.
- ✓ Promptly investigate any reported complaints of harassment or discrimination.
- ✓ Promptly investigate any inappropriate conduct of which you are aware, regardless of whether it has been reported or not.
- ✓ Take prompt, effective remedial action.
- ✓ Review policies on a regular basis to ensure compliance with the most recent changes in the law. ■

## FMLA

# FMLA advisory opinions

*The United States Department of Labor is charged with the enforcement of the Family and Medical Leave Act*

(FMLA). The FMLA has been the subject of much confusion and subject to some conflicting court opinions over certain definitions of terms used in the statute. Recently, the Department of Labor issued advisory opinions concerning certain issues that appear to be recurring problems in the enforcement of the FMLA.

## Common colds and flu as serious health conditions

The FMLA defines a "serious health condition" as one requiring "incapacity of more than three days and continuing treatment by a health care provider." Ordinarily, common colds, the flu, and upset stomachs do not seem to meet the definition of a serious health condition. This is because such conditions are generally treated with over-the-counter medications, bed rest, and intake of fluids.

Under a prior opinion letter, the Wage and Hour Division of the Department of Labor had issued an opinion stating that minor illnesses, including earaches, minor ulcers, headaches other than migraines, routine dental or orthodontic problems, and periodontal disease, would not be converted to serious health conditions unless there were complications. From this opinion, most employers and courts had understandably taken the view that common colds, the flu, and upset stomachs were not serious health conditions.

The Wage and Hour Division recently withdrew this opinion and issued a new opinion which stated that if any of these above-mentioned conditions exist, then a serious health condition may exist. In order to be considered a serious health condition, however, an employee must be incapacitated for more than three consecutive days and be under a course of continuing treatment by a health care provider for the ailment.

**Note:** This is going to further complicate employers' decisions regarding absenteeism for these ordinary "run of the mill" symptoms that every person will have at some point during his or her working life. It is going to require employers to make the decision of whether a particular absence based on "ordinary" symptoms will trigger FMLA coverage. The advisory opinion does nothing to assist employers in making this determination. Continued care should be maintained when an employer is contemplating discipline based upon consecutive days of absences. FMLA Advisory Opinion Letter No. 86.

## Bronchitis exception clarified

The wage and hour administrator had also previously issued an opinion stating that serious health conditions can be created when an ordinary condition becomes complicated. The example used by the administrator in this opinion letter was "bronchitis that turns into bronchial pneumonia."

The administrator has withdrawn this opinion and stated that bronchitis does not ordinarily qualify as a serious health condition but would qualify under the standards listed above if it incapacitates an employee for more than three days and requires continuing treatment by a health care provider. This opinion letter states that any question regarding whether a serious health condition exists and when it commenced "may be" resolved by obtaining a medical certification from the employee's health care provider.

**Note:** Again, this does nothing but further complicate the lives of employers trying to make a determination about what may well be chronic absentee issues. FMLA Advisory Opinion Letter No. 87.

## FMLA leave for separate reasons

One of the issues that continues to arise under the FMLA is whether an employee can take FMLA leave during a designated 12-month period for separate reasons. It has generally been assumed that during the designated 12-month period, an employee may take up to 12 weeks of FMLA leave.

However, many employers have begun designating what is known as a "rolling" 12 months as the time period for measuring FMLA. A "rolling" period is the 12 months measured forward from the date the employee first took FMLA leave. This is permissible under the regulations.

Thus, if an employee takes one week of leave for bronchial pneumonia commencing July 1 of a "rolling" period, then that employee would have 11 weeks of FMLA leave available until the following July 1. However, if an employer designates a calendar year method for measuring the 12 months of availability, then the situation may change. Under a calendar year designation, an employee can take two weeks of FMLA leave commencing December 1 and then be eligible for 12 more weeks of leave commencing the following January 1.

Employers should take care that they understand clearly the periods for which they have designated the taking of FMLA leave. FMLA Advisory Opinion Letter No. 88.

## Sick leave for FMLA leave

Two opinions were issued by the wage and hour administrator dealing with the issue of applying sick leave to FMLA leave. First, employers may mandate or employees may substitute accrued paid leave for the unpaid leave provided by the FMLA. However, the administrator's opinion makes it clear that any paid leave must be both earned and available to the employee. Further, an employer may also "advance" such leave to an employee during an FMLA absence but is not required to do so. FMLA Advisory Opinion Letter No. 81.

> Any paid leave must be both earned and available to the employee.

In the second situation, an opinion was addressed to an employee seeking to have paid sick leave substituted for unpaid FMLA leave to care for newly adopted children. The administrator opined that the decision to substitute paid leave for unpaid leave in that situation is discretionary by the employer and is not mandated by the FMLA.

In the situation before the administrator, the employer's health care policy allowed sick leave for employees who gave birth. The employee was not allowed to use sick leave to care for newly adopted children. The administrator held that this practice was permissible under the FMLA since the FMLA does not require an employer to provide sick leave or to allow the use of sick leave when the employee is not ill. As with Opinion No. 81 above, an employer is certainly free to allow sick leave in that situation if it wishes to do so or to allow an employee to take any other paid leave, such as vacation leave, but is not required to do so. FMLA Advisory Opinion Letter No. 85.

## LEGISLATIVE UPDATE

# What's an employer to do?

*In 1996, Congress passed three significant pieces of health care reform legislation — the Health Insurance Portability and Accountability Act (HIPAA), the Mental Health Parity Act (MHPA), and the Newborns' and Mothers' Health Protection Act (NMHPA). Employers that sponsor group health plans for their employees have spent much of 1997 trying to understand and implement HIPAA, the most comprehensive of the three laws and the only one that went into effect this year. Employers now must prepare to implement the other two laws, which go into effect as of the first plan year beginning on or after January 1, 1998.*

### Beware of potentially conflicting laws

In implementing each of these new health insurance laws, you must be careful not to violate other laws, including federal civil rights laws such as the Americans with Disabilities Act (ADA) and Title VII of the Civil Rights Act. In comments recently submitted to the federal Department of Labor (DOL) on the trilogy of health care laws passed in 1996, the Equal Employment Opportunity Commission (EEOC) urged the DOL to issue regulations that clarify potential conflicts between federal health care laws and civil rights laws. Without such clarification, the EEOC noted, you could inadvertently violate one law when implementing another.

While you await such clarification (in DOL regulations to be issued in the near future), it may be helpful for you to take a look at the potential areas of conflict pointed out by the EEOC in its comments to the DOL earlier this year.

### HIPAA vs. ADA

**HIPAA.** Of HIPAA's many mandates, perhaps those that remain the foggiest for employers with health plans that must implement HIPAA are the nondiscrimination rules.

HIPAA imposes nondiscrimination rules for group health plans in two areas: eligibility to enroll in the plan and premium rates. In general, HIPAA prohibits a plan from establishing eligibility rules, or imposing a higher premium rate than the premium for similarly situated individuals, based on a "health status-related" factor. Such factors include health status, medical condition (physical or mental), claims experience, receipt of health care, medical history, genetic information, evidence of insurability (including conditions arising out of acts of domestic violence), and disability.

Interim final regulations issued earlier this year provide only minimal guidance for employers in interpreting HIPAA's nondiscrimination rules. However, the three federal agencies responsible for implementing HIPAA plan to issue further regulations in this area in the near future (read 1998).

**HIPAA vs. ADA.** As you know, the ADA broadly prohibits employment discrimination against qualified individuals with disabilities. This prohibition, the EEOC noted in its comments to the DOL, extends to employer-provided health benefits. Thus, the two sets of rules overlap with each other. What does that mean for employers responsible for complying with both laws?

According to the EEOC comments, while there are areas of overlap between HIPAA and the ADA, each law covers aspects of employer-provided health benefits that are not covered by the other, and compliance with one does not necessarily ensure compliance with the other. For example, the HIPAA rules prohibit discrimination (in eligibility to enroll and premium rates) based on conditions that may not be considered disabilities under the ADA. The ADA, on the other hand, while it applies only to individuals with ADA-defined disabilities, prohibits disability-based discrimination in areas beyond enrollment and premiums — it generally extends to all aspects of employer-provided health benefits, including limitations or restrictions on the nature or level of benefits or coverage for similarly situated individuals.

**HIPAA nondiscrimination regs coming soon.** Confused? That's why the EEOC has asked the DOL to clarify the relationship between HIPAA's nondiscrimination rules and the nondiscrimination provisions of the ADA. It is hoped that the second round of HIPAA nondiscrimination regulations that the DOL has promised to provide will clarify what an employer must (and must not) do to comply with *both* HIPAA and the ADA.

### Mental Health Parity Act vs. ADA

**Mental Health Parity Act.** This law generally requires employer-sponsored group health plans that provide mental health benefits to maintain parity between those benefits and medical/surgical benefits in the application of

lifetime and annual dollar limits. That is, the law prohibits a health plan from setting either annual or lifetime dollar limits on plan coverage for mental health benefits *unless* the plan sets the same limits on "substantially all" medical and surgical benefits.

**MHPA vs. ADA.** Under the MHPA, the term "mental health benefits" means benefits with respect to mental health services, *as defined under the terms of the plan*. The ADA (which, as you recall, also applies to employer-provided health benefits) also allows a plan to define mental health benefits, *but*, subject to a very narrow exception, it does not permit the plan to make a disability-based distinction in the definition.

A plan term or provision is disability-based if it singles out a particular disability (*e.g.*, AIDS, schizophrenia), a discrete group of disabilities (*e.g.*, cancers, kidney diseases), or disability in general (*e.g.*, no coverage of any condition that substantially limits a major life activity).

**MHPA and NMHPA regs expected this fall.** Regulations to implement both the MHPA and the NMHPA are expected this fall. The EEOC has recommended to the DOL that those regs contain a warning that the ADA generally prohibits disability-based distinctions in employer-provided health plans as well as an explanation of disability-based criteria.

## Newborns' and Mothers' Health Protection Act vs. Title VII

**Newborns' and Mothers' Health Protection Act.** This law generally requires employer-sponsored group health plans that provide hospitalization benefits in connection with childbirth to provide coverage for at least a minimum hospital stay after childbirth. Specifically,

- *after a normal, vaginal birth*, the plan must provide coverage for both mother and newborn for at least a 48-hour hospital stay; and
- *after a cesarean section*, the plan must provide coverage for both mother and newborn for at least a 96-hour hospital stay.

The law provides for *one exception* to the minimum stay requirement. If the attending health care provider, in consultation with the mother, decides that an earlier release for the mother and/or the newborn is appropriate, then the plan may limit its coverage to that shorter period. However, the law contains several safeguards designed to prevent plans and insurers from attempting to induce providers or mothers to agree to a stay shorter than the required minimum.

**NMHPA vs. Title VII.** Although the NMHPA does not require plans to offer hospitalization benefits in connection with childbirth, employers that sponsor health plans should know that Title VII of the federal Civil Rights Act may require such benefits. Title VII generally requires that the same plan terms and provisions that apply to costs incurred for medical conditions unrelated to pregnancy *also* apply to costs incurred for pregnancy-related conditions. Specifically, Title VII prohibits a plan from excluding hospitalization benefits for childbirth *if* the plan provides hospitalization benefits for other medical conditions.

**Once again, look for the regs.** The EEOC has recommended that the portion of the DOL regs dealing with the NMHPA include a cautionary statement that Title VII prohibits pregnancy discrimination in employer-provided health plans. According to the agency, this means that a plan's terms and provisions (including those related to hospital benefits) must be applied to pregnancy, childbirth, or related medical conditions on the same terms and conditions as they are applied to other conditions.

ALASKA EMPLOYMENT LAW LETTER (ISSN 1085-9144) is published monthly for $137 per year for Perkins Coie by M. Lee Smith Publishers LLC, 5201 Virginia Way, P.O. Box 5094, Brentwood, TN 37024-5094, 1-800-274-6774 or custserv@mleesmith.com or http://www.mleesmith.com. Copyright 1997 M. Lee Smith Publishers LLC. Photocopying or reproducing in any form in whole or in part is a violation of federal copyright law and is strictly prohibited without the publisher's consent. Editorial inquiries should be directed to Thomas M. Daniel at Perkins Coie, 1029 West Third Avenue, Suite 300, Anchorage, AK 99501, (907) 279-8561. ALASKA EMPLOYMENT LAW LETTER is not intended to be and should not be used as a substitute for specific legal advice, since legal opinions may only be given in response to inquiries regarding specific factual situations. If legal advice is required, the services of counsel should be sought.