Case 3:03-cv-00174-RRB   Document 30-12   Filed 08/01/2006   Page 1 of 5

JOHN GILBERT vs. APC NATCHIQ, INC.                    DEPOSITION OF MARK C. NELSON
CASE NO. 3:03-CV-00174-RRB                                         JUNE 15, 2006

Page 1

```
        IN THE UNITED STATES DISTRICT COURT
            FOR THE DISTRICT OF ALASKA


JOHN GILBERT,              )
                           )
       Plaintiff,          )
                           )
vs.                        )
                           )
APC NATCHIQ, INC.,         )
                           )
       Defendant.          )
_____)   Case No. 3:03-CV-00174-RRB


           DEPOSITION OF MARK C. NELSON
                  June 15, 2006

APPEARANCES:
       FOR THE PLAINTIFF:       MR. KENNETH L. COVELL
                                Attorney at Law
                                Law Offices of
                                   Kenneth L. Covell
                                712 West 8th Avenue
                                Fairbanks, Alaska   99701
                                (907) 452-4377


       FOR THE DEFENDANT:       MS. PATRICIA ZOBEL
                                DeLisio Moran Geraghty
                                   & Zobel, P.C.
                                Attorneys at Law
                                943 West 6th Avenue
                                Anchorage, Alaska   99501
                                (907) 279-9574


       ALSO PRESENT:            MR. DOUGLAS SMITH


                      * * * *
```

EXHIBIT D
PAGE 1 OF 5

Case 3:03-cv-00174-RRB   Document 30-12   Filed 08/01/2006   Page 2 of 5

JOHN GILBERT vs. APC NATCHIQ, INC.
CASE NO. 3:03-CV-00174-RRB

DEPOSITION OF MARK C. NELSON
JUNE 15, 2006

Page 2

1  PURSUANT TO NOTICE, the Deposition of MARK C. NELSON
2  was taken on behalf of the Plaintiff before Cheri Tabor, Notary
3  Public in and for the State of Alaska and Reporter for Metro
4  Court Reporting at the law offices of DeLisio Moran Geraghty &
5  Zobel, P.C., 943 West 6th Avenue, Anchorage, Alaska 99501, on
6  the 15th day of June 2006, commencing at the hour of 10:30 a.m.
7  * * * *
8  TABLE OF CONTENTS
9  Direct Examination by Mr. Covell . . . . . . . . . . 4
10
11
12  EXHIBITS
13  N-1 - Memo from Mark Nelson . . . . . . . . . . . . 10
    N-2 - Deposition of Mark C. Nelson . . . . . . . 16
14  N-3 - Safety Supervisor Job Announcement . . . . . 32
    N-4 - Supplemental Disclosure from Patricia
15      Zobel . . . . . . . . . . . . . . . . . . 32
    N-5 - Safety Department Organizational Chart . . . 33
16  N-6 - New job announcements and
        description . . . . . . . . . . . . . . . 43
17
18                    * * * *
19
20
21
22
23
24
25

Page 3

1                    PROCEEDINGS
2       (On record)
3           COURT REPORTER: My name is Cheri Tabor and I'm
4   a court reporter for Metro Court Reporting in Anchorage,
5   Alaska. Today's date is June 15, 2006, and the time is
6   approximately 10:30 a.m. We are at the offices of DeLisio
7   Moran Geraghty & Zobel, P.C., 943 West 6th Avenue, Anchorage,
8   Alaska 99501 for the deposition of Mark Nelson. This case is
9   in the United States District Court for the District of Alaska,
10  in the matter of Gilbert v. APC, Case No. 3:03-CV-00174 RRB.
11      Mr. Nelson, please raise your right hand so I can swear
12  you in.
13      (Oath administered)
14          MR. NELSON: I do.
15              MARK C. NELSON
16  having first been duly sworn under Oath, testified as follows
17  on examination:
18          COURT REPORTER: Thank you. Please state your
19  full name and spell your last name for the record.
20  A   Mark Christian Nelson, N-e-l-s-o-n.
21          COURT REPORTER: And I need a mailing address
22  for you.
23  A   3900 C Street, Suite 301, Anchorage, 99503.
24          COURT REPORTER: I also need a daytime or
25

Page 4

1   message telephone number.
2   A   441-8071.
3           COURT REPORTER: Thank you. Counsel would you
4   please identify yourselves for the record?
5           MR. COVELL: Kenneth Covell for plaintiff
6   Gilbert.
7           MS. ZOBEL: Patricia Zobel for APC defendant.
8           COURT REPORTER: Thank you. You may proceed.
9           MR. COVELL: Thank you.
10              DIRECT EXAMINATION
11  BY MR. COVELL:
12  Q   Mr. Nelson, you were deposed a few years ago on a case
13      called Zuber v. APC, right?
14  A   Correct.
15  Q   And in preparation for today's deposition, did you have
16      an opportunity to review that prior deposition?
17  A   The only prior I've done, is five minutes ago I reread
18      the letter from the State -- and I just did that.
19  Q   Okay. I don't intend to go into depth in your prior
20      deposition, but do you have any reason, even if you
21      haven't reviewed your prior deposition to think your
22      answers would be different today than they would be
23      from back then, at least in general?
24  A   They should -- they should be identical.
25  Q   Okay. And what you just reviewed, was this WHOL-122,

Page 5

1       is that the letter you reviewed, the letter from Randy
2       Carr to you?
3   A   Is that the -- yes.
4   Q   Okay. Since 2003, I guess what I'm trying to get at is
5       briefly where you are in the organization since last we
6       spoke. What I understood when we last spoke was you
7       were president of APC Natchiq, is that right or wrong
8       or close?
9   A   Correct.
10  Q   All right. And that was 26 of August 2003, does that
11      sound about right?
12  A   It's right. Correct.
13  Q   Right around August 26th? Okay. So, since then where
14      have you been job wise or organizationally with APC?
15      And I understand that there's AES Energy Services and
16      that's all somewhat unclear to me, but if you could try
17      to briefly run us through your position, let's say
18      relative to your old position -- organizationally?
19  A   2004, I moved to -- from the presidency of APC to --
20      the company name was changed to ASRC Energy Services
21      Operations and Maintenance. Sometime in the period
22      after that deposition, until the time I left, we
23      changed the company name. I moved to the parent
24      company, ASRC Energy.
25  Q   Okay.

EXHIBIT D
PAGE 2 OF 5

2 (Pages 2 to 5)

Case 3:03-cv-00174-RRB   Document 30-12   Filed 08/01/2006   Page 3 of 5

JOHN GILBERT vs. APC NATCHIQ, INC.
CASE NO. 3:03-CV-00174-RRB

DEPOSITION OF MARK C. NELSON
JUNE 15, 2006

Page 6

1  A   Headed up the business development group for the parent
2      company for about a year. And in the -- December of
3      this year, moved over at -- a different job offer.
4      Moved over as a COO of a construction holding company.
5  Q   Which.....
6  A   I'm no longer employed by ASRC Energy Services.
7  Q   Okay. So you went to this construction holding
8      company, sometime in the last year or so, I think.
9  A   In the last six months.
10 Q   Okay. And so you're out of ASRC entirely, at that
11     point?
12 A   Right. I'm out of ASRC Energy Services.
13 Q   Is the company you're with now, an ASRC company?
14 A   Yes.
15 Q   And what's the name of that?
16 A   ASRC Construction Holding Company.
17 Q   Okay. So you were in the presidency through '04, and
18     then you went into marketing and development, is that
19     right?
20 A   Correct.
21 Q   And what did you market and develop, just briefly?
22 A   Business of ASRC Energy Services.
23 Q   Okay. So you still would have been president in April
24     '03 when the positions of safety specialist and safety
25     supervisor were reclassified from exempt to non- -- no,

Page 7

1      from non-exempt to exempt?
2  A   Correct.
3  Q   All right. And assuming Mr. Gilbert ended his
4      employment about April '03, he would have been one of
5      the employees under your direct command?
6  A   At that time I was president, if he was an employee of
7      APC, he would have been in a -- in the direct line
8      of --
9  Q   Okay. And why don't we cover this question right now:
10     Do you know Mr. Gilbert vaguely or not at all?
11 A   Only by name.
12 Q   Okay. And is that because of the lawsuit or is that
13     because at the time he was there, you had some exposure
14     to him?
15 A   Probably a combination of both.
16 Q   Okay. But basically it's.....
17 A   If he walked in here right now, I wouldn't know the
18     guy.
19 Q   All right. Basically, the familiarity is if you saw
20     his name on a roster, you'd go, that's one of my guys
21     or I think that's one of my guys?
22 A   In the context of APC, sure.
23 Q   In Zuber we discussed you examining the position of
24     safety specialist and making a determination whether or
25     not that position ought to be eligible for overtime or

Page 8

1      not eligible for overtime, right?
2  A   Can you rep- --
3  Q   Sure.
4  A   In this previous deposition?
5  Q   In the previous case, in Zuber -- correct me if I
6      interchange the names here. In the Zuber case, we
7      spent a lot of time talking with you about whether or
8      not the safety specialist job was exempt or non-exempt.
9  A   I don't -- I don't recall. The case -- we spent time
10     around another position, a warehouseman, may -- we may
11     have. I'd have to look back to the deposition. I
12     don't know how much detail in the deposition we talked
13     about safety specialist.
14 Q   Okay. Well.....
15 A   Well maybe we did, yes.
16 Q   Okay. Let me represent to you that's reflected in your
17     deposition.
18 A   Okay.
19 Q   That you spent a fair amount of time discussing
20     conversations with Randy Carr, using some worksheets
21     concerning questions of whether or not somebody ought
22     to be exempt under the administrative professional or
23     other exemptions. Is this refreshing your recollection
24     at all?
25 A   Yes, okay. Safety special.....

Page 9

1  Q   Right.
2  A   Not a supervisor.
3  Q   Right.
4  A   Okay, yes.
5  Q   Did you do any examination of the position of safety
6      supervisor to determine whether or not it ought to be
7      exempt for overtime or not?
8          MS. ZOBEL: You're speaking of 1998 or at any
9      time?
10         MR. COVELL: Let's say ever, for the time being
11     and then we can break it down by time.
12 A   At the time, and I don't -- which year this was -- '97,
13     '90- -- the same timeframe I spoke with the State
14     representative which was Carr, Randy Carr.
15 Q   Right.
16 A   I -- I went through all position on the North Slope.
17 Q   Okay. And so if Mr. Carr's letter is June 26, '97, it
18     would be in that timeframe?
19 A   Right.
20 Q   Okay. And you've got a copy of that there with you,
21     right?
22 A   Right.
23 Q   Okay. And that's alternatively referred to on the face
24     of it, in the right-hand corner as WHOL-122, right?
25 A   Correct.

EXHIBIT  D
PAGE  3  OF  5

Case 3:03-cv-00174-RRB    Document 30-12    Filed 08/01/2006    Page 4 of 5

JOHN GILBERT vs. APC NATCHIQ, INC.                              DEPOSITION OF MARK C. NELSON
CASE NO. 3:03-CV-00174-RRB                                      JUNE 15, 2006

Page 10

1   MR. COVELL: Why don't we get this marked
2   number one, here please, madam clerk.
3       COURT REPORTER: Exhibit N-1 marked.
4       (Deposition Exhibit N-1 marked)
5   MR. COVELL: And then just for the record we
6   should probably make these Z's in front of the APC's, would you
7   agree with that?
8       MS. ZOBEL: G. Why would you do Z?
9       MR. COVELL: Why don't we go off record for
10  just a second.
11      (Off record)
12      (On record)
13      MR. COVELL: And for purposes of clarity here,
14  we've agreed that the N-1 will place a Z on each page in front
15  of the APC numbers, because it's our belief that they came from
16  the Zuber case originally, in order to avoid confusion with
17  similarly numbered pages disclosed in Gilbert. All right. I
18  can get back on my train of thought here.
19  Q   (By Mr. Covell) And in looking at the last two pages
20      then of N-1, that's that Randy Carr letter of June 26,
21      '97 to yourself, and it's alternatively designated near
22      the upper right-hand corner as WHOL-122, is that right?
23  A   Correct.
24      MS. ZOBEL: Could I ask what the WHOL is?
25      MR. COVELL: It's wage and hour opinion letter.

Page 11

1       MS. ZOBEL: Of course, it is. All right. I
2   was thinking you had put it on there.....
3       MR. COVELL: No.
4       MS. ZOBEL: .....in the prior deposition.
5       MR. COVELL: Okay.
6       MS. ZOBEL: Too many numbers in this thing.
7       MR. COVELL: And acronyms, too.
8       MS. ZOBEL: Yes.
9   Q   (By Mr. Covell) So, you said, going back -- testing my
10      memory here, you said at the time contemporaneous to
11      that, you did a review of all positions in APC?
12  A   Correct.
13  Q   Okay. And one of those --
14  A   It's one of the positions.
15  Q   I apologize, Mr. Nelson, sometimes the questions we ask
16      sound stupid, but for clarity of the record we have to
17      ask the redundant questions.
18      MS. ZOBEL: And I think I need to clarify the
19  record here with the regard to the safety supervisor position,
20  because I think that they were different at the time that Mark
21  was doing this in '97 and '98 and I think that comes from the
22  testimony of Doug Smith, because when he came in it was a
23  different -- he created that position. It was different from
24  what had been held by Mr. Cannon or Gary Buchanan, I think.
25  Not Gary Buchanan, but other people who had held that. And you

Page 12

1   can query him about that, but that's my understanding and I
2   don't want the record to be messed up because we're talking
3   applies and oranges.
4       MR. COVELL: Well that's.....
5       MS. ZOBEL: See if that's his understanding.
6       MR. COVELL: All right.
7   Q   (By Mr. Covell) So, around that time of Mr. Carr's
8       letter, you did a review of the safety supervisor
9       position to see whether or not he qualified for
10      overtime or not? He said yes to that question.
11      Subsequent question now, is tell me what you did in
12      that regard? In other words tell me how you conducted
13      your review.
14  A   For a safety supervisor?
15  Q   Uh-huh.
16  A   I started with the position -- the employees in the
17      position. In the year '96, '97, Bob Cannon was the
18      supervisor, one of the supervisors, and basically
19      talked with those employees or that person about the
20      position. Although at the time, those positions were
21      direct reports of mine, so I also had a pretty good
22      background of what they were doing for me as a direct
23      report. So the combination of those two things, I
24      could draw a conclusion in that if I felt the -- there
25      was further research I needed to do, then I would

Page 13

1       further research the position.
2   Q   Okay. And did that come to pass or not?
3   A   Well for.....
4   Q   Did you do further research?
5   A   The safety supervisors were a position that I needed
6       further clarification around which was also part of my
7       conversation, in general, with the Wage and Hour
8       Division.
9   Q   All right. So, you talked to Mr. Cannon? You had a
10      conversation with the Wage and Hour Division and we
11      should assume that conversation or conversations was
12      with Mr. Carr or not?
13  A   I know I had at least one conversation with Mr. Carr.
14      You're drawing on 10 years ago now.
15  Q   Sure.
16  A   I -- I know I talked with him. I can almost remember
17      some of it very vividly -- the details of the
18      conversation with Mr. Cannon, but how many
19      conversations with the State now, I don't recall.
20  Q   Okay. But, it's my recollection, I've looked at your
21      deposition more recently.....
22  A   Yes, you may be better -- answer the question.
23  Q   I think you said you may have talked to Mr. Carr five
24      or six times. Something in that nature would be --
25      okay. But besides -- was there another actor besides

EXHIBIT D
PAGE 4 OF 5

Case 3:03-cv-00174-RRB   Document 30-12   Filed 08/01/2006   Page 5 of 5

JOHN GILBERT vs. APC NATCHIQ, INC.
CASE NO. 3:03-CV-00174-RRB

DEPOSITION OF MARK C. NELSON
JUNE 15, 2006

Page 14

1   Mr. Carr, that you recollect?
2 A I don't recall.
3 Q Okay. So you talked to Cannon and you talked to Carr
4   and then what conclusion, if any, did you reach about
5   the exempt or non-exempt status of the safety super- --
6   let me pull that question. Did you do anything else in
7   considering whether or not the safety supervisor ought
8   to be exempt or non-exempt?
9 A If the file didn't reference a written document, and
10  with the safety supervisors, I don't recall doing one.
11  I don't think there was a -- there's a stand checklist.
12  I -- you've got a copy of it, that we used to do back
13  then, or I had done a number of them at the time. I
14  don't recall doing one for the safety supervisors.
15 Q Okay.
16 A I doubt that I did given my recollection of the
17  position at this time.
18 Q And then you brought up the checklist and whatnot --
19  papers. I'm not aware of any papers that relate to the
20  safety supervisor analysis as opposed to there are some
21  that you mentioned in regard to the safety specialist
22  position.
23 A The second tier. Right, that's correct.
24 Q Okay. And so that -- me not having any comports was
25  your recollection of what you did?

Page 15

1 A Uh-huh (affirmative).
2 Q Okay. All right. What training or experience did you
3   have at that time in human relation? I'm sorry, human
4   resources or employee resources, personnel, whatever
5   you want to call it that would qualify you to make an
6   exempt, non-exempt determination?
7 A Well, I was competent to talk with the State, and read
8   and understand the regs as best I could interpret. I
9   think at the time I asked our Anchorage office for
10  assistance for a second or third opinion and based upon
11  my formal education, I came to some conclusions around
12  all of the positions on the North Slope whether they
13  were exempt or non-exempt.
14 Q Let me paraphrase here, just to try to move things
15  along. If I'm suggesting incorrectly, straighten me
16  out, but you read and write English, you've gone to
17  school, you have a degree in accounting, you can
18  analyze things as well as the next person on the street
19  so to speak, or perhaps better because of your training
20  and education of whatever field you're in, and that
21  enables you to make that determination, is that
22  essentially what you're telling me?
23 A Correct.
24 Q Okay. And then my question, at least in part, leans
25  toward saying besides having the abilities that many

Page 16

1   might, do you have any specialized training, education
2   or experience that would lend you an ability perhaps
3   above somebody else with that and I don't mean to
4   demean accounting, but to call it the generic
5   education, training and experience as opposed to some
6   nature of specialized training, experience or education
7   in the area of human resources? Do you under that as a
8   question?
9 A Is that a question?
10 Q That was the question.
11 A I'm not sure I know how to answer. Let me.....
12 Q All right. Do you have specialized training and
13  experience in human resources?
14 A Outside of the work place, beyond conference -- I think
15  one of them lies with the State or some of those --
16 Q Okay. You've been in conference or seminar, but
17  generally not?
18 A Those are specialized trainings around wage and hour,
19  they last 3, 4 days -- put on by the State, that type
20  of thing. Beyond that, no.
21 Q Okay.
22     MR. COVELL: I'd like to take a brief pause
23  here madame reporter.
24  (Off record)
25          (Deposition Exhibit N-2 marked)

Page 17

1   (On record)
2       MR. COVELL: Mr. Nelson, we marked for you
3   Exhibit N-3, is it?
4       COURT REPORTER: N-2.
5 Q (By Mr. Covell) N-2, which is your former deposition
6   and I directed your attention to pages 26, line 23
7   through page 28, line 20. You've had a chance to read
8   that off record?
9 A (No audible answer)
10 Q You need to answer audibly.
11 A Okay. I'm sorry. I didn't understand it was a
12  question -- yes.
13 Q All right. Thank you. Is what you're saying there in
14  that passage about a review of the safety supervisor
15  position, the same thing you're telling me today?
16 A Yes.
17 Q Okay.
18  (Off record comments)
19 Q And besides that review then you did at that time of
20  the safety supervisor position for eligibility for
21  overtime from that time until you left your job as
22  president in 2004, were you involved in any other
23  reviews of the safety supervisor position for
24  eligibility of overtime?
25 A No.

EXHIBIT D
PAGE 5 OF 5