```
              IN THE UNITED STATES DISTRICT COURT

                    FOR THE DISTRICT OF ALASKA

RONALD E. ZUBER,                  )
                                  )
        Plaintiff,                )
                                  )
vs.                               )
                                  )        ORIGINAL
APC NATCHIQ, INC.,                )
                                  )
        Defendant.                )
_____)

Case No. A03-0052 CV (RRB)

              DEPOSITION OF MARK C. NELSON

APPEARANCES:

For the Plaintiff:        Kenneth L. Covell, Esq.
                          712 Eighth Avenue
                          Fairbanks, Alaska  99701

For the Defendant:        Gregory L. Youngmun, Esq.
                          DeLisio, Moran, Geraghty & Zobel
                          943 West Sixth Avenue, Suite 110
                          Anchorage, Alaska  99501

Also Present:             Ronald E. Zuber

                        *  *  *  *  *

     Pursuant to Notice, the Deposition of MARK C. NELSON was
taken on behalf of the Plaintiff before Teresa E. Mielke, Notary
Public in and for the State of Alaska and Reporter for Gemini
Reporting Services, at the Offices of Gemini Reporting Services,
943 West Sixth Avenue, Suite 110, Anchorage, Alaska, on the 26th
day of August, 2003, commencing at the hour of 1:50 p.m.

                        *  *  *  *  *
```



Reporting Services
943 West 6th, Suite 110
Anchorage, Alaska 99501



June 15,
DATE 2006  EX. N.2
WITNESS Nelson
METRO COURT REPORTING
(907) 276-3876

EXHIBIT  A
PAGE  1  OF 10

Case 3:03-cv-00174-RRB    Document 34-2    Filed 08/03/2006    Page 2 of 10

Case No. A03-0052 CV (RRB)    CondenseIt!™    Zuber v. APC Natchiq, Inc.

### Page 10

1    talking about today as president or are you talking about
2    when I was operations manager in Kuparuk?
3  Q  For the time frame '96 forward, regardless of what your
4    job was, were there -- was there a person or a position
5    that the safety supervisors reported to, and that person
6    or job was the overall head of the safety department?
7  A  For APC, no.
8  Q  Okay, was it -- do you remember a Mr. Heffler or Heffley
9    or Heffer -- Heffner having a job like that?
10 A  Keith Heffner, yes.
11 Q  And did he have a job like that?
12 A  Keith Heffner was -- I'm not sure what period of time he
13    was employed with the company, but I believe always with
14    the parent company Natchiq.
15 Q  Okay, and what was his title, or is or was his title, if
16    you know?
17 A  Somewhat -- something along the line of a corporate --
18    corporate HSE manager.
19 Q  Okay, Mr. Buchanan called him the corporate safety guy, I
20    think, is that.....
21 A  Okay.
22 Q  .....reasonable.....
23 A  Sure.
24 Q  .....name for him? All right, and prior to become AES was
25    Mr. Heffler -- Heffler, is that the right name? Heff.....

### Page 11

1  A  You're going to get me saying this now. Heffner.
2  Q  Mr. Heffner in that same position as corporate safety guy?
3  A  At the -- in which time frame?
4  Q  Well, recently you changed from APC Natchiq to AES,
5    right.....
6  A  Okay.
7  Q  .....within a year or so?
8  A  Today Keith Heffner is -- wait. Keith, yeah, today is not
9    our corporate safety man with AES. Today our corporate
10   safety man, 2003, is Doug Smith. So help me from there,
11   I'm not sure I under.....
12 Q  All right, well, the -- we can go to either spot with
13   this. So Doug Smith is the corporate safety man. Today
14   do the specialists report to a safety supervisor and then
15   do the safety supervisors report to -- not exclusively but
16   to Mr. Smith?
17 A  Do they have a channel of communication, a line of
18   reporting to the corporate safety man?
19 Q  Yes.
20 A  Sure.
21 Q  Okay, and they might -- the safety supervisors might as
22   well -- might also report to operations manager at
23   Kuparuk, right?
24 A  Yes.
25 Q  All right. From the time frame in 1996 forward was there

### Page 12

1    always a position, whether it be at Natchiq or APC, that
2    was comparable to Mr. Smith's and Mr. Heffner's job?
3  A  With some gaps, maybe. I can't recall. Yeah.
4  Q  Generally that would be the.....
5  A  Company philosophy would have a corporate safety officer
6    or corporate safety man on the -- yes.
7  Q  Okay, all right. Would it be reasonable to call that
8    position a corporate safety director or a safety director?
9  A  I'm sure -- I don't know the distinction, director versus
10   manager versus officer but.....
11 Q  I'm not trying to.....
12 A  .....senior -- senior safety resource to management, yes.
13 Q  Okay, all right.
14   MR. COVELL: That's too early, isn't it?
15   MR. YOUNGMUN: It's 2:10.
16   MR. COVELL: Yes, it's too early.
17 Q  Do you have -- or, when you were APC did you have a legal
18   department?
19 A  What year?
20 Q  1996 forward.
21 A  The -- I did not have access to a legal department in '96.
22   The legal in-house counsel we currently have today was
23   hired, I'm going to say, '99, 2000.
24 Q  Okay, if -- prior to that time if you had need for legal
25   resource would the company obtain them for you?

### Page 13

1  A  We would've made a decision as to need and -- sure, of
2    course, right.
3  Q  Okay. In 1996 you had occasion to -- or, did you have
4    occasion to evaluate various positions with APC for their
5    categorization as exempt or nonexempt for purposes of
6    overtime under state and federal law?
7  A  I started '96, I think the time frame '97 is when I really
8    -- was really more -- did more of an evaluation.
9  Q  Okay, and what precipitated you to do that, if you recall?
10 A  Concerns that I had just in the -- in the media and
11   whatnot regarding exempt versus nonexempt.
12 Q  Let me show you Exhibits 1 and 2 here, I represent to you
13   Exhibit 1 is what was supplied to us in discovery as a job
14   description for safety specialist, and Exhibit 2 is a job
15   announcement for a safety specialist job. Are you
16   familiar with Exhibit 1 there?
17 A  Want me to read it, or.....
18 Q  No, I'm just asking if that's.....
19 A  I recognize the general outline, yes.
20 Q  Okay. All right, do you recollect using that back in '96
21   or '97 in connection with evaluating whether or not a
22   safety specialist position was exempt or nonexempt?
23 A  This particular job description?
24 Q  Or one similar to it. This one -- we looked at these
25   earlier today, and we have potentially three of them.

EXHIBIT A
PAGE 2 OF 10

Case 3:03-cv-00174-RRB   Document 34-2   Filed 08/03/2006   Page 3 of 10

Case No. A03-0052 CV (RRB)　　　　Condenselt!™　　　　Zuber v. APC Natchiq, Inc.

### Page 14

1. There's Exhibit 1, there's this job advertisement, I
2. guess, and then there was.....
3. MR. YOUNGMUN: 145.
4. Q And this is -- I'm showing you Exhibit 4 that's designated
5. APC 145. We came to the -- or, we came to the possible
6. conclusion that this APC 145 is an older version of this
7. Exhibit 1, and that they're apparently similar but there's
8. some minor differences in them. And it's just to
9. hopefully save us some time. In doing a review of the
10. exempt status as a safety specialist did you use a job
11. description -- this job description or one like it in
12. doing a review, to your recollection?
13. A It could have been a partial review that I did at the time
14. by using this material.
15. Q All right, can you take a minute, and we'll go off record
16. if you need to, and read these and see if in your opinion
17. these fairly describe the position of safety specialist
18. with APC from 1996 to date?
19. A Okay, you're -- you're asking me are these basically the
20. same position evolving over the last.....
21. Q Sure.
22. A .....X years or something?
23. Q Yes, yes.
24. A Well, you want -- if you want me to read them verbatim I
25. can. I can probably look at.....

### Page 15

1. Q No, I.....
2. A .....them structurally and say they're probably the
3. evaluation of -- you know, this was probably an old one,
4. that's dated something last year, and this is probably
5. this year. So, yeah, I would say it's probably an
6. evaluation of time over -- without reading it verbatim.
7. Q From '96 to date have there been any dramatic changes in
8. the duties of the safety specialist?
9. A In the day to day duties?
10. Q Yes.
11. A No.
12. Q All right. Why don't you take a look at what's -- that's
13. Exhibit 4, right? No, that's your copy, I have a copy
14. right here. I just kind of -- In the course of evaluating
15. the position was there some paperwork generated? When you
16. examined the position of safety specialist and other
17. positions concerning their exempt or nonexempt status was
18. there some paperwork generated in that regard?
19. A Yes.
20. Q Okay, and -- okay. In Exhibit 4 I have these papers that
21. were produced by your company to me, and I'd like to go
22. through them with you and discuss them, so if you could
23. turn to Page 137, which is the first page following the
24. legal pleadings there.
25. A This article?

### Page 16

1. Q Yes.
2. A Okay.
3. Q Okay, is that article, which I understand to be a Forbes
4. magazine article, what precipitated your interest in
5. reviewing exempt versus nonexempt positions?
6. A I think so, primarily.
7. Q Looking at the second page of that in the next to last
8. paragraph, about four lines down they talk about a case,
9. Auer, A-U-E-R v. Robbins, do you see that right down in
10. here?
11. A Yes, um-hm.
12. Q Okay, did you read that case?
13. A No.
14. Q Are you familiar with that case at all?
15. A No.
16. Q All right, and did you set some -- something in motion to
17. track the progress of that case?
18. A No.
19. Q Looking at the next page, which is 139, this seems to be --
20. does this have much to do with the classification of
21. exempt/nonexempt?
22. A Doesn't appear to.
23. MR. COVELL: Okay, do you want these, Greg? That's the
24. other copy there, sure.
25. Q Okay, let's go to the next page here. This is 140, this

### Page 17

1. appears to be a memo from you to Anne Hippe and Toby
2. Osborn, do you -- I guess is that what it is?
3. A Yes.
4. Q Do you recollect generating this.....
5. A Yes.
6. Q .....today?
7. A It looks like one of mine.
8. Q All right, and who's Anne Hippe and Toby Osborn?
9. A Anne Hippe at the time was the comptroller, Toby Osborn
10. was the CFO.
11. Q Okay, and CFO is chief financial officer?
12. A Yes.
13. Q Okay, so these are money people, is that.....
14. A Money people, yes.
15. Q Okay, all right. And does that essentially say you're
16. concerned about people being exempt or nonexempt and you
17. wanted to look into that matter and explore it?
18. A Right, at that time I was concerned and looking for -- I
19. don't think I had much exposure at the time to exempt
20. versus nonexempt and were looking for how do you classify,
21. were we correct, were we not correct, looking for answers.
22. Q Okay, and also in conjunction with looking at the exempt,
23. nonexempt, did you also have a concern about whether or
24. not paying people a daily salary was something you ought
25. or ought not to be doing?

### Page 18

1 A  Is that what my memo says?
2 Q  Yes, I'd suggest to you that in these further papers.....
3 A  Suggest it? Sure, if that's what I was suggesting.
4 Q  Okay, all right. We already discussed -- let's go through
5     these. 145 appearing to be the job description that more
6     or less describes the job of safety specialist.
7 A  Oh, so, okay, project superintendent on 141.....
8 Q  Right.
9 A  .....and engineers, super -- materials supervisors, 145,
10     yes, safety specialists.
11 Q  Okay, and those pages you just went through before are
12     other job descriptions for the company, is that right?
13 A  Yes.
14 Q  Did you review not only the safety specialists but those
15     other job descriptions back in this time frame, '96, '97?
16 A  Yes.
17 Q  Okay, turning to 147, is that your handwriting?
18 A  Yes, it is.
19 Q  Okay, much better than mine, believe me. What's this
20     paper represent, or what's it all about, if you can tell
21     us?
22 A  I don't know all of what was going through my -- what was
23     going through my mind at this time. There were -- there's
24     a distinction in Alaska law between exempt/nonexempt,
25     three categories. The ones that I would be concerned

### Page 19

1     with, administrative, professional, executive. I believe
2     it was -- in fact, I'm almost -- can almost remember the
3     conversation with Randy Carr was around supervisors. I
4     was unaware at the time supervisors was a whole separate
5     classification and how it was classed in state law, but it
6     was something that should be set aside and we -- something
7     we should be concerned about, that you could classify them
8     as exempt. But it's really exempt, they should be paid
9     for all hours worked, but they could be paid at the
10     straight time rate, and it was something I had never heard
11     before. It was a note I made. This is some of those
12     chicken scratches that I was making, maybe at the time I
13     was even talking to him, for all I know. These are --
14     these are -- these people listed below are maybe notes in
15     my mind at the time of people that were paid exempt, could
16     -- that could be -- maybe they were improperly -- I didn't
17     know at the time, I was making notes to check them out. I
18     suspect that's what it was.
19 Q  All right, and then turning to Pages -- well, as a group,
20     148 through 157.
21 A  Okay.
22 Q  Can you tell us what those are, in general?
23 A  Yeah, they're some kind of a -- a test that you walk
24     through and check whether they meet the criteria of exempt
25     or nonexempt, basically.

### Page 20

1 Q  Did you want to call them a cheat sheet?
2 A  Yeah, I don't -- whatever you.....
3 Q  A checklist for.....
4 A  .....for a layman, to --
5 Q  .....more formal.....
6 A  Sure.
7 Q  .....sounding?
8 A  More or less, yeah.
9 Q  All right, do you know where these -- the blanks came
10     from, as far as these checklists go?
11 A  Don't know today, yeah.
12 Q  All right, do you know if maybe you got them from -- well,
13     never mind, okay. All right, do you know what 158 and 159
14     are and why they might be included here as being relevant
15     to this case?
16 A  158?
17 Q  And 159.
18 A  One fifty -- They -- they are printouts, I'm not sure out
19     of what system, if it was the data base we used at the
20     time on the Slope. Appear to be employees who were paid
21     on a day rate.
22 Q  Okay, do you know what was under the black-outs on those
23     pages?
24 A  No.
25 Q  Do you know why the black-outs are there?

### Page 21

1 A  I don't recall. They may have been non -- nonexempt, I
2     don't know.
3 Q  All right, and then Page 160, do you know why this is
4     here? Might that be additional day rate people?
5 A  Additional people, right.
6 Q  All right. Looking at Page 161, that looks like that's
7     perhaps an e-mail from you to Harvill/Price, and I believe
8     we were told they were some type of managers, perhaps.
9     Well, who are Harvill/Price?
10 A  Well, let me familiarize myself with this for a second
11     here.
12 Q  Any time you want to do that, just say so, I don't mean to
13     rush you.
14 A  Well, I can walk you through. Harvill and Price were
15     super -- they were ARCO supervisors at the time, it was
16     John Harvill, Mike Price, just used the last names. Bill
17     Hurley at the time was -- was ARCO'S HR manager in
18     Anchorage. He may have been on the Slope periodically,
19     but he was their HR manager. This would've been sent
20     from, looks like Mike Price to Bill Hurley, the initial e-
21     mail, asking the question -- well, it says, he writes,
22     Mark Nelson is reviewing the APC positions, "he was
23     curious as to how ARCO determined this. They would like
24     to use our input as benchmarking information on" the
25     issue. I -- I probably went to him at the time and said,

EXHIBIT A
PAGE 4 OF 10

Case 3:03-cv-00174-RRB    Document 34-2    Filed 08/03/2006    Page 5 of 10

Case No. A03-0052 CV (RRB)    CondenseIt!™    Zuber v. APC Natchiq, Inc.

### Page 22

1   hey, how do you guys do it. You know, this is in December
2   of '96, it was early on, I was -- I had concerns. I went
3   to these guys and said what's the -- in fact, I think the
4   article, the Forbes article, referenced a case against
5   ARCO. I probably assumed at the time ARCO had -- was very
6   fluent in this subject and could help me.
7  Q  Okay. I believe it does reference an article.
8  A  They in turn referred me to their compensation specialist
9      or analyst here, Nancy Williams, gave me her number.
10 Q  Okay, did you ever talk to Nancy Williams?
11 A  Talked to somebody, don't recall the name.
12 Q  Concerning classification of positions as exempt or
13     nonexempt?
14 A  Yes.
15 Q  Okay, do you recollect anything from the conversation?
16 A  Is that -- do you have a fax they sent me? It was in the
17     file when I turned it over. Is that coming up here?
18 Q  I -- look at the next page.
19 A  Bingo. Okay, yes, I spoke with Nancy Williams, there is
20     it. She -- I spoke with her about -- actually I was
21     trying to get information about the case, she was not very
22     forthcoming about the case, and she said something to the
23     effect of we use a -- I don't know, I'll share with you
24     some information, and she shared, I think, that fax right
25     there it, basically.

### Page 23

1  Q  All right, and that's got a cover sheet, it says cover
2      plus eight, so let's just count, one, two, three, four,
3      five, six, seven, eight takes you through what's labeled
4      APC.....
5  A  Yeah.
6  Q  .....170. So is it your recollection that those
7      subsequent eight pages were the fax that you.....
8  A  Yeah.
9  Q  .....received from -- Okay, all right. So you had this
10     conversation, she wasn't forthcoming about the case, but
11     she said I'll share these materials with you and she sent
12     those subsequent eight pages. Did the conversation --
13     what else do you recollect about the conversation, if
14     anything, or is that.....
15 A  She said they'd made changes in some of their positions,
16     some of them they hadn't -- I don't really recall at the
17     time. I -- I should say I recall at the time they were --
18     there was an issue around engineers, field engineers, I
19     don't remember how they ended up classifying -- I think
20     that's what their suit -- the original suit was brought
21     against. I may have asked, I think I did, about the
22     supervisory people, how they were classifying maybe the --
23     The positions I was concerned about at the time were
24     warehouseman, safety specialist, engineers and whatnot,
25     and I think that she told me, I'm going to say

### Page 24

1      recollection is that she told me that they still
2      classified safety as exempt, that they had maybe made
3      changes in their engineering, but they weren't at liberty
4      really to disclose too much information around that.
5  Q  Okay, is it fair to say, and correct me if I'm wrong
6      because I'm not trying to testify here, that the
7      conversation with her was somewhat guarded as to what they
8      did or what they were doing?
9  A  Yes.
10 Q  Okay, and she said well, here is -- not to put this
11     rudely, but she sort of said here is some materials, try
12     to work it out with these?
13 A  Yeah, she -- and you're dating me, this is six or seven
14     years ago, so I don't remember the verbatim conversation.
15     It was something that, you know, we had the suit, we're
16     not -- we don't want to talk about it. I think it had
17     been settled out of court, I don't know that it was made
18     public. She said, I'll -- you know, I could tell you some
19     here -- but I don't think at the time it helped me, it's
20     not -- I wasn't going to rely solely on her -- her
21     opinions or what she told me to make a final judgment. So
22     I -- it was just -- that was just early in the game.
23 Q  Step in the process?
24 A  Yes.
25 Q  Okay, all right. Let's go ahead and turn over to Page 171

### Page 25

1      because it might be answering some of our questions.
2      There appears to be an e-mail there from you to Chris
3      Boyle, indicates you talked with Nancy Williams, she faxed
4      you a guideline, refer you to Rose Garcia or LouAnn in
5      their payroll. Do you remember talking to Rose or LouAnn
6      in payroll?
7  A  Well, I -- I said here it was LouAnn I talked with, so I
8      -- I must've. You know, I don't -- I don't really recall
9      the conversation, though.
10 Q  Okay. Was it.....
11 A  If I read this -- if you want me to read this, it would --
12     looks like one of my e-mails, so I can read it if you like
13     and.....
14 Q  No, we've got it in the record I'm just as much trying to
15     jog your memory as we have this -- we have this
16     information essentially -- well, you're establishing it
17     for us as your e-mail that was made contemporaneous with
18     you going through this classification procedure. All
19     right, and that second half of that first paragraph starts
20     to address the day rate issue, as you can see. Does that
21     refresh your recollection that that was a matter that was
22     of concern to you, along with the exemption status?
23 A  Yes. Or partial. I think at the time my concern was as
24     much partial payment of a day rate.
25 Q  Okay. Let's see here. What -- well, let's just put this

Case 3:03-cv-00174-RRB    Document 34-2    Filed 08/03/2006    Page 6 of 10

Case No. A03-0052 CV (RRB)    CondenseIt!™    Zuber v. APC Natchiq, Inc.

### Page 38

1  you to put it in writing because these guys do not believe
2  that they don't fit the -- into the exempt category.
3  Which subsequently came out this letter that he sent me.
4  Q  All right, but you -- in regard to safety specialists you
5      don't recollect what you told Mr. Carr the safety
6      specialists did?
7  A  Well, I would -- I would've described their -- their day to
8      day duties to Mr. Carr and had a conversation back and
9      forth, which he offered the -- he actually offered a
10     verbal opinion about every one. It was really only the
11     warehousemen that I said, look, I got a problem here with
12     the morale and the issue of my employees, I need you to
13     put it in writing because they don't believe it.
14 Q  Let me draw your attention here to -- why don't we look at
15     Page 163, we see the third or fourth paragraph, depending
16     on what you do with the bullets, it says, "One of the more
17     complex areas of", could you read that paragraph for us?
18 A  Want me to read it out loud?
19 Q  Yes, please.
20 A  "One of the more complex areas of the FLSA is its
21     classification of certain employees as exempt or excluded
22     from coverage by the overtime requirements of the law. An
23     employee is presumed to be nonexempt", parentheses,
24     "covered by the law and entitled to receive overtime pay",
25     comma, "unless the employee (sic) can show that the

### Page 39

1      employee's job duties and pay meet certain criteria".
2  Q  Did you review that material when you were doing this
3      review back in '96, '97? Did you read this paper, 163?
4  A  I -- I'm sure I did, sure.
5  Q  Okay. And you -- and you did read the Forbes article,
6      which is perhaps -- would you agree, to paraphrase it it
7      sort of says this area is a quagmire? That a fair way to
8      characterize that article?
9  A  Don't really recall, I haven't read it recently, but.....
10 Q  Okay, well, it's kind of like a watch-out article, isn't
11     it?
12 A  Oh, sure, that was my -- set my alarm bells off, yes.
13 Q  All right. And then I draw your attention to Page -- I
14     think it's -- I've probably gone by it here -- 154 and
15     155. Is that your handwriting on 154?
16 A  Yes.
17 Q  All right, and did you use this checklist to make your
18     determination concerning -- or, what did you use this
19     checklist for?
20 A  Checklist was the basis that I went through, I don't know
21     that I ever truly completed it per se, it's not obviously
22     formal by any means in the sense that I formalized it or
23     signed it. It is my handwriting and I did use it to
24     formulate the basis for classification of our employees.
25 Q  Okay, do you know if you filled this out when you were

### Page 40

1      talking to Mr. Carr or if you did it at another time, if
2      you know?
3  A  I don't recall, it was part of the file and it was
4      something that would've been part of the overall
5      determination.
6  Q  Okay, you checked off there under administrative test
7      "performs office or nonmanual work directly related to
8      management policies or general business operations", and
9      you checked that. I take it that that means that you felt
10     that a safety specialist does that, is that so?
11 A  Yes.
12 Q  All right, let me draw your attention to the other set of
13     checklists, which is Page 166, and up towards the binding
14     there there's some notations -- well, out here. Is that
15     your handwriting on the right-hand side of that paper?
16 A  Yes.
17 Q  All right, and that says "directly related to management
18     policies, this means to affect" with an A "these
19     policies", slant, "change the".....
20 A  Change them.
21 Q  "Change them, not work with (sic)... policies", and
22     that's to the right of an arrow that comes off of "primary
23     duty is office or nonmanual work directly related to
24     management policies or general business operations of the
25     employer or" the "employer's customers". Do you recollect

### Page 41

1      making that note?
2  A  It's my writing, so I -- I'm sure I did, yes.
3  Q  And do you know where you got that information from in the
4      note?
5  A  I can't say verbatim, it -- it could have been from my
6      discussions with Randy Carr. At the time I viewed him as
7      the chief specialist, if you will, but I -- I can't say
8      that.
9  Q  Okay, what duties does a safety specialist have that
10     affects or changes policy?
11 A  What duties?
12 Q  What does a safety specialist do that fulfills that
13     requirement as it was to be exempt?
14 A  You mean beyond the -- okay, you're at what does a safety
15     specialist did that affects policy?
16 Q  Sure, affects policy, yeah.
17 A  Well, the safety specialist is one who -- who actually --
18     in the oilfield a big piece of our work is safety, right?
19     So it's a little bit hard to imagine, maybe, if you don't
20     work, there's a policy for everything, especially back in
21     '96 when -- when maybe this was going -- but in '96 we
22     were very light on policy, if you will. Safety
23     specialists at that time were -- were formulating,
24     writing, coaching, everything to do with those -- those
25     policies and procedures that were being formulated at the

EXHIBIT A
PAGE 6 OF 10


ALASKA PETROLEUM CONTRACTORS INC.
*General Contractors*

June 19, 1997

Faxed to: (907) 269-4992

Mr. Randy Carr
Director of Labor & Safety
State of Alaska
Anchorage, Alaska

Re:   Determination Letter

Dear Mr. Carr:

Attached you will find two documents, the first is a job description written for our material supervisors and the second is a form stating "Notice of Wage Payments." Please help me with the following determinations.

I want to confirm we are operating within the legal bounds of paying an employee on an exempt basis for the position of "Materials Supervisor" based upon the job description attached. In addition, when we do pay employees on an exempt basis we first have them sign the form titled "Notice of wage payments." I also want to make sure this form gives us the latitude to pay a legitimate exempt employee on a day rate given they could work anywhere from .5 hours to 24 hours in a given day. Should the form also state the requirement of hours work in the range?

These are just two issues I'm looking to clear up to ensure we are operating outside of any gray areas and paying our employees according to state and federal laws. I appreciate any help you can give me, my office telephone number is 659-7344. Thank you.

Sincerely,

*Mark C. Nelson*

Mark C. Nelson
Operations Manager

EXHIBIT A
PAGE 7 OF 10

APC0201

A Subsidiary of Arctic Slope Regional Corporation





# ALASKA PETROLEUM CONTRACTORS INC.
## General Contractors

June 25, 1997                               Faxed to: 907-269-4992

Mr. Randy Carr
Director of Labor & Safety
State of Alaska
Anchorage, Alaska

Re:    Opinion Letter

Dear Mr. Carr:

Thank you for assisting me over the telephone in making a determination as to overtime exemptions for our staff. The discussion surrounding "supervisors" as being exempt from over time pay (premium pay) but yet have to be paid for all hours worked has been difficult to pull from the regulations.

Please respond in writing to give us a definition as to how it works and the cautions of classifying an employee as a supervisor. We can easily find the classifications for administrative, professionals and executives but do not see a clear path for the supervisors.

Thank you for your help,

Sincerely,

Mark C. Nelson
Operations Manager

EXHIBIT __A__
PAGE __8__ OF __10__

Pouch 340014
Prudhoe Bay, Alaska 99734
Fax: 907-659-7706

APC0202

# STATE OF ALASKA

**TONY KNOWLES, GOVERNOR**

3301 Eagle Street, Suite 301
P.O. Box 107021
Anchorage, Alaska 99510-7021
Phone: (907) 269-4900
Fax: (907) 269-4915

**DEPARTMENT OF LABOR**
**WAGE AND HOUR ADMINISTRATION**
**LABOR STANDARDS & SAFETY DIVISION**

June 26, 1997
Dictated: 6/25/97

WHOL #122

Mark C. Nelson
Operations Manager
Alaska Petroleum Contractors Inc.
P. O. Box 190747
6700 Arctic Spur Road
Anchorage, AK 99519-0747

Dear Mr. Nelson:

I have reviewed the information you have submitted documenting the duties of your Materials Supervisors. I appears that they are employed in a supervisory capacity as defined in 8 AAC 15.910 (14), which states:

> . . . those primary duties performed by an employee who is employed solely for the purpose of regularly assigning and directing the activities of other employees; and is responsible for results of the work performed and; who does not perform duties regularly performed by the employees supervised, except for brief periods of time not to exceed 20 percent of the hours worked in the workweek; for the purpose of AS 23.10.060, "supervisory capacity" does not apply to an employee required by the employer to perform those activities on an intermittent or substitute basis during the course of employment.

As such, they are exempt from overtime under AS 23.10.060, which states in pertinent part:

> **Payment for overtime.** (a) An employer who employs employees engaged in commerce or other business, or in the production of goods or materials in the state may not employ an employee for a workweek longer than 40 hours or for more than eight hours a day. **This section does not apply to the employment of a person acting in a supervisory capacity.** [Emphasis added]
>
> (b) If an employer finds it necessary to employ an employee in excess of 40 hours a week or eight hours a day, compensation for the overtime at the rate of one and one-half times the regular rate of pay shall be paid.

EXHIBIT  A
PAGE  9  OF 10

APC0203

Mark C. Nelson -2- June 26, 1997

The more common exemptions for Administrative, Executive or Professional employees are found in AS 23.10.055. This exemption applies to both minimum wage and overtime. Since those types of employees are not entitled to a minimum wage, their salaries are considered compensation for any and all hours they may work.

The explanation as to why employees in a supervisory capacity must be paid for all hours worked is not found in the regulations. It must be pieced together from the statutes and court rulings. The U.S. Supreme Court has held that employees who are not exempt from minimum wage must be paid for all hours they are "suffered or permitted" to work.

Exempt administrative employees, for example, are paid for all hours worked, but are not guaranteed any minimum hourly rate. Employees working in a supervisory capacity must also be paid for all hours worked. The hiring agreement and pay practices for supervisors establish a contractual hourly straight-time rate of pay for the *Materials Supervisors*. They are statutorily and/or contractually entitled to be paid that rate for all hours worked, without any overtime premium, pursuant to the exemption stated in AS 23.10.060.

I hope this information is helpful. If you have any further questions, do not hesitate to contact our office.

Sincerely,

J. R. (Randy) Carr
Chief
Labor Standards

JRC:cah
apc

EXHIBIT A
PAGE 10 OF 10

APC0204