IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF ALASKA

JOHN GILBERT,                    )
                                 )
            Plaintiff,           )
                                 )
v.                               )
                                 )
APC NATCHIQ, INC.,               )
                                 )
            Defendant.           ) Case No.: 3:03-CV-00174-RRB
_____)

### DEFENDANT'S MOTION FOR SUMMARY JUDGMENT TO DISMISS PLAINTIFF'S OVERTIME CLAIMS UNDER THE ADMINISTRATIVE EXEMPTION AND MEMORANDUM IN SUPPORT THEREOF

#### I.   INTRODUCTION AND RELIEF REQUESTED

Defendant, APC Natchiq, Inc. ("APC"), by and through its attorneys DeLisio Moran Geraghty & Zobel, P.C., moves this court pursuant to Federal Rule of Civil Procedure 56(c) for summary judgment that the Plaintiff, John Gilbert's ("Gilbert") position as a Safety Supervisor falls under the administrative exemption to the Alaska Wage and Hour Act ("AWHA") and the Fair Labor Standards Act ("FLSA").

Gilbert filed suit against his former employer, APC, to recover alleged unpaid overtime compensation pursuant to the AWHA and FLSA. During the time that Gilbert was employed as a Safety Supervisor he qualified as a bona fide administrative employee and was, therefore, exempt from the overtime wage requirements of both the AWHA and the FLSA. Accordingly,

DELISIO MORAN
GERAGHTY & ZOBEL, P.C.

943 WEST 6TH AVENUE
ANCHORAGE, ALASKA
99501-2033
——
(907) 279-9574

Gilbert requests this court grant APC's motion for summary judgment.

## II.   FACTS

### A.   Gilbert's Employment History with APC.

APC is an oilfield services contractor providing a wide variety of oilfield management and support services on the North Slope and other areas of Alaska.  APC employed Gilbert as a Safety Specialist on the North Slope of Alaska at Kuparuk from January 30, 2001 to January 1, 2002.  Plaintiff's Complaint at ¶ 4.  Gilbert was then promoted to Safety Supervisor and worked in that capacity from January 3, 2002 to April 22, 2003, when he voluntarily terminated his employment with APC.  Id. at ¶ 4. Throughout his employment with APC, Gilbert generally worked a two week on/two week off rotation, and was paid a set rate per day for all hours worked in the day.  Id. at ¶ 5.   He earned $350 per day during the period January 30, 2001–April 16, 2001; $375 per day during the period April 17, 2001–June 18, 2001; $425 per day from June 19, 2001–January 1, 2002; and finally $475 per day from January 3, 2002–April 20, 2003.  Id. at ¶ 5.

### B.   Gilbert's Specialized Training and Knowledge.

Gilbert received a Bachelor of Science in Environmental Engineering from Montana College of Mineral Science and Technology.   Exhibit A (Deposition of John Gilbert, p. 10,

DELISIO MORAN
GERAGHTY & ZOBEL, P.C.

943 WEST 6TH AVENUE
ANCHORAGE, ALASKA
99501-2033
———
(907) 279-9574

Exhibit G-1 to deposition). He then received a Masters of Science in Mining Engineering from the Montana School of Mines. <u>Id.</u> In all, Gilbert had approximately 12 years of higher education (post-high school). <u>Id.</u> at 20

Gilbert attended several safety trainings in the course of his employment with APC, including a 40-hour HAZWOPER class, an 8-hour HAZWOPER supervisor class, a mining safety related certification, and a 30-hour OSHA course. <u>Id.</u> at 17. He also attended radiological safety classes. <u>Id.</u>

Prior to working with APC, Gilbert had approximately six (6) years experience working in safety related positions. <u>Id.</u> at 20. Gilbert considered health, safety and environment his profession, requiring specialized training and knowledge. <u>Id.</u> at 26-27. Gilbert testified during his deposition that his work as a Safety Supervisor required experience and use of his specialized education. <u>Id.</u> at 27.

C.   **Safety Supervisor Job Description.**

The job description for the Safety Supervisor provided as follows:

. . . The position is responsible for the coordination and oversight of Health, Safety, Environmental and Training functions. . . .

The Safety Supervisor provides consultation to both construction and maintenance operations regarding compliance, company policies, and safe work practices. Responsibilities include supervision of six Safety

DELISIO MORAN
GERAGHTY & ZOBEL, P.C.

943 WEST 6TH AVENUE
ANCHORAGE, ALASKA
99501-2033
____
(907) 279-9574

Specialists, development of site specific policies and procedures, risk assessments, incident investigations, audits and monitoring of ongoing activities, and coordination of health surveys.

Qualified candidates must have professional safety experience with process operations . . . Excellent organizational, communication, and leadership skills are required. The successful candidate must be capable of working in a team environment, be a self-starter, and be goal and task oriented . . .

Exhibit B (Deposition of Douglas Smith, pp. 75-76, Exhibit S-2 to deposition). Gilbert testified at his deposition that the description accurately described his job. Exhibit A at 32. He provided consultation to both construction and maintenance operations. Id. at 33. He supervised six Safety Specialists. Id. at 33-34. He developed site specific policies and procedures, as well as risk assessments, incident investigations, audits and monitoring of safety protocols, and coordinated health surveys. Id. at 34-35. Gilbert stated that he had the requisite background and education to carry out the responsibilities of the Safety Supervisor. Id. at 19.

**D.    Gilbert's Job Duties.**

Gilbert testified that during his tenure as a Safety Supervisor with APC, he was "involved in pulling together" special environmental programs and permits within the company. Id. at 24. This work required "quite a bit of time" getting federal and state safety regulations together in order to be in

DeLisio Moran
Geraghty & Zobel, P.C.

943 West 6th Avenue
Anchorage, Alaska
99501-2033

____

(907) 279-9574

compliance.  Id. at 25.  Gilbert interpreted written regulations (CFR's) and implemented them in the field.  Id. at 30.  This required that he use his own independent judgment as to how the regulations would best be implemented in the field.  Id.  He was called upon to "interpret data" and his work had potentially significant impact on the health and safety of others.  Id. at 27-29.  Additionally, he was, at times, responsible for training or assisting with the training of safety employees.  Id. at 31.

Gilbert had authority to purchase equipment when requested by someone within the safety department.  Id. at 86.  He undertook to determine whether the department could replace old equipment.  Id. at 88-89 (Exhibit G-7 to Gilbert deposition).  He met with equipment vendors, analyzed costs, and created spreadsheets to determine whether it was economical to purchase new equipment.  Id.  He created spreadsheets of sampling costs and reported to management with recommendations.  Id. at 93.

Gilbert also undertook to modify the HSE department's policy, procedure and guidelines manual ("PP&G").  Id. at 85.  A significant amount of his time was spent on this project and he served as the project coordinator.  Id. at 107-118.  He was responsible for revising and drafting policies.  Id. at 101.  Gilbert specifically drafted the Naturally Occurring Radioactive Material ("NORM") reporting policy.  Id. at 102 (Exhibits G-12 &

DELISIO MORAN
GERAGHTY & ZOBEL, P.C.

943 WEST 6TH AVENUE
ANCHORAGE, ALASKA
99501-2033
____
(907) 279-9574

104493v3 - Motion For Summary Judgment re: Dismissal of Overtime Claims
4 *Gilbert v. APC Natchiq*, Case No.: 3:03-cv-00174 RRB; Page 5 of 35

G-13 to Gilbert deposition).  This required Gilbert to interpret the Ludlum meter instructions, establish the procedures for testing, and implement the policy in the field.  Id. at 104-105.

Gilbert also updated and finalized the "man basket lifting" procedures, which required him to analyze newly enacted OSHA regulations and draft an updated policy.  Id. at 108-109.  He advocated for an improvement in the "rescue response available to personnel working at the wash bay."  Id. at 110  He created guidelines for recording and reporting spills using current company activity and applicable regulations to create the guidelines. Id. at 110-112 (Exhibit G-16 to Gilbert deposition).

When Gilbert was about to go "off rotation," he drafted "change-out notes" which served to update his alternate, Ron Kirk, the only other Safety Supervisor, about events and issues that transpired during his rotation.  Id. at 68 (Exhibit G-7 to Gilbert deposition).  The memos documented that Gilbert monitored and reported employee accidents/injuries; assisted with accident investigations; made suggestions to avoid future accidents in accident reports before issuance of final drafts; and fielded employment inquiries from potential applicants.  Id. at 68-81.  Gilbert gave input into hiring decisions; problem-solved with discontented employees; and fielded complaints about safety employees from site workers.  Id. at 81-82.

DELISIO MORAN
GERAGHTY & ZOBEL, P.C.

943 WEST 6TH AVENUE
ANCHORAGE, ALASKA
99501-2033

(907) 279-9574

Doug Smith ("Smith") was the HSE (Health, Safety & Environment) Manager at APC during the time Gilbert was employed as a Safety Supervisor. Exhibit B at 5. Smith was Gilbert's direct supervisor. Exhibit A at 57. Smith explained that the hierarchy of employees within the HSE department was such that Safety Specialists reported to Safety Supervisors who then reported to him. Exhibit B at pp. 5-7; see also Exhibit G-5 to Gilbert deposition. Smith described the duties of the Safety Supervisor as follows:

> [a]n expectation of the job was that they were the coordinator of the specialist, and in that role provided . . . a degree of oversight and direction to those embedded employees. And then in my absence, I worked a four-day on, three-day off schedule, and in my absence from the Slope, they were the step-up for the department and fill the roll of HSE manager in my absence.

Exhibit B at 14-15. Smith clarified that while a Safety Supervisor may occasionally be required to perform some of the functions of a Safety Specialist, they did not routinely do the work of a Specialist. Id. at 15.

Gilbert supervised and directed the Specialist's work. Smith testified that Gilbert was responsible for coordination of their schedules and duties.

> Q. . . . So when a safety supervisor acted as the coordinator or [sic] the specialist . . . what physically would he do that was coordinating them? . . .

DeLisio Moran
Geraghty & Zobel, P.C.

943 West 6th Avenue
Anchorage, Alaska
99501-2033
____
(907) 279-9574

> A.  Schedule coordination, personnel coming and going, trying to help work vacation coverage by scheduling other people to work over, providing answers, you know, questions and answers both up the chain of command with the client, with our people who liaison, conduit of information flow.

Id. at 15-16.   Gilbert fielded daily questions from the Specialists and responded to various issues regarding performance of their job.   Id. at 17.   When asked about Gilbert's supervisory duties, Smith explained:

> . . . [t]he majority of the questions were more technical in nature about how to execute on-the-job. We had varying levels of specialists with different levels of experience, and the supervisor was an experienced – more experienced position that had more authoritative knowledge, technical knowledge, and was oftentimes a reference for the specialist to conduct business.

Id. at 17.   Gilbert was also responsible for directing the actions of the Safety Specialists:

> It was within [Safety Supervisor's] scope of authority to redirect resources. For example, if we had a job that day that needed extra assistance from one of their specialists, they would have the authority to ask for and redirect people to assist and coordinate when we had the abnormal conditions.

Id. at 18-19.   Gilbert had authority to and did direct Specialists to work at a specific location or change their work location.   Id.   Smith looked to the Supervisor to be the second in command, to know what the Specialists were doing on a day-to-day basis, and to direct their work and location depending upon the needs of the company and the client.   Id. at 21.

DeLisio Moran
Geraghty & Zobel, P.C.

943 West 6th Avenue
Anchorage, Alaska
99501-2033
———
(907) 279-9574

104493v3 - Motion For Summary Judgment re: Dismissal of Overtime Claims
4 *Gilbert v. APC Natchiq*, Case No.: 3:03-cv-00174 RRB; Page 8 of 35

Gilbert gave the following example of work requiring coordination of safety employees:

> For example, somebody would come in and say, they are going to have somebody on pad such and such, at this time to do the confined space and I would say, I will now since I know about it. So, I'd call one of these guys, whoever was out in the field closest to their need and get them on the radio and send them over there.

Exhibit A at 61-62.

Gilbert's duties on a day-to-day basis were to serve as a "second tier supervisor" in the HSE department. <u>Exhibit B at 21.</u> His job expectations were that he would assist in "formulat[ing] a better department, and provide . . . direction and oversight and growth in the department from procedure writing to employee development." <u>Id.</u> at 21-22. According to Gilbert, he was "frequently" required to interface with the client and in this capacity acted as a spokesperson for the HSE Department. <u>Exhibit A</u> at 63-64, 96-97.

Gilbert was responsible for data analysis in order to establish procedure. For example:

> . . . the [specialist's] job might have been to identify that we're going to do some paint removal somewhere, and it could have lead in it. . . . [Gilbert's] position oftentimes, the supervisor position, would help coordinate the disposition of that lead-potential pain [sic] to a lab, receive results, interpret those results, and determine if we had an issue with lead.

DELISIO MORAN
GERAGHTY & ZOBEL, P.C.

943 WEST 6TH AVENUE
ANCHORAGE, ALASKA
99501-2033

(907) 279-9574

Exhibit B at 23.  After analyzing the information regarding the level of lead in the paint, Gilbert would decide whether the procedure for that job required respirators and then direct employees in performance of the paint removal.  Id. at 24. Oversight of this type of safety analysis was reserved for the Safety Supervisor to ensure compliance with applicable standards.  Id. at 25.

Gilbert also acted as the HSE Manager in Smith's absence. Smith worked a three day on the slope, four day off the slope rotation.  Exhibit A at 61.  When Smith was not on the Slope Gilbert was the acting Safety Manager in his stead.  Id.; see also Exhibit B at 19-20.  When asked to give examples of the responsibilities he undertook when Smith was absent, Gilbert responded as follows:

> Gather everybody's timecards, sign them and make sure that they got submitted to the accounting.  Answer all the questions in regards to the department, you know, like we talked earlier about people coming and asking questions about the construction or the field services area production services, so I would handle those questions as best I could.  Try to keep things rolling.

Exhibit A at 61.  When Gilbert was the acting HSE manager, he had the same authority as Smith.  Exhibit B at 27-28.  If a serious incident occurred when Gilbert was the acting HSE Manager he may be required to notify Smith, but had autonomy in deciding how to proceed.  Id.  He also facilitated safety

DELISIO MORAN
GERAGHTY & ZOBEL, P.C.

943 WEST 6TH AVENUE
ANCHORAGE, ALASKA
99501-2033

———
(907) 279-9574

104493v3 - Motion For Summary Judgment re: Dismissal of Overtime Claims
4 *Gilbert v. APC Natchiq*, Case No.: 3:03-cv-00174 RRB; Page 10 of 35

meetings when Smith was off rotation, and attended senior staff meetings as the HSE department representative.  Id. at 30; see also Exhibit A at 67-68.

Smith summarized the Safety Supervisor position as follows:

> . . . the supervisor position in Kaparuk was in the chain of command over a department, and it provided administrative oversight and was a step up for the manager position and a member of the senior management team in my absence . . .

Exhibit B at 50.

Gilbert occupied an office at the Kaparuk camp, and had administrative support staff.  Id. at 55-56.  Gilbert testified that his primary role as a Safety Supervisor was in the office. Exhibit A at 98.

Gilbert represented that his job as a Safety Supervisor was nothing more than a "glorified Safety Specialist."  Id. at 39. His deposition testimony, however, was that the supervisor position was a separate role, and that the work was primarily office work.  Id. at 41.  It required Gilbert "to be in the office to respond to the Kaparuk project."  Id. at 40.  As a Safety Supervisor, Gilbert attended "supervisors meetings" that were not attended by Specialists.  Id. at 115-116.  He also created the agendas for and facilitated HSET weekly staff meetings.  Id. at 135 (exhibit G-27 to Gilbert deposition). He responded to questions, concerns and complaints from the client

DELISIO MORAN
GERAGHTY & ZOBEL, P.C.

943 WEST 6TH AVENUE
ANCHORAGE, ALASKA
99501-2033
____
(907) 279-9574

and up the chain in his company and was a coordinator of those in the field. He was the one who received and dealt with complaints from safety specialists about personnel issues and other employees complaining about the safety specialists. Id. at 81-82. He reported accidents and injuries to OSHA and exercised his judgment in determining the correct manner in which to report the injuries. Id at 63. His job entailed many responsibilities and functions entirely different from those performed by the specialists.

E.    **APC'S Motion**.

Based upon the above facts, APC moves this court for summary judgment that Gilbert falls under the administrative exemption to the AWHA and FLSA. APC's motion is limited to Gilbert's employment as a Safety Supervisor. The Ninth Circuit has already determined that the Safety Specialist position was a non-exempt position. See Zuber v. APC Natchiq, Inc., 144 Fed. Appx. 657 (9th Cir. 2005).

APC's analysis of the FLSA and its interpretive regulations is pursuant to the statute in existence as of June 20, 2003, the time Gilbert filed his complaint. The FLSA and many of its regulations were subsequently amended, effective August 23, 2004.

DeLisio Moran
Geraghty & Zobel, P.C.

943 West 6th Avenue
Anchorage, Alaska
99501-2033
——
(907) 279-9574

## IV.  POINTS AND AUTHORITIES

**A.    <u>Summary Judgment is Proper because the Undisputed Facts
Establish that, as a Matter of Law, Gilbert Qualified as an
Administrative Employee Exempt from Overtime Compensation</u>.**

Pursuant to Federal Rule 56, a party against whom a claim
is asserted may move for summary judgment in the party's favor
as to all or any part thereof.  Fed. R. Civ. P. 56(b).  Summary
judgment is appropriate if the pleadings, depositions, answers
to interrogatories, and admissions on file, together with the
affidavits, if any, show that there is no genuine issue as to
any material fact and that the moving party is entitled to a
judgment as a matter of law.  Fed. R. Civ. P. 56(c).  Dismissal
of an employee's overtime claim on summary judgment is proper
where the undisputed facts establish that the employee fits
squarely within the administrative exemption to overtime
compensation.  <u>See</u> <u>Webster v. Public School Employees of Wash.,
Inc.</u>, 247 F.3d 910 (9th Cir. 2001); <u>Kennedy v. Commonwealth
Edison Co.</u>, 410 F.3d 365 (7th Cir. 2005).  In the case at hand,
the material facts are undisputed and, as a matter of law,
Gilbert satisfies the administrative employee test under the
AWHA and FLSA.  Gilbert is, therefore, exempt from overtime and
his claims should be dismissed.

DELISIO MORAN
GERAGHTY & ZOBEL, P.C.

943 WEST 6TH AVENUE
ANCHORAGE, ALASKA
99501-2033

(907) 279-9574

104493v3 - Motion For Summary Judgment re: Dismissal of Overtime Claims
4 *Gilbert v. APC Natchiq*, Case No.: 3:03-cv-00174 RRB; Page 13 of 35

**B.  APC Properly Classified Gilbert's Position as a Safety Supervisor as an Administrative Employee Exempt from Overtime Compensation Under the AWHA and FLSA.**

Gilbert brings claims for overtime under both the AWHA and FLSA.   Under the AWHA, a non-exempt employee is entitled to overtime compensation for hours worked in excess of forty hours per week or eight hours per day.   AS 23.10.060(b).   Under the FLSA, a non-exempt employee is entitled to overtime pay for hours worked in excess of forty hours per week.   29 USC § 207.  Certain employees, including those serving in bona fide administrative capacities, are exempt from the overtime provisions of the AWHA and FLSA.   AS 23.10.055(9); 29 USC § 213.  Here, Gilbert's duties as a Safety Supervisor fit squarely within the definition of administrative employee under both the AWHA and the FLSA.

**1.  Gilbert's duties satisfy the AWHA definition of an administrative employee.**

The Alaska Administrative Code defines the administrative employment exemption to require proof of six factors, specifying that an "administrative employee" is a worker:

A) whose primary duty consists of work directly related to management policies or supervising the general business operations of the employer;

(B) who customarily and regularly exercises discretion and independent judgment;

(C) who performs work only under general supervision;

(D) who is paid on a salary or fee basis;

DELISIO MORAN
GERAGHTY & ZOBEL, P.C.

943 WEST 6TH AVENUE
ANCHORAGE, ALASKA
99501-2033
——
(907) 279-9574

(E) who regularly and directly assists a proprietor or an exempt executive employee of the employer; and

(F) who performs work along specialized or technical lines requiring special training, experience or knowledge and does not devote more than 20 percent, or in the case of an employee of a retail or service establishment who earns at least two and one half times the state minimum wage per hour for the first 40 hours of employment each week and who does not devote more than 40 percent of the employee's weekly hours to activities that are not described in this paragraph [.]

8 AAC 15.910(a)(1).

Applying the deposition testimony of Gilbert and his supervisor, Doug Smith, shows that, as a matter of law, Gilbert satisfies each prong of the administrative employee test under the state statute.

> **a. Gilbert's primary duties consisted of work directly related to management policies or supervising the general business operations of the employer.**

The first inquiry to be made under the AWHA is whether Gilbert's primary duties consisted of work directly related to management policies or supervising the general business operations of the employer. The phrase "directly related to management policies or general business operations" is not defined in the AWHA or in the state regulations. The AWHA provides that terms not defined in the AWHA or in regulations adopted under it shall be defined as they are defined in the

DeLisio Moran
Geraghty & Zobel, P.C.

943 West 6th Avenue
Anchorage, Alaska
99501-2033
——
(907) 279-9574

FLSA or regulations adopted under it.  AS 23.10.145. The federal

regulations define the phrase as follows:

(a)  The phrase "directly related to management policies or general business operations of his employer or his employer's customers" describes those types of activities relating to the administrative operations of a business as distinguished from "production" or, in retail or service establishment, "sales" work.  In addition to describing the types of activities, the phrase limits the exemption to persons who perform work of substantial importance to the management or operation of the business of his employer or his employer's customers.

\* \* \*

(c) As used to describe work of substantial importance to the management or operation of the business, <u>the phrase 'directly related to management policies or general business operations' is not limited to persons who participate in the formulation of management policies or in the operation of the business as a whole.  Employees whose work is 'directly related' to management policies or to general business operations include those whose work affects policy or whose responsibility it is to execute or carry it out</u>.  The phrase includes a wide variety of persons who either carry out major assignments in conducting the operations of the business, or whose work affects business operations to a substantial degree, even though their assignments are tasks related to the operation of a particular segment of the business.

\* \* \*

(5)  The test of 'directly related to management policies or general business operations' is also met by many persons <u>employed as advisory specialists</u> and consultants of various kinds, credit managers, <u>safety directors</u>, claim agents and adjusters, wage-rate analysts. . . ., and many others.

(6)  It should be noted in this connection that an employer's volume of activities may make it necessary to employ a number of employees in some of these categories.  The fact that there are a number of other employees of the same employer carrying out

DeLisio Moran
Geraghty & Zobel, P.C.

943 West 6th Avenue
Anchorage, Alaska
99501-2033
———
(907) 279-9574

assignments of the same relative importance or performing identical work does not affect the determination of whether they meet this test so long as the work of each such employee is of substantial importance to the management or operation of the business.

29 CFR § 541.205 (emphasis added).

In a case addressing this issue, <u>Copas v. East Bay Municipal Utility Dist.</u>, 61 F.Supp.2d 1017 (N.D.Cal. 1999), the court concluded that an Occupational Health and Safety Administrator employed with East Bay Municipal Utility District, a publicly owned utility, qualified as an exempt administrative employee reasoning that the evidence showed that his primary duties involved the performance of nonmanual work directly related to the District's general business operations. The court concluded that his work entailed administrative rather than production activity because he served as the District's advisory Specialist on health and safety issues. <u>Id.</u> at 1041. The employee was directly responsible for coordinating and implementing the District's occupational health and safety program and workers' compensation program. His job duties included: informing supervisors and managers in various divisions and departments regarding whether their safety programs were in compliance with the applicable regulations; coordinated and monitored the District's accident prevention program; investigated accidents; analyzed the causes of

DeLisio Moran
Geraghty & Zobel, P.C.

943 West 6th Avenue
Anchorage, Alaska
99501-2033
____
(907) 279-9574

accidents; reviewed accident reports; implemented measures to prevent the recurrence of accidents; secured instructors, equipment, training aids, and facilities for safety training; participated in the presentation of safety training programs; and monitored new developments relating to safety programs and regulations; attended meetings with regulatory agencies; attended workers' compensation appeals board hearings; hired and supervised third-party investigators, evaluated and made recommendations regarding settlement of workers' compensation claims and had some authority to read and sign settlement agreements; monitored claims administrator contract; and coordinated the Employee Assistance Program. Id. 1039-1041.

Likewise, the evidence in this case shows that Gilbert's primary duties mirror those of the safety administrator in the Copas case. The only activity that Gilbert did not perform that Copas performed was to deal with the workers compensation claims except to fill out the report of injury forms and to make reports of injuries to OSHA. Exhibit A at 62-63. Gilbert did all of the other activities involved. Gilbert's work was directly related to management policies regarding safety. One of the major assignments he worked on while a Safety Supervisor was as the coordinator of the rewriting of all of the safety policies for the company. Exhibit A at 85, 101-105. Not only was he

DELISIO MORAN
GERAGHTY & ZOBEL, P.C.

943 WEST 6TH AVENUE
ANCHORAGE, ALASKA
99501-2033

(907) 279-9574

coordinating the writing of the policies, but it was also his responsibility to carry out APC's safety policies.  Exhibit B at 23-25.

In this respect he supervised the general business operations of APC as they related to safety and the HSE Department.

### b.  Gilbert customarily and regularly exercised discretion and independent judgment.

Prong (B) of the state test for an administrative employee is one "who customarily and regularly exercises discretion and independent judgment". Again, none of the phrases contained in the test is defined in the state statute or the regulations. The phrase "discretion and independent judgment" is defined at 29 CFR 541.207(a) and provides, in part:

> (a) In general, the exercise of discretion and independent judgment involves the comparison and the evaluation of possible courses of conduct and acting or making a decision after the various possibilities have been considered. The term as used in the regulations in subpart A of this part, moreover, implies that the person has the authority or power to make an independent choice, free from immediate direction or supervision and with respect to matters of significance.

Further, the regulations expressly state that the exercise of discretion and independent judgment does not require the complete absence of review:

> (1) The term 'discretion and independent' as used in the regulations in Subpart A of this part does not

DELISIO MORAN
GERAGHTY & ZOBEL, P.C.

943 WEST 6TH AVENUE
ANCHORAGE, ALASKA
99501-2033
____
(907) 279-9574

necessarily imply that the decisions made by the employee must have a finality that goes with unlimited authority and a complete absence of review. <u>The decisions made as a result of the exercise of discretion and independent judgment may consist of recommendations for action rather than the actual taking of action</u>. The fact that an employee's decision may be subject to review and that upon occasion the decisions are revised or reversed after review does not mean that the employee is not exercising discretion and independent judgment within the meaning of the regulations in Subpart A of this part. . . .

29 CFR 541.207(e) (emphasis added). The federal regulations also define "customarily and regularly", terms not defined in the state act:

The work of an exempt administrative employee must require the exercise of discretion and independent judgment customarily and regularly. The phrase "customarily and regularly" signifies a frequency which must be greater than occasional but which, of course, may be less than constant. The requirement will be met by the employee who normally and recurrently is called upon to exercise and does exercise discretion and independent judgment in the day-to-day performance of his duties. The requirement is not met by the occasional exercise of discretion and independent judgment.

29 CFR § 541.207(g).

In <u>Brock v. On Shore Quality Control Specialists, Inc.</u>, 1987 WL 31398 (W.D. Tex. 1987), the court was considering the interpretation of this part of the test. The <u>Brock</u> court held that pipeline inspectors were administrative employees exempt from the overtime requirements of the FLSA. Defendants provided pipeline inspection to oil companies that lay oil and gas

DeLisio Moran
Geraghty & Zobel, P.C.

943 West 6th Avenue
Anchorage, Alaska
99501-2033

_____

(907) 279-9574

pipelines and the employees at issue were pipeline inspectors. The duties of the inspectors included: inspecting each weld on the pipeline; reading x-rays to determine if the weld was proper; deciding if a weld passed his inspection; authority to shut down a pipeline construction site if the weather did not permit good welds to be made; test welders to determine if welders were qualified to serve on the pipeline crew; cause consistently bad welders to be dismissed; inspected welds; and oversaw safety practices. No defendant employee oversaw the inspector's work and the inspectors did not check with their home office in order to make a decision. Inspectors did not perform manual labor.

The court concluded that there was no question that the primary duty of all the inspectors at issue consisted of performance of non-manual work directly related to management policies or general business operations of Defendants or of Defendants' customers. Thus, the only issue was whether or not the performance of that primary duty included work requiring the exercise of discretion and independent judgment. The court concluded that "[I]t is readily apparent from the testimony presented at the trial that all the inspectors employed by the Defendants used their independent judgment and discretion to carry out their duties", reasoning as follows:

DeLisio Moran
Geraghty & Zobel, P.C.

943 West 6th Avenue
Anchorage, Alaska
99501-2033
____
(907) 279-9574

104493v3 - Motion For Summary Judgment re: Dismissal of Overtime Claims
4 *Gilbert v. APC Natchiq*, Case No.: 3:03-cv-00174 RRB; Page 21 of 35

Plaintiff's argument that the inspectors merely apply the specifications set by the contract or by a certain prescribed industry standards is not supported by the evidence. Although the inspectors did work pursuant to specifications set by the contract, the evidence showed that their powers included the ability to deviate from those specifications when the situation required. The evidence indicated that on numerous occasions, sometimes on a daily basis, the inspectors deviated from prescribed standards. There is no question from a review of the evidence that the inspectors were not mechanically applying the standards set by prescribed specifications.

Id. at 7. The court rejected the employees' argument that they simply applied the specifications of the code to guide them in their judgments. The court stated that although the code sets out general guidelines for welding of pipes, the code requires the exercise of a great deal of discretion in deciding whether the standards are met. Further, the inspectors decided whether the specifications are applicable to a situation, and made decisions regarding deviating from specifications. Id.

Similarly, Gilbert's job as a safety supervisor required him to regularly exercise discretion and independent judgment. His job required him to analyze, draft and implement Health Safety and Environment policies and procedures (Exhibit A at 34-35, 85, 101-105, 107-18); he supervised six (6) Safety Specialists and directed their work (Id. at 17, 33-34); he managed their schedules, approved timecards and dealt with assignments; (Id. at 61-62; see also Exhibit B at 19); provided

DELISIO MORAN
GERAGHTY & ZOBEL, P.C.

943 WEST 6TH AVENUE
ANCHORAGE, ALASKA
99501-2033

(907) 279-9574

input on hiring decisions (<u>Exhibit A</u> at 61-62, <u>Exhibit B</u> at 17-19); fielded employee complaints (<u>Exhibit A</u> at 81-82); interfaced frequently with clients, even acting as a spokesperson for the company (<u>Id.</u> at 63-64, 96-97); facilitated staff meetings and attended meetings reserved for management only (<u>Id.</u> at 115-116, 135). He did analysis for purchasing of equipment and from whom to make the purchases. <u>Id.</u> at 93. All of these duties require the exercise of independent judgment and discretion and none of this work is done by safety specialists. Gilbert's work focused on directing safety policy and implementing those policies in the field.

Gilbert testified that during his tenure as a Safety Supervisor, a significant portion of his time was spent on coordinating revisions to the PP&G manual. <u>Exhibit A</u> at 85, 107-118. This undertaking required both discretion and independent judgment. <u>Id.</u> at 30. Gilbert evaluated possible courses of conduct and made recommendations for action. <u>Exhibit A</u> at 25, 30, 102, 104-105, 108-112.

Doug Smith's deposition testimony also included a concrete example of the independent judgment exercised by Gilbert in the performance of his duties. <u>Exhibit B</u> at 62. He explained that on a worksite requiring removal of paint, a Specialist would obtain samples to determine if it contained lead or otherwise

DELISIO MORAN
GERAGHTY & ZOBEL, P.C.

943 WEST 6TH AVENUE
ANCHORAGE, ALASKA
99501-2033

(907) 279-9574

posed a health risk. _Id._ Gilbert was then charged with coordination of the samples, analysis of the data and implementation of any necessary safety measures (e.g. respirators). _Id._ Thus, it was up to Gilbert to determine the method and means of best protecting the health and safety of the employees removing the paint.

Gilbert further testified that he interpreted written regulations (CFR's), and wrote policies for their implementation in the field by others. _Exhibit A_ at 30. This required that he use his own independent judgment as to how the regulations would best be implemented in the field. _Id._ Gilbert was required to "interpret data," and his work had potentially significant impact on the health and safety of others. _Id._ at 27-29.

Additionally, he was, at times, responsible for training or assisting with the training of safety employees. _Id._ at 31. He decided what resources to replace and equipment to purchase and from what vendor and at what cost. _Id._ at 86, 88-89. He investigated accidents and created recommendations for accident prevention in the future. _Id._ at 68-81. He advocated for an improvement in the "rescue response available to personnel working at the wash bay" where he felt there was not adequate safety measures in place. _Id._ at 110. He created guidelines for recording and reporting spills using current company

DELISIO MORAN
GERAGHTY & ZOBEL, P.C.

943 WEST 6TH AVENUE
ANCHORAGE, ALASKA
99501-2033
____
(907) 279-9574

activity and applicable regulations to create the guidelines. Id. at 110-112 (Exhibit G-16 to Gilbert deposition).

The evidence shows that Gilbert did not just mechanically apply standards set by prescribed specifications. Gilbert's job required constant exercise of discretion and independent judgment. Thus he meets this prong of the test.

### c. Gilbert performed work only under general supervision.

The third requirement of the state test for an administrative employee is that he must perform his work only under general supervision. Gilbert had significant autonomy and independence in the performance of his job. On a day-to-day basis, Gilbert performed his job duties without direct supervision. Exhibit B at 19, 21. He facilitated meetings, coordinated employee work and acted as the HSE Manager in Doug Smith's absence. Exhibit A at 19-20, 61-62. Smith testified that when he was off rotation or not on the North Slope, Gilbert had authority to make decisions that affected the HSE Department. Exhibit B at 27-28. While serious incidents or accidents may require that Gilbert notify Smith, he had the autonomy to make recommendations and proceed accordingly. Id. He independently investigated accidents and made recommendations to prevent them from occurring in the future. Exhibit A at 68-81. Smith, the Head of the HSE Department at APC testified that

DeLISIO MORAN
GERAGHTY & ZOBEL, P.C.

943 WEST 6TH AVENUE
ANCHORAGE, ALASKA
99501-2033
____
(907) 279-9574

Gilbert was his replacement when he was off of the slope and that he filled the role of HSE manager in his absence. <u>Exhibit B</u> at 14-15. Because Smith was only on the slope four days at a time, Gilbert could potentially be the acting HSE almost half of the time he was on the slope. See <u>Exhibit A,</u> at 43-44; Exhibit G to Deposition.

Gilbert's management and direction of the Safety Specialists also shows that he worked only under general supervision. <u>Exhibit B</u> at 17, 19. Gilbert was not required to clear the Specialists' work schedules or job duties with Smith. <u>Id.</u> at 19. As Smith testified, "it was within [Gilbert's] scope of authority to redirect resources. . . . If we had a job that needed extra assistance from one of the specialists, [he] would have the authority to redirect people . . . " <u>Id.</u> at 18.

There is no evidence that Gilbert had to run management decisions "up the flag pole" before he could take action. He had discretion and autonomy, and, accordingly, worked under general supervision.

### d.  Gilbert was paid on a "salary basis"

The fourth requirement that must be met under the state test is that Gilbert must be paid on a salary or fee basis. The term "salary" is defined at 15 AAC 15.910(a)(22) as "a fixed and recurring amount of money constituting all or part of an exempt

DELISIO MORAN
GERAGHTY & ZOBEL, P.C.

943 WEST 6TH AVENUE
ANCHORAGE, ALASKA
99501-2033

(907) 279-9574

employee's compensation, which amount is not subject to reduction because of variations in the quality or quantity of the work performed." Gilbert was paid between $325 and $425 per day throughout his employment as a supervisor, regardless of the number of hours worked. Thus, the day rate paid Gilbert falls within the definition of "salary."

### e. Gilbert regularly and directly assisted an exempt executive employee of APC.

Subpart (E) of the test requires that Gilbert be found to have regularly assisted an exempt employee of the employer. There is little question that Gilbert's position meets this requirement. As a Safety Supervisor, Gilbert regularly and directly assisted Doug Smith, an exempt executive employee. Smith was Gilbert's supervisor in the chain of command and was exempt as an executive employee. Exhibit B at 5; Exhibit A at 57. Smith looked to the Supervisor to be the second in command, to know what the Specialists were doing on a day-to-day basis, and to direct their work and location depending upon the needs of the company and the client. Exhibit B at 21. Gilbert's duties on a day-to-day basis were to serve as a "second tier supervisor" in the HSE department. Id. His job expectations were that he would assist in "formulat[ing] a better department, and provide . . . direction and oversight and growth in the department from procedure writing to employee development." Id.

DeLisio Moran
Geraghty & Zobel, P.C.

943 West 6th Avenue
Anchorage, Alaska
99501-2033
_____
(907) 279-9574

at 22. Smith had the authority to hire, fire or discipline employees and Gilbert provided input in such matters. Gilbert also acted in Smith's position when Doug Smith was off of the slope. His job was directly one of assisting Doug Smith, an exempt employee.

> **f.  Gilbert performed work along specialized or technical lines requiring special training, experience and knowledge.**

The last requirement to be met in the analysis of Gilbert's position of safety supervisor is whether he performed work along specialized or technical lines requiring special training, experience and knowledge. Gilbert is well educated, having a B.S. in Environmental Engineering from Montana College of Mineral Science and Technology, and a Masters of Science in Mining Engineering from Montana School of Mines. <u>Exhibit A</u> at 10. In addition, Gilbert has completed numerous health, safety and environmental training classes applicable to his job as a Safety Specialist. <u>Id.</u> at 17. These classes cumulatively included over 80 hours of course work, and covered issues such as OSHA courses, Hazardous waste removal courses and hazardous waste supervisor classes. <u>Id</u>. Gilbert had six years experience in safety related positions prior to beginning work with APC. <u>Id.</u> at 20. Gilbert himself testified that the Safety Supervisor position required specialized training and knowledge. <u>Id.</u> at

DELISIO MORAN
GERAGHTY & ZOBEL, P.C.

943 WEST 6TH AVENUE
ANCHORAGE, ALASKA
99501-2033

_____

(907) 279-9574

26-27.  Thus, there is no question of fact that Gilbert meets the prong of the administrative employee exemption requiring work along specialized or technical lines.

> **g.  Gilbert did not devote more than 20 percent of his weekly activities to non-exempt work.**

The final part of the test for the state classification is that Gilbert did not work more than 20 percent of his weekly activities in performing non-exempt work. Gilbert claims, without support, that more than 20 percent of his activities were spend on non-exempt work.  <u>Exhibit A</u> at 146.  "Mere allegations" are insufficient to defeat summary judgment. <u>Gasaway v. Northwestern Mutual Life Ins. Co.</u>, 26 F.3d 957, 960 (9th Cir. 1994); <u>Blue v. Widnall</u>, 162 F.3d 541, 546 (9th Cir. 1998) (holding that plaintiff's mere assertions that his qualifications were superior to those of applicant ultimately selected for position are insufficient to raise issue of pretext sufficient to defeat summary judgment on his claim of discrimination); <u>see</u> <u>also</u> <u>Seshadri v. Kasrian</u>, 130 F.3d 798, 802 (7th Cir. 1997)("Testimony can and should be rejected without a trial if, in the circumstances, no reasonable person would believe it.").  Gilbert's conclusory assertion that he spent more than 20% of his time on non-exempt work is contrary to his testimony and the specific examples given of his job duties.

The fact that Gilbert occasionally performed the work of a Safety Specialist does not defeat his exempt status.  While

DeLisio Moran
Geraghty & Zobel, P.C.

943 West 6th Avenue
Anchorage, Alaska
99501-2033

(907) 279-9574

occasionally called upon to perform job duties of a Specialist, Gilbert did not perform manual work. This work occurred only when they were short staffed or the nature of the job required his expertise or additional hands to complete the activity.

Gilbert testified that the PP&G manual was a significant project that required a lot of his time. Exhibit A at 85, 107-118. When asked about his specific job duties he talked about formulating policy, creating spreadsheets, purchasing equipment, monitoring incidents and accidents, analyzing and implementing regulations, interpreting data, directing and supervising six specialists. Exhibit A at 68-81, 85, 88-89, 107-118; Exhibit B at 15-16.

Gilbert further testified that the Safety Supervisor position was separate and apart from the Specialist position that needed to be filled. Exhibit A at 41. He testified that it required him "to be in the office to respond to the Kaparuk project." Id. at 40. As a supervisor, he attended meetings that Specialists did not routinely attend and facilitated meetings. Id. at 115-116, 135.

Gilbert's conclusory testimony that he spent more than 20% of his time on non-manual work is conclusory and not credible. The specific examples of his work requirements and duties simply do not leave enough time for him to spend more than 20% of his time on non-exempt work. Smith testified that in his opinion Gilbert would not be spending more than 20% of his time performing non-exempt work. Exhibit B at 50-51. When Smith did an

DELISIO MORAN
GERAGHTY & ZOBEL, P.C.

943 WEST 6TH AVENUE
ANCHORAGE, ALASKA
99501-2033
____
(907) 279-9574

analysis of the position to determine that it was exempt, one of the largest component's he considered was the period of time that the person holding the position would routinely perform non-exempt work. Id. His opinion was that the position did not require that Gilbert spend more than 20% of his time doing non-exempt work. Id. The safety specialist would not routinely perform specialist work. Id. at 15. The only time that a supervisor would do specialist work was when there was a need for back-up in the field or if there was excess work that was required to be done now and there was no specialist physically present who could do it. Id. On those occasions even Mr. Smith would respond and perform specialist work. Id. However, this was not a regular part of the job and was considered to be non-routine. Id.

Gilbert's testimony is an unsupported allegation that does not raise an issue of fact. Whereas, the facts revealed in Gilbert and Smith's testimony demonstrates that this prong of the administrative exemption test is satisfied.

**2. Gilbert's work duties satisfy the FLSA definition of an administrative employee.**

The FLSA's definition of a bona fide "administrative" employee is similar to the AWHA definition. The FLSA defines administrative employee as any employee:

(a) Whose primary duty consists of either:

(1) The performance of office or nonmanual work directly related to management policies or general business operations of his employer or his employer's customers, . . .

DeLisio Moran
Geraghty & Zobel, P.C.

943 West 6th Avenue
Anchorage, Alaska
99501-2033

(907) 279-9574

(b) Who customarily and regularly exercises discretion and independent judgment; and

(c)(1) Who regularly and directly assists a proprietor, or an employee employed in a bona fide executive or administrative capacity (as such terms are defined in the regulations of this subpart), or

(2) Who performs under only general supervision work along specialized or technical lines requiring special training, experience, or knowledge, or

(3) Who executes under only general supervision special assignments and tasks; and

(d) Who does not devote more than 20 percent. . .of his hours worked in the workweek to activities which are not directly and closely related to the performance of the work described in paragraphs (a) through (c) of this section; and

(e) Who is compensated for his services on a salary or fee basis at a rate of not less that $155 per week. . . .

(2) Provided, That an employee who is compensated on a salary or fee basis at a rate of not less than $250 per week. . .and whose primary duty consists of the performance of work described in paragraph (a) of this section, which includes work requiring the exercise of discretion and independent judgment, shall be deemed to meet all the requirements of this section.

29 CFR § 541.2. Section 541.2(e)(2) sets forth the "short test" which is applicable to high-salaried employees, such as Gilbert. Under the short test, the employee's primary duty must consist of the performance of office or nonmanual work directly related to management policies or general business operations of his employer or his employer's customers and the employee's job must include work requiring the exercise of discretion and

DeLisio Moran
Geraghty & Zobel, P.C.

943 West 6th Avenue
Anchorage, Alaska
99501-2033

(907) 279-9574

independent judgment. Examples of administrative employees include "credit managers, purchasing agents, buyers, <u>safety directors</u>, personnel directors, and labor relations directors." 29 CFR 541.201(a)(2)(ii) (emphasis added). The federal regulations specifically include "providing for the safety of the men and the property" as exempt work when performed by an employee in the management of his department. 29 CFR § 541.102(b).

Here, application of the undisputed facts discussed above to the FLSA "long" and "short" test shows that Gilbert was properly classified as an administrative employee exempt from overtime. To resolve any question, however, APC applies the facts to the short test.

Under 29 CFR § 541.2(e)(2), the FLSA "short test", Gilbert was an administrative employee if he was compensated on a salary or fee basis at a rate of not less than $250 per week, and he primarily performed work requiring the exercise of discretion and independent judgment. It is undisputed that Gilbert earned more than $250 per week. In fact, payroll records show that he earned approximately $80,000 per year. Additionally, Gilbert himself testified that his work required independent judgment. <u>Exhibit A</u> at 30. The plethora of facts noted above further show his independence and discretion in making decisions within the HSE Department. Gilbert was second-in-command when Smith was

DELISIO MORAN
GERAGHTY & ZOBEL, P.C.

943 WEST 6TH AVENUE
ANCHORAGE, ALASKA
99501-2033
——
(907) 279-9574

absent; he supervised and directed the Specialists; he analyzed and implemented regulations; he made decisions regarding needed equipment and its purchase, he drafted policy, he set agendas for and facilitated meetings; and was a direct contact for clients.  All of these duties required independent discretion and judgment, and were performed under only general supervision.

Thus, Gilbert satisfies the FLSA's "short test" and is exempt from overtime.  APC, therefore, requests that the court grant summary dismissing Gilbert's overtime claims.

## V.  CONCLUSION

Gilbert's testimony and the testimony of Doug Smith shows that Gilbert was properly classified as exempt from overtime. APC, therefore, requests that this court grant summary judgment dismissing his overtime claims under the AWHA and FLSA.

DATED this 4th day of August, 2006, at Anchorage, Alaska.

DeLISIO MORAN GERAGHTY & ZOBEL, P.C.
Attorneys for APC Natchiq, Inc.

/s/ Patricia L. Zobel
By: _____
Patricia L. Zobel
Bar No. 7906067

DELISIO MORAN
GERAGHTY & ZOBEL, P.C.

943 WEST 6TH AVENUE
ANCHORAGE, ALASKA
99501-2033
____
(907) 279-9574

E-Mail: pzobel@dmgz.com
Danielle M. Ryman
Bar No. 9911071
E-Mail: dryman@dmgz.com
943 West 6th Avenue
Anchorage, Alaska 99501
Telephone: (907) 279-9574
Facsimile: (907) 276-4231


This is to certify that a true copy of the
foregoing was served via electronic service
or U.S. Mail this 4th day of August, 2006,
to the following:

Kenneth L. Covell
712 8th Avenue
Fairbanks, AK 99701


By: ____/s/ Jean K. Adams_____
        Jean K. Adams

DELISIO MORAN
GERAGHTY & ZOBEL, P.C.

943 WEST 6TH AVENUE
ANCHORAGE, ALASKA
99501-2033
——
(907) 279-9574