JOHN GILBERT vs. APC NATCHIQ, INC.
CASE NO. 3:03-CV-00174-RRB

DEPOSITION OF JOHN D. GILBERT
MAY 31, 2006

Page 1

```
 1              IN THE UNITED STATES DISTRICT COURT
 2                   FOR THE DISTRICT OF ALASKA
 3
    JOHN GILBERT,                )
 4                               )
            Plaintiff,            )
 5                               )
    v.                           )
 6                               )
    APC NATCHIQ, INC.,           )
 7                               )
            Defendant.            )
 8  _____)   Case No. 3:03-CV-00174-RRB
 9
                   DEPOSITION OF JOHN D. GILBERT
10                        June 7, 2006
11  APPEARANCES:
12          FOR THE PLAINTIFF:     MR. KENNETH L. COVELL
                                   Attorney at Law
13                                 712 West 8th Avenue
                                   Fairbanks, Alaska  99701
14                                 (907)  452-4377
15
            FOR THE DEFENDANT:     MS. PATRICIA ZOBEL
16                                 DeLisio Moran Geraghty
                                      & Zobel, P.C.
17                                 Attorneys at Law
                                   943 West 6th Avenue
18                                 Anchorage, Alaska  99501
                                   (907)  279-9574
19
            ALSO PRESENT:          MR. DOUGLAS SMITH
20
21                             *  *  *  *
22
23
24
25                                          EXHIBIT  A
```

JOHN GILBERT vs. APC NATCHIQ, INC.
CASE NO. 3:03-CV-00174-RRB

DEPOSITION OF JOHN D. GILBERT
MAY 31, 2006

Page 2

```
 1      PURSUANT TO NOTICE, the Deposition of JOHN D. GILBERT
 2   was taken on behalf of the Defendant before Cheri Tabor, Notary
 3   Public in and for the State of Alaska and Reporter for Metro
 4   Court Reporting, at DeLisio Moran Geraghty & Zobel, P.C., 943
 5   West 6th Avenue, Anchorage, Alaska 99501, on the 31st day of
 6   May 2006, commencing at the hour of 9:07 a.m.
 7                              * * * *
 8                      TABLE OF CONTENTS
 9   Direct Examination by Ms. Zobel .......... 5
     Cross Examination by Mr. Covell .......... 152
10   Redirect Examination by Ms. Zobel ........ 163
     Recross Examination by Mr. Covell ........ 165
11
12
     EXHIBITS
13
      G-1 - John Gilbert's resume ............. 9
14    G-2 - Safety supervisor job description ..... 32
      G-3 - Shift calendar ................ 44
15    G-4 - Slope pay calculator ............ 45
      G-5 - Kuparuk River Unit
16          Organizational Chart ............ 56
      G-6 - Senior Staff Meeting Agenda ........ 64
17    G-7 - Change out memorandum ............ 67
      G-8 - Instrument replacement analysis ....... 87
18    G-9 - Letter to Mr. Gilbert from Dr. Ellis,
            dated May 16, 2002 ............ 89
19    G-10 - Letter to Mr. Gilbert from Mr. Irish,
             dated May 14, 2002 ............ 91
20    G-11 - Memorandum concerning sampling cost
             dated Mar. 9, 2003 ............ 92
21    G-12 - Memorandum to APC Safety Specialists
             dated Feb. 16, 2002 ........... 102
22    G-13 - Excerpt, NORM Testing and Reporting
             Procedure .................. 103
23    G-14 - Suspended Personnel Platform Lifting
             Procedures Form .............. 105
24    G-15 - Handwritten notes ............. 111
      G-16 - Memorandum to APC HSET Department
25           - Kuparuk, dated Feb. 17, 2002 ...... 113
```

Page 3

```
 1    G-17 - HSET Action Item Log .......... 113
      G-18 - Weekly Supervisor's Meetings Minutes ... 115
 2    G-19 - Level 4/3 Incident Investigation
            Follow-up Report, dated June 8, 2002 ... 117
 3    G-20 - Handwritten notes ............. 118
      G-21 - Proposed hourly rate computations ..... 120
 4    G-22 - HSET Staff Meeting ............ 120
      G-23 - Memorandum to APC - Natchiq HSET
 5          Department, dated June 18, 2002 ..... 124
      G-24 - Memorandum to APC Safety Specialists,
 6          dated Feb. 16, 2002 ........... 129
      G-25 - Post-Job Contractor Evaluation ...... 129
 7    G-26 - APC HSET Staff ............... 134
      G-27 - APC HSET Staff ............... 134
 8    G-28 - Memorandum concerning exposure monitoring
            results, dated Feb. 10, 2003 ....... 140
 9    G-29 - Audiometric Test Documentation Procedures . 144
      G-30 - Memorandum concerning APC 624 construction
10          internal review 2001 action log,
            dated Mar. 16, 2002 ........... 145
11
                              * * * *
12
13
14
15
16
17
18
19
20
21
22
23
24
25
```

Page 4

```
 1                    P R O C E E D I N G S
 2         (On record)
 3         COURT REPORTER: My name is Cheri Tabor and I'm
 4   a court reporter for Metro Court Reporting in Anchorage,
 5   Alaska. Today's date is May 31, 2006, and the time is
 6   approximately 9:07 a.m. We are at the offices of DeLisio Moran
 7   Geraghty & Zobel, P.C., 943 West 6th Avenue, Anchorage, Alaska
 8   99501 for the deposition of John Gilbert. This case is in the
 9   United States District Court for the District of Alaska, in the
10   matter of Gilbert v. APC, Case No. 3:03-CV-00174 RRB.
11         Mr. Gilbert, would you please raise your right hand?
12         (Oath administered)
13         MR. GILBERT: I do.
14                    JOHN D. GILBERT
15   having first been duly sworn under Oath, testified as follows
16   on examination:
17         COURT REPORTER: Thank you. Please state your
18   full name and spell your last name for the record.
19   A     John D. Gilbert, G-i-l-b-e-r-t.
20         COURT REPORTER: May I please have your mailing
21   address?
22   A     3291 East 500 North in Lewisville, Idaho 83431.
23         COURT REPORTER: Okay. And I also need a
24   daytime or message telephone number for you.
25   A     208-754-4098.
```

Page 5

```
 1         COURT REPORTER: All right. Thank you.
 2   Counsel would you please identify yourselves and who you
 3   represent?
 4         MR. COVELL: Kenneth Covell for Mr. Gilbert.
 5         MS. ZOBEL: And I'm Patricia Zobel here on
 6   behalf of APC Natchiq and Doug Smith who is a representative of
 7   the company is present.
 8         COURT REPORTER: All right. Thank you. You
 9   may proceed.
10                    DIRECT EXAMINATION
11   BY MS. ZOBEL:
12   Q     Yes, Mr. Gilbert, good morning.
13   A     Good morning.
14   Q     We're going to be doing a series of questions regarding
15         your claim for wage and hour. You understand that's
16         the purpose for you being here today, do you not?
17   A     Correct.
18   Q     Okay. The court reporter started to give you a bunch
19         of what I call rules of the road and I'll do those
20         myself here on the record and if she wants to add any I
21         would invite her to do so. The first is that she is
22         recording that which you respond to my questions so you
23         must be sure that your answers are audible, that you
24         answer verbally. Nodding doesn't pick up on the tape
25         recording, do you understand that?
```

JOHN GILBERT vs. APC NATCHIQ, INC.
CASE NO. 3:03-CV-00174-RRB

DEPOSITION OF JOHN D. GILBERT
MAY 31, 2006

Page 6

1  A   Yes, I do.
2  Q   Okay, good. To the extent that you're able to answer
3      yes or no, please do so as opposed to uh-huh or unh-
4      unh. Those can be misunderstood when they are
5      transcribed as to whether it was affirmative or
6      negative.
7  A   Very good.
8  Q   Okay. Also I'm not asking you to guess. To the extent
9      that you recall, please answer my questions. If you
10     have a question about the question I'm asking you, if
11     you don't understand, tell me so. I will repeat it, or
12     I will try and break it down so that it's easier for
13     you to answer. All right?
14 A   Very good.
15 Q   All right. If you want to break let me know, and we'll
16     take a break. Your counsel is present, you have the
17     right to discuss questions with counsel before
18     answering, however, I will note it for the record that
19     you are leaving to discuss with counsel before you
20     answer a particular question. And that's in the record
21     for whatever it's worth. But we will take breaks if
22     you'd like to do so, and just let me know.
23 A   Okay.
24 Q   I'm not trying to make this a marathon. That's one of
25     the differences when you have a woman doing it.

Page 7

1       MS. ZOBEL: Yes, counsel, you look like you
2   have a question.
3       MR. COVELL: One other thing, she might ask you
4   a question and I might object. Okay? At that point, wait
5   until I state my objection and as a general proposition,
6   whether or not I object, you still have to answer the question.
7   I may -- I doubt it, but I may direct you not to answer the
8   question. If we do then, she and I might have a conversation
9   on the record. But.....
10 A    Okay.
11      MR. COVELL: You just wait until we get done,
12  and then you can look at either of us, and probably one of us
13  will say go and answer the question.
14      MS. ZOBEL: Go ahead and answer the question,
15  yes.
16 Q    (By Ms. Zobel) The most important rule is that we do
17     not talk on top of each other. I will try to give you
18     the courtesy of allowing you to complete your answer
19     before I ask my next question. And if you will not
20     anticipate what I'm asking you, but will let me finish
21     the question, we will get a question answer, question
22     answer and the record will be far easier to understand
23     and the court reporter will thank us at the end of the
24     day.
25 A    Okay.

Page 8

1  Q   All right. Before we begin do you have any questions?
2  A   No, I have no questions.
3  Q   All right. Do you feel competent to go through this
4      deposition today?
5  A   Yes, I do.
6  Q   And you've not taken any substances that would affect
7      your ability to understand or answer my questions?
8  A   No, I have not.
9  Q   All right. Mr. Gilbert, your full name, could you give
10     that again for the record?
11 A   John David Gilbert.
12 Q   And you've already given us your address, how long have
13     you lived in Lewisville, Idaho?
14 A   Approximately two years.
15 Q   And your date of birth?
16 A   12/07 of 1963.
17 Q   And your Social Security Number?
18 A   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.
19 Q   And are you married?
20 A   Yes, I am.
21 Q   And do you have dependents?
22 A   Yes, I do.
23 Q   How many?
24 A   Two.
25 Q   Okay. And this is a test, what was the date of your

Page 9

1   marriage?
2  A   That is a test. I was married in 2000 -- July 15th of
3      2000.
4  Q   Okay. I'm going to show you your resume which may make
5      this simpler to deal with. Somehow we've ended up with
6      one page of three. Excuse me counsel.
7      (Off record)
8      (On record)
9       MR. COVELL: I can just look over his shoulder.
10      MS. ZOBEL: Actually what the problem is I have
11  page one, two and three I do not have.
12      MR. COVELL: Okay. Let's give this to the
13  court reporter, she can go ahead and mark that section.
14          (Deposition Exhibit G-1 marked)
15 Q   (By Ms. Zobel) Mr. Gilbert you graduated from high
16     school, correct?
17 A   Yes, I did.
18 Q   What year?
19 A   1982.
20 Q   And you received a high school diploma?
21 A   Yes.
22 Q   And where was that?
23 A   That was at Cortez High School in Phoenix, Arizona.
24 Q   And according to this page --
25      MS. ZOBEL: Have you marked the first sheet?

3 (Pages 6 to 9)

Case 3:03-cv-00174-RRB    Document 38-2    Filed 08/04/2006    Page 4 of 9

JOHN GILBERT vs. APC NATCHIQ, INC.
CASE NO. 3:03-CV-00174-RRB

DEPOSITION OF JOHN D. GILBERT
MAY 31, 2006

Page 10

```
1       COURT REPORTER: Yes.
2       MS. ZOBEL: You may keep the second sheet.
3       COURT REPORTER: All right.
4       MS. ZOBEL: Just for reference. I'm going to
5  show you what's been marked as Exhibit 1, it's the first page
6  of three that will be Exhibit 1 and G-1 I believe is the way we
7  have agreed to do these.
8       COURT REPORTER: Yes.
9       MR. COVELL: Right.
10      COURT REPORTER: Thank you.
11      MS. ZOBEL: Here are the pages, Doug.
12 Q   (By Ms. Zobel) According to page one, you attended
13     Montana Tech -- let's see Glendale Community College
14     first, correct?
15 A   Correct.
16 Q   And eventually you received your B.S. in Environmental
17     Engineering in 1994?
18 A   Correct.
19 Q   And that was from where?
20 A   That's Montana College of Mineral Science and
21     Technology.
22 Q   Okay. And then you received a Masters, is that from
23     the same school, or is that.....
24 A   That's correct, it's the same school. They just had a
25     name change. It's formally known as the Montana School
```

Page 11

```
1      of Mines.
2 Q    Okay.
3      MS. ZOBEL: Let's stop for one second. We do
4  not need to have page two and three separately marked. We just
5  want to be sure everybody now has three pages, and they should
6  be marked at the bottom APC0013 through -- or 12, 13, and 14.
7  Okay.
8 A    Okay.
9      MS. ZOBEL: And I'll get us a stapler at a
10 break. Okay. Having had our first snafu, we can now move on
11 hopefully.
12 Q   (By Ms. Zobel) John this was what you gave to APC.
13     Have you an updated CV with you maybe?
14 A   I do not have an updated one with me. I do have an
15     updated version, I just don't have one with me.
16 Q   And this would have ended with your job prior to going
17     to work at APC, is that correct?
18 A   Correct.
19 Q   And that was -- can you pronounce the mining company
20     for me?
21 A   Hecla.....
22 Q   Hecla.
23 A   .....Mining Company.
24 Q   Okay. Tell me what you did with Hecla?
25 A   I was basically a mine engineer for the company and
```

Page 12

```
1      primarily taking care of reclamation of the closed down
2      gold mine and in addition to that I took care of the
3      overall health and safety responsibilities for the
4      employees at the mine.
5 Q    Okay. In addition to the degrees that you have listed,
6      on the last page, page 14, you have specialized
7      training.....
8 A    Uh-huh (affirmative).
9 Q    .....that is listed?
10 A   Uh-huh (affirmative).
11 Q   And you have certifications in a number of different
12     areas. Could you, just for the record, tell us what
13     the certifications are? Professional certifications --
14     I don't want just the training you've had, I want the
15     actual certifications.
16 A   I actually have no professional certifications. I have
17     -- was pursing my CSP and have since stopped pursuing
18     it.
19 Q   Okay.
20 A   I have no professional certifications whatsoever.
21 Q   All right. In pursuing your certification as a
22     certified safety professional, how many hours do you
23     think you've put in?
24 A   Not many. Eighty.
25 Q   Okay.
```

Page 13

```
1 A    A couple of weeks.
2 Q    Okay. And was that classroom?
3 A    No.
4 Q    What was it?
5 A    Self-study.
6 Q    What would you have to do to complete that?
7 A    Oh, give them a bunch more money now that my first go
8      around has expired and then start studying again.
9      Probably put in half a year maybe, I don't know what it
10     would take now. It would take considerable effort.
11 Q   Okay. And looking at your education and background,
12     the AAS in quality control technology, explain to me
13     what that is?
14 A   That's a two-year associates degree in quality control
15     technology. And, basically, there was a time in my
16     life I thought I was going to be building missiles for
17     the military, I was going to be a quality inspector for
18     them and changed direction.
19 Q   And the direction you changed was what?
20 A   Into environmental engineering on the civil side.
21 Q   Tell me what is entitled (ph) in environmental
22     engineering and don't just say environmental
23     engineering, tell me what that is?
24 A   Environmental engineering is primarily as perceived as
25     cleaning up air, water, soil, chemicals, spills of any
```

4 (Pages 10 to 13)

JOHN GILBERT vs. APC NATCHIQ, INC.
CASE NO. 3:03-CV-00174-RRB

DEPOSITION OF JOHN D. GILBERT
MAY 31, 2006

Page 14

1  nature. Primarily, my focus was acid rock drainage in
2  the mining industry which is the natural development of
3  sulfite and acidic waters from sulfite materials.
4  Q  Okay. In that course of study did you have courses
5     that would train you in monitoring air, water, et
6     cetera?
7  A  Yes, I did.
8  Q  Okay. And how about any kind of courses in chemistry
9     that would allow you to understand the significance of
10    the testing that you would be doing?
11 A  Yes, I took chemistry courses.
12 Q  Okay. And do you think that's translatable into the
13    kind of work that you were doing as a specialist -- as
14    a specialist at APC?
15 A  Yes. The school I went to, Montana Tech, also has one
16    of the better safety programs around. And the
17    education you get in the environmental field and the
18    safety field is pretty much hand in hand up until about
19    the beginning or the middle of your third year, at
20    which time you break off. So the chemistry courses for
21    environmental engineering and the chemistry courses for
22    the safety program are -- are pretty much identical up
23    to that point. So, yes, is the answer to your
24    question.
25 Q  So they're applicable then?

Page 15

1  A  They're applicable.
2  Q  Right. Within the course of study that you did, in
3     your undergraduate degree, what percentage of them
4     would have been associated with safety training --
5     safety monitoring, safety training, things that you
6     feel were applicable to your safety specialist job or
7     your safety supervisor job?
8  A  Just the general courses would be applicable. In other
9     words, general chemistry, general math, general
10    physics. On the high end there may have been some air
11    monitoring courses that I took that would be
12    applicable.
13 Q  Okay.
14 A  Although, on the environmental side, it's typically
15    engross. In other words, you're sampling for the
16    masses and not for a single individual that you would
17    sample for in the safety specialist position.
18 Q  Okay. And at Montana tech, your M.S., your emphasis
19    was -- it says mineral waste treatment emphasis?
20 A  Engineering.
21 Q  Or in mine, I see.
22 A  Mine and mineral waste treatment emphasis.
23 Q  Okay.
24 A  And that was again to become more specialized in the
25    cleanup of acid rock drainage, mining solutions.

Page 16

1  Q  What brought you to the Slope since you were a mine
2     guy?
3  A  I got a call from a friend of mine that worked up there
4     and they were looking for an individual to come up and
5     it was a place I'd always wanted to work, and just
6     visit, and go to. So the opportunity presented itself
7     and I went.
8  Q  Okay. In terms of your M.S., how long did it take you
9     to get it?
10 A  Eighteen months.
11 Q  And within that particular program do you have to do a
12    thesis?
13 A  I chose the non-thesis route.
14 Q  And do you have to do any kind of testing or anything
15    in order -- orals -- to get the degree?
16 A  Yes. Oh, yes.
17 Q  And what did those entail? What were the areas?
18 A  It was all mining related.
19 Q  Okay.
20 A  And I think I had a week's worth of oral boards and
21    some high level testing.
22 Q  Was any of it safety related?
23 A  No.
24 Q  Now, within the safety field what, if any, training
25    have you had that would be specialized towards safety?

Page 17

1  A  The only specialized training I really had is probably
2     the 40-hour HAZWOPER class, the 8-hour HAZWOPER, I
3     think they still call it the HAZWOP supervisor class,
4     safety related in the mining industry is the MSHA
5     training. It's an annual certification. I've had --
6     these are all, you know, one week or less classes. I
7     also have a 30-hour OSHA course.
8  Q  Okay. Is it under the most recent or under the prior
9     version of OSHA?
10 A  That's the most recent version.
11 Q  It changed in 2002, so did you have training in both?
12 A  It was -- it was prior or excuse me post-2002.
13 Q  Okay. And that was specific to your job as a safety
14    supervisor?
15 A  Even though I'm not necessarily.....
16 Q  Well you were employed during that time?
17 A  Yes, I was employed during that time.
18 Q  With APC?
19 A  With APC, yes. I think that's the class Doug sent me
20    to.
21 Q  Okay.
22 A  In Anchorage.
23 Q  All right. What is radiological worker one and two?
24 A  Those are classes that allow you to go to work in a
25    radiological area such as, you know, some of the

Case 3:03-cv-00174-RRB    Document 38-2    Filed 08/04/2006    Page 6 of 9

JOHN GILBERT vs. APC NATCHIQ, INC.
CASE NO. 3:03-CV-00174-RRB

DEPOSITION OF JOHN D. GILBERT
MAY 31, 2006

Page 18

1  national labs. Like where I currently work you have to
2  have radiological one and radiological two training in
3  order to work there.
4  Q  And the training teaches you safety and how to deal
5     with it?
6  A  Correct.
7  Q  Okay. And you had that.....
8  A  Evacuation procedures and so forth.
9  Q  And Geoprobe, what is that?
10 A  That's just a small drilling rig. It allows you to do
11    subsurface sampling of soil and water. It's a tract
12    drilling rig is all it is.
13 Q  Okay. At the time that you came to work with APC as a
14    safety specialist, which would have been back in
15    January of '01, did you believe that you had the
16    qualifications to work as a safety specialist as
17    described by APC?
18 A  I did after they hired me. Yes -- yes, I did.
19 Q  Okay. Did you feel competent in carrying out the job
20    in a safe and competent and professional manner?
21 A  Yes.
22 Q  Okay. And you feel that you had had the prior
23    training, or they provided you with the training
24    necessary in order to do that?
25 A  I felt that I probably had enough background to do it

Page 19

1  from my previous jobs.
2  Q  Okay. How about the safety supervisor position after
3     working for APC and with your background, did you
4     believe that you had the background and education to be
5     able to carry out the responsibilities of that
6     position?
7  A  Yes. I don't believe that the responsibilities of that
8     position were any different than the responsibilities
9     of the safety specialist.
10 Q  Okay. Do you think it's the same job?
11 A  Pretty close. Yes, any of the safety specialists could
12    have done the same job that I was doing as the safety
13    supervisor. And, in fact, we did at times rotate
14    through and other guys filled in. So I think it was
15    just an equal level job with maybe a few more caveats
16    thrown in.
17 Q  Why do you think you were paid over $100.00 a day more?
18 A  That, I don't know. I think I was doing a good job for
19    them. I don't know why they paid me $100.00 more a
20    day.
21 Q  You didn't mind did you?
22 A  Heck, no.
23 Q  Okay. Do you believe that in carrying out your
24    position as a safety supervisor that you used your
25    education and background and training?

Page 20

1  A  Not in the engineering side I didn't.
2  Q  Okay.
3  A  In fact, I used my background from the safety work that
4     I had done previously, for sure.
5  Q  Okay. How many years of education would you estimate
6     that you have?
7  A  Too many. I have probably, let's see, at least I'd say
8     nine years.
9  Q  Of upper education?
10 A  Correct.
11 Q  After high school?
12 A  Yes.
13 Q  So if we add 12 to that, you've got 21 years?
14 A  A lot.
15 Q  And how many years do you estimate that prior to going
16    to work for APC you had been working in positions that
17    had some responsibilities regarding safety?
18 A  Those would have started in 1995 with PDC Engineers.
19 Q  Looking at the job before '95 with Westinghouse, that
20    looks like you're doing some sort of testing, were you
21    not? Water, corrosion, inspection of water stored
22    nuclear fuel.
23 A  Uh-huh (affirmative).
24 Q  Is that a health and safety issue?
25 A  No.

Page 21

1  Q  All right. How about the internship that you did, set
2     up a chemical inventory report for hazardous
3     substances?
4  A  No.
5  Q  That's not a safety issue?
6  A  No, it's not.
7  Q  Is that knowledge though that's important for somebody
8     in safety to know in terms of hazardous substances --
9     an inventory?
10 A  Oh, yes. Definitely.
11 Q  Okay. So that's applicable to the work that you
12    subsequently did?
13 A  Well in this particular case it was all environmentally
14    related strictly for the CERCLA and RECLA subsections,
15    and I had no interaction with the safety department at
16    the mine.
17 Q  Okay. Beginning in '95 you did -- in your jobs you did
18    have contact and interface with health and safety?
19 A  Yes, strictly from the standpoint we had guess working
20    out in the field. So we had to go out and, you know,
21    apply the OSHA regulations to the guys doing the
22    construction out there. So we just assisted in that.
23    It was a small group of guys. So there was several of
24    us that were out there, you know, taking part in that.
25 Q  That's the PDC Engineers group that you're specifically

Case 3:03-cv-00174-RRB   Document 38-2   Filed 03/04/2006   Page 7 of 9

JOHN GILBERT vs. APC NATCHIQ, INC.
CASE NO. 3:03-CV-00174-RRB

DEPOSITION OF JOHN D. GILBERT
MAY 31, 2006

Page 22

1   talking about?
2  A   Correct.
3  Q   Now with Aspen Creek, it says that you did water system
4      design, water sampling and analysis. You did
5      permitting and control system design, industrial
6      ventilation design, water and soil remediation, all of
7      that has to do, or does it not, with sampling and being
8      aware of what is present in the environment and setting
9      up a system to contain it?
10 A   Correct.
11 Q   Okay. And that would also be applicable to the work
12     that you would do as a safety supervisor, would it not?
13 A   Not in this case, it would not. This was all directly
14     related to pollution control and reclamation, soil
15     stability. I'm trying to remember which design I did
16     for the ventilation system, but it's not coming back to
17     me right now.
18 Q   Well the department you worked in was Health, Safety
19     and Environment, correct?
20 A   Correct.
21 Q   And they were within your concerns over spills, were
22     there not?
23 A   Yes.
24 Q   And there were concerns over leaks of chemicals into
25     the atmosphere, correct?

Page 23

1  A   Yes.
2  Q   H20, for example, or hydrogen sulfite, things of that
3      nature?
4  A   Yes.
5  Q   Okay. Now, in looking at and monitoring the
6      environmental repercussions and the responsibilities
7      you had in this Aspen Creek, if not directly the same,
8      would they not be parallel? The kind of experience
9      that you would find helpful in.....
10 A   I guess there's some generic knowledge there that could
11     pass through with, you know, with everything so --
12 Q   Okay. And familiarity with environmental requirements,
13     reading the CFR, knowing what the federal and state
14     requirements are, that sort of experience?
15 A   Yes.
16 Q   All of that was entailed in this, and important in the
17     job you subsequently had?
18 A   Yes.
19 Q   How about with Cypress-Amax Gold? Either one of the
20     two jobs that you had with them, environmental
21     specialist and then you were a mine engineer? Again,
22     are there parallels or specifics within those jobs that
23     you believe would have been important or applicable to
24     the job that you did as either a specialist or
25     supervisor for APC?

Page 24

1  A   I think again there's generic items that pass through
2      all of these positions that I've had since I got out of
3      school that would assist me in doing a safety position
4      type job.
5  Q   Okay. For example, it says you maintained and
6      developed special environmental programs and permits,
7      you've set up environmental programs within or a
8      specialized safety programs within APC, did you not, as
9      a supervisor?
10 A   I don't know quite what you mean by specialized safety
11     programs. The programs that we had in place at APC
12     were fairly nonexistent when -- when I first got there
13     in 2001 and by the time I left they were coming
14     together. But, again, they're just a reiteration of
15     the -- of the OSHA standards kind of custom fit for the
16     work that's done up on the North Slope.
17 Q   And you were involved in putting together those
18     programs -- pulling them together, is that correct?
19 A   Yes.
20 Q   Okay. And that was part of your job?
21 A   Yes.
22 Q   Yes. Was it a large part of your job?
23 A   Towards the end there I spent some considerable time on
24     it. I think we all did. It was unfinished when I
25     left, but it was a pretty good chunk of the work, yes.

Page 25

1  Q   Okay.
2  A   We all devoted quite a bit of time to getting the
3      regulations put together or the rules and regulations
4      put together.
5  Q   To be in compliance with the federal standards and
6      state, OSHA, et cetera?
7  A   Yes, to be more in compliance. I think you're always
8      striving to be as compliant as you can be.
9  Q   Okay. And what about this job, MSE Technology
10     Applications? You did project management there,
11     correct?
12 A   Uh-huh (affirmative).
13 Q   And that would be applicable to the work that you did
14     at APC?
15 A   No, not necessarily. Most of the work I did for MSE
16     was with the EPA's mine waste treatment group. And it
17     had to do strictly with the reclamation of abandoned
18     work environment.
19 Q   Okay. But I'm thinking you described yourself as doing
20     project management, and I'm just talking that
21     terminology that would be involved generically in the
22     kind of work that you did for APC, would it not?
23 A   I don't think you can relate anything I did with MSE to
24     what I did with APC.
25 Q   Okay. And why is that?

Case 3:03-cv-00174-RRB   Document 38-2   Filed 08/04/2006   Page 8 of 9

JOHN GILBERT vs. APC NATCHIQ, INC.
CASE NO. 3:03-CV-00174-RRB

DEPOSITION OF JOHN D. GILBERT
MAY 31, 2006

### Page 26

1  A  Just two totally different jobs.
2  Q  Because of the nature of the industry or the nature of
3     the subject matter?
4  A  Both, yes.
5  Q  Okay. Now in your job with HECLA it looks like you had
6     a health and safety responsibility?
7  A  Yes.
8  Q  Describe that for me.
9  A  Basically, put together health and safety procedure for
10    the 30-some odd employees we had working at the mine --
11    at the mine, and since it didn't exist before I got
12    there put that together. And then just basically
13    developed a mine plan if you will for the employees to
14    become in compliance with OSHA standards.
15 Q  Okay.
16 A  It's shut down since -- we were rolling from an
17    operating mine which would have been under MSHA rule,
18    to a reclaimed mine which is under OSHA rules.
19 Q  Okay. And that's similar to some of the
20    responsibilities you had with APC?
21 A  Yes.
22 Q  Okay. Have you considered health, safety and
23    environment a profession?
24 A  Yes.
25 Q  And does it require specialized training?

### Page 27

1  A  Yes.
2  Q  And specialized knowledge?
3  A  Yes.
4  Q  And the kind of work that you were doing, both as a
5     specialist and as a supervisor, did it require
6     experience and use of your education?
7  A  Yes.
8  Q  And that education, is it specialized? I mean is that
9     something that I could walk out and do? I have a
10    different kind of specialized education, correct?
11 A  I guess, the answer is you'd have to have specialized
12    training, but anybody can get specialized training.
13 Q  Some people are more fit for certain kinds of things
14    than others.
15 A  Right.
16 Q  Was part of your job to interpret complex data --
17    testing data?
18    MR. COVELL: Excuse me, I've got to object as
19 to when and where he's doing that.
20 Q  (By Ms. Zobel) As a safety supervisor was part of your
21    job to interpret complex data?
22 A  I'm not sure I would call it complex, but we did
23    interpret data.
24 Q  Okay. From testing that was done in the field?
25 A  Yes.

### Page 28

1  Q  And if you were wrong in your interpretation, could
2     that result in a health threat?
3  A  Yes.
4  Q  And if you misinterpreted that could it lead to
5     somebody's death?
6  A  You hope not. You hope you have enough procedures in
7     place that by the time you're sampling that -- I would
8     have to say no, it cannot lead to somebody's death.
9  Q  Well if you were wrong though in your interpretation of
10    the data?
11 A  You wouldn't let it get to that point.
12 Q  Okay. You would have all kinds of systems in place to
13    prevent it getting to the point where it would threaten
14    somebody?
15 A  Yes, there's administrative engineering and -- and PPE
16    criteria that you always put in place before you get to
17    that stage.
18 Q  And PPE being personal protective equipment?
19 A  Correct, yes.
20 Q  And, but all of that as a whole, all of those different
21    PPE criteria, the different standards that are put in,
22    for example, for how to do a confined space issue, all
23    of those particular requirements are steps that are put
24    in and drawn up by health and safety, correct?
25 A  They're provided to you in the -- in the CFR standards.

### Page 29

1  Q  Okay. Was part of your responsibility though to see
2     that they were carrying those out?
3  A  Yes.
4  Q  Within the different areas?
5  A  Yes.
6  Q  Okay. And having the requirement of carrying out those
7     kinds of activities, that carries with it
8     responsibilities for people, does it not?
9  A  Can you explain that to me?
10 Q  Yes, that was a backwards question. I'm sorry. The
11    job had responsibilities for people's health and safety
12    and to make sure that people were operating safely,
13    correct?
14 A  Correct.
15 Q  Okay. And if you were wrong in the way that you
16    interpreted something, or the data, that responsibility
17    and somebody were injured, that responsibility would
18    come back to you?
19 A  I suppose if a person in a safety field made a gross
20    error then yes, you could be responsible for somebody's
21    injury or illness or what have you.
22 Q  Okay. And within the job you had to take CFR's and
23    OSHA requirements and you had to translate what's on
24    paper requirements into actual programs as to how they
25    would be performed in the field?

JOHN GILBERT vs. APC NATCHIQ, INC.
CASE NO. 3:03-CV-00174-RRB

DEPOSITION OF JOHN D. GILBERT
MAY 31, 2006

Page 30

1  A   I would say that we took what was written in the CFR's
2      and implemented those words into the field.
3  Q   Okay. And sometimes that took translation?
4  A   Of course, yes.
5  Q   And that's the kind of work that you were doing when
6      you were a safety supervisor, is that correct?
7  A   A safety supervisor or a safety specialist, they were
8      one in the same there.
9  Q   Okay.
10 A   Using the CFR's the same way so --
11 Q   And you were required to exercise your own judgment as
12     to what those meant?
13 A   I don't know what you mean by exercise my own judgment
14     as to what they meant. I mean.....
15 Q   Well you used.....
16 A   .....they're laid out in the CFR's so you just
17     basically read them and --
18 Q   Interpret them.
19 A   Interpret them I suppose, yes.
20 Q   All right. And the way in which they applied though to
21     that particular situation you were using your judgment
22     as to how they would best be implemented in the field?
23 A   Yes, you want to make sure you're trying to implement
24     them as they're written.
25 Q   Okay. And within the job that you had as to -- let me

Page 31

1      rephrase that. You had responsibilities also to train
2      other people who did have your level of expertise and
3      in understanding the health and safety
4      responsibilities?
5  A   Yes and no I suppose. We had a training department if
6      that's what you mean. Other employees -- we had a
7      training department that would provide training and at
8      times I assist them because I would fill in for those
9      guys providing general safety training to the
10     employees. I don't know if I gave any specific
11     training to any of the safety specialists.
12 Q   Okay.
13 A   If that's what you're asking, I'm not sure.
14 Q   Well that -- how about lay people? Did you do any of
15     the training at all, outside of the training
16     department? Do you train the trainers, for example?
17 A   No. No.
18 Q   Okay. Did you help determine what the trainers would
19     be training?
20 A   (No audible answer)
21 Q   Does that make sense?
22 A   I think I understand.
23 Q   Were you setting part of the agenda that the trainers
24     would follow?
25 A   Not necessarily, no.

Page 32

1  Q   Okay. Did you work in coordination with those people
2      in determining what training programs were needed?
3  A   The training programs were pretty much laid out when I
4      got there, so I -- I'm trying to recall if there any
5      significant changes in the training programs and I
6      guess I would have to say no, there were no significant
7      changes in the training programs.
8  Q   Okay.
9  A   After I arrived so --
10 Q   Okay. I'm going to show you what we previously
11     produced as APC0041. And this is a copy of the safety
12     supervisor description, have you seen that before?
13 A   I don't know if I've seen this before or not.
14 Q   Okay. Does that sound like your job?
15 A   Yes, it generally does.
16 Q   All right.
17     MS. ZOBEL: That's been marked as Exhibit what?
18         (Deposition Exhibit G-2 marked)
19     COURT REPORTER: G-2.
20     MS. ZOBEL: All right. Exhibit G-2.
21 Q   (By Ms. Zobel) Now within this it says, for example,
22     you have the -- now it does say you have oversight of
23     training functions. Health, safety, environment and
24     training functions. But you say the training program
25     is pretty much in effect and humming along?

Page 33

1  A   Yes.
2  Q   Okay. So you didn't have to do a lot of tweaking
3      there?
4  A   No.
5  Q   Now it says you have development of site specific
6      policy and procedures, was that correct?
7  A   Let me catch up to you here.
8  Q   I'm sorry. I'm leaping ahead of you.
9      MR. COVELL: Last sentence of the second
10 paragraph there.
11 Q   (By Ms. Zobel) Responsibilities include.....
12 A   Oh, okay.
13 Q   Let's just take the whole paragraph or that sentence.
14     Let's start at the beginning of that paragraph.
15 A   Okay.
16 Q   Safety supervisor provides consultation to both
17     construction and maintenance operations, was that
18     correct?
19 A   Yes.
20 Q   Okay. Regarding compliance, company policies and safe
21     work practices?
22 A   Yes.
23 Q   Okay. And it says responsibilities include supervision
24     of six safety specialists?
25 A   Yes, there was six safety specialists working there.

METRO COURT REPORTING
745 West 4th Avenue, Suite 425, Anchorage, Alaska 99501
907.276.3876                                    metro@gci.net