JOHN GILBERT vs. APC NATCHIQ, INC.
CASE NO. 3:03-CV-00174-RRB

DEPOSITION OF JOHN D. GILBERT
MAY 31, 2006

Page 34

1  Q   And you had the responsibility to supervise them?
2  A   Yes, it's a gray area in my opinion, but -- yes.
3  Q   Okay. Development of site specific polices and
4      procedures?
5  A   Yes, we all did that.
6  Q   And risk assessments?
7  A   Yes.
8  Q   Incident investigations?
9  A   Yes.
10 Q   Audits and monitoring of ongoing activities?
11 A   Yes, I'm not quite sure what that means.
12 Q   For example, the activities of safety specialists, were
13     you auditing and monitoring ongoing activities by
14     safety specialties?
15 A   Auditing and monitoring?
16 Q   Yes or no?
17 A   No.
18 Q   Okay. How about auditing and monitoring of ongoing
19     activities such as the usage safety protocols?
20 A   Yes.
21 Q   Okay. Coordination of health surveys?
22 A   Coordination of health surveys, yes.
23 Q   Okay. Within this description, let me see if we can
24     establish some base line here. If I understand the way
25     that APC has this put together, the safety specialist

Page 35

1      were, a term I'll use is embedded. They were
2      specifically assigned to a location facility and
3      project, is that correct?
4  A   For the most part, that's correct.
5  Q   Okay. So somebody would go every -- you weren't
6      handing out assignments each time this guy would show
7      up at work, he'd go and work on pads, for example?
8  A   Sure, everybody kind of had their assigned area and
9      then if somebody was absent there'd be fill-in, you
10     know, somebody will go over and fill in.
11 Q   Okay. All right. And these guys actually were getting
12     specific -- in addition to working independently and
13     doing monitoring, and you agree with me, they worked
14     independently?
15 A   Yes, oh yes -- definitely.
16 Q   And in addition to working independently they would
17     also respond to whoever was the supervisor within
18     control of that particular construction project or area
19     of maintenance?
20 A   Well they reported to or had direct liaison with --
21     whether it's the maintenance supervisor or the
22     maintenance foreman or -- they had their own areas to
23     report to. They -- one was maintenance, one was
24     construction, one was operations, and one was drilling.
25 Q   Okay. And those are the different specialists within

Page 36

1      those different areas?
2  A   Yes, that's right.
3  Q   Your job, as a safety supervisor was not embedded in
4      any of those specific areas, but rather was more
5      generalized over all of those areas, would that be
6      correct?
7  A   Yes.
8  Q   Okay. So that, whereas, one safety specialist might be
9      working in construction, you would be working with
10     construction and pads and whatever else the other areas
11     where you listed?
12 A   Sure, yes.
13 Q   Okay. And then within your responsibilities or within
14     your job as a safety supervisor, you had to answer to
15     Doug Smith, correct.....
16 A   Yes.
17 Q   .....as your immediate supervisor?
18 A   Yes.
19 Q   Whereas, these gentlemen, the safety specialist would
20     answer to the foreman who -- or the supervisors who
21     were in their construction areas who weren't safety
22     people necessarily, correct?
23        MR. COVELL: I'm going to object to the form of
24 the question as to when you say answer as to what that means?
25        MS. ZOBEL: All right. I'll rephrase it. I'll

Page 37

1  be happy to rephrase it.
2         MR. COVELL: Just to keep it clear for the
3  record.
4         MS. ZOBEL: I'll be happy to rephrase that.
5  Q   (By Ms. Zobel) They were getting specific assignments
6      from, for example, let's use an example; they're going
7      to do a confined space entry in a particular project.
8      And let's say it's in a construction project, would
9      that make sense?
10 A   Sure, yes.
11 Q   And so the safety specialist would be responsible to
12     make sure that they do the confined space entry
13     correctly, is that correct?
14 A   That's correct.
15 Q   But he would be being told by the supervisor of that
16     construction project, we're going to do confined space
17     today and this is where we need you?
18 A   That is also correct.
19 Q   Okay. Whereas, in your position as a safety supervisor
20     you were not taking direction from the other craft
21     supervisors, except in a generalized way if they needed
22     something to be dealt with from a company wide safety
23     issue?
24 A   No, that's not necessarily true. I was not immune to
25     having some of the department heads come to me and say

Case 3:03-cv-00174-RRB   Document 38-3   Filed 08/04/2006   Page 2 of 9

JOHN GILBERT vs. APC NATCHIQ, INC.
CASE NO. 3:03-CV-00174-RRB

DEPOSITION OF JOHN D. GILBERT
MAY 31, 2006

Page 38

1  hey we need this over here.
2  Q   Give me an example of what they would say, this over
3      here?
4  A   Can you come to the wash bay and do the confined space
5      entry for the guys in the -- in the wash bay. We've
6      got another guy that's, for instance, the safety
7      specialist that was there, he's tied up on another
8      permit in the heavy shop, for instance.
9  Q   Okay.
10 A   So I would pack up and go over and do that.
11 Q   And that would be on an intermittent basis if somebody
12     else who was embedded with that group wasn't able to
13     carry out that responsibility?
14 A   Yes, it could be a daily event, you know. So it could
15     be at any time, every day or twice a week, or, you
16     know, what I mean.
17 Q   Well it didn't happen every day though, did it?
18 A   No, it did not happen every day.
19         MR. COVELL: I want to state another objection.
20 I think it's just a matter of style, but I think the way you're
21 not phrasing your questions as questions. You're making the
22 statement saying that would be this that would be that. So I
23 object to the form of the question.
24         MS. ZOBEL: Okay.
25         MR. COVELL: Because they're technically not

Page 39

1  question, so --
2         MS. ZOBEL: All right.
3  Q   (By Ms. Zobel) I think your answer was that that did
4      not happen daily. It was something that could happen
5      that you would be called on, but it happened
6      intermittently, is that.....
7  A   Correct.
8  Q   All right. In general, though your job was not to do
9      those on site activities but to rather work from the
10     corporate side of the job of health, safety, and
11     environment?
12        MR. COVELL: Technically that's not a question.
13        MS. ZOBEL: Is that correct?
14        MR. COVELL: Okay. Now, that's a question.
15        MS. ZOBEL: He answers before I get to say, is
16 that correct.
17 A   Okay. I'll quit.
18        MR. COVELL: That's all right.
19 Q   (By Ms. Zobel) Is that correct?
20 A   No.
21 Q   No? Well --
22 A   I don't quite understand the corporate side. I mean,
23     the way I look at my job as a safety supervisor, if I
24     may, it was not too much more than a glorified safety
25     specialist. Somebody had to be in the office to take

Page 40

1  care of all the questions that were brought to the
2  department each and every day by the rest of the field.
3  Could I -- was I qualified to do that? Yes. Were the
4  rest of the guys qualified to do that? Absolutely. We
5  were all similarly qualified to do the same job. So if
6  I wasn't in the office somebody else would have to come
7  in and fill in and do exactly what I was doing. If I
8  went to the field to get a confined space entry done,
9  somebody would have to fill in for me in the office.
10 So we would just shuffle things around and make it all
11 work. Does that answer your questions.
12 Q   That's helpful. The position that you held though was,
13     if I'm understanding what you just said, was something
14     that was necessary? That it was a job that somebody
15     had to do in terms of being in the office to respond to
16     the Kuparuk project as a whole?
17 A   Yes.
18        MR. COVELL: Okay. Now wait, if it's not a
19 question.....
20        MS. ZOBEL: There was a question mark at the
21 end of that one.
22        MR. COVELL: Was there? Well if it's not a
23 question don't answer it. Okay? All right. Think about
24 whether it's a question or not, if it's not a question don't
25 answer it. All right.

Page 41

1         MS. ZOBEL: This is going to get confusing for
2  me, I can see it now.
3         MR. COVELL: Sometimes people will say is it,
4  or does it, or was. If the question comes at the end of the
5  sentence, wait for it. And then if it's a question answer it,
6  thank you. Pardon me.
7         MS. ZOBEL: That's all right.
8         MR. COVELL: These things in conversational
9  English you can take the inflection and everything else. When
10 this eventually gets typed up on the paper oftentimes it looks
11 significantly different from the way it sounds, so that's the
12 reason for niggling (ph) here. Thank you.
13 Q   (By Ms. Zobel) Okay. It was necessary to have
14     somebody in the position that you were in, was it not?
15 A   Yes.
16 Q   Okay. And that it was a separate role to be filled
17     than that of safety specialist, was it not?
18 A   Yes.
19 Q   Okay. We talked briefly before about your employment
20     history. Let's back up for a second to your resume.
21     Within the jobs that you held prior to going to work
22     with APC, were you ever paid on a day rate?
23 A   No.
24 Q   Okay. Since you have left APC, by whom have you been
25     employed?

JOHN GILBERT vs. APC NATCHIQ, INC.
CASE NO. 3:03-CV-00174-RRB

DEPOSITION OF JOHN D. GILBERT
MAY 31, 2006

Page 42

1  A   MSE Technology Applications.
2  Q   You went back to a prior employer?
3  A   Correct.
4  Q   What did you do for them?
5  A   Identical job I was doing here.
6  Q   Okay. When you say -- we have to make the record
7      clear.
8  A   Hydrogeologic and mining engineer.
9  Q   The same job that appears on APC document 12 and is
10     Exhibit G-1?
11 A   Correct.
12 Q   And how were you paid there?
13 A   Yearly salary.
14 Q   Not a day rate?
15 A   Correct.
16 Q   Is that an exempt position or nonexempt?
17 A   I'm not sure.
18 Q   Are you paid overtime?
19 A   Yes.
20 Q   Okay. And what were the dates that you worked for
21     them?
22 A   I honestly can't remember. Let's see. I've got to go
23     back a little bit.
24 Q   Let's go back and establish your dates that you worked
25     for APC, and then that may help, and we can go from

Page 43

1      there. You worked as a safety specialist for what
2      dates?
3  A   2001 to 2003.
4  Q   As a safety specialist?
5  A   Specialist. I don't recall the exact date of the
6      transfer to the safety supervisor so --
7  Q   Let me tell you what my records state and you can tell
8      if that's correct or not. 01/30/01 to 01/01/02 as a
9      safety specialist, does that sound correct?
10 A   Sounds reasonable.
11 Q   Okay. And then on 01/03/02 you were transferred to a
12     safety supervisor.....
13 A   Yes, ma'am.
14 Q   Does that sound correct?
15 A   Sounds correct.
16 Q   Okay. Let me find a document. And then you left,
17     according to my records, on 04/22/03 as a safety
18     supervisor, does that sound correct?
19 A   Sounds correct.
20 Q   All right. I've got a shift calendar that is here that
21     looks like it's something that was changed as of
22     05/07/02. And I'd like you to just look and tell me if
23     this appears accurate as to -- I don't mean the exact
24     dates but the fact that you had certain weeks on and
25     certain weeks off.

Page 44

1      COURT REPORTER: G-3 is marked.
2          (Deposition Exhibit G-3 marked)
3  A   All right.
4  Q   (By Ms. Zobel) And this is the 2002 shift calendar, is
5      that -- do you recognize this?
6  A   Yes.
7  Q   All right. Does this accurately set out what would
8      have been your days on and days off in this -- in the
9      generalized sense? I don't want you to be saying,
10     you're testifying that you worked on May 1st, but that
11     you were on for a certain number of weeks, and then
12     off. Does this look accurate?
13 A   Yes, this would have been just a simple schedule I put
14     together to give me a general idea when I was going to
15     be on the Slope and off the Slope.
16 Q   Okay. And you did a Tuesday change out?
17 A   Yes.
18 Q   And that remained the same for the time through the end
19     of the time that you worked with APC as a safety
20     supervisor, is that correct?
21 A   Well in detail I don't recall because sometimes you
22     come in a day early or leave a day later or, you know,
23     stay an extra week. So, you know, this would have been
24     something I would have put together just to give me a
25     general idea of when I was coming on and when I was

Page 45

1      going off, subject to change.
2  Q   Okay. And how were you paid? What was your pay?
3  A   As a safety supervisor?
4  Q   Supervisor, yes.
5  A   I believe it was 425 a day.
6  Q   Four seventy-five?
7  A   Okay. Four seventy-five.
8  Q   On a daily basis?
9  A   Yes.
10 Q   I'm going to show you.....
11     MS. ZOBEL: Madame court reporter.
12 Q   .....what we have marked as document 491.
13     COURT REPORTER: And this will be G-4.
14         (Deposition Exhibit G-4 marked)
15 (Off record comments)
16 Q   (By Ms. Zobel) Is this something you put together?
17 Q   It may have been something I put together or it may
18     have been something that Sam Taylor put together.
19 A   Okay.
20 Q   Does this accurately reflect your day rate and number
21     of days worked per year, do you believe?
22 A   The -- it looks like the day rate of 475 is correct,
23     but I don't know if it accurately predicts how many
24     days I worked in a year, I couldn't tell you without
25     looking at my records how many days I worked so --

Case 3:03-cv-00174-RRB   Document 38-3   Filed 08/04/2006   Page 4 of 9

JOHN GILBERT vs. APC NATCHIQ, INC.
CASE NO. 3:03-CV-00174-RRB

DEPOSITION OF JOHN D. GILBERT
MAY 31, 2006

**Page 46**

1  Q   Okay.
2  A   Again, it's just a tool to figure out what your pay is
3      so when you get your paycheck stub you can balance it
4      against and say we're generally correct so --
5  Q   Okay. And Sam Taylor at one point worked as your
6      alternate as a safety supervisor?
7  A   I believe that's correct.
8  Q   So if he prepared this it would have been as a
9      supervisor?
10 A   No. This was prepared when I -- when we first -- we
11     arrived on the Slope the same day as safety specialists
12     and so within our first hitch we would have put this
13     together.
14 Q   Showing a day rate of 475?
15 A   Oh, you just change it as it went along. So, I mean,
16     the spreadsheet itself was built early. But you could
17     insert any day rate you wanted.
18 Q   Okay.
19 A   And it would just do the calculations for you.
20 Q   All right. But that would reflect your rate of
21     pay.....
22 A   Yes.
23 Q   .....at the time that you left APC, correct?
24     MR. COVELL: And we're talking about the 475?
25 A   Four seventy-five.

**Page 47**

1      MS. ZOBEL: That's correct. Not the 500.
2  Q   (By Ms. Zobel) Do you know why that 500 was done?
3      What that was?
4  A   Don't have a clue.
5  Q   All right.
6      MS. ZOBEL: That's your copy.
7      MR. COVELL: Just for the record, these ones
8  with the yellow stickers on them, at the end of the deposition
9  are going to the court reporter. So we don't want to
10 accidentally fold these up in our materials and take them with
11 us.
12 A   Very good.
13     MS. ZOBEL: And if want a copy of them, you can
14 get the copy that is being given to the.....
15     MR. COVELL: Reporter.
16     MS. ZOBEL: To the reporter.
17     MR. COVELL: And, I'll also have a copy.
18 A   Yes.
19 Q   (By Ms. Zobel) Ron Kirk was also your alternate, was
20     he not?
21 A   Yes at one time he was my alternate.
22 Q   As a safety specialist, is that correct?
23 A   Yes.
24 Q   Okay. And is it possible that's Mr. Kirk's day rate,
25     or do you know?

**Page 48**

1  A   I have no idea.
2  Q   All right.
3      MS. ZOBEL: I want to be sure I've got my
4  records not running away.
5  Q   (By Ms. Zobel) Okay. Back now to this listing of
6      employment that you've done subsequent. Looking at
7      04/22/03 as your last day with APC, can you give me a
8      clue of when you went back to work with MSE Technology
9      Applications?
10 A   Around April of '04.
11 Q   You took some time off?
12 A   Yes, I did. I took some time off and finished
13     rebuilding my house and sold it in Challis, Idaho.
14     (Off record comments)
15 Q   And after you went to work with -- have you worked for
16     anybody else besides MSE since leaving APC?
17 A   Yes, I have.
18 Q   Okay. When did you leave MSE?
19 A   That would have been about nine months afterwards, so
20     around -- what does that put us into December of '04?
21     And then I went to work for -- god, my brain's taking a
22     break here.
23     MS. ZOBEL: Do you want to take a break? We've
24 been doing this over an hour?
25 A   Can we do that and I'll think about that.

**Page 49**

1      MS. ZOBEL: That's fine.
2      (Off record)
3      (On record)
4  Q   (By Ms. Zobel) Okay. We were talking, Mr. Gilbert,
5      about the positions that you've held since, and you
6      were going to tell me who you went to work with after
7      MSE Technology?
8  A   Yes, and I thought about it, and guess what?
9  Q   What?
10 A   I can't remember their name.
11 Q   Okay.
12 A   However, it's the same company that I've worked for
13     since. There's been several contract changes, so the
14     name of the owner of the company has changed although
15     the location has not. So I currently work for CH2M
16     Hill, Washington Group and.....
17 Q   And -- go ahead.
18 A   And I've worked for them since the MSE position.
19 Q   And that would have been since December of '04?
20 A   Correct.
21 Q   And tell me what you do for CH2M Hill?
22 A   I'm a civil engineer.
23 Q   And are you actually working in Washington State or in
24     Lewiston? Oh, you're not in Lewis- -- where are you?
25 A   Lewisville.

JOHN GILBERT vs. APC NATCHIQ, INC.
CASE NO. 3:03-CV-00174-RRB

DEPOSITION OF JOHN D. GILBERT
MAY 31, 2006

Page 50

1  Q  Lewisville. You're not in Lewiston?
2  A  I actually work at a small place called Scoville, Idaho
3     which is the Idaho National Engineering Laboratory.
4  Q  And does your job entail any health and safety
5     responsibilities?
6  A  No, it does not.
7  Q  And how are you paid there?
8  A  Salary position.
9  Q  And how is that calculated, in the sense, is it on a
10    day rate, an hourly rate, or an annualized?
11 A  I'm not sure to be honest. It's not a day rate, so
12    it's a yearly salary but I get, again, overtime for
13    every hour I work overtime.
14 Q  Okay. Have you worked previous to the job with APC on
15    a day rate?
16 A  No.
17 Q  Did you ever try to negotiate a day rate with anyone?
18 A  No.
19 Q  Have you worked since with anyone on a day rate?
20 A  No.
21 Q  Have you ever tried to negotiate a day rate with any of
22    these people that you worked with since?
23 A  No.
24 Q  Have you ever brought a wage and hour lawsuit
25    previously?

Page 51

1  A  No.
2  Q  Or since?
3  A  No.
4  Q  Now in your work with APC, you were paid in what
5     method, day rate?
6  A  Yes.
7  Q  That's a question mark. Okay. And your day rate went
8     up a variety of times based upon how long you'd been
9     with the company, is that correct?
10 A  I had several pay raises while I was there, that's
11    correct.
12 Q  Okay. And your last, I think we established was 475 an
13    hour, correct?
14 A  Correct.
15    MR. COVELL: That's a day.
16    MS. ZOBEL: What did I say, an hour?
17    MR. COVELL: I think so.
18 A  An hour.
19 Q  (By Ms. Zobel) Okay. Did you have a contract with APC
20    Natchiq?
21 A  No.
22 Q  Now the number of hours that you actually worked per
23    day, did that fluctuate?
24 A  Yes.
25 Q  Did you have an understanding with the company as to a

Page 52

1     minimum number of hours that you were expected to work
2     in exchange for the day rate?
3  A  That would have been 12 hours.
4  Q  Okay. That was your understanding of the expectation?
5  A  Yes.
6  Q  Okay. And you've provided us with -- or your counsel
7     did, a series of calendars that are dated and show the
8     dates that you were on the Slope.
9  A  Yes.
10 Q  Okay. And these are previously then -- I did not mark
11    those as exhibits to this deposition. I just want to
12    confirm some information regarding them.
13 A  Okay.
14 Q  They are marked, for the record, beginning 0033 and
15    they go through 115 -- 0115. And those records --
16    first of all, is that your handwriting on them?
17 A  Yes, it is.
18 Q  And did you keep these while you were working there
19    contemporaneous?
20 A  Yes, I did. I kept them every day.
21 Q  Okay. And why did you do this?
22 A  Habit. Same book here.
23 Q  Do you do that in your current job?
24 A  Yes, I do.
25 Q  And these record the number of hours, I'm assuming,

Page 53

1     that you worked. For example, there's a 12, as 12
2     point -- a 21.5, a 13.5, a 12, a 13.5, a 12, and a 12
3     kind of thing.
4  A  Correct.
5  Q  And those are the dates or the time that you worked, is
6     that correct?
7  A  Those are the hours I worked in the day.
8  Q  Yes. You answered the question I was trying to ask,
9     thank you. Later in the records I saw when we get into
10    2002 that you noted actual hours when you came in. For
11    example, at random I opened it up to March 25 and the
12    entry is office work, 6:00 a.m. to 6:00 p.m. and why
13    did you change your habit then?
14 A  I have no good answer for you there, I just don't know.
15 Q  Okay. But this would reflect that you, on that day --
16    what would that reflect on that date? The entry March
17    25th?
18 A  Twelve hours of work on Monday, March 25th.
19 Q  In the office?
20 A  Yes.
21 Q  Okay. And then if we went to another one, May 14th of
22    2002, on page 78, it says meeting Pat Holland, Paul
23    Booth, something in design, maybe you can read this to
24    us.
25 A  Which day are we looking at?

14 (Pages 50 to 53)

Case 3:03-cv-00174-RRB  Document 38-3  Filed 08/04/2006  Page 6 of 9

JOHN GILBERT vs. APC NATCHIQ, INC.
CASE NO. 3:03-CV-00174-RRB

DEPOSITION OF JOHN D. GILBERT
MAY 31, 2006

Page 54

1 Q We're just at random opening it.
2 A Meeting Pat Holland at the paint booth. Concerns a
3   design of hose, it looks like.
4 Q Okay. Who's Pat Holland?
5 A Pat Holland was a light shop foreman.
6 Q Okay.
7 A Light shop.
8 Q And he called you in to look at design on something
9   that he thought might be unsafe, is that correct?
10 A It could have been, yes.
11 Q Okay. So would this be one of the instances that you
12   talked about where you might go into the field?
13 A Yes.
14 Q Okay. And then it says, office 5:30 to 6:30 p.m. so
15   you were back in the office.....
16 A Back in the office.
17 Q .....after doing that? Okay. So if I wanted to find
18   out, in general, when you were in the office, and when
19   you were out, would this accurately reflect, at least,
20   in general, the times when you were working in
21   different places?
22 A Yes.
23 Q Okay. Talking about -- and I'm skipping over safety
24   specialist and going to concentrate on safety
25   supervisor pursuant to the discussions we've already

Page 55

1   had. So all of these questions are going to be after
2   you were promoted to a supervisory position. Okay?
3 A Okay.
4 Q Do you believe it was a promotion?
5 A I think anytime you're given more money, it may be a
6   promotion.
7 Q Okay. Where physically were you expected to report
8   each day? Where was your office or did you have an
9   office?
10 A Yes, we had a section of the Kuparuk camp that the
11   safety guys had for offices.
12 Q Okay. And did you and your alternate physically have
13   an office assigned to you?
14 A Yes, all the safety specialists had an office assigned
15   to them and safety supervisors.
16 Q Okay. And, in fact, I've got a schematic, I think, of
17   your office and a listed of equipment or ergonomic
18   furniture that was ordered for you. Was that done
19   after you were promoted?
20 A I don't recall. You'd have to ask Doug with -- I don't
21   recall when we ordered that stuff.
22 Q Okay. But we're not asking Doug today.
23 A Okay.
24   MR. SMITH: I'm sorry John.
25 Q (By Ms. Zobel) Did you have an administrative staff

Page 56

1   that was assigned to work with you?
2 A The department had a secretary, yes.
3 Q And did you give that secretary assignments to work on?
4 A Yes and no. Primarily they had their task to do every
5   day that just went unchanging. You know, they'd file
6   the paperwork, they would fill out injury and illness
7   reports, take care of the -- mostly it was just
8   paperwork I guess. Filing records.
9 Q Was that filing and paperwork in support of your
10   position, at least partially question mark?
11 A More in support of the department, not necessarily my
12   position.
13 Q Okay. The material that you generated, did they file
14   it?
15 A Some of it yes.
16 Q Okay. There's an organization chart that we have.
17   COURT REPORTER: All right. G-5 is marked.
18       (Deposition Exhibit G-5 marked)
19   MR. COVELL: Thank you.
20 Q (By Ms. Zobel) Have you seen this before?
21 A I saw it yesterday.
22 Q Okay. Among the documents that we provided to your
23   counsel?
24 A Correct.
25 Q This safety manager as Doug Smith and then you as a

Page 57

1   safety supervisor with an alternate of Ron Kirk, was
2   that accurate in the reporting -- as to the reporting
3   that -- as to the person you reported to?
4 A Did I report to Doug Smith?
5 Q Yes.
6 A Yes.
7 Q Okay. And the admin assistant, it shows them as being
8   connected to your position, so -- and was that accurate
9   also?
10 A I don't quite know how to answer that. I think they
11   were connected as much Doug as they were to me.
12 Q All right. Okay. They supported both of you?
13 A Correct.
14 Q Then you have below that the safety specialist as
15   reporting to you, is that, and you were earlier
16   testifying, I think, that you did supervise those
17   positions, is that correct?
18   MR. COVELL: I guess, I'll object to compound.
19   MS. ZOBEL: Yes.
20   MR. COVELL: So she can either break it down to
21 two.
22   MS. ZOBEL: I can break it down to two.
23 Q (By Ms. Zobel) You supervised those safety specialists
24   that were below you, did you not?
25 A Yes.

15 (Pages 54 to 57)

JOHN GILBERT vs. APC NATCHIQ, INC.
CASE NO. 3:03-CV-00174-RRB

DEPOSITION OF JOHN D. GILBERT
MAY 31, 2006

Page 58

1  Q   Okay then it shows the -- what's IH safety specialist?
2  A   Industrial hygiene.
3  Q   Okay. And that's just another safety specialist? They
4      couldn't get them all on the same line, is that right
5      or is that somebody different?
6  A   Sam just had an industrial hygiene background.
7  Q   Okay.
8  A   So he.....
9  Q   Did he float?
10 A   Yes.
11 Q   Okay. Whereas, these other positions were embedded?
12 A   In general, yes.
13 Q   Okay. And you would, if we had to say float as a word,
14     you would be available as a consultant for each of
15     these other -- all these fields down below you. IH
16     safety construction, field services production, and
17     field safety?
18         MR. COVELL: I would object to compound. No
19 question.
20         MS. ZOBEL: There was a question.
21         MR. COVELL: I didn't hear it, I'm sorry.
22         MS. ZOBEL: Okay.
23 Q   (By Ms. Zobel) Can you answer it?
24         MR. COVELL: Do you understand it?
25 A   I think, the question as I understand it, is I could be

Page 59

1      a direct substitute for any of these guys.....
2  Q   That isn't what I was asking.
3  A   Okay.
4  Q   Did you, in your position -- did you act as a
5      consultant to these different subspecialties, the
6      safety specialist in the field, the production service
7      safety specialty, et cetera?
8  A   I don't think I acted as a consultant, no.
9  Q   If they had a question or if what we -- let me ask you
10     this then: We had a listing on your calendar that we
11     just looked at, at random where somebody had a concern
12     of a hose you said, correct?
13 A   Uh-huh (affirmative).
14 Q   And they came to you to have you look at this as a
15     consultant, correct?
16 A   In that light yes, you're correct.
17 Q   Okay. What if a construction safety specialist, I
18     believe it's Tommy Brown, had a question would he bring
19     it to you? And let me rephrase that: Had a question
20     regarding the meeting as data or how to go about doing
21     some procedure, would he consult with you?
22 A   He could, yes.
23 Q   Okay. Is this organization chart as far you know, does
24     this represent your understanding of the department
25     that you worked in?

Page 60

1  A   It might have been at the very early stage and I'm not
2      -- there were so many guys that came and went through
3      there. In fact, there was one guy every 30 days that
4      came and went, so at one point this may have been
5      accurate but --
6  Q   In terms of the names of the individuals, not the job
7      description is that what you're referring to?
8  A   Yes, the job description names look kind of -- look
9      right.
10 Q   Okay.
11 A   Uh-huh (affirmative).
12 Q   So if somebody may -- who held that position might come
13     and go, but the positions remained the same throughout
14     the time that you worked there, is that correct?
15 A   Well, again, the -- I mean this is just a snapshot in
16     time from a very early stage. Ron Kirk who you have
17     listed here as safety supervisor with me became a
18     safety specialist with Michael Davis.
19 Q   Let's stop a second. Ignoring the names of who filled
20     which of these blocks, did this construction as to an
21     organization chart remain essentially the same during
22     the time that you worked as a safety supervisor?
23 A   Essentially the same.
24 Q   Okay. All right. Doug Smith was your immediate
25     supervisor but he -- there were times when Mr. Smith

Page 61

1      was not on the Slope correct?
2  A   Correct.
3  Q   And when he was gone, did you act in his stead?
4  A   For certain things I did yes.
5  Q   Okay. Give me some examples of what you did in his
6      shoes, when he wasn't there.
7  A   Gather everybody's timecards, sign them and make sure
8      that they got submitted to the accounting. Answer all
9      the questions in regards to the department, you know,
10     like we talked earlier about people coming and asking
11     questions about the construction or the field services
12     area production services, so I would handle those
13     questions as best I could. Try to keep things rolling.
14 Q   Okay. Did you attend supervisory meetings?
15 A   Can you explain that supervisory business?
16 Q   I'll give you some specifics in a minute, okay? Where
17     you attended, we'll talk about that. When you said
18     answer questions from the departments that would come
19     into the office, give me a, for example, what would
20     somebody be asking?
21 A   For example, somebody would come in and say, hey are
22     you going to have somebody on pad such and such, at
23     this time to do the confined space and I would say, I
24     will know since I know about it. So, I'd call one of
25     these guys, whoever was out in the field closest to

16 (Pages 58 to 61)

Case 3:03-cv-00174-RRB   Document 38-3   Filed 08/04/2006   Page 8 of 9

JOHN GILBERT vs. APC NATCHIQ, INC.
CASE NO. 3:03-CV-00174-RRB

DEPOSITION OF JOHN D. GILBERT
MAY 31, 2006

Page 62

1   their need and get them on the radio and send them over
2   there.
3 Q  Okay. In that sense were you a coordinator of the work
4   that was being done by HSE?
5 A  You could say that, yes.
6 Q  Okay. What's another, for example, kind of question
7   you might get?
8 A  The client, Industrial Hygienist might come down and
9   ask did you guys do samples on this date, at this
10  location and I would go to the sample record book, and
11  open it up and say yes or no.
12 Q  And would they ask you for what the results were or
13  anything like that?
14 A  Yes, we'd just show them it's all in the books, so
15  you'd open the book and say, if it was there, here's
16  the results for that day, on this person.
17 Q  Okay. Give me another, for example.
18 A  Somebody might come and say, hey we have an injury or
19  an illness with a particular employee and you need to
20  go to the medical and meet him and make sure that the
21  appropriate paperwork's filled out so I would handle
22  that.
23 Q  Okay. And that was within the Workers' Comp program
24  and the OSHA recordable program?
25 A  That was just out of the recordable program.

Page 63

1 Q  Okay. Now there were -- thinking about the recordable
2   program under OSHA there were certain illnesses or
3   injuries that would occur that would not be recordable,
4   is that correct, under the regulations?
5 A  Correct.
6 Q  And would you be the person who would make the
7   determination as to whether this was recordable as a
8   lost time or personal incident?
9 A  I could be that person, yes.
10 Q  Okay. And you'd be exercising your judgment over the
11  situation?
12     MR. COVELL: Objection.
13 Q  (By Ms. Zobel) Is that correct?
14 A  I would be exercising the requirements of the CFR and
15  the company's regulations. Not my judgment -- but the
16  company's order, federal government's.
17 Q  All right. You said a moment ago as one of your
18  examples that you -- that the client might come to you
19  and ask a questions if something were done. Was this
20  an activity that you would do fairly regularly to
21  interface with the client, Phillips Alaska?
22 A  Yes, it happened quite frequently.
23 Q  Okay. Were you at times considered a spokesperson for
24  the Department of Health -- HSE, for APC when it came
25  to interacting with the client?

Page 64

1 A  Yes, you could say that.
2 Q  Okay. Let's look at some of these meetings, I said
3   we'd be talking about. Well I think we'll look at some
4   of these meetings.
5     COURT REPORTER: I'm marking G-6.
6       (Deposition Exhibit G-6 marked)
7 Q  Senior staff meeting, February 13, 2002. This is
8   during the time period when you were a safety
9   specialist, was it not? I mean a safety supervisor,
10  was it not, sorry?
11 A  Yes.
12 Q  That's February '02. I just wanted to be sure we were
13  on the.....
14     MR. COVELL: Just to make it easy, I thought
15  this was safety specialist time.
16     MS. ZOBEL: No.
17     MR. COVELL: All right.
18     MS. ZOBEL: No, safety specialist began as a
19  one.....
20     MR. COVELL: 01/02 through 4/03. Okay.
21     MS. ZOBEL: Yes, 01/03/02 safety supervisor.
22 A  We need to write those on the board.
23     MS. ZOBEL: I know. I have a cheat sheet.
24 A  Okay.
25     MR. COVELL: So it's approximately a year and a

Page 65

1   half safety supervisor from January of '02?
2     MS. ZOBEL: Through April of 03?
3     MR. COVELL: Right. And then for a year prior
4   to that safety specialist?
5 A  Correct.
6     MS. ZOBEL: That's correct, but we're only
7   dealing with six months at least under my theory.
8     MR. COVELL: Well weather or not he's entitled
9   to money.....
10    MS. ZOBEL: Yes.
11    MR. COVELL: .....is your theory. But whether
12  or not he was actually there in that position, we agree to
13  that?
14    MS. ZOBEL: Yes, yes.
15    MR. COVELL: That's fine.
16 Q  (By Ms. Zobel) Now senior staff meeting, who would
17  have been -- besides yourself, you're listed as an
18  attendee and we deleted names.
19 A  Oh, okay.
20 Q  Yes, you were the only one there. Who else would have
21  attended this, and you don't have to give me names.
22  We'll just get the org chart, is there anybody on this
23  org chart would have been there besides yourself or
24  Doug Smith if he were there.
25    MR. COVELL: Now just for the record, you're

Case 3:03-cv-00174-RRB   Document 38-3   Filed 08/04/2006   Page 9 of 9

JOHN GILBERT vs. APC NATCHIQ, INC.
CASE NO. 3:03-CV-00174-RRB

DEPOSITION OF JOHN D. GILBERT
MAY 31, 2006

Page 66

1 referring to what's marked as.....
2     MS. ZOBEL: G-5.
3     MR. COVELL: G-5 is the org chart.
4 A  Can I just look at this senior staff meeting for just a
5    second maybe it'll jog my memory here.
6 Q  (By Ms. Zobel) Sure.
7 A  See, I can't tell if this is a -- is this a Phillips
8    senior staff meeting or an APC senior staff meeting?
9 Q  Well let me ask you this: You're shown as an attendee
10   of this and as a safety specialist you never would have
11   attended a senior staff meeting whether it was an APC
12   senior staff meeting or a PAI senior staff meeting
13   would you have?
14 A  There's a chance that I could have attended a senior
15   staff meeting as a safety specialist.
16 Q  Okay. After.....
17 A  For both companies.
18 Q  After you became a safety supervisor, was there a
19   situation where anyone who was a safety specialist
20   would ever have attended these meetings or would it
21   only be you or Doug Smith?
22 A  No, it could have been anybody out of the department.
23   Any of the -- any of the safety specialists could have
24   attended one of these -- could have.
25 Q  Could have. But was that the norm?

Page 67

1 A  Yes.
2 Q  That they did it regularly?
3 A  By regularly, what do you mean?
4 Q  Well these meetings were held what, monthly?
5 A  That I don't know.
6 Q  All right. Was there ever a senior-staff meeting held
7    that you know somebody who was a safety specialist
8    attended when you were otherwise available or Doug
9    Smith was available?
10 A  I can't answer that, I don't recall.
11 Q  All right. What about -- I'm going to show you some
12   change out notes that you did.
13     MS. ZOBEL: Oh, a mess up.
14 A  It doesn't have a yellow sticky on it yet.
15    COURT REPORTER: G-7.
16         (Deposition Exhibit G-7 marked)
17    MR. COVELL: Madame clerk, do you just want to
18 pass the exhibit stickers down here, do you trust us with them?
19 And we could put them on perhaps?
20    COURT REPORTER: I do trust you.
21    MS. ZOBEL: Whatever is easiest, I want to move
22 this along.
23 Q  (By Ms. Zobel) Were there meetings that were held
24    amount the senior staff of APC that you step into the
25    position and attend when Doug Smith was unavailable?

Page 68

1 A  Yes.
2 Q  Okay. And your representation would be the HSE
3    department?
4 A  Yes.
5 Q  Okay. These are some examples of some of your change
6    out notes, we've marked it as Exhibit G-7. Do you
7    recognize these?
8 A  I recognize the notes, yes.
9 Q  This would have bene January 3rd of 2002, it looks
10   like. So, now, you said the date on this is 01/20/01.
11   You don't mean that do you? Change out notes of
12   January 3 -- yes, haven't you misstated the date?
13 A  Probably blew the date, yes.
14 Q  Okay. These were done to -- for what reason?
15 A  Well first of all I guess the two, the change out
16   memorandum two, I don't know -- what did you.....
17 Q  We took all the names out.
18 A  Are you sure there was a name there?
19 Q  Yes, there was a name there.
20 A  Because sometimes I would just keep my notes here for
21   the next go around when I didn't have an alternate or
22   nobody to hand these off to.
23 Q  Okay.
24 A  So I just wanted to make sure there was.
25 Q  Yes.

Page 69

1 A  Okay. So you took a name off there, so I provided this
2    to my alternate, whoever that might have been at the
3    time to let them know what I had done during my time
4    period on the Slope and to assist them in getting up to
5    speed for what was going on overall.
6 Q  Okay. And it looks like there, you've divided it into
7    topics. And lets go through those topics and have you
8    tell me generally, what your responsibilities were?
9    Illness and injuries, what were your responsibilities
10   here?
11 A  Basically, I am just stating who got hurt, when, and
12   what their status was and how they were handled and
13   probably whether or not they were -- well in which
14   regard they were classified, you know. Were they a
15   first aid incident, were they a recordable incident --
16 Q  Time loss, et cetera?
17 A  Yes, so on.
18 Q  And what within the injury area besides determining and
19   recording that people were a time loss for your OSHA
20   300 or OSHA 200 depending on the time period log, what
21   other, if any responsibilities, did you have vis a vis
22   somebody who was injured?
23 A  I'm not quite sure how to answer that. I guess
24   basically somebody would bring -- would call me first
25   of all or let us know -- let me know, let the