Case 3:03-cv-00174-RRB   Document 38-4   Filed 08/04/2006   Page 1 of 8

JOHN GILBERT vs. APC NATCHIQ, INC.
CASE NO. 3:03-CV-00174-RRB

DEPOSITION OF JOHN D. GILBERT
MAY 31, 2006

Page 70

1  department know that there's an injured employee on his
2  way to the medical facility at which point they would
3  come in and kind of hand them off to me. Or if whoever
4  was in the office at the time and they would take over.
5  Run them to the medic, make sure they got to the medic,
6  got in there, filled out all the appropriate paperwork
7  and then, you know, if they needed a ride to the
8  airport to get off of the Slope, you'd drive them to
9  airport and put them on a plane, send them to medical
10 facilities if they needed it. Or you would attend to
11 them and their needs and their bunk if you will, their
12 room. And then besides that it was just notifying
13 their supervisor as to what had happened and making
14 sure that all the paperwork was complete.
15 Q  I note on here where you talk about some people coming
16    back onto the job in light duty, for example. Is this
17    something that you had any responsibility for returning
18    people to work to minimize the recordables?
19 A  No, it's a pretty -- that's a pretty gray area. It's,
20    you know, when you bring somebody back light duty,
21    that's kind of a gray area in the rules and regulations
22    so --
23 Q  In what sense?
24 A  Well you know you have first aids and then you have
25    recordables and then you have nonrecordables. So when

Page 71

1  you have a light duty, you're just trying to save your
2  time here -- yourself a recordable incident or a lost
3  time incident by bringing them back. Keeping them on,
4  not doing exactly what their function is as well. So
5  I honestly can't remember whether I would have had
6  anything to do with that, but most work returns and
7  light duty were not -- they were above my level. I
8  would not have made that call to bring somebody back on
9  light duty, it would have been Doug, Gary Buchanan or
10 one of the department supervisors in construction
11 production, drilling, et cetera.
12 Q  Okay. And if the determination was made to return
13    somebody to light duty did you do any monitoring of
14    whether they were physically capable of doing this in a
15    safe manner?
16 A  No, because if they brought somebody back on light
17    duty, he'd basically be sitting at a desk doing
18    nothing.
19 Q  Within the need to know area it looks like you've got
20    clearance isn't the correct word, but you were in the
21    chain of command that has -- that is privy to people's
22    medication uses and the nature of their injury and
23    treatment, was that correct?
24 A  Where are you at?
25 Q  I'm looking just in general, all of these reported that

Page 72

1  somebody has an infection, they're given antibiotics,
2  if somebody is going to a chiropractor, et cetera. So
3  you're in the need to know level for medical, correct?
4 A  That would have just been provided information from the
5    medic.
6 Q  Okay.
7 A  But any of the safety supervisors or any of the safety
8    specialists, if they had brought this person to the
9    medic would have been in the -- in the know. They
10   would have known the same thing.
11 Q  So within the chain of command, and when the individual
12   is injured, the information regarding their medical is
13   that generally known or is that something that is
14   restricted to certain people?
15 A  The general medication is probably known by everybody
16   in the safety department although we try to keep it,
17   you know, private. But what happens with the medic and
18   the injured employee is strictly their confidential
19   business, you know. When an employee went in, if he
20   had an unknown injury, you know, I mean, you bring
21   them, in and they behind closed doors the medic would
22   evaluate him, prescribe him and all you would get is
23   this guy's, you know, bed rest for a week or he's
24   getting on the plane and going to town, and, you know,
25   here's his medication to get him there and that's all

Page 73

1  you'd know.
2 Q  When they go back onto the job, what are the -- who are
3    the people who would be privy to the information
4    regarding.....
5 A  Their supervisor.
6 Q  The supervisor only?
7 A  Yes.
8 Q  Okay.
9 A  I mean the supervisor of their department. They would
10   need to know.
11 Q  It's a need to know basis?
12 A  Yes. They would need to know what medications they
13   were on and so forth, and then the company had a policy
14   also that, you know, if you were out for an extended
15   period of time, you'd have to come back with a doctor's
16   release and the occasionally you'd have to go see the
17   company doctor to confirm that release.
18 Q  Okay. Next category is vehicle incidents?
19 A  Uh-huh (affirmative).
20 Q  What responsibility did you have vis a vis property
21   damage or in this case a vehicle incident?
22 A  Just recording it, so you could get down in the books
23   that there was an accident or same with the spills, you
24   know --
25 Q  Were you in the lineup to whom those incidents would be

Case 3:03-cv-00174-RRB    Document 38-4    Filed 08/04/2006    Page 2 of 8

JOHN GILBERT vs. APC NATCHIQ, INC.
CASE NO. 3:03-CV-00174-RRB

DEPOSITION OF JOHN D. GILBERT
MAY 31, 2006

Page 74

1  reported?
2  A  Yes, uh-huh (affirmative).
3  Q  And you'd be keeping paperwork then of that
4     information?
5  A  Yes, there was a book in the department that we kept
6     all the information in.
7  Q  Did you ever do any specific inspections or not
8     inspections, but did you go out in the field and
9     actually look at a vehicle incident and do any kind of
10    a safety audit on what happened? Did you ever
11    investigate accidents -- there we go.
12 A  Yes.
13 Q  What kind of accidents would you have been involved in
14    investigating?
15 A  Two trucks colliding on the Haul Road, god, scaffolding
16    tipping over, I don't know. Shoot, it could have been
17    a plethora of things, I don't know.
18 Q  Okay. An individual being injured would that be
19    something that you would investigate -- a fatality?
20 A  Yes, I would assist in an investigation. I mean, I was
21    never in charge of any of the investigations, but
22    assisted in a lot of them.
23 Q  And that was part of your duties as a safety
24    supervisor?
25 A  And specialist, yes.

Page 75

1  Q  And in your position as safety supervisor, you had the
2     additional responsibility of keeping the paperwork
3     regarding them, is that not correct as opposed to the
4     specialist?
5  A  No, actually, probably did less investigations as a
6     safety supervisor than I did as a safety specialist and
7     the paperwork portion of the investigations was really
8     the responsibility of the department, managers or
9     supervisors, if you will, not the responsibility of the
10    safety department although we would assist in almost
11    every incident or illness investigation so --
12 Q  Okay.
13 A  But the specialists were more involved in than I would
14    have been as a supervisor position.
15 Q  Well what would be your role, if there were an accident
16    then as a supervisor?
17 A  I think the final role would be to, you know, make any
18    comments you might have because they would assemble the
19    report and then they would distribute it to everybody
20    and then ask for comments. You would mark your
21    comments, send it back, they would issue a final
22    report. You'd review it. If there was any property
23    damage or if there was a recordable, whatever type of
24    injury you might have, you want to make sure you
25    followed up with the appropriate paperwork, get it

Page 76

1     filed in the system, and that would be that.
2  Q  Okay. When you said comments in reviewing it, what
3     sort of comments would you be making?
4  A  Well that's a pretty blanket statement, it could be
5     anything. You know, like a spelling error.
6  Q  Oh.
7  A  To, you know, that's not the way I heard it type of
8     comment, this is what I heard, you know.
9  Q  Would you be making any comments regarding this
10    occurring in the future or implementing some change in
11    procedure because of this accident?
12 A  It's potentially -- yes, you could make a comment that
13    says, geez, I think that from now on we ought to not,
14    you know, let guys drive 50 miles an hour on the Haul
15    Road so --
16 Q  Yes.
17 A  Maybe they need to drive 30, you know, so --
18 Q  When you did the review of these accident reports, was
19    it as a representative of the department as a whole of
20    APC or what capacity was it?
21 A  I guess it would just be another comment or I'm not so
22    sure it would be as a whole because there might be two
23    other safety specialists, you know making comments at
24    the same time, so it'd just be another comment or -- to
25    the investigation. I mean, my comments were not the

Page 77

1     last word.
2  Q  Well I guess what I'm getting at is why did they send
3     it to you if safety specialists have already looked at
4     it, if they didn't need somebody from corporate to look
5     at it, or from whoever was a representative of the
6     department?
7  A  I think it's to get more eyes on it, personally. I
8     have no good answer for you there. I mean, why did
9     they send it to the safety specialist? So it could be
10    the opposite question, so we had several people
11    involved in all of these investigations so --
12 Q  UA's, urinalysis?
13 A  Uh-huh (affirmative).
14 Q  And what was your responsibility there?
15 A  Let's see, we would bring the employees in for random
16    and then scheduled urinalysis and perform the entire
17    urinalysis procedure, you know.
18 Q  What was your role in the urinalysis program?
19 A  Same as everybody else's. You'd bring them in and
20    you'd sit them down. You'd have them fill out the
21    initial paperwork. You'd check them for contraband.
22    You'd take them in, give them the cup, watch them do
23    their thing in the cup, pull it back, make sure that
24    the temperature was correct on the cup and everything
25    looked okay. Then you would split the sample, load the

Case 3:03-cv-00174-RRB   Document 38-4   Filed 08/04/2006   Page 3 of 8

JOHN GILBERT vs. APC NATCHIQ, INC.
CASE NO. 3:03-CV-00174-RRB

DEPOSITION OF JOHN D. GILBERT
MAY 31, 2006

Page 78

1     sample in a sample bag and fill out the final paperwork
2     and send it to town.
3  Q  Who else would do this? You said the same as everybody
4     else?
5  A  Every- -- almost everybody in the department was able
6     to do those urinalysis except for the secretary.
7  Q  When you say in the department, who are you referring
8     to?
9  A  All the safety specialists, myself, and Doug and the
10    IH.
11 Q  Okay. And among those individuals who were trained to
12    be able to do this, you had to be trained to.....
13 A  Correct.
14 Q  You had to be able to sign off on them, correct -- to
15    be able to do them?
16 A  You had to be trained.....
17 Q  Right.
18 A  In order to do the test, yes.
19 Q  All right. If you were available, were you the one
20    that did them as opposed to other individuals?
21 A  I guess the answer's yes, if I was available I would do
22    it. However, if somebody else was available they would
23    do it so -- and I don't know how to split that up.
24    It's -- it was a free for all. If you had time you did
25    it, irregardless of who you were.

Page 79

1  Q  Okay. Let's take the -- you had two programs for
2     urinalysis, correct?
3  A  Can you --
4  Q  One that would be if there was an accident it was
5     required that people give a UA, correct?
6  A  Correct.
7  Q  And then you had random?
8  A  Correct.
9  Q  Within those two, if somebody were in the random group,
10    would you be expected to be the one administering those
11    UA's.....
12 A  Not necessarily.
13 Q  .....within the office?
14 A  Not necessarily.
15 Q  You'd bring safety specialist out of the field in order
16    to do those?
17 A  It's -- it's -- yes. It's highly possible. There
18    could be a safety specialist doing it instead of me.
19 Q  Well what was the norm, not whether it was possible?
20 A  There is no norm. It was just a free for all. If you
21    had time you would do it. I was not specifically
22    responsible for doing a random urinalysis.
23 Q  Okay.
24       MR. COVELL: I need to take a five minute break
25    for a quick phone call. I apologize.

Page 80

1        MS. ZOBEL: Sure.
2     (Off record)
3     (On record)
4  Q  (By Ms. Zobel) Going this list of areas that you're
5     reporting on, it says safety department. Let's go to
6     page 299 of this exhibit. The first bullet says blank
7     called from Soldotna regarding the 624 Safety
8     Specialist JVA. Would that be about a job or why would
9     he be calling?
10 A  That -- yes, it could be about a job, I'm not sure. I
11    would -- it's hard to say.
12 Q  Okay. Did people call you when they're looking for
13    employment within the safety department at Kuparuk?
14 A  They could have called me, yes.
15 Q  Okay. Did you have some hand in reviewing or getting
16    JVA's or the hiring process?
17 A  No, I simply would take the phone call, gather up -- if
18    somebody sent a resume we'd gather it up, if we were
19    hiring. And then we -- we would as a department, I
20    guess, if -- well there's a couple of different ways it
21    could have happened. Sometimes guys would just show up
22    and say I'm working, and that would happen. Other
23    times we'd be short a hand and the word would go out,
24    hey call everybody you know and see if we can get them
25    up here. You know, if you know anybody. So as a group

Page 81

1     we'd all call who we knew and they would send a resume
2     or some other form of information and we'd all kind of
3     just look through them and then a final decision would
4     be made as to -- if they're going to hire them or not.
5  Q  Who would make the final decision?
6  A  Doug in this particular instance.
7  Q  Okay. And would Doug be looking to you to give him
8     your input as to who would be hired?
9  A  Myself and others, yes.
10 Q  Who would the others be?
11 A  All the safety specialists.
12 Q  Okay. There's another bullet point down here about
13    mid-way through about a Mr. Ken Quinlan who contacted
14    me. He's an IH who is currently working in Arizona.
15    He's looking for work.
16 A  Uh-huh (affirmative).
17 Q  And then you told him to send the resume to a certain
18    e-mail. Who's e-mail is that?
19 A  It might have been mine. It might have been Doug's, I
20    don't know.
21 Q  Does that look like yours?
22 A  I don't recall.
23 Q  All right. Then back up on this page, on 299 it says
24    blank approached me about a problem she's having with
25    her alternate and is unhappy with the amount of work

21 (Pages 78 to 81)

Case 3:03-cv-00174-RRB   Document 38-4   Filed 08/04/2006   Page 4 of 8

JOHN GILBERT vs. APC NATCHIQ, INC.
CASE NO. 3:03-CV-00174-RRB

DEPOSITION OF JOHN D. GILBERT
MAY 31, 2006

Page 82

1   that's being completed during her hitch. Did you have
2   responsibilities to deal with unhappy employees within
3   the department?
4  A   No, I -- Doug handled all that.
5  Q   Well if Doug wasn't there did you just blow them off
6   and say wait until Doug's there or what did you do?
7  A   Pretty much.
8  Q   Oh. Did you ever problem solve with people who were
9   unhappy?
10 A   Yes, sure.
11 Q   All right. It says I've not talked with blank and
12  there's always two sides to the story, would you do the
13  two sides to the story? Would you investigate?
14 A   I know what this is all about here. This is Kim and
15  Amanda were not -- they were butting heads and, you
16  know, I just deferred all this to Doug.
17 Q   Is that because it wasn't your responsibility or
18  because you just didn't want to deal with the personnel
19  issues in the admin office?
20 A   I don't think it was my responsibility so --
21 Q   Okay. What about if there was some lack of
22  attentiveness or work ethic or whatever on the part of
23  the safety specialist? Would it be your responsibility
24  to call that to their attention and tell them they
25  needed to get it straight?

Page 83

1  A   I can't ever recall that happening, so I don't know how
2   to answer that. No.
3  Q   You never had anybody from any of the different places
4   where these people were embedded -- the supervisors
5   calling you and saying we're having trouble with so and
6   so?
7  A   Oh, I think there was a lot of that particular type of
8   stuff going on all the time. You know, I mean the
9   safety department is not -- how shall I put this --
10  well liked by either management or employee.
11 Q   Why is that?
12 A   You're the bad guy. You know, you're always -- you
13  have nothing good to tell management and you're always
14  on the employee's back to make them work safe so nobody
15  likes you. Yes, you could get a call several times a
16  day complaining about the safety guy.
17 Q   And you're the guy that they would bring those
18  complaints you?
19 A   Yes, myself or Doug or Ron Kirk or.....
20 Q   As your alternate?
21 A   Gary Buchanan or.....
22 Q   Gary over -- what was his position -- over Doug?
23 A   Yes, he's the -- let's see if I can get this right.
24 Q   You don't have to worry about what his.....
25 A   I don't know, I can't remember his title.

Page 84

1  Q   Okay.
2  A   It would be a guess.
3  Q   Then safety staff meetings: when you hold a safety
4   staff meeting, would you conduct those meetings?
5  A   (No audible answer)
6  Q   It says I basically went over what so and so presented
7   to the rest of the group the previous Saturday. Also
8   discussed the modification to the APC PP and G manual.
9   We're right here.
10 A   Two 99, right here. It looks like I did conduct that
11  one, yes.
12 Q   Okay. Is that some of what you regularly did?
13 A   Well we weren't very good at having regular meetings.
14 Q   When you held meetings, who conducted them?
15 A   It's -- it's possible that I conducted them. It's also
16  possible Doug conducted them or one of the safety
17  specialists if he had something in particular he wanted
18  to talk about he would conduct them. It was pretty
19  informal.
20 Q   Okay. He'd be on the agenda, but somebody else would
21  set the agenda?
22 A   I don't even know if you could go as far as saying
23  there was an agenda.
24 Q   Oh, I've got some agendas.
25 A   Okay. Good.

Page 85

1  Q   We'll get to some of those in a minute.
2  A   Good.
3  Q   Now, it says here that you discussed a modification of
4   a -- what's a PP and G manual?
5  A   That stands for policy, procedures and guidelines
6   manual.
7  Q   And was it your responsibility to -- it says it --
8   modifying the program to meet our needs? Was that part
9   of your responsibility to come up with suggestions on
10  how to do that?
11 A   No, it wasn't my responsibility. I guess I took it
12  upon myself to jump in and -- and update what they
13  already had to more -- to meet the current needs of
14  what we were doing on the -- on the Slope at the time.
15 Q   Okay what's the ASH 2002 rollout?
16 A   That is the -- what the heck does that stand for?
17  Alaska Safety and Health 2002 manual that the client
18  puts out. I think that came from ConocoPhillips -- or
19  it's actually a conglomeration of Conoco and BP and all
20  the oil companies at the -- on the Slope get together
21  and they revise this little safety and health manual
22  every year that they give to the employees. I don't
23  know if it's every year or not, but a small manual that
24  they give to all the employees every year. I mean,
25  it's just general health and safety information for the

Case 3:03-cv-00174-RRB   Document 38-4   Filed 08/04/2006   Page 5 of 8

JOHN GILBERT vs. APC NATCHIQ, INC.
CASE NO. 3:03-CV-00174-RRB

DEPOSITION OF JOHN D. GILBERT
MAY 31, 2006

Page 86

1     Slope.
2 Q   Okay. Was it your job to be sure that the people that were below you on the org chart had that information as to changes that needed to be complied with?
5 A   No. No, it was general knowledge. You just -- I mean, you could get one of those manuals anywhere.
7 Q   So it was just hit or miss, you didn't have discussions about them?
9 A   Oh, we were all in -- we helped to review this thing months in advance. So everybody was in the know as to what it was. So it looks to me like somebody in -- e-mailed to me and I just passed it on to everybody else.
14 Q   Okay. Within the safety department, if somebody in the field needed a piece of equipment did you have authority to purchase that of to authorize purchase of it?
18 A   It may have had authority to opera- -- to authorize the purchase or -- or get it.
20 Q   Okay. And within the budget for the department itself, did you come up with a wish list, so to speak, or contribute to what kinds of equipment needed to be purchased for the department?
24 A   Yes, I think you see that here in this next bullet. We put together a list, and I just went through and asked

Page 87

1 everybody what we -- what they thought we needed and we put together a list and I put them together here.
3 Q   Okay.
4 A   It just.....
5 Q   Well have -- here's something called an instrument replacement analysis.
7 A   Uh-huh (affirmative).
8     MS. ZOBEL: And madame court reporter would you pass them a sticker please?
10     MR. COVELL: I've got the stickers.
11     MS. ZOBEL: Oh, all right.
12     MR. COVELL: So we'll mark this G-8 for the record.
14     (Deposition Exhibit G-8 marked)
15     MS. ZOBEL: That's fine.
16 Q   (By Ms. Zobel) Do you recognize this? It has your name in the right-hand corner.
18 A   Oh, yes, this is a spreadsheet I built. Okay.
19 Q   What is it you did?
20 A   Let's see here.
21 Q   I don't know if this is all of it, but tell me what this page represents.
23 A   Well give me a second. I'll get up to speed here. It looks like I was trying to come up with a cost analysis of -- we had some old equipment on there. Some old

Page 88

1 monitoring equipment and we wanted to replace it with something newer. So, let's see here. There must be a separate sheet that goes with the newer -- this is all equipment, I believe. So, there's probably another sheet that has -- that compares the bottom line cost of all this old equipment with the bottom line cost of some new equipment.
8 Q   Okay. Were you make recommendations in this analysis for things that needed to be replaced or were you just inventorying stuff?
11 A   I think what we had was -- I think we had some guys come up and demo some new equipment and we thought it was pretty neat. So we decided we would determine whether or not it was worth the money.
15 Q   Okay. And.....
16 A   So I guess I was probably just comparing costs is all I was doing.
18 Q   And that was part of your job description that you would analyze what equipment would be best to be replaced and how to replace it?
21 A   Oh, I don't know if you could say that. I think everybody was involved in whether or not we would replace equipment or not.
24 Q   But doing the analysis. I mean everybody didn't do an analysis separately like this?

Page 89

1 A   I can't say that they did or did not. I have no idea whether somebody else did an analysis like this or not for the same or similar equipment.
4 Q   How is it that you would do such an analysis? I mean would you be assigned to do it or did you take it on yourself and do it?
7 A   Either way, maybe somebody asked me to do it, or I could have just said well I wonder if it's worth buying the new stuff? How much is the old stuff worth and just did this.
11 Q   Okay. Did you meet with vendors and talk to them about equipment that might be available out there.....
13 A   At times.
14 Q   .....to be useful?
15 A   At times, yes.
16 Q   Okay. I have a --
17     MR. COVELL: There you go. We'll be on G-9 on this next paper.
19     (Deposition Exhibit G-9 marked)
20     MS. ZOBEL: Okay.
21 Q   (By Ms. Zobel) This is -- it looks like somebody writing to you or this is like, somehow, we ended up with page one of this. But tell me what this is if you can?
25 A   Yes, this is a gentleman that -- I can't remember

Case 3:03-cv-00174-RRB   Document 38-4   Filed 08/04/2006   Page 6 of 8

JOHN GILBERT vs. APC NATCHIQ, INC.
CASE NO. 3:03-CV-00174-RRB

DEPOSITION OF JOHN D. GILBERT
MAY 31, 2006

Page 90

1  whether we looked into it or he presented himself to us
2  to come up and provide some fall protection training
3  for the department, all the guys and our department as
4  well as maybe the guys in Phillips too, so --
5  Q  Okay. And you met with this gentleman?
6  A  I don't believe I ever met this guy, but I can't recall
7     for sure.
8  Q  Oh, you had a discussion with him it looks like?
9  A  Yes, I think all it was was a phone discussion, on the
10    phone, and then he sent -- this is like a -- this is
11    just like a quote.
12 Q  Uh-hum. Would you be -- using this as an example, not
13    specifically, this particular situation, when you would
14    meet with vendors, would you then pass on your
15    recommendation one way or another as to whether it
16    would be appropriate for the department?
17 A  Yes, I guess. You know, I mean, there's all sorts of
18    salesmens (ph) up there so --
19 Q  Yes. And you wouldn't pass everyone of them on to Doug
20    or the upper -- on to the department, would you?
21 A  I tried to pass everything that was presented to me
22    along to everybody in the department.
23 Q  So you said there's all kinds of vendors up there. So
24    every time you talked to a vendor you disseminated that
25    information?

Page 91

1  A  Tried to.
2  Q  Would there ever be a situation where you decide this
3     just isn't worthwhile and you wouldn't waste people's
4     time?
5  A  Could have been, yes.
6  Q  Okay. I'm going to show you another one of these just
7     to ask you about it.
8  A  Okay.
9        MR. COVELL: G-10.
10         (Deposition Exhibit G-10 marked)
11       MS. ZOBEL: Madame court reporter do you want
12 these still?
13       COURT REPORTER: Yes, please.
14       MS. ZOBEL: Okay.
15 Q  (By Ms. Zobel) This is -- can you tell me what this
16    is?
17 A  Let's see here. Again, it's just another -- Gravitec.
18    It must be a fall protection system, I'm guessing. And
19    somebody just sent a brochure to us, probably all this
20    was, you know.
21 Q  Okay. And you were the point person that they sent it
22    to?
23 A  In this case, yes.
24 Q  Okay. And do you know what you did with the Gravitec
25    System information?

Page 92

1  A  Probably passed it along to the department; Doug and
2     the rest of the guys and I think that's where it got
3     dropped. Nothing become of it.
4  Q  Who's the rest of the guys?
5  A  The safety specialists.
6       MR. COVELL: I just annotated that G-10 again
7  because the dash between the G and the 10 made it look like a
8  G-40.
9       MS. ZOBEL: Oh.
10      MR. COVELL: So that's what I was doing there.
11      MS. ZOBEL: Okay. Yes, we're going to put you
12 in charge of this, you better do it right.
13      MR. COVELL: I'm trying. My handwriting is not
14 exemplary.
15 Q  (By Ms. Zobel) This is another memo. I just want to
16    ask you what this is.
17      MR. COVELL: G-11.
18         (Deposition Exhibit G-11 marked)
19 A  G-11.
20      MS. ZOBEL: Sounds like a bingo number, doesn't
21 it?
22 Q  (By Ms. Zobel) Okay. Tell me what this is?
23 A  It looks like it is a memo from me to somebody. And it
24    just simply summarizes what our costs were in -- from
25    '95 to 2002, I guess.

Page 93

1  Q  This is a.....
2  A  Assembling costs.
3  Q  This is to input for the budget?
4  A  It looks that way.
5  Q  Okay. Who's John Harvill?
6  A  I don't recall.
7  Q  Do you know who N-a-t-l-s-c-o is?
8  A  It's just a sampling analysis lab.
9  Q  Okay.
10 A  So it look to me like somebody wanted to know how much
11    money we had spent over the years on sampling with this
12    outfit, so I went to the book and opened it up and
13    added it up and sent him an e-mail.
14 Q  So you created the work? Did you do a worksheet to do
15    that, is that what you did?
16 A  Yes, I would have just used a spreadsheet.
17 Q  Okay. Within your job you talked about how -- and your
18    not the most popular people because you're telling
19    people what they can't do and how they have to do
20    things safely, if somebody was not doing things safely
21    out in the field, what was your responsibility?
22 A  To stop the work and correct the situation and make
23    sure that they've preformed their work in an
24    appropriate safe manner.
25 Q  Okay. Did you have any voice in any of the discipline

24 (Pages 90 to 93)

Case 3:03-cv-00174-RRB   Document 38-4   Filed 08/04/2006   Page 7 of 8

JOHN GILBERT vs. APC NATCHIQ, INC.
CASE NO. 3:03-CV-00174-RRB

DEPOSITION OF JOHN D. GILBERT
MAY 31, 2006

Page 94

1  that might come out of the violation of safety?
2  A  No. Can you expand on that please when you say.....
3  Q  Well could you, for example, could you -- did you ever
4     make recommendations that somebody be terminated or
5     disciplined because of their actions?
6  A  No.
7  Q  Okay. I noted in one of the memos, and I don't think I
8     copied it, something about calling -- referring to the
9     cop aspect of the job and that people were not doing
10    that. Tell me what you meant by that?
11        MR. COVELL: If you can answer the question.
12 Q  (By Ms. Zobel) You nodded when I used the term cop.
13 A  Well the term copy, is just simply, you know, the --
14    there was always a separate approach and it would just
15    -- would funnel down from primarily Gary Buchanan --
16    that I want you guys to be policemen out there on the
17    patrol all the time. Making sure that, you know, these
18    guys are in line. And then it would swing, you know,
19    these were on a -- a pendulum -- these ideas. So, it
20    would go from being the cop to being the -- you're best
21    buddy, you know. And then it'd go back to being the
22    cop. So, back and forth, back and forth and that's all
23    that refers to. So, if you're the cop you're out
24    there, by god, I'm writing you up, you know. You're
25    doing the wrong thing, I'm going to -- I'm shutting you

Page 95

1     down. You can't work any more. You know, taking the
2     hard line. And then the other side would be, you know,
3     you guys, you know, you might want to reconsider what
4     you're doing and try a different approach.
5  Q  Okay. So if the pendulum was on the side of the cop
6     mentality, if the perception of corporate was -- or
7     Gary Buchanan was -- that we weren't following through
8     on that, what would role be then? To communicate that
9     to the troops or what?
10 A  Yes.
11 Q  Okay. If there had bene a violation of safety that
12    came to your attention, did you ever suggest that there
13    be new training implemented?
14 A  Could have, yes.
15 Q  And would you recommend ever that there be transfers or
16    anything like that of individuals?
17 A  I don't think I would have ever made a recommendation
18    that somebody get transferred. I might have gotten mad
19    at somebody and said take a day off, but there's really
20    nothing formal there at all so --
21 Q  Okay.
22 A  It's -- you know, it's difficult being the safety guy
23    out there because the last thing you want is somebody
24    to get hurt while you're trying to keep them safe so --
25 Q  Yes. In addition to having federal and state

Page 96

1     regulations that you had to follow in safety -- and
2     that's a given, you did have to follow state and
3     federal regulations, correct?
4  A  Correct.
5  Q  Were there compliance requirements from clients as well
6     -- from the client?
7  A  Yes.
8  Q  Okay. So did your responsibilities include working
9     with the client in any manner in developing those
10    requirements?
11 A  Not in developing the clients' requirements. I worked
12    with the client.
13        MR. COVELL: And just to be clear, these are
14 client safety requirements, right?
15        MS. ZOBEL: Yes, yes. Safety -- within his
16 field, right.
17        MR. COVELL: Okay.
18 Q  (By Ms. Zobel) And how would you work with the client?
19    Explain that to me. What were your interfaces?
20 A  I might go to a drill pad and meet with one of the
21    client's safety specialists or their super- --
22    supervisory personnel and walk down a job.
23 Q  Meaning walk down a job -- what's that mean?
24 A  Just walking down for safety issues -- safety problems.
25 Q  And what would happen if there were safety issues

Page 97

1     discovered?
2  A  Put our heads together and come up with a way to
3     mitigate them.
4  Q  Okay. And you were one of the people that was
5     designated to do this with the client?
6  A  You could say that as well as all the guys in the
7     department, every safety specialist, the manager, the
8     -- everybody was designated to do that to work with the
9     client and provide them with what they needed.
10 Q  Okay. Let's talk a little bit about the department and
11    you were there when there were changes made within the
12    department were you not?
13 A  Yes.
14 Q  Okay. When you first went to work, did the position
15    that you held when you left exist?
16 A  Yes.
17 Q  It did. Who held it?
18 A  The position?
19 Q  Of safety supervisor?
20 A  That I can't answer. I don't know.
21 Q  Okay. Within your position as a safety supervisor, did
22    you have responsibilities that were different from the
23    safety specialists?
24 A  Not different, but probably in addition.
25 Q  Okay. Tell me what they were in addition.

Case 3:03-cv-00174-RRB   Document 38-4   Filed 08/04/2006   Page 8 of 8

JOHN GILBERT vs. APC NATCHIQ, INC.
CASE NO. 3:03-CV-00174-RRB

DEPOSITION OF JOHN D. GILBERT
MAY 31, 2006

Page 98

1  A   I guess the only thing that really separates it is that
2      you're -- you're not out in the field as much as the
3      safety specialist. So you'd be again, answering the
4      questions of the -- from the client or from whomever
5      while you were in the office. So, it would be the
6      primary, you know, you boil it right down to it. You
7      know, that's probably the primary difference. You're
8      taking care of the questions that are presented to the
9      office, because you're the guy in the office.
10     Otherwise, you're, you know, still go out in the field
11     and do the same sampling and same testing, same walk
12     downs, everything is identical to the safety
13     specialist.
14 Q   Those activities that you just described, sampling,
15     testing, walk downs --
16 A   Uh-huh (affirmative).
17 Q   Was that your primary role or was your primary role in
18     the office?
19 A   Primarily it would be in the office.
20 Q   Okay. And when it is that you would do this sampling
21     testing and walk downs?
22 A   It could be at any given moment. Any -- any -- no set
23     time or schedule.
24 Q   Would it be at the request of whom?
25 A   It could be at the request of the client, it could be

Page 99

1      at the request of upper management, it could be at the
2      request of one of the safety specialists, it could be
3      at the request of one of the department managers.
4  Q   And would it be done because the safety specialists who
5      ordinarily would be there, would not be available?
6  A   That would be one reason, yes.
7  Q   Okay. Would you do it for there were a problem? Would
8      you be called out specially if there were some sort of
9      a problem?
10 A   Can you explain that a little bit? I mean, if there's
11     some sort of a problem -- what?
12 Q   Well you said that it might be at the request of the
13     supervisor -- the line supervisors in the field?
14 A   Yes, if -- if there's a -- god the reasons are infinite
15     why you might be called to go out and do something.
16     But -- and a for example would be the client's methane
17     meter's not giving them the correct reading. Can you
18     come out and confirm with a different meter, the two
19     meters are in sync. I mean, it could be anything.
20 Q   Okay. And who would call you under those
21     circumstances?
22 A   Again, it could be the client, it could be the -- the
23     department heads, it could be the -- another safety
24     specialist, it could be a crewmember. Anybody, any
25     employee could call me.

Page 100

1  Q   Okay. Are you doing that as a back-up to these people
2      or as a substitute when somebody else isn't available
3      or --
4  A   Both.
5  Q   Both. Okay. All right. And this -- the amount of
6      time that you did these kinds of activities was what?
7  A   I don't know. At random, it could be on a daily basis
8      some shifts on the Slope or it could be a weekly basis.
9      Some weeks maybe not at all.
10 Q   Intermittent?
11 A   All over the board.
12 Q   But is that accurate that it would be intermittent or
13     on an as-needed basis as opposed to that being your
14     first responsibility?
15 A   Oh, I think that was a primary responsibility was not
16     office work, but a primary responsibility would be to
17     make sure that everybody in the field is taken care of
18     before the paperwork is taken care of in the office.
19     So, if you wanted to assign priorities, the field work
20     would come first and then everything else would be
21     secondary.
22 Q   Okay. Within the assigned activities that you were
23     doing though, how often would you have to exercise this
24     as compared with the office work that you also had to
25     do?

Page 101

1  A   I can't put it -- I mean, I don't know how to better
2      explain it than it was just at random.
3  Q   Okay.
4  A   It was all over the board. Some -- some hitches it
5      would be daily. You know, other hitches it would be
6      zero so --
7  Q   Okay. There was -- let me see if I can find that. One
8      of the projects that it looked like you were assigned
9      to early on was to rewrite some sort of a policy
10     handbook, is that jogging your memory? Can you tell me
11     what that was?
12 A   Yes, the department was a whole, we all chipped in and
13     tried to rewrite the policies, procedures and
14     guidelines manual. We all took different sections of
15     it. That thing's a huge document. I forget how many
16     pages. No, it wasn't complete when I left. So, I
17     don't know if it ever got finished, but it's a big
18     document.
19 Q   Were you the point of coordination for that document?
20 A   Yes, I was the guy that was taking everybody's papers
21     and putting them in the notebook, so --
22 Q   Did you write some procedures for different policies?
23 A   It's possible. Either wrote them or rewrote them.
24 Q   Okay. NORM testing -- is this an example of something
25     that you would have been responsible for putting

26 (Pages 98 to 101)