Case 3:03-cv-00174-RRB   Document 38-5   Filed 08/04/2006   Page 1 of 8

JOHN GILBERT vs. APC NATCHIQ, INC.
CASE NO. 3:03-CV-00174-RRB

DEPOSITION OF JOHN D. GILBERT
MAY 31, 2006

**Page 102**

1  together procedures?
2      MR. COVELL: G-12. So who's Norm?
3      (Deposition Exhibit G-12 marked)
4      MS. ZOBEL: NORM is the Naturally Occurring
5  Radioactive Material.
6      MR. COVELL: Oh, okay. I thought it was one of
7  the other specialists. So -- okay.
8  A  This is just a memo that's breaking down what PAI sent
9    to everybody.
10 Q  (By Ms. Zobel) And PAI is Phillips Alaska?
11 A  It's Phillips Alaska, yes. So it's just.....
12 Q  They were the client?
13 A  .....the client, yes. This just came from the client.
14   This just summarizes what -- what the heck was his
15   name? Sanchez -- Tom Sanchez put this together so I
16   just put this together and passed it along to everybody
17   in the -- in the department.
18 Q  Now here's the actual testing and procedure. Did you
19   not write this procedure?
20 A  Yes. Yes, I did. I just copied what came off of here
21   and threw it right in here, but this -- there was NORM
22   testing and procedures. I mean this manual existed
23   before and this is just another iteration -- an update
24   if you will. It should have taken place long before we
25   got there but it didn't so we were trying to update it.

**Page 103**

1      MR. COVELL: And that's marked G-13.
2      (Deposition Exhibit G-13 marked)
3  Q  (By Ms. Zobel) Okay. You said you took what was in
4    this one, meaning G-12?
5  A  This -- yes. I took what was passed down from Tom
6    Sanchez' PAI, regurgitated that in the memo G-12, and
7    then took it and cut and pasted into the 2002 HEST and
8    P and P manual, G-13. So the verbiage should be.....
9  Q  Well I don't see on G-12 where it says how to do the
10   calibration or what the action levels were, et cetera.
11 A  That just comes right off of the -- the Ludlum meters
12   operators manual.
13 Q  Okay.
14 A  Yes, there's his name -- Diane Kobayashi and Tom
15   Sanchez.
16 Q  Okay. So let me see if I can track the procedure you
17   did. Somebody comes in and says to you we're going to
18   start doing this testing and procedure?
19 A  Uh-huh (affirmative).
20 Q  Is that correct? In this case the client said we're
21   going to do NORM testing?
22 A  That's correct.
23 Q  And then what would your role be in that procedure?
24 A  If they ask me to do the NORM testing I would go to
25   Diane Kobayashi or Tom Sanchez and pick up a Ludlum

**Page 104**

1    meter and all the calibration instruments and sources
2    that go with that meter, and then I would take it out
3    to the field following this direction here.
4  Q  I think you're misunderstanding my question. I'm not
5    asking you if you did NORM testing, I'm talking about
6    what you -- when you interface with these people and
7    they said we're going to do NORM testing, then your
8    responsibility was what -- to communicate it to the
9    other people, to get them a procedure to follow? What
10   was your responsibility?
11 A  To say okay and follow the client's direction.
12 Q  But you wrote this?
13 A  Yes, this is just one section of many that go into the
14   overall P and P manual.
15 Q  Okay.
16 A  But this is -- did I develop all these levels and
17   action levels and what to do with the source and all
18   that? Absolutely, not. This is just a regurgitation
19   straight from the Ludlum meter instructions.
20 Q  Okay. But you went to the instructions, you found
21   them, you set up the procedure -- you put it together
22   as a procedure for people to use?
23 A  Yes, except for the action levels which were set by
24   PAI.
25 Q  Okay. All right. So if I'm understanding you, and

**Page 105**

1    correct me if I'm wrong, the client came to you and
2    said, we're going to start doing this NORM testing?
3    You then got the resources, you found the information
4    that was needed to comply with what they wanted, you
5    put it in a procedure that went into the manual, and
6    was disseminated to the employees, is that correct?
7  A  Yes.
8  Q  Okay. Would this have been a similar process in doing
9    a -- this is a suspended personnel platform lifting
10   procedure form, did you develop this?
11 A  No.
12 Q  Who did?
13 A  It was Don Chenault did this one.
14 Q  Okay. It's out of your folder, it looks like.
15 A  Yes, because I was taking everybody's items and
16   assimilating them into one location.
17 Q  Okay.
18     COURT REPORTER: G-14 marked.
19     MR. COVELL: Yes, ma'am.
20     (Deposition Exhibit G-14 marked)
21 Q  (By Ms. Zobel) When you got a section like this from
22   somebody else, did you read them over, and check them
23   over for accuracy?
24 A  Yes, we all swapped back and forth. I mean, there was
25   -- I don't know -- recall right offhand how many

Case 3:03-cv-00174-RRB    Document 38-5    Filed 08/04/2006    Page 2 of 8

JOHN GILBERT vs. APC NATCHIQ, INC.
CASE NO. 3:03-CV-00174-RRB

DEPOSITION OF JOHN D. GILBERT
MAY 31, 2006

Page 106

```
 1   different sections there are of this thing. It's a
 2   huge document. So every time somebody would develop
 3   more, we'd all take turns redlining it for each other.
 4 Q I saw a -- I don't know where it is now. I saw a memo
 5   that you sent out to people about the procedure of
 6   putting together this manual, and you noted in that
 7   manual -- in that thing, that this was going to be a
 8   quote daunting task, is that an accurate description of
 9   what you believe this task was?
10 A Yes. It was a huge task, absolutely.
11 Q What was the goal, what were you doing?
12 A This.....
13       MR. COVELL: Object. Just as to where and when
14 -- what his goal was, okay?
15       MS. ZOBEL: Putting together this manual --
16 what was his role in putting together this manual?
17       MR. COVELL: I'm sorry, you said role?
18       MS. ZOBEL: Yes.
19       MR. COVELL: I thought you said goal, so --
20       MS. ZOBEL: No.
21       MR. COVELL: I have hearing loss, sorry.
22       MS. ZOBEL: That's fine.
23       MR. COVELL: Okay. Go ahead.
24 A My role is simply to get an updated policies and
25   procedures manual for the company.
```

Page 107

```
 1 Q As it applied to safety?
 2 A Yes, it's just strictly safety -- it's, again, it's a
 3   regurgitation of the federal and state and applicable
 4   Slope work procedures as they apply to OSHA
 5   regulations. And it's been done before. This was just
 6   updating a previous version that hadn't been done for
 7   years.
 8 Q And this would be because of changes in regulations and
 9   procedures that were followed except for.....
10 A Sure.
11 Q Okay. And what percentage of your time do you think
12   you dedicated to doing this?
13 A A lot at the end. I mean, we were all working
14   feverishly to get this thing together. I spent a
15   significant amount of time before I was let go, working
16   on this document, you know, as we all did so --
17 Q Comparing your work with the people who were the safety
18   specialists, were you spending a larger amount of your
19   time doing this than they were?
20 A Not necessarily, no.
21 Q So, they -- we had safety specialists and you spending
22   as you described it a huge amount of your time doing
23   just this?
24 A Correct.
25 Q Okay. And your job what -- within the grand scheme of
```

Page 108

```
 1   things was to coordinate it all?
 2 A Yes. I was the point of contact to take it all and get
 3   it electronically into one spot and then, you know, I
 4   just had 3-ring binders, so I'd grab them and throw
 5   them in there and assemble everything -- get it in one
 6   spot.
 7 Q Did you assign particular areas to different people to
 8   develop?
 9 A I don't think I assigned them, I think we all just kind
10   of said hey, I'll do this, I'll do that, we all just
11   kind of went our merry way. I don't think there was
12   any -- there was no master list that said you were
13   going to do this, and you're going to do that so --
14 Q I'm looking at the exhibits that we marked as -- your
15   change out notes.
16 A Okay.
17       MR. COVELL: It might be 8 -- 7, I believe is
18 what you're referring to, 12001 is really --
19 A G-7.
20       MR. COVELL: Yes, G-7.
21 A G-7.
22 Q (By Ms. Zobel) Yes.
23 A Okay. G-7.
24 Q On Job 624 on page 4 of 5. It refers to you -- the
25   second line, that you finalized the manbasket lifting
```

Page 109

```
 1   requirements?
 2 A Okay.
 3 Q Tell me what you did with that?
 4 A I honestly can't remember. Obviously, let's see here,
 5   it was a section of the manual we've just been talking
 6   about. And all -- everybody's comments were in. No
 7   more comments to add to that section. So, I just put
 8   it -- put it in the electronic version located in that
 9   electronic folder and is the hard copy attached here?
10   No.
11 Q And I'm looking for them right now.
12 A Yes, there was a hard copy there somewhere so --
13 Q Okay. Is that a section that you would have written
14   yourself or is it somebody else -- you just took
15   somebody else's project?
16 A It would have just been, again, just a regurgitation of
17   what was done before and what comes out of the OSHA
18   requirements and what was already in place.
19 Q So you were taking the OSHA requirements and updating
20   it?
21 A No. I wasn't updating the OSHA requirements.
22 Q No, this manbasket procedure in the context of update
23   -- were you updating it using the new OSHA
24   requirements?
25 A Yes. And probably the new Slope requirements and
```

Case 3:03-cv-00174-RRB     Document 38-5     Filed 08/04/2006     Page 3 of 8

JOHN GILBERT vs. APC NATCHIQ, INC.
CASE NO. 3:03-CV-00174-RRB

DEPOSITION OF JOHN D. GILBERT
MAY 31, 2006

Page 110

1  anything else that wasn't applicable to how work was
2  currently being done.
3  Q  And then going now to the next Job 625, it says I've
4     been discussing the need for an improvement in the
5     rescue response available to personnel working at the
6     wash bay?
7  A  Yes.
8  Q  Okay. Was this something that you worked on, getting a
9     change in the procedure?
10 A  Yes, I tried getting a change in the -- in the
11    procedure with the client from about the first week I
12    worked Kuparuk.
13 Q  Were you ever able to effectuate that?
14 A  Negative. Never could.
15 Q  Okay.
16       MS. ZOBEL: Let's go off record. Let me get a
17 little organized.
18    (Off record)
19    (On record)
20 Q  (By Ms. Zobel)  Did you do guidelines for such things
21    as recording and reporting spills?
22 A  Yes.
23 Q  Okay. And is that some sort of -- where did you get
24    the guidance for writing those guidelines?
25 A  It would have been a combination of materials that were

Page 111

1  previously in place. It would have been current
2  company activity, I guess you'll call it, and then the
3  CFR's.
4  Q  Okay. When the OSHA requirements changed, in terms of
5     reporting, that was in 2002, just to refresh your
6     recollection and I think the record will show that. Do
7     you recall being responsible for anything, company wide
8     with regard to that, or at least at Kuparuk, not
9     company wide?
10 A  I don't recall any specifics, but certainly there was a
11    changing of recording methodology between the OSHA 2000
12    log and the OSHA 300 log. So, whatever -- whatever
13    accompanied that, I'm sure that we all got on the
14    bandwagon with --
15 Q  All right. This is document 1826.
16       MR. COVELL: It's got a G-15 on it.
17          (Deposition Exhibit G-15 marked)
18 A  Let's see, Tom Sanchez.
19 Q  (By Ms. Zobel)  Are these your notes?
20 A  Yes, it looks like my handwriting.
21 Q  Okay. It's -- it shows down here at the bottom, it
22    says research if we need to update the DASH 200 for
23    2001 based on the 2002 dash 300 requirements. Is that
24    something that -- tell me what was going on there?
25 A  I think we just talked about that. It would have been

Page 112

1  the difference in the 200 log DASH -- DASH 200.
2  Q  Actually, I think its DASH and not dash. It would be
3     the reporting forms.....
4  A  It would be the reporting forms.....
5  Q  .....for it. Right.
6  A  Right. Yes, I -- it's just a note to myself it looks
7     here. These are all just notes to myself just saying
8     there's -- there's obviously going to be some changes.
9     I guess i just needed to know what they are so it's
10    just a note to myself saying --
11 Q  That's something that you needed to do?
12 A  Yes, I need to probably look into that.
13 Q  And did you look into that?
14 A  I'm sure I did, yes.
15 Q  Okay. And would you have then informed others of your
16    findings that -- how they needed to operate with that?
17 A  Perhaps, maybe not.
18 Q  We mentioned a minute ago the spill reporting and
19    recording guidelines.
20 A  Uh-huh (affirmative).
21 Q  Is that in your document that you did?
22       MR. COVELL: G-16.
23          (Deposition Exhibit G-16 marked)
24 A  Yes, that's one I did.
25 Q  (By Ms. Zobel)  Okay. This is -- let me give you this

Page 113

1  action item. You guys seemed very organized. You had
2  all kinds of spreadsheets, it looked like, is that
3  right?
4  A  Tried to.
5  Q  Yes.
6       MR. COVELL: G-17.
7          (Deposition Exhibit G-17 marked)
8  Q  (By Ms. Zobel)  Were you the one who created these --
9     Action Item Logs?
10 A  No. I don't -- no.
11       MR. COVELL: Just for the record, this in the
12 upper left says log initiated by Doug Smith.
13 A  Doug Smith.
14 Q  (By Ms. Zobel)  Okay. And it shows you as having some
15    assignments, is that correct? It says responsible
16    person. Tell me what you were responsible to do?
17 A  Gilbert is the second line. Okay. So, put medical
18    files into PDF format and reduce paper for staying on
19    site. At one time there was a push to put -- make
20    everything electronic because the paperwork was just --
21    but it was a mountain of paperwork to handle. So, we
22    at one time discussed trying to make everything
23    electronic. So, we would scan all of the documents in
24    and then keep an electronic version but I don't know if
25    that flew because the requirements of recordkeeping --

Case 3:03-cv-00174-RRB    Document 38-5    Filed 08/04/2006    Page 4 of 8

JOHN GILBERT vs. APC NATCHIQ, INC.
CASE NO. 3:03-CV-00174-RRB

DEPOSITION OF JOHN D. GILBERT
MAY 31, 2006

Page 114

1  recordkeeping requirements that OSHA used.
2  Q  Look at number three, is the one I'm referring to.
3  A  Put together summary of IMED/APC interface and process
4     of injury management and occupational -- put together
5     summary.
6  Q  It says need process written up, is that something you
7     did?
8  A  If I did, I don't recall. I don't know what that's all
9     about.
10 Q  It's says an interface between the new OSHA
11    requirements and....
12 A  IMED is the -- one of the medical providers up there on
13    the Slope. So it would have been --
14 Q  But it goes on to say process for injury management and
15    occupational health.
16 A  I don't know.
17 Q  You don't recall what you did?
18 A  No, I don't.
19 Q  All right.
20        MS. ZOBEL: That was exhibit what?
21        MR. COVELL: Exhibit 17, that I had.
22 Q  (By Ms. Zobel) Do you ever write JVA's for people for
23    hiring?
24 A  Not that I recall.
25        MR. COVELL: I guess for the record, what's

Page 115

1  JVA?
2        MS. ZOBEL: A job vacancy announcement.
3        MR. COVELL: Okay. There we go. Thank you.
4        MS. ZOBEL: You've got to know the lingo.
5        MR. COVELL: MBA I know.
6  Q  (By Ms. Zobel) Among the meetings that you attended, I
7     showed you the one that was a staff meeting.
8  A  Uh-huh (affirmative).
9  Q  And then we talked about safety meetings that were
10    within the department, were there other meetings that
11    you would attend, such as a supervisor meeting?
12 A  There was a Phillips meeting, I think they called it
13    the supervisors' meeting.
14 Q  Okay. And who would be asked to attend those?
15 A  Oh man, the list could be long there. It could be
16    everybody from Phillips.
17        (Deposition Exhibit G-18 marked)
18 Q  Okay. This says distribution: all superintendents,
19    supervisors, and construction managers.
20 A  Okay.
21 Q  Okay. So that would be the people who would be
22    expected to attend?
23 A  Yes, and amongst others, you know, so --
24 Q  Okay. You wouldn't have attended these as a safety
25    specialist, would you?

Page 116

1  A  It's -- it's possible you could have attended as a
2     safety specialist, yes.
3  Q  It wasn't the expectation though? You were -- it was
4     a.....
5  A  Correct.
6  Q  .....supervisor's meeting?
7  A  Correct. But there again, if there was a need for
8     somebody to be in there to go over a safety item, then
9     there would be a specialist there so --
10 Q  Okay. No, I'm talking about as a regular participant
11    in the meetings and not on any.....
12 A  Correct.
13 Q  .....specific need? Okay. And the action item list
14    and the sidebars to action item list, these are things
15    that would be discussed, examples?
16 A  Uh-huh (affirmative). Yes.
17 Q  Okay.
18        MS. ZOBEL: What exhibit number was this?
19        COURT REPORTER: G-18.
20        MS. ZOBEL: Thank you. This is going to be
21 G-19. Oh, you're having to get creative.
22        (Deposition Exhibit G-19 marked)
23        MR. COVELL: Yes, this one's going vertical.
24 Q  (By Ms. Zobel) Okay. Tell me what this is?
25 A  Let's see. I honestly don't remember what this is.

Page 117

1  Q  Okay. But have you seen this form, an Incident
2     Investigation Follow-up Report?
3  A  Yes, it doesn't look familiar to me, but obviously my
4     name's on it, so.....
5  Q  It -- go ahead.
6  A  It appears to me that it's something that was probably
7     instigated. I think recalling back, Phillips had a
8     change in how they wanted things classified when there
9     was an incident. And so it looks to me like it's some
10    type of a follow-up report on that.
11 Q  Okay.
12 A  Let me see if I can figure this out. So it looks there
13    was an injury somewhere that Phillips reported to me
14    and I had to resp- -- reply to that in some manner
15    and --
16 Q  With recommended remedial action?
17 A  Yes.
18 Q  Okay. At some point while you were working as a safety
19    supervisor, was there a determination made to change
20    the safety specialist to hourly employees from a day
21    rate employee?
22 A  Well there was certainly discussion, but no changes
23    were in effect.
24 Q  You didn't work with Doug Smith in coming up with an
25    evaluation of what the hourly rate would be for the

Case 3:03-cv-00174-RRB   Document 38-5   Filed 08/04/2006   Page 5 of 8

JOHN GILBERT vs. APC NATCHIQ, INC.
CASE NO. 3:03-CV-00174-RRB

DEPOSITION OF JOHN D. GILBERT
MAY 31, 2006

Page 118

1 safety specialists?
2 A We all worked to come up with numbers for a change from
3 day rate to hourly. All the safety specialists and
4 Doug and myself and -- but those didn't go into effect
5 until -- apparently, after I left.
6 Q Okay. Are these some more of your notes?
7 A Yes, they are.
8 Q (By Ms. Zobel) Okay. Tell me what that first note
9 says? What exhibit number are we on?
10     MR. COVELL: G-20, I believe.
11         (Deposition Exhibit G-20 marked)
12     MS. ZOBEL: Okay. G-20.
13 A Let's see. It says, hourly transition from day rate,
14 has a copy of -- has a copy of labor laws.
15 Q (By Ms. Zobel) Did you review the labor laws with
16 regard to classification of individuals?
17 A I don't believe I ever did. It's possible that I
18 looked at -- it's possible that I looked at a labor law
19 book up there, but I'm not sure of that. It's
20 possible.
21 Q Okay.
22 A I think I remember one laying around up there.
23 Q Well what was going on? Tell me what was happening?
24 A There was just a shift going. They were talking about
25 moving guys from day rate to hourly rate and what that

Page 119

1 -- what that number would be, you know. How to
2 calculate that number? How do you go from a day rate
3 to a -- to an hourly rate?
4 Q Okay. At the time that this was going on, did you at
5 any time talk to Mr. Smith or anybody else about
6 whether or not your own position ought to be made
7 hourly as opposed to paid on a day rate?
8 A Yes. Oh, yes, everybody was included.
9 Q But you were a safety supervisor?
10 A True.
11 Q Was your job included in being looked at for hourly?
12 A Yes, as far as I recall.
13 Q Okay. And tell me what you recall as the discussions
14 of that?
15 A The main point of discussion was just how to come up
16 with the number. I mean, when you're transferring
17 everybody from day rate to hourly rate, how do you do
18 that? What is that conversion?
19 Q And did you do such conversion with regard to your own
20 rate -- your own job?
21 A I did conversions, yes.
22 Q For your day rate at 475?
23 A I believe, so. I should have, yes.
24 Q And where are those calculations?
25 A Should be in your information there.

Page 120

1 Q Is that some of the material that was given us in
2 production?
3 A I don't know. I'd have to look. Off the top of my
4 head, I don't know. I.....
5 Q Do you have copies of them with you?
6 A Perhaps. This is all the same stuff that you guys
7 have. So -- just give me a second and I'll look.
8 Q Okay.
9     (Off record)
10         (Deposition Exhibits G-21 and G-22 marked)
11     (On record)
12 Q (By Ms. Zobel) We've premarked Exhibit G-21 which you
13 pulled out of your notebook. Tell me what this is.
14 A Just a proposed hourly rate conversion from day rate to
15 hourly rate and also shows the proposed overtime rate.
16 Q Okay. Now, everybody is listed as a safety specialist,
17 all the hourly rates.
18 A Uh-huh (affirmative).
19 Q When did you do this?
20 A I didn't do this.
21 Q Who did this?
22 A I -- I think maybe Doug did it, I don't know. I have
23 no idea for sure who did it.
24 Q Who's writing is this that's listed all the people?
25 A I can't tell you that either for sure.

Page 121

1 Q All right. But it doesn't include a safety supervisor
2 position?
3 A No, it does not.
4 Q But you had an assumption that this would -- that you
5 would be changed over also to an hourly rate?
6 A Yes.
7     MS. ZOBEL: Let's go off the record.
8 (Off record)
9 (On record)
10 Q (By Ms. Zobel) Tell me what conversation or what
11 information you had that led you to believe that you
12 would be transferred to hourly as opposed to staying on
13 the day rate?
14 A There was just multiple conversations about changing
15 everybody from day rate to hourly rate and it went on
16 for several hitches on and off and -- and as I
17 understand it now they have flopped everybody to day
18 rate, but that was after I left or to hourly rate after
19 I left. But there was just multiple conversations of,
20 you know, we're going to go to hourly rate and, you
21 know, what is your hourly rate going to be? And then
22 this is the last piece of paper that I have in regards
23 to that so --
24 Q Who were those discussions with?
25 A Myself and Doug, and also all of the safety

Case 3:03-cv-00174-RRB   Document 38-5   Filed 08/04/2006   Page 6 of 8

JOHN GILBERT vs. APC NATCHIQ, INC.
CASE NO. 3:03-CV-00174-RRB

DEPOSITION OF JOHN D. GILBERT
MAY 31, 2006

### Page 122

1  specialists. And the -- well, I guess, the admin gals
2  were already hourly, I believe.
3  Q  And you understood from some source that that included
4  your position as safety supervisor?
5  A  Correct.
6  Q  Can you recount for me any specifics of discussions
7  that you met with anybody about your job being
8  reclassified?
9  A  The only -- the only conversations I particularly
10  recall are ones Doug and I had about how -- how you
11  come up -- what is the actual conversion from day rate
12  to hourly rate, and what would that mean for everybody
13  in the department and so that's this -- this was the
14  final hourly number.
15  Q  But do you recall having any discussions with him over
16  why your job would be reclassified or if your job
17  specifically would be reclassified also?
18  A  Nothing -- no, I do not.
19  Q  Okay. And is it just that you made an assumption or
20  did somebody say you're going to be hourly too?
21  A  It was just assumed we're all going hourly -- the whole
22  department so --
23  Q  Okay. I'm looking at a 02/19/03 staff meeting, which
24  is already marked as Exhibit G-22 and it's -- the date
25  of the staff meeting, can you tell us that?

### Page 123

1  A  02/19 of '03.
2  Q  And you were still a safety supervisor at that point,
3  correct?
4  A  Correct.
5  Q  Okay. Now it says change from day rate to hourly,
6  March 1st. Is that March 1st, your note?
7  A  No, these are not my notes.
8  Q  These are not your notes?
9  A  That's correct.
10  Q  Do know who's they are?
11  A  I do not.
12  Q  Okay. Do you see where it says, overtime
13  authorization?
14  A  Uh-huh (affirmative).
15  Q  And it says if not a call-out must have supervisor
16  approval?
17  A  Okay.
18  Q  Were you one of the people who would give approval for
19  somebody working overtime?
20  A  Negative. No -- no, not to my knowledge because nobody
21  went to hourly -- nobody went to hourly rate while I
22  was employed there.
23  Q  That's your recollection?
24  A  Yes, it's my recollection.
25  Q  Okay. Did you ever contact wage and hour department

### Page 124

1  either the state or the federal to have a discussion as
2  to whether you should be paid on an hourly basis with
3  overtime?
4  A  Myself, personally?
5  Q  Yes.
6  A  Not that I recall, no.
7  Q  Did you have conversations with anybody who had had
8  such discussions?
9  A  Not that I recall there either.
10  (Off record comments)
11  Q  (By Ms. Zobel) I'd like to talk about some of the
12  specific programs that you were involved in just from
13  the documents that I've pulled out and have you tell me
14  about them. And we will start with (off record
15  comments) lead program sampling.
16  MR. COVELL: All right. This will be G-23.
17  (Deposition Exhibit G-23 marked)
18  (Off record comments)
19  Q  (By Ms. Zobel) This is from John Gilbert to the HEST
20  Department. Okay. So tell me what you're doing here?
21  A  Let's see. Oh let's see here if this comes back to me.
22  It looks like it was probably a kind of summary of how
23  Phillips Kuparuk wanted us to perform our lead sampling
24  to -- I think the first line under specifics, it
25  probably said Diane Kobayashi will determine proper

### Page 125

1  sampling method and amount of sample needed per the
2  method.
3  Q  She was Phillip Alaska?
4  A  She's Phillip Alaska's Industrial Hygienist.
5  Q  Okay.
6  A  Or ways, I don't know if she still works there or not
7  but --
8  Q  Look at the first paragraph. It says that there was a
9  brief meeting between somebody, yourself and the client
10  present by phone.
11  A  Yes.
12  Q  To discuss the systematic approach to sampling of lead.
13  A  Uh-huh (affirmative).
14  Q  Then it looks like if -- am I not correct, that you had
15  certain responsibilities that you were going to do
16  certain.....
17  A  Yes.
18  Q  Develop certain things?
19  A  Yes.
20  Q  And such as a matrix for the sampling?
21  A  Let's see. Yes, this was -- what this was, and it's
22  coming back to me now, this is a summary of what Diane
23  wanted us to do for our lead sampling because the
24  current method that we had to take care of the lead
25  sampling recordkeeping and all that was not very good

Case 3:03-cv-00174-RRB   Document 38-5   Filed 08/04/2006   Page 7 of 8

JOHN GILBERT vs. APC NATCHIQ, INC.
CASE NO. 3:03-CV-00174-RRB

DEPOSITION OF JOHN D. GILBERT
MAY 31, 2006

**Page 126**

1 and they came down looking for some type of sample
2 analysis and I think they talked to Don Chenault about
3 that. And when Don showed them they were not happy
4 with -- so, we all got together and it probably says
5 somewhere in here too, although blanked out that Sam
6 Taylor, myself and probably Jim Dickey were involved in
7 this conversation and she basically just told me what
8 she wanted and this is a regurgitation of that
9 particular meeting. And I wrote it down so everybody
10 in our department would know how it was to be done.
11 Q   But you actually had to complete matrixes identifying
12 places where the sampling would be done, et cetera?
13 A   Actually that would to Don Chenault. Yes, Don did
14 that, I didn't do that. But my name's down here so --
15 Q   What did you.....
16 A   Michael Davis did a lot of this though.
17 Q   Why would your name be on here if it says John
18 completed the matrix? Spreadsheet is located under
19 your folder?
20 A   Yes, I probably built the first one and then it went
21 into this -- into the machine that Chenault took over
22 like a good -- like all of the lead sampling, near as I
23 can recall for the department. So I probably built a
24 spreadsheet just like Diane wanted it, put it in the --
25 yes, see I put it in the PAI lead management area so

**Page 127**

1 that they could access it. They knew exactly where it
2 was it at so Diane could get to it and got it all set
3 up and then Don and the rest of the guys took it over.
4 Q   Okay.
5       MS. ZOBEL: What's the exhibit number on that
6 please?
7       MR. COVELL: G-23.
8 A   Twenty-three.
9 Q   (By Ms. Zobel) Now, you said earlier in response to
10 your question when we were talking about the manbasket
11 project, and you -- or the manlift project, and you
12 said that Chenault did that. Do you recall that?
13 A   Uh-huh (affirmative).
14 Q   Okay. Let's look at Exhibit G-7.
15      MR. COVELL: That's the change out notes again?
16      MS. ZOBEL: Yes.
17 Q   (By Ms. Zobel) It says that you finalized the
18 manbasket lifting requirements and modified the
19 suspended personnel platform lifting procedures form.
20 I think that's the one that you said that had been done
21 by Chenault.
22      MR. COVELL: What are you on there?
23      MS. ZOBEL: I'm on page 300.
24      MR. COVELL: Okay.
25 A   Okay.

**Page 128**

1       MS. ZOBEL: Under Job 624.
2 A   Okay.
3 Q   (By Ms. Zobel) So, you would have, if I'm
4 understanding that, you actually -- Chenault may have
5 done the original but you then went in and modified it,
6 or made changes to it?
7 A   He -- like I said, I was keeping the main electronic
8 copy of everything. So then somebody would take a hard
9 copy, make redlines on it, and give it to me. I would
10 go in the electronic copy and just make those changes.
11 Q   And did you make the redlines on documents that people
12 had done?
13 A   Yes, sure. We all did. We all looked at each other's
14 documents to make sure that we were all in agreement
15 with what was going to go in it, you bet.
16 Q   Okay. We talked about the NORM testing. This is
17 another piece of the NORM testing.
18      MR. COVELL: Exhibit G-24.
19            (Deposition Exhibit G-24 marked)
20 Q   (By Ms. Zobel) This is Kuparuk NORM testing and
21 reporting procedure. Did we look at this previously?
22 Is it a duplicate?
23 A   It's a duplicate.
24 Q   Okay. I'm sorry.
25 (Off record comments)

**Page 129**

1 Q   (By Ms. Zobel) Contract auditing classes and prejob
2 safety evaluations.
3       MR. COVELL: Exhibit G-25.
4             (Deposition Exhibit G-25 marked)
5 Q   (By Ms. Zobel) Tell me what this is?
6 A   Golly, contractors. [Witness reading to himself] I
7 have no idea what this is.
8 Q   Did you do any kind of auditing for safety and
9 environmental testing?
10 A   Let's see here. [Witness reading to himself] This was
11 something sent from PAI.
12 Q   Uh-hum.
13 A   Down to us.
14 Q   Right.
15 A   It says we had to get in compliance with PAI's
16 direction.
17 Q   Okay. They're the client?
18 A   They are the client. So this is the form that somebody
19 must have gave to me or handed out in a meeting and I
20 -- looks like I'm just trying to answer the questions
21 that they're asking there.
22 Q   Okay. And then having answered the questions with some
23 no's and some question marks, did you later then go and
24 bring the department into compliance with the auditing
25 process?

33 (Pages 126 to 129)

Case 3:03-cv-00174-RRB   Document 38-5   Filed 08/04/2006   Page 8 of 8

JOHN GILBERT vs. APC NATCHIQ, INC.
CASE NO. 3:03-CV-00174-RRB

DEPOSITION OF JOHN D. GILBERT
MAY 31, 2006

Page 130

1  A   It's hard to say. This doesn't ring -- really ring a
2      bell to me at all. This --
3  Q   Would this have been within the scope of the type of
4      work that you were doing though?
5  A   Sure.
6  Q   Okay.
7  A   Let's see, what does it say here in the contract? This
8      -- this may have even come from one of the PAI safety
9      specialists and it could have come from anybody, I
10     don't know who it came from. So, like I say, it
11     doesn't ring a bell to me. I mean, did we have a
12     follow-up on action items from cancelled prejudged
13     safety evaluations? No, we didn't.
14 Q   Let me ask a different question. Is this something
15     that you would be using to audit another contractor who
16     would be onsite besides APC?
17 A   We didn't audit any other contractors unless we had
18     subs working for us and --
19 Q   Okay. So this is.....
20 A   I mean they just presented us their approved safety and
21     health plan, if that was the case and away they went.
22     They went to work.
23 Q   Okay. Were you responsible for approving those?
24 A   No. No.
25 Q   Okay. So this would have been something that directed

Page 131

1      APC to come into compliance with the safety evaluation,
2      safety environmental task assessments from PAI?
3  A   That's the way it looks to me.
4  Q   Okay.
5  A   This -- this seems to me like it was just a question
6      and answer form wrote down from PAI because they went
7      through the -- let's see if I get this right. From
8      Phillips to ConocoPhillips they had a meeting of, you
9      know, a meshing of two companies or whatever you call
10     it correctly during that period of time. There was a
11     rewrite of their company policies. So that may be
12     where that came from. I'm not sure.
13 Q   And you don't recall if you did the assessment?
14 A   Oh, I -- there'd be no assessment on our part. I mean,
15     it's just.....
16     MS. ZOBEL: It looks like we've only got one
17 piece of it. Let me show you these documents. This is the
18 page that you had.
19 A   Okay.
20 Q   (By Ms. Zobel) And then there's training information,
21     the job contractor evaluation regarding going through
22     doing an assessment, the contractor root cause
23     investigation process -- does any of this refresh your
24     recollection?
25 A   Not really. Sorry.

Page 132

1  Q   If it.....
2  A   I mean, it's obviously my writing. But, I mean, I
3      don't --
4  Q   If, having done this assessment you found you were out
5      of compliance with the client's requirements, was it
6      your responsibility to then go back and fill in the
7      blank on this or do whatever the compliance was needed?
8      MR. COVELL: Okay. Mr. Gilbert I'm going to
9  direct you to listen to the question and answer the question.
10 I know this material --
11     MS. ZOBEL: We found his notes. Yes.
12 A   One more time please?
13     MR. COVELL: Let's stop here for a moment. You
14 handed him a book that you have labeled as AES production
15 volume two and you showed him pages numbered 887 through 893?
16     MS. ZOBEL: 886.
17     MR. COVELL: 886 through 893, all right. And
18 then you're asking him a question as to those pages, or to
19 additional.....
20     MS. ZOBEL: He can look at his own notes.
21 These are his.
22 Q   (By Ms. Zobel) I believe these are your notes, are
23     they not?
24 A   It looks like my writing, yes.
25 Q   On 894? Okay. And then there's more evaluation

Page 133

1      following that. Do you recall all of this?
2  A   I -- I -- what jogs my memory is the fact that Joel's
3      name is here and I think that Joel brought this down
4      when he was still working for PAI -- Joel McAlister.
5  Q   Okay.
6  A   And said hey, you need to go through this checklist or
7      hand this to Doug and go through this and make sure
8      that, you know, you can answer this because this is
9      going to be in some type of an audit that -- that PAI
10     or ConocoPhillips was going to have on their
11     subcontractors, APC, being one of them so --
12 Q   Okay.
13 A   It -- it may be that -- I mean, some of these are just
14     blank, so it's --
15 Q   And you identify the checkmarks in the mid-job
16     contractor evaluation under water, for example, as
17     being your writing?
18 A   Correct.
19 Q   So.....
20 A   But I would have just taken these. To get the answer
21     yes or no, or not applicable, I would have simply gone
22     to our policies, procedures and guidelines manual and
23     found out if we had something in there that matched
24     that criteria.
25 Q   And if you didn't, what would you do about it?