Case 3:03-cv-00174-RRB    Document 38-6    Filed 08/04/2006    Page 1 of 9

JOHN GILBERT vs. APC NATCHIQ, INC.
CASE NO. 3:03-CV-00174-RRB

DEPOSITION OF JOHN D. GILBERT
MAY 31, 2006

Page 134

1  A    Inform him.
2  Q    And then what would you have done about it after that?
3       Would he have directed you to correct it?
4  A    He would have gave me direction one way or another,
5       yes.
6  Q    Okay. Do you recall any of that?
7  A    No, sorry.
8  Q    Okay. All right.
9          MS. ZOBEL: Here we go, staff meeting agenda.
10 I promised you an agenda. Actually, I've got a whole slug of
11 them.
12         MR. COVELL: Okay. We're running out of
13 stickers madame clerk. That's G-26.
14         MS. ZOBEL: Go ahead and mark G-26 and G-27.
15         (Deposition Exhibits G-26 and G-27 marked)
16      (Off record comments)
17 Q    (By Ms. Zobel) We had a prior discussion about whether
18      or not you conducted the staff meetings?
19 A    Uh-huh (affirmative).
20 Q    And I've given you Exhibit G-26 and Exhibit G-27.
21 A    Uh-huh (affirmative).
22 Q    And Exhibit G-27, as I recall is a series of different
23      meetings where you're listed as a facilitator, is that
24      correct -- different dates?
25 A    Twelve -- let's see, these all look -- okay. I have

Page 135

1       two of the same it appears.
2  Q    What date?
3  A    02/13 of '02.
4          MR. COVELL: 1479 and 1480.
5  Q    (By Ms. Zobel) All right. And then 03/13 and 04/10?
6  A    Yes.
7  Q    Okay. Now, does that -- did you write the agendas for
8       these meetings as a facilitator?
9  A    No, this is not -- anyhow this is not a text or a font
10      that I would use to type up anything. So, I didn't put
11      this together.
12 Q    You didn't put the topics together or the actual
13      document?
14 A    I didn't put the document together for sure.
15 Q    How about all the other information?
16 A    General information, yes. It looks somebody's coming
17      tomorrow to buy.....
18         MR. COVELL: Just to be clear John, you're on
19 02/13, APC479?
20 A    Right.
21         MR. COVELL: Okay. Go ahead.
22 A    And it looks to me like I'm just telling everybody
23      what's been told to me. Let's see. It looks there
24      might have -- like, for instance, the second bullet:
25      There's been a questions about the transition from day

Page 136

1       rate to hourly rate. This will be discussed when --
2       I'm sure it said when Doug gets back.
3  Q    (By Ms. Zobel) Okay.
4  A    So I'm just regurgitating information to whoever's
5       coming on shift at this point in time to let them know
6       what's going on. Just a quick meeting to say, hey guys
7       here's what's going on at this point. I'd be curious
8       to know on 02/13 of '02, was I just coming on shift or
9       just leaving or mid-shift or where was I?
10 Q    Why does that make a difference?
11 A    Well I'm thinking that reason this is put together was
12      just to simply get everybody in one spot at one time
13      and say here's what's going on guys and then I was
14      probably on a plane out of there.
15 Q    What about 1477?
16 A    77. Again, this is not a form that I would -- that I
17      would have made. So, I don't know where the form came
18      from.
19 Q    Now this one is heading Meeting Agenda. Is this
20      something you would have put together as a facilitator?
21 A    My name's down as the facilitator, but I would not have
22      made this form.
23 Q    Would someone in admin have put it together for you?
24 A    It's possible, but I wouldn't have asked them to do
25      that. I mean, this is just not my style. I mean this

Page 137

1       is -- this is a premade deal that you go on there, you
2       know, in Word and pull up a meeting agenda and it
3       prints this stuff out for you. But it's not something
4       I would use.
5  Q    What about, starting on 1479 with the 02/13/02, is it
6       possible that these are the minutes that were kept as a
7       result of the meeting?
8  A    It's possible.
9  Q    Okay.
10 A    Highly possible.
11 Q    And that these were meetings that you facilitated?
12 A    Well I just sat in and took meetings or something that
13      was passed down to me from management or combination of
14      sources and then I -- I just got everybody in the -- in
15      the meeting and somebody took notes while we were
16      talking, you know, to get everybody up to speed while
17      we're here before I left or what have you before there
18      was a shift change. It could be anything.
19 Q    Well safety staff meetings, did you have them only when
20      you had a shift change?
21 A    No they.....
22 Q    Or were they regular?
23 A    .....were not scheduled in any -- we tried several
24      times to get a safety meeting on, you know, we're going
25      to have it on this day all the time by god. It never

Case 3:03-cv-00174-RRB   Document 38-6   Filed 08/04/2006   Page 2 of 9

JOHN GILBERT vs. APC NATCHIQ, INC.
CASE NO. 3:03-CV-00174-RRB

DEPOSITION OF JOHN D. GILBERT
MAY 31, 2006

Page 138

1  happened. So, they were just kind of hit or miss. We
2  weren't very good at getting together as a group and
3  making that up.
4  Q  Okay. I'm going to show you your notes from your
5     production and this is document 69 and it says that you
6     had a weekly staff meeting?
7  A  Weekly staff meeting -- O Wing, yes.
8  Q  Okay.
9  A  But that doesn't -- I mean we had a meeting, but --
10 Q  It wasn't change out notes. You're there?
11 A  I'm there. I'm it, yes. So that's the first day in.
12    Okay. So that's the first day in. So there would have
13    been guys coming in with me. So a lot of these items
14    would have been to regurgitate to the guys coming in so
15    we'd all --
16 Q  And 03/13, the same thing? This is at the shift
17    change. You're having a safety meeting with the new
18    crew that comes in on that tower?
19 A  So this probably would have been with Doug was going
20    off the Slope, so we had all been together -- got this
21    all done at one time. This.....
22 Q  Doug would be off Slope and you'd be conducting it in
23    his place?
24 A  That could be or he could be there and we're all in the
25    same group. I don't know, it's hard to say.

Page 139

1  Q  Okay. Was it your responsibility when he was gone to
2     conduct these meetings in his absence?
3  A  I'm not sure of that either. It wasn't a steadfast
4     thing. I mean the meetings were just hit or miss. We
5     didn't have it went -- like I said before, we attempted
6     on several occasions through the whole time I was on
7     the Slope to set up meetings that happened here and
8     here and here, but we were not very good at
9     communicating to one another. The best thing we could
10    do was the change out notes. So, very informal.
11 Q  Okay.
12 A  So, yes, my name's down as facilitator, but I could
13    have just been regurgitating, I mean -- or somebody
14    just put me down as facilitator because I was the one
15    passing along the word so --
16 Q  Well you ran the meeting. Is that what facilitator
17    means?
18 A  I'm not sure what he definition of facilitator means.
19    MR. COVELL: I'm going to object to compound
20    question here. One, what the word means. The other one's what
21    he did.
22    MS. ZOBEL: Okay.
23 Q  (By Ms. Zobel) Next Exhibit G-27 is industrial hygiene
24    air sampling, is that memorandum?
25    MR. COVELL: Ms. Zobel, I --

Page 140

1    MS. ZOBEL: Am I on the wrong number?
2    MR. COVELL: This one's G-27.
3    MS. ZOBEL: G-28, you're correct.
4    MR. COVELL: So I have the February 10 as G-28.
5    MS. ZOBEL: You're correct. I've got one on
6  top of the other.
7    (Deposition Exhibit G-28 marked)
8  A  Twenty-eight.
9  Q  (By Ms. Zobel) This is an Industrial Hygiene Air
10    Sampling Event Memorandum, tell me what it is? That's
11    the title on it.
12 A  Oh, let's see. This must have been -- let's see here.
13    This is something I probably worked up with Sam Taylor
14    -- sent to Doug. It looks like I sent it to minor
15    projects superintendents, probably also Phillips
16    Alaska, amongst others I suppose. Exposure monitoring
17    results, stainless steel cutting event, salt water
18    treatment plant.....
19 Q  So what happened, if you recall?
20 A  I actually don't recall.
21 Q  Okay.
22 A  So, if I could just read it.
23 Q  Well I'm not asking you to talk about the specific
24    event. Tell me about your role that would be played
25    when you had a sampling event.

Page 141

1  A  It would be the same role as any of the safety
2     specialists. If somebody asked me to go do sampling,
3     I'd assemble all the material I needed to do the
4     sampling and go do it. And then you follow through all
5     the way to making sure that the data was sent to the
6     laboratory and analyzed and when the data came back you
7     recorded the events and if there was an overexposure
8     then you called the employee in and notified the
9     employee of the exposure and notified his supervisor of
10    the exposure and notified Doug for sure of what was
11    going on.
12 Q  You've signed the report at the end, correct -- or at
13    least your name appears on it?
14 A  Yes.
15 Q  Okay. Is this something that was unique to you as a
16    safety supervisor or was it something that was also by
17    the specialist, but you happened to do this one?
18 A  It was done by the specialist, primarily, you know.
19    But, again, we all took -- it's like we discussed
20    earlier, if you needed to go do the sampling you would
21    do it. This just happens to be one that I did. So, it
22    looks like -- although this was definitely in
23    conjunction with Sam.
24 Q  Who is Sam?
25 A  Sam Taylor, the IH, that we had on the staff.

Case 3:03-cv-00174-RRB    Document 38-6    Filed 08/04/2006    Page 3 of 9

JOHN GILBERT vs. APC NATCHIQ, INC.
CASE NO. 3:03-CV-00174-RRB

DEPOSITION OF JOHN D. GILBERT
MAY 31, 2006

Page 142

1  Q   Okay. But you don't know why.....
2  A   It might have even been Don Chenault -- might even have
3      been in on this one too. It was probably Dru (ph)
4      Bedford, too.
5  Q   Was this one fairly significant that you had so many
6      people involved?
7  A   It's hard to say. It doesn't ring a bell to me. I
8      mean, we got three -- two guys here that we -- we
9      sampled for and -- and obviously somebody up the ladder
10     was asking a lot of questions, so this report got put
11     together.
12 Q   Okay.
13     MS. ZOBEL: Let's go off the record.
14 (Off record)
15 (On record)
16 Q   (By Ms. Zobel) Okay. You were talking about what --
17     we were trying to discuss what role you had in the
18     safety staff meetings in terms of communicating
19     information. And let's look at the February 13, 2002
20     meeting -- senior staff meeting that you attended. Do
21     you see where action management item number two says
22     corporate wants all band-aid logs eliminated?
23     Discussion revolved around what our options are?
24     MR. COVELL: Second paragraph.
25 A   Yes, I see that.

Page 143

1  Q   (By Ms. Zobel) Okay. Now, look at document G-27, the
2      second page, 1479.
3  A   Okay.
4  Q   And then it says, it's one of the bullets, the third
5      from the bottom, it's a possibility band-aid log could
6      be eliminated. It's being discussed with management
7      currently.
8  A   Yes, so -- it's just, I'm regurgitating what I heard
9      here.
10 Q   Okay. So you attended one meeting and now you're.....
11 A   Passed it along at the rest of the meeting.
12 Q   .....reporting it back to the other -- to the staff?
13 A   Yes.
14 Q   Okay.
15 A   Yes.
16 Q   All right.
17 A   Thanks for clearing that up.
18 Q   Does that help you? It wasn't me. Okay. Now,
19     audiometric. What's audiometric?
20 A   Audiometric.
21 Q   Audiometric.
22 A   Yes.
23 Q   What is it?
24 A   A hearing test.
25     MS. ZOBEL: This is an exhibit again. What

Page 144

1  number are we on?
2     MR. COVELL: G-29.
3     (Deposition Exhibit G-29 marked)
4  Q   (By Ms. Zobel) All right. Audiometric Test
5      Documentation Procedures, did you put these together?
6  A   I don't know. Let me take a look at it.
7  Q   All right. It has your little desktop on it.
8  A   No, actually I -- I didn't. This was a regurgitation
9      of Woody McCoven's notes that he had on the front of a
10     three-ring binder on how to do audiometric testing.
11     And so instead of using his handwritten notes, I
12     retyped it so it would be in the computer in one spot.
13     And then.....
14 Q   Okay.
15 A   And then filed it here on this O-drive. So, that was
16     just a regurgitation of one of the training guy's
17     stuff.
18 Q   Okay. Is that a procedure that was then rolled out to
19     the safety specialists to carry out?
20 A   The safety specialists had always been doing it. It
21     was all -- it's just a typed -- it's a retype of
22     handwritten document that Woody made.
23 Q   Okay.
24     MS. ZOBEL: I'm going to give you some action
25     -- is this what I want? A memo from you.

Page 145

1     MR. COVELL: G-30.
2     (Deposition Exhibit G-30 marked)
3  A   I'll swap you. Okay. [Witness reading to himself]
4  Q   (By Ms. Zobel) Tell me what this is?
5  A   It looks like Gary Buchanan asked me to look over the
6      2001 internal action log for the construction crew.
7  Q   What's an action log?
8  A   I couldn't tell you, it's been too long. I don't know.
9      Number 2 NEO Training present NEO training.....
10 Q   Right.
11     MR. COVELL: You may want to --
12     MS. ZOBEL: What.
13     MR. COVELL: Go ahead.
14     MS. ZOBEL: I asked him what the action log
15 was.
16     MR. COVELL: Okay. And he said, I don't know.
17     MS. ZOBEL: Okay.
18 A   Sorry. I.....
19 Q   (By Ms. Zobel) Go ahead and tell me what you believe
20     you were doing here. You were commenting for Gary as
21     to having looked over the logs?
22 A   I'm replying to Gary Buchanan that I looked over this
23     log that he provided to me and he was -- he's obviously
24     asked me to look it over and make comments, so that's
25     all I'm doing here.

JOHN GILBERT vs. APC NATCHIQ, INC.
CASE NO. 3:03-CV-00174-RRB

DEPOSITION OF JOHN D. GILBERT
MAY 31, 2006

Page 146

1  Q    Okay.
2  A    So it's.....
3  Q    And Gary Buchanan was?
4  A    The head honcho, the operations manager.
5  Q    Okay.
6  A    This is where we talk about the safety copy mentality and the voice of the safety department being inconsistent and new employee orientation training requirements, so --
10 Q    And are you indicating here some places where there need to be improvement?
12 A    I just think I'm stating my opinions.
13 Q    Okay. And he solicited your opinion?
14 A    Yes, in this case he did here.
15 Q    Okay. Do you have an opinion as to whether you spent more than 20 percent of your time in doing manual labor type activities?
18 A    Twenty percent of my time doing manual labor activities? During my entire employment?
20 Q    No, during your tenure as a safety supervisor?
21 A    Probably did about -- it's conceivable I spent more than 20 percent of my time doing a manual -- manual work.
24 Q    Is it likely, though?
25 A    Yes.

Page 147

1  Q    And what would you define as manual labor that you would have done?
3  A    Go into the field and -- and performing the field work or in the office performing, I guess -- I guess the question is what are we calling manual labor?
6  Q    No, I'm asking you how you have defined it when you said the answer was yes?
8  A    I guess, you know, data entry would be one -- one portion of that where you're just simply sitting down inputting data into a computer.
11 Q    Give me another example of what you mean, data entry?
12 A    Well all of the industrial hygiene sampling logs that we got, we'd have to -- we had a program so you'd have to sit down and take the raw data and sit down and type it in. You just transcribe it right off a written form and put it in the machine so you'd have an electronic record of it. So there was a lot of data entry. So that's kind of brain dead work. So I'd -- I'd say that's -- that's the majority of it right there. You know, it'd be some type of a data entry, some type of field work, assembling, calibrating instruments. That's all kind of manual labor. That's about it.
23 Q    We talked about you performing field work -- data entry, is this material that other people gave to you and you're doing entry or is this something you

Page 148

1       generated that you're inputting?
2  A    Both.
3  Q    Both. Okay. Are you -- are you doing summaries and correlations of these data when you're putting them in?
5  A    No, it's all cookbook stuff. You just follow the -- you know, the -- all the calculations that one would do are already done for you. You've just got to look them up in the book or in our particular case, excuse me, there's a computer program we had and it's all done, there so --
11 Q    Okay.
12 A    You know --
13 Q    All right. What was the third you said you did? Oh, calibrating instruments?
15 A    Uh-huh (affirmative).
16 Q    And who else did calibration of instruments?
17 A    Everybody did calibrations.
18 Q    How is it that you would come to be doing calibrations as a safety supervisor?
20 A    If you had to calibrate an instrument every time it was used. So, if somebody would call me to go do a permit then I would have to calibrate the instrument before I left the office as would anybody.
24 Q    Okay. All right. So this would be in conjunction with the work that you did as a field worker?

Page 149

1  A    Sure.
2  Q    All right. Tell me what the most responsibility was you had in your position as a safety supervisor?
4  A    Just making sure somebody didn't get injured on my shift. So, it was just employee safety was the greatest responsibility.
7  Q    And within the project that you worked on as a safety supervisor, which ones of those do you think were most important?
10 A    I don't understand what you mean by projects.
11 Q    Well tell me what some of the projects were you did as a safety -- in the office -- safety specialist -- supervisor.
14 A    The biggest time consumer would be just assembling the policy, procedures and guidelines document that we talked about.
17 Q    Give me an example of other projects that you worked on.
19 A    Oh, I assisted in the lead sampling program, and I assisted in the UA program, assisted in the audiometric, and the respiratory program. Assisted in the training program.
23 Q    When you say assisted, was this in putting together policy?
25 A    No, just, you know, actually performing the work. You

38 (Pages 146 to 149)

METRO COURT REPORTING
745 West 4th Avenue, Suite 425, Anchorage, Alaska 99501
907.276.3876                                              metro@gci.net

JOHN GILBERT vs. APC NATCHIQ, INC.
CASE NO. 3:03-CV-00174-RRB

DEPOSITION OF JOHN D. GILBERT
MAY 31, 2006

Page 150

1  know, in all cases like the -- every six months or
2  every two years you'd have to come around and get
3  reevaluated for your hearing and your respiratory.
4  Don't quote me on the timeliness because I really don't
5  recall exactly what the timeliness were.
6  Q   So this is the administering of the checkouts for
7      people?
8  A   You bring the employee in, you pull out his file.
9  Q   Uh-hum.
10 A   You put him in the hearing booth, you put the goodies
11     on him and give him a hearing test.
12 Q   Didn't you contract that out?
13 A   No.
14 Q   Okay. And how about writing the procedures to be
15     followed on any of these projects, lead sampling,
16     respiratory, auditory?
17 A   Again, most of that stuff is a regurgitation writ- --
18     either from the instrument manufacturer's operations
19     manual or right out of the CFR, or there was something
20     already in place that may not have been typed up and
21     put in an -- an electronic format. It may have just
22     been on a piece of paper in somebody's handwriting on
23     the back of a three-ring binder. So, you know, we did
24     a lot of organizing up there trying to get everything
25     into something that looked a little professional, if

Page 151

1   you will. So, and my input went in as well as
2   everybody else's into those programs so --
3  Q   Is there any programs that you worked on that you don't
4      believe were worked on by other safety specialists?
5  A   Well no. I'm pretty sure that everybody got involved
6      in the majority of things. So, we tried to bounce
7      everything off one another. There's just simply too
8      much activity going on up there for one guy to make a
9      call unless its loaded down upper management.
10 Q   And did Doug rely on you as his assistant to do these
11     sorts of things?
12 A   Myself, amongst others sure.
13 Q   Okay. Did you were second below Doug and you would
14     step up when he was gone, is that correct?
15 A   Well I'm not sure I understand the word step-up but
16     when Doug was gone it would be myself or one of the
17     other safety specialists that would be so-called in
18     charge when they -- when he left.
19 Q   Well he weren't present, was somebody else in charge
20     other than yourself?
21 A   A lot of reliance was still funnelled to Ron Kirk since
22     he'd been up there for so long even though he was not
23     necessarily in -- he moved over to the safety
24     specialist position at the -- the wash bay or the heavy
25     shop and a lot of times they would just communicate by

Page 152

1   him by faxing so --
2  Q   Okay. And was that something that -- well all right.
3      But under the chain of command when Doug was gone it
4      was your responsibility to take over his position, is
5      that correct?
6  A   That's correct.
7  Q   Okay.
8      MS. ZOBEL: All right. Let's call it a day.
9  You want to cross?
10     MR. COVELL: Let's take five minutes.
11 (Off record)
12 (On record)
13         CROSS EXAMINATION
14 BY MR. COVELL:
15 Q   Mr. Gilbert, you were asked some questions about
16     interpreting data earlier by Ms. Zobel. I believe you
17     gave an affirmative answer to that question, that you
18     interpret data?
19 A   Yes.
20 Q   Okay. When you were doing that, were you doing a
21     process that would have been similar to analyzing or
22     doing original scientific research where you might
23     gather a bunch of data points, and then plot a bell
24     curve or something of that nature?
25 A   No.

Page 153

1  Q   Okay. Were you doing some type of situation where you
2      might get data from the field and enter it either into
3      an electronic program or a hand program and then come
4      up with some results?
5  A   Yes.
6  Q   Okay. You were asked a question about exercising
7      judgment. When you did your job did you have the
8      authority to deviate from standards that were given you
9      either in CFR, state regulations, PPC manual or company
10     manuals or requirements?
11 A   No.
12 Q   Okay. In G-2 which was a job description, I saw the
13     words risk assessments. Did you do something that you
14     thought was a risk assessment?
15 A   I don't recall having anything that said risk
16     assessment, however, we may have gone out and looked at
17     a job and said, geez fellas your scaffolding is not
18     erected correctly and therefore you have to reassemble
19     it.
20 Q   Okay. Would it be appropriate to call that identifying
21     a safety hazard?
22 A   Yes.
23 Q   Okay. And would that be a duty of safety specialist
24     when they did a walk down or an audit to identify a
25     safety hazard?

Case 3:03-cv-00174-RRB   Document 38-6   Filed 08/04/2006   Page 6 of 9

JOHN GILBERT vs. APC NATCHIQ, INC.
CASE NO. 3:03-CV-00174-RRB

DEPOSITION OF JOHN D. GILBERT
MAY 31, 2006

Page 154

1  A   Yes.
2  Q   You were asked some questions about whether or not you
3      had a contract with APC, and I believe you indicated no
4      to that question.
5  A   Correct.
6  Q   All right. Did you have -- whether written or not, an
7      agreement with APC that you would work for them and
8      they would pay you money for some amount of work?
9  A   Yes.
10 Q   Are there various pieces of paper that commemorate that
11     agreement?
12 A   Yes.
13 Q   Okay. Did you have a specific correspondence with APC
14     in that regard?
15 A   I -- yes, I do. I did.
16 Q   Okay. And when did that happen?
17 A   That was before I went to the Slope.
18 Q   Okay. And how did that transpire? Was that e-mail
19     letter form, do you know?
20 A   As I recall it was in a letter form they just sent me a
21     letter of employment. As I recall it was from Michael
22     Day and Ron Kirk.
23 Q   Okay. And to your knowledge do you have that paper
24     somewhere?
25 A   I don't know. I'd have to look. I don't know if I

Page 155

1      have it or not.
2  Q   Okay. Would it be your expectation that the company
3      might have it in their file somewhere?
4  A   Yes -- should have.
5  Q   And that would be when you started out in '01?
6  A   '01.
7  Q   Okay.
8  A   Yes.
9  Q   All right. In the duties you undertook as safety
10     supervisor when you were staying in the office most of
11     the time, to differentiate what you did there from
12     safety specialist, is it correct that you dealt with
13     more paperwork, you answered more questions, you dealt
14     with the injured more -- let me back up here and try to
15     make this sound sensible.
16         MS. ZOBEL: And not to leading.
17         MR. COVELL: Okay.
18 Q   (By Mr. Covell) All right. As a safety supervisor
19     were the duties that you did different in volume versus
20     types of duties from being a safety specialist?
21 A   Yes.
22 Q   Okay. So is it right then that you say, did more
23     paperwork, answered more questions, dealt with the
24     injured more, and those types of things.
25 A   Yes, that's correct.

Page 156

1  Q   Okay. All right. When you were -- how many
2      secretaries were there -- the admin assistants?
3  A   Just one.
4  Q   Okay. Because there were two ladies listed on the list
5      and they'd change out, right?
6  A   Yes, and then one went away for good so --
7  Q   Okay. And then for the off weeks did you have one
8      or --
9  A   No, actually we didn't. There was just Kim.
10 Q   Okay. All right. There was that note in your daily
11     log, something about helping somebody on a pad with a
12     hose, do you remember that? You don't need to look.
13 A   Yes.
14 Q   Okay. The person that called you to that situation,
15     was that a safety specialist or was that a client,
16     meaning Conoco?
17 A   It was -- it was not a safety specialist.
18 Q   Okay.
19 A   Client.
20 Q   Did the safety specialist call you from the field to
21     consult about doing the safety specialist job?
22 A   No, the would have called me from the field to say, hey
23     I need some help out here to do this particular walk
24     down or there's too much activity I need another guy
25     out here, or I'm going to this pad, you need to cover

Page 157

1      me on this pad. So, but there was, you know, those
2      guys are all -- they're not coming to me as the expert
3      in the safety field.
4  Q   So is it fair to say, when -- even if you got called by
5      a safety specialist, it was to be an extra set of hands
6      as opposed to being somebody that would be instructing
7      them what to do?
8  A   Yes.
9  Q   Ms. Zobel asked you a question about being a
10     spokesperson. Were you the guy that got in front of
11     the microphones and made press announcements?
12 A   No.
13 Q   When you said spokesperson or you answered
14     affirmatively to that, what did you mean being company
15     spokesperson?
16 A   Again, your the lead man or the guy in the office, so,
17     somebody's got to answer the questions from the
18     department.
19 Q   Okay. When a person is injured from a safety point of
20     view concerning their medication, is one of the main
21     concerns whether or not they're going to be on pain
22     meds?
23 A   That is a big concerns, yes.
24 Q   And why is that a big concern?
25 A   Well obviously if they're on medications they may not

40 (Pages 154 to 157)

Case 3:03-cv-00174-RRB    Document 38-6    Filed 08/04/2006    Page 7 of 9

JOHN GILBERT vs. APC NATCHIQ, INC.
CASE NO. 3:03-CV-00174-RRB

DEPOSITION OF JOHN D. GILBERT
MAY 31, 2006

Page 158

1      be able to their job correctly and pose a greater
2      danger to themselves or others if they're medicated.
3 Q   Okay. In the change out notes in Exhibit G-7, is there
4      anything that you addressed that you did in those notes
5      that's any different than what a safety specialist
6      would do?
7 A   No.
8 Q   When you talked about, you know, not being liked by the
9      workers, not being liked by the company because you're
10    a bad news man, so to speak and getting complaints from
11    the field about a safety guy. When you got those
12    complaints would you administer discipliriary act to the
13    safety specialist?
14 A   No.
15 Q   What would you do with those complaints?
16 A   Well I would call the safety specialist, and say, hey
17    you're stepping on some toes out there and you really,
18    you know, made some guys angry and, you know, you need
19    to change your approach or I would refer a lot of it to
20    Doug so --
21 Q   In G-8, there was some questions about doing cost
22    analysis I think about some scientific equipment. How
23    often did you do something like that?
24 A   Very infrequently.
25 Q   Okay. Off the top of your head can you recollect have

Page 159

1      done something like that otherwise?
2 A   I might have done something similar to that, maybe two
3      or three times the entire time I was employed.
4 Q   Okay.
5 A   At APC -- I don't know.
6 Q   When you did that were you analyzing the cost benefit
7      analysis to the equipment for company?
8 A   No, I was just simply adding numbers, and here's what
9      that cost and here's what this cost, and somebody else
10    can make the decision as to whether it's a viable
11    purchase option.
12 Q   And as far as that equipment did you make a decision as
13    to whether or not it was purchased?
14 A   No, I didn't.
15 Q   Do you know if that equipment was ever purchased?
16 A   That particular equipment, I don't know. I think that
17    was just a list of old equipment that we had. So, I
18    know we bought some new equipment on and off throughout
19    the time I was employed there so --
20 Q   All right. In G-11 there was something about setting
21    out costs. I think that was the $4,000.00 to send off
22    to analyze or whatever they were in Colorado and the
23    lead paint or whatever it was?
24 A   Yes.
25 Q   How often did you do something like that?

Page 160

1 A   Again, very infrequently.
2 Q   All right. You were asked a question about being able
3      to stop the work. Did you ever stop the work on a job?
4 A   Yes.
5 Q   How often did that happen?
6 A   Again, infrequently. But maybe every other hitch up
7      there you might run across a small job you had to shut
8      down for just a short period of time.
9 Q   Okay. Is it correct that under the health, safety
10    scheme that APC has that any employee can stop a job?
11 A   Yes.
12 Q   At one point you were saying oftentimes as the safety
13    supervisor you got called to the field and you said it
14    could be daily down to zero. When you said daily, did
15    you mean that you could be spending the whole day doing
16    field work?
17 A   It's conceivable you could spend the whole day doing
18    field work. Sure -- yes.
19 Q   Okay. Even in days you weren't doing field work, was
20    the work in the office different than the work that the
21    safety specialist did?
22 A   No.
23 Q   In regard to questions about writing procedures or
24    rewriting procedures we talked about the NORM, the
25    N-O-R-M which was --

Page 161

1 A   Normally occurring radioactivity material.
2 Q   Okay. You indicate in your questions that was a
3      regurgitation or a cut and past of information that you
4      had gotten from, I can't remember, either the company
5      or some --
6 A   PAI.
7 Q   PAI, okay. And you took from one or two or three
8      sources and wrote that up?
9 A   That's correct.
10 Q   As far as being asked about these various other memos
11    concerning PPC which is policies, procedures and.....
12 A   It's PPG.
13 Q   PPG, okay.
14 A   Policies, procedures and guidelines.
15 Q   Guidelines.
16 A   Yes.
17 Q   When you were involved in generating revisions of
18    those, were they done in the same manner as redoing or
19    doing the NORM PPG?
20 A   Oh, yes, definitely.
21 Q   How much time did you spend in meetings?
22 A   Not a lot. I don't know.
23 Q   Okay. Would it be an hour a week, hour a month?
24 A   It could. A couple hours a week.
25 Q   Okay. In regards to G-25, all those pieces of paper

Case 3:03-cv-00174-RRB    Document 38-6    Filed 08/04/2006    Page 8 of 9

JOHN GILBERT vs. APC NATCHIQ, INC.
CASE NO. 3:03-CV-00174-RRB
DEPOSITION OF JOHN D. GILBERT
MAY 31, 2006

Page 162

1    with the checkmarks, and you indicated those were your
2    checkmarks, was that based because some of those pages
3    had notes in your handwriting?
4  A  It looked like my handwriting, yes.
5  Q  The G-27 exhibit, let me just find that.
6       MS. ZOBEL: Meeting agendas?
7       MR. COVELL: Yes, meeting agenda and then the
8    meeting notes.
9  Q  (By Mr. Covell) Are these the types of items that
10   would be similarly addressed in change out notes?
11 A  Yes.
12 Q  Okay. And you indicated that at least on one of these
13   days, perhaps the February 13, that was either an
14   arrival or departure date for you, is that right?
15 A  Correct. It could be the very next morning.
16 Q  You were going to do it at shift, if you know?
17 A  I think the 13th was a Wednesday, so it would have been
18   -- I would have arrived on Tuesday evening and this
19   would have been the first day I was on the Slope, I
20   believe looking at the --
21 Q  And just so I understand this, when you guys changed
22   out, did you, like, change out a whole crew at a time
23   or did you overlap so half the guys were there for a
24   week?
25 A  It's about 50-50. It's about half the guys there.

Page 163

1    It's not just a complete rollover of the crew.
2  Q  Okay.
3  A  You have to have continuity so the word can get passed
4    along there.
5  Q  All right. Who was the boss in the health and safety
6    department when you were there?
7  A  Doug.
8  Q  Okay.
9       MR. COVELL: That's all I have.
10      MS. ZOBEL: Just a couple.
11          REDIRECT EXAMINATION
12 BY MS. ZOBEL:
13 Q  You didn't do change out notes with safety specialists,
14   but rather your counterpart, is that correct?
15 A  Well it's -- for a good majority of the time I didn't
16   have a counterpart. So, a lot of times it would just
17   be whoever was left over, like Bob Carrier, Ron Kirk,
18   Robert.....
19 Q  When you had a counterpart.....
20 A  Yes.
21 Q  .....the change out notes were for the counterpart, not
22   for the safety specialists general consumption?
23 A  Well, you know, yes. I mean if the safety specialist
24   needed to see it, we did. I mean there was no set
25   thing that says you can't see this.

Page 164

1  Q  But your intent was to change out with your
2    counterpart?
3  A  Whoever that might be, that's correct.
4  Q  Okay. And if you were then getting there, getting
5    change out notes and then having a safety staff
6    meeting, it was for the purpose of informing people who
7    were just coming in what had occurred while they were
8    gone as well from a management standpoint, was it not?
9  A  Yes. It was an all inclusive meeting, so everything
10   that went on was regurgitated to -- well, for instance,
11   when I didn't have a change out partner, somebody, one
12   of the safety specialists would come to me if Doug was
13   gone and say, hey here's what's been going on. So, I
14   would take that information, I'd pass it along to the
15   rest of the guys.
16 Q  Okay.
17 A  Somebody had to be the go-between with the information.
18 Q  In this correspondence that you talked about with APC,
19   prior to being employed.....
20 A  Uh-huh (affirmative).
21 Q  .....did it set out a specific number of hours straight
22   time and overtime hours that you would be expected to
23   work?
24 A  That I don't recall. I'd have to find the paper and
25   look.

Page 165

1  Q  Did it establish anything other than a day rate?
2  A  I don't recall that either. It's -- I asked for and
3    received a specific letter of employment. Prior to
4    that there was going to be no paperwork whatsoever, and
5    they said just get on the plane and come and I says
6    (sic), no you guys need to send me something in writing
7    that states that I have a job with you so --
8  Q  Did it state that it was for a term certain, or was it
9    just that you had a job?
10 A  Again, I'd have to look at the paper, I haven't -- I
11   haven't looked at.
12      MS. ZOBEL: I have no other questions.
13          RECROSS EXAMINATION
14 BY MR. COVELL:
15 Q  All right. Just to follow-up on that; was, to your
16   recollection, was the gist of the letter more
17   concerning what your job duties were going to be than
18   terms of employment time and money, or do you know?
19 A  It was just simply, if I recall correctly it was just
20   simply, this is a letter to inform you that you have a
21   job with APC and come on up. So, again, I haven't --
22   I'd have to go look for that.
23 Q  You didn't want to get off the plane and hear who are
24   you?
25 A  Precisely.

Case 3:03-cv-00174-RRB    Document 38-6    Filed 08/04/2006    Page 9 of 9

JOHN GILBERT vs. APC NATCHIQ, INC.  
CASE NO. 3:03-CV-00174-RRB

DEPOSITION OF JOHN D. GILBERT  
MAY 31, 2006

Page 166

1  MR. COVELL: All right. That's all I got.
2  (Off record)
3
4
5  *** END OF PROCEEDINGS ***
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25

Page 168

1            CERTIFICATE
2  UNITED STATES OF AMERICA   )
                              ) ss.
3  STATE OF ALASKA            )
4      I, Jerri Young, Notary Public in and for the State of
   Alaska and Reporter with Metro Court Reporting, do hereby
5  certify:
6      THAT the annexed and foregoing Deposition of JOHN D.
   GILBERT was taken before Cheri Tabor on the 31st day of May
7  2006, commencing at the hour of 9:07 o'clock a.m., at the
   offices of DeLisio Moran Geraghty & Zobel, P.C., 943 West 6th
8  Avenue Anchorage, Alaska 99501, pursuant to Notice to take said
   Deposition of said Witness on behalf of the Defendant;
9
       THAT the above-named Witness before examination, was
10 duly sworn to testify to the truth, the whole truth, and
   nothing but the truth;
11
       THAT this Deposition, as heretofore annexed, is a true
12 and correct transcription of the testimony of said Witness
   taken by Cheri Tabor and hereafter transcribed by her;
13
       THAT the original of the Deposition transcript will be
14 lodged in a sealed envelope with the attorney requesting
   transcription of same, as required by Civil Rule 30(f)(1)
15 amended, that attorney being:
16     MS. PATRICIA ZOBEL, DeLisio Moran Geraghty & Zobel,
   P.C., Attorneys at Law, 943 West 6th Avenue, Anchorage,
17 Alaska 99501;
18     THAT I am not a relative, employee or attorney of any
   of the parties, nor am I financially interested in this action.
19
       IN WITNESS WHEREOF, I have hereunto set my hand and
20 affixed my seal this 19th day of June 2006.
21
22     _____
       Jerri Young
       Notary Public in and for Alaska
23     My Commission Expires: 11/03/07
24
25

Page 167

1            SIGNATURE
2
3  STATE OF ALASKA      )
                        ) ss.
4  THIRD JUDICIAL DISTRICT )
5      I, JOHN D. GILBERT, have read the foregoing
6  deposition and have made corrections thereto. Any and all
7  changes, explanations, deletions and/or additions to my
8  testimony may be found on the correction sheet(s) enclosed with
9  this transcript.
10
11     _____
       JOHN D. GILBERT
12
13
   STATE OF ALASKA      )
14                      )ss.
   THIRD JUDICIAL DISTRICT )
15
       THIS IS TO CERTIFY that on this ____ day of
16
   _____ 2006, before me appeared JOHN D. GILBERT, to me
17
   known and known to be the person named in and who executed the
18
   foregoing instrument, and acknowledge voluntarily signing and
19
   sealing the same.
20
21
22     _____
       Notary Public in and for
       State of Alaska, at Anchorage
23     My Commission Expires:_____
24
25