Case 3:03-cv-00174-RRB    Document 38-9    Filed 08/04/2006    Page 1 of 8

JOHN GILBERT vs. APC NATCHIQ, INC.                    DEPOSITION OF DOUGLAS L. SMITH
CASE NO.: 3:03-CV-00174-RRB                                              JUNE 1, 2006

Page 1

```
                IN THE UNITED STATES DISTRICT COURT
                     FOR THE DISTRICT OF ALASKA

JOHN GILBERT,                    )
                                 )
         Plaintiff,              )
                                 )
    vs.                          )
                                 )
APC NATCHIQ, INC.                )
                                 )
         Defendants.             )  Case No. 3:03-CV-00174-RRB
                                 )
```

DEPOSITION OF DOUGLAS L. SMITH
June 1, 2006

APPEARANCES:

FOR THE PLAINTIFF:          MR. KENNETH L. COVELL
                            Attorney at Law
                            712 Eighth Avenue
                            Fairbanks, Alaska 99701
                            (907) 452-4377

FOR THE DEFENDANTS:         MS. PATRICIA L. ZOBEL
                            DeLisio Moran Geraghty & Zobel
                            Attorneys at Law
                            943 West Sixth Avenue
                            Anchorage, Alaska 99501
                            (907) 279-9574

ALSO PRESENT:               MR. JOHN GILBERT

* * * *

EXHIBIT *B*

Case 3:03-cv-00174-RRB    Document 38-9    Filed 08/04/2006    Page 2 of 8

JOHN GILBERT vs. APC NATCHIQ, INC.
CASE NO.: 3:03-CV-00174-RRB

DEPOSITION OF DOUGLAS L. SMITH
JUNE 1, 2006

Page 2

1
2    Pursuant to Notice, the Deposition of DOUGLAS L. SMITH
3    was taken on behalf of the Plaintiff before Cheri Tabor,
4    Notary Public in and for the State of Alaska, and electronic
5    reporter for Metro Court Reporting at the offices of DeLisio
6    Moran Geraghty & Zobel, 943 West Sixth Avenue, Anchorage,
7    Alaska, on the 1st day of June, 2006, commencing at the hour
8    of 11:30 o'clock a.m.
9                           * * * *
10                    TABLE OF CONTENTS
11   Direct Examination by Mr. Covell . . . . . . . . . 4
12
13   EXHIBITS                              PAGE
14   S-1 - Letter, 6/25/97, Nelson to Carr . . . . . . 56
     S-2 - Job description, safety supervisor . . . . . 79
15
16                           * * * *

Page 3

1           PROCEEDINGS
2    (On record)
3           COURT REPORTER: We're on record. My name is
4    Cheri Tabor, and I'm a court reporter for Metro Court
5    Reporting in Anchorage, Alaska. Today's date is June 1, 2006,
6    and the time is approximately 11:30 a.m. We're at the offices
7    of DeLisio Moran Geraghty & Zobel, PC, 943 West Sixth Avenue,
8    Anchorage, Alaska 99501 for the deposition of Doug Smith.
9    This case is in the United States District Court for the
10   District of Alaska, in the matter of Gilbert, versus APC, Case
11   Number 3:03-CV-00174 (RBR).
12          Sir, Mr. Smith, would you please raise your right hand
13   so I could swear you in?
14       (Oath administered)
15          MR. SMITH: I do.
16              DOUGLAS L. SMITH
17   having first been duly sworn under oath, testified as follows:
18          COURT REPORTER: Thank you. Would you please
19   state your full name and spell your last for the record.
20   A    Douglas Lee Smith, S-M-I-T-H.
21          COURT REPORTER: May I have a mailing address.
22   A    3900 C Street, Suite 701, Anchorage, Alaska 99503.
23          COURT REPORTER: Thank you. I also need a
24   daytime or a message telephone number.
25   A    907-339-6331.

Page 4

1           COURT REPORTER: Okay. Counsel, would you
2    please identify yourselves and who you represent?
3           MR. COVELL: Kenneth Covell for John Gilbert.
4           MS. ZOBEL: Patricia Zobel for APC Natchiq.
5           COURT REPORTER: Sir, would you like to
6    identify yourself?
7           MR. GILBERT: I'm John Gilbert.
8           COURT REPORTER: Thank you. All right. You
9    may proceed.
10          MR. COVELL: All right.
11              DIRECT EXAMINATION
12   BY MR. COVELL:
13   Q    Good morning, Mr. Smith.
14   A    Good morning.
15   Q    Have you ever been deposed before?
16   A    A few times.
17   Q    Okay. And what was that in regard to?
18   A    Just prior case log with injury claims, general
19        liability claims at Veco Corporation.
20   Q    Okay. All right. Just briefly then, if you don't
21        understand a question, say so. If you need to take a
22        break, say so. It's informal in a way. It's all
23        being tape recorded. You're under oath. You have
24        your counsel here, you can talk to her if you want to.
25        Okay?

Page 5

1    A    I understand.
2    Q    All right. What's your current position?
3    A    I'm the HSET director for ASRC Entities Services,
4         that's the parent company of operations and
5         maintenance division which was previously known as
6         APC.
7    Q    Okay.
8    A    So there's been some name changes in the corporation,
9         and I work at the corporate level, which is the parent
10        of that entity.
11   Q    Okay. And back in 2001 through 2003 when Mr. Gilbert
12        worked for APC or Natchiq, you were at Kuparuk, is
13        that.....
14   A    That's correct.
15   Q    .....where you were.....
16   A    I was an APC employee at Kuparuk in the position of
17        HSE manager for that department.
18   Q    Okay. Is my general understanding correct that you
19        move up a notch.....
20   A    Yes.
21   Q    .....or a position in the organizational chart?
22   A    That's how they would have me believe it, so, yes.
23   Q    Okay. All right. I.....
24   A    Yeah, that's correct.
25   Q    All right. At a time Mr. Gilbert worked at Kuparuk,

Case 3:03-cv-00174-RRB    Document 38-9    Filed 08/04/2006    Page 3 of 8

JOHN GILBERT vs. APC NATCHIQ, INC.
CASE NO.: 3:03-CV-00174-RRB

DEPOSITION OF DOUGLAS L. SMITH
JUNE 1, 2006

Page 6

1     is it correct that the general organizational scheme
2     in the way of hierarchy in health and safety would be
3     there are safety specialists, safety supervisor, and
4     then you, and you title at that time, tell me again,
5     was safety.....
6  A  I was hired as a safety manager which was a new
7     position for that organization.
8  Q  Okay. I see.
9  A  That -- that position did not exist prior to my
10    arrival.
11 Q  Okay. Prior to your arrival, was there a corporate
12    safety man in Anchorage?
13 A  There was a safety supervisor on site.
14 Q  Okay.
15 A  And that was Ron Kirk.
16 Q  Okay. And then who would Ron -- who was Ron's direct
17    report I think is how you guys like to put it?
18 A  Yeah, at that time Ron was a direct report to Gary
19    Buchanan as the safety supervisor in the department.
20    And.....
21 Q  And was Gary.....
22 A  .....the specialists.....
23 Q  .....in Anchorage or was Gary.....
24 A  Gary -- Gary was Anchorage-based.
25    (Telephone ringing)

Page 7

1  Q  Okay.
2     MS. ZOBEL: Do you need to take a.....
3  A  No, I'm just turning it off. Sorry.
4     MS. ZOBEL: Okay.
5  A  Gary was based on the Slope. He was the project
6     manager or contract business manager for the Kuparuk
7     contract. He was the operations manager.
8  Q  Okay. And is that different than unit supervisor?
9  A  Business unit manager, those guys have had a multitude
10    of titles. We refer to them as the contract manager
11    or business unit manager, and they were responsible
12    for the entire operational contract for APC at
13    Kuparuk.
14 Q  So the safety supervisor would answer to Buchanan in
15    the unit manager or similar position?
16 A  Yes, prior to my arrival, Ron Kirk reported to Gary
17    Buchanan.
18 Q  And then was there a safety guy in Anchorage that was
19    higher up the food chain or not?
20 A  Yes, there was a corporate safety manager. At that
21    time it was Scott Brower.
22 Q  Okay. All right. Let's see, what did you do to
23    prepare for your deposition today, if anything?
24 A  Came yesterday and just, you know, knowledge of the
25    events since I was present, but that's about it.

Page 8

1  Q  Okay. Did you ever do an evaluation of the safety
2     specialist position to determine whether it was exempt
3     or non-exempt from overtime?
4  A  Yes. The -- in fact, I had been involved in an
5     evaluation at a previous employer with that position.
6     And after I arrived at this company, we discussed the
7     position, exempt versus non-exempt. And one thing
8     that's important is that one of the things we worked
9     -- always worked against or was a bit of an issue is a
10    lot of positions, can (indiscernible) extra hours in
11    the specialist field around the country are being paid
12    in an exempt mode, so by us defining those as non-
13    exempt was -- we felt was correct with the
14    determination of the labor law, but was not exactly
15    industry standard. So we were always sort of with the
16    uphill battle to move these two hourly, not within the
17    company, but just as a general industry position. So
18    we evaluated the positions based on the -- the
19    Department of Labor checklist provided at the time,
20    and determined that these positions would were -- most
21    likely would be better suited to be under hourly
22    positions. And the guys who were having call-outs in
23    the evening and such, the nature of the embedded
24    employees, were being called out, so there was a move
25    to move them to hourly after I arrived there. But it

Page 9

1     took some time to change the contract language, put
2     the rates in, and effect the changed for the
3     specialists.
4  Q  Okay. And did that then actually happen on or after
5     April of '03?
6  A  It happened March 1st of '03 is when we finally got
7     the -- what we call employee information records, a
8     status change actually into payroll and changed the
9     specialist' pay rates to hourly was March 1 of '03.
10 Q  And when did the guys in the field -- and we're
11    talking safety.....
12 A  Specialists.
13 Q  .....supervisor here?
14 A  Safety specialist.
15 Q  Oh, okay. All right. Safety specialist. All right.
16 A  And at the same time, we -- I evaluated personally
17    with Gary Buchanan the position that Ron Kirk had
18    previously held as safety supervisor. And it's
19    important to understand the chain.....
20    MS. ZOBEL: Let's.....
21 A  .....of progression.
22    MS. ZOBEL: Let's wait until he asks the
23    question.
24 A  Yeah.
25 Q  (By Mr. Covell) Okay.

Case 3:03-cv-00174-RRB   Document 38-9   Filed 08/04/2006   Page 4 of 8

JOHN GILBERT vs. APC NATCHIQ, INC.
CASE NO.: 3:03-CV-00174-RRB

DEPOSITION OF DOUGLAS L. SMITH
JUNE 1, 2006

Page 14

1  exempt or non-exempt classification of the safety
2  supervisor position at APC?
3  A   No.
4  Q   Okay. You were at Kuparuk when the safety supervisor
5      was there and classified as exempt, right?
6  A   No, it was exempt -- -- when -- when I arrived at the
7      position, the supervisory position was already being
8      paid at a day rate which was filled by Ron Kirk.
9  Q   Well, Mr. Gilbert was a safety supervisor, right?
10 A   He became Ron Kirk's alternate.
11 Q   Okay. All right. And when he was in that job, he was
12     being classified and paid as an exempt employee,
13     right?
14 A   Yes, he went into the job, and the job was already
15     established as an exempt position.
16 Q   Okay. And you were his boss then?
17 A   That's correct.
18 Q   Okay. All right. What different duties did the
19     safety supervisor have when Mr. Gilbert was in that
20     position versus a safety specialist?
21 A   In my opinion and in my observation, an expectation of
22     the job was that they were the coordinator of the
23     specialist, and in that role provided, you know, a
24     degree of oversight and direction to these embedded
25     employees. And then in my absence -- I worked a four-

Page 15

1      day on, three-day off schedule, and in my absence from
2      the Slope, they were the step-up for the department
3      and fill the roll of HSE manager in my absence.
4  Q   Okay. So they were the coordinator of the other
5      specialists. These other specialists generally had --
6      I don't know if duty stations is the right word, but
7      generally had a routine set of work that they were
8      going to do, or expect to do, is that right?
9  A   That's correct.
10 Q   Okay. So a guy would have wash bay, or light duty
11     shop, or a pad or something to that effect?
12 A   That's correct.
13 Q   Okay. Would the safety supervisor do safety
14     specialist work routinely?
15 A   Not routinely.
16 Q   Okay. What safety specialist work would the safety
17     supervisor do?
18 A   Probably the same as I would do, and that would be a
19     back-up for the field, if there be excess work,
20     someone off shift, in training, geographically not
21     available, because they're too far out to one site, so
22     we might respond to a scenario on their behalf.
23 Q   Okay.
24 A   And that would include myself as well.
25 Q   Okay. So when a safety supervisor acted as the

Page 16

1      coordinator or the specialist, I mean, what physically
2      would he do that was coordinating them? Would he pick
3      up the phone and call people? Would he call meetings?
4      Would arrange their schedules? I mean, what types of
5      things?
6  A   Schedule coordination, personnel coming and going,
7      trying to help work out vacation coverage by
8      scheduling other people to work over, providing
9      answers, you know, questions and answers both up the
10     chain of command with the client, with our people who
11     liaison, conduit of information flow.
12 Q   Okay. And when you said answers questions, would that
13     generally be to the client, to Conoco-Phillips or
14     whoever was.....
15 A   Both sides, internal.....
16 Q   And what.....
17 A   .....and external.
18 Q   Internal to?
19 A   APC.
20 Q   APC upstairs. Was there a lot of questions that came
21     from the specialists to the safety supervisor?
22 A   I think there was daily questions probably from each
23     of them of some type, and they vary in technical
24     nature. Some very simple and some technical.
25 Q   Okay. Well, if you know, would they be along the

Page 17

1      lines that, you know, I'm busy on this pad, can you
2      come out and do this other test for me on the other
3      pad, or would they be more of the nature of, you know,
4      how do I run this meter? If you know.
5  A   I think that the majority of the questions were more
6      technical in nature about how to execute on-the-job.
7      We had varying levels of specialists with different
8      levels of experience, and the supervisor was an
9      experienced -- more experienced position that had more
10     authoritative knowledge, technical knowledge, and was
11     oftentimes a reference for the specialist to conduct
12     business.
13 Q   Could you give me an example of what that kind of
14     question would be?
15 A   Yeah. I'm on the pad and I don't clearly understand
16     how to run this Ludlum meter, you know, can you help
17     me out over the phone, or come out and show me? I'm
18     running the snapshot, the gas chromatograph, I'm going
19     to need some assistance with that. Policy, maybe some
20     policy questions. What is our procedure or policy
21     regarding a particular subject matter.
22 Q   Okay. As to policy and procedure, that was all in a
23     book which sounded like it was going under a never-
24     ending revision. Is that fair to say?
25 A   There was a policy and procedure manual being revised,

Case 3:03-cv-00174-RRB   Document 38-9   Filed 08/04/2006   Page 5 of 8

JOHN GILBERT vs. APC NATCHIQ, INC.
CASE NO.: 3:03-CV-00174-RRB

DEPOSITION OF DOUGLAS L. SMITH
JUNE 1, 2006

Page 18

1  that's fair to say.
2  Q   Okay. And policy and procedures would or ought to be
3      or hopefully were in there?
4  A   Not totally encompassing. A lot of our job requires,
5      you know, thought and technical background to derive
6      answers, and not everything is written down for us.
7  Q   What does the safety coordinator position of today do
8      differently than the safety specialist position of
9      yesterday?
10         MS. ZOBEL: Safety specialist or.....
11         MR. COVELL: I'm sorry. Thank you. Thank
12 you.
13 Q   (By Mr. Covell) Safety supervisor position.
14 A   They have more hands-on assignments. They are ask --
15     asked to actually be solely responsible for, for
16     example, all UA collections. We no longer use a third
17     party as we were at the time. They've got a lot more
18     duties that are routine, nonsupervisory, non-directing
19     role.
20 Q   What directing actions did the safety supervisor do?
21 A   It was within their scope of authority to redirect
22     resources. For example, if we had a job that day that
23     needed extra assistance from one of their specialists,
24     they would have the authority to ask for and redirect
25     people to assist and coordinate when we had the

Page 19

1      abnormal conditions.
2  Q   Okay. But do you know if the safety supervisor ever
3      actually directed somebody to, say, get off that pad
4      and go to this one?
5  A   Yes.
6  Q   And who, what, when, where, why and how? Can you tell
7      me?
8  A   No. I had, of course, my scope of activity and the
9      supervisor had their scope.
10 Q   Right.
11 A   So the only way for me to quantify how much directing
12     took place was to speak specialists that were employed
13     then, that are still employed now and gauge what their
14     perception was of the supervisor's positions and how
15     much direction they felt they received from that role.
16 Q   Uh-huh.
17 A   And that's how I derive my opinion that there was
18     quite a bit of directing or coordinating that went on
19     from that position, as I expected it to.
20 Q   Okay. Well, let me.....
21 A   And in my absence, it was the sole managerial position
22     left on the site.
23 Q   Let me sort of work on the coordinating versus
24     directing issue here for a little bit. I mean, -- and
25     I'm asking for examples, I'm not suggesting this

Page 20

1      happened, but, for instance, were ever in the office
2      with Mr. Gilbert or Mr. Kirk, and you hear them on the
3      phone saying, safety special Smith, you leave pad 19
4      and you go to pad 20 now and perform hot work permit?
5  A   In the back of my mind I want to say, yes, I've heard
6      those conversations, but I could not give you exactly
7      who, what, when, where at this late stage of the.....
8  Q   And to that same type of situation, have you had a
9      safety specialist come to you and say, yesterday Mr.
10     Kirk called me and said I have to go from pad 19 to
11     pad 20, and do a hot -- and explain that to you or
12     complain about it or whatever they might communicate
13     about it?
14 A   No, I can't recall that exact line of communication,
15     and I don't think it would have been something I would
16     have normally heard.
17 Q   Okay. If this is coordinating the work, is that more
18     of a collegial or peer coordination type of thing
19     where the men go to work in the morning and say, okay,
20     here are the jobs. We've got this extra job here to
21     do today, because this is a special project or
22     something, how are we going to divide this up, and
23     they sort of put their input in and share and decide
24     who can do which and what, and get it covered that
25     way, versus the boss man coming in and say, you go

Page 21

1      here today, you go here today and you go there today?
2      If you can say.
3  A   It was certainly not a democracy. And in my position,
4      I looked to the supervisor to be the second in
5      command, and they had authoritative capability to
6      direct work and -- but in these embedded employees,
7      you need to understand what they're doing that day,
8      what their priorities are before you make a decision
9      who's best available to be redirected. So even though
10     there would be conversation, it was not up for a vote
11     who wanted to go do which activity.
12 Q   Okay. Did you ever confer with Mr. Gilbert when you
13     were considering reclassifying the safety supervisor
14     job or eliminating it as the case may be, as to what
15     he did on a day-to-day basis?
16 A   I don't think John and I sat down and went through any
17     specific classification question and answer of his
18     position.
19 Q   Okay. Giving examples to the extent you possibly can,
20     can you tell me what you understood he did on a day-
21     to-day basis?
22 A   Yeah. I think my understanding of his job duties was
23     to be a second tier supervisor in the department, help
24     us, you know, formulate a better department, and
25     provide, you know, direction and oversight and growth

Case 3:03-cv-00174-RRB    Document 38-9    Filed 08/04/2006    Page 6 of 8

JOHN GILBERT vs. APC NATCHIQ, INC.
CASE NO.: 3:03-CV-00174-RRB

DEPOSITION OF DOUGLAS L. SMITH
JUNE 1, 2006

Page 22

1  in the department from procedure writing to employee
2  development.
3  Q  Okay. But like if you can give it to me by task, so
4     say on a typical day I would expect he would go and
5     conduct a meeting for the first hour, go out and do a
6     hot space entry permit, come back for an hour, or come
7     back, work two hours on PP&G revision, maybe eat, you
8     know, then routine at 1:30 you have to go out to pad
9     so and so or go supervise somebody at pad so and so
10    for about an hour, you know, and like that. Can you
11    break it down like that for me?
12 A  I cannot, and the only reason not is because our days
13    were never typical. They were very untypical, and we
14    responded to the needs as they arose, but on a
15    typical, uninterrupted day.....
16 Q  On a typical untypical day?
17 A  .....you would focus on -- a great deal of the time we
18    were spending the time on policy/procedure
19    development, be a resource to both the client and our
20    other department staff on direction, questions,
21    answers, supporting them in a way to complete their
22    activities. And what we had is a lot of -- the nature
23    of our business is the unplanned events take place and
24    then you get engaged in those. There might be an
25    incident -- might be a lead -- a lead issue, or a

Page 23

1     number of things.
2  Q  Sure. You might have to go out and investigate an
3     accident, you might have a lead meter go out somewhere
4     I take it or --
5  A  You may have a question on where you remove some
6     paint, how much area do I need to pull, who's going to
7     coordinate the sampling at the lab, and, you know, so
8     -- and those functions came up quite frequently.
9  Q  Okay. And of those duties you just described in that
10    answer to that last question, how many of those
11    duties, if any, are different from the duties a safety
12    specialist would have performed?
13 A  The specialist -- let's take lead for example, lead
14    paint. His job might have been to identify that we're
15    going to do some paint removal somewhere, and it could
16    have lead in it. His job may be to work with someone
17    to remove the paint product, and then get it into the
18    department for disposition and review. We -- John's
19    position oftentimes, the supervisor position, would
20    help coordinate the disposition of that lead-potential
21    pain to a lab, receive results, interpret those
22    results, and determine if we had an issue with lead.
23 Q  Okay. So the guy in the field might get the paint
24    samples, bring them into John; John might mail them
25    off to the lab in Colorado, which is one of the ones

Page 24

1     you used I think and then Colorado might send them
2     back and say, here's your level, is that.....
3  A  That's correct. And based on the level,
4     interpretating [sic] that data, we would say, we need
5     to be in respirators or not, and provide that
6     direction back to the field and send them on their
7     way.
8  Q  Okay. And when you get the -- is it correct that when
9     you get the test result from Colorado of parts per
10    million or whatever it is, there's some manual that
11    dictates whether or not if the test result is in a
12    certain range, you -- I don't know if you classify
13    them as level 1 remediation, 2, 3, but whether or not
14    it's respirators or suits or, you know, wash downs or
15    whatever the appropriate treatment is?
16 A  Yeah, there's a lead standard from OSHA that we go by.
17 Q  Okay. Okay. All right. So then the coor -- or the
18    supervisor might look in the manual and say, okay, we
19    have a level 19, therefore you need to use procedure 3
20    kind of thing?
21 A  In context, that's correct. Yes.
22 Q  Okay. All right. Okay. And might also a safety
23    specialist make those same kinds of -- or might not
24    also a safety specialist do that same work vis-a-vis
25    looking at the sample and deciding what type of

Page 25

1     remediation procedure was necessary?
2  A  Not usually, because we tended to want to have
3     oversight of those kind of exposure levels from this
4     -- from the supervisory positions to ensure we were in
5     compliance.
6  Q  Okay. Did specialists fill the supervisory role when
7     there was no safety supervisor on a hitch?
8  A  If there was an absence from any position, the next
9     most qualified person was stepped up to that role as a
10    fill-in if we had available personnel. But when they
11    went to the new role, they assumed those duties and
12    responsibilities, and it was a temporary step up.
13 Q  Okay. And when that happened, did they get a letter
14    saying you're -- for these two weeks, you're
15    temporarily supervisor or not?
16 A  Email transmission to indicate to the staff who was in
17    what position so they would know whom to call.
18 Q  Okay. Did anything go into their personnel folder in
19    that regard, if you know?
20 A  No.
21 Q  Did they get more money?
22 A  Not if it was temporary assignment.
23 Q  Okay. Okay. As far as -- and this dovetails nicely.
24    As far as your comments regarding Mr. Gilbert filling
25    in -- well, okay. Let's not go there yet. Did Mr.

Case 3:03-cv-00174-RRB   Document 38-9   Filed 08/04/2006   Page 7 of 8

JOHN GILBERT vs. APC NATCHIQ, INC.
CASE NO.: 3:03-CV-00174-RRB

DEPOSITION OF DOUGLAS L. SMITH
JUNE 1, 2006

Page 26

1  Gilbert ever have the authority to hire and fire
2  people?
3  A   He never had to fire anyone, but I would say that not
4      -- not by himself as nor did I as the manager. It
5      would have taken consultation with HR and Gary
6      Buchanan as the business unit manager to actually
7      terminate employees.
8  Q   Okay. So if there's a piece of paper terminating a
9      guy, would Gary Buchanan be the guy who signed it?
10 A   He would -- yes, and the one termination I was
11     involved with early on in the -- my tenure there, it
12     required Gary's signature and HR approval to process
13     it.
14 Q   Okay. And then is the converse true as to hiring,
15     that Gary would sign it, and HR would.....
16 A   That's correct.
17 Q   .....approve it? Okay. All right. So position-wise
18     in the organizational chart, he's two steps away from
19     Gary?
20 A   That's correct.
21 Q   Okay. When he stepped up as you put it to the HSE
22     position -- that was your job, is that right?
23 A   No. HSE manager.
24 Q   HSE manager. He would get an email then saying you're
25     HSE manager for this time frame?

Page 27

1  A   Because I was on a standing four and three rotation I
2      was there Monday through Thursday.
3  Q   Uh-huh.
4  A   Anytime I was absent, it was a standing order that
5      they were the next step up in point of contact for my
6      position.
7  Q   Okay. And what additional authority would he have to
8      exercise in that position?
9  A   That position as a step-up into my absence has the
10     same authority as I have in the position with a degree
11     of consultation by phone on any significant matters.
12     But if un -- if unreachable, that position has the
13     full -- the full authority.
14 Q   And when you say consultation by phone, you mean that
15     Mr. Gilbert in the HSE -- acting HSE manager position
16     would call you and consult with you?
17 A   Not on every decision, but if we had a significant
18     incident, we have a company policy of notification to
19     the next level, and I would always get notified of a
20     major event in my absence as I would if I was in town
21     for a meeting, I would get called. Or if I was
22     actually on my R and R days, I would be called, so --
23 Q   This job follows you around whether you're off or not?
24 A   And it's just a matter of company reporting policy.
25     It's not a matter of asking permission to proceed.

Page 28

1      It's a matter of notification.
2  Q   And what kind of issues might you get a phone call
3      about when you were on R and R?
4  A   Company policy required notification up the chain of
5      command for a lost time accident.
6  Q   Okay.
7  A   Significant spills.
8  Q   Okay.
9  A   That's always in our policy requirements is
10     notification on incidents.
11 Q   What kind of decisions might Mr. Gilbert have made as
12     HSE acting manager that he wouldn't have called you
13     about, and he wouldn't have made as safety supervisor?
14 A   More -- I think more of it's decisions that might have
15     been discussed or progressed and staff meetings that I
16     would normally been the primary attendee that in my
17     stead Ron or John would have attended. We had a
18     senior staff meeting that they would attend in my
19     absence, and there was always progress on action items
20     that would need to be relayed or discussed, or some
21     degree of decisionmaking took place in my absence that
22     normally I would have been the primary attendee to
23     those meetings and been involved with those decisions.
24 Q   Okay. So they'd go to these meetings. They'd
25     disseminate that information, and it's a little

Page 29

1      unclear about the decisionmaking. Are you saying
2      decision making within this sphere of those meetings,
3      and the issues that are being discussed there, or do
4      you mean independent of that?
5  A   The most -- most frequently decisions would have had
6      to have been made to keep things progressed, like at
7      those meetings, and also if other issues came up, I
8      can't think of one specifically, but it could have
9      been an HR-related matter, could have been someone
10     needing additional time off, shift change, problems
11     with someone's performance in the field of a given day
12     that needed to be addressed or other managerial
13     matters that I would have normally maybe been -- been
14     addressing.
15 Q   Okay. Well, for instance, I think yesterday we heard
16     about apparently the administrative staff, Kim and
17     somebody else, seemed to be going at it as it were.
18     Is that a situation that you eventually dealt with and
19     got resolved?
20 A   Initially it was dealt with by Ron Kirk, which John's
21     alternate.
22 Q   Uh-hum.
23 A   And the resolution that he came up with wasn't
24     satisfying to the two people that had issues, so we --
25     it eventually made it to me, and we took a different

Case 3:03-cv-00174-RRB   Document 38-9   Filed 08/04/2006   Page 8 of 8

JOHN GILBERT vs. APC NATCHIQ, INC.
CASE NO.: 3:03-CV-00174-RRB

DEPOSITION OF DOUGLAS L. SMITH
JUNE 1, 2006

Page 30

1    action.
2  Q  And was that letting one of them go or.....
3  A  Actually, no, we had a discussion of working more
4     collaboratively together and fixing some problems.
5     Eventually there was a reduction in force that
6     eliminated one of those positions, but it was not
7     associated with this performance issue.
8  Q  Okay. All right. And so as far as specific examples
9     of what a safety supervisor, or Mr. Gilbert might have
10    done as safety supervisor, outside of what we've
11    already discussed, do you have any other examples you
12    can give me?
13 A  If I was on shift, I would normally have been the
14    facilitator on some of the safety meetings. And in my
15    absence, I expected those to continue to be held, and
16    the facilitator role of that fell to the supervisory
17    position.
18 Q  Okay. If there was a -- and I don't know if this
19    happened or not, and you can comment in that regard,
20    but if there was a time when you're not there, and
21    there's no safety supervisor there, then would a
22    safety specialist be the facilitator for the meeting?
23 A  Only if they're stepped up into that supervisory role.
24 Q  Okay. When Mr. Gilbert was a safety specialist, do
25    you know if he ever was stepped up into safety

Page 31

1     supervisor?
2  A  Not during my tenure, no.
3  Q  Okay. Had he been, would he have received an email in
4     that regard?
5  A  There should have been an email designating who was
6     assuming the role of supervisor or manager in their
7     absence.
8  Q  Okay. And who -- I would assume that when you're HSE
9     manager and you're gone, you're saying you didn't send
10    an email, because that was a routine thing, right?
11 A  Between my position as manager and the supervisor
12    position, it was an on-going basis of my schedule that
13    required them to be stepped up in my absence, so there
14    was not an email, but on the vacation coverage or
15    other unscheduled coverage issues, if someone was
16    stepped up, the person departing, supervisor or
17    manager, would put out an email who was going to be
18    their step up and their points of contact.
19 Q  Okay. So it would either come from you or the safety
20    supervisor.....
21 A  Yes.
22 Q  .....that -- the email?
23 A  That's correct.
24 Q  Okay. All right. Is it right or wrong that the
25    safety -- well, let me just ask it this way. You have

Page 32

1     -- and you have had safety specialists, safety
2     supervisor, and safety coordinator -- is that the name
3     of the coordinator job?
4  A  The new position is called a safety coordinator.
5  Q  Okay. What activities are co-extensive to all those
6     positions, if any?
7  A  Ones that bridge all those positions?
8  Q  Yeah. In other words, what jobs, what tasks do each
9     one of those guys do that are the, you know, if you do
10    -- for instance, does each one of those jobs do hot
11    work permits?
12 A  We're talking routine tasks or what tasks you may do?
13 Q  Well -- yeah. Well, let's start with may. Do each
14    one of those jobs do hot work permits?
15 A  Any of our positions may do a hot work permit.
16 Q  Okay. And each one -- okay. And the same as to
17    confined space entry?
18 A  That's correct.
19 Q  Okay. The same as to walk-downs or audits?
20 A  That's correct.
21 Q  The same as to PP&G revision and update?
22 A  No.
23 Q  Okay. Who would or wouldn't be doing that?
24 A  The specialist may have input into the language of a
25    particular policy or procedure but final authority

Page 33

1     over the final content and for regulatory compliance
2     and final approval would come from a higher authority,
3     supervisor or manager's position.
4  Q  Okay. Did the supervisors routinely sign off on the
5     revised PP&G?
6  A  There is not a particular sign-off location on any of
7     those policies.
8  Q  If there's a new P -- a newer, revised PP&G, wouldn't
9     that be something that's passed by you and got your
10    approval in one form or another?
11 A  Ultimately it would have to go to corporate for
12    approval.
13 Q  Okay. All right. Besides those tasks I mentioned to
14    my recollection and thinking, that comprises a large
15    portion of what a safety specialist does, and I think
16    you're telling me you don't -- or is that so?
17 A  That's only a portion of what they do. Permitting is
18    actually probably only 20 percent of their activity.
19 Q  Okay. So beyond that -- well, there's permitting and
20    auditing -- okay. What else would you expect the
21    safety specialist to be doing?
22 A  From an auditing perspective, that does cover the
23    field presence of going out and being visible to
24    employees, looking for compliance, coaching of
25    employees in safe practices, just insuring that people