JOHN GILBERT vs. APC NATCHIQ, INC.
CASE NO.: 3:03-CV-00174-RRB

DEPOSITION OF DOUGLAS L. SMITH
JUNE 1, 2006

Page 50

```
 1  A    I'm not aware of any positions that were exempt hourly
 2       positions.
 3  Q    Vis-a-vis the safety supervisor position, why wouldn't
 4       a safety supervisor be entitled to be paid for all
 5       hours worked in excess of their normal shift in this
 6       -- particular if they're called out or something, just
 7       like the Greeley position?
 8  A    In my opinion, the Greeley position was one deep with
 9       no supervisory or directing responsibilities. There
10       was no one reporting in an organization to that
11       position.
12  Q    Let me stop you. What does one deep mean? I.....
13  A    One person, no other -- they were only -- there was
14       only one person in the safety department at Fort
15       Greeley versus having a department of personnel to
16       direct and administrate over.
17  Q    Okay.
18  A    So my interpretation and looking at the positions, the
19       differential is the supervisor position in Kuparuk was
20       in the chain of command over a department, and it
21       provided administrative oversight and was a step up
22       for the manager position and a member of the senior
23       management team in my absence, so they were very
24       different in nature from my opinion.
25  Q    And so because of that then, they wouldn't be entitled
```

Page 51

```
 1       to be paid for every hour worked without the overtime
 2       premium?
 3  A    More based on my interpretation of the -- kind of the
 4       80/20 rule of how much percentage of time that
 5       position would routinely perform duties that would
 6       fall into a non-exempt category.
 7  Q    Okay. So the reason why the safety supervisor
 8       wouldn't get paid for every hour worked was because in
 9       your opinion they weren't spending 20 percent of their
10       time doing non-exempt work?
11  A    That's the largest component with the additional
12       component being that I viewed them to be more
13       supervisory in nature because of the department
14       configuration of the organization.
15  Q    Okay. I think you've already told us you're not aware
16       of Carr's letter.
17       MR. COVELL: But let's go ahead and get that,
18       Madame Clerk, out of the B exhibits.
19       MS. ZOBEL: I'm going to object to questions
20       in which you're asking him to draw legal conclusions with
21       regard to these payments. I think that's for the court to
22       decide in this case.
23       MR. COVELL: Okay. That's fine. Objection's
24       noted.
25       COURT REPORTER: So the last two look like the
```

Page 52

```
 1       Randy Carr letters.
 2       MR. COVELL: Okay. Thank you.
 3       COURT REPORTER: You're welcome.
 4       MR. COVELL: I'm just taking 6 here, I'm
 5       giving you the rest back.
 6       COURT REPORTER: Very good.
 7  A    Do you have a copy of it?
 8  Q    (By Mr. Covell) Yeah, I'm going to.....
 9       MS. ZOBEL: He's going to.....
10  Q    .....give you this one.
11       MS. ZOBEL: .....give you that.
12  Q    You already looked at this. And I believe you
13       indicated you're not familiar with it, but -- and I'm
14       not suggesting one way or the other that you are or
15       you aren't, but just looking at it again, is that --
16       that letter is not familiar to you, is that correct?
17  A    That's correct.
18  Q    Okay. Would you look at the last page of the
19       document, and go ahead and read the second and third
20       to last paragraphs.
21       MS. ZOBEL: I'd ask that he read the third,
22       fourth and fifth -- the -- starting at the top of the page.
23       MR. COVELL: That's fine with me.
24  Q    (By Mr. Covell) All right. I guess now that we've
25       got you reading, why don't you go ahead.....
```

Page 53

```
 1  A    Well.....
 2  Q    .....and read -- read aloud for us.....
 3  A    Yes. Would you like for me to start at exempt?
 4       MS. ZOBEL: Why don't we -- we could go off
 5       the record and let him read it to himself.
 6  A    I don't mind reading it.
 7       MS. ZOBEL: I mean, is there any reason that
 8       we need to have this.....
 9       MR. COVELL: That's fine. Go ahead.
10       MS. ZOBEL: .....read into the record?
11       MR. COVELL: Let's go off record. Go ahead
12       and read it.
13       (Off record)
14       (On record)
15       COURT REPORTER: We're back on record at
16       12:47.
17  Q    (By Mr. Covell) All right. Mr. Smith, you've been
18       looking at the last two pages of what was marked this
19       morning as B-6, and we're going to get that marked
20       again for this deposition.
21       MS. ZOBEL: I think he looked at the last page
22       of B-6.
23       MR. COVELL: Okay. That's fine.
24       MS. ZOBEL: If you want him to read the first
25       page, he can do that, too.
```

14 (Pages 50 to 53)

Case 3:03-cv-00174-RRB    Document 38-10    Filed 08/04/2006    Page 2 of 5

JOHN GILBERT vs. APC NATCHIQ, INC.
CASE NO.: 3:03-CV-00174-RRB

DEPOSITION OF DOUGLAS L. SMITH
JUNE 1, 2006

Page 54

1   MR. COVELL: No, that's okay. In any event,
2   we'll get that marked for this deposition, make it an exhibit
3   to this deposition.
4   MS. ZOBEL: Just the last page, or the whole
5   exhibit?
6   MR. COVELL: Might as well mark the whole
7   exhibit for.....
8   MS. ZOBEL: That's fine.
9   MR. COVELL: .....continuity's sake.
10  MS. ZOBEL: Then let's let him review the
11  whole exhibit.
12  MR. COVELL: Okay. Let's go off record then.
13  (Off record)
14  (Deposition Exhibit S-1 marked)
15  (On record)
16  COURT REPORTER: We're back on record at
17  12:53.
18  Q   (By Mr. Covell) Mr. Smith, you looked at this B-6
19      which is now also D.....
20  MS. ZOBEL: S.
21  Q   I'm sorry, S-1, right?
22  A   That is correct.
23  Q   Okay. And you read the whole document, and you also
24      read that last page?
25  A   That's correct.

Page 55

1   Q   Okay. Is the direction that appears on the last page
2       about paying an employee for all hours worked the type
3       of guidance that you followed in deciding that the
4       Fort Greeley position out to be paid for all hours
5       worked?
6   A   It was not the guidance that I was provided, and was
7       not -- this -- this is the first time I've seen this
8       document, and did not use this document or language of
9       that particular type by Mr. Carr in making that
10      evaluation.
11  Q   Okay. But is it the same issue? In other words, you
12      look at these positions and say, this person is
13      exempt, but still needs to be paid for all hours
14      worked?
15  A   I think we solved the problem, but unfortunately I
16      didn't use this as the issue to resolve the problem.
17      I was not aware of this opinion. Because of the
18      difficulty in determining this, based on what Mr. Carr
19      states as needing to piece it together from statutes
20      and prior rulings, our approach on that was -- the
21      position at Fort Greeley was more based around the
22      expectation, since that was a singular position, that
23      it would likely be experiencing a lot of call-out
24      time.
25  Q   If somebody's exempt and they get a call out, from

Page 56

1       what you understand and what the rule is from doing
2       the Greeley case, should they get paid for every hour
3       worked?
4   A   I believe they should if it's a routine expectation.
5   Q   Okay. What if they routinely worked -- if their
6       scheduled shift was 12 hours and they routinely worked
7       in excess of 12 hours, should they expect to get paid
8       for every hour worked?
9   MS. ZOBEL: Are you -- are you talking about
10      in the context of people who are exempt under administrative/
11      executive, or are you talking about under the supervisory?
12  MR. COVELL: Either.
13  A   Could I get a definition of routine? What you would
14      consider routinely working over.....
15  Q   (By Mr. Covell) More than once.....
16  A   .....the scheduled.....
17  Q   .....more than once a week.
18  A   I think if you were routine -- routinely working more
19      than once a week, you would have to look at what are
20      the tasks that time's being spent on. If those tasks
21      do not fit within the exempt status, you would need to
22      compensate those employees.
23  Q   Okay. Should the safety supervisor position have been
24      compensated for every hour worked under that standard
25      if they worked in excess of 12 hours a day and were

Page 57

1       engaged in non-exempt duties?
2   MS. ZOBEL: I'm going to object to the extent
3       it calls for a legal conclusion.
4   MR. COVELL: Thank you.
5   Q   (By Mr. Covell) You can go ahead and answer.
6   A   I -- when I did the -- my personal review of that
7       position, I did not feel that that position engaged in
8       duties and the overtime expectation of call-out and
9       routine functions to be classified as non-exempt. So
10      that job at that location with that title, no, I don't
11      feel that position was a non-exempt position.
12  Q   Okay. And I'm saying for the purposes of this
13      question, it's a non-exempt position. Okay. Agreeing
14      with you. And then saying, if they're.....
15  A   Non -- let me rephrase that. I want to make sure that
16      it was -- it was a -- it was not a non-exempt position
17      of my opinion at that location at that time, that the
18      duties involved and the hours expected to be on the
19      job did not in my opinion make it a non-exempt
20      position, that I felt like even with this letter of
21      new information for me, I would not have made a
22      suggestion to reclassify that job hourly at that time.
23  Q   And you're saying the safety special -- safety
24      supervisor position in Kuparuk when Mr. Gilbert was
25      there?

15 (Pages 54 to 57)

Case 3:03-cv-00174-RRB    Document 38-10    Filed 08/04/2006    Page 3 of 5

JOHN GILBERT vs. APC NATCHIQ, INC.
CASE NO.: 3:03-CV-00174-RRB

DEPOSITION OF DOUGLAS L. SMITH
JUNE 1, 2006

Page 62

1    Zobel is objecting to this ques -- or this line of questions
2    and the court may rule on this at a latter date.
3         MS. ZOBEL: That's correct.
4         MR. COVELL: Okay.
5         MS. ZOBEL: And it's a standing objection so I
6    don't interrupt you.
7         MR. COVELL: I -- that's fine with me. Thank
8    you. Okay.
9    Q    (By Mr. Covell) So in regard to the safety supervisor
10        position, if the safety supervisor worked hours
11        routinely in excess of their regular shift, wouldn't
12        it seem that this directs APC to pay the safety
13        supervisor for all hours worked?
14   A    If we had determined at the time that it was
15        supervisory, and I was aware of this letter, yes, but
16        I did not feel that -- I felt the position at the time
17        met the exemption, and was not entitled to all hours
18        worked or overtime.
19   Q    Okay. So with this information, would that answer
20        change then, if I understood what you told me in your
21        answer?
22   A    No.
23   Q    Okay. And.....
24   A    Not from my personal position, no.
25   Q    Okay. And why is that?

Page 63

1    A    The -- just as my position as the HSE manager I
2         believe was clearly exempt, because of the routine
3         step-up into that role with same functionality, and
4         the administrative direction in the department that
5         went on, and the amount of time spent administrating
6         versus routine task working, that that position,
7         unlike Fort Greeley, would be an exempt role.
8    Q    Did the safety supervisor supervise or did the safety
9         supervisor administer?
10   A    You'll have to give me your definition of supervise
11        versus administer.
12   Q    Well, the definition of supervi -- or administrative
13        is in the regulations you talked about, which you're
14        familiar with?
15   A    That's correct.
16   Q    Okay. So are you saying that the safety supervisor
17        met the administrative test?
18   A    I believe at the time that that position did meet --
19        did meet the test.
20   Q    All right. And are you familiar with the supervisory
21        test?
22   A    I haven't looked at them in the last few months, but I
23        have looked at them in the past.
24   Q    Okay. Let's look at the first page of Mr. Carr's
25        letter there. Does that seem in that first indented

Page 64

1         paragraph referencing 8 AAC 15.910(14) seem to set out
2         the supervisory test?
3    A    This supervisory test as spelled out here with these
4         embedded employees mainly getting their daily task
5         direction from their, as we called them at the time,
6         clients that they were assigned to. Even though they
7         were internal APC personnel, we've referred to them as
8         our clients from the safety department. Their daily
9         direction was determined a lot by their activities and
10        direction, so our functionality was less daily
11        direction and more administration facilitation,
12        scheduling, the HR functionality, department
13        directions, implementation of policy and procedure.
14   Q    Okay. Thank you for that answer. Does this seem to
15        set out what the test for a supervisory employee would
16        be? That is, an exempt supervisory employee?
17        MS. ZOBEL: To the extent you're asking for a
18   legal conclusion, I object.
19        MR. COVELL: Thank you.
20   A    So what you're asking me, just for clarification is
21        the first.....
22        MR. COVELL: Let me withdraw the question.
23   A    .....the first indented paragraph?
24   Q    (By Mr. Covell) Is this -- is this the test for a
25        supervisory employee exemption?

Page 65

1    A    As I know of it, yes.
2    Q    Okay. All right. All right. And then did the
3         position of safety supervisor that Mr. Gilbert
4         occupied meet this test for exemption?
5    A    so for clarification, you're asking me if that
6         position met the exemption per this test as
7         supervisory?
8    Q    Right.
9    A    I -- I feel like it does not meet supervisory, that it
10        meets administrative more than supervisory based on
11        the context of this paragraph.
12   Q    Okay. And which elements of this paragraph doesn't
13        the safety supervisor position meet?
14   A    The being employed solely for the purpose of regularly
15        assigning the activities, directing activities of
16        other employees. So -- and the regularly assigning,
17        that regularly assigning component is more of a
18        functionality that took place at the embedded site.
19   Q    Okay. Okay. And then -- let's see. And then would
20        you say the safety supervisor was responsible for
21        results of the work performed of other employees? I
22        guess would you -- okay. Would you say that's so or
23        not, the safety supervisor is responsible for the
24        results of the work performed by other employees?
25   A    Not directly. The specialists were more responsible

Case 3:03-cv-00174-RRB   Document 38-10   Filed 08/04/2006   Page 4 of 5

JOHN GILBERT vs. APC NATCHIQ, INC.
CASE NO.: 3:03-CV-00174-RRB

DEPOSITION OF DOUGLAS L. SMITH
JUNE 1, 2006

Page 74

1   supervisor approve timesheets?
2   A   Yes.
3   Q   And was there a line on them for him to sign off on
4       them or --
5   A   There was.
6   Q   Okay. All right.
7       (Pause)
8   Q   All right. That's all I should have on that one.
9           MS. ZOBEL: Do you want your copy back?
10          MR. COVELL: Sure. Thanks.
11  Q   (By Mr. Covell) Are you aware that the company's
12      asserting a good faith defense in this case?
13  A   Yes.
14  Q   Okay. Are you aware of any paperwork that the company
15      intends to rely upon in asserting its good faith
16      defense?
17  A   No.
18  Q   Okay.
19          MR. COVELL: Let's go off record.
20      (Off record)
21      (On record)
22          COURT REPORTER: We're back on record at 1:28.
23          MR. COVELL: That's all I have. Thank you.
24          MS. ZOBEL: And I'm just looking at my notes.
25      Probably go off record for a moment.

Page 75

1           COURT REPORTER: All right.
2       (Off record)
3       (On record)
4           COURT REPORTER: We're back on record at 1:28.
5           MS. ZOBEL: I have no questions.
6           MR. COVELL: No questions. I can't.
7           MS. ZOBEL: No questions.
8           MR. COVELL: Yeah.
9           COURT REPORTER: All right. This concludes
10      the deposition at 1:29.
11      (Off record)
12      (On record)
13          COURT REPORTER: We're back on record at 1:30.
14  Q   (By Mr. Covell) I'm handing you B-2.....
15          MR. COVELL: .....which I think we'll go ahead
16      and make whatever subsequent S it will be here.
17          COURT REPORTER: S-2.
18          MR. COVELL: S-2.
19  Q   Are you familiar with that document?
20  A   Yes, I am.
21  Q   All right. And that's a job description for safety
22      supervisor, is that right?
23  A   That's correct.
24  Q   Do you -- where did it come from?
25  A   This description was in place when I arrived, and it

Page 76

1       was the position being held by Ron Kirk.
2   Q   Okay.
3   A   And I reviewed the description prior to making a
4       decision to place an alternate opposite of Ron Kirk.
5   Q   Okay. And.....
6   A   And I felt that generally it was correct in its
7       content.
8   Q   Okay. And was that in a file folder on the Slope?
9   A   There was a list of job descriptions that were there
10      in a binder, along with ergonomic assessments.
11  Q   Okay. So do you know when that was generated or who
12      generated, its history or anything?
13  A   I do not know the history or the date of generation.
14  Q   Okay. And you just came across it when you started up
15      there more or less?
16  A   Yeah, I went looking for the -- the company's -- I was
17      new to the company, I went looking for their job
18      description for that position, and that the -- this is
19      what I was -- located, and at that time, you know, it
20      was -- is in the right context. Now, this document
21      has been revised after that time frame. And in fact
22      it shows the -- one of the updates, like the Phillips
23      Alaska I think was a terminology change, because prior
24      it was listed in there as Arco Alaska. And so we made
25      a couple terminologies. But the job description, the

Page 77

1       duties entailed have -- are substantially, exact same
2       as when I reviewed that in 2002.
3   Q   Okay. All right. Thank you.
4           MR. COVELL: I'd like.....
5           MS. ZOBEL: Don't give it to him.
6           MR. COVELL: Yeah, make that an exhibit.
7       That's all I have.
8           COURT REPORTER: Are we off record? Is this
9       the conclusion?
10          MS. ZOBEL: Yes.
11          COURT REPORTER: Okay.
12          MR. COVELL: Yeah.
13          COURT REPORTER: 1:32 We're off record
14      (Off record)
15          (Deposition Exhibit S-2 marked)
16      * * * END OF PROCEEDINGS * * *

## Safety Supervisor

Alaska Petroleum Contractors, Inc. is seeking a Safety Supervisor. Alaska Petroleum Contractors is the primary contractor for Phillips Alaska, Inc. at the Kuparuk River Field, in Prudhoe Bay, Alaska. This position is responsible for the coordination and oversight of Health, Safety, Environmental, and Training functions. The position is based in the Kuparuk River Unit of the North Slope Oil Field.

The Safety Supervisor provides consultation to both construction and maintenance operations regarding compliance, company policies, and safe work practices. Responsibilities include supervision of six Safety Specialists, development of site specific policies and procedures, risk assessments, incident investigations, audits and monitoring of ongoing activities, and coordination of health surveys.

Qualified candidates must have professional safety experience with process operations. Industrial construction and maintenance experience in a petro-chemical environment is preferred. Excellent organizational, communication, and leadership skills are required. The successful candidate must be capable of working in a team environment, be a self-starter, and be goal and task oriented. A four-year degree in safety or a safety related field with an additional five years of work experience is preferred.

Alaska Petroleum Contractors offers a competitive salary and benefits package. For consideration please send a cover letter and a resume to:

Alaska Petroleum Contractors<br>
Job 2626, Operations Manager<br>
P.O. Box 340014<br>
Prudhoe Bay, AK 99734<br>
Fax: (907) 659 – 7207

Alaska Petroleum Contractors is an equal opportunity employer.



June 1,
DATE 2006 EX. S.2
WITNESS D. Smith
METRO COURT REPORTING
(907) 276-3876

APC0041