1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF ALASKA


JOHN GILBERT,            )
                        )
       Plaintiff,     )
                        )
v.                   )
                        )
APC NATCHIQ, INC.,    )
                        )
       Defendant.     )
_____)  Case No. 3:03-CV-00174-RRB


**DEPOSITION OF JOHN D. GILBERT**
**June 7, 2006**

APPEARANCES:
        **M E T R O   C O U R T   R E P O R T I N G**
745 West Fourth Avenue, Suite 425
Anchorage, Alaska 99501
(907) 276-3876

```
1      FOR THE PLAINTIFF:        MR. KENNETH L. COVELL
                                 Attorney at Law
2                                712 West 8th Avenue
                                 Fairbanks, Alaska  99701
3                                (907) 452-4377

4
       FOR THE DEFENDANT:        MS. PATRICIA ZOBEL
5                                DeLisio Moran Geraghty
                                    & Zobel, P.C.
6                                Attorneys at Law
                                 943 West 6th Avenue
7                                Anchorage, Alaska  99501
                                 (907) 279-9574
8
       ALSO PRESENT:             MR. DOUGLAS SMITH
9

10
                          *  *  *  *
11

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```

**M E T R O   C O U R T   R E P O R T I N G**
745 West Fourth Avenue, Suite 425
Anchorage, Alaska 99501
(907) 276-3876

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

        PURSUANT TO NOTICE, the Deposition of **JOHN D. GILBERT**

was taken on behalf of the Defendant before Cheri Tabor, Notary

Public in and for the State of Alaska and Reporter for Metro

Court Reporting, at DeLisio Moran Geraghty & Zobel, P.C., 943

West 6th Avenue, Anchorage, Alaska 99501, on the 31st day of

May 2006, commencing at the hour of 9:07 a.m.

                        **\* \* \* \***
                    **TABLE OF CONTENTS**

    Direct Examination by Ms. Zobel .......................5
    Cross Examination by Mr. Covell ...................152
    Redirect Examination by Ms. Zobel .................163
    Recross Examination by Mr. Covell .................165

          **M E T R O   C O U R T   R E P O R T I N G**
                745 West Fourth Avenue, Suite 425
                    Anchorage, Alaska 99501
                        (907) 276-3876

1

**EXHIBITS**

2

G-1 - John Gilbert's resume..........................9

3       G-2 - Safety supervisor job description ............32
        G-3 - Shift calendar ..............................44

4       G-4 - Slope pay calculator.........................45
        G-5 - Kuparuk River Unit

5             Organizational Chart ......................56
        G-6 - Senior Staff Meeting Agenda .................64

6       G-7 - Change out memorandum........................67
        G-8 - Instrument replacement analysis.............87

7       G-9 - Letter to Mr. Gilbert from Dr. Ellis,
              dated May 16, 2002.........................89

8       G-10 - Letter to Mr. Gilbert from Mr. Irish,
               dated May 14, 2002........................91

9       G-11 - Memorandum concerning sampling cost
               dated Mar. 9, 2003........................92

10      G-12 - Memorandum to APC Safety Specialists
               dated Feb. 16, 2002......................102

11      G-13 - Excerpt, NORM Testing and Reporting
               Procedure................................103

12      G-14 - Suspended Personnel Platform Lifting
               Procedures Form .........................105

13      G-15 - Handwritten notes..........................111
        G-16 - Memorandum to APC HSET Department

14             - Kuparuk, dated Feb. 17, 2002 ...........113
        G-17 - HSET Action Item Log ......................113

15      G-18 - Weekly Supervisor's Meetings Minutes .......115
        G-19 - Level 4/3 Incident Investigation

16             Follow-up Report, dated June 8, 2002 ......117
        G-20 - Handwritten notes..........................118

17      G-21 - Proposed hourly rate computations ..........120
        G-22 - HSET Staff Meeting ........................120

18      G-23 - Memorandum to APC - Natchiq HSET
               Department, dated June 18, 2002 .........124

19      G-24 - Memorandum to APC Safety Specialists,
               dated Feb. 16, 2002 .....................129

20      G-25 - Post-Job Contractor Evaluation .............129
        G-26 - APC HSET Staff ............................134

21      G-27 - APC HSET Staff ............................134
        G-28 - Memorandum concerning exposure monitoring

22             results, dated Feb. 10, 2003.............140
        G-29 - Audiometric Test Documentation Procedures ...144

23      G-30 - Memorandum concerning APC 624 construction
               internal review 2001 action log,

24             dated Mar. 16, 2002......................145

25                          * * * *

**M E T R O   C O U R T   R E P O R T I N G**

745 West Fourth Avenue, Suite 425

Anchorage, Alaska 99501

(907) 276-3876

**P R O C E E D I N G S**

1

2       (On record)

3               COURT REPORTER:  My name is Cheri Tabor and I'm

4   a court reporter for Metro Court Reporting in Anchorage,

5   Alaska.  Today's date is May 31, 2006, and the time is

6   approximately 9:07 a.m.  We are at the offices of DeLisio Moran

7   Geraghty & Zobel, P.C., 943 West 6th Avenue, Anchorage, Alaska

8   99501 for the deposition of John Gilbert.  This case is in the

9   United States District Court for the District of Alaska, in the

10  matter of Gilbert v. APC, Case No. 3:03-CV-00174 RRB.

11      Mr. Gilbert, would you please raise your right hand?

12      (Oath administered)

13              MR. GILBERT:  I do.

14                      **JOHN D. GILBERT**

15  having first been duly sworn under Oath, testified as follows

16  on examination:

17              COURT REPORTER:  Thank you.  Please state your

18  full name and spell your last name for the record.

19      John D. Gilbert, G-i-l-b-e-r-t.

20              COURT REPORTER:  May I please have your mailing

21  address?

22      3291 East 500 North in Lewisville, Idaho 83431.

23              COURT REPORTER:  Okay.  And I also need a

24  daytime or message telephone number for you.

25      208-754-4098.

                COURT REPORTER:  All right.  Thank you.

Counsel would you please identify yourselves and who you

represent?

3            MR. COVELL:  Kenneth Covell for Mr. Gilbert.

4            MS. ZOBEL:  And I'm Patricia Zobel here on

behalf of APC Natchiq and Doug Smith who is a representative of

the company is present.

7            COURT REPORTER:  All right.  Thank you.  You

may proceed.

9                    **DIRECT EXAMINATION**

BY MS. ZOBEL:

Q1     Yes, Mr. Gilbert, good morning.

A2     Good morning.

Q3     We're going to be doing a series of questions regarding

14     your claim for wage and hour.  You understand that's

15     the purpose for you being here today, do you not?

A6     Correct.

Q7     Okay.  The court reporter started to give you a bunch

18     of what I call rules of the road and I'll do those

19     myself here on the record and if she wants to add any I

20     would invite her to do so.  The first is that she is

21     recording that which you respond to my questions so you

22     must be sure that your answers are audible, that you

23     answer verbally.  Nodding doesn't pick up on the tape

24     recording, do you understand that?

A5     Yes, I do.

Q      Okay, good.  To the extent that you're able to answer

**M E T R O   C O U R T   R E P O R T I N G**

745 West Fourth Avenue, Suite 425

Anchorage, Alaska 99501

(907) 276-3876

1       yes or no, please do so as opposed to uh-huh or unh-

2       unh.  Those can be misunderstood when they are

3       transcribed as to whether it was affirmative or

4       negative.

5   A   Very good.

6   Q   Okay.  Also I'm not asking you to guess.  To the extent

7       that you recall, please answer my questions.  If you

8       have a question about the question I'm asking you, if

9       you don't understand, tell me so.  I will repeat it, or

10      I will try and break it down so that it's easier for

11      you to answer.  All right?

12  A   Very good.

13  Q   All right.  If you want to break let me know, and we'll

14      take a break.  Your counsel is present, you have the

15      right to discuss questions with counsel before

16      answering, however, I will note it for the record that

17      you are leaving to discuss with counsel before you

18      answer a particular question.  And that's in the record

19      for whatever it's worth.  But we will take breaks if

20      you'd like to do so, and just let me know.

21  A   Okay.

22  Q   I'm not trying to make this a marathon.  That's one of

23      the differences when you have a woman doing it.

24          MS. ZOBEL:  Yes, counsel, you look like you

25  have a question.

            MR. COVELL:  One other thing, she might ask you

a question and I might object.  Okay?  At that point, wait
until I state my objection and as a general proposition,
whether or not I object, you still have to answer the question.
I may -- I doubt it, but I may direct you not to answer the
question.  If we do then, she and I might have a conversation
on the record.  But.....

A    Okay.

MR. COVELL:  You just wait until we get done,
and then you can look at either of us, and probably one of us
will say go and answer the question.

MS. ZOBEL:  Go ahead and answer the question,
yes.

Q    (By Ms. Zobel)  The most important rule is that we do
not talk on top of each other.  I will try to give you
the courtesy of allowing you to complete your answer
before I ask my next question.  And if you will not
anticipate what I'm asking you, but will let me finish
the question, we will get a question answer, question
answer and the record will be far easier to understand
and the court reporter will thank us at the end of the
day.

A    Okay.

Q    All right.  Before we begin do you have any questions?

A    No, I have no questions.

Q    All right.  Do you feel competent to go through this
deposition today?

A      Yes, I do.

Q      And you've not taken any substances that would affect
       your ability to understand or answer my questions?

A      No, I have not.

Q      All right.  Mr. Gilbert, your full name, could you give
       that again for the record?

A      John David Gilbert.

Q      And you've already given us your address, how long have
       you lived in Lewisville, Idaho?

A      Approximately two years.

Q      And your date of birth?

A      12/07 of 1963.

Q      And your Social Security Number?

A      ████████████

Q      And are you married?

A      Yes, I am.

Q      And do you have dependents?

A      Yes, I do.

Q      How many?

A      Two.

Q      Okay.  And this is a test, what was the date of your
       marriage?

A      That is a test.  I was married in 2000 -- July 15th of
       2000.

Q      Okay.  I'm going to show you your resume which may make
       this simpler to deal with.  Somehow we've ended up with

1       one page of three.  Excuse me counsel.

2       (Off record)

3       (On record)

4              MR. COVELL:  I can just look over his shoulder.

5              MS. ZOBEL:  Actually what the problem is I have
6       page one, two and three I do not have.

7              MR. COVELL:  Okay.  Let's give this to the
8       court reporter, she can go ahead and mark that section.

9                          **(Deposition Exhibit G-1 marked)**

10      (By Ms. Zobel)  Mr. Gilbert you graduated from high

11      school, correct?

12      A     Yes, I did.

13      Q     What year?

14      A     1982.

15      Q     And you received a high school diploma?

16      A     Yes.

17      Q     And where was that?

18      A     That was at Cortez High School in Phoenix, Arizona.

19      Q     And according to this page --

20             MS. ZOBEL:  Have you marked the first sheet?

21             COURT REPORTER:  Yes.

22             MS. ZOBEL:  You may keep the second sheet.

23             COURT REPORTER:  All right.

24             MS. ZOBEL:  Just for reference.  I'm going to
25      show you what's been marked as Exhibit 1, it's the first page
        of three that will be Exhibit 1 and G-1 I believe is the way we

have agreed to do these.

2          COURT REPORTER:  Yes.

3          MR. COVELL:  Right.

4          COURT REPORTER:  Thank you.

5          MS. ZOBEL:  Here are the pages, Doug.

6     Q    (By Ms. Zobel)  According to page one, you attended

7          Montana Tech -- let's see Glendale Community College

8          first, correct?

9     A    Correct.

10    Q    And eventually you received your B.S. in Environmental

11         Engineering in 1994?

12    A    Correct.

13    Q    And that was from where?

14    A    That's Montana College of Mineral Science and

15         Technology.

16    Q    Okay.  And then you received a Masters, is that from

17         the same school, or is that.....

18    A    That's correct, it's the same school.  They just had a

19         name change.  It's formally known as the Montana School

20         of Mines.

21    Q    Okay.

22         MS. ZOBEL:  Let's stop for one second.  We do

23    not need to have page two and three separately marked.  We just

24    want to be sure everybody now has three pages, and they should

25    be marked at the bottom APC0013 through -- or 12, 13, and 14.

Okay.

**M E T R O   C O U R T   R E P O R T I N G**

1      A      Okay.

2             MS. ZOBEL:  And I'll get us a stapler at a

3      break.  Okay.  Having had our first snafu, we can now move on

4      hopefully.

5      Q      (By Ms. Zobel)  John this was what you gave to APC.

6             Have you an updated CV with you maybe?

7      A      I do not have an updated one with me.  I do have an

8             updated version, I just don't have one with me.

9      Q      And this would have ended with your job prior to going

10            to work at APC, is that correct?

11     A      Correct.

12     Q      And that was -- can you pronounce the mining company

13            for me?

14     A      Hecla.....

15     Q      Hecla.

16     A      .....Mining Company.

17     Q      Okay.  Tell me what you did with Hecla?

18     A      I was basically a mine engineer for the company and

19            primarily taking care of reclamation of the closed down

20            gold mine and in addition to that I took care of the

21            overall health and safety responsibilities for the

22            employees at the mine.

23     Q      Okay.  In addition to the degrees that you have listed,

24            on the last page, page 14, you have specialized

25            training.....

       A      Uh-huh (affirmative).

**M E T R O   C O U R T   R E P O R T I N G**
745 West Fourth Avenue, Suite 425
Anchorage, Alaska 99501
(907) 276-3876

Q       .....that is listed?

A       Uh-huh (affirmative).

Q       And you have certifications in a number of different

4       areas.  Could you, just for the record, tell us what

5       the certifications are?  Professional certifications --

6       I don't want just the training you've had, I want the

7       actual certifications.

A       I actually have no professional certifications.  I have

9       -- was pursing my CSP and have since stopped pursuing

10      it.

Q       Okay.

A       I have no professional certifications whatsoever.

Q       All right.  In pursuing your certification as a

14      certified safety professional, how many hours do you

15      think you've put in?

A       Not many.  Eighty.

Q       Okay.

A       A couple of weeks.

Q       Okay.  And was that classroom?

A       No.

Q       What was it?

A       Self-study.

Q       What would you have to do to complete that?

A       Oh, give them a bunch more money now that my first go

25      around has expired and then start studying again.

        Probably put in half a year maybe, I don't know what it

1    would take now.  It would take considerable effort.

2    Q    Okay.  And looking at your education and background,

3    the AAS in quality control technology, explain to me

4    what that is?

5    A    That's a two-year associates degree in quality control

6    technology.  And, basically, there was a time in my

7    life I thought I was going to be building missiles for

8    the military, I was going to be a quality inspector for

9    them and changed direction.

10    Q    And the direction you changed was what?

11    A    Into environmental engineering on the civil side.

12    Q    Tell me what is entitled (ph) in environmental

13    engineering and don't just say environmental

14    engineering, tell me what that is?

15    A    Environmental engineering is primarily as perceived as

16    cleaning up air, water, soil, chemicals, spills of any

17    nature.  Primarily, my focus was acid rock drainage in

18    the mining industry which is the natural development of

19    sulfite and acidic waters from sulfite materials.

20    Q    Okay.  In that course of study did you have courses

21    that would train you in monitoring air, water, et

22    cetera?

23    A    Yes, I did.

24    Q    Okay.  And how about any kind of courses in chemistry

25    that would allow you to understand the significance of

the testing that you would be doing?

A    Yes, I took chemistry courses.

Q    Okay.  And do you think that's translatable into the
kind of work that you were doing as a specialist -- as
a specialist at APC?

A    Yes.  The school I went to, Montana Tech, also has one
of the better safety programs around.  And the
education you get in the environmental field and the
safety field is pretty much hand in hand up until about
the beginning or the middle of your third year, at
which time you break off.  So the chemistry courses for
environmental engineering and the chemistry courses for
the safety program are -- are pretty much identical up
to that point.  So, yes, is the answer to your
question.

Q    So they're applicable then?

A    They're applicable.

Q    Right.  Within the course of study that you did, in
your undergraduate degree, what percentage of them
would have been associated with safety training --
safety monitoring, safety training, things that you
feel were applicable to your safety specialist job or
your safety supervisor job?

A    Just the general courses would be applicable.  In other
words, general chemistry, general math, general
physics.  On the high end there may have been some air
monitoring courses that I took that would be

1     applicable.

2  Q  Okay.

3  A  Although, on the environmental side, it's typically
4     engross.  In other words, you're sampling for the
5     masses and not for a single individual that you would
6     sample for in the safety specialist position.

7  Q  Okay.  And at Montana tech, your M.S., your emphasis
8     was -- it says mineral waste treatment emphasis?

9  A  Engineering.

10 Q  Or in mine, I see.

11 A  Mine and mineral waste treatment emphasis.

12 Q  Okay.

13 A  And that was again to become more specialized in the
14     cleanup of acid rock drainage, mining solutions.

15 Q  What brought you to the Slope since you were a mine
16     guy?

17 A  I got a call from a friend of mine that worked up there
18     and they were looking for an individual to come up and
19     it was a place I'd always wanted to work, and just
20     visit, and go to.  So the opportunity presented itself
21     and I went.

22 Q  Okay.  In terms of your M.S., how long did it take you
23     to get it?

24 A  Eighteen months.

25 Q  And within that particular program do you have to do a
     thesis?

**M E T R O   C O U R T   R E P O R T I N G**
745 West Fourth Avenue, Suite 425
Anchorage, Alaska 99501
(907) 276-3876

A        I chose the non-thesis route.

Q        And do you have to do any kind of testing or anything

3        in order -- orals -- to get the degree?

A        Yes.  Oh, yes.

Q        And what did those entail?  What were the areas?

A        It was all mining related.

Q        Okay.

A        And I think I had a week's worth of oral boards and

9        some high level testing.

Q10      Was any of it safety related?

A11      No.

Q12      Now, within the safety field what, if any, training

13       have you had that would be specialized towards safety?

A14      The only specialized training I really had is probably

15       the 40-hour HAZWOPER class, the 8-hour HAZWOPER, I

16       think they still call it the HAZWOP supervisor class,

17       safety related in the mining industry is the MSHA

18       training.  It's an annual certification.  I've had --

19       these are all, you know, one week or less classes.  I

20       also have a 30-hour OSHA course.

Q21      Okay.  Is it under the most recent or under the prior

22       version of OSHA?

A23      That's the most recent version.

Q24      It changed in 2002, so did you have training in both?

A25      It was -- it was prior or excuse me post-2002.

Q        Okay.  And that was specific to your job as a safety

1      supervisor?

A      Even though I'm not necessarily.....

Q      Well you were employed during that time?

A      Yes, I was employed during that time.

Q      With APC?

A      With APC, yes.  I think that's the class Doug sent me

7      to.

Q      Okay.

A      In Anchorage.

Q      All right.  What is radiological worker one and two?

A      Those are classes that allow you to go to work in a

12     radiological area such as, you know, some of the

13     national labs.  Like where I currently work you have to

14     have radiological one and radiological two training in

15     order to work there.

Q      And the training teaches you safety and how to deal

17     with it?

A      Correct.

Q      Okay.  And you had that.....

A      Evacuation procedures and so forth.

Q      And Geoprobe, what is that?

A      That's just a small drilling rig.  It allows you to do

23     subsurface sampling of soil and water.  It's a tract

24     drilling rig is all it is.

Q      Okay.  At the time that you came to work with APC as a

       safety specialist, which would have been back in

1      January of '01, did you believe that you had the
2      qualifications to work as a safety specialist as
3      described by APC?
4    A  I did after they hired me.  Yes -- yes, I did.
5    Q  Okay.  Did you feel competent in carrying out the job
6      in a safe and competent and professional manner?
7    A  Yes.
8    Q  Okay.  And you feel that you had had the prior
9      training, or they provided you with the training
10     necessary in order to do that?
11   A  I felt that I probably had enough background to do it
12     from my previous jobs.
13   Q  Okay.  How about the safety supervisor position after
14     working for APC and with your background, did you
15     believe that you had the background and education to be
16     able to carry out the responsibilities of that
17     position?
18   A  Yes.  I don't believe that the responsibilities of that
19     position were any different than the responsibilities
20     of the safety specialist.
21   Q  Okay.  Do you think it's the same job?
22   A  Pretty close.  Yes, any of the safety specialists could
23     have done the same job that I was doing as the safety
24     supervisor.  And, in fact, we did at times rotate
25     through and other guys filled in.  So I think it was
       just an equal level job with maybe a few more caveats

**M E T R O   C O U R T   R E P O R T I N G**

1      thrown in.

2    Q   Why do you think you were paid over $100.00 a day more?

3    A   That, I don't know.  I think I was doing a good job for

4      them.  I don't know why they paid me $100.00 more a

5      day.

6    Q   You didn't mind did you?

7    A   Heck, no.

8    Q   Okay.  Do you believe that in carrying out your

9      position as a safety supervisor that you used your

10      education and background and training?

11   A   Not in the engineering side I didn't.

12   Q   Okay.

13   A   In fact, I used my background from the safety work that

14      I had done previously, for sure.

15   Q   Okay.  How many years of education would you estimate

16      that you have?

17   A   Too many.  I have probably, let's see, at least I'd say

18      nine years.

19   Q   Of upper education?

20   A   Correct.

21   Q   After high school?

22   A   Yes.

23   Q   So if we add 12 to that, you've got 21 years?

24   A   A lot.

25   Q   And how many years do you estimate that prior to going

to work for APC you had been working in positions that

1    had some responsibilities regarding safety?

2  A  Those would have started in 1995 with PDC Engineers.

3  Q  Looking at the job before '95 with Westinghouse, that

4    looks like you're doing some sort of testing, were you

5    not?  Water, corrosion, inspection of water stored

6    nuclear fuel.

7  A  Uh-huh (affirmative).

8  Q  Is that a health and safety issue?

9  A  No.

10  Q  All right.  How about the internship that you did, set

11    up a chemical inventory report for hazardous

12    substances?

13  A  No.

14  Q  That's not a safety issue?

15  A  No, it's not.

16  Q  Is that knowledge though that's important for somebody

17    in safety to know in terms of hazardous substances --

18    an inventory?

19  A  Oh, yes.  Definitely.

20  Q  Okay.  So that's applicable to the work that you

21    subsequently did?

22  A  Well in this particular case it was all environmentally

23    related strictly for the CERCLA and RECLA subsections,

24    and I had no interaction with the safety department at

25    the mine.

Q  Okay.  Beginning in '95 you did -- in your jobs you did

1    have contact and interface with health and safety?

2    A    Yes, strictly from the standpoint we had guess working

3    out in the field.  So we had to go out and, you know,

4    apply the OSHA regulations to the guys doing the

5    construction out there.  So we just assisted in that.

6    It was a small group of guys.  So there was several of

7    us that were out there, you know, taking part in that.

8    Q    That's the PDC Engineers group that you're specifically

9    talking about?

10   A    Correct.

11   Q    Now with Aspen Creek, it says that you did water system

12   design, water sampling and analysis.  You did

13   permitting and control system design, industrial

14   ventilation design, water and soil remediation, all of

15   that has to do, or does it not, with sampling and being

16   aware of what is present in the environment and setting

17   up a system to contain it?

18   A    Correct.

19   Q    Okay.  And that would also be applicable to the work

20   that you would do as a safety supervisor, would it not?

21   A    Not in this case, it would not.  This was all directly

22   related to pollution control and reclamation, soil

23   stability.  I'm trying to remember which design I did

24   for the ventilation system, but it's not coming back to

25   me right now.

Q    Well the department you worked in was Health, Safety

1       and Environment, correct?

2   A   Correct.

3   Q   And they were within your concerns over spills, were

4       there not?

5   A   Yes.

6   Q   And there were concerns over leaks of chemicals into

7       the atmosphere, correct?

8   A   Yes.

9   Q   H20, for example, or hydrogen sulfite, things of that

10      nature?

11  A   Yes.

12  Q   Okay.  Now, in looking at and monitoring the

13      environmental repercussions and the responsibilities

14      you had in this Aspen Creek, if not directly the same,

15      would they not be parallel?  The kind of experience

16      that you would find helpful in.....

17  A   I guess there's some generic knowledge there that could

18      pass through with, you know, with everything so --

19  Q   Okay.  And familiarity with environmental requirements,

20      reading the CFR, knowing what the federal and state

21      requirements are, that sort of experience?

22  A   Yes.

23  Q   All of that was entailed in this, and important in the

24      job you subsequently had?

25  A   Yes.

Q   How about with Cypress-Amax Gold?  Either one of the

1    two jobs that you had with them, environmental

2    specialist and then you were a mine engineer?  Again,

3    are there parallels or specifics within those jobs that

4    you believe would have been important or applicable to

5    the job that you did as either a specialist or

6    supervisor for APC?

7  A  I think again there's generic items that pass through

8    all of these positions that I've had since I got out of

9    school that would assist me in doing a safety position

10   type job.

11 Q  Okay.  For example, it says you maintained and

12   developed special environmental programs and permits,

13   you've set up environmental programs within or a

14   specialized safety programs within APC, did you not, as

15   a supervisor?

16 A  I don't know quite what you mean by specialized safety

17   programs.  The programs that we had in place at APC

18   were fairly nonexistent when -- when I first got there

19   in 2001 and by the time I left they were coming

20   together.  But, again, they're just a reiteration of

21   the -- of the OSHA standards kind of custom fit for the

22   work that's done up on the North Slope.

23 Q  And you were involved in putting together those

24   programs -- pulling them together, is that correct?

25 A  Yes.

   Q  Okay.  And that was part of your job?

1    A      Yes.

2    Q      Yes.  Was it a large part of your job?

3    A      Towards the end there I spent some considerable time on

4           it.  I think we all did.  It was unfinished when I

5           left, but it was a pretty good chunk of the work, yes.

6    Q      Okay.

7    A      We all devoted quite a bit of time to getting the

8           regulations put together or the rules and regulations

9           put together.

10    Q      To be in compliance with the federal standards and

11          state, OSHA, et cetera?

12    A      Yes, to be more in compliance.  I think you're always

13          striving to be as compliant as you can be.

14    Q      Okay.  And what about this job, MSE Technology

15          Applications?  You did project management there,

16          correct?

17    A      Uh-huh (affirmative).

18    Q      And that would be applicable to the work that you did

19          at APC?

20    A      No, not necessarily.  Most of the work I did for MSE

21          was with the EPA's mine waste treatment group.  And it

22          had to do strictly with the reclamation of abandoned

23          work environment.

24    Q      Okay.  But I'm thinking you described yourself as doing

25          project management, and I'm just talking that

           terminology that would be involved generically in the

1       kind of work that you did for APC, would it not?

2   A   I don't think you can relate anything I did with MSE to

3       what I did with APC.

4   Q   Okay.  And why is that?

5   A   Just two totally different jobs.

6   Q   Because of the nature of the industry or the nature of

7       the subject matter?

8   A   Both, yes.

9   Q   Okay.  Now in your job with HECLA it looks like you had

10      a health and safety responsibility?

11  A   Yes.

12  Q   Describe that for me.

13  A   Basically, put together health and safety procedure for

14      the 30-some odd employees we had working at the mine --

15      at the mine, and since it didn't exist before I got

16      there put that together.  And then just basically

17      developed a mine plan if you will for the employees to

18      become in compliance with OSHA standards.

19  Q   Okay.

20  A   It's shut down since -- we were rolling from an

21      operating mine which would have been under MSHA rule,

22      to a reclaimed mine which is under OSHA rules.

23  Q   Okay.  And that's similar to some of the

24      responsibilities you had with APC?

25  A   Yes.

Q       Okay.  Have you considered health, safety and

**M E T R O   C O U R T   R E P O R T I N G**

1       environment a profession?

2       Yes.

3       And does it require specialized training?

4       Yes.

5       And specialized knowledge?

6       Yes.

7       And the kind of work that you were doing, both as a

8       specialist and as a supervisor, did it require

9       experience and use of your education?

10      Yes.

11      And that education, is it specialized?  I mean is that

12      something that I could walk out and do?  I have a

13      different kind of specialized education, correct?

14      I guess, the answer is you'd have to have specialized

15      training, but anybody can get specialized training.

16      Some people are more fit for certain kinds of things

17      than others.

18      Right.

19      Was part of your job to interpret complex data --

20      testing data?

21          MR. COVELL:  Excuse me, I've got to object as

22      when and where he's doing that.

23      (By Ms. Zobel)  As a safety supervisor was part of your

24      job to interpret complex data?

25      I'm not sure I would call it complex, but we did

        interpret data.

Q    Okay.  From testing that was done in the field?

A    Yes.

Q    And if you were wrong in your interpretation, could

4    that result in a health threat?

A    Yes.

Q    And if you misinterpreted that could it lead to

7    somebody's death?

A    You hope not.  You hope you have enough procedures in

9    place that by the time you're sampling that -- I would

10   have to say no, it cannot lead to somebody's death.

Q    Well if you were wrong though in your interpretation of

12   the data?

A    You wouldn't let it get to that point.

Q    Okay.  You would have all kinds of systems in place to

15   prevent it getting to the point where it would threaten

16   somebody?

A    Yes, there's administrative engineering and -- and PPE

18   criteria that you always put in place before you get to

19   that stage.

Q    And PPE being personal protective equipment?

A    Correct, yes.

Q    And, but all of that as a whole, all of those different

23   PPE criteria, the different standards that are put in,

24   for example, for how to do a confined space issue, all

25   of those particular requirements are steps that are put

in and drawn up by health and safety, correct?

**M E T R O   C O U R T   R E P O R T I N G**

745 West Fourth Avenue, Suite 425

Anchorage, Alaska 99501

(907) 276-3876

A    They're provided to you in the -- in the CFR standards.

Q    Okay.  Was part of your responsibility though to see

3    that they were carrying those out?

A    Yes.

Q    Within the different areas?

A    Yes.

Q    Okay.  And having the requirement of carrying out those

8    kinds of activities, that carries with it

9    responsibilities for people, does it not?

10    Can you explain that to me?

Q11    Yes, that was a backwards question.  I'm sorry.  The

12    job had responsibilities for people's health and safety

13    and to make sure that people were operating safely,

14    correct?

A15    Correct.

Q16    Okay.  And if you were wrong in the way that you

17    interpreted something, or the data, that responsibility

18    and somebody were injured, that responsibility would

19    come back to you?

A20    I suppose if a person in a safety field made a gross

21    error then yes, you could be responsible for somebody's

22    injury or illness or what have you.

Q23    Okay.  And within the job you had to take CFR's and

24    OSHA requirements and you had to translate what's on

25    paper requirements into actual programs as to how they

    would be performed in the field?

1    A    I would say that we took what was written in the CFR's

2         and implemented those words into the field.

3    Q    Okay.  And sometimes that took translation?

4    A    Of course, yes.

5    Q    And that's the kind of work that you were doing when

6         you were a safety supervisor, is that correct?

7    A    A safety supervisor or a safety specialist, they were

8         one in the same there.

9    Q    Okay.

10        Using the CFR's the same way so --

11   Q    And you were required to exercise your own judgment as

12        to what those meant?

13   A    I don't know what you mean by exercise my own judgment

14        as to what they meant.  I mean.....

15   Q    Well you used.....

16   A    .....they're laid out in the CFR's so you just

17        basically read them and --

18   Q    Interpret them.

19   A    Interpret them I suppose, yes.

20   Q    All right.  And the way in which they applied though to

21        that particular situation you were using your judgment

22        as to how they would best be implemented in the field?

23   A    Yes, you want to make sure you're trying to implement

24        them as they're written.

25   Q    Okay.  And within the job that you had as to -- let me

          rephrase that.  You had responsibilities also to train

1    other people who did have your level of expertise and

2    in understanding the health and safety

3    responsibilities?

4    Yes and no I suppose.  We had a training department if

5    that's what you mean.  Other employees -- we had a

6    training department that would provide training and at

7    times I assist them because I would fill in for those

8    guys providing general safety training to the

9    employees.  I don't know if I gave any specific

10   training to any of the safety specialists.

11   Okay.

12   If that's what you're asking, I'm not sure.

13   Well that -- how about lay people?  Did you do any of

14   the training at all, outside of the training

15   department?  Do you train the trainers, for example?

16   No.  No.

17   Okay.  Did you help determine what the trainers would

18   be training?

19   (No audible answer)

20   Does that make sense?

21   I think I understand.

22   Were you setting part of the agenda that the trainers

23   would follow?

24   Not necessarily, no.

25   Okay.  Did you work in coordination with those people

in determining what training programs were needed?

1    A    The training programs were pretty much laid out when I

2    got there, so I -- I'm trying to recall if there any

3    significant changes in the training programs and I

4    guess I would have to say no, there were no significant

5    changes in the training programs.

6    Q    Okay.

7    A    After I arrived so --

8    Q    Okay.  I'm going to show you what we previously

9    produced as APC0041.  And this is a copy of the safety

10   supervisor description, have you seen that before?

11   A    I don't know if I've seen this before or not.

12   Q    Okay.  Does that sound like your job?

13   A    Yes, it generally does.

14   Q    All right.

15        MS. ZOBEL:  That's been marked as Exhibit what?

16        **(Deposition Exhibit G-2 marked)**

17        COURT REPORTER:  G-2.

18        MS. ZOBEL:  All right.  Exhibit G-2.

19   Q    (By Ms. Zobel)  Now within this it says, for example,

20   you have the -- now it does say you have oversight of

21   training functions.  Health, safety, environment and

22   training functions.  But you say the training program

23   is pretty much in effect and humming along?

24   A    Yes.

25   Q    Okay.  So you didn't have to do a lot of tweaking

     there?

A        No.

Q        Now it says you have development of site specific

3        policy and procedures, was that correct?

A        Let me catch up to you here.

Q        I'm sorry.  I'm leaping ahead of you.

6                  MR. COVELL:  Last sentence of the second

7        paragraph there.

Q        (By Ms. Zobel)  Responsibilities include.....

A        Oh, okay.

Q10      Let's just take the whole paragraph or that sentence.

11       Let's start at the beginning of that paragraph.

A12      Okay.

Q13      Safety supervisor provides consultation to both

14       construction and maintenance operations, was that

15       correct?

A16      Yes.

Q17      Okay.  Regarding compliance, company policies and safe

18       work practices?

A19      Yes.

Q20      Okay.  And it says responsibilities include supervision

21       of six safety specialists?

A22      Yes, there was six safety specialists working there.

Q23      And you had the responsibility to supervise them?

A24      Yes, it's a gray area in my opinion, but -- yes.

Q25      Okay.  Development of site specific polices and

         procedures?

A       Yes, we all did that.

Q       And risk assessments?

A       Yes.

Q       Incident investigations?

A       Yes.

Q       Audits and monitoring of ongoing activities?

A       Yes, I'm not quite sure what that means.

Q       For example, the activities of safety specialists, were

9       you auditing and monitoring ongoing activities by

10      safety specialties?

A11     Auditing and monitoring?

Q12     Yes or no?

A13     No.

Q14     Okay.  How about auditing and monitoring of ongoing

15      activities such as the usage safety protocols?

A16     Yes.

Q17     Okay.  Coordination of health surveys?

A18     Coordination of health surveys, yes.

Q19     Okay.  Within this description, let me see if we can

20      establish some base line here.  If I understand the way

21      that APC has this put together, the safety specialist

22      were, a term I'll use is embedded.  They were

23      specifically assigned to a location facility and

24      project, is that correct?

A25     For the most part, that's correct.

Q       Okay.  So somebody would go every -- you weren't

1    handing out assignments each time this guy would show

2    up at work, he'd go and work on pads, for example?

3    A  Sure, everybody kind of had their assigned area and

4    then if somebody was absent there'd be fill-in, you

5    know, somebody will go over and fill in.

6    Q  Okay.  All right.  And these guys actually were getting

7    specific -- in addition to working independently and

8    doing monitoring, and you agree with me, they worked

9    independently?

10    A  Yes, oh yes -- definitely.

11    Q  And in addition to working independently they would

12    also respond to whoever was the supervisor within

13    control of that particular construction project or area

14    of maintenance?

15    A  Well they reported to or had direct liaison with --

16    whether it's the maintenance supervisor or the

17    maintenance foreman or -- they had their own areas to

18    report to.  They -- one was maintenance, one was

19    construction, one was operations, and one was drilling.

20    Q  Okay.  And those are the different specialists within

21    those different areas?

22    A  Yes, that's right.

23    Q  Your job, as a safety supervisor was not embedded in

24    any of those specific areas, but rather was more

25    generalized over all of those areas, would that be

correct?

1      A      Yes.

2      Q      Okay.  So that, whereas, one safety specialist might be

3             working in construction, you would be working with

4             construction and pads and whatever else the other areas

5             where you listed?

6      A      Sure, yes.

7      Q      Okay.  And then within your responsibilities or within

8             your job as a safety supervisor, you had to answer to

9             Doug Smith, correct.....

10     A      Yes.

11     Q      .....as your immediate supervisor?

12     A      Yes.

13     Q      Whereas, these gentlemen, the safety specialist would

14            answer to the foreman who -- or the supervisors who

15            were in their construction areas who weren't safety

16            people necessarily, correct?

17                    MR. COVELL:  I'm going to object to the form of

18     the question as to when you say answer as to what that means?

19                    MS. ZOBEL:  All right.  I'll rephrase it.  I'll

20     be happy to rephrase it.

21                    MR. COVELL:  Just to keep it clear for the

22     record.

23                    MS. ZOBEL:  I'll be happy to rephrase that.

24     Q      (By Ms. Zobel)  They were getting specific assignments

25            from, for example, let's use an example; they're going

              to do a confined space entry in a particular project.

1     And let's say it's in a construction project, would

2     that make sense?

3  A   Sure, yes.

4  Q   And so the safety specialist would be responsible to

5     make sure that they do the confined space entry

6     correctly, is that correct?

7  A   That's correct.

8  Q   But he would be being told by the supervisor of that

9     construction project, we're going to do confined space

10    today and this is where we need you?

11  A  That is also correct.

12  Q  Okay.  Whereas, in your position as a safety supervisor

13    you were not taking direction from the other craft

14    supervisors, except in a generalized way if they needed

15    something to be dealt with from a company wide safety

16    issue?

17  A  No, that's not necessarily true.  I was not immune to

18    having some of the department heads come to me and say

19    hey we need this over here.

20  Q  Give me an example of what they would say, this over

21    here?

22  A  Can you come to the wash bay and do the confined space

23    entry for the guys in the -- in the wash bay.  We've

24    got another guy that's, for instance, the safety

25    specialist that was there, he's tied up on another

      permit in the heavy shop, for instance.

Q       Okay.

A       So I would pack up and go over and do that.

Q       And that would be on an intermittent basis if somebody
        else who was embedded with that group wasn't able to
        carry out that responsibility?

A       Yes, it could be a daily event, you know.  So it could
        be at any time, every day or twice a week, or, you
        know, what I mean.

Q       Well it didn't happen every day though, did it?

A       No, it did not happen every day.

        MR. COVELL:  I want to state another objection.
        I think it's just a matter of style, but I think the way
        you're not phrasing your questions as questions.  You're making
        the statement saying that would be this that would be that.  So
        I object to the form of the question.

        MS. ZOBEL:  Okay.

        MR. COVELL:  Because they're technically not
        question, so --

        MS. ZOBEL:  All right.

Q       (By Ms. Zobel)  I think your answer was that that did
        not happen daily.  It was something that could happen
        that you would be called on, but it happened
        intermittently, is that.....

A       Correct.

Q       All right.  In general, though your job was not to do
        those on site activities but to rather work from the

1    corporate side of the job of health, safety, and

2    environment?

3              MR. COVELL:  Technically that's not a question.

4              MS. ZOBEL:  Is that correct?

5              MR. COVELL:  Okay.  Now, that's a question.

6              MS. ZOBEL:  He answers before I get to say, is

7    that correct.

8    A    Okay.  I'll quit.

9              MR. COVELL:  That's all right.

10    Q    (By Ms. Zobel)  Is that correct?

11    A    No.

12    Q    No?  Well --

13    A    I don't quite understand the corporate side.  I mean,

14    the way I look at my job as a safety supervisor, if I

15    may, it was not too much more than a glorified safety

16    specialist.  Somebody had to be in the office to take

17    care of all the questions that were brought to the

18    department each and every day by the rest of the field.

19     Could I -- was I qualified to do that?  Yes.  Were the

20    rest of the guys qualified to do that?  Absolutely.  We

21    were all similarly qualified to do the same job.  So if

22    I wasn't in the office somebody else would have to come

23    in and fill in and do exactly what I was doing.  If I

24    went to the field to get a confined space entry done,

25    somebody would have to fill in for me in the office.

     So we would just shuffle things around and make it all

1    work.  Does that answer your questions.

2    Q    That's helpful.  The position that you held though was,

3         if I'm understanding what you just said, was something

4         that was necessary?  That it was a job that somebody

5         had to do in terms of being in the office to respond to

6         the Kuparuk project as a whole?

7    A    Yes.

8              MR. COVELL:  Okay.  Now wait, if it's not a

9    question.....

10             MS. ZOBEL:  There was a question mark at the

11   end of that one.

12             MR. COVELL:  Was there?  Well if it's not a

13   question don't answer it.  Okay?  All right.  Think about

14   whether it's a question or not, if it's not a question don't

15   answer it.  All right.

16             MS. ZOBEL:  This is going to get confusing for

17   me, I can see it now.

18             MR. COVELL:  Sometimes people will say is it,

19   or does it, or was.  If the question comes at the end of the

20   sentence, wait for it.  And then if it's a question answer it,

21   thank you.  Pardon me.

22             MS. ZOBEL:  That's all right.

23             MR. COVELL:  These things in conversational

24   English you can take the inflection and everything else.  When

25   this eventually gets typed up on the paper oftentimes it looks

     significantly different from the way it sounds, so that's the

**M E T R O   C O U R T   R E P O R T I N G**
745 West Fourth Avenue, Suite 425
Anchorage, Alaska 99501
(907) 276-3876

reason for niggling (ph) here.  Thank you.

Q        (By Ms. Zobel)  Okay.  It was necessary to have
         somebody in the position that you were in, was it not?

A        Yes.

Q        Okay.  And that it was a separate role to be filled
         than that of safety specialist, was it not?

A        Yes.

Q        Okay.  We talked briefly before about your employment
         history.  Let's back up for a second to your resume.
         Within the jobs that you held prior to going to work
         with APC, were you ever paid on a day rate?

A        No.

Q        Okay.  Since you have left APC, by whom have you been
         employed?

A        MSE Technology Applications.

Q        You went back to a prior employer?

A        Correct.

Q        What did you do for them?

A        Identical job I was doing here.

Q        Okay.  When you say -- we have to make the record
         clear.

A        Hydrogeologic and mining engineer.

Q        The same job that appears on APC document 12 and is
         Exhibit G-1?

A        Correct.

Q        And how were you paid there?

**M E T R O   C O U R T   R E P O R T I N G**

A       Yearly salary.

Q       Not a day rate?

A       Correct.

Q       Is that an exempt position or nonexempt?

A       I'm not sure.

Q       Are you paid overtime?

A       Yes.

Q       Okay.  And what were the dates that you worked for
9       them?

10      I honestly can't remember.  Let's see.  I've got to go
11      back a little bit.

12      Let's go back and establish your dates that you worked
13      for APC, and then that may help, and we can go from
14      there.  You worked as a safety specialist for what
15      dates?

16      2001 to 2003.

17      As a safety specialist?

18      Specialist.  I don't recall the exact date of the
19      transfer to the safety supervisor so --

20      Let me tell you what my records state and you can tell
21      if that's correct or not.  01/30/01 to 01/01/02 as a
22      safety specialist, does that sound correct?

23      Sounds reasonable.

24      Okay.  And then on 01/03/02 you were transferred to a
25      safety supervisor.....

A       Yes, ma'am.

Q     Does that sound correct?

A     Sounds correct.

Q     Okay.  Let me find a document.  And then you left,
according to my records, on 04/22/03 as a safety
supervisor, does that sound correct?

A     Sounds correct.

Q     All right.  I've got a shift calendar that is here that
looks like it's something that was changed as of
05/07/02.  And I'd like you to just look and tell me if
this appears accurate as to -- I don't mean the exact
dates but the fact that you had certain weeks on and
certain weeks off.

          COURT REPORTER:  G-3 is marked.

                              **(Deposition Exhibit G-3 marked)**

A     All right.

Q     (By Ms. Zobel)  And this is the 2002 shift calendar, is
that -- do you recognize this?

A     Yes.

Q     All right.  Does this accurately set out what would
have been your days on and days off in this -- in the
generalized sense?  I don't want you to be saying,
you're testifying that you worked on May 1st, but that
you were on for a certain number of weeks, and then
off.  Does this look accurate?

A     Yes, this would have been just a simple schedule I put
together to give me a general idea when I was going to

1    be on the Slope and off the Slope.

2  Q    Okay.  And you did a Tuesday change out?

3  A    Yes.

4  Q    And that remained the same for the time through the end

5    of the time that you worked with APC as a safety

6    supervisor, is that correct?

7  A    Well in detail I don't recall because sometimes you

8    come in a day early or leave a day later or, you know,

9    stay an extra week.  So, you know, this would have been

10    something I would have put together just to give me a

11    general idea of when I was coming on and when I was

12    going off, subject to change.

13  Q    Okay.  And how were you paid?  What was your pay?

14  A    As a safety supervisor?

15  Q    Supervisor, yes.

16  A    I believe it was 425 a day.

17  Q    Four seventy-five?

18  A    Okay.  Four seventy-five.

19  Q    On a daily basis?

20  A    Yes.

21  Q    I'm going to show you.....

22        MS. ZOBEL:  Madame court reporter.

23    .....what we have marked as document 491.

24        COURT REPORTER:  And this will be G-4.

25                    **(Deposition Exhibit G-4 marked)**

(Off record comments)

**M E T R O   C O U R T   R E P O R T I N G**

745 West Fourth Avenue, Suite 425

Anchorage, Alaska 99501

(907) 276-3876

Q    (By Ms. Zobel)  Is this something you put together?

Q    It may have been something I put together or it may

2    have been something that Sam Taylor put together.

A    Okay.

Q    Does this accurately reflect your day rate and number

6    of days worked per year, do you believe?

A    The -- it looks like the day rate of 475 is correct,

8    but I don't know if it accurately predicts how many

9    days I worked in a year, I couldn't tell you without

10   looking at my records how many days I worked so --

Q    Okay.

A    Again, it's just a tool to figure out what your pay is

13   so when you get your paycheck stub you can balance it

14   against and say we're generally correct so --

Q    Okay.  And Sam Taylor at one point worked as your

16   alternate as a safety supervisor?

A    I believe that's correct.

Q    So if he prepared this it would have been as a

19   supervisor?

A    No.  This was prepared when I -- when we first -- we

21   arrived on the Slope the same day as safety specialists

22   and so within our first hitch we would have put this

23   together.

Q    Showing a day rate of 475?

A    Oh, you just change it as it went along.  So, I mean,

     the spreadsheet itself was built early.  But you could

**M E T R O   C O U R T   R E P O R T I N G**

1        insert any day rate you wanted.

2    Q    Okay.

3    A    And it would just do the calculations for you.

4    Q    All right.  But that would reflect your rate of

5        pay.....

6    A    Yes.

7    Q    .....at the time that you left APC, correct?

8            MR. COVELL:  And we're talking about the 475?

9    A    Four seventy-five.

10           MS. ZOBEL:  That's correct.  Not the 500.

11   Q    (By Ms. Zobel)  Do you know why that 500 was done?

12       What that was?

13   A    Don't have a clue.

14   Q    All right.

15           MS. ZOBEL:  That's your copy.

16           MR. COVELL:  Just for the record, these ones

17   with the yellow stickers on them, at the end of the deposition

18   are going to the court reporter.  So we don't want to

19   accidentally fold these up in our materials and take them with

20   us.

21   A    Very good.

22           MS. ZOBEL:  And if want a copy of them, you can

23   get the copy that is being given to the.....

24           MR. COVELL:  Reporter.

25           MS. ZOBEL:  To the reporter.

             MR. COVELL:  And, I'll also have a copy.

A      Yes.

Q      (By Ms. Zobel)  Ron Kirk was also your alternate, was

3      he not?

A      Yes at one time he was my alternate.

Q      As a safety specialist, is that correct?

A      Yes.

Q      Okay.  And is it possible that's Mr. Kirk's day rate,

8      or do you know?

A      I have no idea.

Q      All right.

11             MS. ZOBEL:  I want to be sure I've got my

       records not running away.

Q      (By Ms. Zobel)  Okay.  Back now to this listing of

14     employment that you've done subsequent.  Looking at

15     04/22/03 as your last day with APC, can you give me a

16     clue of when you went back to work with MSE Technology

17     Applications?

A      Around April of '04.

Q      You took some time off?

A      Yes, I did.  I took some time off and finished

21     rebuilding my house and sold it in Challis, Idaho.

22     (Off record comments)

Q      And after you went to work with -- have you worked for

24     anybody else besides MSE since leaving APC?

A      Yes, I have.

Q      Okay.  When did you leave MSE?

1      That would have been about nine months afterwards, so

2      around -- what does that put us into December of '04?

3      And then I went to work for -- god, my brain's taking a

4      break here.

5           MS. ZOBEL:  Do you want to take a break?  We've

6      been doing this over an hour?

7      Can we do that and I'll think about that.

8           MS. ZOBEL:  That's fine.

9      (Off record)

10     (On record)

11     (By Ms. Zobel)  Okay.  We were talking, Mr. Gilbert,

12     about the positions that you've held since, and you

13     were going to tell me who you went to work with after

14     MSE Technology?

15     Yes, and I thought about it, and guess what?

16     What?

17     I can't remember their name.

18     Okay.

19     However, it's the same company that I've worked for

20     since.  There's been several contract changes, so the

21     name of the owner of the company has changed although

22     the location has not.  So I currently work for CH2M

23     Hill, Washington Group and.....

24     And -- go ahead.

25     And I've worked for them since the MSE position.

Q      And that would have been since December of '04?

A     Correct.

Q     And tell me what you do for CH2M Hill?

A     I'm a civil engineer.

Q     And are you actually working in Washington State or in

5     Lewiston?  Oh, you're not in Lewis- -- where are you?

A     Lewisville.

Q     Lewisville.  You're not in Lewiston?

A     I actually work at a small place called Scoville, Idaho

9     which is the Idaho National Engineering Laboratory.

Q10   And does your job entail any health and safety

11    responsibilities?

A12   No, it does not.

Q13   And how are you paid there?

A14   Salary position.

Q15   And how is that calculated, in the sense, is it on a

16    day rate, an hourly rate, or an annualized?

A17   I'm not sure to be honest.  It's not a day rate, so

18    it's a yearly salary but I get, again, overtime for

19    every hour I work overtime.

Q20   Okay.  Have you worked previous to the job with APC on

21    a day rate?

A22   No.

Q23   Did you ever try to negotiate a day rate with anyone?

A24   No.

Q25   Have you worked since with anyone on a day rate?

A     No.

Q    Have you ever tried to negotiate a day rate with any of

2    these people that you worked with since?

A    No.

Q    Have you ever brought a wage and hour lawsuit

5    previously?

A    No.

Q    Or since?

A    No.

Q    Now in your work with APC, you were paid in what

10   method, day rate?

A11  Yes.

Q12  That's a question mark.  Okay.  And your day rate went

13   up a variety of times based upon how long you'd been

14   with the company, is that correct?

A15  I had several pay raises while I was there, that's

16   correct.

Q17  Okay.  And your last, I think we established was 475 an

18   hour, correct?

A19  Correct.

20          MR. COVELL:  That's a day.

21          MS. ZOBEL:  What did I say, an hour?

22          MR. COVELL:  I think so.

A23  An hour.

Q24  (By Ms. Zobel)  Okay.  Did you have a contract with APC

25   Natchiq?

A    No.

1  Q    Now the number of hours that you actually worked per

2       day, did that fluctuate?

3  A    Yes.

4  Q    Did you have an understanding with the company as to a

5       minimum number of hours that you were expected to work

6       in exchange for the day rate?

7  A    That would have been 12 hours.

8  Q    Okay.  That was your understanding of the expectation?

9  A    Yes.

10 Q    Okay.  And you've provided us with -- or your counsel

11      did, a series of calendars that are dated and show the

12      dates that you were on the Slope.

13 A    Yes.

14 Q    Okay.  And these are previously then -- I did not mark

15      those as exhibits to this deposition.  I just want to

16      confirm some information regarding them.

17 A    Okay.

18 Q    They are marked, for the record, beginning 0033 and

19      they go through 115 -- 0115.  And those records --

20      first of all, is that your handwriting on them?

21 A    Yes, it is.

22 Q    And did you keep these while you were working there

23      contemporaneous?

24 A    Yes, I did.  I kept them every day.

25 Q    Okay.  And why did you do this?

   A    Habit.  Same book here.

Q    Do you do that in your current job?

A    Yes, I do.

Q    And these record the number of hours, I'm assuming,
     that you worked.  For example, there's a 12, as 12
     point --  a 21.5, a 13.5, a 12, a 13.5, a 12, and a 12
     kind of thing.

A    Correct.

Q    And those are the dates or the time that you worked, is
     that correct?

A    Those are the hours I worked in the day.

Q    Yes.  You answered the question I was trying to ask,
     thank you.  Later in the records I saw when we get into
     2002 that you noted actual hours when you came in.  For
     example, at random I opened it up to March 25 and the
     entry is office work, 6:00 a.m. to 6:00 p.m. and why
     did you change your habit then?

A    I have no good answer for you there, I just don't know.

Q    Okay.  But this would reflect that you, on that day --
     what would that reflect on that date?  The entry March
     25th?

A    Twelve hours of work on Monday, March 25th.

Q    In the office?

A    Yes.

Q    Okay.  And then if we went to another one, May 14th of
     2002, on page 78, it says meeting Pat Holland, Paul
     Booth, something in design, maybe you can read this to

**M E T R O   C O U R T   R E P O R T I N G**

1       us.

2   A   Which day are we looking at?

3   Q   We're just at random opening it.

4   A   Meeting Pat Holland at the paint booth.  Concerns a

5       design of hose, it looks like.

6   Q   Okay.  Who's Pat Holland?

7   A   Pat Holland was a light shop foreman.

8   Q   Okay.

9   A   Light shop.

10  Q   And he called you in to look at design on something

11      that he thought might be unsafe, is that correct?

12  A   It could have been, yes.

13  Q   Okay.  So would this be one of the instances that you

14      talked about where you might go into the field?

15  A   Yes.

16  Q   Okay.  And then it says, office 5:30 to 6:30 p.m. so

17      you were back in the office.....

18  A   Back in the office.

19  Q   .....after doing that?  Okay.  So if I wanted to find

20      out, in general, when you were in the office, and when

21      you were out, would this accurately reflect, at least,

22      in general, the times when you were working in

23      different places?

24  A   Yes.

25  Q   Okay.  Talking about -- and I'm skipping over safety

        specialist and going to concentrate on safety

1    supervisor pursuant to the discussions we've already

2    had.  So all of these questions are going to be after

3    you were promoted to a supervisory position.  Okay?

4  A    Okay.

5  Q    Do you believe it was a promotion?

6  A    I think anytime you're given more money, it may be a

7    promotion.

8  Q    Okay.  Where physically were you expected to report

9    each day?  Where was your office or did you have an

10    office?

11  A    Yes, we had a section of the Kuparuk camp that the

12    safety guys had for offices.

13  Q    Okay.  And did you and your alternate physically have

14    an office assigned to you?

15  A    Yes, all the safety specialists had an office assigned

16    to them and safety supervisors.

17  Q    Okay.  And, in fact, I've got a schematic, I think,of

18    your office and a listed of equipment or ergonomic

19    furniture that was ordered for you.  Was that done

20    after you were promoted?

21  A    I don't recall.  You'd have to ask Doug with -- I don't

22    recall when we ordered that stuff.

23  Q    Okay.  But we're not asking Doug today.

24  A    Okay.

25        MR. SMITH:  I'm sorry John.

Q    (By Ms. Zobel)  Did you have an administrative staff

**M E T R O   C O U R T   R E P O R T I N G**

1    that was assigned to work with you?

2    A    The department had a secretary, yes.

3    Q    And did you give that secretary assignments to work on?

4    A    Yes and no.  Primarily they had their task to do every

5    day that just went unchanging.  You know, they'd file

6    the paperwork, they would fill out injury and illness

7    reports, take care of the -- mostly it was just

8    paperwork I guess.  Filing records.

9    Q    Was that filing and paperwork in support of your

10    position, at least partially question mark?

11    A    More in support of the department, not necessarily my

12    position.

13    Q    Okay.  The material that you generated, did they file

14    it?

15    A    Some of it yes.

16    Q    Okay.  There's an organization chart that we have.

17         COURT REPORTER:  All right.  G-5 is marked.

18              **(Deposition Exhibit G-5 marked)**

19         MR. COVELL:  Thank you.

20    (By Ms. Zobel)  Have you seen this before?

21    A    I saw it yesterday.

22    Q    Okay.  Among the documents that we provided to your

23    counsel?

24    A    Correct.

25    Q    This safety manager as Doug Smith and then you as a

safety supervisor with an alternate of Ron Kirk, was

1    that accurate in the reporting -- as to the reporting

2    that -- as to the person you reported to?

3  A    Did I report to Doug Smith?

4  Q    Yes.

5  A    Yes.

6  Q    Okay.  And the admin assistant, it shows them as being

7    connected to your position, so -- and was that accurate

8    also?

9  A    I don't quite know how to answer that.  I think they

10    were connected as much Doug as they were to me.

11  Q    All right.  Okay.  They supported both of you?

12  A    Correct.

13  Q    Then you have below that the safety specialist as

14    reporting to you, is that, and you were earlier

15    testifying, I think, that you did supervise those

16    positions, is that correct?

17         MR. COVELL:  I guess, I'll object to compound.

18         MS. ZOBEL:  Yes.

19         MR. COVELL:  So she can either break it down to

20  two.

21         MS. ZOBEL:  I can break it down to two.

22  Q    (By Ms. Zobel)  You supervised those safety specialists

23    that were below you, did you not?

24  A    Yes.

25  Q    Okay then it shows the -- what's IH safety specialist?

A    Industrial hygiene.

Q    Okay.  And that's just another safety specialist?  They

2    couldn't get them all on the same line, is that right

3    or is that somebody different?

A    Sam just had an industrial hygiene background.

Q    Okay.

A    So he.....

Q    Did he float?

A    Yes.

Q    Okay.  Whereas, these other positions were embedded?

A10  In general, yes.

Q11  Okay.  And you would, if we had to say float as a word,

12   you would be available as a consultant for each of

13   these other -- all these fields down below you.   IH

14   safety construction, field services production, and

15   field safety?

16        MR. COVELL:  I would object to compound.  No

17   question.

18        MS. ZOBEL:  There was a question.

19        MR. COVELL:  I didn't hear it, I'm sorry.

20        MS. ZOBEL:  Okay.

Q21  (By Ms. Zobel)  Can you answer it?

22        MR. COVELL:  Do you understand it?

A23  I think, the question as I understand it, is I could be

24   a direct substitute for any of these guys.....

Q25  That isn't what I was asking.

A    Okay.

Q    Did you, in your position -- did you act as a
2    consultant to these different subspecialties, the
3    safety specialist in the field, the production service
4    safety specialty, et cetera?
A    I don't think I acted as a consultant, no.
Q    If they had a question or if what we -- let me ask you
7    this then:  We had a listing on your calendar that we
8    just looked at, at random where somebody had a concern
9    of a hose you said, correct?
A10   Uh-huh (affirmative).
Q11   And they came to you to have you look at this as a
12   consultant, correct?
A13   In that light yes, you're correct.
Q14   Okay.  What if a construction safety specialist, I
15   believe it's Tommy Brown, had a question would he bring
16   it to you?  And let me rephrase that:  Had a question
17   regarding the meeting as data or how to go about doing
18   some procedure, would he consult with you?
A19   He could, yes.
Q20   Okay.  Is this organization chart as far you know, does
21   this represent your understanding of the department
22   that you worked in?
A23   It might have been at the very early stage and I'm not
24   -- there were so many guys that came and went through
25   there.  In fact, there was one guy every 30 days that
     came and went, so at one point this may have been

1       accurate but --

2   Q   In terms of the names of the individuals, not the job

3       description is that what you're referring to?

4   A   Yes, the job description names look kind of -- look

5       right.

6   Q   Okay.

7   A   Uh-huh (affirmative).

8   Q   So if somebody may -- who held that position might come

9       and go, but the positions remained the same throughout

10      the time that you worked there, is that correct?

11  A   Well, again, the -- I mean this is just a snapshot in

12      time from a very early stage.  Ron Kirk who you have

13      listed here as safety supervisor with me became a

14      safety specialist with Michael Davis.

15  Q   Let's stop a second.  Ignoring the names of who filled

16      which of these blocks, did this construction as to an

17      organization chart remain essentially the same during

18      the time that you worked as a safety supervisor?

19  A   Essentially the same.

20  Q   Okay.  All right.  Doug Smith was your immediate

21      supervisor but he -- there were times when Mr. Smith

22      was not on the Slope correct?

23  A   Correct.

24  Q   And when he was gone, did you act in his stead?

25  A   For certain things I did yes.

    Q   Okay.  Give me some examples of what you did in his

1    shoes, when he wasn't there.

2    Gather everybody's timecards, sign them and make sure

3    that they got submitted to the accounting.  Answer all

4    the questions in regards to the department, you know,

5    like we talked earlier about people coming and asking

6    questions about the construction or the field services

7    area production services, so I would handle those

8    questions as best I could.  Try to keep things rolling.

9    Q    Okay.  Did you attend supervisory meetings?

10   Can you explain that supervisory business?

11   Q    I'll give you some specifics in a minute, okay?  Where

12   you attended, we'll talk about that.  When you said

13   answer questions from the departments that would come

14   into the office, give me a, for example, what would

15   somebody be asking?

16   For example, somebody would come in and say, hey are

17   you going to have somebody on pad such and such, at

18   this time to do the confined space and I would say, I

19   will know since I know about it.  So, I'd call one of

20   these guys, whoever was out in the field closest to

21   their need and get them on the radio and send them over

22   there.

23   Q    Okay.  In that sense were you a coordinator of the work

24   that was being done by HSE?

25   You could say that, yes.

Q    Okay.  What's another, for example, kind of question

1    you might get?

2    A    The client, Industrial Hygienist might come down and

3    ask did you guys do samples on this date, at this

4    location and I would go to the sample record book, and

5    open it up and say yes or no.

6    Q    And would they ask you for what the results were or

7    anything like that?

8    A    Yes, we'd just show them it's all in the books, so

9    you'd open the book and say, if it was there, here's

10    the results for that day, on this person.

11    Q    Okay.  Give me another, for example.

12    A    Somebody might come and say, hey we have an injury or

13    an illness with a particular employee and you need to

14    go to the medical and meet him and make sure that the

15    appropriate paperwork's filled out so I would handle

16    that.

17    Q    Okay.  And that was within the Workers' Comp program

18    and the OSHA recordable program?

19    A    That was just out of the recordable program.

20    Q    Okay.  Now there were -- thinking about the recordable

21    program under OSHA there were certain illnesses or

22    injuries that would occur that would not be recordable,

23    is that correct, under the regulations?

24    A    Correct.

25    Q    And would you be the person who would make the

determination as to whether this was recordable as a

**M E T R O   C O U R T   R E P O R T I N G**

1    lost time or personal incident?

2    A    I could be that person, yes.

3    Q    Okay.  And you'd be exercising your judgment over the

4    situation?

5        MR. COVELL:  Objection.

6    Q    (By Ms. Zobel)  Is that correct?

7    A    I would be exercising the requirements of the CFR and

8    the company's regulations.  Not my judgment -- but the

9    company's order, federal government's.

10   All right.  You said a moment ago as one of your

11   examples that you -- that the client might come to you

12   and ask a questions if something were done.  Was this

13   an activity that you would do fairly regularly to

14   interface with the client, Phillips Alaska?

15   A    Yes, it happened quite frequently.

16   Q    Okay.  Were you at times considered a spokesperson for

17   the Department of Health -- HSE, for APC when it came

18   to interacting with the client?

19   A    Yes, you could say that.

20   Q    Okay.  Let's look at some of these meetings, I said

21   we'd be talking about.  Well I think we'll look at some

22   of these meetings.

23        COURT REPORTER:  I'm marking G-6.

24        **(Deposition Exhibit G-6 marked)**

25   Q    Senior staff meeting, February 13, 2002.  This is

during the time period when you were a safety

**M E T R O   C O U R T   R E P O R T I N G**

745 West Fourth Avenue, Suite 425

Anchorage, Alaska 99501

(907) 276-3876

1      specialist, was it not?  I mean a safety supervisor,

2      was it not, sorry?

3    A  Yes.

4    Q  That's February '02.  I just wanted to be sure we were

5      on the.....

6          MR. COVELL:  Just to make it easy, I thought

7    this was safety specialist time.

8          MS. ZOBEL:  No.

9          MR. COVELL:  All right.

10          MS. ZOBEL:  No, safety specialist began as a

11    one.....

12          MR. COVELL:  01/02 through 4/03.  Okay.

13          MS. ZOBEL:  Yes, 01/03/02 safety supervisor.

14    A  We need to write those on the board.

15          MS. ZOBEL:  I know.  I have a cheat sheet.

16    A  Okay.

17          MR. COVELL:  So it's approximately a year and a

18    half safety supervisor from January of '02?

19          MS. ZOBEL:  Through April of 03?

20          MR. COVELL:  Right.  And then for a year prior

21    to that safety specialist?

22    A  Correct.

23          MS. ZOBEL:  That's correct, but we're only

24    dealing with six months at least under my theory.

25          MR. COVELL:  Well weather or not he's entitled

to money.....

**M E T R O   C O U R T   R E P O R T I N G**

745 West Fourth Avenue, Suite 425

Anchorage, Alaska 99501

(907) 276-3876

1          MS. ZOBEL:  Yes.

2          MR. COVELL:  .....is your theory.  But whether

3   or not he was actually there in that position, we agree to

4   that?

5          MS. ZOBEL:  Yes, yes.

6          MR. COVELL:  That's fine.

7   Q     (By Ms. Zobel)  Now senior staff meeting, who would

8         have been -- besides yourself, you're listed as an

9         attendee and we deleted names.

10  A     Oh, okay.

11  Q     Yes, you were the only one there.  Who else would have

12        attended this, and you don't have to give me names.

13        We'll just get the org chart, is there anybody on this

14        org chart would have been there besides yourself or

15        Doug Smith if he were there.

16         MR. COVELL:  Now just for the record, you're

17  referring to what's marked as.....

18         MS. ZOBEL:  G-5.

19         MR. COVELL:  G-5 is the org chart.

20        Can I just look at this senior staff meeting for just a

21        second maybe it'll jog my memory here.

22  Q     (By Ms. Zobel)  Sure.

23  A     See, I can't tell if this is a -- is this a Phillips

24        senior staff meeting or an APC senior staff meeting?

25  Q     Well let me ask you this:  You're shown as an attendee

          of this and as a safety specialist you never would have

1    attended a senior staff meeting whether it was an APC

2    senior staff meeting or a PAI senior staff meeting

3    would you have?

4  A    There's a chance that I could have attended a senior

5    staff meeting as a safety specialist.

6  Q    Okay.   After.....

7  A    For both companies.

8  Q    After you became a safety supervisor, was there a

9    situation where anyone who was a safety specialist

10    would ever have attended these meetings or would it

11    only be you or Doug Smith?

12  A    No, it could have been anybody out of the department.

13    Any of the -- any of the safety specialists could have

14    attended one of these -- could have.

15  Q    Could have.  But was that the norm?

16  A    Yes.

17  Q    That they did it regularly?

18  A    By regularly, what do you mean?

19  Q    Well these meetings were held what, monthly?

20  A    That I don't know.

21  Q    All right.  Was there ever a senior staff meeting held

22    that you know somebody who was a safety specialist

23    attended when you were otherwise available or Doug

24    Smith was available?

25  A    I can't answer that, I don't recall.

Q    All right.  What about -- I'm going to show you some

1      change out notes that you did.

2              MS. ZOBEL:  Oh, a mess up.

3      It doesn't have a yellow sticky on it yet.

4              COURT REPORTER:  G-7.

5                      **(Deposition Exhibit G-7 marked)**

6              MR. COVELL:  Madame clerk, do you just want to

7      pass the exhibit stickers down here, do you trust us with them?

8      And we could put them on perhaps?

9              COURT REPORTER:  I do trust you.

10             MS. ZOBEL:  Whatever is easiest, I want to move

11     this along.

12     (By Ms. Zobel)  Were there meetings that were held

13     amount the senior staff of APC that you step into the

14     position and attend when Doug Smith was unavailable?

15     Yes.

16     Okay.  And your representation would be the HSE

17     department?

18     Yes.

19     Okay.  These are some examples of some of your change

20     out notes, we've marked it as Exhibit G-7.  Do you

21     recognize these?

22     I recognize the notes, yes.

23     This would have bene January 3rd of 2002, it looks

24     like.  So, now, you said the date on this is 01/20/01.

25      You don't mean that do you?  Change out notes of

       January 3 -- yes, haven't you misstated the date?

**M E T R O   C O U R T   R E P O R T I N G**

745 West Fourth Avenue, Suite 425

Anchorage, Alaska 99501

(907) 276-3876

A    Probably blew the date, yes.

Q    Okay.  These were done to -- for what reason?

A    Well first of all I guess the two, the change out

4    memorandum two, I don't know -- what did you.....

Q    We took all the names out.

A    Are you sure there was a name there?

Q    Yes, there was a name there.

A    Because sometimes I would just keep my notes here for

9    the next go around when I didn't have an alternate or

10    nobody to hand these off to.

Q    Okay.

A    So I just wanted to make sure there was.

Q    Yes.

A    Okay.  So you took a name off there, so I provided this

15    to my alternate, whoever that might have been at the

16    time to let them know what I had done during my time

17    period on the Slope and to assist them in getting up to

18    speed for what was going on overall.

Q    Okay.  And it looks like there, you've divided it into

20    topics.  And lets go through those topics and have you

21    tell me generally, what your responsibilities were?

22    Illness and injuries, what were your responsibilities

23    here?

A    Basically, I am just stating who got hurt, when, and

25    what their status was and how they were handled and

probably whether or not they were -- well in which

**M E T R O   C O U R T   R E P O R T I N G**

745 West Fourth Avenue, Suite 425

Anchorage, Alaska 99501

(907) 276-3876

1    regard they were classified, you know.  Were they a
2    first aid incident, were they a recordable incident --
3  Q  Time loss, et cetera?
4  A  Yes, so on.
5  Q  And what within the injury area besides determining and
6    recording that people were a time loss for your OSHA
7    300 or OSHA 200 depending on the time period log, what
8    other, if any responsibilities, did you have vis a vis
9    somebody who was injured?
10   I'm not quite sure how to answer that.  I guess
11   basically somebody would bring -- would call me first
12   of all or let us know -- let me know, let the
13   department know that there's an injured employee on his
14   way to the medical facility at which point they would
15   come in and kind of hand them off to me.  Or if whoever
16   was in the office at the time and they would take over.
17    Run them to the medic, make sure they got to the
18   medic, got in there, filled out all the appropriate
19   paperwork and then, you know, if they needed a ride to
20   the airport to get off of the Slope, you'd drive them
21   to airport and put them on a plane, send them to
22   medical facilities if they needed it.  Or you would
23   attend to them and their needs and their bunk if you
24   will, their room.  And then besides that it was just
25   notifying their supervisor as to what had happened and
     making sure that all the paperwork was complete.

**M E T R O   C O U R T   R E P O R T I N G**

Q    I note on here where you talk about some people coming

2    back onto the job in light duty, for example.  Is this

3    something that you had any responsibility for returning

4    people to work to minimize the recordables?

A    No, it's a pretty -- that's a pretty gray area.  It's,

6    you know, when you bring somebody back light duty,

7    that's kind of a gray area in the rules and regulations

8    so --

Q    In what sense?

A10  Well you know you have first aids and then you have

11   recordables and then you have nonrecordables.  So when

12   you have a light duty, you're just trying to save your

13   time here -- yourself a recordable incident or a lost

14   time incident by bringing them back.  Keeping them on,

15   not doing exactly what their function is as well.  So

16   I honestly can't remember whether I would have had

17   anything to do with that, but most work returns and

18   light duty were not -- they were above my level.  I

19   would not have made that call to bring somebody back on

20   light duty, it would have been Doug, Gary Buchanan or

21   one of the department supervisors in construction

22   production, drilling, et cetera.

Q23  Okay.  And if the determination was made to return

24   somebody to light duty did you do any monitoring of

25   whether they were physically capable of doing this in a

safe manner?

A    No, because if they brought somebody back on light

2    duty, he'd basically be sitting at a desk doing

3    nothing.

Q    Within the need to know area it looks like you've got

5    clearance isn't the correct word, but you were in the

6    chain of command that has -- that is privy to people's

7    medication uses and the nature of their injury and

8    treatment, was that correct?

A    Where are you at?

Q    I'm looking just in general, all of these reported that

11   somebody has an infection, they're given antibiotics,

12   if somebody is going to a chiropractor, et cetera.  So

13   you're in the need to know level for medical, correct?

A    That would have just been provided information from the

15   medic.

Q    Okay.

A    But any of the safety supervisors or any of the safety

18   specialists, if they had brought this person to the

19   medic would have been in the -- in the know.  They

20   would have known the same thing.

Q    So within the chain of command, and when the individual

22   is injured, the information regarding their medical is

23   that generally known or is that something that is

24   restricted to certain people?

A    The general medication is probably known by everybody

     in the safety department although we try to keep it,

**M E T R O   C O U R T   R E P O R T I N G**

1    you know, private.  But what happens with the medic and

2    the injured employee is strictly their confidential

3    business, you know.  When an employee went in, if he

4    had an unknown injury, you know, I mean, you bring

5    them, in and they behind closed doors the medic would

6    evaluate him, prescribe him and all you would get is

7    this guy's, you know, bed rest for a week or he's

8    getting on the plane and going to town, and, you know,

9    here's his medication to get him there and that's all

10   you'd know.

11   Q  When they go back onto the job, what are the -- who are

12   the people who would be privy to the information

13   regarding.....

14   A  Their supervisor.

15   Q  The supervisor only?

16   A  Yes.

17   Q  Okay.

18   A  I mean the supervisor of their department.  They would

19   need to know.

20   Q  It's a need to know basis?

21   A  Yes.  They would need to know what medications they

22   were on and so forth, and then the company had a policy

23   also that, you know, if you were out for an extended

24   period of time, you'd have to come back with a doctor's

25   release and the occasionally you'd have to go see the

     company doctor to confirm that release.

Q     Okay.  Next category is vehicle incidents?

A     Uh-huh (affirmative).

Q     What responsibility did you have vis a vis property

4     damage or in this case a vehicle incident?

A     Just recording it, so you could get down in the books

6     that there was an accident or same with the spills, you

7     know --

Q     Were you in the lineup to whom those incidents would be

9     reported?

A     Yes, uh-huh (affirmative).

Q     And you'd be keeping paperwork then of that

12    information?

A     Yes, there was a book in the department that we kept

14    all the information in.

Q     Did you ever do any specific inspections or not

16    inspections, but did you go out in the field and

17    actually look at a vehicle incident and do any kind of

18    a safety audit on what happened?  Did you ever

19    investigate accidents -- there we go.

A     Yes.

Q     What kind of accidents would you have been involved in

22    investigating?

A     Two trucks colliding on the Haul Road, god, scaffolding

24    tipping over, I don't know.  Shoot, it could have been

25    a plethora of things, I don't know.

Q     Okay.  An individual being injured would that be

1    something that you would investigate -- a fatality?

2    A    Yes, I would assist in an investigation.  I mean, I was

3    never in charge of any of the investigations, but

4    assisted in a lot of them.

5    Q    And that was part of your duties as a safety

6    supervisor?

7    A    And specialist, yes.

8    Q    And in your position as safety supervisor, you had the

9    additional responsibility of keeping the paperwork

10    regarding them, is that not correct as opposed to the

11    specialist?

12    A    No, actually, probably did less investigations as a

13    safety supervisor than I did as a safety specialist and

14    the paperwork portion of the investigations was really

15    the responsibility of the department, managers or

16    supervisors, if you will, not the responsibility of the

17    safety department although we would assist in almost

18    every incident or illness investigation so --

19    Q    Okay.

20    A    But the specialists were more involved in than I would

21    have been as a supervisor position.

22    Q    Well what would be your role, if there were an accident

23    then as a supervisor?

24    A    I think the final role would be to, you know, make any

25    comments you might have because they would assemble the

report and then they would distribute it to everybody

**M E T R O   C O U R T   R E P O R T I N G**

745 West Fourth Avenue, Suite 425

Anchorage, Alaska 99501

(907) 276-3876

1    and then ask for comments.  You would mark your

2    comments, send it back, they would issue a final

3    report.  You'd review it.  If there was any property

4    damage or if there was a recordable, whatever type of

5    injury you might have, you want to make sure you

6    followed up with the appropriate paperwork, get it

7    filed in the system, and that would be that.

8    Q    Okay.  When you said comments in reviewing it, what

9    sort of comments would you be making?

10   A    Well that's a pretty blanket statement, it could be

11   anything.  You know, like a spelling error.

12   Q    Oh.

13   A    To, you know, that's not the way I heard it type of

14   comment, this is what I heard, you know.

15   Q    Would you be making any comments regarding this

16   occurring in the future or implementing some change in

17   procedure because of this accident?

18   A    It's potentially -- yes, you could make a comment that

19   says, geez, I think that from now on we ought to not,

20   you know, let guys drive 50 miles an hour on the Haul

21   Road so --

22   Q    Yes.

23   A    Maybe they need to drive 30, you know, so --

24   Q    When you did the review of these accident reports, was

25   it as a representative of the department as a whole of

     APC or what capacity was it?

1    I guess it would just be another comment or I'm not so
2    sure it would be as a whole because there might be two
3    other safety specialists, you know making comments at
4    the same time, so it'd just be another comment or -- to
5    the investigation.  I mean, my comments were not the
6    last word.
7  Q  Well I guess what I'm getting at is why did they send
8    it to you if safety specialists have already looked at
9    it, if they didn't need somebody from corporate to look
10   at it, or from whoever was a representative of the
11   department?
12 A  I think it's to get more eyes on it, personally.  I
13   have no good answer for you there.  I mean, why did
14   they send it to the safety specialist?  So it could be
15   the opposite question, so we had several people
16   involved in all of these investigations so --
17 Q  UA's, urinalysis?
18 A  Uh-huh (affirmative).
19 Q  And what was your responsibility there?
20 A  Let's see, we would bring the employees in for random
21   and then scheduled urinalysis and perform the entire
22   urinalysis procedure, you know.
23 Q  What was your role in the urinalysis program?
24 A  Same as everybody else's.  You'd bring them in and
25   you'd sit them down.  You'd have them fill out the
     initial paperwork.  You'd check them for contraband.

1    You'd take them in, give them the cup, watch them do

2    their thing in the cup, pull it back, make sure that

3    the temperature was correct on the cup and everything

4    looked okay.  Then you would split the sample, load the

5    sample in a sample bag and fill out the final paperwork

6    and send it to town.

7  Q  Who else would do this?  You said the same as everybody

8    else?

9  A  Every- -- almost everybody in the department was able

10   to do those urinalysis except for the secretary.

11 Q  When you say in the department, who are you referring

12   to?

13 A  All the safety specialists, myself, and Doug and the

14   IH.

15 Q  Okay.  And among those individuals who were trained to

16   be able to do this, you had to be trained to.....

17 A  Correct.

18 Q  You had to be able to sign off on them, correct -- to

19   be able to do them?

20 A  You had to be trained.....

21 Q  Right.

22 A  In order to do the test, yes.

23 Q  All right.  If you were available, were you the one

24   that did them as opposed to other individuals?

25 A  I guess the answer's yes, if I was available I would do

     it.  However, if somebody else was available they would

**M E T R O   C O U R T   R E P O R T I N G**

745 West Fourth Avenue, Suite 425

Anchorage, Alaska 99501

(907) 276-3876

1    do it so -- and I don't know how to split that up.

2    It's -- it was a free for all.  If you had time you did

3    it, irregardless of who you were.

Q    Okay.  Let's take the -- you had two programs for

5    urinalysis, correct?

A    Can you --

Q    One that would be if there was an accident it was

8    required that people give a UA, correct?

A    Correct.

Q    And then you had random?

A    Correct.

Q    Within those two, if somebody were in the random group,

13    would you be expected to be the one administering those

14    UA's.....

A    Not necessarily.

Q    .....within the office?

A    Not necessarily.

Q    You'd bring safety specialist out of the field in order

19    to do those?

A    It's -- it's -- yes.  It's highly possible.  There

21    could be a safety specialist doing it instead of me.

Q    Well what was the norm, not whether it was possible?

A    There is no norm.  It was just a free for all.  If you

24    had time you would do it.  I was not specifically

25    responsible for doing a random urinalysis.

Q    Okay.

1          MR. COVELL:  I need to take a five minute break

2    for a quick phone call.  I apologize.

3          MS. ZOBEL:  Sure.

4    (Off record)

5    (On record)

6    (By Ms. Zobel)  Going this list of areas that you're

7    reporting on, it says safety department.  Let's go to

8    page 299 of this exhibit.  The first bullet says blank

9    called from Soldotna regarding the 624 Safety

10   Specialist JVA.  Would that be about a job or why would

11   he be calling?

12   That -- yes, it could be about a job, I'm not sure.  I

13   would -- it's hard to say.

14   Okay.  Did people call you when they're looking for

15   employment within the safety department at Kuparuk?

16   They could have called me, yes.

17   Okay.  Did you have some hand in reviewing or getting

18   JVA's or the hiring process?

19   No, I simply would take the phone call, gather up -- if

20   somebody sent a resume we'd gather it up, if we were

21   hiring.  And then we -- we would as a department, I

22   guess, if -- well there's a couple of different ways it

23   could have happened.  Sometimes guys would just show up

24   and say I'm working, and that would happen.  Other

25   times we'd be short a hand and the word would go out,

     hey call everybody you know and see if we can get them

1    up here.  You know, if you know anybody.  So as a group

2    we'd all call who we knew and they would send a resume

3    or some other form of information and we'd all kind of

4    just look through them and then a final decision would

5    be made as to -- if they're going to hire them or not.

Q    Who would make the final decision?

A    Doug in this particular instance.

Q    Okay.  And would Doug be looking to you to give him

9    your input as to who would be hired?

A10   Myself and others, yes.

Q11   Who would the others be?

A12   All the safety specialists.

Q13   Okay.  There's another bullet point down here about

14   mid-way through about a Mr. Ken Quinlan who contacted

15   me.  He's an IH who is currently working in Arizona.

16   He's looking for work.

A17   Uh-huh (affirmative).

Q18   And then you told him to send the resume to a certain

19   e-mail.  Who's e-mail is that?

A20   It might have been mine.  It might have been Doug's, I

21   don't know.

Q22   Does that look like yours?

A23   I don't recall.

Q24   All right.  Then back up on this page, on 299 it says

25   blank approached me about a problem she's having with

her alternate and is unhappy with the amount of work

1    that's being completed during her hitch.  Did you have

2    responsibilities to deal with unhappy employees within

3    the department?

4    A    No, I -- Doug handled all that.

5    Q    Well if Doug wasn't there did you just blow them off

6    and say wait until Doug's there or what did you do?

7    A    Pretty much.

8    Q    Oh.  Did you ever problem solve with people who were

9    unhappy?

10   A    Yes, sure.

11   Q    All right.  It says I've not talked with blank and

12   there's always two sides to the story, would you do the

13   two sides to the story?  Would you investigate?

14   A    I know what this is all about here.  This is Kim and

15   Amanda were not -- they were butting heads and, you

16   know, I just deferred all this to Doug.

17   Q    Is that because it wasn't your responsibility or

18   because you just didn't want to deal with the personnel

19   issues in the admin office?

20   A    I don't think it was my responsibility so --

21   Q    Okay.  What about if there was some lack of

22   attentiveness or work ethic or whatever on the part of

23   the safety specialist?  Would it be your responsibility

24   to call that to their attention and tell them they

25   needed to get it straight?

A    I can't ever recall that happening, so I don't know how

1      to answer that.  No.

2      You never had anybody from any of the different places

3      where these people were embedded -- the supervisors

4      calling you and saying we're having trouble with so and

5      so?

6      Oh, I think there was a lot of that particular type of

7      stuff going on all the time.  You know, I mean the

8      safety department is not -- how shall I put this --

9      well liked by either management or employee.

10     Why is that?

11     You're the bad guy.  You know, you're always -- you

12     have nothing good to tell management and you're always

13     on the employee's back to make them work safe so nobody

14     likes you.  Yes, you could get a call several times a

15     day complaining about the safety guy.

16     And you're the guy that they would bring those

17     complaints you?

18     Yes, myself or Doug or Ron Kirk or.....

19     As your alternate?

20     Gary Buchanan or.....

21     Gary over -- what was his position -- over Doug?

22     Yes, he's the -- let's see if I can get this right.

23     You don't have to worry about what his.....

24     I don't know, I can't remember his title.

25     Okay.

A      It would be a guess.

**M E T R O   C O U R T   R E P O R T I N G**

745 West Fourth Avenue, Suite 425

Anchorage, Alaska 99501

(907) 276-3876

1    Q    Then safety staff meetings:  when you hold a safety

2         staff meeting, would you conduct those meetings?

3    A    (No audible answer)

4    Q    It says I basically went over what so and so presented

5         to the rest of the group the previous Saturday.  Also

6         discussed the modification to the APC PP and G manual.

7          We're right here.

8    A    Two 99, right here.  It looks like I did conduct that

9         one, yes.

10   Q    Okay.  Is that some of what you regularly did?

11   A    Well we weren't very good at having regular meetings.

12   Q    When you held meetings, who conducted them?

13   A    It's -- it's possible that I conducted them.  It's also

14        possible Doug conducted them or one of the safety

15        specialists if he had something in particular he wanted

16        to talk about he would conduct them.  It was pretty

17        informal.

18   Q    Okay.  He'd be on the agenda, but somebody else would

19        set the agenda?

20   A    I don't even know if you could go as far as saying

21        there was an agenda.

22   Q    Oh, I've got some agendas.

23   A    Okay.  Good.

24   Q    We'll get to some of those in a minute.

25   A    Good.

     Q    Now, it says here that you discussed a modification of

1      a -- what's a PP and G manual?

2   A   That stands for policy, procedures and guidelines

3      manual.

4   Q   And was it your responsibility to -- it says it --

5      modifying the program to meet our needs?  Was that part

6      of your responsibility to come up with suggestions on

7      how to do that?

8   A   No, it wasn't my responsibility.  I guess I took it

9      upon myself to jump in and -- and update what they

10      already had to more -- to meet the current needs of

11      what we were doing on the -- on the Slope at the time.

12   Q   Okay what's the ASH 2002 rollout?

13   A   That is the -- what the heck does that stand for?

14      Alaska Safety and Health 2002 manual that the client

15      puts out.  I think that came from ConocoPhillips -- or

16      it's actually a conglomeration of Conoco and BP and all

17      the oil companies at the -- on the Slope get together

18      and they revise this little safety and health manual

19      every year that they give to the employees.  I don't

20      know if it's every year or not, but a small manual that

21      they give to all the employees every year.  I mean,

22      it's just general health and safety information for the

23      Slope.

24   Q   Okay.  Was it your job to be sure that the people that

25      were below you on the org chart had that information as

      to changes that needed to be complied with?

1    A    No.  No, it was general knowledge.  You just -- I mean,
2         you could get one of those manuals anywhere.
3    Q    So it was just hit or miss, you didn't have discussions
4         about them?
5    A    Oh, we were all in -- we helped to review this thing
6         months in advance.  So everybody was in the know as to
7         what it was.  So it looks to me like somebody in --
8         e-mailed to me and I just passed it on to everybody
9         else.
10   Q    Okay.  Within the safety department, if somebody in the
11        field needed a piece of equipment did you have
12        authority to purchase that of to authorize purchase of
13        it?
14   A    It may have had authority to opera- -- to authorize the
15        purchase or -- or get it.
16   Q    Okay.  And within the budget for the department itself,
17        did you come up with a wish list, so to speak, or
18        contribute to what kinds of equipment needed to be
19        purchased for the department?
20   A    Yes, I think you see that here in this next bullet.  We
21        put together a list, and I just went through and asked
22        everybody what we -- what they thought we needed and we
23        put together a list and I put them together here.
24   Q    Okay.
25   A    It just.....
     Q    Well have -- here's something called an instrument

**M E T R O   C O U R T   R E P O R T I N G**

745 West Fourth Avenue, Suite 425

Anchorage, Alaska 99501

(907) 276-3876

1    replacement analysis.

2    Uh-huh (affirmative).

3         MS. ZOBEL:  And madame court reporter would you

4    pass them a sticker please?

5         MR. COVELL:  I've got the stickers.

6         MS. ZOBEL:  Oh, all right.

7         MR. COVELL:  So we'll mark this G-8 for the

8    record.

9                        **(Deposition Exhibit G-8 marked)**

10        MS. ZOBEL:  That's fine.

11   (By Ms. Zobel)  Do you recognize this?  It has your

12   name in the right-hand corner.

13   Oh, yes, this is a spreadsheet I built.  Okay.

14   What is it you did?

15   Let's see here.

16   I don't know if this is all of it, but tell me what

17   this page represents.

18   Well give me a second.  I'll get up to speed here.  It

19   looks like I was trying to come up with a cost analysis

20   of -- we had some old equipment on there.  Some old

21   monitoring equipment and we wanted to replace it with

22   something newer.  So, let's see here.  There must be a

23   separate sheet that goes with the newer -- this is all

24   equipment, I believe.  So, there's probably another

25   sheet that has -- that compares the bottom line cost of

     all this old equipment with the bottom line cost of

1      some new equipment.

2    Q    Okay.  Were you make recommendations in this analysis

3      for things that needed to be replaced or were you just

4      inventorying stuff?

5    A    I think what we had was -- I think we had some guys

6      come up and demo some new equipment and we thought it

7      was pretty neat.  So we decided we would determine

8      whether or not it was worth the money.

9    Q    Okay.  And.....

10   A    So I guess I was probably just comparing costs is all I

11      was doing.

12   Q    And that was part of your job description that you

13      would analyze what equipment would be best to be

14      replaced and how to replace it?

15   A    Oh, I don't know if you could say that.  I think

16      everybody was involved in whether or not we would

17      replace equipment or not.

18   Q    But doing the analysis.  I mean everybody didn't do an

19      analysis separately like this?

20   A    I can't say that they did or did not.  I have no idea

21      whether somebody else did an analysis like this or not

22      for the same or similar equipment.

23   Q    How is it that you would do such an analysis?  I mean

24      would you be assigned to do it or did you take it on

25      yourself and do it?

A    Either way, maybe somebody asked me to do it, or I

1     could have just said well I wonder if it's worth buying

2     the new stuff?  How much is the old stuff worth and

3     just did this.

4   Q    Okay.  Did you meet with vendors and talk to them about

5     equipment that might be available out there.....

6   A    At times.

7   Q    .....to be useful?

8   A    At times, yes.

9   Q    Okay.  I have a --

10          MR. COVELL:  There you go.  We'll be on G-9 on

11   this next paper.

12                          **(Deposition Exhibit G-9 marked)**

13          MS. ZOBEL:  Okay.

14   Q    (By Ms. Zobel)  This is -- it looks like somebody

15     writing to you or this is like, somehow, we ended up

16     with page one of this.  But tell me what this is if you

17     can?

18   A    Yes, this is a gentleman that -- I can't remember

19     whether we looked into it or he presented himself to us

20     to come up and provide some fall protection training

21     for the department, all the guys and our department as

22     well as maybe the guys in Phillips too, so --

23   Q    Okay.  And you met with this gentleman?

24   A    I don't believe I ever met this guy, but I can't recall

25     for sure.

Q    Oh, you had a discussion with him it looks like?

**M E T R O   C O U R T   R E P O R T I N G**
745 West Fourth Avenue, Suite 425
Anchorage, Alaska 99501
(907) 276-3876

A   1    Yes, I think all it was was a phone discussion, on the
    2    phone, and then he sent -- this is like a -- this is
    3    just like a quote.
Q   4    Uh-hum.  Would you be -- using this as an example, not
    5    specifically, this particular situation, when you would
    6    meet with vendors, would you then pass on your
    7    recommendation one way or another as to whether it
    8    would be appropriate for the department?
A   9    Yes, I guess.  You know, I mean, there's all sorts of
   10    salesmens (ph) up there so --
Q  11    Yes.  And you wouldn't pass everyone of them on to Doug
   12    or the upper -- on to the department, would you?
A  13    I tried to pass everything that was presented to me
   14    along to everybody in the department.
Q  15    So you said there's all kinds of vendors up there.  So
   16    every time you talked to a vendor you disseminated that
   17    information?
A  18    Tried to.
Q  19    Would there ever be a situation where you decide this
   20    just isn't worthwhile and you wouldn't waste people's
   21    time?
A  22    Could have been, yes.
Q  23    Okay.  I'm going to show you another one of these just
   24    to ask you about it.
A  25    Okay.

              MR. COVELL:  G-10.
       **M E T R O   C O U R T   R E P O R T I N G**

1                    **(Deposition Exhibit G-10 marked)**

2                    MS. ZOBEL:  Madame court reporter do you want
3    these still?

4                    COURT REPORTER:  Yes, please.

5                    MS. ZOBEL:  Okay.

6    Q   (By Ms. Zobel)  This is -- can you tell me what this
7        is?

8    A   Let's see here.  Again, it's just another -- Gravitec.
9         It must be a fall protection system, I'm guessing.
10       And somebody just sent a brochure to us, probably all
11       this was, you know.

12   Q   Okay.  And you were the point person that they sent it
13       to?

14   A   In this case, yes.

15   Q   Okay.  And do you know what you did with the Gravitec
16       System information?

17   A   Probably passed it along to the department; Doug and
18       the rest of the guys and I think that's where it got
19       dropped.  Nothing become of it.

20   Q   Who's the rest of the guys?

21   A   The safety specialists.

22                   MR. COVELL:  I just annotated that G-10 again
23   because the dash between the G and the 10 made it look like a
24   G140.

25                   MS. ZOBEL:  Oh.

                     MR. COVELL:  So that's what I was doing there.

1          MS. ZOBEL:  Okay.  Yes, we're going to put you

in charge of this, you better do it right.

3          MR. COVELL:  I'm trying.  My handwriting is not

exemplary.

Q     (By Ms. Zobel)  This is another memo.  I just want to

6          ask you what this is.

7          MR. COVELL:  G-11.

8                    **(Deposition Exhibit G-11 marked)**

A     G-11.

10          MS. ZOBEL:  Sounds like a bingo number, doesn't

it?

Q     (By Ms. Zobel)  Okay.  Tell me what this is?

A     It looks like it is a memo from me to somebody.  And it

14          just simply summarizes what our costs were in -- from

15          '95 to 2002, I guess.

Q     This is a.....

A     Assembling costs.

Q     This is to input for the budget?

A     It looks that way.

Q     Okay.  Who's John Harvill?

A     I don't recall.

Q     Do you know who N-a-t-l-s-c-o is?

A     It's just a sampling analysis lab.

Q     Okay.

A     So it look to me like somebody wanted to know how much

money we had spent over the years on sampling with this

1    outfit, so I went to the book and opened it up and

2    added it up and sent him an e-mail.

3    Q   So you created the work?  Did you do a worksheet to do

4    that, is that what you did?

5    A   Yes, I would have just used a spreadsheet.

6    Q   Okay.  Within your job you talked about how -- and your

7    not the most popular people because you're telling

8    people what they can't do and how they have to do

9    things safely, if somebody was not doing things safely

10   out in the field, what was your responsibility?

11   A   To stop the work and correct the situation and make

12   sure that they've preformed their work in an

13   appropriate safe manner.

14   Q   Okay.  Did you have any voice in any of the discipline

15   that might come out of the violation of safety?

16   A   No.  Can you expand on that please when you say.....

17   Q   Well could you, for example, could you -- did you ever

18   make recommendations that somebody be terminated or

19   disciplined because of their actions?

20   A   No.

21   Q   Okay.  I noted in one of the memos, and I don't think I

22   copied it, something about calling -- referring to the

23   cop aspect of the job and that people were not doing

24   that.  Tell me what you meant by that?

25        MR. COVELL:  If you can answer the question.

Q   (By Ms. Zobel)  You nodded when I used the term cop.

**M E T R O   C O U R T   R E P O R T I N G**

A    Well the term copy, is just simply, you know, the --
     there was always a separate approach and it would just
     -- would funnel down from primarily Gary Buchanan --
     that I want you guys to be policemen out there on the
     patrol all the time.  Making sure that, you know, these
     guys are in line.  And then it would swing, you know,
     these were on a -- a pendulum -- these ideas.  So, it
     would go from being the cop to being the -- you're best
     buddy, you know.  And then it'd go back to being the
     cop.  So, back and forth, back and forth and that's all
     that refers to.  So, if you're the cop you're out
     there, by god, I'm writing you up, you know.  You're
     doing the wrong thing, I'm going to -- I'm shutting you
     down.  You can't work any more.  You know, taking the
     hard line.  And then the other side would be, you know,
     you guys, you know, you might want to reconsider what
     you're doing and try a different approach.

Q    Okay.  So if the pendulum was on the side of the cop
     mentality, if the perception of corporate was -- or
     Gary Buchanan was -- that we weren't following through
     on that, what would role be then?  To communicate that
     to the troops or what?

A    Yes.

Q    Okay.  If there had bene a violation of safety that
     came to your attention, did you ever suggest that there
     be new training implemented?

A     Could have, yes.

Q     And would you recommend ever that there be transfers or
      anything like that of individuals?

A     I don't think I would have ever made a recommendation
      that somebody get transferred.  I might have gotten mad
      at somebody and said take a day off, but there's really
      nothing formal there at all so --

Q     Okay.

A     It's -- you know, it's difficult being the safety guy
      out there because the last thing you want is somebody
      to get hurt while you're trying to keep them safe so --

Q     Yes.  In addition to having federal and state
      regulations that you had to follow in safety -- and
      that's a given, you did have to follow state and
      federal regulations, correct?

A     Correct.

Q     Were there compliance requirements from clients as well
      -- from the client?

A     Yes.

Q     Okay.  So did your responsibilities include working
      with the client in any manner in developing those
      requirements?

A     Not in developing the clients' requirements.  I worked
      with the client.

            MR. COVELL:  And just to be clear, these are
client safety requirements, right?

**M E T R O   C O U R T   R E P O R T I N G**

1          MS. ZOBEL:  Yes, yes.  Safety -- within his
2    field, right.

3          MR. COVELL:   Okay.

Q    (By Ms. Zobel)  And how would you work with the client?
5    Explain that to me.  What were your interfaces?

A    I might go to a drill pad and meet with one of the
7    client's safety specialists or their super- --
8    supervisory personnel and walk down a job.

Q    Meaning walk down a job -- what's that mean?

A    Just walking down for safety issues -- safety problems.

Q    And what would happen if there were safety issues
12    discovered?

A    Put our heads together and come up with a way to
14    mitigate them.

Q    Okay.  And you were one of the people that was
16    designated to do this with the client?

A    You could say that as well as all the guys in the
18    department, every safety specialist, the manager, the
19    -- everybody was designated to do that to work with the
20    client and provide them with what they needed.

Q    Okay.  Let's talk a little bit about the department and
22    you were there when there were changes made within the
23    department were you not?

A    Yes.

Q    Okay.  When you first went to work, did the position
     that you held when you left exist?

A        Yes.

Q        It did.  Who held it?

A        The position?

Q        Of safety supervisor?

A        That I can't answer.  I don't know.

Q        Okay.  Within your position as a safety supervisor, did

7        you have responsibilities that were different from the

8        safety specialists?

A        Not different, but probably in addition.

Q10      Okay.  Tell me what they were in addition.

A11      I guess the only thing that really separates it is that

12       you're -- you're not out in the field as much as the

13       safety specialist.  So you'd be again, answering the

14       questions of the -- from the client or from whomever

15       while you were in the office.  So, it would be the

16       primary, you know, you boil it right down to it.  You

17       know, that's probably the primary difference.  You're

18       taking care of the questions that are presented to the

19       office, because you're the guy in the office.

20       Otherwise, you're, you know, still go out in the field

21       and do the same sampling and same testing, same walk

22       downs, everything is identical to the safety

23       specialist.

Q24      Those activities that you just described, sampling,

25       testing, walk downs --

A        Uh-huh (affirmative).

Q    Was that your primary role or was your primary role in
2    the office?

A    Primarily it would be in the office.

Q    Okay.  And when it is that you would do this sampling
5    testing and walk downs?

A    It could be at any given moment.  Any -- any -- no set
7    time or schedule.

Q    Would it be at the request of whom?

A    It could be at the request of the client, it could be
10   at the request of upper management, it could be at the
11   request of one of the safety specialists, it could be
12   at the request of one of the department managers.

Q13  And would it be done because the safety specialists who
14   ordinarily would be there, would not be available?

A15  That would be one reason, yes.

Q16  Okay.  Would you do it for there were a problem?  Would
17   you be called out specially if there were some sort of
18   a problem?

A19  Can you explain that a little bit?  I mean, if there's
20   some sort of a problem -- what?

Q21  Well you said that it might be at the request of the
22   supervisor -- the line supervisors in the field?

A23  Yes, if -- if there's a -- god the reasons are infinite
24   why you might be called to go out and do something.
25   But -- and a for example would be the client's methane
     meter's not giving them the correct reading.  Can you

**METRO  COURT  REPORTING**

745 West Fourth Avenue, Suite 425

Anchorage, Alaska 99501

(907) 276-3876

1    come out and confirm with a different meter, the two

2    meters are in sync.  I mean, it could be anything.

3  Q  Okay.  And who would call you under those

4    circumstances?

5  A  Again, it could be the client, it could be the -- the

6    department heads, it could be the -- another safety

7    specialist, it could be a crewmember.  Anybody, any

8    employee could call me.

9  Q  Okay.  Are you doing that as a back-up to these people

10    or as a substitute when somebody else isn't available

11    or --

12  A  Both.

13  Q  Both.  Okay.  All right.  And this -- the amount of

14    time that you did these kinds of activities was what?

15  A  I don't know.  At random, it could be on a daily basis

16    some shifts on the Slope or it could be a weekly basis.

17     Some weeks maybe not at all.

18  Q  Intermittent?

19  A  All over the board.

20  Q  But is that accurate that it would be intermittent or

21    on an as-needed basis as opposed to that being your

22    first responsibility?

23  A  Oh, I think that was a primary responsibility was not

24    office work, but a primary responsibility would be to

25    make sure that everybody in the field is taken care of

    before the paperwork is taken care of in the office.

1    So, if you wanted to assign priorities, the field work

2    would come first and then everything else would be

3    secondary.

Q    Okay.  Within the assigned activities that you were

5    doing though, how often would you have to exercise this

6    as compared with the office work that you also had to

7    do?

A    I can't put it -- I mean, I don't know how to better

9    explain it than it was just at random.

Q    Okay.

A    It was all over the board.  Some -- some hitches it

12    would be daily.  You know, other hitches it would be

13    zero so --

Q    Okay.  There was -- let me see if I can find that.  One

15    of the projects that it looked like you were assigned

16    to early on was to rewrite some sort of a policy

17    handbook, is that jogging your memory?  Can you tell me

18    what that was?

A    Yes, the department was a whole, we all chipped in and

20    tried to rewrite the policies, procedures and

21    guidelines manual.  We all took different sections of

22    it.  That thing's a huge document.  I forget how many

23    pages.  No, it wasn't complete when I left.  So, I

24    don't know if it ever got finished, but it's a big

25    document.

Q    Were you the point of coordination for that document?

1    A    Yes, I was the guy that was taking everybody's papers

2    and putting them in the notebook, so --

3    Q    Did you write some procedures for different policies?

4    A    It's possible.  Either wrote them or rewrote them.

5    Q    Okay.  NORM testing -- is this an example of something

6    that you would have been responsible for putting

7    together procedures?

8          MR. COVELL:  G-12.  So who's Norm?

9                    **(Deposition Exhibit G-12 marked)**

10          MS. ZOBEL:  NORM is the Naturally Occurring

11    Radioactive Material.

12          MR. COVELL:  Oh, okay.  I thought it was one of

13    the other specialists.  So -- okay.

14    A    This is just a memo that's breaking down what PAI sent

15    to everybody.

16    Q    (By Ms. Zobel)  And PAI is Phillips Alaska?

17    A    It's Phillips Alaska, yes.  So it's just.....

18    Q    They were the client?

19    A    .....the client, yes.  This just came from the client.

20    This just summarizes what -- what the heck was his

21    name?  Sanchez -- Tom Sanchez put this together so I

22    just put this together and passed it along to everybody

23    in the -- in the department.

24    Q    Now here's the actual testing and procedure.  Did you

25    not write this procedure?

A    Yes.  Yes, I did.  I just copied what came off of here

1    and threw it right in here, but this -- there was NORM

2    testing and procedures.  I mean this manual existed

3    before and this is just another iteration -- an update

4    if you will.  It should have taken place long before we

5    got there but it didn't so we were trying to update it.

6        MR. COVELL:  And that's marked G-13.

7                    **(Deposition Exhibit G-13 marked)**

8  Q  (By Ms. Zobel)  Okay.  You said you took what was in

9    this one, meaning G-12?

10 A  This -- yes.  I took what was passed down from Tom

11   Sanchez' PAI, regurgitated that in the memo G-12, and

12   then took it and cut and pasted into the 2002 HEST and

13   P and P manual, G-13.  So the verbiage should be.....

14 Q  Well I don't see on G-12 where it says how to do the

15   calibration or what the action levels were, et cetera.

16 A  That just comes right off of the -- the Ludlum meters

17   operators manual.

18 Q  Okay.

19 A  Yes, there's his name -- Diane Kobayashi and Tom

20   Sanchez.

21 Q  Okay.  So let me see if I can track the procedure you

22   did.  Somebody comes in and says to you we're going to

23   start doing this testing and procedure?

24 A  Uh-huh (affirmative).

25 Q  Is that correct?  In this case the client said we're

     going to do NORM testing?

A    That's correct.

Q    And then what would your role be in that procedure?

A    If they ask me to do the NORM testing I would go to

4    Diane Kobayashi or Tom Sanchez and pick up a Ludlum

5    meter and all the calibration instruments and sources

6    that go with that meter, and then I would take it out

7    to the field following this direction here.

Q    I think you're misunderstanding my question.  I'm not

9    asking you if you did NORM testing, I'm talking about

10    what you -- when you interface with these people and

11    they said we're going to do NORM testing, then your

12    responsibility was what -- to communicate it to the

13    other people, to get them a procedure to follow?  What

14    was your responsibility?

A    To say okay and follow the client's direction.

Q    But you wrote this?

A    Yes, this is just one section of many that go into the

18    overall P and P manual.

Q    Okay.

A    But this is -- did I develop all these levels and

21    action levels and what to do with the source and all

22    that?  Absolutely, not.  This is just a regurgitation

23    straight from the Ludlum meter instructions.

Q    Okay.  But you went to the instructions, you found

25    them, you set up the procedure -- you put it together

    as a procedure for people to use?

1    Yes, except for the action levels which were set by

2    PAI.

3    Q   Okay.  All right.  So if I'm understanding you, and

4        correct me if I'm wrong, the client came to you and

5        said, we're going to start doing this NORM testing?

6        You then got the resources, you found the information

7        that was needed to comply with what they wanted, you

8        put it in a procedure that went into the manual, and

9        was disseminated to the employees, is that correct?

10   A   Yes.

11   Q   Okay.  Would this have been a similar process in doing

12       a -- this is a suspended personnel platform lifting

13       procedure form, did you develop this?

14   A   No.

15   Q   Who did?

16   A   It was Don Chenault did this one.

17   Q   Okay.  It's out of your folder, it looks like.

18   A   Yes, because I was taking everybody's items and

19       assimilating them into one location.

20   Q   Okay.

21           COURT REPORTER:  G-14 marked.

22           MR. COVELL:  Yes, ma'am.

23                   **(Deposition Exhibit G-14 marked)**

24   Q   (By Ms. Zobel)  When you got a section like this from

25       somebody else, did you read them over, and check them

     over for accuracy?

1    Yes, we all swapped back and forth.  I mean, there was

2    -- I don't know -- recall right offhand how many

3    different sections there are of this thing.  It's a

4    huge document.  So every time somebody would develop

5    more, we'd all take turns redlining it for each other.

6    I saw a -- I don't know where it is now.  I saw a memo

7    that you sent out to people about the procedure of

8    putting together this manual, and you noted in that

9    manual -- in that thing, that this was going to be a

10   quote daunting task, is that an accurate description of

11   what you believe this task was?

12   Yes.  It was a huge task, absolutely.

13   What was the goal, what were you doing?

14   This.....

15          MR. COVELL:  Object.  Just as to where and when

16   what his goal was, okay?

17          MS. ZOBEL:  Putting together this manual --

18   what was his role in putting together this manual?

19          MR. COVELL:  I'm sorry, you said role?

20          MS. ZOBEL:  Yes.

21          MR. COVELL:  I thought you said goal, so --

22          MS. ZOBEL:  No.

23          MR. COVELL:  I have hearing loss, sorry.

24          MS. ZOBEL:  That's fine.

25          MR. COVELL:  Okay.  Go ahead.

A    My role is simply to get an updated policies and

**M E T R O   C O U R T   R E P O R T I N G**

745 West Fourth Avenue, Suite 425

Anchorage, Alaska 99501

(907) 276-3876

1    procedures manual for the company.

2    Q    As it applied to safety?

3    A    Yes, it's just strictly safety -- it's, again, it's a

4    regurgitation of the federal and state and applicable

5    Slope work procedures as they apply to OSHA

6    regulations.  And it's been done before.  This was just

7    updating a previous version that hadn't been done for

8    years.

9    Q    And this would be because of changes in regulations and

10    procedures that were followed except for.....

11    A    Sure.

12    Q    Okay.  And what percentage of your time do you think

13    you dedicated to doing this?

14    A    A lot at the end.  I mean, we were all working

15    feverishly to get this thing together.  I spent a

16    significant amount of time before I was let go, working

17    on this document, you know, as we all did so --

18    Q    Comparing your work with the people who were the safety

19    specialists, were you spending a larger amount of your

20    time doing this than they were?

21    A    Not necessarily, no.

22    Q    So, they -- we had safety specialists and you spending

23    as you described it a huge amount of your time doing

24    just this?

25    A    Correct.

Q    Okay.  And your job what -- within the grand scheme of

**M E T R O   C O U R T   R E P O R T I N G**

1    things was to coordinate it all?

2    A    Yes.  I was the point of contact to take it all and get

3    it electronically into one spot and then, you know, I

4    just had 3-ring binders, so I'd grab them and throw

5    them in there and assemble everything -- get it in one

6    spot.

7    Q    Did you assign particular areas to different people to

8    develop?

9    A    I don't think I assigned them, I think we all just kind

10    of said hey, I'll do this, I'll do that, we all just

11    kind of went our merry way.  I don't think there was

12    any -- there was no master list that said you were

13    going to do this, and you're going to do that so --

14    Q    I'm looking at the exhibits that we marked as -- your

15    change out notes.

16    A    Okay.

17        MR. COVELL:  It might be 8 -- 7, I believe is

what you're referring to, 12001 is really --

19    A    G-7.

20        MR. COVELL:  Yes, G-7.

21    A    G-7.

22    Q    (By Ms. Zobel)  Yes.

23    A    Okay.  G-7.

24    Q    On Job 624 on page 4 of 5.  It refers to you -- the

25    second line, that you finalized the manbasket lifting

requirements?

A      Okay.

Q      Tell me what you did with that?

A      I honestly can't remember.  Obviously, let's see here,
4      it was a section of the manual we've just been talking
5      about.  And all -- everybody's comments were in.  No
6      more comments to add to that section.  So, I just put
7      it -- put it in the electronic version located in that
8      electronic folder and is the hard copy attached here?
9      No.

Q20    And I'm looking for them right now.

A21    Yes, there was a hard copy there somewhere so --

Q22    Okay.  Is that a section that you would have written
13     yourself or is it somebody else -- you just took
14     somebody else's project?

A15    It would have just been, again, just a regurgitation of
16     what was done before and what comes out of the OSHA
17     requirements and what was already in place.

Q18    So you were taking the OSHA requirements and updating
19     it?

A20    No.  I wasn't updating the OSHA requirements.

Q21    No, this manbasket procedure in the context of update
22     -- were you updating it using the new OSHA
23     requirements?

A24    Yes.  And probably the new Slope requirements and
25     anything else that wasn't applicable to how work was
       currently being done.

1    Q    And then going now to the next Job 625, it says I've

2         been discussing the need for an improvement in the

3         rescue response available to personnel working at the

4         wash bay?

5    A    Yes.

6    Q    Okay.  Was this something that you worked on, getting a

7          change in the procedure?

8    A    Yes, I tried getting a change in the -- in the

9         procedure with the client from about the first week I

10        worked Kuparuk.

11   Q    Were you ever able to effectuate that?

12   A    Negative.  Never could.

13   Q    Okay.

14              MS. ZOBEL:  Let's go off record.  Let me get a

15   little organized.

16        (Off record)

17        (On record)

18   Q    (By Ms. Zobel)  Did you do guidelines for such things

19        as recording and reporting spills?

20   A    Yes.

21   Q    Okay.  And is that some sort of -- where did you get

22        the guidance for writing those guidelines?

23   A    It would have been a combination of materials that were

24        previously in place.  It would have been current

25        company activity, I guess you'll call it, and then the

          CFR's.

Q    Okay.  When the OSHA requirements changed, in terms of
2    reporting, that was in 2002, just to refresh your
3    recollection and I think the record will show that.  Do
4    you recall being responsible for anything, company wide
5    with regard to that, or at least at Kuparuk, not
6    company wide?
A    I don't recall any specifics, but certainly there was a
8    changing of recording methodology between the OSHA 2000
9    log and the OSHA 300 log.  So, whatever -- whatever
10   accompanied that, I'm sure that we all got on the
11   bandwagon with --
Q    All right.  This is document 1826.
13         MR. COVELL:  It's got a G-15 on it.
14                        **(Deposition Exhibit G-15 marked)**
A    Let's see, Tom Sanchez.
Q    (By Ms. Zobel)  Are these your notes?
A    Yes, it looks like my handwriting.
Q    Okay.  It's -- it shows down here at the bottom, it
19   says research if we need to update the DASH 200 for
20   2001 based on the 2002 dash 300 requirements.  Is that
21   something that -- tell me what was going on there?
A    I think we just talked about that.  It would have been
23   the difference in the 200 log DASH -- DASH 200.
Q    Actually, I think its DASH and not dash.  It would be
25   the reporting forms.....
A    It would be the reporting forms.....

**M E T R O   C O U R T   R E P O R T I N G**
745 West Fourth Avenue, Suite 425
Anchorage, Alaska 99501
(907) 276-3876

Q       .....for it.  Right.

A       Right.  Yes, I -- it's just a note to myself it looks

3       here.  These are all just notes to myself just saying

4       there's -- there's obviously going to be some changes.

5        I guess i just needed to know what they are so it's

6       just a note to myself saying --

Q       That's something that you needed to do?

A       Yes, I need to probably look into that.

Q       And did you look into that?

A10     I'm sure I did, yes.

Q11     Okay.  And would you have then informed others of your

12      findings that -- how they needed to operate with that?

A13     Perhaps, maybe not.

Q14     We mentioned a minute ago the spill reporting and

15      recording guidelines.

A16     Uh-huh (affirmative).

Q17     Is that in your document that you did?

18              MR. COVELL:  G-16.

19                          **(Deposition Exhibit G-16 marked)**

A20     Yes, that's one I did.

Q21     (By Ms. Zobel)  Okay.  This is -- let me give you this

22      action item.  You guys seemed very organized.  You had

23      all kinds of spreadsheets, it looked like, is that

24      right?

A25     Tried to.

Q       Yes.

1          MR. COVELL:  G-17.

2                    **(Deposition Exhibit G-17 marked)**

3     (By Ms. Zobel)  Were you the one who created these --

4     Action Item Logs?

5     A    No.  I don't -- no.

6          MR. COVELL:  Just for the record, this in the

7     upper left says log initiated by Doug Smith.

8     A    Doug Smith.

9     Q    (By Ms. Zobel)  Okay.  And it shows you as having some

10    assignments, is that correct?  It says responsible

11    person.  Tell me what you were responsible to do?

12    A    Gilbert is the second line.  Okay.  So, put medical

13    files into PDF format and reduce paper for staying on

14    site.  At one time there was a push to put -- make

15    everything electronic because the paperwork was just --

16    but it was a mountain of paperwork to handle.  So, we

17    at one time discussed trying to make everything

18    electronic.  So, we would scan all of the documents in

19    and then keep an electronic version but I don't know if

20    that flew because the requirements of recordkeeping --

21    recordkeeping requirements that OSHA used.

22    Q    Look at number three, is the one I'm referring to.

23    A    Put together summary of IMED/APC interface and process

24    of injury management and occupational -- put together

25    summary.

Q     It says need process written up, is that something you

1      did?

2      A    If I did, I don't recall.  I don't know what that's all

3      about.

4      Q    It's says an interface between the new OSHA

5      requirements and....

6      A    IMED is the -- one of the medical providers up there on

7      the Slope.  So it would have been --

8      Q    But it goes on to say process for injury management and

9      occupational health.

10     I don't know.

11     Q    You don't recall what you did?

12     A    No, I don't.

13     Q    All right.

14            MS. ZOBEL:  That was exhibit what?

15            MR. COVELL:  Exhibit 17, that I had.

16     (By Ms. Zobel)  Do you ever write JVA's for people for

17     hiring?

18     A    Not that I recall.

19            MR. COVELL:  I guess for the record, what's

20     JVA?

21            MS. ZOBEL:  A job vacancy announcement.

22            MR. COVELL:  Okay.  There we go.  Thank you.

23            MS. ZOBEL:  You've got to know the lingo.

24            MR. COVELL:  MBA I know.

25     (By Ms. Zobel)  Among the meetings that you attended, I

       showed you the one that was a staff meeting.

1      Uh-huh (affirmative).

2      And then we talked about safety meetings that were

3      within the department, were there other meetings that

4      you would attend, such as a supervisor meeting?

5      There was a Phillips meeting, I think they called it

6      the supervisors' meeting.

7      Okay.  And who would be asked to attend those?

8      Oh man, the list could be long there.  It could be

9      everybody from Phillips.

10                         **(Deposition Exhibit G-18 marked)**

11     Okay.  This says distribution:  all superintendents,

12     supervisors, and construction managers.

13     Okay.

14     Okay.  So that would be the people who would be

15     expected to attend?

16     Yes, and amongst others, you know, so --

17     Okay.  You wouldn't have attended these as a safety

18     specialist, would you?

19     It's -- it's possible you could have attended as a

20     safety specialist, yes.

21     It wasn't the expectation though?  You were -- it was

22     a.....

23     Correct.

24     .....supervisor's meeting?

25     Correct.  But there again, if there was a need for

somebody to be in there to go over a safety item, then

1    there would be a specialist there so --

2    Okay.  No, I'm talking about as a regular participant

3    in the meetings and not on any.....

4    Correct.

5    .....specific need?  Okay.  And the action item list

6    and the sidebars to action item list, these are things

7    that would be discussed, examples?

8    Uh-huh (affirmative).  Yes.

9    Okay.

10         MS. ZOBEL:  What exhibit number was this?

11         COURT REPORTER:  G-18.

12         MS. ZOBEL:  Thank you.  This is going to be

13   G-19.  Oh, you're having to get creative.

14                          **(Deposition Exhibit G-19 marked)**

15         MR. COVELL:  Yes, this one's going vertical.

16   (By Ms. Zobel)  Okay.  Tell me what this is?

17   Let's see.  I honestly don't remember what this is.

18   Okay.  But have you seen this form, an Incident

19   Investigation Follow-up Report?

20   Yes, it doesn't look familiar to me, but obviously my

21   name's on it, so.....

22   It -- go ahead.

23   It appears to me that it's something that was probably

24   instigated.  I think recalling back, Phillips had a

25   change in how they wanted things classified when there

     was an incident.  And so it looks to me like it's some

1    type of a follow-up report on that.

2  Q  Okay.

3  A  Let me see if I can figure this out.  So it looks there
4    was an injury somewhere that Phillips reported to me
5    and I had to resp- -- reply to that in some manner
6    and --

7  Q  With recommended remedial action?

8  A  Yes.

9  Q  Okay.  At some point while you were working as a safety
10    supervisor, was there a determination made to change
11    the safety specialist to hourly employees from a day
12    rate employee?

13  A  Well there was certainly discussion, but no changes
14    were in effect.

15  Q  You didn't work with Doug Smith in coming up with an
16    evaluation of what the hourly rate would be for the
17    safety specialists?

18  A  We all worked to come up with numbers for a change from
19    day rate to hourly.  All the safety specialists and
20    Doug and myself and -- but those didn't go into effect
21    until -- apparently, after I left.

22  Q  Okay.  Are these some more of your notes?

23  A  Yes, they are.

24  Q  (By Ms. Zobel)  Okay.  Tell me what that first note
25    says?  What exhibit number are we on?

           MR. COVELL:  G-20, I believe.
        **M E T R O   C O U R T   R E P O R T I N G**

1                          **(Deposition Exhibit G-20 marked)**

2              MS. ZOBEL:  Okay.  G-20.

3       Let's see.  It says, hourly transition from day rate,

4       has a copy of -- has a copy of labor laws.

5       (By Ms. Zobel)  Did you review the labor laws with

6       regard to classification of individuals?

7       I don't believe I ever did.  It's possible that I

8       looked at -- it's possible that I looked at a labor law

9       book up there, but I'm not sure of that.  It's

10      possible.

11      Okay.

12      I think I remember one laying around up there.

13      Well what was going on?  Tell me what was happening?

14      There was just a shift going.  They were talking about

15      moving guys from day rate to hourly rate and what that

16      -- what that number would be, you know.  How to

17      calculate that number?  How do you go from a day rate

18      to a -- to an hourly rate?

19      Okay.  At the time that this was going on, did you at

20      any time talk to Mr. Smith or anybody else about

21      whether or not your own position ought to be made

22      hourly as opposed to paid on a day rate?

23      Yes.  Oh, yes, everybody was included.

24      But you were a safety supervisor?

25      True.

Q       Was your job included in being looked at for hourly?

**M E T R O   C O U R T   R E P O R T I N G**

A     Yes, as far as I recall.

Q     Okay.   And tell me what you recall as the discussions

3     of that?

A     The main point of discussion was just how to come up

5     with the number.   I mean, when you're transferring

6     everybody from day rate to hourly rate, how do you do

7     that?   What is that conversion?

Q     And did you do such conversion with regard to your own

9     rate -- your own job?

A10   I did conversions, yes.

Q11   For your day rate at 475?

A12   I believe, so.   I should have, yes.

Q13   And where are those calculations?

A14   Should be in your information there.

Q15   Is that some of the material that was given us in

16    production?

A17   I don't know.   I'd have to look.   Off the top of my

18    head, I don't know.   I.....

Q19   Do you have copies of them with you?

A20   Perhaps.   This is all the same stuff that you guys

21    have.   So -- just give me a second and I'll look.

Q22   Okay.

23    (Off record)

24                    **(Deposition Exhibits G-21 and G-22 marked)**

25    (On record)

Q     (By Ms. Zobel)  We've premarked Exhibit G-21 which you

**M E T R O   C O U R T   R E P O R T I N G**

745 West Fourth Avenue, Suite 425

Anchorage, Alaska 99501

(907) 276-3876

117

1    pulled out of your notebook.  Tell me what this is.

2    Just a proposed hourly rate conversion from day rate to

3    hourly rate and also shows the proposed overtime rate.

4    Okay.  Now, everybody is listed as a safety specialist,

5    all the hourly rates.

6    Uh-huh (affirmative).

7    When did you do this?

8    I didn't do this.

9    Who did this?

10   I -- I think maybe Doug did it, I don't know.  I have

11   no idea for sure who did it.

12   Who's writing is this that's listed all the people?

13   I can't tell you that either for sure.

14   All right.  But it doesn't include a safety supervisor

15   position?

16   No, it does not.

17   But you had an assumption that this would -- that you

18   would be changed over also to an hourly rate?

19   Yes.

20        MS. ZOBEL:  Let's go off the record.

21   (Off record)

22   (On record)

23   (By Ms. Zobel)  Tell me what conversation or what

24   information you had that led you to believe that you

25   would be transferred to hourly as opposed to staying on

the day rate?

A      There was just multiple conversations about changing

2      everybody from day rate to hourly rate and it went on

3      for several hitches on and off and -- and as I

4      understand it now they have flopped everybody to day

5      rate, but that was after I left or to hourly rate after

6      I left.  But there was just multiple conversations of,

7      you know, we're going to go to hourly rate and, you

8      know, what is your hourly rate going to be?  And then

9      this is the last piece of paper that I have in regards

10     to that so --

Q11    Who were those discussions with?

A12    Myself and Doug, and also all of the safety

13     specialists.  And the -- well, I guess, the admin gals

14     were already hourly, I believe.

Q15    And you understood from some source that that included

16     your position as safety supervisor?

A17    Correct.

Q18    Can you recount for me any specifics of discussions

19     that you met with anybody about your job being

20     reclassified?

A21    The only -- the only conversations I particularly

22     recall are ones Doug and I had about how -- how you

23     come up -- what is the actual conversion from day rate

24     to hourly rate, and what would that mean for everybody

25     in the department and so that's this -- this was the

       final hourly number.

1  Q    But do you recall having any discussions with him over

2       why your job would be reclassified or if your job

3       specifically would be reclassified also?

4  A    Nothing -- no, I do not.

5  Q    Okay.  And is it just that you made an assumption or

6       did somebody say you're going to be hourly too?

7  A    It was just assumed we're all going hourly -- the whole

8       department so --

9  Q    Okay.  I'm looking at a 02/19/03 staff meeting, which

10      is already marked as Exhibit G-22 and it's -- the date

11      of the staff meeting, can you tell us that?

12 A    02/19 of '03.

13 Q    And you were still a safety supervisor at that point,

14      correct?

15 A    Correct.

16 Q    Okay.  Now it says change from day rate to hourly,

17      March 1st.  Is that March 1st, your note?

18 A    No, these are not my notes.

19 Q    These are not your notes?

20 A    That's correct.

21 Q    Do know who's they are?

22 A    I do not.

23 Q    Okay.  Do you see where it says, overtime

24      authorization?

25 A    Uh-huh (affirmative).

Q    And it says if not a call-out must have supervisor

1    approval?

2    Okay.

3    Were you one of the people who would give approval for

4    somebody working overtime?

5    Negative.  No -- no, not to my knowledge because nobody

6    went to hourly -- nobody went to hourly rate while I

7    was employed there.

8    That's your recollection?

9    Yes, it's my recollection.

10    Okay.  Did you ever contact wage and hour department

11    either the state or the federal to have a discussion as

12    to whether you should be paid on an hourly basis with

13    overtime?

14    Myself, personally?

15    Yes.

16    Not that I recall, no.

17    Did you have conversations with anybody who had had

18    such discussions?

19    Not that I recall there either.

20    (Off record comments)

21    (By Ms. Zobel)  I'd like to talk about some of the

22    specific programs that you were involved in just from

23    the documents that I've pulled out and have you tell me

24    about them.  And we will start with (off record

25    comments) lead program sampling.

MR. COVELL:  All right.  This will be G-23.
**M E T R O   C O U R T   R E P O R T I N G**
745 West Fourth Avenue, Suite 425
Anchorage, Alaska 99501
(907) 276-3876

1                                    **(Deposition Exhibit G-23 marked)**

2          (Off record comments)

3     Q   (By Ms. Zobel)  This is from John Gilbert to the HEST

4          Department.  Okay.  So tell me what you're doing here?

5     A   Let's see.  Oh let's see here if this comes back to me.

6           It looks like it was probably a kind of summary of how

7          Phillips Kuparuk wanted us to perform our lead sampling

8          to --I think the first line under specifics, it

9          probably said Diane Kobayashi will determine proper

10         sampling method and amount of sample needed per the

11         method.

12    Q    She was Phillip Alaska?

13    A    She's Phillip Alaska's Industrial Hygienist.

14    Q    Okay.

15    A    Or ways, I don't know if she still works there or not

16         but --

17    Q    Look at the first paragraph.  It says that there was a

18         brief meeting between somebody, yourself and the client

19         present by phone.

20    A    Yes.

21    Q    To discuss the systematic approach to sampling of lead.

22    A    Uh-huh (affirmative).

23    Q    Then it looks like if -- am I not correct, that you had

24         certain responsibilities that you were going to do

25         certain.....

A     Yes.

Q       Develop certain things?

A       Yes.

Q       And such as a matrix for the sampling?

A       Let's see.  Yes, this was -- what this was, and it's

5       coming back to me now, this is a summary of what Diane

6       wanted us to do for our lead sampling because the

7       current method that we had to take care of the lead

8       sampling recordkeeping and all that was not very good

9       and they came down looking for some type of sample

10      analysis and I think they talked to Don Chenault about

11      that.  And when Don showed them they were not happy

12      with -- so, we all got together and it probably says

13      somewhere in here too, although blanked out that Sam

14      Taylor, myself and probably Jim Dickey were involved in

15      this conversation and she basically just told me what

16      she wanted and this is a regurgitation of that

17      particular meeting.  And I wrote it down so everybody

18      in our department would know how it was to be done.

Q19     But you actually had to complete matrixes identifying

20      places where the sampling would be done, et cetera?

A21     Actually that would to Don Chenault.  Yes, Don did

22      that, I didn't do that.  But my name's down here so --

Q23     What did you.....

A24     Michael Davis did a lot of this though.

Q25     Why would your name be on here if it says John

        completed the matrix?  Spreadsheet is located under

1       your folder?

2    A  Yes, I probably built the first one and then it went

3       into this -- into the machine that Chenault took over

4       like a good -- like all of the lead sampling, near as I

5       can recall for the department.  So I probably built a

6       spreadsheet just like Diane wanted it, put it in the --

7       yes, see I put it in the PAI lead management area so

8       that they could access it.  They knew exactly where it

9       was it at so Diane could get to it and got it all set

10      up and then Don and the rest of the guys took it over.

11   Q  Okay.

12          MS. ZOBEL:  What's the exhibit number on that

13   please?

14          MR. COVELL:  G-23.

15   A  Twenty-three.

16   Q  (By Ms. Zobel)  Now, you said earlier in response to

17      your question when we were talking about the manbasket

18      project, and you -- or the manlift project, and you

19      said that Chenault did that.  Do you recall that?

20   A  Uh-huh (affirmative).

21   Q  Okay.  Let's look at Exhibit G-7.

22          MR. COVELL:  That's the change out notes again?

23          MS. ZOBEL:  Yes.

24   Q  (By Ms. Zobel)  It says that you finalized the

25      manbasket lifting requirements and modified the

        suspended personnel platform lifting procedures form.

124

1    I think that's the one that you said that had been done

2    by Chenault.

3            MR. COVELL:  What are you on there?

4            MS. ZOBEL:  I'm on page 300.

5            MR. COVELL:  Okay.

6    Okay.

7            MS. ZOBEL:  Under Job 624.

8    Okay.

9    (By Ms. Zobel)  So, you would have, if I'm

10   understanding that, you actually -- Chenault may have

11   done the original but you then went in and modified it,

12   or made changes to it?

13   He -- like I said, I was keeping the main electronic

14   copy of everything.  So then somebody would take a hard

15   copy, make redlines on it, and give it to me.  I would

16   go in the electronic copy and just make those changes.

17   And did you make the redlines on documents that people

18   had done?

19   Yes, sure.  We all did.  We all looked at each other's

20   documents to make sure that we were all in agreement

21   with what was going to go in it, you bet.

22   Okay.  We talked about the NORM testing.  This is

23   another piece of the NORM testing.

24           MR. COVELL:  Exhibit G-24.

25                   **(Deposition Exhibit G-24 marked)**

Q    (By Ms. Zobel)  This is Kuparuk NORM testing and

**M E T R O   C O U R T   R E P O R T I N G**
745 West Fourth Avenue, Suite 425
Anchorage, Alaska 99501
(907) 276-3876

1    reporting procedure.  Did we look at this previously?

2    Is it a duplicate?

3  A    It's a duplicate.

4  Q    Okay.  I'm sorry.

5    (Off record comments)

6  Q    (By Ms. Zobel)  Contract auditing classes and prejob

7    safety evaluations.

8         MR. COVELL:  Exhibit G-25.

9                          **(Deposition Exhibit G-25 marked)**

10  Q    (By Ms. Zobel)  Tell me what this is?

11  A    Golly, contractors.  [Witness reading to himself]  I

12    have no idea what this is.

13  Q    Did you do any kind of auditing for safety and

14    environmental testing?

15  A    Let's see here.  [Witness reading to himself]  This was

16    something sent from PAI.

17  Q    Uh-hum.

18  A    Down to us.

19  Q    Right.

20  A    It says we had to get in compliance with PAI's

21    direction.

22  Q    Okay.  They're the client?

23  A    They are the client.  So this is the form that somebody

24    must have gave to me or handed out in a meeting and I

25    -- looks like I'm just trying to answer the questions

    that they're asking there.

Q    Okay.  And then having answered the questions with some
2    no's and some question marks, did you later then go and
3    bring the department into compliance with the auditing
4    process?
A    It's hard to say.  This doesn't ring -- really ring a
6    bell to me at all.  This --
Q    Would this have been within the scope of the type of
8    work that you were doing though?
A    Sure.
Q    Okay.
A    Let's see, what does it say here in the contract?  This
12   -- this may have even come from one of the PAI safety
13   specialists and it could have come from anybody, I
14   don't know who it came from.  So, like I say, it
15   doesn't ring a bell to me.  I mean, did we have a
16   follow-up on action items from cancelled prejudged
17   safety evaluations?  No, we didn't.
Q    Let me ask a different question.  Is this something
19   that you would be using to audit another contractor who
20   would be onsite besides APC?
A    We didn't audit any other contractors unless we had
22   subs working for us and --
Q    Okay.  So this is.....
A    I mean they just presented us their approved safety and
25   health plan, if that was the case and away they went.
     They went to work.

**M E T R O   C O U R T   R E P O R T I N G**
745 West Fourth Avenue, Suite 425
Anchorage, Alaska 99501
(907) 276-3876

Q    Okay.  Were you responsible for approving those?

A    No.  No.

Q    Okay.  So this would have been something that directed
     APC to come into compliance with the safety evaluation,
     safety environmental task assessments from PAI?

A    That's the way it looks to me.

Q    Okay.

A    This -- this seems to me like it was just a question
     and answer form wrote down from PAI because they went
     through the -- let's see if I get this right.  From
     Phillips to ConocoPhillips they had a meeting of, you
     know, a meshing of two companies or whatever you call
     it correctly during that period of time.  There was a
     rewrite of their company policies.  So that may be
     where that came from.  I'm not sure.

Q    And you don't recall if you did the assessment?

A    Oh, I -- there'd be no assessment on our part.  I mean,
     it's just.....

          MS. ZOBEL:  It looks like we've only got one
     piece of it.  Let me show you these documents.  This is the
     page that you had.

A    Okay.

Q    (By Ms. Zobel)  And then there's training information,
     the job contractor evaluation regarding going through
     doing an assessment, the contractor root cause
     investigation process -- does any of this refresh your

128

1      recollection?

2   A   Not really.  Sorry.

3   Q   If it.....

4   A   I mean, it's obviously my writing.  But, I mean, I

5      don't --

6   Q   If, having done this assessment you found you were out

7      of compliance with the client's requirements, was it

8      your responsibility to then go back and fill in the

9      blank on this or do whatever the compliance was needed?

10          MR. COVELL:  Okay.  Mr. Gilbert I'm going to

11  direct you to listen to the question and answer the question.

12  I know this material --

13          MS. ZOBEL:  We found his notes.  Yes.

14  A   One more time please?

15          MR. COVELL:  Let's stop here for a moment.  You

16  handed him a book that you have labeled as AES production

17  volume two and you showed him pages numbered 887 through 893?

18          MS. ZOBEL:  886.

19          MR. COVELL:  886 through 893, all right.  And

20  then you're asking him a question as to those pages, or to

21  additional.....

22          MS. ZOBEL:  He can look at his own notes.

23  These are his.

24  Q   (By Ms. Zobel)  I believe these are your notes, are

25      they not?

A   It looks like my writing, yes.

**M E T R O   C O U R T   R E P O R T I N G**

745 West Fourth Avenue, Suite 425

Anchorage, Alaska 99501

(907) 276-3876

Q    On 894?  Okay.  And then there's more evaluation

2    following that.  Do you recall all of this?

A    I -- I -- what jogs my memory is the fact that Joel's

4    name is here and I think that Joel brought this down

5    when he was still working for PAI -- Joel McAlister.

Q    Okay.

A    And said hey, you need to go through this checklist or

8    hand this to Doug and go through this and make sure

9    that, you know, you can answer this because this is

10   going to be in some type of an audit that -- that PAI

11   or ConocoPhillips was going to have on their

12   subcontractors, APC, being one of them so --

Q13  Okay.

A14  It -- it may be that -- I mean, some of these are just

15   blank, so it's --

Q16  And you identify the checkmarks in the mid-job

17   contractor evaluation under water, for example, as

18   being your writing?

A19  Correct.

Q20  So.....

A21  But I would have just taken these.  To get the answer

22   yes or no, or not applicable, I would have simply gone

23   to our policies, procedures and guidelines manual and

24   found out if we had something in there that matched

25   that criteria.

Q    And if you didn't, what would you do about it?

A    Inform him.

Q    And then what would you have done about it after that?

3     Would he have directed you to correct it?

A    He would have gave me direction one way or another,

5    yes.

Q    Okay.  Do you recall any of that?

A    No, sorry.

Q    Okay.  All right.

9         MS. ZOBEL:  Here we go, staff meeting agenda.

10   promised you an agenda.  Actually, I've got a whole slug of

11   them.

12        MR. COVELL:  Okay.  We're running out of

13   stickers madame clerk.  That's G-26.

14        MS. ZOBEL:  Go ahead and mark G-26 and G-27.

15        **(Deposition Exhibits G-26 and G-27 marked)**

16   (Off record comments)

Q17   (By Ms. Zobel)  We had a prior discussion about whether

18   or not you conducted the staff meetings?

A19   Uh-huh (affirmative).

Q20   And I've given you Exhibit G-26 and Exhibit G-27.

A21   Uh-huh (affirmative).

Q22   And Exhibit G-27, as I recall is a series of different

23   meetings where you're listed as a facilitator, is that

24   correct -- different dates?

A25   Twelve -- let's see, these all look -- okay.  I have

     two of the same it appears.

131

Q      What date?

A      02/13 of '02.

3              MR. COVELL:  1479 and 1480.

Q      (By Ms. Zobel)  All right.  And then 03/13 and 04/10?

A      Yes.

Q      Okay.  Now, does that -- did you write the agendas for

7      these meetings as a facilitator?

A      No, this is not -- anyhow this is not a text or a font

9      that I would use to type up anything.  So, I didn't put

10     this together.

Q11    You didn't put the topics together or the actual

12     document?

A13    I didn't put the document together for sure.

Q14    How about all the other information?

A15    General information, yes.  It looks somebody's coming

16     tomorrow to buy.....

17             MR. COVELL:  Just to be clear John, you're on

02/13, APC479?

A19    Right.

20             MR. COVELL:  Okay.  Go ahead.

A21    And it looks to me like I'm just telling everybody

22     what's been told to me.  Let's see.  It looks there

23     might have -- like, for instance, the second bullet:

24     There's been a questions about the transition from day

25     rate to hourly rate.  This will be discussed when --

       I'm sure it said when Doug gets back.

132

Q       (By Ms. Zobel)   Okay.

A       So I'm just regurgitating information to whoever's

3       coming on shift at this point in time to let them know

4       what's going on.  Just a quick meeting to say, hey guys

5       here's what's going on at this point.  I'd be curious

6       to know on 02/13 of '02, was I just coming on shift or

7       just leaving or mid-shift or where was I?

Q       Why does that make a difference?

A       Well I'm thinking that reason this is put together was

10      just to simply get everybody in one spot at one time

11      and say here's what's going on guys and then I was

12      probably on a plane out of there.

Q13     What about 1477?

A14     77.  Again, this is not a form that I would -- that I

15      would have made.  So, I don't know where the form came

16      from.

Q17     Now this one is heading Meeting Agenda.  Is this

18      something you would have put together as a facilitator?

A19     My name's down as the facilitator, but I would not have

20      made this form.

Q21     Would someone in admin have put it together for you?

A22     It's possible, but I wouldn't have asked them to do

23      that.  I mean, this is just not my style.  I mean this

24      is -- this is a premade deal that you go on there, you

25      know, in Word and pull up a meeting agenda and it

        prints this stuff out for you.  But it's not something

**M E T R O   C O U R T   R E P O R T I N G**

1      I would use.

2  Q   What about, starting on 1479 with the 02/13/02, is it

3      possible that these are the minutes that were kept as a

4      result of the meeting?

5  A   It's possible.

6  Q   Okay.

7  A   Highly possible.

8  Q   And that these were meetings that you facilitated?

9  A   Well I just sat in and took meetings or something that

10     was passed down to me from management or combination of

11     sources and then I -- I just got everybody in the -- in

12     the meeting and somebody took notes while we were

13     talking, you know, to get everybody up to speed while

14     we're here before I left or what have you before there

15     was a shift change.  It could be anything.

16  Q  Well safety staff meetings, did you have them only when

17     you had a shift change?

18  A  No they.....

19  Q  Or were they regular?

20  A  .....were not scheduled in any -- we tried several

21     times to get a safety meeting on, you know, we're going

22     to have it on this day all the time by god.  It never

23     happened.  So, they were just kind of hit or miss.  We

24     weren't very good at getting together as a group and

25     making that up.

Q      Okay.  I'm going to show you your notes from your

1    production and this is document 69 and it says that you

2    had a weekly staff meeting?

3  A  Weekly staff meeting -- O Wing, yes.

4  Q  Okay.

5  A  But that doesn't -- I mean we had a meeting, but --

6  Q  It wasn't change out notes.  You're there?

7  A  I'm there.  I'm it, yes.  So that's the first day in.

8    Okay.  So that's the first day in.  So there would have

9    been guys coming in with me.  So a lot of these items

10    would have been to regurgitate to the guys coming in so

11    we'd all --

12  Q  And 03/13, the same thing?  This is at the shift

13    change.  You're having a safety meeting with the new

14    crew that comes in on that tower?

15  A  So this probably would have been with Doug was going

16    off the Slope, so we had all been together -- got this

17    all done at one time.  This.....

18  Q  Doug would be off Slope and you'd be conducting it in

19    his place?

20  A  That could be or he could be there and we're all in the

21    same group.  I don't know, it's hard to say.

22  Q  Okay.  Was it your responsibility when he was gone to

23    conduct these meetings in his absence?

24  A  I'm not sure of that either.  It wasn't a steadfast

25    thing.  I mean the meetings were just hit or miss.  We

    didn't have it went -- like I said before, we attempted

**M E T R O   C O U R T   R E P O R T I N G**

745 West Fourth Avenue, Suite 425

Anchorage, Alaska 99501

(907) 276-3876

1    on several occasions through the whole time I was on

2    the Slope to set up meetings that happened here and

3    here and here, but we were not very good at

4    communicating to one another.  The best thing we could

5    do was the change out notes.  So, very informal.

6  Q    Okay.

7  A    So, yes, my name's down as facilitator, but I could

8    have just been regurgitating, I mean -- or somebody

9    just put me down as facilitator because I was the one

10    passing along the word so --

11  Q    Well you ran the meeting.  Is that what facilitator

12    means?

13  A    I'm not sure what he definition of facilitator means.

14        MR. COVELL:  I'm going to object to compound

15  question here.  One, what the word means.  The other one's what

16  he did.

17        MS. ZOBEL:  Okay.

18  Q    (By Ms. Zobel)  Next Exhibit G-27 is industrial hygiene

19    air sampling, is that memorandum?

20        MR. COVELL:  Ms. Zobel, I --

21        MS. ZOBEL:  Am I on the wrong number?

22        MR. COVELL:  This one's G-27.

23        MS. ZOBEL:  G-28, you're correct.

24        MR. COVELL:  So I have the February 10 as G-28.

25        MS. ZOBEL:  You're correct.  I've got one on

top of the other.

1                    **(Deposition Exhibit G-28 marked)**

2       Twenty-eight.

3       (By Ms. Zobel)  This is an Industrial Hygiene Air

4       Sampling Event Memorandum, tell me what it is?  That's

5       the title on it.

6       Oh, let's see.  This must have been -- let's see here.

7        This is something I probably worked up with Sam Taylor

8       -- sent to Doug.  It looks like I sent it to minor

9       projects superintendents, probably also Phillips

10      Alaska, amongst others I suppose.  Exposure monitoring

11      results, stainless steel cutting event, salt water

12      treatment plant.....

13      So what happened, if you recall?

14      I actually don't recall.

15      Okay.

16      So, if I could just read it.

17      Well I'm not asking you to talk about the specific

18      event.  Tell me about your role that would be played

19      when you had a sampling event.

20      It would be the same role as any of the safety

21      specialists.  If somebody asked me to go do sampling,

22      I'd assemble all the material I needed to do the

23      sampling and go do it.  And then you follow through all

24      the way to making sure that the data was sent to the

25      laboratory and analyzed and when the data came back you

        recorded the events and if there was an overexposure

1    then you called the employee in and notified the

2    employee of the exposure and notified his supervisor of

3    the exposure and notified Doug for sure of what was

4    going on.

5  Q  You've signed the report at the end, correct -- or at

6    least your name appears on it?

7  A  Yes.

8  Q  Okay.  Is this something that was unique to you as a

9    safety supervisor or was it something that was also by

10    the specialist, but you happened to do this one?

11  A  It was done by the specialist, primarily, you know.

12    But, again, we all took -- it's like we discussed

13    earlier, if you needed to go do the sampling you would

14    do it.  This just happens to be one that I did.  So, it

15    looks like -- although this was definitely in

16    conjunction with Sam.

17  Q  Who is Sam?

18  A  Sam Taylor, the IH, that we had on the staff.

19  Q  Okay.  But you don't know why.....

20  A  It might have even been Don Chenault -- might even have

21    been in on this one too.  It was probably Dru (ph)

22    Bedford, too.

23  Q  Was this one fairly significant that you had so many

24    people involved?

25  A  It's hard to say.  It doesn't ring a bell to me.  I

    mean, we got three -- two guys here that we -- we

1    sampled for and -- and obviously somebody up the ladder

2    was asking a lot of questions, so this report got put

3    together.

4    Q   Okay.

5        MS. ZOBEL:  Let's go off the record.

6    (Off record)

7    (On record)

8    Q   (By Ms. Zobel)  Okay.  You were talking about what --

9    we were trying to discuss what role you had in the

10   safety staff meetings in terms of communicating

11   information.  And let's look at the February 13, 2002

12   meeting -- senior staff meeting that you attended. Do

13   you see where action management item number two says

14   corporate wants all band-aid logs eliminated?

15   Discussion revolved around what our options are?

16       MR. COVELL:  Second paragraph.

17   A   Yes, I see that.

18   Q   (By Ms. Zobel)  Okay.  Now, look at document G-27, the

19   second page, 1479.

20   A   Okay.

21   Q   And then it says, it's one of the bullets, the third

22   from the bottom, it's a possibility band-aid log could

23   be eliminated.  It's being discussed with management

24   currently.

25   A   Yes, so -- it's just, I'm regurgitating what I heard

     here.

Q    Okay.  So you attended one meeting and now you're.....

A    Passed it along at the rest of the meeting.

Q    .....reporting it back to the other -- to the staff?

A    Yes.

Q    Okay.

A    Yes.

Q    All right.

A    Thanks for clearing that up.

Q    Does that help you?  It wasn't me.  Okay.  Now,
audiometric.  What's audiometric?

A    Audiometric.

Q    Audiometric.

A    Yes.

Q    What is it?

A    A hearing test.

         MS. ZOBEL:  This is an exhibit again.  What
number are we on?

         MR. COVELL:  G-29.

                    **(Deposition Exhibit G-29 marked)**

Q    (By Ms. Zobel)  All right.  Audiometric Test
Documentation Procedures, did you put these together?

A    I don't know.  Let me take a look at it.

Q    All right.  It has your little desktop on it.

A    No, actually I -- I didn't.  This was a regurgitation
of Woody McCoven's notes that he had on the front of a
three-ring binder on how to do audiometric testing.

1   And so instead of using his handwritten notes, I

2   retyped it so it would be in the computer in one spot.

3    And then.....

Q   Okay.

A   And then filed it here on this O-drive.  So, that was

6   just a regurgitation of one of the training guy's

7   stuff.

Q   Okay.  Is that a procedure that was then rolled out to

9   the safety specialists to carry out?

A10  The safety specialists had always been doing it.  It

11  was all -- it's just a typed -- it's a retype of

12  handwritten document that Woody made.

Q13  Okay.

14       MS. ZOBEL:  I'm going to give you some action

15  is this what I want?  A memo from you.

16       MR. COVELL:  G-30.

17                    **(Deposition Exhibit G-30 marked)**

A18  I'll swap you.  Okay.  [Witness reading to himself]

Q19  (By Ms. Zobel)  Tell me what this is?

A20  It looks like Gary Buchanan asked me to look over the

21  2001 internal action log for the construction crew.

Q22  What's an action log?

A23  I couldn't tell you, it's been too long.  I don't know.

24   Number 2 NEO Training present NEO training.....

Q25  Right.

       MR. COVELL:  You may want to --
**M E T R O   C O U R T   R E P O R T I N G**

1           MS. ZOBEL:  What.

2           MR. COVELL:  Go ahead.

3           MS. ZOBEL:  I asked him what the action log
was.

5           MR. COVELL:  Okay.  And he said, I don't know.

6           MS. ZOBEL:  Okay.

A       Sorry.  I.....

Q       (By Ms. Zobel)  Go ahead and tell me what you believe

9       you were doing here.  You were commenting for Gary as

10      to having looked over the logs?

A11     I'm replying to Gary Buchanan that I looked over this

12      log that he provided to me and he was -- he's obviously

13      asked me to look it over and make comments, so that's

14      all I'm doing here.

Q15     Okay.

A16     So it's.....

Q17     And Gary Buchanan was?

A18     The head honcho, the operations manager.

Q19     Okay.

A20     This is where we talk about the safety copy mentality

21      and the voice of the safety department being

22      inconsistent and new employee orientation training

23      requirements, so --

Q24     And are you indicating here some places where there

25      need to be improvement?

A       I just think I'm stating my opinions.

**M E T R O   C O U R T   R E P O R T I N G**
745 West Fourth Avenue, Suite 425
Anchorage, Alaska 99501
(907) 276-3876

Q    Okay.  And he solicited your opinion?

A    Yes, in this case he did here.

Q    Okay.  Do you have an opinion as to whether you spent

4    more than 20 percent of your time in doing manual labor

5    type activities?

A    Twenty percent of my time doing manual labor

7    activities?  During my entire employment?

Q    No, during your tenure as a safety supervisor?

A    Probably did about -- it's conceivable I spent more

10    than 20 percent of my time doing a manual -- manual

11    work.

Q12   Is it likely, though?

A13   Yes.

Q14   And what would you define as manual labor that you

15    would have done?

A16   Go into the field and -- and performing the field work

17    or in the office performing, I guess -- I guess the

18    question is what are we calling manual labor?

Q19   No, I'm asking you how you have defined it when you

20    said the answer was yes?

A21   I guess, you know, data entry would be one -- one

22    portion of that where you're just simply sitting down

23    inputing data into a computer.

Q24   Give me another example of what you mean, data entry?

A25   Well all of the industrial hygiene sampling logs that

we got, we'd have to -- we had a program so you'd have

**M E T R O   C O U R T   R E P O R T I N G**

1    to sit down and take the raw data and sit down and type

2    it in.  You just transcribe it right off a written form

3    and put it in the machine so you'd have an electronic

4    record of it.  So there was a lot of data entry.  So

5    that's kind of brain dead work.  So I'd -- I'd say

6    that's -- that's the majority of it right there.  You

7    know, it'd be some type of a data entry, some type of

8    field work, assembling, calibrating instruments.

9    That's all kind of manual labor.  That's about it.

10    We talked about you performing field work -- data

11    entry, is this material that other people gave to you

12    and you're doing entry or is this something you

13    generated that you're inputting?

14    Both.

15    Both.  Okay.  Are you -- are you doing summaries and

16    correlations of these data when you're putting them in?

17    No, it's all cookbook stuff.  You just follow the --

18    you know, the -- all the calculations that one would do

19    are already done for you.  You've just got to look them

20    up in the book or in our particular case, excuse me,

21    there's a computer program we had and it's all done

22    there so --

23    Okay.

24    You know --

25    All right.  What was the third you said you did?  Oh,

      calibrating instruments?

A    Uh-huh (affirmative).

Q    And who else did calibration of instruments?

A    Everybody did calibrations.

Q    How is it that you would come to be doing calibrations
5    as a safety supervisor?

A    If you had to calibrate an instrument every time it was
7    used.  So, if somebody would call me to go do a permit
8    then I would have to calibrate the instrument before I
9    left the office as would anybody.

Q    Okay.  All right.  So this would be in conjunction with
11    the work that you did as a field worker?

A    Sure.

Q    All right.  Tell me what the most responsibility was
14    you had in your position as a safety supervisor?

A    Just making sure somebody didn't get injured on my
16    shift.  So, it was just employee safety was the
17    greatest responsibility.

Q    And within the project that you worked on as a safety
19    supervisor, which ones of those do you think were most
20    important?

A    I don't understand what you mean by projects.

Q    Well tell me what some of the projects were you did as
23    a safety -- in the office -- safety specialist --
24    supervisor.

A    The biggest time consumer would be just assembling the
     policy, procedures and guidelines document that we

1      talked about.

2   Q   Give me an example of other projects that you worked

3      on.

4   A   Oh, I assisted in the lead sampling program, and I

5      assisted in the UA program, assisted in the

6      audiometric, and the respiratory program.  Assisted in

7      the training program.

8   Q   When you say assisted, was this in putting together

9      policy?

10  A   No, just, you know, actually performing the work.  You

11     know, in all cases like the -- every six months or

12     every two years you'd have to come around and get

13     reevaluated for your hearing and your respiratory.

14     Don't quote me on the timeliness because I really don't

15     recall exactly what the timeliness were.

16  Q   So this is the administering of the checkouts for

17     people?

18  A   You bring the employee in, you pull out his file.

19  Q   Uh-hum.

20  A   You put him in the hearing booth, you put the goodies

21     on him and give him a hearing test.

22  Q   Didn't you contract that out?

23  A   No.

24  Q   Okay.  And how about writing the procedures to be

25     followed on any of these projects, lead sampling,

       respiratory, auditory?

A    Again, most of that stuff is a regurgitation writ- --
2    either from the instrument manufacturer's operations
3    manual or right out of the CFR, or there was something
4    already in place that may not have been typed up and
5    put in an -- an electronic format.  It may have just
6    been on a piece of paper in somebody's handwriting on
7    the back of a three-ring binder.  So, you know, we did
8    a lot of organizing up there trying to get everything
9    into something that looked a little professional, if
10   you will.  So, and my input went in as well as
11   everybody else's into those programs so --

Q    Is there any programs that you worked on that you don't
13   believe were worked on by other safety specialists?

A    Well no.  I'm pretty sure that everybody got involved
15   in the majority of things.  So, we tried to bounce
16   everything off one another.  There's just simply too
17   much activity going on up there for one guy to make a
18   call unless its loaded down upper management.

Q    And did Doug rely on you as his assistant to do these
20   sorts of things?

A    Myself, amongst others sure.

Q    Okay.  Did you were second below Doug and you would
23   step up when he was gone, is that correct?

A    Well I'm not sure I understand the word step-up but
25   when Doug was gone it would be myself or one of the
     other safety specialists that would be so-called in

1     charge when they -- when he left.

2  Q  Well he weren't present, was somebody else in charge

3     other than yourself?

4  A  A lot of reliance was still funnelled to Ron Kirk since

5     he'd been up there for so long even though he was not

6     necessarily in -- he moved over to the safety

7     specialist position at the -- the wash bay or the heavy

8     shop and a lot of times they would just communicate by

9     him by faxing so --

10    Okay.  And was that something that -- well all right.

11    But under the chain of command when Doug was gone it

12    was your responsibility to take over his position, is

13    that correct?

14 A  That's correct.

15 Q  Okay.

16         MS. ZOBEL:  All right.  Let's call it a day.
   You want to cross?

18         MR. COVELL:  Let's take five minutes.

19    (Off record)

20    (On record)

21              **CROSS EXAMINATION**

   BY MR. COVELL:

23    Mr. Gilbert, you were asked some questions about

24    interpreting data earlier by Ms. Zobel.  I believe you

25    gave an affirmative answer to that question, that you

      interpret data?

148

A    Yes.

Q    Okay.  When you were doing that, were you doing a
process that would have been similar to analyzing or
doing original scientific research where you might
gather a bunch of data points, and then plot a bell
curve or something of that nature?

A    No.

Q    Okay.  Were you doing some type of situation where you
might get data from the field and enter it either into
an electronic program or a hand program and then come
up with some results?

A    Yes.

Q    Okay.  You were asked a question about exercising
judgment.  When you did your job did you have the
authority to deviate from standards that were given you
either in CFR, state regulations, PPC manual or company
manuals or requirements?

A    No.

Q    Okay.  In G-2 which was a job description, I saw the
words risk assessments.  Did you do something that you
thought was a risk assessment?

A    I don't recall having anything that said risk
assessment, however, we may have gone out and looked at
a job and said, geez fellas your scaffolding is not
erected correctly and therefore you have to reassemble
it.

Q    Okay.  Would it be appropriate to call that identifying
2    a safety hazard?

A    Yes.

Q    Okay.  And would that be a duty of safety specialist
5    when they did a walk down or an audit to identify a
6    safety hazard?

A    Yes.

Q    You were asked some questions about whether or not you
9    had a contract with APC, and I believe you indicated no
10   to that question.

A    Correct.

Q    All right.  Did you have -- whether written or not, an
13   agreement with APC that you would work for them and
14   they would pay you money for some amount of work?

A    Yes.

Q    Are there various pieces of paper that commemorate that
17   agreement?

A    Yes.

Q    Okay.  Did you have a specific correspondence with APC
20   in that regard?

A    I -- yes, I do.  I did.

Q    Okay.  And when did that happen?

A    That was before I went to the Slope.

Q    Okay.  And how did that transpire?  Was that e-mail
25   letter form, do you know?

A    As I recall it was in a letter form they just sent me a

**M E T R O   C O U R T   R E P O R T I N G**

745 West Fourth Avenue, Suite 425
Anchorage, Alaska 99501
(907) 276-3876

1   letter of employment.  As I recall it was from Michael

2   Day and Ron Kirk.

3   Q   Okay.  And to your knowledge do you have that paper

4   somewhere?

5   A   I don't know.  I'd have to look.  I don't know if I

6   have it or not.

7   Q   Okay.  Would it be your expectation that the company

8   might have it in their file somewhere?

9   A   Yes -- should have.

10  And that would be when you started out in '01?

11  A   '01.

12  Q   Okay.

13  A   Yes.

14  Q   All right.  In the duties you undertook as safety

15  supervisor when you were staying in the office most of

16  the time, to differentiate what you did there from

17  safety specialist, is it correct that you dealt with

18  more paperwork, you answered more questions, you dealt

19  with the injured more -- let me back up here and try to

20  make this sound sensible.

21          MS. ZOBEL:  And not to leading.

22          MR. COVELL:  Okay.

23  Q   (By Mr. Covell)  All right.  As a safety supervisor

24  were the duties that you did different in volume versus

25  types of duties from being a safety specialist?

A   Yes.

Q    Okay.  So is it right then that you say, did more

2    paperwork, answered more questions, dealt with the

3    injured more, and those types of things.

A    Yes, that's correct.

Q    Okay.  All right.  When you were -- how many

6    secretaries were there -- the admin assistants?

A    Just one.

Q    Okay.  Because there were two ladies listed on the list

9    and they'd change out, right?

A    Yes, and then one went away for good so --

Q    Okay.  And then for the off weeks did you have one

12    or --

A    No, actually we didn't.  There was just Kim.

Q    Okay.  All right.  There was that note in your daily

15    log, something about helping somebody on a pad with a

16    hose, do you remember that?  You don't need to look.

A    Yes.

Q    Okay.  The person that called you to that situation,

19    was that a safety specialist or was that a client,

20    meaning Conoco?

A    It was -- it was not a safety specialist.

Q    Okay.

A    Client.

Q    Did the safety specialist call you from the field to

25    consult about doing the safety specialist job?

A    No, the would have called me from the field to say,hey

1    I need some help out here to do this particular walk

2    down or there's too much activity I need another guy

3    out here, or I'm going to this pad, you need to cover

4    me on this pad.  So, but there was, you know, those

5    guys are all -- they're not coming to me as the expert

6    in the safety field.

Q    So is it fair to say, when -- even if you got called by

8    a safety specialist, it was to be an extra set of hands

9    as opposed to being somebody that would be instructing

10   them what to do?

A    Yes.

Q    Ms. Zobel asked you a question about being a

13   spokesperson.  Were you the guy that got in front of

14   the microphones and made press announcements?

A    No.

Q    When you said spokesperson or you answered

17   affirmatively to that, what did you mean being company

18   spokesperson?

A    Again, your the lead man or the guy in the office, so,

20   somebody's got to answer the questions from the

21   department.

Q    Okay.  When a person is injured from a safety point of

23   view concerning their medication, is one of the main

24   concerns whether or not they're going to be on pain

25   meds?

A    That is a big concerns, yes.

153

Q    And why is that a big concern?

A    Well obviously if they're on medications they may not
     be able to their job correctly and pose a greater
     danger to themselves or others if they're medicated.

Q    Okay.  In the change out notes in Exhibit G-7, is there
     anything that you addressed that you did in those notes
     that's any different than what a safety specialist
     would do?

A    No.

Q    When you talked about, you know, not being liked by the
     workers, not being liked by the company because you're
     a bad news man, so to speak and getting complaints from
     the field about a safety guy.  When you got those
     complaints would you administer disciplinary act to the
     safety specialist?

A    No.

Q    What would you do with those complaints?

A    Well I would call the safety specialist, and say, hey
     you're stepping on some toes out there and you really,
     you know, made some guys angry and, you know, you need
     to change your approach or I would refer a lot of it to
     Doug so --

Q    In G-8, there was some questions about doing cost
     analysis I think about some scientific equipment.  How
     often did you do something like that?

A    Very infrequently.

154

Q    Okay.  Off the top of your head can you recollect have
2    done something like that otherwise?

A    I might have done something similar to that, maybe two
4    or three times the entire time I was employed.

Q    Okay.

A    At APC -- I don't know.

Q    When you did that were you analyzing the cost benefit
8    analysis to the equipment for company?

A    No, I was just simply adding numbers, and here's what
10   that cost and here's what this cost, and somebody else
11   can make the decision as to whether it's a viable
12   purchase option.

Q13  And as far as that equipment did you make a decision as
14   to whether or not it was purchased?

A15  No, I didn't.

Q16  Do you know if that equipment was ever purchased?

A17  That particular equipment, I don't know.  I think that
18   was just a list of old equipment that we had.  So, I
19   know we bought some new equipment on and off throughout
20   the time I was employed there so --

Q21  All right.  In G-11 there was something about setting
22   out costs.  I think that was the $4,000.00 to send off
23   to analyze or whatever they were in Colorado and the
24   lead paint or whatever it was?

A25  Yes.

Q    How often did you do something like that?

**M E T R O   C O U R T   R E P O R T I N G**

745 West Fourth Avenue, Suite 425

Anchorage, Alaska 99501

(907) 276-3876

A    Again, very infrequently.

Q    All right.  You were asked a question about being able
     to stop the work.  Did you ever stop the work on a job?

A    Yes.

Q    How often did that happen?

A    Again, infrequently.  But maybe every other hitch up
     there you might run across a small job you had to shut
     down for just a short period of time.

Q    Okay.  Is it correct that under the health, safety
     scheme that APC has that any employee can stop a job?

A    Yes.

Q    At one point you were saying oftentimes as the safety
     supervisor you got called to the field and you said it
     could be daily down to zero.  When you said daily, did
     you mean that you could be spending the whole day doing
     field work?

A    It's conceivable you could spend the whole day doing
     field work.  Sure -- yes.

Q    Okay.  Even in days you weren't doing field work, was
     the work in the office different than the work that the
     safety specialist did?

A    No.

Q    In regard to questions about writing procedures or
     rewriting procedures we talked about the NORM, the
     N-O-R-M which was --

A    Normally occurring radioactivity material.

M E T R O   C O U R T   R E P O R T I N G
745 West Fourth Avenue, Suite 425
Anchorage, Alaska 99501
(907) 276-3876

Q      Okay.  You indicate in your questions that was a

2      regurgitation or a cut and past of information that you

3      had gotten from, I can't remember, either the company

4      or some --

A      PAI.

Q      PAI, okay.  And you took from one or two or three

7      sources and wrote that up?

A      That's correct.

Q      As far as being asked about these various other memos

10     concerning PPC which is policies, procedures and.....

A      It's PPG.

Q      PPG, okay.

A      Policies, procedures and guidelines.

Q      Guidelines.

A      Yes.

Q      When you were involved in generating revisions of

17     those, were they done in the same manner as redoing or

18     doing the NORM PPG?

A      Oh, yes, definitely.

Q      How much time did you spend in meetings?

A      Not a lot.  I don't know.

Q      Okay.  Would it be an hour a week, hour a month?

A      It could.  A couple hours a week.

Q      Okay.  In regards to G-25, all those pieces of paper

25     with the checkmarks, and you indicated those were your

       checkmarks, was that based because some of those pages

1    had notes in your handwriting?

2    A    It looked like my handwriting, yes.

3    Q    The G-27 exhibit, let me just find that.

4         MS. ZOBEL:  Meeting agendas?

5         MR. COVELL:  Yes, meeting agenda and then the

6    meeting notes.

7    Q    (By Mr. Covell)  Are these the types of items that

8    would be similarly addressed in change out notes?

9    A    Yes.

10   Q    Okay.  And you indicated that at least on one of these

11   days, perhaps the February 13, that was either an

12   arrival or departure date for you, is that right?

13   A    Correct.  It could be the very next morning.

14   Q    You were going to do it at shift, if you know?

15   A    I think the 13th was a Wednesday, so it would have been

16   -- I would have arrived on Tuesday evening and this

17   would have been the first day I was on the Slope, I

18   believe looking at the --

19   Q    And just so I understand this, when you guys changed

20   out, did you, like, change out a whole crew at a time

21   or did you overlap so half the guys were there for a

22   week?

23   A    It's about 50-50.  It's about half the guys there.

24   It's not just a complete rollover of the crew.

25   Q    Okay.

A    You have to have continuity so the word can get passed

1       along there.

2       Q       All right.  Who was the boss in the health and safety

3               department when you were there?

4       A       Doug.

5       Q       Okay.

6                       MR. COVELL:  That's all I have.

7                       MS. ZOBEL:  Just a couple.

8                       **REDIRECT EXAMINATION**

9       BY MS. ZOBEL:

10      Q       You didn't do change out notes with safety specialists,

11              but rather your counterpart, is that correct?

12      A       Well it's -- for a good majority of the time I didn't

13              have a counterpart.  So, a lot of times it would just

14              be whoever was left over, like Bob Carrier, Ron Kirk,

15              Robert.....

16      Q       When you had a counterpart.....

17      A       Yes.

18      Q       .....the change out notes were for the counterpart, not

19              for the safety specialists general consumption?

20      A       Well, you know, yes.  I mean if the safety specialist

21              needed to see it, we did.  I mean there was no set

22              thing that says you can't see this.

23      Q       But your intent was to change out with your

24              counterpart?

25      A       Whoever that might be, that's correct.

        Q       Okay.  And if you were then getting there, getting

                **M E T R O   C O U R T   R E P O R T I N G**

1    change out notes and then having a safety staff

2    meeting, it was for the purpose of informing people who

3    were just coming in what had occurred while they were

4    gone as well from a management standpoint, was it not?

5  A    Yes.  It was an all inclusive meeting, so everything

6    that went on was regurgitated to -- well, for instance,

7    when I didn't have a change out partner, somebody, one

8    of the safety specialists would come to me if Doug was

9    gone and say, hey here's what's been going on.  So, I

10    would take that information, I'd pass it along to the

11    rest of the guys.

12  Q    Okay.

13  A    Somebody had to be the go-between with the information.

14  Q    In this correspondence that you talked about with APC,

15    prior to being employed.....

16  A    Uh-huh (affirmative).

17  Q    .....did it set out a specific number of hours straight

18    time and overtime hours that you would be expected to

19    work?

20  A    That I don't recall.  I'd have to find the paper and

21    look.

22  Q    Did it establish anything other than a day rate?

23  A    I don't recall that either.  It's -- I asked for and

24    received a specific letter of employment.  Prior to

25    that there was going to be no paperwork whatsoever, and

    they said just get on the plane and come and I says

160

1    (sic), no you guys need to send me something in writing

2    that states that I have a job with you so --

3    Q    Did it state that it was for a term certain, or was it

4    just that you had a job?

5    A    Again, I'd have to look at the paper, I haven't -- I

6    haven't looked at.

7         MS. ZOBEL:   I have no other questions.

8                    **RECROSS EXAMINATION**

BY MR. COVELL:

10   Q    All right.   Just to follow-up on that; was, to your

11   recollection, was the gist of the letter more

12   concerning what your job duties were going to be than

13   terms of employment time and money, or do you know?

14   A    It was just simply, if I recall correctly it was just

15   simply, this is a letter to inform you that you have a

16   job with APC and come on up.   So, again, I haven't --

17   I'd have to go look for that.

18   Q    You didn't want to get off the plane and hear who are

19   you?

20   A    Precisely.

21        MR. COVELL:   All right.   That's all I got.

22   (Off record)

23

24

25            **\* \* \*   END OF PROCEEDINGS   \* \* \***

           **M E T R O   C O U R T   R E P O R T I N G**
              745 West Fourth Avenue, Suite 425
                   Anchorage, Alaska 99501
                       (907) 276-3876

1                        **S I G N A T U R E**

2
STATE OF ALASKA          )
3                        ) ss.
THIRD JUDICIAL DISTRICT )
4

5            I, **JOHN D. GILBERT**, have read the foregoing

6  deposition and have made corrections thereto.  Any and all

7  changes, explanations, deletions and/or additions to my

8  testimony may be found on the correction sheet(s) enclosed with

9  this transcript.

10           _____

11           **JOHN D. GILBERT**

12

13 STATE OF ALASKA          )
                           )ss.
14 THIRD JUDICIAL DISTRICT )

15           THIS IS TO CERTIFY that on this _____ day of

16 _____ 2006, before me appeared **JOHN D. GILBERT**, to me
17 known and known to be the person named in and who executed the
18 foregoing instrument, and acknowledge voluntarily signing and
19 sealing the same.
20

21           _____
             Notary Public in and for
22           State of Alaska, at Anchorage
             My Commission Expires:_____
23

24

25

               **M E T R O   C O U R T   R E P O R T I N G**
                      745 West Fourth Avenue, Suite 425
                        Anchorage, Alaska 99501
                          (907) 276-3876

162

C E R T I F I C A T E

1

UNITED STATES OF AMERICA        )
2                                ) ss.
STATE OF ALASKA                  )
3

        I, Jerri Young, Notary Public in and for the State of
Alaska and Reporter with Metro Court Reporting, do hereby
certify:
5

        THAT the annexed and foregoing Deposition of **JOHN D.**
**GILBERT** was taken before Cheri Tabor on the 31st day of May
2006, commencing at the hour of 9:07 o'clock a.m., at the
offices of DeLisio Moran Geraghty & Zobel, P.C., 943 West 6th
Avenue Anchorage, Alaska 99501, pursuant to Notice to take said
Deposition of said Witness on behalf of the Defendant;

9       THAT the above-named Witness before examination, was
duly sworn to testify to the truth, the whole truth, and
nothing but the truth;

11      THAT this Deposition, as heretofore annexed, is a true
and correct transcription of the testimony of said Witness
taken by Cheri Tabor and hereafter transcribed by her;

13      THAT the original of the Deposition transcript will be
lodged in a sealed envelope with the attorney requesting
transcription of same, as required by Civil Rule 30(f)(1)
amended, that attorney being:
15

        **MS. PATRICIA ZOBEL**, DeLisio Moran Geraghty & Zobel,
16      P.C., Attorneys at Law, 943 West 6th Avenue, Anchorage,
        Alaska 99501;
17

        THAT I am not a relative, employee or attorney of any
of the parties, nor am I financially interested in this action.

19      IN WITNESS WHEREOF, I have hereunto set my hand and
affixed my seal this 19th day of June 2006.
20

21      _____
        Jerri Young
22      Notary Public in and for Alaska
        My Commission Expires: 11/03/07
23

24

25

**M E T R O   C O U R T   R E P O R T I N G**

745 West Fourth Avenue, Suite 425

Anchorage, Alaska 99501

(907) 276-3876