Kenneth L. Covell
LAW OFFICE OF KENNETH L. COVELL
712 Eighth Avenue
Fairbanks, Alaska  99701
(907) 452-4377 telephone
(907) 451-7802 fax

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF ALASKA

| | |
|---|---|
| JOHN GILBERT, | ) |
| | ) |
| Plaintiff, | ) |
| | ) |
| vs. | ) |
| | ) |
| APC NATCHIQ, INC. | ) |
| | ) |
| Defendant. | ) |
| | ) Case No. 3:03-CV-00174 RRB |

## MOTION AND MEMORANDUM OF LAW IN SUPPORT OF

## PLAINTIFF'S MOTION FOR PARTIAL SUMMARY JUDGMENT ON

## THE ISSUES OF GOOD FAITH AND WILLFULNESS

### GOOD FAITH

The defendant has conceded it failed to pay plaintiff Gilbert overtime wages when he was employed as a Safety Specialist.  An employer who violates the Federal overtime law is liable not only for the unpaid overtime compensation, but also in an additional equal amount as liquidated damages 29 USC § 260(b).  These liquidated damages represent compensation, and

not a penalty. Double damages are the norm and single damages are the exception. *Local 246 Utility Workers Union v. S. Cal. Edison Co.,* 83 F.3d 292, 297 (9th Cir. 1996), *Chao v. A-One Medical Services Inc.*, 346 F.3d 908, 919, 920 (9th Cir. 2003).

If an employer proves that it acted in subjective good faith and had objective reasonable grounds for believing that it's conduct did not violate the Federal Labor Standard Act (FLSA), then The Court has discretion to reduce the award of liquidated damages *Id.* The Alaska Wage and Hour Act (AWHA) has similar provisions AS 23.10.055, 23.10.060.

The burden of proof on the issue of good faith is upon the defendant employer.

> "To satisfy § 260, a FLSA liable employer bears the 'difficult' burden of proving both subjective good and objective reasonableness 'with **double damages being** the **norm**, and single damages the exception' *Alvarez v. IBP, Inc.,* 339 F.3d 894, 908-909 (9th Cir. 2003), citing *Herman v. S.R. Sec. Srv. Limited,* 172 F.3d at 142 (2d Cir. 1999). Where the employer fails to carry that burden we have noted, 'liqudated damages are mandatory.' " *Local 246 v. Cal. Edison*, 83 F.3d 292, 297 (9th Cir. 1996).

The employer must take the necessary affirmative steps to ensure compliance. *Alvarez* at 910. Failure to inquire into State law in regard to good faith is discussed in *Bailey v. Fred Meyer,* 100 P.3d 881, (Alaska 2004). AS 23.10.110(g). Inquiry into Alaska law however does not necessarily meet the burden of proof to demonstrate good faith by clear and convincing evidence AS 23.10.110(d).

## WILLFUL

There is generally a two-year statute of limitations under the FLSA. For a three year statute of limitation to apply, plaintiff must prove that the violation was willful. Willful is a term of art, the determination of which is a mixed question of law and fact. *Quinn v. ASEA*, 944 P.2d 468 (Alaska 1997). Mere negligence by the employer in determining it's legal obligation is not sufficient; there must be evidence that the employer affirmatively knew it was violating the FLSA or that it was acting with, "reckless disregard of the FLSA" *McLaughlin v. Richland Shoe*, 486 U.S. 128, 133, 135 n. 13, 108 S. Ct. 1677, 100 L.Ed. 2d 115 (1998) and *Alvarez v. IBP, Inc.,*

339 F.3d 894, 908-909 (9th Cir. 2003). A violation of the FLSA is willful if the employer knew

or showed reckless disregard for the matter where their conduct is prohibited by law *Chao* 346

F.3d 908 (9th Cir. 2003); *Cert. denied* 541 US 1030, 124S.Ct.2095 (2004.)

In *Alvarez* The Court said:

> An examination of the record verifies the propriety of the
> District Court's conclusion. IBP was on notice of it's FLSA
> requirements, yet took no affirmative action to assure compliance
> with them. To the contrary, IBP's actions may more properly be
> characterized as attempts to evade compliance, or to minimize the
> actions necessary to achieve compliance. IBP 'could easily have
> inquired into,' the meaning of the relevant FLSA terms and the
> types of steps necessary to comply therewith [citation omitted]. It
> failed to do so. The District Court appropriately applied § 255's
> three-year statute of limitation to IBP's willful conduct.

## FACTS

Plaintiff filed an extensive brief and exhibits in *Zuber v. APC*. Attached hereto as Exhibit

1 is the willful/good faith motion from Zuber in it's original form. A large portion of it is set out

in whole here. The citations to the Exhibits of the original motion are the ones used here as well.

For clarification purposes, these Exhibits of the original motion are annotated by the capital

letter, "O" before the Exhibit number; Example: Exhibit O-4.

In discovery, in the *Zuber* case, Plaintiff Zuber asked Defendant APC Natchiq what

actions, if any, it took to investigate the overtime acts and insure compliance. In Defendant's

First Supplemental Responses to Plaintiff's First Discovery Requests Answer to Interrogatory

no. 4, they indicated their response. See Exhibit O-4, pp. 1-4.

Additionally, when asked at his deposition, Mr. Nelson was asked:

Q: You spoke to Nancy Williams at ARCO about classification issues, you notified
Anne Hippe and the CFO about your concern about these issues, you spoke to Mr. Carr on a
number of conversations [sic~ and based on — okay, okay. Spoke to Mr. Carr a number of
times. Outside of those external resources, as it were — well, and you used the checklists.
Outside of those resources did you use anything else to make your decision concerning the
classification of safety specialists as exempt? If you recollect and I…

A: I don't believe so.

Nelson Dep. Tab O-AA (hereinafter N.D.) at p. 36

The evidence necessary to decide the issues of willfulness and good faith can be brought to bear by examination of the depositions as submitted, the supporting exhibits, and affidavits, and also the motions and affidavits and their exhibits, filed concerning this issues.

The more expansive description of the actions of Mark Nelson and his interactions with Randy Carr follows:

Mark Nelson, who in 1996 was the manager of the Kaparuk Field came across an article in Forbes magazine indicating that employers were at risk for paying huge blocks of overtime. In response, thereto Nelson made inquiry of ARCO concerning their treatment of certain positions as exempt or nonexempt.[1] Ex. O-4, pp. APC 0137-0138, Tab O-AA, N.D. at 16. Nelson notified the people in his financial department concerning his concern. Tab O-AA, N.D. at 17, lines 8-14. He also sought guidance from ARCO, a company that APC did significant business with and was also mentioned as a defendant in the Forbes article, concerning the issues of exemption from overtime. Tab O-AA, N.D. pp. 22, 23. ARCO's response was somewhat guarded and not very helpful to Nelson in his inquiry.  Tab O-AA, N.D. p. 24, lines 5-23. Eventually Nelson obtained some "check lists" and explored the exempt/nonexempt status of a number of positions. Ex.O-4, pp. APC 0148-0157. Besides being concerned about whether or not certain positions were exempt, Mr. Nelson was also concerned over whether or not certain supervisors, even though exempt were entitled to be paid straight time wages for all hours worked even though exempt. Tab O-AA, N.D., p. 19. In addition he was concerned about the issue of whether or not exempt employees could be paid at a day rate. See Chris Boyle letter to Mark Nelson, April 4, 1997. Ex. O-4. APC 0180-0181.

Nelson also conferred with Randy Carr of the State Department of Labor Wage and Hour Division. There were two letters from Nelson to Carr and one letter from Carr to Nelson.

Plaintiff Ex. O-4, pp. 201-204.  The correspondence, at least initially speak for themselves and address the issues of exemption for position of "Materials Supervisor".

Mr. Carr responded with his letter of June 26, 1997 also notated as Wage and Hour Opinion Letter (WHOL) No. 122. It addresses the exempt status of the position called "Material Supervisor" and also discusses payment of straight time wages for employees in a supervisory capacity, being paid for all hours worked.[2]

Mr. Nelson has testified that Mr. Carr told him that the position of safety supervisor was an exempt position, and he has, in good faith, relied on that opinion from 1996 through 2003 in classifying that position as exempt. Tab O-AA, N.D. at p. 19; p. 32, line 24 - p. 33, line 15. Mr. Nelson did not send a position description to Mr. Carr nor could he recollect at the time of his deposition what he told Mr. Carr the duties of the safety specialist were. Id. When initially asked about the duties of safety specialists at his deposition he responded that the safety specialist was the eyes and ears of management in the field. Tab O-AA, N.D. p. 7, lines 3-12.

## RANDY CARR'S DEPOSITION

Mr. Carr described at his deposition the Department of Labor, Wage and Hour opinion letters and the practice and policy of both the department and himself in giving opinions as to the exempt status of positions.

---

[1] Plaintiff notes that indeed the <u>Forbes</u> article seems to involve the salary basis test as opposed to the duties test, as to whether or not employees were exempt or nonexempt.

[2] Plaintiff notes that even in Carr's letter of April 26, 1997, the complexity of the application of the wage and hour case law statutes and regulations was illustrated to Mr. Nelson wherein at page 2 of his letter he states,

> "The explanation as to why employees in a supervisory capacity must be paid for all hours worked is not found in the regulations. It must be pieced together from the statutes and court rulings. The U.S. Supreme Court has held that employees who are not exempt from minimum wage must be paid for all hours they are 'suffered or permitted' to work".

Such commentary ought to have put Mr. Nelson on notice that it was necessary for an in-depth and thorough review of any positions he was considering the classification as exempt or nonexempt.

Mr. Carr generally indicated that in order for an employer to safely rely upon an opinion of the department in defense to an action of the department for an enforcement of overtime, they would need to have a written formal Wage and Hour Opinion Letter (WHOL). He indicated that if individual asserted that they had a verbal telephone conversation with the department concerning exemption of a position that the department would still pursue them in an appropriate wage and hour action. Carr stated the reasons for this were that often time whether with malicious intent or not the people that contact him for opinions are not aware of what the actual job involves.  He indicated that job descriptions while interesting and read by his department did not always reflect the actual duties of what an employee did "on the ground". He further indicated that especially with the 20 and 40 percent time test for state wage and hour act questions it was absolutely essential to have a break down of both duties f the position and time spent in duties in order for the department to make any type of sensible determination about whether or not the employees are exempt or nonexempt. He further indicated that he would offer an opinion orally if asked about the exemption or nonexempt status of a position. However, it was his practice to always include language in these phone conversations that if you want a formal opinion, you need to get it in writing and other language to that effect. See Carr Dep. (hereinafter C.D.) generally Sept. 8, 2003, Tab O-BB

He also indicated that another reason why the opinions ought to be in writing was exactly what he perceived the issue to be. In the instant case to be that when you come back four, six or eight years later, peoples memories faded and exactly what may or may not have been said during the course of telephone conversation that many years ago is at best speculative.  For example, see O-C.D. at p. 16:

> Q:  Okay. Now, the WHOL is a wage and hour opinion letter. Does the department give oral opinions as to whether or not an employee or position would be exempt or nonexempt?

A:  It is not our practice. That is not to say that someone in my office or even myself in discussing something that somebody might say, "well, you know that doesn't sound like its exempt" or "that sounds like my nonexempt — might be exempt." But the practice is if somebody wants to pursue that then they need to give us the facts in writing because we want to make sure that the fact they are presenting to us are on paper so that we can — we can point to the document six years later and say that these are facts upon which we based that opinion. And most of our opinions contain a caveat — I see this one doesn't but most of our opinions contain a caveat that this is in fact limited to this fact and this fact pattern and this position and shouldn't be applied to any other.

Q:  Okay, when you say this one, you are referring to WHOL 122.

A:  122, yes.[3]

Mr. Carr also noted that the checklist forms used by Mr. Nelson m.D. Tab O-4, pp. APC 150-151) (entitled "test for exemption") were not forms from his office and he had not seen them before; in part ascertaining this by observing that those checklists concerned federal standards. Tab O-BB, O-C.D. at 17, line 21 - p. 18, line 21. Carr further indicated that it would reasonable for an employer to rely upon a determination in paying an employee as exempt or nonexempt pursuant to a formal opinion letter (WHOL). Tab O-BB, C.D. p. 21, lines 12-17.

He further noted he had the opportunity to listen into a number of hearings concerning a good faith defense under state law, and that one of the concerns was that the use of the good faith defense may have been asserted as just a subjective opinion of the individual making the inquiry. Tab O-BB, C.D. p. 21, lines 18 — p. 22, line 11. When he was again asked whether there is such a thing as an opinion concerning exempt or nonexempt status. Tab O-BB, C.D. p. 23, lines 10— p. 24, line 12.  He concludes that response by saying an oral response is "nothing more than just theoretical."

On being questioned as to whether it would be reasonable for an employer to rely upon what might be called an oral opinion, Mr. Carr again expressed his concerned the need to have the entire opinion in writing in order to avoid misunderstanding. Tab O-BB, C.D. p. 24, line

---

[3] Plaintiff's notes that WHOL 122 pertains to the materials supervisor and not the safety specialist position.

24—p. 26, line 10. He further indicated that in these conversations as "generally a part of our patter" that if you want a formal opinion this is how you go about getting it, and in other circumstances, he frequently would refer people to legal counsel. Tab O-BB, C.D. p. 26, lines 10-22. In response to defendant's counsel's questions about "oral opinions" he finishes his response by saying "but if you want a formal opinion from the department you need to put it in writing and send it to Randy Carr". Tab O-BB, C.D. p. 35.

Other ways Carr has indicated an employer might indicate good faith would be to have an opinion letter from the U.S. Depa~ent of Labor. Tab O-BB, C.D. p. 38, lines 3-23. He further indicated that at the legislative testimony regarding adoption of a good faith defense by the state, that there was discussion that the U.S. Department of Labor procedures issued formal written opinion letters; and that they would be an excellent method of establishing that the proper steps had been gone through to show that an employer was trying to do what was right. Tab O-BB, C.D. p. 39, lines 6-21. Carr further indicated that consulting an attorney would arguably be a good step to show good faith, although to his knowledge that was untested in the courts. Tab O-BB, C.D. p. 39, lines 22—p. 40, line 1. His testimony concerning whether or not a "oral opinion" could be used as a defense is to a wage and hour action to recover unpaid overtime is found at Tab O-BB, C.D. p. 40, lines 6-21 and p. 42, lines 10-13. Carr also indicated that it was his practice to preface discussions with persons seeking information about exempt status, that it would be prudent to get a formal opinion letter and he indicated it was his practice both after the good faith defense was enacted. Tab O-BB, C.D. p. 45, line 25 - p. 46, line 19.

In relation to Mr. Carr's concerns about needing to have things in writing and the lack of specificity of a job description (see Tab O-BB, C.D. at pp. 5-11 and p.49. line 16—p. 50, line 3).

When Mr. Cart was asked whether he considered it imprudent not to get a formal opinion, he answered:

> Yes, I do, I think an employer is at risk if they act upon the verbal advice
> without —without giving the department an opportunity to see all the facts and to

provide something in writing that they can later produce as their guidance from the official source, i.e., the department.

Further questioning of Mr. Carr concerning the effect of an oral opinion on prosecution of the claim by the department revealed the following:

Q: Okay. In response to some questions about oral opinions you indicated that you used and I believe you said your specialist used the phrase — if somebody gave you an opinion, you said, well, it sounds like it might be, and then exempt or nonexempt. Is my understanding of your testimony correct that you use that as a matter of routine in your conversation when you make an oral opinion?

A: That and other statements to — to clarify that my oral opinion is only as good as the facts I'm given, and I don't know what the facts are because you've —they're being represented and they might — I might be misinterpreting them, I don't have something on black and white that we can nail down and examine at a future date.

Q: Assuming Mr. Nelson asks you a question about the exemption of safety specialists back in 1997 or so, based on your practice would you say that you made that statement or statement of that nature to them at the time?

A: I would certainly hope so, it is my practice.

Tab O-BB, C.D. p. 55, line 3 — p. 56, line 6.

Q: All right, so just to be clear, not to be redundant, the answer to the question is yes, that it would be imprudent for an employer not to get a formal DOL opinion?

A: I think it would be risky behavior.

Tab O-BB, C.D. p. 55, lines 2-12.

The department keeps a registry of wage and hour opinion letter which is available on the world wide web, the index of which is attached to this memorandum at Tab O-CC. There are approximately 158 opinion letters issued since 1982. Mr. Carr indicates that these opinion letters contain all the materials that the department relied upon in making its decision and the information before it is available for future reference. Tab O-BB, C.D. p. 8, lines 13-18, and generally C.D. p. 5, line 11—p. 13, line 25.

Additionally, during the course of that testimony Mr. Carr notes that when speaking in reference to WHOL and other formal opinions:

> Those are the only types of formal opinions that we issue. We model this somewhat after the U.S. Department of Labor's administrative practice. They have private letter ruling and in some instances, like the IRS uses, and I imagine a lot of federal government agencies use those, that address specific situations as posed by someone, maybe an employer, maybe an employee.

Tab O-BB, C.D. p. 12, lines 20—p. l3, line l.

## WARNINGS TO NELSON

Besides Carr's practice to give admonitions to people requesting opinion letters to "get in writing" and his admonition as noted in footnote 2, supra, in his letter of June 25111 concerning the complicated nature of wage and hour regulation; Nelson was "warned" numerous times during the course of his inquiry as to the complicated nature of the wage and hour regulation. Referring to Tab O-AA, N.D., 38 at line 20, Nelson reads from some of the materials he was reviewing at the time:

> A:  One of the more complex areas of the FLSA is its classification of certain employees as exempt or excluded from coverage by the overtime requirements or the law.  An employee is presumed to be nonexempt, parenthesis, 'covered by the law and entitled to receive overtime pay', comma, 'unless the employee (sic) can show that the employee's job duties and meet certain criteria'.
>
> Q:  Did you review that material when you did this review back in '96, '97? Did you read this paper, 163?
>
> A:  I — I sure did, sure.
> Q:  Okay, and did you read the Forbes article which is perhaps — would you agree to paraphrase it is sort of says that this area is a quagmire that's a fair way to characterize that article. I don't really recall I haven't read it recently, but okay, it's kind of a watch out article isn't it?
>
> A:  Oh, sure, that was my -- set my alarm bells off yes.

Tab O-AA, N.D. p. 38, lines 20—p. 39, line 10.  Page 163 referred to therein is Plaintiff's Dep. Ex. O-4, p. APC 0163.

Mr. Nelson was further asked during his deposition whether he looked at and consults the Code of Federal Regulations on his own to which he responded no. Tab O-AA, N.D. p. 52, lines

6-14.  Had Mr. Nelson or his counsel read the CFR's he may have encountered the interpretive

text of 29 CFR § 5 541.207 read to him at his deposition (Tab O-AA, N.D. p. 52, line 15-22)

which would have been an additional warning to Nelson. It says in part:

> It has been most frequently misunderstood and misapplied by employees of
> [sic]cases involving the following:
>
> 1.  confusion between the exercise of discretion and independent judgment
> and the of skill in applying techniques~ procedures or specific standards;
>
> 2.  misapplication of the term to employees making decisions making
> decisions relating to matter of little importance.

Another warning to Mr. Nelson concerning the problems in ascertaining exempt or nonexempt

status is found at Tab O-4 APC p. 0155, which states in part:

> Note the distinction between exempt and nonexempt can be very difficult to
> discern in certain cases if you have any doubt consult the U.S. Department of
> Labor and your attorney.

Tab O-AA, N.D. p. 69, lines 4-8. When inquired as to whether he ever consulted the U.S.

Department of Labor he indicated no and inquired whether he ever consulted an attorney

he answered no. Tab O-AA, N.D. p. 69, lines 11-13.

At the time Mr. Nelson was also warned by Mr. Boyle the head of Human

Resources:  Additionally, he inquired concerning a letter from Mr. Boyle of April 4,

1997, Tab O-4 APC p. 0182.

Mr. Boyle indicated:

> I know this information may be more than you were looking for, but determining
> proper procedures under the federal and state wage and hour laws is very
> complex.  In speaking with the department, they are often unclear on many issues
> related to exempt status. It appears case law rulings are often contradictory
> resulting in the uncertain application of the regulations. Of course this creates
> even more uncertainty for employers.

Tab O-AA, N.D. p. 69, lines 14-20. WhenNelsonwaS asked these statements and

additional similar ones were a warning that he ought to be very careful in classif~iing

employees, he answered "that's the way I interpreted it, yes". Tab O-AA, N.D. p. 70, lines 12-16.

Interestingly, given all these warnings and being aware of the intricacies of these issues Mr. Nelson chose not to obtain a written wage and hour opinion letter from either Randy Carr at the Alaska Department of Labor and/or United States Department of Labor and/or private counsel.

<u>ANALYSIS</u>

Today we are faced with whether or not this conduct shows that "an employer disregarded the very internal 'possibility' that it was violating the statute". *Alvarez v. IBP*, p. 11 of 19, Lois Law Ed. Section VI, citing *Herman v. RSR Security Svs.*, 172 F.3d 132, 141 (2nd Cir. 1999). Illustrative of the reasons why the State Department of Labor, and Mr. Carr, and apparently the Federal Department of Labor; require written opinions in order to show good faith is demonstrated in this vary case. Mr. Nelson was asked why he obtained a formal opinion letter in this case about other positions but not of the "Material Supervisor." He indicated there were changes in positions with foreman and warehouseman:

> Q: Okay, do you recollect which positions and what adjustments you might have made?

> A: The one that I ended up telling the superintendent to change were the warehouse, its foremen and warehousemen.

> Q: And they got changed from?

> A: Exempt to nonexempt.

Tab O-AA, N.D. p. 26, lines 9-14.

Further discussion concerning the determination letter for warehousemen begins at page 37, line 11 indicating that the warehousemen were adamant that they were professionals and inferred that they wanted to be classified as exempt hence he got the

opinion letter from Mr. Carr. Tab O-AA, N.D. p. 37, line 11 — p. 38, line 2. What's troubling about this statement of Mr. Nelson is that WHOL No. 122 concerns "Material Supervisor" not a warehouseman, and it shows that the material supervisor can be classified exempt, as opposed to nonexempt. Therefore, by historical fact and records kept in a regular business of the Department of Labor, Mr. Nelson's testimony in regard to his reasoning and actions at the time, is unquestionably incorrect.

### WHAT CONCLUSIONS CAN WE DRAW FROM MR. NELSON'S FACTUALLY INCORRECT TESTIMONY?

Based upon a review of the index for opinion letters, it does not indicate there is an WHOL that concerns warehousemen or positions of that nature; when reviewed in total and/or examined around the time of June 26, 1997 when wage and hour opinion letter concerning "Material Supervisors" was issued. This testimony illustrates the very reason why the State Department of Labor only issues a formal opinion letter. If one attempted to rely upon the misrecollection of the individuals such as Mr. Nelson, and the recollections of Mr. Carr about purported determinations made six or seven years ago, the court would find that no reliable determinations can be made.

One could draw the conclusion that Mr. Nelson is being purposely untruthful. Putting that possibility aside the other conclusion is that Mr. Nelson is seriously misrecollecting the situation. If he remembers getting a formal opinion letter about warehouseman being classified as a nonexempt, when in fact it appears that he got a letter about a "Material Supervisor" being classified as exempt, any of his recollections about his conversations with Mr. Carr simply cannot be relied upon. At the time of his deposition, he really did not recall what he told Mr. Carr the safety specialist job duties were. That in and of itself would made any reliance upon how Mr. Carr's purported opinion about the exempt or nonexempt status of safety specialist unreliable. However,

given this painfully clear illustration of why memory ought not to be relied about upon in a situation such as this, the court can only reach the conclusion that the necessary steps were not taken to ensure that APC was not subject to the very possibility that it was violating the Wage and Hour Act.

APC has employed numerous safety specialists over the years and is not difficult to envision class action suit over a matter such as this ranging into the millions of dollars. See Zuber Affidavit in Support of Cross Motion for Summary Judgment on the Issues of Willfulness and Good Faith, Ex. O-DD.

### IS IT RECKLESS DISREGARD OF THE POSSIBLE VIOLATION UNDER THE FLSA FOR A BUSINESS WITH THE POTENTIAL LIABILITY IN EXCESS OF MILLIONS OF DOLLARS TO RELY UPON A "ORAL OPINION" OTHERWISE UNCOMMEMORATED WHEN IT MAY BE AT RISK FOR SUCH SUBSTANTIAL SUMS

A fair-minded person would have to answer the question yes, its reckless conduct on behalf of APC.

The reasonable steps that a subjectively reasonable businessperson would take under these circumstances would be to obtain the written opinion letter, which the system makes available to it for this very purpose.

### DEFENSE OF GOOD FAITH RELIANCE ON ADMINISTRATIVE REGULATION

**§ 790.13 General nature of defense** indicates:

> (a) Under the provisions of sections 9 and 10 of the Portal Act, an employer has a defense against liability or punishment in any action or proceeding brought against him for failure to comply with the minimum wage and overtime provisions of the Fair Labor Standards Act, where the employer pleads and proves that 'the act or omission complained of was in good faith in conformity with and in reliance of any administrative regulation, order, ruling, approval, or interpretation' or 'any administrative practice or enforcement policy * * * with respect to the class of employers to which he belonged.' In order to provide a defense with respect to acts or commission occurring on or after May 14, 1947 (the effective date of the Portal Act), the regulation, order, ruling, approval,

> interpretation, administrative practice or enforcement policy relied upon and conformed with must be that of the 'Administrator of the Wage and Hour Division of the Department of Labor,' <u>and a regulation, order, ruling, approval, or interpretation of the Administrator may be relied on only if it is in writing.</u>

See notes to decision 29 CFR, 790.13 indicating this regulation applies to FLSA 29 U.S.C. § 260 citing to *Kennedy v. Critical Intervention Services, Inc.*, 199 F.2d 1305 (M.D. Fla. 2002).

From this CFR, it appears that a good faith defense under the federal act cannot be relied upon unless it is in writing. The reasons for such a regulation, the plaintiff suggests, are abundantly clear based upon the facts of this case.

Even if the writing is required, it is clear that APC was not acting in good faith.

## THE STATE ACT

As far as the State Act goes, there is no good faith unless inquires are made into Alaska law AS 23.10.100(d). Defendant suggests arguably in this instance no inquiry was made into Alaska law, while Mr. Carr may be a knowledgeable individual is not an attorney.

Even if oral inquiry of Mr. Carr can be considered an inquiry under Alaska law, while the inquiry was made, the court can find that no comprehensive response was made; as it is Carr's practice to inquires, that if they want a formal opinion they need to get it in writing.

## OTHER ACTIONS OF THE DEFENDANT SHOW BOTH LACK OF GOOD FAITH AND RECKLESS CONDUCT

### FAILURE TO PAY FOR ALL HOURS WORKED

Mark Nelson, in obtaining WHOL 122, demonstrated that APC was well aware of it's need to comply with the AWHA and FLSA. He demonstrated the ability to submit the appropriate materials to Randy Carr at the Dept. of Labor and obtain a State Department of Labor determination. He demonstrated that he could obtain a letter which would exempt APC from liquidated damage liability.

Randy Carr's WHOL letter 122 had further information and direction for APC and Mr. Nelson.  It tells Mr. Nelson that employees who are supervisors are entitled to be paid for all hours worked.  Exhibit O-BB (Deposition Exhibit O-6, APC 0203-0204).

For example, if an employee worked as a supervisor and was exempt under a supervisory exemption, they might work a twelve-hour day.  Should they work a thirteen-hour day, they would receive one extra hour of straight-time pay.

Mark Nelson, Christopher Boyle, and Doug Smith were all asked at their depositions whether they were aware of any payments that were made to any APC employees for all hours worked.  Nelson 2006 Deposition (Exhibit C) p.27, line 7 through p.30, line 15; Smith (Exhibit D) 2006 Deposition p.51, line 17 through p.62, line 22.

They were aware of no such incidents.  Further, in plaintiff's request for discovery of February 17, 2006, defendant was asked, in Interrogatories No. 22 and 23, Exhibit E, to describe how material supervisors and/or any supervisors were paid for all hours they were expected to work.  Defendant would not answer the question.

Clearly, what this demonstrates is a total lack of good faith effort on the part of defendant to comply with the law.  There is no evidence that APC ever paid any supervisor "for all hours worked," see Boyle deposition, Exhibit B, p.70, line 17 through p.78, despite the fact that they had a written directive to do so from the State Department of Labor.

## NO RECORDS

Attempting to ascertain the circumstances of defendant's reclassification of the safety specialist from exempt to nonexempt, counsel asked Douglas Smith (the individual who did the reclassification, and was designated by the defendant as most knowledgeable about it) the following:

> Q:  Let me be as hopefully direct and clear as possible.  What I envision is perhaps there is a file folder that says, review of safety specialist [Safety Supervisor] job for transfer from exempt to non-exempt, and there being, you know, 2 or 10 or 50 papers in there.

A:  None that I have been able to locate.
Smith (Exhibit D) 2006 Deposition p.13 lines 9 through p.14, line 3.

It may have been tactically wise for APC to have no written record here, even thought they changed the name of the position from Safety Supervisor to Safety Coordinator.  Such information could be used by plaintiff to show that the position was later reclassified from exempt to nonexempt.   Additionally, there might be other important uses to plaintiff of such materials.  Were APC acting in good faith, they probably would have created and/or preserved such a record.  However, it would appear that the lack of a paper trail here, is yet one more attempt by APC to evade the AWHA and the FLSA.  It seems that not only Mr. Boyle's Human Resources department has no binders, paper records or files concerning classifications and reclassifications of positions; the people in the field that actually did reclassifications, have no paper record as well.  In this instance, Doug Smith reclassifying Safety Supervisor from exempt to nonexempt (and changing the name of Safety Coordinator; and in a prior instance Mark Nelson on the Safety Specialist position) see depositions of Boyle, Nelson and Smith.

## FAILURE TO PAY 90-DAY PENALTY

AS 23.10.110(a) provides for liquidated damages under the AWHA in the amount equal to the overtime damages awarded.  AS 23.05.140(b) provides that, once an employee is terminated, his wages become due within three days.  AS 23.05.140(d) provides that, if an employer violates section (b), the employer may be required to pay the employee a penalty in the amount of the employee's regular wage, salary, or other compensation from the time of demand to the time of payment, or for 90 working days, whichever is the lesser amount. Plaintiff made a demand for payment in this matter on May 2, 2006, received by defendant's counsel on May 4, 2006; 90 days have since lapsed.

Defendant's failure to pay Gilbert wages and overtime, it absolutely knew it owed from a year ago, is absolute evidence of a lack of good faith. It again shows a willfulness to violate the FLSA. It may make some tactical sense, but it destroys any defenses to good faith and willfulness.

## OTHER EVIDENCE OF RECKLESS CONDUCT GARNERED FROM THE DEPOSITION OF CHRIS BOYLE

The Boyle deposition is rife with evidence of reckless conduct in regard to classifying employees as exempt or nonexempt. Boyle is and was the Director of Human Resources for APC, Boyle Deposition, Exhibit B, at p. 5, lines 11-12. Boyle indicates that in evaluating persons in their positions for exempt status that it is the procedure of APC to have that done by employees in the field, Boyle Deposition, Exhibit B, at p.7, line 10 through p.21, line 13. [4] When asked in his deposition, p.25, line 14, as to what exemption the safety supervisor might be exempt under, administrative professional or executive, he responds he does not know, p.25, lines 14-19. Yet, when asked at the end of his deposition if he might testify at trial, he indicates that he would and furthermore that it would be his opinion that the safety supervisor position was exempt from overtime, p.78, line 24 through p.79, line 7. Yet he again, acknowledges that he does not know what exemption it might be under p. 80, lines 7-11.

When Boyle is asked about documentation regarding field people making decisions on exemptions and/or nonexemptions, "Is there any paperwork trail that would accompany that consideration?" he replies, "Not that I'm aware of on this particular document here," p. 32, lines 18-23. Boyle does acknowledge that if someone else where trying to decide what happened in regard to a review of exempt/nonexempt status, then having paperwork would be useful, p. 34, line 16 through p. 35, line 7.

---

[4] This alone demonstrates a wanton recklessness in regard to FLSA. Leaving the often times confusing and difficult task of classifying employees and/or positions as exempt or nonexempt to individuals in the field with unknown expertise, in no way can be said to meet the objectively reasonable standard of good faith. It can only be said that making a determination in that manner is a reckless disregard of the FLSA.

Boyle is not aware of any positions considered for classification by APC where an hour by hour analysis was done (for the 20% rule), p. 42, lines 7-10.  Boyle is willing to give his opinion as to whether or not the safety supervisor position is exempt.  However, when asked, "Okay.  What have you done on this case so far?" he responds, "A:  Nothing" p. 49, lines 16-17.

Boyle and Nelson's correspondence, Exhibits, shows that there is a discussion between them concerning the exemption/nonexemption of supervisory positions, such as nonexempt Foreman, p. 61, line 2.  Boyle does not agree that the concern about a nonexempt or working Foreman would be something that would apply to the safety supervisor position, p.61-63 (Is this a good faith effort to comply?).  Boyle does agree that Wage and Hour Law is very complex, p. 65, lines 12-16.  In fact, the entire deposition is filled with similar examples of reckless disregard for the AWHA and FLSA.

As Judges Cudahy, O'Scannlain, and Gould said in *Chao,* at p.919 n.7; and as, Judges Nelson, Thomas, and Illston, said in *Alvarez* at p.908; it would appear that APC's actions in this case are not ones of an attempt to comply, but rather ones of an attempt to evade the AWHA and FLSA.  The actions of defendant in this matter are clearly willful.  If there is willfulness, there can be no good faith, *Ellwell v. University Hospital Home Care Services,* 276 F.3d 840, n.5 (6th Cir. 2002).  Defendant cannot demonstrate good faith on a record like this.

### CASE LAW AND CITES ON GOOD FAITH

"FIE's feeble efforts evince the opposite of good faith and instead, demonstrate a 'knowing or reckless disregard' of FIE's overtime obligations under the FLSA as to those CRs found by this Court to be nonexempt. …As mentioned, one troubling aspect of FIE's post-Bell conduct is FIE's director of Class Action Coordination's testimony that he alone determined that FIE CRs were exempt and that he did not seek counsel's formal advise on the issue.  FIE waived any reliance on an advice of counsel defense, which it was entitled to do, thus preserving the attorney-client privilege and preventing discovery of the substance of any communications.  I do not draw any inference, adverse or otherwise, as to what counsel's advice may have been.  Nonetheless, that FIE did not seek formal advice of counsel is substantial evidence that FIE disregarded it's duty of inquiry under the circumstances.

Farmers Insurance Exchange Claims Representatives' Overtime Pay Litigation, 336 F.Supp.2d at

1107, 1108-1109 (D.Or., 2004).

In *In re Farmers* 300 F.Supp.2d 1020 (D.Or., November, 2003), the Court said,

> "…while FIE's failure to obtain a formal opinion of counsel or the DOL, in the aftermath of the *Bell* decision in view of ongoing litigation may be understandable, it is not objectively reasonable in terms of FIE's obligation to make a good faith effort to comply with the requirements of the FLSA in various state overtime laws.  As noted, in *Martin,* ignorance 'will not exonerate the employer under the objective reasonableness standard,' 940 F.2d at 907, and neither does negligence. See *Ellewell* 276 F.3d 840.  In summary, I conclude that FIE has failed to satisfy its burden with respect to both the § 259 and § 260 good Faith defenses…"

In *Tumlty v. FedEx Ground* 2005 WL 1979, 104, The Court said,

> "…Fed Ex Ground did not present any other evidence to show that it had objectively reasonable grounds for believing that its conduct did not violate the FLSA…Fed Ex Ground's subjected good faith [] has no bearing on whether it had objectively reasonable grounds to believe that its conduct did not violate the FLSA."

That same comment, arguably applies to this case.  Whether or not APC, or it's

employees, wish to claim that they really believed they were doing the right thing, an objectively

reasonable person simply will not believe that a personnel department that has no job

descriptions in it's files; and no records whatsoever of the written records of the eligibility of it's

employees right to overtime is acting in good faith; particularly when they have internal

memorandum from nearly ten years ago saying that job positions need to be critically analyzed

to see whether or not the employees are entitled to overtime compensation.  Further that the

internal correspondence indicate that they should be especially aware of, "working Foreman type

jobs".  The defendant may believe what it wants, however, a reasonable person observing the

situation from the outside simply will not go there.  The facts of what APC did and does are not

in dispute.  The Court should rule that APC has not meet it's difficult burden to show that it was

acting in good faith, and further should find that it's actions in violating the FLSA rise to the

level of reckless disregard of the act.

## CONCLUSION

The burden of proof is on the defendant to prove good faith.  It is clear that defendant, even at this late date in litigation, has no indication as to which exempt category Mr. Gilbert is in, for them to say that they can establish by clear and convincing evidence, they place him in an appropriate category is totally unfounded.  The evidence bearing on good faith is the same evidence that bears on willfulness.

It is clear that the defendant, by their actions, have to intention of following the FLSA and the AWHA.  They knew they had a potential problem with overtime, as acknowledged by Mr. Nelson's actions back in 1997.  Mr. Boyle's letter indicates that all the positions ought to be reviewed comprehensively.  Mr. Carr's letter indicates that APC needs to pay all supervisors for all hours worked.  This was not done, and defendant has no shred of evidence that they even attempted to follow this written directive in an official AWHA letter.

They knew they should have paid Gilbert as of August 2005, for overtime and acknowledge their liability as such, but failed to do so.  The evidence goes on, and on, and on, and on.

The Court should find that defendant did not act in good faith in this matter and that actions violating the FLSA are willful.

Respectfully submitted this 4th day of August, 2006 at Fairbanks, Alaska.

LAW OFFICES OF KENNETH L. COVELL
Attorney for John Gilbert

s/Kenneth L. Covell
712 8th Ave.
Fairbanks, AK 99701
Phone:  907.452.4377
Fax:  907.451.7802
E-mail:  kcovell@gci.net
Attorney Bar #:  8611103

**CERTIFICATE OF SERVICE**

This is to certify that a copy of the foregoing has been
Electronically sent to the following attorney(s):

**Patricia Zobel**
**DeLisio Moran Geraghty & Zobel**
**943 W. 6th Ave.**
**Anchorage, AK 99501**

Dated: 8/04/06
By: ____/s/ Emily S. Ervin_____
      Emily S. Ervin for Kenneth L. Covell