IN THE UNITED STATES DISTRICT COURT

1

FOR THE DISTRICT OF ALASKA

2

JOHN GILBERT,                        )
3                                    )
        Plaintiff,                   )
4                                    )
    vs.                              )
5                                    )
APC NATCHIQ, INC.                    )
6                                    )
        Defendants.                  )   Case No. 3:03-CV-00174-RRB
7 _____    )

8

**DEPOSITION OF CHRISTOPHER B. BOYLE**
9                    **June 1, 2006**

10

**APPEARANCES:**
11

        **FOR THE PLAINTIFF:**        **MR. KENNETH L. COVELL**
12                                    Attorney at Law
                                      712 Eighth Avenue
13                                    Fairbanks, Alaska 99701
                                      (907) 452-4377
14

        **FOR THE DEFENDANT:**        **MS. PATRICIA L. ZOBEL**
15                                    DeLisio Moran Geraghty &
                                      Zobel
16                                    Attorneys at Law
                                      943 West Sixth Avenue
17                                    Anchorage, Alaska 99501
                                      (907) 279-9574
18

        **ALSO PRESENT:**            **MR. JOHN GILBERT**
19
                              * * * *
20

21

22

23

24

25

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

Pursuant to Notice, the Deposition of **CHRISTOPHER B. BOYLE** was taken on behalf of the Plaintiff before Cheri Tabor, Notary Public in and for the State of Alaska, and electronic reporter for Metro Court Reporting at the offices of DeLisio Moran Geraghty & Zobel, 943 West Sixth Avenue, Anchorage, Alaska, on the 1st day of June, 2006, commencing at the hour of 9:00 o'clock a.m.

* * * *

**TABLE OF CONTENTS**

Direct Examination by Mr. Covell ................... 4

**METRO COURT REPORTING**

*745 West Fourth Avenue, Suite 425*

*Anchorage, Alaska 99501*

*(907) 276-3876*

1

<u>**EXHIBITS**</u>                                                      <u>**PAGE**</u>

2

B-1 –  Memo, 12/26/96, Boyle to Dieckmeyer et al ... 15
3          B-2 –  Position description, Safety Supervisor ..... 32
          B-3 –  Memo, 12/7/96, Nelson to Hippe & Osborn ..... 53
4          B-4 –  Memo, 4/4/97, Boyle to Nelson & Schick ...... 59
          B-5 –  Letter, 6/19/97, Nelson to Carr ............. 68
5          B-6 –  Letter, 6/25/97, Nelson to Carr ............. 69

6                          *  *  *  *

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

**METRO COURT REPORTING**
*745 West Fourth Avenue, Suite 425*
*Anchorage, Alaska 99501*
*(907) 276-3876*

1              **P R O C E E D I N G S**

2        (On record)

3              COURT REPORTER:  We're on record.  My name is

4  Cheri Tabor and I'm a court reporter with Metro Court

5  Reporting in Anchorage, Alaska.  Today's date is June 1, 2006,

6  and the time is approximately 9:00 a.m.  We are at the offices

7  of DeLisio Moran Geraghty & Zobel, P.C., 943 West Sixth

8  Avenue, Anchorage, Alaska 99501 for the deposition of Chris

9  Boyle.  This case is in the United States District Court for

10 the District of Alaska in the matter of <u>Gilbert vs. APC</u>, Case

11 Number 3:03-CV-00174 (RBR).

12       Sir, would you please raise your right hand so I could

13 swear you in.

14       (Oath administered)

15             MR. BOYLE:  I do.

16             **CHRISTOPHER B. BOYLE**

17 having first been duly sworn under oath, testified as follows:

18             COURT REPORTER:  Thank you.  Please state your

19 full name and spell your last name for the record.

20       Christopher B. Boyle.  B-O-Y-L-E.

21             COURT REPORTER:  All right.  And I need a

22 mailing address.

23       3900 C Street, Anchorage 99503.

24             COURT REPORTER:  Okay.

25       Suite 700.

             COURT REPORTER:  Okay.  Thank you.  And how

about a daytime or a message telephone number.

A       339-6924.

        COURT REPORTER:  All right.  Counsel, would
you please identify yourselves and who you represent, and if
you have a guest, please introduce your guest.

        MR. COVELL:  Kenneth Covell for plaintiff John
Gilbert.

        MS. ZOBEL:  And I'm Patricia Zobel.  I'm here
on behalf of APC Natchiq, Inc.  And I believe Mr. Gilbert is
in the room.

        COURT REPORTER:  All right.  You may proceed.

        MR. COVELL:  Thank you.

                    **DIRECT EXAMINATION**

BY MR. COVELL:

Q       Mr. Boyle, you're the human resources director APC or
        its progeny, is that correct?

A       Yes.

Q       Okay.  And you've been in that position since about
        1994, is that right?

A       No.

Q       Okay.  '90 -- when have you been in that position
        since?

A       With that title, probably late 90s.

Q       Okay.

A       Or 2000.  Not -- I don't recall exactly.

Q       And prior to -- you're the head of the department,

1      whatever the title might be, right?

2   A   No, I'm not.

3   Q   Okay.

4   A   No, I'm not.

5   Q   All right.  Okay.  What -- are you the head of

6      something?

7          MS. ZOBEL:  His household maybe.

8   A   No, I have a direct supervisor, senior vice president

9      of human resources.  I report to him.  I am the

10      director of human resources.  In that capacity I deal

11      with policies, procedures, et cetera.

12   Q   Okay.  And the individual that's above you, the vice

13      president, they have other duties besides dealing with

14      human resources, is that correct?

15   A   Correct.

16   Q   Okay.

17   A   And that's senior vice president not vice -- vice

18      president.

19   Q   So is it fair to say you're the nuts and bolts, day-

20      to-day man that runs the human resources department?

21   A   No.

22   Q   Okay.

23   A   In certain aspects of the human resources, yes.

24   Q   Okay.

25   A   But to say the whole department, no.

Q    Okay.  All right.  And in regard -- well, all right.

1    That's fine.  Okay.  And as far as people within APC,

2    is -- or you're ASRC Energy Services now?  What should

3    we be calling.....

4    I work for ASRC Energy Services.

5    Okay.

6    And there's many subsidiaries beneath that parent

7    organization.

8    Okay.  When Mr. Gilbert worked for the organization or

9    a permutation of it, it was known as APC, is that

10   right?  Or not?

11   I don't know whether it was straight APC or at that

12   time maybe APC Natchiq.

13   Okay.  All right.

14   I'm not sure which one.

15   Okay.  And when the organization you're with went

16   through its name change, permutations, and

17   reorganizations, did your area of responsibility

18   expand greatly?  In other words, did you have sort of

19   a division with 300 people and then get to be the

20   director of sort of a broad spectrum of companies or

21   divisions with thousands of people?

22   No.  It was pretty much the same.

23   Okay.  All right.  Approximately how many people come

24   under the auspices of your department?

25   Gosh, I can't answer that.  I don't know.

Q    Okay.  Is it tens, hundreds, thousands?

**METRO COURT REPORTING**
*745 West Fourth Avenue, Suite 425*
*Anchorage, Alaska 99501*
*(907) 276-3876*

1       Within the organization at that time just APC I

2       believe had close to 1500 to 2000 employees.

3   Q   Okay.

4   A   But I can't -- again, that -- they weren't directly

5       under my auspices as you referenced.

6   Q   Well, what -- well, one of the issues that you in your

7       official capacity would deal with is whether or not

8       somebody is classified as exempt or non-exempt for

9       overtime, right?  Or wrong?

10  A   I could get involved in reviews.

11  Q   All right.  So at the time Mr. Gilbert worked there,

12      roughly '01 to '03, how many people could you have an

13      effect on their position as to whether it's exempt or

14      non-exempt?

15  A   Gosh, I -- I don't know.

16  Q   Okay.  Would that be.....

17  A   You would be asking me to speculate.

18  Q   Would that be in that range of 1500 people?

19  A   I -- I'm just citing the population of that

20      organization.

21  Q   Okay.  Good.  That's.....

22  A   Yeah.

23  Q   I'm just trying to get.....

24  A   Approximately.

25  Q   Okay.  I'm.....

A       Yeah.

Q    .....just trying to get a drift here.  Is that number
2    significantly different today?

A    Yes.

Q    Okay.  And approximately what the -- what might that
5    number be today?

A    With -- the organization is now titled ASRC Energy
7    Services Operations and Maintenance.

Q    Right.

A    And they have close to 2,000 employees.

Q    Okay.  All right.

A    Just that organization.

Q    Okay.  Now, do you have -- that's -- what I'm trying
13   to find out is did you -- your field of authority, if
14   that's the right way to put it, or the people you
15   provided human resources to has expanded greatly or
16   not?

A    Based on -- if you just work it based on the increased
18   number of employees within the organization, just
19   based on that, yes.

Q    Okay.

A    You know, just based on the increased number.

Q    All right.  But it didn't go from say 1500 people to
23   10,000 people?

A    No.

Q    But from maybe 1500 to 2500, something like --
     something.....

A     Sure.

Q     .....along those lines?  Okay.  Good.  All right.

3          MS. ZOBEL:  Just to clarify the record, I
think he said 2,000, not 2500.

5          MR. COVELL:  That's fine.

6     Yeah.

7          MS. ZOBEL:  Okay.

Q     (By Mr. Covell)  Okay.  What did you do to prepare for

9     today's deposition, if anything?

A     I read -- I read my previous deposition.

Q     Okay.  Is there anything about that deposition that

12     you read that you disagree with, that you think was

13     incorrect when you said it, or was misquoted or

14     anything to that effect?

A     On the brief review I did, no.

Q     Okay.  All right.  You were involved with the Zuber

17     case, right?

A     Yes, I was deposed in that case.

Q     Okay.  And you were involved in assisting the company

20     in getting the papers together and working on the

21     case, right?

A     In that case, yes.

Q     Okay.  And that's also true in this case?

A     I've had very minimal involvement in this case.

Q     Okay.  Who at the company -- it's been suggested to me

     that you, Mark Nelson and Doug Smith are the people at

1       the company who would have the most knowledge

2       concerning the matters involved in this case.  Would

3       you agree with that, disagree with that, think there's

4       some -- well, would you agree with that or disagree

5       with that?

6       It all depends on what the questions are.

7       Okay.  Well, as to questions regarding what Mr.

8       Gilbert did -- well, let's put that aside.  Questions

9       regarding whether or not his position as safety

10      supervisor is exempt?

11      I would have very little knowledge of what his day-to-

12      day activities are.

13      Okay.  But would you have knowledge as to the

14      applicable rules and regulations and now determine

15      whether or not that was an exempt or non-exempt

16      position?

17      I can just site, you know, the -- the regulations

18      under wage and hour, and but applying that to what his

19      day-to-day activities are, I don't know how those

20      connect.

21      Okay.  Is there anybody in the company that does know

22      how those connect?

23      His direct supervisor at the time I'm sure.

24      And that would be Doug Smith?

25      I believe that's correct.

Q       Okay.  All right.  When Mis -- you have expertise in

1    the field of human relations, right?

2    A    Human resources.

3    Q    Human resources, I'm sorry.  Excuse me.  All right.

4    Human resources.  And that would -- was that a yes?

5    A    Yes, I do.

6    Q    Okay.  All right.

7    A    Yes, sir.

8    Q    Okay.

9    A    Yes.

10    Q    All right.  And I take it by your title that you would

11    be the person in the company with the most or the best

12    knowledge in that area, is that fair to say?

13    A    In what area?

14    Q    The area of determining whether a position ought to be

15    exempt or non-exempt, putting aside what somebody

16    actually does, because you don't have that

17    information?

18    A    I would disagree with that.

19    Q    Okay.  Who might that be?

20    A    There is no one person, unless -- unless we farm it

21    out to outside counsel.  As I'd -- it's a

22    collaborative effort between human resources and the

23    on-site personnel.

24    Q    Okay.  All right.  And in the case of Mr. -- in Mr.

25    Zuber's lawsuit, we had a lot of discussion about

that.  There was a process, if you will, and don't let

1    me put words in your mouth, okay, but there's a
2    process whereby the field department and human
3    resources would get together, figure out what a guy
4    did, apply the regulations and decide whether or not
5    they ought to be classified exempt of non-exempt, is
6    that fair to say?
7    A    No.
8    Q    All right.  What would be fair to say?
9    A    That may happen.
10   Okay.
11   A    But the job site may take the initiative to undertake
12   that review, and it's not required to consult with
13   human resources.  But if there is an issue, like I
14   said before, it's a collaborative effort, and then a
15   determination is made.
16   Q    Okay.  So at some point human resources has to get
17   involved to make a determination, is that right.....
18   A    No.
19   Q    .....or wrong?
20   A    That's not what I said.
21   Q    Okay.  Well, I'm trying to.....
22   A    It may get involved.
23   Q    Okay.  Well, can the job site say, gee, this ought to
24   be exempt or non-exempt and switch it and have no
25   involvement from human resources?
A    They can.

Q    Don't you have to put out a new job position

2    description or change to get the name changed or the

3    description changed at payroll so the pay is

4    different?

A    There's -- there is a process that is accomplished

6    through filing paperwork to change job titles and so

7    on.  Again, getting back to the number of employees,

8    the number of transactions, I do not see every

9    transaction that passes through the company.

Q    Okay.  Do you know of any instance where a job got

11    changed from exempt to non-exempt and human resources

12    had no involvement with it?

A    I'm try -- I'm sure there's cases out there, yes.

Q    Okay.  Could -- could you.....

A    I can't cite any, but.....

Q    Because nobody told you, right?

A    Yeah.

Q    Yeah, it's.....

A    Yeah.

Q    Okay.  All right.  Okay.  What expertise do the people

21    in the field departments, if that's the right way to

22    put it, have in determining whether or not an

23    individual ought to be classified exempt or non-

24    exempt?

A    They have access to the appropriate wage and hour

    regulations, the appropriate -- at the time the short

1    and long tests that were issued to guide individuals

2    in making an assessment whether the position is --

3    should be appropriately classified as exempt or -- or

4    not.

5  Q  Okay.  And those short and long tests were distributed

6    to the field divisions back in '97 or so?

7  A  I can't answer that for sure.  I don't know.

8  Q  Okay.  All right.  Did you review any of the exhibits

9    from your deposition?

10 A  No.

11 Q  Okay.

12         MR. COVELL:  Why don't we start with number 1,

13 Madame Clerk.

14         MS. ZOBEL:  And I believe we decided yesterday

15 this is going to be B-1.

16         MR. COVELL:  That works for me.

17         MS. ZOBEL:  Okay.  I'm glad you're here again

18 today.

19         COURT REPORTER:  Thank you.

20         MR. COVELL:  Yeah.  We like continuity.

21         MS. ZOBEL:  The same court reporter.  She

22 wasn't -- we weren't sure we'd get her back today.

23         MR. COVELL:  Okay.  Let me put the sticker on

24 that, Madame Clerk.

25              **(Deposition Exhibit B-1 marked)**

       COURT REPORTER:  All right.  Exhibit B-1

**METRO COURT REPORTING**
*745 West Fourth Avenue, Suite 425*
*Anchorage, Alaska 99501*
*(907) 276-3876*

1       marked.

2                   MR. COVELL:  All right.  Here you go.

3             (By Mr. Covell)  I'm handing you B-1.  This purports

4             to be a memo from yourself December 26th, 1996.  The

5             subsequent pages concern exemptions under the State

6             Wage and Hour Act, and, let's see here.

7                   MS. ZOBEL:  It looks like you're missing a

8       page.

9                   MR. COVELL:  All right.  And which page might

10      be missing, do you know?

11                  MS. ZOBEL:  Well, the last page ends in the

12      middle of a sentence.

13                  MR. COVELL:  Okay.

14                  MS. ZOBEL:  I don't know whether it was

15      included when he sent that or not, but.....

16                  MR. COVELL:  I think this is the way I got it.

17                  MS. ZOBEL:  Okay.  That's fine.

18                  MR. COVELL:  And if you feel there's a reason

19      to supplement it, I'm more than happy to.....

20                  MS. ZOBEL:  Sure.  I'll take a look.

21                  MR. COVELL:  .....leave that open.

22                  MS. ZOBEL:  I did not bring down the

23      deposition or the records that pertain to Mr. -- I'm assuming

24      you got this out of Mr. Zuber's file?

25                  MR. COVELL:  Right.  This would be from the

Zuber file.

**METRO COURT REPORTING**
*745 West Fourth Avenue, Suite 425*
*Anchorage, Alaska 99501*
*(907) 276-3876*

1        MS. ZOBEL:  And I did not bring those records
with me, so.....

3        MR. COVELL:  And I haven't done this, and it
didn't occur to me until after I'd copied them all, for the
point of our clarity, it would have been real helpful that
anything that's from Zuber we'd put a Z before the APC, on the
- that won't be on your stickers, Madam Clerk, but just for
- because we have in this case APC with sequential numbers.
As a matter of fact.....

10       MS. ZOBEL:  And these are going to not be the
same numbers as the documents which we produced to you in this
case.  APC 0184 is not this record in the.....

13       MR. COVELL:  In this case, did you.....

14       MS. ZOBEL:  .....in Gilbert.

15       MR. COVELL:  .....start like at 1,000 in
Gilbert or something?

17       MS. ZOBEL:  I have -- we started at 1.

18       MR. COVELL:  Oh.  Right.

19       MS. ZOBEL:  00001.

20       MR. COVELL:  So that's what I'm saying, so in
so in Gilbert there will be an APC 184, right?  So.....

22       MS. ZOBEL:  Right.  And it's not this
document.

24       MR. COVELL:  Right.  So what I'm saying is, we
ought to put -- I should have put Z's in front of them all,
but.....

1          MS. ZOBEL:  You could ask the witness to do

that, and I have.....

3          MR. COVELL:  Right.  That's.....

4          MS. ZOBEL:  .....no problem with it happening.

5     Q    (By Mr. Covell)  That's what I'd like you to do.  If

6          you could put a Z before that APC on the bottom right-

7          hand corner of the page, please.

8          MS. ZOBEL:  Actually the APC number seems to

be obliterated.

10         MR. COVELL:  Obliterated.  I'm still going to

put a Z there.

12         MS. ZOBEL:  All right.

13         MR. COVELL:  And on the following pages, and

I'll try to keep up with this either through myself or the

witness.  And if anybody wants to remind me we're not doing

that, it would be good.

17         MS. ZOBEL:  Was that a look at me, that I'm

supposed to remind you?

19         MR. COVELL:  I was.....

20         MS. ZOBEL:  I'll be happy to remind you.

21         MR. COVELL:  .....only suggesting that one

morning, you know, you'll be going through the papers and

going is this a Zuber or.....

24         MS. ZOBEL:  I know.  I agree.

25         MR. COVELL:  Right.

Q    (By Mr. Covell)  Okay.  All right.  So getting back

1    to B-1 here, Mr. Boyle, and why don't you look with me

2    in the -- in the body of the letter, I think there's a

3    paragraph or sentence in there saying, here's the

4    regulations for your use.  See if you can identify

5    that, and I'll look for it, too.

6    (Pause)

Q    Okay.  In that paragraph that starts with 1, the

8    second sentence, see the sentence, provided as

9    guidance is an attached document which provides

10    functional definitions of exempt employees in

11    administrative, executive, and professional positions.

A    Uh-huh.  (Affirmative)

Q    Okay.

A    Okay.

Q    So it would appear from this exhibit that in 1996 you

16    sent out this document to various people in the field,

17    is that so?

A    Correct.

Q    Okay.  All right.  So they would have had that

20    resource available to them in the field?

A    Yes.

Q    All right.  And then it's your expectation, or your

23    understanding of the way classification works at your

24    company, that the field people would make a

25    determination as to whether or not an individual was

exempt or non-exempt, sometimes with consultation with

1      you and your department, and sometimes without?

2      Yes.

3      Okay.  All right.  Okay.  To your knowledge was there

4      ever an investigation, review or examination of the

5      position of safety specialist as to whether or not it

6      was exempt or non-exempt for purposes of overtime?

7      I believe Mark -- Mark Nelson had undertaken such a

8      review.

9      And this is -- I'm distinguishing safety supervisor

10     from safety specialist.

11     I thought you had just said specialist?

12     If I said that, that's not what I wanted to say,

13     so.....

14     Could you restate.....

15     Okay.  You bet.

16     .....then, please?

17     As to the classification of safety specialist, which

18     was the second job Mr. Gilbert had after he got

19     promoted.....

20             MS. ZOBEL:  No, that.....

21     No.

22             MR. GILBERT:  No.

23             MS. ZOBEL:  .....would be safety supervisor.

24             MR. COVELL:  Okay.  I'm misstating it.  I'm

25  sorry.  Safety -- safety supervisor.  Thank you for correcting

me.

**METRO COURT REPORTING**
*745 West Fourth Avenue, Suite 425*
*Anchorage, Alaska 99501*
*(907) 276-3876*

1    Q    (By Mr. Covell)  The second job that he had, safety

2    supervisor, was there ever an investigation,

3    examination, whatever you want to call it, as to

4    whether or not that job ought to be classified exempt

5    or non-exempt?

6    A    Not to my knowledge.

7    Q    Okay.  All right.  Is that something that you likely

8    would have been aware of?

9    A    Not necessarily.

10   Q    Okay.  Not even since the Zuber case?  Okay.  The

11   Zuber case involved the classification of safety

12   specialist, right?

13   A    Yes.

14   Q    And you were involved in that matter?

15   A    Yes.

16   Q    And if that precipitated somehow or ever was just

17   temporally related to a review of safety supervisor,

18   wouldn't you think that was something that you would

19   be -- either be involved in or at least hear about?

20   A    Well, no, I disagree with that.

21   Q    Okay.

22   A    Because I think the cases were so close together in --

23   in the time frame that it doesn't apply.

24   Q    Okay.  So if such a thing were to happen and you might

25   or might not be involved as human resources, but

apparently you weren't, because either it didn't

1    happen or you didn't hear about it, would the other

2    person or persons who would know about it be Doug

3    Smith?

4    I can't answer that.  I can't speculate on what he may

5    have done or not.

6    Not -- don't speculate, but assume that some nature of

7    review was done in that regard, okay?  Let's say

8    somebody comes in your office, says, Mr. Boyle,

9    there's been a review done somewhere here in the

10   company, do you know about it?  No, sir, I don't.

11   Well, who should we call to try to find out, or who do

12   you think might have involved in doing this?

13        MS. ZOBEL:  Objection, calls for speculation.

14   You can go ahead and answer if you know.

15   Logically I would either direct the person to the

16   business unit manager, or the safety director of the

17   corporation.

18   (By Mr. Covell)  Okay.  And who's the safety director

19   of the corporation?

20   I think at that -- that time it was Doug Smith.

21   Okay.  All right.

22   There -- there had been some changes, and he was

23   elevated to that position approximately that time.

24   Okay.  All right.  And even if it weren't Mr. Smith,

25   he could tell you who was before him or after him if

     there's a time frame issue there?

1    A    Yes.

2    Q    Okay.  Good.  All right.  And then as far as unit

3    manager goes, and I recognize that people are moving

4    around and we have different times here, but at one

5    point is it correct that Mark Nelson was the unit

6    manager for the job Mr. Gilbert would have been in?

7    A    Yes, at Kuparuk.

8    Q    Okay.  All right.  Okay.  All right.  Besides those

9    two individuals-slant-jobs, are there any other either

10    people or positions that would have been involved, or

11    might have been involved in such a review?

12    A    It could be the individual that occupies the position.

13    Q    Okay.  And tell me how that might come about?

14    A    Well, from the standpoint of clearly identifying day-

15    to-day activities and responsibilities, it would be

16    logical to talk to the people that are actually

17    performing the job.

18    Q    Okay.  All right.  And if a review was done, it would

19    then make sense to say, what do you do every day,

20    because even if somebody's job description says

21    they're doing A, because of the pressure of the work

22    place, they may indeed be involved doing B all day

23    instead, even if they don't want to be?

24    A    Possibly.

25    Q    Okay.  All right.  And so if people in the field were

to make the determination as to whether somebody was

1    exempt or non-exempt, I believe I asked you what

2    expertise they might have in that area, and that's how

3    I believe we got off on these attachments to Exhibit

4    1, besides having that resource to make that

5    determinations, what other skill, expertise or tools

6    might they have to make the determination of exempt or

7    non-exempt?

8         MS. ZOBEL:  Calls for speculation.

9         MR. COVELL:  Okay.  Well.....

10   Yeah, I would be speculating.

11   (By Mr. Covell)  Right.  Well.....

12   You'd -- you'd have to go back and review each

13   individual's educational background, had they attended

14   special courses on this.  That I don't know.

15   Okay.  All right.

16        MS. ZOBEL:  If you want to narrow it down to

17   one individual or several individuals, he might.....

18        MR. COVELL:  Okay.

19        MS. ZOBEL:  .....have knowledge of that.

20   (By Mr. Covell)  All right.  Well, what expertise

21   might Doug Smith have in that regard, if you know?

22   I don't.

23   Okay.

24   I don't know.

25   All right.  What expertise might Mark Nelson have in

     that regard, if you know?

A     I don't know.

Q     Okay.  All right.

3     (Off record comments)

Q     The safety supervisor job no longer exists, right?

A     I -- I'm not certain about that.

Q     Okay.

A     I don't know.

Q     I think it's been represented to us that that job got

9     reclassified or organized sometime in the range of

10    2003.  You don't know?

A11   I don't know.

Q12   Okay.  All right.  When -- in any event, when the job

13    existed, it was classified as exempt or do you know or

14    not know?

A15   Yes.

Q16   Okay.

A17   It's my understanding.

Q18   All right.  Among the classifications of exemption,

19    there are at least administrative, professional and

20    executive, and perhaps others.  Which of these

21    classifications of exemption was the safety supervisor

22    job in?

A23   I don't know.

Q24   Okay.

A25   It could have been in any -- any one of those that you

      listed.

Q    Okay.  All right.  And you've never had opportunity to
2    do the analysis of that position as to whether or not
3    it's exempt or not exempt?

A    No.

Q    All right.  And this is a redundant question, but I'm
6    asking it to be clear for the record, so forgive me,
7    you've never done the analysis to figure out whether
8    or not it fits into administrative, professional,
9    executive or other categories either?

10   No.

Q11  All right.  Do you know when that job was created?

A12  I don't.

Q13  Okay.  I had been under the impression from some
14   materials it had started when Mr. Gilbert took the
15   job, which would have been January of '01 I believe,
16   but.....

17        MS. ZOBEL:  January of '02.

Q18  January of '02.  Okay.  All right.  But he indicated
19   to me that wasn't the case.  Do you have any
20   information off the top of your head in that regard.

A21  I don't.

Q22  Okay.  All right.  Do you remember that job existing
23   say in '94 or '97?

A24  I would have to speculate on that, because I
25   don't.....

Q    That's fine.  That's.....

A     .....I didn't belong to.....

Q     .....let's move on.

A     .....the organization.

Q     Okay.  All right.

A     In fact, I wasn't even employed in '94.

Q     When we did your deposition last time, we'd been

7     asking for a job description of safety supervisor, and

8     it was represented to my by Mr. Youngman that it

9     didn't exist, and we discussed that during your

10    deposition.  First of all, do you recollect that, or

11    had you -- and/or.....

12          MR. COVELL:  I know it's compound, and you can

13    object.

Q14   .....and/or had you seen that in your review of your

15    deposition recently?

A16   I don't recall the discussion, but I reviewed that in

17    the deposition, yes.

Q18   Okay.  And do you believe that to be true, that.....

A19   That's correct.  I'm not aware of a job description

20    that's available.

Q21   Okay.  All right.  Yesterday in a deposition we got G-

22    2, which was a job description.  Do you know where

23    that came from and -- well, okay.  And then the next

24    question I'll ask you is when it was created?

A25   I don't know to either question.

Q     Okay.  Does human resources keep copies of job

**METRO COURT REPORTING**
*745 West Fourth Avenue, Suite 425*
*Anchorage, Alaska 99501*
*(907) 276-3876*

1    descriptions?

2    At -- at the time that was retained at the job site.

3    Okay.

4    And it currently is as a matter of fact.

5    So the practice still is, is to keep the job
6    description at the job site?

7    If they exist to begin with.

8    Okay.  And so you don't necessarily have one for every
9    job?

10   No.

11   Okay.  All right.  And I'm probably be redundant here,
12   but that's the current practice as well?  You don't
13   have a centralized file of job descriptions in
14   Anchorage?

15   Not -- well, not at this point.  We are developing one
16   though.

17   Okay.

18   We're working on that as a -- as a project this year.

19   Okay.  Who would know, or if you wanted to find out --
20   well, okay.  Who would know when, where, why, how that
21   was developed, if you know?

22   Would you restate the question?  I'm not sure
23   what.....

24   Okay.  There's a job description for safety
25   supervisor.  I'll represent that to you.  We saw it
     yesterday.  Okay.  Assume that to be true.  And.....

1    A    Back in 2000, 2001, is that the time frame you're
2         requesting?
3    Q    Well, from the date of your deposition in 2003, I
4         think, until today, it would appear that that job
5         description was created or written.  Do you think --
6         is that fair to say?
7    A    I have no knowledge of that.
8    Q    Okay.
9    A    I don't know.
10   Q    Well, if nobody can find one in '03, either it didn't
11        exist or nobody could find it, right?  Would you.....
12   A    Agree.
13   Q    .....agree with that?  Okay.  So between '03 and
14        yesterday, either somebody found it or wrote it.
15        Would you agree with that?
16   A    Yes.
17   Q    Okay.  So what I'm trying to get at is who either
18        found it or created it?
19   A    I don't know.
20   Q    Okay.  If you were looking for that, how would you go
21        about trying to find out that information?
22   A    If I was looking for the job description, or the
23        individual who found it or created it, because.....
24   Q    How it came to be on this earth?
25   A    I would have to go back to the job site, Kuparuk.
     Q    Okay.  And.....

A    And start asking questions.

Q    And would Doug Smith be the guy to go to on that?

A    He would probably be one of the people.

Q    Okay.

A    Yes.

Q    Any other names that come to mind, names.....

A    No.

Q    .....or positions.....

A    No.

Q    .....that come to mind that would be a resource to
find that information?

A    Again the business unit manager.

Q    Okay.

A    Gary Buchanan.

Q    Okay.  All right.  Do you or your department review
job descriptions when they're created?

A    Again, what time frame?

Q    Between your deposition and yesterday?

A    I have not other than the ones that we've created
within the department beginning the mid part of last
year.

Q    Okay.  And that's part of your on-going project to get
a data base as you -- if you will of job descriptions?

A    Yes.

Q    Okay.  All right.  And this would be a redundant
question, but during the course of that, you haven't

1    done one for -- haven't reviewed one for safety

2    supervisor, right?

3    There prob -- I'm not sure if there is one existing

4    for that position given our current project.  I mean,

5    we've got about 250 job titles, and I don't recall

6    each one specifically.

7    So the description we saw yesterday might have come

8    out of your building data bank of job descriptions, is

9    that right or wrong?

10    I can't answer that.  I'd have to take a look at the

11    job description you're referring to.

12    Okay.

13          MR. COVELL:  Let's go off record.

14    (Off record)

15                    **(Deposition Exhibit B-2 marked)**

16    (On record)

17          COURT REPORTER:  We're back on record at 9:37.

18    (By Mr. Covell)  What you have before you, Mr. Boyle,

19    is marked Exhibit B-2 which was also marked G-2 in Mr.

20    Gilbert's deposition yesterday for the record.

21    That's the job description I was talking about.  In

22    looking at that, does that does it jog your memory as

23    to whether you've seen it before or not?

24    I have not seen that, no.

25    Okay.  All right.  Is that in a format of the job

descriptions that are going into your data bank?

**METRO COURT REPORTING**

*745 West Fourth Avenue, Suite 425*
*Anchorage, Alaska 99501*
*(907) 276-3876*

A    No.

Q    Okay.  All right.  Does -- and again, it's -- can you

3    tell from looking at it, if that looks like something

4    that might have been generated in the field?

A    It looks like, yes.

Q    Okay.  All right.  Excellent.

7         MS. ZOBEL:  May I see it, Chris?  Thank you.

8    (Pause)

Q    (By Mr. Covell)  When that job description -- assuming

10    that job description was created in the field, would

11    it have been appropriate for the person that did it to

12    consider whether or not it was an exempt or non-exempt

13    position?

A    I would think so, yes.

Q    Okay.  Is there any paperwork trail that would

16    accompany that consideration?

A    Not that I'm aware of on this particular document

18    here.

Q    Okay.

A    I don't know if there's any back up to it.

Q    Okay.  Should there be?

A    If there was a question about whether it is exempt or

23    not, there hopefully would have been some analysis

24    performed.

Q    Okay.  And we may have covered this.  We've covered it

    either this time or last time, but try and move things

1    along, I'll give you a little narrative here.  Ms.

2    Zobel can object.  But are the types of things that

3    would precipitate an examination of exempt or non-

4    exempt be a complaint from an employee, a question

5    from a supervisor, some correspondence from the

6    Department of Labor, things of that nature?

A    It could be any one of those.

Q    Okay.  All right.  Do you know if Mr. Gilbert ever

9    made a complaint about whether or not he was getting

10   overtime?

A    Not that I'm aware of.

Q    Okay.  If he did make such a complaint, what should

13   APC, and let me just use APC as a blanket name, APC or

14   Natchiq as a blanket name for whatever name the

15   company might have at the time.  What should APC do

16   about that?

A    I would think there would be some higher level review

18   of the complaint, like we perform with any -- any

19   complaint on a routine basis.

Q    Okay.  So if he went -- he's a safety supervisor, and

21   he went to his boss and said, hey, I'm not getting

22   overtime, I ought to get overtime, what level would

23   that get reviewed at in that instance?  Or should it

24   get reviewed at?

A    It all depends.  It may stop with a discussion with

     the upper level supervisor, you know, that direct

1    report or it may go on to the next higher level.

2    That's up to the individual supervisor.

3  Q    Okay.  And in this instance, if Doug Smith was the

4    next level up, it might end with him, or it might go

5    from Doug Smith to who or what position?

6  A    To his bus -- his supervisor, which I believe at the

7    time was Gary Buchanan, the business unit manager.

8  Q    Okay.  All right.  And then -- is it correct then that

9    they should be making an examination as to whether or

10    not the job ought to be exempt or non-exempt?

11  A    There -- there would hopefully be some review if there

12    was an issue, a question about the status.

13  Q    Okay.  All right.  And then -- this could be a

14    multiple question, but would there be paper -- would

15    or should there be paperwork to commemorate that

16    examination for exempt/non-exempt status?

17  A    There may or may not be, depending upon the complexity

18    of the issue.

19  Q    Okay.  From the point of view of your job, would you

20    find it desirable if there was?

21  A    Yes.

22  Q    Okay.

23  A    Yes.

24  Q    And from the point of view of somebody else trying to

25    decide what happened, would you agree that having

    commemorative paperwork would be helpful?

A    It would be helpful, yes.

Q    Okay.  You may have answered this question for me
2    already, but to be clear, are you currently familiar
3    with the position description for safety specialist
4    and safety supervisor?
5    

A    Am I familiar with the job descriptions?

Q    Sure.  Yes.

A    No.

Q    Okay.  All right.  Are you familiar with either of
10   them?

A    The one that you just provided.....
11

Q    Okay.  Because it just.....
12

A    .....yes, although I didn't review it, you know.
13

Q    It just passed by you?
14

A    Yes.
15

Q    Okay.  Beyond that -- okay.  Put that one aside.  Are
16   you familiar with the safety specialist job
17   description?
18

A    The last one I reviewed was in the Zuber case.
19

Q    Okay.  All right.  Are you aware of -- or if you can
20   answer the question, okay, what's the differences
21   between the duties of the safety supervisor and the
22   safety specialist, if that's within your knowledge?
23

A    Again, I don't know what the safety supervisor
24   actually did on a day-to-day basis.
25

Q    Okay.  And the person or persons to address those

**METRO COURT REPORTING**
*745 West Fourth Avenue, Suite 425*
*Anchorage, Alaska 99501*
*(907) 276-3876*

1    types of questions to would be Mr. Smith, Mr. Gilbert

2    or whoever filled those positions, and perhaps Mr.

3    Buchanan.....

4    A    Yes.

5    Q    .....or Mr. Buchanan's job?  All right.  Very good.

6    You have fairly extensive experience in, I want to say

7    human relations, it's human resources, right?  And we

8    went.....

9    A    Yes.

10   Q    Okay.  All right.  And that's -- you've been with the

11   department at APC since '94?

12   A    Again, I work for ASRC Energy Services and I when I

13   hired on it was Natchiq.

14   Q    Okay.

15   A    And APC is a subsidiary of Natchiq.

16   Q    Okay.  But you.....

17   A    But, yes, I've been with.....

18   Q    You've been in HR.....

19   A    .....the organization.

20   Q    .....since you've been here in '94?

21   A    December 1994.

22   Q    Prior to that, you were at Marathon for.....

23   A    Marathon Oil.

24   Q    And you were in HR for some number of years before

25   that?

A    Yes.

1    Q    And you -- is -- your training isn't initially in HR,

2         right, it's something else?  Am I.....

3    A    No, it is.

4    Q    Oh, okay.  All right.  So you've got a degree in labor

5         relations?

6    A    Yes.

7    Q    And what year was that roughly?

8    A    1980.

9    Q    Okay.  So you've been in labor relations, human

10        relations for your career, is that right?

11   A    Yes.

12   Q    Okay.

13        MS. ZOBEL:  Human resources.

14        MR. COVELL:  Human -- I'm sorry, human

15   resources.  That's why I always like calling it personnel.  I

16   just never was able to make the switch.  Okay.

17        MS. ZOBEL:  A big difference.

18        MR. COVELL:  Yeah.  Uh-huh.  HR/ER, but that

19   might be emergency room, so -- all right.

20        MS. ZOBEL:  We could call it HR.

21        MR. COVELL:  HR.

22   A    Sure.

23        MR. COVELL:  HR.  I'll try to work with that.

24        MS. ZOBEL:  That works with either human

25   relations or human resources.

          MR. COVELL:  There you go.

1          MS. ZOBEL:  So you don't have to worry about

2   which one you're referring to.

3          MR. COVELL:  All right.

4   A   A good point.

5   Q   (By Mr. Covell)  Do you feel that you're competent to

6       make determinations as to whether or not a position a

7       position ought to be exempt or non-exempt for purposes

8       of overtime?

9   A   Given the proper background information on specific

10      activities of the position, and being able to

11      adequately compare that with the wage and hour

12      regulations, and in consultation with job site

13      personnel, yes.

14  Q   Okay.  Do you feel that the people in the field who

15      make these decisions about exempt/non-exempt are

16      competent to make those decisions?

17         MS. ZOBEL:  Objection, overly broad.

18  Q   You can answer.

19         MS. ZOBEL:  The people in the field is broad.

20  A   Well, the.....

21  Q   (By Mr. Covell)  Go ahead.

22  A   .....yeah.  The -- the project supervision, again

23      going through the same process that I would go

24      through, consult with their support resources, yes.

25  Q   Okay.  And that answer holds even recognizing they may

        not have the same training and experience that you do?

1    A    Yes.

2    Q    Okay.  When you do an analysis -- or you've done

3         analysis of exempt/non-exempt status for overtime over

4         the years, is that right?

5    A    Correct.

6    Q    Okay.  When you do that, do you consider the state 20

7         percent test?

8    A    Yes.

9    Q    Okay.  Do you know whether or not the people in the

10        field do that?

11   A    It's part of the language in the regulations.  So I

12        would say they would have to if they're comparing the

13        position with the wage and hour definitions of the

14        classifications.

15   Q    Okay.  When you do that, how do you do an analysis as

16        to whether or not somebody spends 20 percent of their

17        time doing non-exempt work?

18   A    Well, again you have to get back to the day-to-day

19        functions of the position and analyze that.

20   Q    Okay.  And my understanding from talking to you this

21        time and last time is that you're not up north

22        watching the guy in the Carharts and the gloves do his

23        job, so you don't know what they do from day-to-day,

24        right?

25   A    That's correct.

     Q    Okay.  So I take it you have to get that information

1     communicated to you somehow?

2   A   Yes.

3   Q   All right.  And then do you do a time analysis where

4       you break down and say, this individual works a 12-

5       hour day, and four hours a day they're at task A, and

6       four hours a day they're at task B, and four hours a

7       day they're at task C, and then do the math for the

8       20-percent number?

9   A   Well, I'm not sure if it gets that detailed.

10  Q   Okay.  Tell me.....

11  A   Again, you would have to actually get out there and

12      consult with the individual job site personnel,

13      consult with the individual if appropriate that's

14      actually performing the job, and make an educated

15      decision based on the relevant wage and hour laws.

16  Q   Okay.  Without finding out how many hours a day

17      somebody spends on a particular task, can you make a

18      reasonable analysis of whether or not they're spending

19      20 percent of their time on non-exempt duties?

20  A   I think you can.

21  Q   Can you explain that to me?

22  A   Well, you've got a set number of hours in a day, and

23      the person doesn't do exactly the same thing every

24      single day, and you have to take a look at the

25      functions on a day-to-day basis, you know, are they --

        are they filing for 10 minutes and then out in the

**METRO COURT REPORTING**
*745 West Fourth Avenue, Suite 425*
*Anchorage, Alaska 99501*
*(907) 276-3876*

1    field making independent decisions and applying

2    discretion in their -- their jobs, you know.

3    Q    Well, isn't it a gross analysis of the time, saying

4    you file 10 minutes, and you're in the field making

5    independent decisions the rest of the day, therefore I

6    know something in the range of 90 or 95 percent of

7    your time's spent on exempt duties?

8    A    Well, that's -- that was just an example that I cited.

9    Q    Okay.

10    You know, that the -- that the process would have to

11    be followed to actually analyze the position.

12    Q    Okay.  But that -- isn't that a less formal

13    application if you're going to analyze what somebody

14    does hour-by-hour, minute-by-minute?

15    A    Well, again, I just use that as an example.

16    Q    Sure.

17    A    It may be a more formal process that's applied given

18    the position and the need to analyze individual

19    functions.

20    Are you aware of any case in considering positions for

21    classification where ACP -- APC did an hour-by-hour as

22    it were analysis of what somebody did?

23    A    Not that I'm aware of.

24    Q    Okay.  And, of course, you're aware that there's -- or

25    at least there were two different sets of rules as to

     overtime, one under the state law, and one under the

1    federal law?

2    A    Yes.

3    Q    Okay.  And are the people in the field that made these

4    exempt/non-exempt decisions aware of that?

5    A    Yes, I believe.

6    Q    Okay.  They should be in any event?

7    A    They should be.

8    Q    Okay.  APC kept some nature of time records for its

9    employees, right?  Time -- hours worked?

10   A    Yes.

11   Q    Okay.  In this case I'd represent to you we've been

12   provided with two sets of time logs for Mr Gilbert.

13   One set shows 10 hours a day consistently, and one set

14   shows one day worked.  Are you familiar with that?

15   A    No, I'm not.

16   Q    All right.  Is that something that you would expect to

17   see provided in this case?

18   A    I can't comment on that.  I don't know what documents

19   you're referring to.

20   Q    Okay.  All right.  Well, let me show you here.

21        COURT REPORTER:  Would you like me to go off

22   record for a moment?

23        MR. COVELL:  Sure.  That would.....

24        COURT REPORTER:  All right.

25   (Off record)

     (On record)

1          COURT REPORTER:  We're back on record at 9:54.

2     (By Mr. Covell)  Mr. Boyle, I've placed in front of

3     you pages that are marked APC I believe 84 through --

4     I don't know, there's another -- well, to.....

5          MS. ZOBEL:  It's 48.

6     Forty-eight to.....

7          MS. ZOBEL:  You're reading upside down.

8     .....to 84 is one style of documents, and then 85 to

9     the end is another style of document.

10    Okay.

11    Okay.  Not -- actually not.....

12         MS. ZOBEL:  Actually I don't believe that's

13    correct.

14         MR. COVELL:  Okay.  That's not correct.  Let

15    me back -- I withdraw that question.

16    (By Mr. Covell)  You've got some papers in front of

17    you.  What's the first number on the first page in

18    front of you, sir?

19    Forty-eight.

20    Okay.  And what's the last number on the last page in

21    front of you?

22    Eighty-five.

23         MS. ZOBEL:  No.

24    Oh.  103.

25    All right.  And I represent to you those were

      disclosed to me in Natchiq's 26(A) disclosure received

1    by me around January 5th, 2004.  Okay.  All right.  Do

2    you know what those are?

3    A    Not specifically.  I can speculate that this top

4    document, 0048, is some reference to time.

5    Q    All right.  Some nature of time.....

6    A    Yes.

7    Q    .....record, right?  And that reflects 10 hours a day

8    consistently, is that right?

9    A    Yes, there's a column, straight -- straight time

10   hours, 10.

11   Q    Okay.  And it starts in January of -- or, no.....

12   A    September 2002 on this.....

13   Q    Okay.

14   A    .....particular document.

15   Q    All right.  And there are pages and pages that are

16   nearly identical to that, right?

17   A    Yes.

18   Q    All right.  So it would appear that -- okay.  Do you

19   know if that -- all right.  Let's look at the second

20   set of papers, there -- for whatever -- any one of

21   those.

22   A    Any one?

23   Q    Just say what number that is, if there is one.  Of

24   course, there isn't, right?

25   A    I don't see a number.

            MS. ZOBEL:  No, there isn't.  It's been cut

off.

2       (By Mr. Covell)  All right.  So go to the next page,
3       try to keep those in order, please.  The next one
4       behind it or before it.
5       We're looking for a number?
6       Sure.
7               MS. ZOBEL:  Here's a number.
8       APC 114, okay?  And that reflects one hour a day
9       worked, right?  Or, pardon me, one day worked per day
10      I guess.
11              MS. ZOBEL:  These are not in order, because we
12   the last date is APC 103 that.....
13              MR. COVELL:  Okay.
14              MS. ZOBEL:  .....you had him -- and this is
15   14, so.....
16              MR. COVELL:  Okay.
17      (By Mr. Covell)  Apparently they're out of order, but
18      in any event you're looking at 114.  Does that also
19      appear to be some nature of time record?
20      Yes.  It's titled weekly time sheet.
21      Okay.  There you go.  And as far as units per day
22      worked, what does it indicate?
23      One.
24      And would you take that to mean -- what would you take
25      that to mean?  One what?
A       I would assume that that represents the person worked

1    on that particular day.

2    Q   Okay.  So it's one -- would it be fair to say one day

3    worked?

4    A   Yes.

5    Q   Okay.  And it's not one hour worked, right?  We

6    wouldn't expect that?

7    A   No, at -- one of the -- I mean, the columns are titled

8    days.

9    Q   Okay.  All right.

10    Days worked.  Or.....

11    Q   All right.  Besides those time records, are you aware

12    of any other time records that APC might have for Mr.

13    Gilbert?

14    A   Not that I'm aware of.

15    Q   Okay.  Mr. Gilbert submitted what might be called a

16    daily log that has an indication of hours worked per

17    day, varying in the ranges of 11, 12, 13, 14 hours.

18    Do you have any information that would dispute his

19    representation that he worked those hours?

20    A   I have no seen the documents you're referring to, so

21    really I can't comment on it.

22    Q   Okay.  Would you like to?  Would that be helpful in

23    answering the question?

24    A   Yes.

25    Q   All right.  So why don't we get this back here, and

    I'll get that out of your way.

1          MR. COVELL:  We're not going to mark that as

2     an exhibit.

3     Q     Okay.  I'm going to hand you what's in discovery

4          entitled Plaintiff's Initial Disclosures, and I'll

5          refer you to any number of these pages.  Ms. Zobel has

6          a copy there for you.  Does that appear to be a day

7          planner or log looking material?

8          MS. ZOBEL:  You're on page 87?

9     Q     Just pick one with a bunch of entries.  Okay.  And

10         we're looking at page 87.  Have you seen this document

11         or a similar form of this document in this case

12         before?

13    A     No.

14    Q     Okay.  Do you see how, for instance, on Tuesday,

15         August 6th, there's a 12 written here?

16    A     Yes.

17    Q     And then on the 7th, 13.5, and then on the 8th, 12,

18         and then on the 9th, 14, and then on Saturday the 1st,

19         12, and on Sunday the 11th, 13?

20    A     Yes.

21    Q     All right.  I represent to you that Mr. Gilbert says

22         those are the hours he worked that day.  And I had

23         asked you if you had any records besides the ones we

24         looked at in your disclosure that would indicate the

25         hours he had worked when he worked for you?

A     Not that I'm aware of.

1    Q    Okay.  And besides written records, do you have, or --

2         MR. COVELL:  Let me withdraw that.

3    Q    Does APC have any information that would contradict

4         Mr. Gilbert's assertion he worked particular hours on

5         particular days?

6    A    Not that I'm aware of.

7    Q    Okay.  Thank you.  There we go, we're back to the

8         other glasses.

9         MR. COVELL:  Why don't we go off for just a

10        second.

11        COURT REPORTER:  Sure.

12        (Off record)

13        (On record)

14        COURT REPORTER:  All right.  We're back on

15        record at 10:04.

16   Q    (By Mr. Covell)  Earlier we talked about your

17        involvement in the case, and I think you said

18        something to the extent of very little, and not -- or

19        to be redundant, to be thorough, what do you have to

20        do with this case?

21   A    I'm not sure.

22   Q    Okay.  What have you done on this case so far?

23   A    Nothing.

24   Q    Okay.

25   A    Other than read my previous deposition.

     Q    Have you been involved.....

1   A   And I think I have worked with Counsel on

2       documentation requests and discovery requests.

3   Q   Okay.

4   A   Although I don't even remember what -- what was

5       generated, because most of the material had already

6       been submitted.

7   Q   Okay.  Do you know, besides the -- what I might call

8       mundane materials, the payroll record, his personnel

9       file, do you know if there are any papers that exist

10      that concern the classification of the safety

11      supervisor position as exempt or non-exempt?

12  A   I'm not aware of any.

13  Q   Okay.  And is it correct that if such papers existed,

14      one would expect to find them in your office?

15  A   Not necessarily.

16  Q   Okay.

17  A   No.

18  Q   In your prior deposition I think you indicated

19      something to the effect that you or your office would

20      be the central point for the gathering of papers of

21      that nature, do you recollect saying that?

22  A   I think that was in reference to discovery requests.

23  Q   Okay.  All right.  If there are papers that

24      commemorate a review of the exempt/non-exempt status

25      of the safety supervisor, would you -- would the

    places you expect to find them be your office, or in

1     the appropriate field office?

2     They could be in either one.

3     Okay.  Those would be the places you would look?

4     That's where I would look, yes.

5     All right.  Okay.  So besides what you've already told

6     me, that's been your extent of involvement in this

7     matter?

8     Yes, I've had very little very little involvement.

9     Okay.  Believe me, there are times I want a no answer,

10    you know.  No -- yeah, that's better.

11            MS. ZOBEL:  Is that our phone?

12            MR. COVELL:  Yeah, I'm ignoring it.

13            MS. ZOBEL:  Okay.

14            MR. COVELL:  But thank you.

15    (Whispered conversation)

16    (Pause)

17    (By Mr. Covell)  Okay.  During the course of -- okay

18    at one point you did get involved in the analysis of

19    the exempt/non-exempt status of the safety specialist

20    position, is that right?  Or wrong?

21    I don't believe I did.

22    Okay.

23    I think Mark Nelson was performing that -- that

24    initial review along with several other positions at

25    the time.

Q     All right.  And when that was going on, you were in

1       the loop in Mark Allen -- Mark Nelson's activities?

2   A   Not specifically, no.

3   Q   Okay.  Let me hand you, and these should be Z's, a

4       memo.....

5               MR. COVELL:  Here, why don't we go -- what

6       have we got?  3?

7               COURT REPORTER:  B-3.

8               MR. COVELL:  B-3.  Let me stick that on there.

9                       **(Deposition Exhibit B-3 marked)**

10              MR. COVELL:  Here's a copy for you, Ms. Zobel.

11  Q   (By Mr. Covell)  A memo from Mark Nelson to Anne

12      Hippe, and I -- if -- don't wrack your brain, but does

13      this look familiar to you?  If it doesn't, I've got

14      some other paperwork that will probably refer back to

15      this.

16  A   Yes.  Yes, it does.

17  Q   Okay.  And I'm trying to speed things up.  Was this

18      something that sort of was at the beginning of Mr.

19      Nelson looking onto whether jobs are exempt or non-

20      exempt?

21  A   Well, from what I can recall, there was an article

22      attached to this that's referenced as the Forbes

23      Magazine attached article.

24  Q   Right.

25  A   And there was a particular case that addressed exempt

        status, and I think he had some questions about that

1     which generated this.

2     Q     Okay.  And you saw that at some point relatively

3     speaking contemporaneous to December '96?

4     A     I don't recall exactly when, but it was ultimately

5     forwarded on to me, yes.

6     Q     Okay.  All right.  And did that eventually -- and.....

7           MS. ZOBEL:  I'm sorry, could I ask what B-2

8     is?

9           MR. COVELL:  B-2 is G-2, isn't it?

10          MS. ZOBEL:  Oh, all right.  All right.  Thank

11    you.

12          MR. COVELL:  All right.

13          MS. ZOBEL:  I didn't mean to interrupt you.

14    My apologies.

15          MR. COVELL:  I would rather get it straight

16    now than be pulling my hair out at three in the morning.

17          MS. ZOBEL:  Yeah, I'm sitting here with a

18    1.....

19          MR. COVELL:  Yeah.

20          MS. ZOBEL:  .....and a 3.

21          MR. COVELL:  Yeah.

22    Q     (By Mr. Covell)  Okay.  All right.  And then do you

23    recollect that that generated sort of subsequent

24    follow-on correspondence between yourself/Mr. Nelson,

25    Mr Nelson/Randy Carr?  And I'll get you some papers

      here, but I'm trying to work along.  Does that ring

1    any bells with you?

2    Yes, I'm not sure specifically if this memo generated

3    the subsequent activity, but on or about that time

4    frame there were several issues going on that were

5    being reviewed.

6    Okay.  All right.  Let me hand you another one, a

7    letter dated December 26, '96.  Come on now.

8             MS. ZOBEL:  I believe you've already produced

9    that.....

10            MR. COVELL:  Oh, that's that one.

11            MS. ZOBEL:  .....Counsel, that's Exhibit 1.

12            MR. COVELL:  Okay.

13            MS. ZOBEL:  B-1.

14            MR. COVELL:  Excellent.  Thank you.  All

15   right.

16            MS. ZOBEL:  You don't have that, Mister.....

17   Oh.

18            MS. ZOBEL:  .....Chris.  B-1, please?

19            COURT REPORTER:  I do not have B-1.

20            MR. COVELL:  It's right here.

21   Isn't it?  Yeah.

22            MS. ZOBEL:  Oh, all right.

23            MR. COVELL:  Okay.

24            MS. ZOBEL:  I'm sorry.

25   (By Mr. Covell)  All right.  So this B-1 letter is

     from you, and if you look at that last sentence of the

1    first paragraph, it says, in addition, it's

2    appropriate to review whether personnel currently paid

3    as exempt are properly classified.  It says that,

4    right?

A    Under number 1?

Q    Right.....

A    The first.....

Q    .....right there.

9         MS. ZOBEL:  We have a different letter.

Q20  Okay.  December 26, '96.

A21  Yes.

12        MS. ZOBEL:  This isn't a December 26th, '96

13letter.

14        MR. COVELL:  I've got it here.

A15  That's what I've got.

16        MR. COVELL:  Okay.  And what do you have?

17        MS. ZOBEL:  The same thing.  You gave it to

18me.

19        MR. COVELL:  Okay.  All right.

Q20  (By Mr. Covell)  And looking at the last sentence of

21   the first full paragraph, can you read that for me?

A22  The main issue is whether the day rate is an

23   appropriate form of payment under wage and hour laws.

24    In addition, it is appropriate to review -- it is

25   appropriate to review whether personnel currently paid

     as exempt are properly classified.

1    Q    Okay.  So that was a direction to -- okay.  Who are

2    these folks at the top of the page there, to?

3    A    Don Dieckmeyer, Scott Eliason, Dick Frederick, Lee

4    Gabrielson, Jack Laasch -- just business unit heads.

5    Q    Okay.  Unit managers.....

6    A    Yes.

7    Q    .....generally speaking?

8    A    Not -- not all out in the field though.

9    Q    Okay.  But.....

10   A    Lead people.

11   Q    Okay.  And then this is -- the -- I think this -- what

12   -- the letter is on a day rate issue, but you're

13   saying also, take a look at your people and see

14   whether they're exempt or non-exempt, right?

15   A    Yes.

16   Q    Okay.  And then you say here are the attachments,

17   here's some guidelines to work with that we talked

18   about earlier?

19   A    Yes.

20   Q    Okay.  And that's December 26th, which is the -- you

21   know, the end of -- the day after Christmas.  You were

22   working?

23   A    I could have been, yes.

24   Q    All right.  Did you get.....

25   A    Darn it.  Maybe we can talk.

            MS. ZOBEL:  Oh, Chris, you didn't say that.

1      Yeah.  Strike that.

2          MS. ZOBEL:  Yeah.

3          MR. COVELL:  I'll stipulate to that being

4    stricken from the record.

5      (By Mr. Covell)  Okay.  So it's some weeks after that

6      that Anne Hippe memo, which is B-4 [sic] I believe.

7      Yes.

8      Right.  Okay.  And then subsequent to that, April 4,

9      '97, we get another letter from you.

10         MR. COVELL:  Will you mark that sequentially,

11   please, Madame Clerk.

12        COURT REPORTER:  I'm sorry.  You just referred

13   to something as B-4, this is B-4.

14        MR. COVELL:  Okay. I stand corrected.

15        COURT REPORTER:  We do not have a B-4.

16        MR. COVELL:  Whatever the Anne Hippe letter of

17   December 7, '96.....

18        COURT REPORTER:  That's B-3.

19        MR. COVELL:  B-3.

20        COURT REPORTER:  All right.

21        MR. COVELL:  That's what I meant to say.

22        COURT REPORTER:  Right now we're going to mark

23   B-4.

24        MR. COVELL:  That's what we want.

25               **(Deposition Exhibit 4 marked)**

        MS. ZOBEL:  And this should also be marked as

1   a Z.....

2               MR. COVELL:  Excellent.

3               MS. ZOBEL:  .....APC 010.....

4               MR. COVELL:  Yes.

5               MS. ZOBEL:  .....80 -- 180.

6               MR. COVELL:  Thank you.  And do we have any
other ones here that should be Z's?  I think we.....

8               MS. ZOBEL:  I think Madam Clerk has put a Z on
every one of them so far.

10              MR. COVELL:  Excellent.

11              COURT REPORTER:  Yes.

12              MR. COVELL:  Thank you.

13              MS. ZOBEL:  You may want to put them on yours.

14              MR. COVELL:  I want to, but I can't walk and
chew gum at the same time, so I'm not getting there.  But
thank you.

17              MS. ZOBEL:  You're welcome.

18      (By Mr. Covell)  Okay.  All right.  Mr. Boyle, looking

19      at B-4, this is continuing correspondence along the

20      vein of day rate and wage and hour classification, is

21      that right?

22      Yes.

23      Okay.

24      I'm not -- however, I'm not sure if it's connected

25      directly with the December 7th memo from Mark Nelson

        to Anne Hippe, Toby Osborn.

Q    Okay.  Is it either indirectly connected or at least
2    addressing as far as exemption goes the same subject
3    matter?
A    Well, it's addressing -- this -- the April 4th letter
5    is addressing specifically the appropriateness of day
6    rate.
Q    Okay.  Well, I'm looking at the second paragraph.
8    Alaska has no specific wage -- okay, that's fine.
9    Thank you for helping me here.  Looking at the second
10   paragraph, it says -- why don't you read that for us,
11   please?
A    Alaska has no specific wage and hour law addressing
13   the payment of a day rate to exempt employees.  Of
14   course, the first step an employer must take is to
15   properly classify an employee as exempt, parenthesis,
16   not eligible for overtime, or non-exempt.  I've
17   previously provided some information on this subject
18   and would recommend we again look at the foreman and
19   similarly classified employees to ensure their status
20   can stand up to the exemption test.
Q    Okay.  Is it fair to say that that paragraph is a
22   reiteration of the sentence in the April 4th letter
23   that says, I have previously -- hang on.  We're in the
24   April 4th letter.  In the perhaps B-1 exhibit, the
25   December 26, '96 letter, in addition, it is
     appropriate to review whether personnel currently paid

1    as exempt are properly classified.  Do you want me to

2    repeat it?

3    A   Yes, please.

4    Q   Okay.  The second paragraph of the April 4 letter, is

5    it fair to characterize that as a follow up to the

6    December 26th letter at the last part of the first

7    paragraph that talks about whether people are properly

8    classified as exempt or non-exempt?

9    A   Again, I don't think there is a direction connection

10    between the December 26th letter and this April 4th

11    letter.

12    Q   Okay.

13    A   This -- the April 4th letter appears to be

14    specifically addressing foremen, and this is -- this

15    -- the December 26th letter seems to be addressing

16    just the general issue of exempt versus non-exempt.

17    Q   Okay.  So December 26th is more general, and April 7

18    [sic] is more specific as to foreman?

19    A   Based on that paragraph that I read, yes.

20    Q   Okay.  All right.  Would -- is it reasonable to think

21    a safety supervisor for purposes of analysis for

22    classification as exempt or non-exempt as a foreman?

23    A   I would disagree with that.

24    Q   Okay.

25    A   Based on the little knowledge I have of both those

    positions and what they do.

**METRO COURT REPORTING**
*745 West Fourth Avenue, Suite 425*
*Anchorage, Alaska 99501*
*(907) 276-3876*

Q    Okay.

A    They're entirely different functions.

Q    And what's the difference in the functions?

A    The foreman may be actual -- they could be working

5    foremen actually down -- down there working with the

6    -- with the crews, clearly a non-exempt position in my

7    opinion, versus a safety supervisor who, you know, may

8    have other duties.

Q    Okay.  But a safety supervisor as well could be down

10    there working with the crews as well, right?

A    To perform functions?  No.

Q12    Couldn't be?

A13    No.

Q14    A safety supervisor couldn't be doing a.....

A15    They're not going to be down there digging ditches,

16    they're not going to be down there hammering nails.

Q17    And neither would a safety specialist, right?

A18    I wouldn't think so.

Q19    Okay.  But a safety supervisor -- well, do you know if

20    safety supervisors at least at times did the same work

21    as a safety specialist?

A22    I don't know.

Q23    Okay.  Would that surprise you if that was the case?

A24    No.

Q25    Okay.  All right.  Is it fair to say that as far as

guys that pound nails or turn wrenches, have a first

1    line supervisor and that's the foreman?

2    They've got someone that they report to.

3    Okay.  And.....

4    I don't know if it would be the foreman or some other

5    position.

6    Well, what other position might it be?

7    There could be other lead positions.

8    Okay.  And what might they be called?

9    Lead.

10    Okay.  All right.  And are they a separate job

11    description from mechanic or plumber?

12    Yes, it may be.

13    Okay.  Okay.  All right.  And at this time did you

14    have a concern that people in lead positions may or

15    may not be properly classified as exempt or non-

16    exempt?

17    I don't believe there was a concern on those

18    positions, because they were classified as non-exempt.

19    Okay.  And then is it correct that the foreman as far

20    as exempt and non-exempt go were a mixed?

21    I don't know at that time.  I -- I can't recall.

22    Okay.  But in any event, this letter is saying is take

23    a look at those jobs and figure it out, guys?

24    Yes.

25    Okay.  All right.  Okay.  And had somebody gone and

    looked at the safety supervisor position in receiving

1    this letter, that would have been okay with you,

2    right?

3         MS. ZOBEL:  I'm going to object, because I

4    don't think that position was even in existence at that time.

5         MR. COVELL:  Do you know when the position

6    came into existence?

7         MS. ZOBEL:  You can ask Doug Smith, he'll

8    know.

9         MR. COVELL:  Okay.  All right.

10   (By Mr. Covell)  Had the safety specialist --

11   supervisor position existed at that time, and somebody

12   got ahold of this memo and examined that, whether

13   they're exempt or non-exempt, would that have been

14   okay with you?

15   I don't understand your question.

16   All right.

17   What are you.....

18   Somebody's out in the field, Doug Smith or Buchanan or

19   Mark Nelson, and they get this memo, and they read

20   it.....

21   Uh-huh.

22   .....and they say, yeah, Mr. Boyle sent me a memo, I

23   should look at foremen and see if they're classified

24   right.  Okay.  And they go and say -- whether you

25   intend it or not, they say, well, foremen, safety

     supervisor, I'm going to look at the safety supervisor

**METRO COURT REPORTING**
*745 West Fourth Avenue, Suite 425*
*Anchorage, Alaska 99501*
*(907) 276-3876*

1   position to see if they're classified properly or not.

2    Had that happened, would that be okay with you as HR?

3   Well, you would be asking me to speculate.  This memo

4   may -- may be a key to individuals that, hey, well,

5   let's while we're at take a look at other positions.

6   Okay.  All right.  Okay.  All right.  Now actually if

7   you turn to the second page of that and look under

8   recommendations, the first sentence says,

9   recommendations relative to date rate issues, but the

10   first recommendation is review all occupations where

11   there may be questions concerning whether they are

12   properly classified as exempt, non-exempt, foremen and

13   other personnel whose actual job responsibilities and

14   duties may not meet the overtime test.  Would it be

15   reasonable for somebody to take that directive to say,

16   we should look at the safety supervisor position and

17   review it for exempt/non-exempt status?

18       MS. ZOBEL:  Assuming that it existed.

19   (By Mr. Covell)  Assuming that.....

20    Yes.

21   .....it existed.  All right.

22   Assuming.

23   Okay.  Okay.  When -- if a job doesn't exist and it's

24   created, is it the policy of APC to examine it for

25   exempt or non-exempt status?

A   Yes, they should have reviewed or at least considered

1    the -- the proper classification.

2    Q    Okay.  All right.  And the last page of that exhibit,

3    the second to last paragraph indicates in the second

4    line, federal wage and hour law is very complex.  Do

5    you agree with that?

6    A    I do.

7    Q    Okay.  And in reading your deposition, did you see

8    that last time we took your deposition we found a

9    number of different instances where there were

10    comments like that in the materials we dealt in that

11    case, saying this is a complex area, you can consult

12    the Department of Labor and comments about it being

13    complex?

14    A    Yes.

15    Q    Okay.  And your answers to those questions haven't

16    changed?

17    A    No.

18    Q    Okay.  All right.  All right.  Let me hand you a

19    letter from Mr. Nelson to Mr. Carr, June 19, '97.

20              MR. COVELL:  And let me get that marked,

21    please.  And that should get a Z on it, too, as Ms. Zobel has

22    been so helpful in pointing out.

23                          (Deposition Exhibit B-5 marked)

24              MR. COVELL:  And we've got.....

25              COURT REPORTER:  B-5 marked.

              MR. COVELL:  .....G-5 [sic].  Okay.

Q    (By Mr. Covell)  Are you familiar with this document,
2    Mr. Boyle.....
3  A    Yes.
Q    .....in a general way?  And you saw it at -- during
5    your last deposition?  I represent to you I believe
6    you saw that during.....
7  A    Yes.
Q    .....your last deposition.  Okay.  All right.  And you
9    -- did you see this at some point relatively
10    contemporaneous to June 19, '97?
11  A    I don't know.
12  Q    Okay.
13  A    I think when I first saw that was during the last
14    deposition.
15  Q    Okay.  All right.  In any event, this would appear to
16    be a correspondence from Mr. Nelson to Mr. Carr who
17    was then with the State Department of Labor concerning
18    whether or not a materials supervisor position would
19    be exempt or not, right?
20  A    Yes.
21  Q    And he sent materials and asked for Mr. Carr's opinion
22    on that, right?
23  A    Yes.
24  Q    Okay.  All right.  As far as either the safety
25    specialist position and/or the safety supervisor
position, assuming they existed on June 19.....

1    MS. ZOBEL:  Of what year?

2    MR. COVELL:  '97.

3    (By Mr. Covell)  June 25, I'm sorry.  APC could have

4    sent a similar correspondence to the Department of

5    Labor and asked for a similar determination, is that

6    right?

7    It could have, yes.

8    Okay.  And to be thorough, as far as you know, that

9    was never done?

10   Not to my knowledge.

11   Okay.  Okay.  I'm sorry, and that was the June 19.

12   Okay.  Now I'm going to hand you a June 25 letter.

13   MR. COVELL:  That will be 6 I believe.

14                   **(Deposition Exhibit B-6 marked)**

15   COURT REPORTER:  B-6 marked.

16   MR. COVELL:  And that should get a Z as well.

17   COURT REPORTER:  I have placed a Z on there.

18   MR. COVELL:  Excellent.

19   (By Mr. Covell)  All right.  And do you recollect

20   seeing this letter and the attached letter from Mr.

21   Carr to Mr. Nelson, which is also labeled WHOL number

22   122?

23   (Pause)

24   I don't believe I've seen the June 25th letter to

25   Randy Carr signed by Mark Nelson; however, I have seen

     the -- the Carr response to Nelson.

**METRO COURT REPORTING**
*745 West Fourth Avenue, Suite 425*
*Anchorage, Alaska 99501*
*(907) 276-3876*

Q    Okay.  And did you see that relatively contemporaneous

2    to June 26th, 1997?

A    I think I saw that at the time of the Zuber case

4    deposition.

Q    Okay.

A    As far as I recall.

Q    Okay.  All right.  So in APC producing this letter

8    from Mr. Carr back in '97, do you know if it came from

9    field files or from HR files?

A    Randy Carr's letter?

Q    Right.

A    I don't recall where it came from.

Q    If you can answer the question, where would you expect

14   in 2003 relatively speaking a 1997 letter would have

15   come from?  This 1997 letter would have come from?

A    In 2003?

17           MS. ZOBEL:  You're talking about in production

from -- in the Zuber case?

19           MR. COVELL:  Right.  Right.

A    I don't recall.

Q    Okay. That's fine.  That's fine.

A    It was a Mark Nelson letter.

Q    All right.  You would expect -- is it fair to say you

24   would have expected it either to come from HR files or

25   from the field files?

A    Yes.

**METRO COURT REPORTING**
*745 West Fourth Avenue, Suite 425*
*Anchorage, Alaska 99501*
*(907) 276-3876*

1    Q    Okay.  All right.  All right.  And this WHOL letter --

2         well, let me ask you this.  Do you know if APC has any

3         other WHOL letters?

4              MS. ZOBEL:  Are you talking about an at all

5    period or relative.....

6              MR. COVELL:  Sure.  Yeah.

7              MS. ZOBEL:  .....relative to this case?

8              MR. COVELL:  At all period.

9    A    There may have been others that Mark Nelson received.

10   (By Mr. Covell)  Okay.

11   A    I -- I can't cite them specifically.

12   Q    Okay.

13   A    Again, it would have been relative to what was

14        produced in the Zuber case.

15   Q    Okay.

16   A    I haven't reviewed any of the exhibits.

17   Q    Well, backing up into a broader question, do you have

18        an HR file or binder that says APC WHOL letters or

19        something similar?

20   A    No, I -- I don't have anything like that.

21   Q    Okay.  All right.  Is this something that you either

22        would like to or think you ought to have on file at

23        HR?

24   A    It would be nice to have those on file.  Yes.

25   Q    Okay.  All right.  But as far as you know, you don't,

         is.....

1       No.

2       .....that right?  Okay.  All right.  Drawing your
3       attention -- well, drawing your attention to Mr.
4       Nelson's portion of that exhibit, that last paragraph
5       there, it says, please respond in writing to give us a
6       definition as to how it works, and the cautions of
7       classifying an employee the supervisor -- as a
8       supervisor.  We can easily find the classifications
9       for administrative, professional and executive, but do
10      not see a clear path for supervisors.  And I guess I
11      should have started at the -- at the last sentence of
12      the above paragraph.  The discussion surrounding
13      supervisors as being exempt from overtime pay, paren,
14      premium pay, close paren, but yet have to be paid for
15      all hours worked has been difficult to pull from the
16      regulations.  Do you see that text?

17      Yes.

18      Okay.  And that concerns an issue that -- and is it
19      correct that that concerns an issue that even if
20      someone is exempt, if they're a supervisor, they're
21      entitled to be paid for all hours worked, is that so?

22      There's a reference to that language in -- in the
23      regulations but the interpretation of how that's
24      applied is left for interpretation.

25      Okay.  All right.  And then Mr. Carr responds to that
        in his letter, and is it fair to say that Mr. Carr

1    essentially says that that's the case, that a

2    supervisor has to be paid for all hours worked, but

3    doesn't have to be given premium pay?

4    Can you cite where you're referencing that?

Q    Sure.  You bet.

6        MS. ZOBEL:  Why don't we go off the record and

7    give him an opportunity.....

8        MR. COVELL:  Yeah, that's fine.

9        MS. ZOBEL:  .....to read the letter?

10       MR. COVELL:  That works.  And.....

11   (Off record)

12   (On record)

13       COURT REPORTER:  We're back on the record at

14   10:39.

Q    (By Mr. Covell)  Mr. Boyle, we were looking for an

16   area of the Randy Carr letter, and I'm speculating

17   you're about to direct me to that next to last

18   paragraph of the letter, is it.....

A    Correct.

Q    Okay.  All right.  And so that letter indicates that

21   supervisors should bet paid for every hour worked, but

22   they don't get premium pay, i.e., half time again on

23   those extra hours, is that right?

A    Let's clarify the paragraph we're referring to.  Does

25   it start out with exempt administrative or the

     explanation?

**METRO COURT REPORTING**
*745 West Fourth Avenue, Suite 425*
*Anchorage, Alaska 99501*
*(907) 276-3876*

Q    Well, let me rephrase the question.  You were going to
2    refer to part of the letter and respond to my
3    question.  What part of the letter were you going to
4    refer to?
A    The second to the last paragraph, exempt
6    administrative employees.
Q    All right.  And what direction does that give to Mr.
8    Nelson and APC as to how to pay employees under the
9    state wage and hour act?
A    It just references that exempt admin -- I can just
11   read it.  I mean, that's the direction.....
12   (indiscernible - simultaneous speech).....
Q    .....answer is it says what it says, is that the
14   answer?
A    Yes.
Q    Okay.  All right.  That's fine.  All right.  What
17   action did APC take to pay all -- to pay supervisors
18   for all hours worked in response to this WHOL 122, if
19   any?
A    I don't know what actions Mark Nelson took.  This was
21   referring to the materials supervisors.
Q    Okay.  That's not my question.  Let me be more
23   specific.  I take this to say that you need to pay as
24   an employer individuals who are supervisors, pay for
25   every hour worked.  Okay?  Not at an overtime rate,
     but a straight time rate.  Is that what you take it to

1     mean?

2     A     I would disagree with your -- I think what you're

3     getting at.  I would disagree with that.

4     Q     Okay.  What would you take it to mean?

5     A     If -- what -- what this is saying is if the

6     individual's an exempt  employee, if -- if they're

7     working you do have to pay them for -- for the time

8     that they work and whatever that particular daily or

9     weekly pay rate is, or pay amount is, that's what you

10    have to pay them.  You're not required to pay premium

11    pay, time and a half.

12    Q     Right.  But you are to pay -- if somebody works.....

13    A     But it doesn't mean that you pay the person, if

14    they're working 18 hours in a day, it doesn't mean

15    that you pay them each and every hour that they

16    actually work.  As a -- as a definition of an exempt

17    employee, they get paid a straight weekly rate, a

18    daily rate.

19    Q     Okay.  So a person might interpret this to mean if

20    they got a day rate for 12 hours for -- well, pick a

21    number I guess, $475 for a day rate, and they worked

22    16 hours, that they ought to get an additional four

23    hours at the rage of 475 divided my 12?

24    A     That would not be my interpretation, no.

25    Q     Okay.  But the question is, not -- I'm not saying

      that's your interpretation.  A person might interpret

1      that to be what this is saying, is that fair to say?

2      I disagree.  You're asking me to interpret your

       interpretation.

4      No, I'm asking you to interpret what it says here, and

5      I'm asking you, if somebody were to make that

6      interpretation of this, would that be a reasonable

7      interpretation?

8             MS. ZOBEL:  Asked and answered.

9      I'll ask it.....

10     Exactly.  I was just going to say, I answered that

11     already, and that would be my.....

12     And your answer.....

13     .....interpretation.

14     .....is that, no, that would not be a reasonable

15     interpretation?

16     That's correct.

17     Okay.  All right.  So is it correct to say -- well,

18     okay.  Is it correct -- yeah, is it correct to say

19     then that APC took no action to pay supervisors pay

20     for all hours worked?  Or let me put it this way.  APC

21     didn't change what it was doing in paying its

22     employees based upon the advice in this letter?

23            MS. ZOBEL:  I'm going to object.  I think he's

24     asked -- you've asked and answered that, and he said he did

25     not know what action was taken in response to this letter.

Q      (By Mr. Covell)  All right.  Go ahead and answer the

1    question.

2    And that would.....

3    Thank you.

4    Yeah, that would have been my response.  And.....

5    Your response is you don't know?

6    I don't know what steps Mark Nelson may have taken as

7    a result of this letter.

8    Okay.  If APC had done that -- how many people do you

9    have who might fit that category?

10   What category?

11   The category of people who are exempt but under the

12   interpretation I suggested would be entitled to

13   additional monies?

14   None if they're classified as exempt.  They get paid

15   what they're set up to get paid, whether it's a day

16   rate or a weekly rate or a monthly rate.

17   Okay.  But if the correct interpretation of this is

18   contrary to what yours is, and that they were entitled

19   to additional monies, how many people would fit in

20   that category?

21   I have no idea.

22   Okay.  Can you estimate?

23   No, sir, I can't.

24   Okay.  If APC decided, and they said, Mr. Boyle, we'd

25    like -- you've worked for us for years, we believe

     you're wrong on that issue, we believe it means we

```
1    have to pay additional monies, and we're going to pay
2    additional monies.  Is that something you would have
3    been involved in or been aware of?
4    If that determination was made, I'm sure many people
5    would have been involved, including myself yes.
6    So had APC paid additional monies pursuant to this,
7    that's something you would have known about?
8    I mean, if.....
9         MS. ZOBEL:  It calls for speculation.
10   Again, if it's.....
11        MR. COVELL:  That's -- I'll let him.....
12   .....if it's a -- if it's a.....
13   (By Mr. Covell)  You can answer.
14   .....one off, probably not.
15   All right.
16   But if it's a -- you know, it affects many, many
17   people, and that was your original question.  You said
18   if all these people were all of a sudden falling under
19   this interpretation, would I be involved, then, yes.
20   If it's a one off situation, probably not.
21   And what does one off mean?
22   You'd have to go back to the number of materials
23   supervisors of that particular asset.  There may have
24   been two that -- that I knew of.
25   All right.  So you.....
A    There may have been four.  I don't know.
```

**METRO COURT REPORTING**
*745 West Fourth Avenue, Suite 425*
*Anchorage, Alaska 99501*
*(907) 276-3876*

Q    One off means a small number of people?

A    Yes.

Q    Okay.  All right.  Okay.  All right.

4              MR. COVELL:  And we got that marked, right?
That's number G-5?  6?

6              MS. ZOBEL:  B-6.

7              MR. COVELL:  B-6, okay.  All right.  And.....

8              MS. ZOBEL:  You have it marked at G-6?  I
believe it's B-6.

10              MR. COVELL:  Yeah.  Thank you.

11              MS. ZOBEL:  This is Mr. Boyle.

12              MR. COVELL:  Thank you.  I've called him Mr.
Boyle consistently, too.

14              MS. ZOBEL:  Yes, you have.

Q15    (By Mr. Covell)  As far as interpreting those sections

16    we talked about, are you aware of any written

17    commemoration of an analysis of what that meant?

A18    Not that I'm aware of, no.

Q19    Okay.  Would you expect that there is one?

A20    I would have no idea.

Q21    Okay.  All right.  Thank you.

22    (Pause)

Q23    And as far as this case goes, do you expect to testify

24    as to whether or not Mr. Gilbert as a safety

25    supervisor was exempt or non-exempt?

A    I'm -- I'm sorry?

Q    As far as this case goes, Gilbert versus APC, do you
2    expect to testify at trial or give evidence otherwise
3    that Mr. Gilbert as a safety supervisor was exempt
4    from overtime?

A    If called, yes.

Q    Okay.  And -- okay.  And I take it your opinion will
7    be that as a safety supervisor, he was exempt from
8    overtime?

A    My opinion, yes.

Q    Okay.  All right.  And what do you base that opinion
11   on?

A    The individual, number 1, as far as I know, what
13   little I know of the position, had direct
14   responsibilities for carrying out assigned tasks,
15   making sure the organization or department completed
16   assigned tasks, may have had supervisor
17   responsibilities for personnel, carrying out
18   management directives, policies, procedures.

Q    Let me interrupt you.  To -- until today, had you done
20   this analysis in preparation for this case?  In other
21   words, prior to today, had you done an analysis of
22   that nature as to whether or not the safety supervisor
23   job was exempt or non-exempt?

A    Of that particular position?

Q    Correct.

A    No.

Q    Okay.

A    No.

Q    All right.  Okay.  And it would be correct to say that
4    whether or not Mr. Gilbert filled in for Mr. Smith up
5    north in Mr. Smith's position, you have little or no
6    knowledge of that circumstance?

A    I don't.

Q    Okay.  And since you haven't done that analysis yet,
9    you can't tell us what category of exemption -- is it
10   fair to say, since you haven't done that analysis yet,
11   you can't tell us what category of exemption the
12   safety supervisor would fall into?

A13  No.

Q14  Okay.  Do you know how many hours the clerical staff
15   at Kuparuk health and safety office worked on a
16   regular basis?

A17  That particular staff?  No.

Q18  Okay.  Do you expect that it would have been 12 hours?

A19  I can say the general work schedules on the Slope are
20   anywhere from 10 hours to 11 and a half hours.

Q21  Okay.

A22  Specific to that department, I don't know.

Q23  Okay.

24   (Pause)

Q25  It's been represented to me that the position of
     safety supervisor has been reclassified around April

1    of 2003.  Am I clear in understanding your testimony

2    today that you were not involved in that

3    reclassification?

4    A    No, I was not.

5    Q    Okay.  I thought you were telling me it was not clear,

6    so thank you.  Again to be clear, and hopefully not

7    too redundant, you -- do you know anything about that

8    or you don't know anything about that, if that was

9    done or not?

10    A    That's correct.

11    Q    Okay.  Okay.  And again to be clear, and hopefully not

12    redundant, do you know if material supervisors were

13    ever paid for all hours they were suffered or

14    permitted to work?

15    A    I would have to go back and take a look at time

16    sheets, individuals who occupied that job title.

17    Q    Okay.  You have no information that.....

18    A    I have.....

19    Q    .....they were?

20    A    No.

21    Q    Okay.  APC has asserted a good faith defense in this

22    case.  What -- are you aware of that?

23    A    Doesn't that -- that's a legal conclusion.  I -- I'm

24    not sure what.....

25    Q    Okay.  Well.....

A    .....(indiscernible - simultaneous speech) there.

1    Q    Well.....

2              MS. ZOBEL:  You're asking if he knows whether

3    we have asserted an affirmative defense of having classified

4    in good faith?

5              MR. COVELL:  Yes.

6              MS. ZOBEL:  Okay.

7    A    Yes.

8    Q    Okay.

9    A    Yes.

10   Q    You're aware of that.  Okay.  What documentation is --

11        will  APC rely upon in asserting that defense, if you

12        know?

13   A    I have no idea.  That's -- that would be something

14        referenced to counsel.

15   Q    Okay.  Okay.

16   (Pause)

17              MR. COVELL:  Off record.

18   (Off record)

19   (On record)

20              COURT REPORTER:  We're back on record.

21              MR. COVELL:  That's all I have, thank you.

22              MS. ZOBEL:  And I have no questions.

23   (Off record)
                  * * * END OF PROCEEDINGS * * *
24

25

## S I G N A T U R E

1
STATE OF ALASKA            )
2                          ) ss.
THIRD JUDICIAL DISTRICT )
3

4          I, **CHRISTOPHER B. BOYLE**, have read the

5 foregoing deposition and have made corrections thereto.  Any

6 and all changes, explanations, deletions and/or additions to

7 my testimony may be found on the correction sheet(s) enclosed

8 with this transcript.

_____
9          **CHRISTOPHER B. BOYLE**

10
STATE OF ALASKA            )
11                         )ss.
THIRD JUDICIAL DISTRICT )
12

13          THIS IS TO CERTIFY that on this _____ day of

14 _____ 2006, before me appeared **CHRISTOPHER B.**

15 **BOYLE**, to me known and known to be the person named in and who

16 executed the foregoing instrument, and acknowledge voluntarily

17 signing and sealing the same.

18          _____
           Notary Public in and for
19          State of Alaska, at Anchorage
           My Commission Expires:_____
20

21

22

23

24

25

**M E T R O  C O U R T  R E P O R T I N G**

*745 West Fourth Avenue, Suite 425*
*Anchorage, Alaska 99501*
*(907) 276-3876*

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

**C E R T I F I C A T E**

UNITED STATES OF AMERICA          )
                                  ) ss.
STATE OF ALASKA                   )

      I, Jerri Young, Notary Public in and for the State of Alaska and Reporter with Metro Court Reporting, do hereby certify:

      THAT the annexed and foregoing Deposition of **CHRISTOPHER B. BOYLE** was taken before Cheri Tabor on the 1st day of June, 2006, commencing at the hour of 9:00 a.m., at the DeLisio Moran Geraghty & Zobel, P.C., 943 West Sixth Avenue, Anchorage, Alaska, pursuant to Notice to take said Deposition of said Witness on behalf of the plaintiff;

      THAT the above-named Witness before examination, was duly sworn to testify to the truth, the whole truth, and nothing but the truth;

**M E T R O   C O U R T   R E P O R T I N G**

*745 West Fourth Avenue, Suite 425*

*Anchorage, Alaska 99501*

*(907) 276-3876*

THAT this Deposition, as heretofore annexed, is a true
1 and correct transcription of the testimony of said Witness
taken by Cheri Tabor and hereafter transcribed by Meredith
2 Downing;

3      THAT the original of the Deposition transcript will be
lodged in a sealed envelope with the attorney requesting
4 transcription of same, as required by Civil Rule 30(f)(1)
amended, that attorney being:
5
       **MR. KENNETH L. COVELL**, Attorney at Law, 712 Eighth
6      Avenue, Fairbanks, Alaska 99701;

7      THAT I am not a relative, employee or attorney of any
of the parties, nor am I financially interested in this
8 action.

9      IN WITNESS WHEREOF, I have hereunto set my hand and
affixed my seal this 3rd day of July 2006.
10

11

12                           _____
                             Jerri Young
                             Notary Public in and for Alaska
13                           My Commission Expires: 11-03-07

14

15

16

17

18

19

20

21

22

23

24

25