1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF ALASKA


JOHN GILBERT,           )
                        )
       Plaintiff,     )
                        )
vs.                 )
                        )
APC NATCHIQ, INC.,    )
                        )
       Defendant.    )
_____)  Case No. 3:03-CV-00174-RRB


**DEPOSITION OF MARK C. NELSON**
**June 15, 2006**

**APPEARANCES:**

*M E T R O   C O U R T   R E P O R T I N G*

*745 West Fourth Avenue, Suite 425*

*Anchorage, Alaska 99501*

*(907) 276-3876*

```
 1      FOR THE PLAINTIFF:      MR. KENNETH L. COVELL
                                Attorney at Law
 2                              Law Offices of
                                   Kenneth L. Covell
 3                              712 West 8th Avenue
                                Fairbanks, Alaska  99701
 4                              (907) 452-4377

 5
        FOR THE DEFENDANT:      MS. PATRICIA ZOBEL
 6                              DeLisio Moran Geraghty
                                   & Zobel, P.C.
 7                              Attorneys at Law
                                943 West 6th Avenue
 8                              Anchorage, Alaska  99501
                                (907) 279-9574
 9

10      ALSO PRESENT:           MR. DOUGLAS SMITH

11

12                          * * * *

13

14

15

16

17

18

19

20

21

22

23

24

25
```

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

        PURSUANT TO NOTICE, the Deposition of **MARK C. NELSON**
was taken on behalf of the Plaintiff before Cheri Tabor, Notary
Public in and for the State of Alaska and Reporter for Metro
Court Reporting at the law offices of DeLisio Moran Geraghty &
Zobel, P.C., 943 West 6th Avenue, Anchorage, Alaska 99501, on
the 15th day of June 2006, commencing at the hour of 10:30 a.m.

                        **\* \* \* \***
                  **TABLE OF CONTENTS**

        Direct Examination by Mr. Covell ....................4


                *M E T R O   C O U R T   R E P O R T I N G*
                    *745 West Fourth Avenue, Suite 425*
                        *Anchorage, Alaska 99501*
                          *(907) 276-3876*

1        **<u>EXHIBITS</u>**

2        N-1 - Memo from Mark Nelson.........................10
         N-2 - Deposition of Mark C. Nelson  ................16
3        N-3 - Safety Supervisor Job Announcement ...........32
         N-4 - Supplemental Disclosure from Patricia
4              Zobel.......................................32
         N-5 - Safety Department Organizational Chart .......33
5        N-6 - New job announcements and
               description................................43

6

7                        * * * *

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

*M E T R O   C O U R T   R E P O R T I N G*

*745 West Fourth Avenue, Suite 425*

*Anchorage, Alaska 99501*

*(907) 276-3876*

1                       **P R O C E E D I N G S**
2        (On record)
3                    COURT REPORTER:  My name is Cheri Tabor and I'm
4   a court reporter for Metro Court Reporting in Anchorage,
5   Alaska.  Today's date is June 15, 2006, and the time is
6   approximately 10:30 a.m.  We are at the offices of DeLisio
7   Moran Geraghty & Zobel, P.C., 943 West 6th Avenue, Anchorage,
8   Alaska 99501 for the deposition of Mark Nelson.  This case is
9   in the United States District Court for the District of Alaska,
10  in the matter of <u>Gilbert v. APC</u>, Case No. 3:03-CV-00174 RRB.
11       Mr. Nelson, please raise your right hand so I can swear
12  you in.
13       (Oath administered)
14                   MR. NELSON:  I do.
15                       <u>MARK C. NELSON</u>
16  having first been duly sworn under Oath, testified as follows
17  on examination:
18                   COURT REPORTER:  Thank you.  Please state your
19  full name and spell your last name for the record.
20  A        Mark Christian Nelson, N-e-l-s-o-n.
21                   COURT REPORTER:  And I need a mailing address
22  for you.
23  A        3900 C Street, Suite 301, Anchorage, 99503.
24                   COURT REPORTER:  I also need a daytime or
25  message telephone number.

1    441-8071.

2              COURT REPORTER:  Thank you.  Counsel would you

3    please identify yourselves for the record?

4              MR. COVELL:  Kenneth Covell for plaintiff

5    Gilbert.

6              MS. ZOBEL:  Patricia Zobel for APC defendant.

7              COURT REPORTER:  Thank you.  You may proceed.

8              MR. COVELL:  Thank you.

9                    **DIRECT EXAMINATION**

10   BY MR. COVELL:

11   Q    Mr. Nelson, you were deposed a few years ago on a case

12        called <u>Zuber v. APC</u>, right?

13   A    Correct.

14   Q    And in preparation for today's deposition, did you have

15        an opportunity to review that prior deposition?

16   A    The only prior I've done, is five minutes ago I reread

17        the letter from the State -- and I just did that.

18   Q    Okay.  I don't intend to go into depth in your prior

19        deposition, but do you have any reason, even if you

20        haven't reviewed your prior deposition to think your

21        answers would be different today than they would be

22        from back then, at least in general?

23   A    They should -- they should be identical.

24   Q    Okay.  And what you just reviewed, was this WHOL-122,

25        is that the letter you reviewed, the letter from Randy

         Carr to you?

*METRO COURT REPORTING*

745 West Fourth Avenue, Suite 425

Anchorage, Alaska 99501

(907) 276-3876

A    Is that the -- yes.

Q    Okay.  Since 2003, I guess what I'm trying to get at is
     briefly where you are in the organization since last we
     spoke.  What I understood when we last spoke was you
     were president of APC Natchiq, is that right or wrong
     or close?

A    Correct.

Q    All right.  And that was 26 of August 2003, does that
     sound about right?

A    It's right.  Correct.

Q    Right around August 26th?  Okay.  So, since then where
     have you been job wise or organizationally with APC?
     And I understand that there's AES Energy Services and
     that's all somewhat unclear to me, but if you could try
     to briefly run us through your position, let's say
     relative to your old position -- organizationally?

A    2004, I moved to -- from the presidency of APC to --
     the company name was changed to ASRC Energy Services
     Operations and Maintenance.  Sometime in the period
     after that deposition, until the time I left, we
     changed the company name.  I moved to the parent
     company, ASRC Energy.

Q    Okay.

A    Headed up the business development group for the parent
     company for about a year.  And in the -- December of
     this year, moved over at -- a different job offer.

1      Moved over as a COO of a construction holding company.

2      Which.....

3      I'm no longer employed by ASRC Energy Services.

4      Okay.  So you went to this construction holding

5      company, sometime in the last year or so, I think.

6      In the last six months.

7      Okay.  And so you're out of ASRC entirely, at that

8      point?

9      Right.  I'm out of ASRC Energy Services.

10      Is the company you're with now, an ASRC company?

11      Yes.

12      And what's the name of that?

13      ASRC Construction Holding Company.

14      Okay.  So you were in the presidency through '04, and

15      then you went into marketing and development, is that

16      right?

17      Correct.

18      And what did you market and develop, just briefly?

19      Business of ASRC Energy Services.

20      Okay.  So you still would have been president in April

21      '03 when the positions of safety specialist and safety

22      supervisor were reclassified from exempt to non- -- no,

23      from non-exempt to exempt?

24      Correct.

25      All right.  And assuming Mr. Gilbert ended his

employment about April '03, he would have been one of

1    the employees under your direct command?

2    A    At that time I was president, if he was an employee of

3    APC, he would have been in a -- in the direct line

4    of --

5    Q    Okay.  And why don't we cover this question right now:

6     Do you know Mr. Gilbert vaguely or not at all?

7    A    Only by name.

8    Q    Okay.  And is that because of the lawsuit or is that

9    because at the time he was there, you had some exposure

10    to him?

11    A    Probably a combination of both.

12    Q    Okay.  But basically it's.....

13    A    If he walked in here right now, I wouldn't know the

14    guy.

15    Q    All right.  Basically, the familiarity is if you saw

16    his name on a roster, you'd go, that's one of my guys

17    or I think that's one of my guys?

18    A    In the context of APC, sure.

19    Q    In _Zuber_ we discussed you examining the position of

20    safety specialist and making a determination whether or

21    not that position ought to be eligible for overtime or

22    not eligible for overtime, right?

23    A    Can you rep- --

24    Q    Sure.

25    A    In this previous deposition?

Q    In the previous case, in _Zuber_ -- correct me if I

1    interchange the names here.  In the _Zuber_ case, we
2    spent a lot of time talking with you about whether or
3    not the safety specialist job was exempt or non-exempt.
4    I don't -- I don't recall.  The case -- we spent time
5    around another position, a warehouseman, may -- we may
6    have.  I'd have to look back to the deposition.  I
7    don't know how much detail in the deposition we talked
8    about safety specialist.
9    Okay.  Well.....
10   Well maybe we did, yes.
11   Okay.  Let me represent to you that's reflected in your
12   deposition.
13   Okay.
14   That you spent a fair amount of time discussing
15   conversations with Randy Carr, using some worksheets
16   concerning questions of whether or not somebody ought
17   to be exempt under the administrative professional or
18   other exemptions.  Is this refreshing your recollection
19   at all?
20   Yes, okay.  Safety special.....
21   Right.
22   Not a supervisor.
23   Right.
24   Okay, yes.
25   Did you do any examination of the position of safety
     supervisor to determine whether or not it ought to be

1       exempt for overtime or not?

2               MS. ZOBEL:  You're speaking of 1998 or at any

3  time?

4               MR. COVELL:  Let's say ever, for the time being

5  and then we can break it down by time.

6       At the time, and I don't -- which year this was -- '97,

7       '90- -- the same timeframe I spoke with the State

8       representative which was Carr, Randy Carr.

9       Q       Right.

10      I -- I went through all position on the North Slope.

11      Okay.  And so if Mr. Carr's letter is June 26, '97, it

12      would be in that timeframe?

13      Right.

14      Okay.  And you've got a copy of that there with you,

15      right?

16      Right.

17      Okay.  And that's alternatively referred to on the face

18      of it, in the right-hand corner as WHOL-122, right?

19      Correct.

20              MR. COVELL:  Why don't we get this marked

21  number one, here please, madam clerk.

22              COURT REPORTER:  Exhibit N-1 marked.

23                      **(Deposition Exhibit N-1 marked)**

24              MR. COVELL:  And then just for the record we

25  should probably make these Z's in front of the APC's, would you

agree with that?

*METRO COURT REPORTING*

1        MS. ZOBEL:  G.  Why would you do Z?

2        MR. COVELL:  Why don't we go off record for
just a second.

4      (Off record)

5      (On record)

6        MR. COVELL:  And for purposes of clarity here,
we've agreed that the N-1 will place a Z on each page in front
of the APC numbers, because it's our belief that they came from
the Zuber case originally, in order to avoid confusion with
similarly numbered pages disclosed in Gilbert.  All right.  I
can get back on my train of thought here.

12    Q    (By Mr. Covell)  And in looking at the last two pages

13        then of N-1, that's that Randy Carr letter of June 26,

14        '97 to yourself, and it's alternatively designated near

15        the upper right-hand corner as WHOL-122, is that right?

16    A    Correct.

17        MS. ZOBEL:  Could I ask what the WHOL is?

18        MR. COVELL:  It's wage and hour opinion letter.

19        MS. ZOBEL:  Of course, it is.  All right.  I
was thinking you had put it on there.....

21        MR. COVELL:  No.

22        MS. ZOBEL:  .....in the prior deposition.

23        MR. COVELL:  Okay.

24        MS. ZOBEL:  Too many numbers in this thing.

25        MR. COVELL:  And acronyms, too.

        MS. ZOBEL:  Yes.

Q    (By Mr. Covell)  So, you said, going back -- testing my

2    memory here, you said at the time contemporaneous to

3    that, you did a review of all positions in APC?

A    Correct.

Q    Okay.  And one of those --

A    It's one of the positions.

Q    I apologize, Mr. Nelson, sometimes the questions we ask

8    sound stupid, but for clarity of the record we have to

9    ask the redundant questions.

10        MS. ZOBEL:  And I think I need to clarify the

11   record here with the regard to the safety supervisor position,

12   because I think that they were different at the time that Mark

13   was doing this in '97 and '98 and I think that comes from the

14   testimony of Doug Smith, because when he came in it was a

15   different -- he created that position.  It was different from

16   what had been held by Mr. Cannon or Gary Buchanan, I think.

17   Not Gary Buchanan, but other people who had held that.  And you

18   can query him about that, but that's my understanding and I

19   don't want the record to be messed up because we're talking

20   apples and oranges.

21        MR. COVELL:  Well that's.....

22        MS. ZOBEL:  See if that's his understanding.

23        MR. COVELL:  All right.

24   (By Mr. Covell)  So, around that time of Mr. Carr's

25   letter, you did a review of the safety supervisor

     position to see whether or not he qualified for

1    overtime or not?  He said yes to that question.

2    Subsequent question now, is tell me what you did in

3    that regard?  In other words tell me how you conducted

4    your review.

A    For a safety supervisor?

Q    Uh-huh.

A    I started with the position -- the employees in the

8    position.  In the year '96, '97, Bob Cannon was the

9    supervisor, one of the supervisors, and basically

10    talked with those employees or that person about the

11    position.  Although at the time, those positions were

12    direct reports of mine, so I also had a pretty good

13    background of what they were doing for me as a direct

14    report.  So the combination of those two things, I

15    could draw a conclusion in that if I felt the -- there

16    was further research I needed to do, then I would

17    further research the position.

Q18    Okay.  And did that come to pass or not?

A19    Well for.....

Q20    Did you do further research?

A21    The safety supervisors were a position that I needed

22    further clarification around which was also part of my

23    conversation, in general, with the Wage and Hour

24    Division.

Q25    All right.  So, you talked to Mr. Cannon?  You had a

conversation with the Wage and Hour Division and we

1    should assume that conversation or conversations was

2    with Mr. Carr or not?

3    A    I know I had at least one conversation with Mr. Carr.

4    You're drawing on 10 years ago now.

5    Q    Sure.

6    A    I -- I know I talked with him.  I can almost remember

7    some of it very vividly -- the details of the

8    conversation with Mr. Cannon, but how many

9    conversations with the State now, I don't recall.

10   Q    Okay.  But, it's my recollection, I've looked at your

11   deposition more recently.....

12   A    Yes, you may be better -- answer the question.

13   Q    I think you said you may have talked to Mr. Carr five

14   or six times.  Something in that nature would be --

15   okay.  But besides -- was there another actor besides

16   Mr. Carr, that you recollect?

17   A    I don't recall.

18   Q    Okay.  So you talked to Cannon and you talked to Carr

19   and then what conclusion, if any, did you reach about

20   the exempt or non-exempt status of the safety super- --

21   let me pull that question.  Did you do anything else in

22   considering whether or not the safety supervisor ought

23   to be exempt or non-exempt?

24   A    If the file didn't reference a written document, and

25   with the safety supervisors, I don't recall doing one.

I don't think there was a -- there's a stand

*METRO COURT REPORTING*

745 West Fourth Avenue, Suite 425

Anchorage, Alaska 99501

(907) 276-3876

1    checklist.  I -- you've got a copy of it, that we used

2    to do back then, or I had done a number of them at the

3    time.  I don't recall doing one for the safety

4    supervisors.

5    Q    Okay.

6    A    I doubt that I did given my recollection of the

7    position at this time.

8    Q    And then you brought up the checklist and whatnot --

9    papers.  I'm not aware of any papers that relate to the

10   safety supervisor analysis as opposed to there are some

11   that you mentioned in regard to the safety specialist

12   position.

13   A    The second tier.  Right, that's correct.

14   Q    Okay.  And so that -- me not having any comports was

15   your recollection of what you did?

16   A    Uh-huh (affirmative).

17   Q    Okay.  All right.  What training or experience did you

18   have at that time in human relation?  I'm sorry, human

19   resources or employee resources, personnel, whatever

20   you want to call it that would qualify you to make an

21   exempt, non-exempt determination?

22   A    Well, I was competent to talk with the State, and read

23   and understand the regs as best I could interpret.  I

24   think at the time I asked our Anchorage office for

25   assistance for a second or third opinion and based upon

     my formal education, I came to some conclusions around

1    all of the positions on the North Slope whether they
2    were exempt or non-exempt.
3  Q   Let me paraphrase here, just to try to move things
4    along.  If I'm suggesting incorrectly, straighten me
5    out, but you read and write English, you've gone to
6    school, you have a degree in accounting, you can
7    analyze things as well as the next person on the street
8    so to speak, or perhaps better because of your training
9    and education of whatever field you're in, and that
10   enables you to make that determination, is that
11   essentially what you're telling me?
12  A   Correct.
13  Q   Okay.  And then my question, at least in part, leans
14   toward saying besides having the abilities that many
15   might, do you have any specialized training, education
16   or experience that would lend you an ability perhaps
17   above somebody else with that and I don't mean to
18   demean accounting, but to call it the generic
19   education, training and experience as opposed to some
20   nature of specialized training, experience or education
21   in the area of human resources?  Do you under that as a
22   question?
23  A   Is that a question?
24  Q   That was the question.
25  A   I'm not sure I know how to answer.  Let me.....
    Q   All right.  Do you have specialized training and

*METRO COURT REPORTING*

745 West Fourth Avenue, Suite 425
Anchorage, Alaska 99501
(907) 276-3876

1      experience in human resources?

2      A    Outside of the work place, beyond conference -- I think

3      one of them lies with the State or some of those --

4      Q    Okay.  You've been in conference or seminar, but

5      generally not?

6      A    Those are specialized trainings around wage and hour,

7      they last 3, 4 days -- put on by the State, that type

8      of thing.  Beyond that, no.

9      Q    Okay.

10          MR. COVELL:  I'd like to take a brief pause

11     here madame reporter.

12     (Off record)

13                              **(Deposition Exhibit N-2 marked)**

14     (On record)

15          MR. COVELL:  Mr. Nelson, we marked for you

16     Exhibit N-3, is it?

17          COURT REPORTER:  N-2.

18     Q    (By Mr. Covell)  N-2, which is your former deposition

19     and I directed your attention to pages 26, line 23

20     through page 28, line 20.  You've had a chance to read

21     that off record?

22     A    (No audible answer)

23     Q    You need to answer audibly.

24     A    Okay.  I'm sorry.  I didn't understand it was a

25     question -- yes.

Q      All right.  Thank you.  Is what you're saying there in

1    that passage about a review of the safety supervisor

2    position, the same thing you're telling me today?

3  A    Yes.

4  Q    Okay.

5    (Off record comments)

6  Q    And besides that review then you did at that time of

7    the safety supervisor position for eligibility for

8    overtime from that time until you left your job as

9    president in 2004, were you involved in any other

10    reviews of the safety supervisor position for

11    eligibility of overtime?

12  A    No.

13  Q    Okay.  Were you aware of any other reviews of the

14    safety supervisor position for eligibility of overtime

15    as opposed to being involved in?  Again, it may sound

16    like a stupid question, but just trying to keep it

17    clear.

18  A    Sounds like it.  And if I understand it, I -- the

19    answer is no.

20  Q    All right.  Thank you.

21  A    You want this exhibit back?

22    MR. COVELL:  Yes, we'll just stack them up

23  right here in front is fine.

24  Q    We've already given you number one.  Why don't you turn

25    your attention to N-1 there.  In looking at N-1, the

    first document there is December 7, '96 memo from

1    yourself to Anne Hippe.  Is this something that either

2    sparked, or was it the beginning of your review of the

3    various positions at APC for overtime?

4  A    Around this time, sure.

5  Q    Okay.  And then following that page is a memo from

6    Christopher Boyle to various people talking about, I

7    guess, day rate and reviewing positions for exempt,

8    non-exempt status, is that right?

9  A    Correct.

10  Q    And is that something that -- let me represent to you

11    in your last deposition even though your name's not on

12    here, I don't believe it is, you represented that you

13    saw that or would have seen it, does that comport with

14    your recollection today?

15  A    Likely.

16  Q    Sure.  Okay.  You see there where it says, please

17    provide me with the requested information by January

18    15, 1997?

19  A    Yes.

20  Q    Okay.  And that would be directed towards the exemption

21    issue, right?

22  A    Yes.

23  Q    Okay.  Did you provide information to Mr. Boyle that

24    date or otherwise in regard to the exempt, non-exempt

25    status of positions with APC?

A    I don't recall.

1    Q    Okay.  And again, if you did, at least as far as the

2         safety supervisor goes, you would expect that there

3         would be any writings in that regard?

4    A    I don't re- -- I don't recall.

5    Q    Okay.  That's fine.  To your recollection are there any

6         writings -- withdraw that.  I think you said you

7         reviewed every position at APC for exempt, non-exempt

8         status, is that a fair characterization or unfair?

9    A    Fair.

10   Q    Okay.  And approximately how many positions would that

11        be?  What's the range in numbers there?

12   A    I wasn't reviewing non-exempt positions.  I was focused

13        on exempt only because as a non-exempt position,

14        there's not a liability.

15   Q    Right.  Okay.

16   A    For employers, anyway.  I looked at the exempt

17        positions.  We could have had a few dozen exempt

18        positions at the time.

19   Q    Okay.

20   A    I'm guess- -- guesstimating.

21   Q    Okay.  And then you reviewed all of those?

22   A    Some would have been fast -- certainly my own position,

23        quickly come to a conclusion around, versus others

24        which I would have had triggers that would require

25        further investigation.

Q    Right.  As to any of those positions do you know if

1    there are any writings concerning the analysis for

2    classification of the positions?

A    I think there were at the time, 10 years ago.

Q    Okay.

A    I don't know if I addressed that in my earlier

6    deposition.  My memory today is far -- is more fuzzy

7    about what I wrote or didn't write 10 years ago.

Q    We do know that we have this WHOL-122, right, in regard

9    to --

A    Yes.

Q    Okay.  Beyond that, and, again, I realize this is

12    redundant, but to be clear for the record, do you know

13    if there are any other writings that would commemorate

14    in any form a review for exemption or non-exemption?

A    And when you say writing, you mean from a determination

16    letter like the one you're referencing WHOL or --

Q    From it being a formal WHOL down to --

A    There was a file at the time that I maintained that was

19    fairly extensive of notes, of checklists.  There was a

20    checklist we used to use of these kinds of memos.  Any

21    information I could gather around the exempt, non-

22    exempt issue to help further my education that I

23    maintained.

Q    Okay.  And can you recollect, and I realize it's 10

25    years, but just asking you for the record.....

A    It's okay.

Q     Can you recollect what positions those notes might
2     apply to?
A     I -- I really can't.
Q     All right.  And would you expect those notes to be in
5     existence as of -- I'll make this a two-part question
6     but I'll give it to you one part at time:  As of today?
A     They could be in some conex somewhere buried.  Are they
8     accessible?  I've moved offices many times and all
9     that.  I -- I don't know if I could ever.....
10     Would you expect that they would have been accessible
11     as of 2003?
12     I think when the prior deposition was given, Ken, I
13     tried to find as much infor- -- as I could.
14     Okay.
15     And if it didn't surface then, it isn't going to
16     surface now.
17     Okay.  So as of your prior deposition, if it was
18     something you could have come across you would have got
19     it for us?
20     I would have pulled it out.
21     All right.  Very good.  Again, in the hopes of saving
22     some time here, in the previous deposition I pointed
23     out a number of passages within these documents that
24     talk about the complications and the difficulties in
25     making the wage and hour exemption determination, you
      acknowledged that those were in there.  Would you agree

1    that making these types of determinations can be

2    difficult and complicated?

3    A    Sure.

4    Q    All right.  In any of these reviews that you did, did

5    you ever do some type of time analysis to consider the

6    issue of whether or not an employee was spending 20

7    percent of his or her time doing what might be called

8    rank and file or worker type of duties?

9    A    Yes.

10   Q    Okay.  And how did you do that?

11   A    Either through interview of the position, the employee,

12   or if I had my own knowledge of being on the project

13   sites, through a combination of those.

14   Q    Okay.  And, again, this will sound redundant, are there

15   any written records commemorating those analysis?

16   A    That haven't already surfaced?  No.

17   Q    Okay.  Do you know if you ever submitted any of that

18   information to Randy Carr either orally or in writing

19   or somehow?

20        MS. ZOBEL:  Other than what's in this stack?

21        MR. COVELL:  Right.

22   A    I sus- -- what I had told you a few years ago in my

23   previous deposition would have been all I had.  There

24   was -- whatever I mentioned then, and my recollection

25   was better two or three years ago than it is today.

Q    Sure.  I understand and appreciate that.  I guess that

*METRO COURT REPORTING*

*745 West Fourth Avenue, Suite 425*
*Anchorage, Alaska 99501*
*(907) 276-3876*

1   springs on this question:  Had there been a detailed

2   commemoration somehow, like you said in writing done

3   then, it would be a whole lot easier for us today to

4   ascertain what you did or didn't do then, right?

5   A  Yes.

6   Q  So is it your testimony, then, that your review of

7   those 24 positions or whatever it was we talked about

8   for exempt, non-exempt at the time contemporaneous to

9   these memoranda would have fulfilled Mr. Boyle's

10  request for somebody to be providing him with

11  information concerning exemption, non-exemption by

12  January 15.  And let me just make a note here, I don't

13  necessarily know that it happened by then, there's

14  subsequent memos and I'm not sticking on that date as

15  to whether or not it was done by that date, but

16  sometime say within that year?  And you want me to ask

17  that again, and be more clear?

18          MS. ZOBEL:  I have no clue what you're asking.

19          MR. COVELL:  Okay.

20  I think I actually understand the question.

21          MS. ZOBEL:  If Mark understands it, go ahead.

22  Let me make the comment, I -- you saw it and you

23  pointed it out in one of the first memos.  I wrote, you

24  know, interoffice memo to the controller, the CFO, at

25  the time and basically said I have questions and

    concerns about the exempt issue that's in the field

1     today.  Shortly, thereafter, you'll see Chris Boyle's

2     e-mail back out to the field, I'm not copied on it,

3     he's asking three weeks later in copying those same

4     people that I wrote to, the CFO and the controller.

5     Q    (By Mr. Covell)  I appreciate the information, but let

6     me just stop you to be clear.

7     A    Yes.

8     Q    So when you're talking about your initial memo you're

9     talking about December 7?

10    A    Right.

11    Q    The first page of it?

12    A    Right.

13    Q    And then you're calling this second page of it, Chris

14    Boyle, December 26, his e-mail, right?

15    A    Correct.

16    Q    Okay.  Go ahead please.

17             MS. ZOBEL:  Actually, it's not an e-mail, I

18    think it's a memo.

19    This is the assumption 10 years ago, but I'm going to

20    -- the world as it was then, I'm thinking -- I'm quite

21    certain that Chris Boyle probably reacted in a positive

22    to my memo that was probably passed on to him.  He was

23    not a direct report of mine, but I'm sure it was passed

24    over and he's saying okay, let's check other sites out

25    there because of these other company heads, the

      Fredricksons, the Gabrielsons, the Laasches, the

*METRO COURT REPORTING*

745 West Fourth Avenue, Suite 425
Anchorage, Alaska 99501
(907) 276-3876

1    Cehulas, these are other people out there.  I'm not

2    copied.  So he's saying, look, I'm going to get -- Mark

3    is doing the analysis for the work that he's oversight

4    -- let's, in turn -- let's look at the rest of pie out

5    there.

Q    (By Mr. Covell)  Okay.  And if you'd turn.....

A    Now.....

Q    Go ahead.

A    Oh, okay.  And the -- you -- part of your question, the

10   January 15th, I was probably well underway.  I don't

11   know that my memo with Mr. Carr are those dates -- but,

12   I was probably well underway of doing some type of

13   analysis already.

Q14  Sure.  Let's turn a few pages back to what's labeled --

15   and it should be inked in ZAPC0180, and it's to you

16   from Boyle April 4, '97?

A17  Yes.

Q18  And would this document then be subsequent

19   communication in regard to, at least in part, the

20   exemption, non-exemption issue we've been discussing?

A21  Yes, as his first paragraph:  In follow-up to your

22   questions of appropriateness -- sure.

Q23  All right.  And let's turn to the next page 181 there,

24   you see, he's still making the recommendation at

25   parenthesis one there:  Review all occupations where

     there may be questions concerning classification of

1      exempt, non-exempt foremen and other personnel, et

2      cetera, right?

3   A  Yes.  You want confirmation that you just read that?

4      Sure.

5   Q  I want confirmation that Mr. Boyle's memo to you is

6      recommending that all occupations where there may be

7      questions concerning they are properly classified, be

8      reviewed.  That's the direction there, right or wrong?

9   A  Yes.

10  Q  All right.  And then subsequent to that starting with

11     201 through the end of it, appear to be documents -- or

12     is it fair to say that they're documents pertain to

13     your communications with Mr. Carr generally concerning

14     the material supervisor job?

15  A  Correct.

16  Q  Okay.  And again, you haven't had a chance to read --

17     well you read this WHOL letter prior to the deposition,

18     right?

19  A  Correct.

20  Q  And in there, in that WHOL letter, there's a discussion

21     about paying supervisors whether exempt or not for

22     every hour worked.  And if you want to take time and

23     review this that's.....

24  A  I think that's -- yes, I think that's correct.

25  Q  Okay.  Did APC ever pay any supervisory person monies

       pursuant to this determination that they're eligible

1    for pay for all hours worked?

2    Did we ever pay any supervisor --

3    Let me back up here.  What I take this to mean is that

4    if the supervisor works, let's say, supposed to work 12

5    hours and you get a certain amount of money for 12

6    hours.  If he works 13 hours he should get 1 hour of

7    straight time, do you take it to mean that or do you

8    take it mean something different?

9    If we classify them in this supervisory classification.

10   Okay.  So, it would mean that he worked hours, he'd get

11   one hour of straight time, but no premium pay for

12   overtime?

13   You could classi- -- right, that's -- I think that's

14   what his determination letter says, right?

15   So, then, my question to you is:  Did APC ever pay

16   anybody from that classification in that manner?  In

17   other words, if a guy worked 13, did he get his extra

18   hour of straight time?

19   Beyond our 12-hour day, you mean?

20   Right.

21   I don't recall.

22   Okay.  And, again, it may sound redundant, follow-up

23   question:  Are there any records that you're aware of

24   that would demonstrate that that did happen?

25   That I don't recall.

Q    Okay.  Did you or APC ever address any employees in

1    that classification and tell them that they were

2    entitled to get straight time pay for every hour

3    worked?  In other words for that 13th or subsequent

4    hour?

A    I don't recall.  I know it was one of our

6    classifications and it was out there.  Do I -- I don't

7    remember a specific conversation with the supervisor.

8    That would have probably been a tier below me.

Q    Okay.

A    At the time.

Q    All right.  Well, for instance, when his letter came

12    out it might be, but I don't know this because I wasn't

13    there, that somebody goes to the individuals in his job

14    and says we need to pay you for every hour worked.  So,

15    subsequent to today or prior to today, whatever, we'll

16    pay you for your time over 12 hours at the straight

17    time rate?

A    It could have easily happened, if this was an issue for

19    me at the time, I communicated well to my direct

20    reports.  I think all of my direct reports at the time

21    were classified as exempt which I was comfortable with.

22     They, in turn, could have gone through their next tier

23    where they would have had supervisors under them and

24    could have communicated this, yes.

Q    Okay.  But.....

A    I am not aware of it.

Q    All right.  So you're not aware that anybody paid
2    anybody any money for all hours worked pursuant to this
3    information coming to your attention?
A    I think it's happened, but I don't recall, like you
5    said, was it Jonny Jones, I don't remember.
Q    Well let's speak more generally, than Jonny Jones.  To
7    the extent that you think it's happened, you know, who,
8    what, when, where, why, how?  What are the
9    circumstances of it?
10    And then I don't recall.  I really don't.
Q11    All right.  And again, it may sound redundant, are you
12    aware of any records to that effect?
A13    No.
Q14    All right.
15         MR. COVELL:  Let's go off record madame clerk.
16    (Off record)
17    (On record)
Q18    (By Mr. Covell)  As far as you know Mr. Nelson, did
19    anybody talk to John Gilbert about what he did on a day
20    to day basis as safety supervisor?
A21    I don't know.  I wasn't -- he was after my time.
Q22    Okay.  But he was there, I represent to you he was
23    there '01, '03, so you would have been way up at the
24    top at the food chain and he would have been somewhere
25    close to the bottom, right?
A    Correct.

*METRO COURT REPORTING*

*745 West Fourth Avenue, Suite 425*
*Anchorage, Alaska 99501*
*(907) 276-3876*

1     Q    Okay.  And that comports with your prior answers that
2          you know his name?
3     A    (No audible answer)
4     Q    Okay.  Do you recollect that back in 2003 we could find
5          a job description for safety supervisor?
6     A    It's.....
7     Q    Let me represent to you that I had thought it was in
8          your deposition, that we discussed that and I was told
9          there was none.  I looked this morning and didn't see
10         it in your deposition so it may be Mr. Boyle's
11         deposition.  And I recognize you're telling me memories
12         have faded, but do you recollect having a safety
13         supervisor position description ever, I guess?
14    A    Oh, I'm sure at the time I was doing -- we put together
15         job descriptions for virtually all positions on the
16         Slope so at the time, mid- to late-90's there would
17         have been one.
18    Q    Okay.  Would you expect that in 2003, that we would
19         have been able to obtain a copy of one either for the
20         Zuber or Gilbert litigation?
21    A    Of a supervisor or --
22    Q    Right.
23    A    There's probably one somewhere.  I don't know where
24         today.
25    Q    All right.  Let me give you a couple of exhibits here.
           We need to get this marked.  You can start reviewing

1       the former Gilbert 2.

2                COURT REPORTER:  This will be N-3.

3                        **(Deposition Exhibit N-3 marked)**

4                MR. COVELL:  Here's one for you to keep.

5                COURT REPORTER:  And I have two, and I'm going

to put a Z on here?

7                MS. ZOBEL:  No.

8                COURT REPORTER:  All right.  No Z.

9                MR. COVELL:  See, we agreed on something.  And

go ahead and mark this one as well please.

11               COURT REPORTER:  N-4 is marked.

12                       **(Deposition Exhibit N-4 marked)**

13   Q  (By Mr. Covell)  And if you look at N-3 and N-4,

14       particularly the third page -- have you had a chance to

15       review that?

16   A  You want me to read this?

17   Q  Well if you look at N-4, it's APC1793, do you agree or

18       disagree with that describing, I guess, under the

19       heading essential functions of the safety supervisor.

20       Does that appear to be accurate or inaccurate or --

21   A  Yes, it looks good.

22   Q  All right.  And then I draw your attention under job

23       description, there's a box here checked AES Operations

24       and Maintenance and also down here there's an effective

25       date 01/01/04.  Given those indicators is it possible

         for you to determine when this might have been

*METRO COURT REPORTING*

745 West Fourth Avenue, Suite 425

Anchorage, Alaska 99501

(907) 276-3876

1     generated, this particular document?

2     I'd assume it was -- I assume it was generated around

3     the -- the effective date.  This document was around

4     January of '04.

5     Okay.  And when did AES Operations and Maintenance,

6     Inc. come into being, if you can tell us?

7     I don't recall the exact date, it was either 2003,

8     2004, when we -- when we changed the names legally over

9     to --

10    Okay.

11    Your question's around -- from APC to AES, I presume?

12    Right.  Something in that timeframe?

13    Somewhere in that timeframe.

14    Very good.  All right.

15         MR. COVELL:  Let me get this one marked here

16    please.

17         COURT REPORTER:  This will be Exhibit N-5.  Is

18    it going to have a Z in front of it?

19         MS. ZOBEL:  No.

20         MR. COVELL:  No.

21                       **(Deposition Exhibit N-5 marked)**

22    (By Mr. Covell)  And since N-5's an organizational

23    chart of what would appear to be the safety department,

24    is it correct that you're aware that around April 2003,

25    the safety supervisor position was either renamed or

      reclassified?

1    A    Correct.

2    Q    Okay.  And that became -- well what title was given to

3         the position that used to be safety supervisor, if you

4         know?

5    A    Beyond this org I'd say -- you mean beyond the safety

6         supervisor here, or I'm not sure I --

7    Q    Let me back up.

8    A    Okay.

9    Q    My recollection from Mr. Smith's deposition is that

10        around April 2003, your company eliminated the safety

11        supervisor job and created a job that had similar

12        functions and would have fit in this organizational

13        chart at the safety supervisor level, does that comport

14        with your knowledge?

15   A    Okay.  And, you know, that -- those details now are

16        getting -- or would have been handled more so between

17        the business unit manger and -- and his direct reports,

18        who would have been Doug Smith at the time.

19   Q    All right.  So, I can take that as an I don't know

20        answer then, correct?

21   A    Yes.

22   Q    Is that fair?

23   A    Probably.

24   Q    All right.  Well let me cut to the quick here:  Do you

25        know what different duties a -- whatever successor

          position there may have been, would have had from a

1    safety supervisor?  In other words, one day you've got

2    the safety supervisor in there, he has certain duties.

3     The next day, a week, a month later, six months later

4    -- whenever it is, the safety supervisor position is

5    gone.  There's a new position there, and they have

6    duties --

7  A  Then, from when I did my analysis, six years prior to

8    this or whatever timeframe?

9  Q  I'm sorry, I didn't understand the answer.

10  A  Okay.  Well it was really a question.

11  Q  Okay.

12  A  You're asking -- I think the distinction you're making

13    -- correct me if I'm wrong, the safety supervisor as it

14    is here in whatever year this was, 2003 versus my

15    analysis of a safety supervisor in the year 1997, or

16    whatever.

17  Q  No, no -- in around April of 2003, when the job got

18    changed from safety supervisor to some other

19    designation, which may be -- does the phrase safety

20    coordinator ring any bells with you?

21  A  No, but are we talking about this one?  The one that

22    says safety supervisor here?

23  Q  Right.  We're talking about that block on the

24    organization chart.

25  A  Okay.  Okay.

Q    I've been told that that job no longer exists.

1      A    Today.

2      Q    Today and as of April '03.

3      A    Okay.

4      Q    You don't know?

5      A    I don't know.

6      Q    All right.  Now, this will sound redundant, and I think

7           I know what the answer's going to be, but just to be

8           clear:  Do you know what the difference between the two

9           jobs would have been as far as duties were?

10     A    No.

11     Q    And, again, recognizing that you barely know

12          Mr. Gilbert, do you have any reason -- withdraw that.

13          Do you know if APC has any records to dispute

14          Mr. Gilbert's claim that he worked varying hours while

15          employed both as a safety specialist and safety

16          supervisor, which, for example, he recorded in the

17          ranges of 12, 13, 14, 15 hours a day?

18     A    Would there be -- am I aware of his records, or am I

19          aware of --

20     Q    Mr. Gilbert claims he worked varying hours while he was

21          employed, from 12 hours on up, sometimes towards 20.

22          But, generally, 12, 13, 14, 15 hours.  My two-part

23          question, question number one is:  Are you aware of any

24          records that would dispute his assertion that he worked

25          those hours?

       A    I would have to answer it this way, is if he claimed to

1      -- I'm not -- I've never seen his claim so I don't know
2      what it is.  If, he were, because of my familiarity
3      with the work -- if he were to claim I worked 15 hours
4      in the field and there were field records to document
5      that claimed something else, it could be anywhere from
6      flight logs to billeting or camp records that he could
7      check -- I mean, there are lots of different records
8      available that could contradict his claim, certainly
9      could be out there.  I'm not aware of those, nor have I
10     seen any research or --
Q11    All right.  And, again, to be clear for the record, you
12     don't have any personal knowledge that would dispute
13     Mr. Gilbert's that he worked a certain number of hours
14     any day?
A15    No.
Q16    Okay.  I represent to you in reviewing your last
17     deposition, you said that you had legal counsel in-
18     house at APC since about 2000, does that seem to be
19     correct?
A20    Yes, at least from then.  I don't remember -- I'm
21     trying to remember when the -- we've always had some
22     counsel at the parent company, but I -- let's say yes.
Q23    All right.  So, if somebody had wanted to consult with
24     in-house counsel concerning an exempt, non-exempt issue
25     that resource of legal counsel would have been
       available to them?

1       A supervisor, manager position, sure.

2       Which yourself and Mr. Boyle would fit --

3       Absolutely.  Uh-huh (affirmative).

4       Did a safety supervisor do intermittent work or

5       substitute on a regular basis for the duties performed

6       by a safety specialist?

7       Repeat the question.

8       Okay.  Let me sort of frame it up for you.  I'm not

9       trying to trick you here.

10      That's all right.

11      I hope I'm not.  Okay.  Safety specialist has certain

12      duties, right?

13      Correct.

14      Okay.  Safety supervisor has certain duties, some of

15      which the company maintains are different than safety

16      specialist, right?

17      Correct.

18      Okay.  Did the safety supervisor do work on an

19      intermittent or substitute basis that the safety

20      specialist did?  You want me to give you an example?

21      Yes.

22      Okay.  For instance, the safety supervisor might be in

23      the office doing whatever they do, might they be called

24      out to the field to do a job, or a piece of work that a

25      safety specialist would normally do?

A       It could certainly happen, sure.

*METRO COURT REPORTING*

745 West Fourth Avenue, Suite 425
Anchorage, Alaska 99501
(907) 276-3876

Q     And when it happened would that be fair to call that

2     happening on an intermittent or substitute basis?

A     I -- I would think it would be -- it would not be

4     frequently.

Q     Okay.  But, here's what I think I've heard over the

6     years in both these cases.  Safety supervisor might be

7     back at the office doing whatever they do, and the

8     safety specialist sort of had areas to work on right?

9     They might have a pad or a section of the oil field?

10    Okay.

Q11   And the safety specialist who was sort of assigned

12    there may be tied up in another job and the client's

13    calling and saying we want, I don't know, confined

14    space entry permit or we need some safety service in

15    another portion of our area now, would a safety

16    supervisor go out and cover that work?

A17   I would suspect, sure.  The client might call a

18    supervisor and say, look the specialist is tied up,

19    could you come out and give us an opinion, could you

20    give us -- could you take a second look, could you

21    advise us on this, that type of thing.  It certainly --

22    could it happen?  Absolutely.  With the special- --

23    would the supervisor respond, I don't know why they

24    wouldn't.

Q25   Okay.  All right.  And, just trying to be clear, the

      question is:  To your knowledge did the safety

1    supervisors do safety specialist work from time to

2    time?

3  A    Not that I'm aware of in -- not that I'm aware of.

4  Q    Okay.

5  A    Because it crosses over.  There's a certain cross over,

6    so --

7  Q    Okay.  The certain crossover being that the safety

8    supervisor does a lot of the same tasks as the safety

9    specialist, is that --

10  A    Well the safety specialist is a person who's out there

11    with the ears and eyes and interpreter and -- and is

12    certainly some one in enforcement.  A lot of dif- -- a

13    lot of different roles that the specialist plays, so

14    the supervisor certainly should no all of those roles,

15    and -- and also then have a -- maybe even higher level

16    of background to be able to assist or to offer a second

17    opinion or to interpret the policy or to write --

18    whatever it may be out there.  But I don't know -- I

19    don't recall -- I think you're asking, and I don't

20    recall whether the safety supervisor went out and did

21      -- covered an area for a week, let's say, for the

22    specialist or something like that or two days or three

23    days.  I don't think that type of thing happened.

24  Q    All right.  But for an.....

25  A    Frequently.

Q    .....afternoon or something they might?

1    A    Possibly.

2    Q    Okay.  Well I mean, for instance, looking at this N --

3         I didn't write it on here.

4         (Off record comments)

5    A    Three.

6              MS. ZOBEL:  Three.

7    A    Four.

8              MR. COVELL:  And four.

9    Q    (By Mr. Covell)  And you looked at this page, 1793 and

10        you go down and look at number 3, it says inspects or

11        tours organization facilities to detect existing or

12        potential accident and health hazards, recommends

13        corrective or preventative actions.  That's a duty of

14        the safety supervisor, right?

15   A    Correct.

16   Q    Okay.  That would also be a duty of the safety

17        specialist, right?

18   A    Absolutely.

19   Q    All right.  And so the safety supervisor would do any

20        of these types of things on 1 through 10, on a daily

21        basis, is that correct?

22   A    The safety supervisor as well as the safety specialist

23        should be doing these 24 hours a day.

24   Q    Okay.

25   A    That's their role.

     Q    That's their job?

A    Right.  They're trained in this, right.

Q    Okay.  Again, in regard to your prior deposition, I

3    asked you some questions about some of the materials

4    concerning determining exempt, non-exempt, and one of

5    the materials said, one of the most expensive mistakes

6    that can be made -- or misdetermining somebody from

7    exempt to non-exempt is one of the most expensive

8    mistakes that can be made when ascertaining the

9    overtime status of people, would you agree that that's

10   true?

A11  Correct.

12        MR. COVELL:  Let's go off record.

13   (Off record)

14                        **(Deposition Exhibit N-6 marked)**

15   (On record)

Q16  (By Mr. Covell)  Mr. Nelson, I've handed you a series

17   of documents labeled N-6 and there seems to be some

18   indication that they're called JVA's or job vacancy

19   announcements.  Earlier I was asking you in relation

20   and by this organization if you know what position may

21   have filled the void that may have been created by the

22   safety supervisor job.  In looking at these names here,

23   HSET Coordinator, HSE Advisor, Safety Specialist, is

24   that -- I guess we may have advisor twice there, might

25   that refresh your recollection as to what job title

     might have replaced that of safety supervisor?

A    I don't know, I wasn't involved with this.

Q    This would appear to be after your time, being 2006,

3    right?

A    Yes, that's way after my time.

Q    All right.  Drawing your attention, conceptually,

6    anyway back to wage and hour letter 122, would it be

7    fair to say that that particular document would protect

8    APC from having to pay overtime?  I'll rephrase that if

9    you like.

10    For a supervisor's position?

11    Right.

12    That was my understanding at the time.

13    Okay.  And do you have any reason -- and has that

14    understanding changed?

15    No.

16         MR. COVELL:  All right.  That's all I have.

17         MS. ZOBEL:  I have no questions.

18    (Off record)

19

20

21         * * *   END OF PROCEEDINGS   * * *

22

23

24

25

1                    **S I G N A T U R E**

2
STATE OF ALASKA          )
3                        ) ss.
THIRD JUDICIAL DISTRICT )
4

5            I, **MARK C. NELSON**, have read the foregoing

6  deposition and have made corrections thereto.  Any and all

7  changes, explanations, deletions and/or additions to my

8  testimony may be found on the correction sheet(s) enclosed with

9  this transcript.

10           _____

11           **MARK C. NELSON**

12

13 STATE OF ALASKA          )
                            )ss.
14 THIRD JUDICIAL DISTRICT )

15           THIS IS TO CERTIFY that on this _____ day of

16 _____ 2006, before me appeared **MARK C. NELSON**, to me

17 known and known to be the person named in and who executed the

18 foregoing instrument, and acknowledge voluntarily signing and

19 sealing the same.

20

21           _____
             Notary Public in and for
22           State of Alaska, at Anchorage
             My Commission Expires:_____
23

24

25

*M E T R O   C O U R T   R E P O R T I N G*

*745 West Fourth Avenue, Suite 425*
*Anchorage, Alaska 99501*
*(907) 276-3876*

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

C E R T I F I C A T E

UNITED STATES OF AMERICA      )
                              ) ss.
STATE OF ALASKA               )

      I, Jerri Young, Notary Public in and for the State of Alaska and Reporter with Metro Court Reporting, do hereby certify:

      THAT the annexed and foregoing Deposition of **MARK C. NELSON** was taken before Cheri Tabor on the 15th day of June 2006, commencing at the hour of 10:30 o'clock a.m., at the offices of DeLisio Moran Geraghty & Zobel, P.C., 943 West 6th Avenue Anchorage, Alaska 99501, pursuant to Notice to take said Deposition of said Witness on behalf of the Plaintiff;

      THAT the above-named Witness before examination, was duly sworn to testify to the truth, the whole truth, and nothing but the truth;

*M E T R O  C O U R T  R E P O R T I N G*

*745 West Fourth Avenue, Suite 425*

*Anchorage, Alaska 99501*

*(907) 276-3876*

        THAT this Deposition, as heretofore annexed, is a true
and correct transcription of the testimony of said Witness
taken by Cheri Tabor and hereafter transcribed by her;

2

        THAT the original of the Deposition transcript will be
lodged in a sealed envelope with the attorney requesting

3
transcription of same, as required by Civil Rule 30(f)(1)
amended, that attorney being:

4

5       **MR. KENNETH L. COVELL**, Law Offices of Kenneth L.
        Covell, Attorney at Law, 712 West 8th Avenue,

6       Fairbanks, Alaska 99701;

7       THAT I am not a relative, employee or attorney of any
of the parties, nor am I financially interested in this action.

8

        IN WITNESS WHEREOF, I have hereunto set my hand and
affixed my seal this 29th day of June 2006.

9

10

11       _____

                        Jerri Young
12                      Notary Public in and for Alaska
                        My Commission Expires: 11/03/07

13

14

15

16

17

18

19

20

21

22

23

24

25

*M E T R O   C O U R T   R E P O R T I N G*

*745 West Fourth Avenue, Suite 425*

*Anchorage, Alaska 99501*

*(907) 276-3876*