IN THE UNITED STATES DISTRICT COURT

1

FOR THE DISTRICT OF ALASKA

2

JOHN GILBERT,                    )
3                                )
         Plaintiff,              )
4                                )
    vs.                          )
5                                )
APC NATCHIQ, INC.                )
6                                )
         Defendants.            )    Case No. 3:03-CV-00174-RRB
7    _____ )

8

**DEPOSITION OF DOUGLAS L. SMITH**
9              **June 1, 2006**

10

**APPEARANCES:**
11
         **FOR THE PLAINTIFF:**        **MR. KENNETH L. COVELL**
12                                     Attorney at Law
                                       712 Eighth Avenue
13                                     Fairbanks, Alaska 99701
                                       (907) 452-4377
14
         **FOR THE DEFENDANTS:**       **MS. PATRICIA L. ZOBEL**
15                                     DeLisio Moran Geraghty &
                                       Zobel
16                                     Attorneys at Law
                                       943 West Sixth Avenue
17                                     Anchorage, Alaska 99501
                                       (907) 279-9574
18
         **ALSO PRESENT:**             **MR. JOHN GILBERT**
19
                         * * * *
20

21

22

23

24

25

**METRO COURT REPORTING**
*745 West Fourth Avenue, Suite 425*
*Anchorage, Alaska 99501*
*(907) 276-3876*

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

        Pursuant to Notice, the Deposition of **DOUGLAS L. SMITH**
was taken on behalf of the Plaintiff before Cheri Tabor,
Notary Public in and for the State of Alaska, and electronic
reporter for Metro Court Reporting at the offices of DeLisio
Moran Geraghty & Zobel, 943 West Sixth Avenue, Anchorage,
Alaska, on the 1st day of June, 2006, commencing at the hour
of 11:30 o'clock a.m.

                        * * * *

                   **TABLE OF CONTENTS**

Direct Examination by Mr. Covell ................... 4

**METRO COURT REPORTING**
*745 West Fourth Avenue, Suite 425*
*Anchorage, Alaska 99501*
*(907) 276-3876*

1

**EXHIBITS**                                              **PAGE**

2

S-1 –  Letter, 6/25/97, Nelson to Carr ............. 56

3

S-2 –  Job description, safety supervisor .......... 79

4

\* \* \* \*

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

**METRO COURT REPORTING**
*745 West Fourth Avenue, Suite 425*
*Anchorage, Alaska 99501*
*(907) 276-3876*

**P R O C E E D I N G S**

1

2    (On record)

3        COURT REPORTER:  We're on record.  My name is
Cheri Tabor, and I'm a court reporter for Metro Court
Reporting in Anchorage, Alaska.  Today's date is June 1, 2006,
and the time is approximately 11:30 a.m.  We're at the offices
of DeLisio Moran Geraghty & Zobel, PC, 943 West Sixth Avenue,
Anchorage, Alaska 99501 for the deposition of Doug Smith.
This case is in the United States District Court for the
District of Alaska, in the matter of <u>Gilbert, versus APC</u>, Case
Number 3:03-CV-00174 (RBR).

12    Sir, Mr. Smith, would you please raise your right hand
so I could swear you in?

14    (Oath administered)

15        MR. SMITH:  I do.

16        <u>**DOUGLAS L. SMITH**</u>

17 having first been duly sworn under oath, testified as follows:

18        COURT REPORTER:  Thank you.  Would you please
state your full name and spell your last for the record.

20    Douglas Lee Smith, S-M-I-T-H.

21        COURT REPORTER:  May I have a mailing address.

22    3900 C Street, Suite 701, Anchorage, Alaska 99503.

23        COURT REPORTER:  Thank you.  I also need a
daytime or a message telephone number.

25    907-339-6331.

        COURT REPORTER:  Okay.  Counsel, would you

1    please identify yourselves and who you represent?

2                MR. COVELL:  Kenneth Covell for John Gilbert.

3                MS. ZOBEL:  Patricia Zobel for APC Natchiq.

4                COURT REPORTER:  Sir, would you like to

5    identify yourself?

6                MR. GILBERT:  I'm John Gilbert.

7                COURT REPORTER:  Thank you.  All right.  You

8    may proceed.

9                MR. COVELL:  All right.

10                    **DIRECT EXAMINATION**

11   BY MR. COVELL:

12   Q    Good morning, Mr. Smith.

13   A    Good morning.

14   Q    Have you ever been deposed before?

15   A    A few times.

16   Q    Okay.  And what was that in regard to?

17   A    Just prior case log with injury claims, general

18        liability claims at Veco Corporation.

19   Q    Okay.  All right.  Just briefly then, if you don't

20        understand a question, say so.  If you need to take a

21        break, say so.  It's informal in a way.  It's all

22        being tape recorded.  You're under oath.  You have

23        your counsel here, you can talk to her if you want to.

24         Okay?

25   A    I understand.

Q    All right.  What's your current position?

**METRO COURT REPORTING**
*745 West Fourth Avenue, Suite 425*
*Anchorage, Alaska 99501*
*(907) 276-3876*

1    I'm the HSET director for ASRC Entities Services,
2    that's the parent company of operations and
3    maintenance division which was previously known as
4    APC.
5    Okay.
6    So there's been some name changes in the corporation,
7    and I work at the corporate level, which is the parent
8    of that entity.
9    Okay.  And back in 2001 through 2003 when Mr. Gilbert
10   worked for APC or Natchiq, you were at Kuparuk, is
11   that.....
12   That's correct.
13   .....where you were.....
14   I was an APC employee at Kuparuk in the position of
15   HSE manager for that department.
16   Okay.  Is my general understanding correct that you
17   move up a notch.....
18   Yes.
19   .....or a position in the organizational chart?
20   That's how they would have me believe it, so, yes.
21   Okay.  All right.  I.....
22   Yeah, that's correct.
23   All right.  At a time Mr. Gilbert worked at Kuparuk,
24   is it correct that the general organizational scheme
25   in the way of hierarchy in health and safety would be
     there are safety specialists, safety supervisor, and

1    then you, and you title at that time, tell me again,

2    was safety.....

3    I was hired as a safety manager which was a new

4    position for that organization.

5    Okay.  I see.

6    That -- that position did not exist prior to my

7    arrival.

8    Okay.  Prior to your arrival, was there a corporate

9    safety man in Anchorage?

10    There was a safety supervisor on site.

11    Okay.

12    And that was Ron Kirk.

13    Okay.  And then who would Ron -- who was Ron's direct

14    report I think is how you guys like to put it?

15    Yeah, at that time Ron was a direct report to Gary

16    Buchanan as the safety supervisor in the department.

17    And.....

18    And was Gary.....

19    .....the specialists.....

20    .....in Anchorage or was Gary.....

21    Gary -- Gary was Anchorage-based.

22    (Telephone ringing)

23    Okay.

24         MS. ZOBEL:  Do you need to take a.....

25    No, I'm just turning it off.  Sorry.

         MS. ZOBEL:  Okay.

**METRO COURT REPORTING**
*745 West Fourth Avenue, Suite 425*
*Anchorage, Alaska 99501*
*(907) 276-3876*

1    Gary was based on the Slope.  He was the project

2    manager or contract business manager for the Kuparuk

3    contract.  He was the operations manager.

4    Q    Okay.  And is that different than unit supervisor?

5    A    Business unit manager, those guys have had a multitude

6    of titles.  We refer to them as the contract manager

7    or business unit manager, and they were responsible

8    for the entire operational contract for APC at

9    Kuparuk.

10    So the safety supervisor would answer to Buchanan in

11    the unit manager or similar position?

12    A    Yes, prior to my arrival, Ron Kirk reported to Gary

13    Buchanan.

14    Q    And then was there a safety guy in Anchorage that was

15    higher up the food chain or not?

16    A    Yes, there was a corporate safety manager.  At that

17    time it was Scott Brower.

18    Q    Okay.  All right.  Let's see, what did you do to

19    prepare for your deposition today, if anything?

20    A    Came yesterday and just, you know, knowledge of the

21    events since I was present, but that's about it.

22    Q    Okay.  Did you ever do an evaluation of the safety

23    specialist position to determine whether it was exempt

24    or non-exempt from overtime?

25    A    Yes.  The -- in fact, I had been involved in an

     evaluation at a previous employer with that position.

**METRO COURT REPORTING**
*745 West Fourth Avenue, Suite 425*
*Anchorage, Alaska 99501*
*(907) 276-3876*

1    And after I arrived at this company, we discussed the
2    position, exempt versus non-exempt.  And one thing
3    that's important is that one of the things we worked
4    -- always worked against or was a bit of an issue is a
5    lot of positions, can (indiscernible) extra hours in
6    the specialist field around the country are being paid
7    in an exempt mode, so by us defining those as non-
8    exempt was -- we felt was correct with the
9    determination of the labor law, but was not exactly
10   industry standard.  So we were always sort of with the
11   uphill battle to move these two hourly, not within the
12   company, but just as a general industry position.  So
13   we evaluated the positions based on the -- the
14   Department of Labor checklist provided at the time,
15   and determined that these positions would were -- most
16   likely would be better suited to be under hourly
17   positions.  And the guys who were having call-outs in
18   the evening and such, the nature of the embedded
19   employees, were being called out, so there was a move
20   to move them to hourly after I arrived there.  But it
21   took some time to change the contract language, put
22   the rates in, and effect the changed for the
23   specialists.
24   Okay.  And did that then actually happen on or after
25   April of '03?
A    It happened March 1st of '03 is when we finally got

1    the -- what we call employee information records, a

2    status change actually into payroll and changed the

3    specialist' pay rates to hourly was March 1 of '03.

4   Q    And when did the guys in the field -- and we're

5    talking safety.....

6   A    Specialists.

7   Q    .....supervisor here?

8   A    Safety specialist.

9   Q    Oh, okay.  All right.  Safety specialist.  All right.

10    And at the same time, we -- I evaluated personally

11    with Gary Buchanan the position that Ron Kirk had

12    previously held as safety supervisor.  And it's

13    important to understand the chain.....

14          MS. ZOBEL:  Let's.....

15   A    .....of progression.

16          MS. ZOBEL:  Let's wait until he asks the

17   question.

18 A    Yeah.

19 Q    (By Mr. Covell)  Okay.

20 A    Yeah.  Well, you were asking about which position

21    we're talking about.  The safety supervisor position

22    was evaluated separate of the specialist.  Only --

23    only the specialists were changed March 1st.  I just

24    want to clarify that.

25 Q    Okay.  Was the safety supervisor eventually changed?

A    No, the position was eliminated.

**METRO COURT REPORTING**
*745 West Fourth Avenue, Suite 425*
*Anchorage, Alaska 99501*
*(907) 276-3876*

Q    Okay.  And what filled the void, if anything?

A    There currently exists a position there now that's

3    called a safety coordinator, and does not have a

4    supervisory title.  That is an hourly-based position.

Q    Okay.  And then your former job, does that still

6    exist, safety manager, if that's.....

A    It does.

Q    .....the right -- okay.  Okay.  And when did the --

9    well, did the supervisor job go away contemporaneous

10   with the coordinator job arriving?

A    There was a void of -- of no position for several

12   months prior to -- we had a staffing reduction, and

13   the job was eliminated.  Several months it was vacant

14   before they recreated the coordinator position.  That

15   was after my departure.

Q    Okay.  All right.  So to summarize this, and correct

17   me if I'm putting it wrong, you and Mr. Buchanan at

18   some point began a review of safety specialists, and

19   as of March 1 of '03 recategorized it as non-exempt,

20   in other words entitled to overtime is.....

A    That's correct.

Q    Okay.  And then subsequent to that, or perhaps

23   parallel, but somewhat in a latter phase, you

24   evaluated safety supervisor, eliminated the position,

25   there's a two-month gap between safety supervisor and

     safety coordinator, and created a safety coordinator

1       position that was entitled to overtime?

2   A   Well, I need to clarify a few points.

3   Q   Sure.

4   A   One, the safety supervisor position.....

5           MS. ZOBEL:  That's fine.  Go ahead.

6   A   Yeah, there's a few points you made that are not

7       correct.

8           MS. ZOBEL:  Okay.

9   Q   (By Mr. Covell)  Okay.

10      So a couple points of clarification.  The safety

11      supervisor position was evaluated in parallel to the

12      specialist, whether it was exempt or non-exempt.

13  Q   Okay.

14  A   The supervisor position was eliminated as a force

15      reduction.

16  Q   Okay.

17  A   A budget reduction, and was vacant for a number of

18      months, and I couldn't tell you exactly how many

19      unless I went and looked at records.

20  Q   That's fine.

21  A   But longer than -- longer than six months before we --

22      that job was refilled as a coordinator role and made

23      hourly.

24  Q   Okay.  Approximately when did the process of the

25      review begin if as to safety specialist it ended March

        1, '03?  You know, what it two months, six months, a

1    year and a half?

2    The review started in '02, and from many of the notes

3    that you've already seen, it was being discussed

4      as early as February of '02.

Q    Okay.  And which notes are you referring to?

A    Some of the notes that were reviewed yesterday where

7    John had related information to the specialist that

8    the hourly rates were being reviewed.

Q    Okay.  And you saw those notes yesterday?

A    I did.

Q    Okay.  Besides the ones yesterday, is there any

12    written commemoration of your actions in conducting

13    the review of the safety specialist and/or safety

14    supervisor job for reclassification?

A    I went to work there in December of '01, so they

16    started immediately after my arrival.  And the

17    information was being disseminated down from my

18    position to -- to John's position about the initiative

19    to review and possibly change these to hourly.

20        MS. ZOBEL:  I think what he's looking for is
do you have any records that.....

A    Not that I've been.....

23        MS. ZOBEL:  .....have not been produced?

A    .....able to locate, no.

Q    (By Mr. Covell)  Let me be as hopefully direct and

    clear as possible.  What I envision is perhaps there's

1  a file folder that says, review of safety specialist
2  job for transfer from exempt to non-exempt, and there
3  being, you know, 2 or 10 or 50 papers in there.
4  A  None that I have been able to locate.
5  Q  Okay.  When you were doing this process, did you
6  generate paperwork?
7  A  No.  And it was direct verbal conversation between
8  myself and Gary Buchanan.
9  Q  Okay.  So is it fair to say other than what you've
10  seen, you wouldn't expect there to be anything else in
11  the way of paperwork?
12  A  Not that I can personally locate, no.
13  Q  Okay.  All right.  That was easy, right?  Okay.  And
14  then prior to your arrival, are you aware of any
15  review or clas -- or review for appropriateness of
16  exempt or non-exempt classification of the safety
17  supervisor position at APC?
18  A  No.
19  Q  Okay.  You were at Kuparuk when the safety supervisor
20  was there and classified as exempt, right?
21  A  No, it was exempt -- -- when -- when I arrived at the
22  position, the supervisory position was already being
23  paid at a day rate which was filled by Ron Kirk.
24  Q  Well, Mr. Gilbert was a safety supervisor, right?
25  A  He became Ron Kirk's alternate.
Q  Okay.  All right.  And when he was in that job, he was

**METRO COURT REPORTING**
*745 West Fourth Avenue, Suite 425*
*Anchorage, Alaska 99501*
*(907) 276-3876*

1    being classified and paid as an exempt employee,

2    right?

3    Yes, he went into the job, and the job was already

4    established as an exempt position.

5    Q    Okay.  And you were his boss then?

6    A    That's correct.

7    Q    Okay.  All right.  What different duties did the

8    safety supervisor have when Mr. Gilbert was in that

9    position versus a safety specialist?

10   In my opinion and in my observation, an expectation of

11   the job was that they were the coordinator of the

12   specialist, and in that role provided, you know, a

13   degree of oversight and direction to these embedded

14   employees.  And then in my absence -- I worked a four-

15   day on, three-day off schedule, and in my absence from

16   the Slope, they were the step-up for the department

17   and fill the roll of HSE manager in my absence.

18   Q    Okay.  So they were the coordinator of the other

19   specialists.  These other specialists generally had --

20   I don't know if duty stations is the right word, but

21   generally had a routine set of work that they were

22   going to do, or expect to do, is that right?

23   A    That's correct.

24   Q    Okay.  So a guy would have wash bay, or light duty

25   shop, or a pad or something to that effect?

A    That's correct.

Q    Okay.  Would the safety supervisor do safety

2    specialist work routinely?

A    Not routinely.

Q    Okay.  What safety specialist work would the safety

5    supervisor do?

A    Probably the same as I would do, and that would be a

7    back-up for the field, if there be excess work,

8    someone off shift, in training, geographically not

9    available, because they're too far out to one site, so

10    we might respond to a scenario on their behalf.

Q    Okay.

A    And that would include myself as well.

Q    Okay.  So when a safety supervisor acted as the

14    coordinator or the specialist, I mean, what physically

15    would he do that was coordinating them?  Would he pick

16    up the phone and call people?  Would he call meetings?

17     Would arrange their schedules?  I mean, what types of

18    things?

A    Schedule coordination, personnel coming and going,

20    trying to help work out vacation coverage by

21    scheduling other people to work over, providing

22    answers, you know, questions and answers both up the

23    chain of command with the client, with our people who

24    liaison, conduit of information flow.

Q    Okay.  And when you said answers questions, would that

    generally be to the client, to Conoco-Phillips or

1       whoever was.....

2       Both sides, internal.....

Q       And what.....

A       .....and external.

Q       Internal to?

A       APC.

Q       APC upstairs.  Was there a lot of questions that came

8       from the specialists to the safety supervisor?

A       I think there was daily questions probably from each

10      of them of some type, and they vary in technical

11      nature.  Some very simple and some technical.

Q       Okay.  Well, if you know, would they be along the

13      lines that, you know, I'm busy on this pad, can you

14      come out and do this other test for me on the other

15      pad, or would they be more of the nature of, you know,

16      how do I run this meter?  If you know.

A       I think that the majority of the questions were more

18      technical in nature about how to execute on-the-job.

19      We had varying levels of specialists with different

20      levels of experience, and the supervisor was an

21      experienced -- more experienced position that had more

22      authoritative knowledge, technical knowledge, and was

23      oftentimes a reference for the specialist to conduct

24      business.

Q       Could you give me an example of what that kind of

        question would be?

1    A    Yeah.  I'm on the pad and I don't clearly understand

2         how to run this Ludlum meter, you know, can you help

3         me out over the phone, or come out and show me?  I'm

4         running the snapshot, the gas chromatograph, I'm going

5         to need some assistance with that.  Policy, maybe some

6         policy questions.  What is our procedure or policy

7         regarding a particular subject matter.

8    Q    Okay.  As to policy and procedure, that was all in a

9         book which sounded like it was going under a never-

10        ending revision.  Is that fair to say?

11   A    There was a policy and procedure manual being revised,

12        that's fair to say.

13   Q    Okay.  And policy and procedures would or ought to be

14        or hopefully were in there?

15   A    Not totally encompassing.  A lot of our job requires,

16        you know, thought and technical background to derive

17        answers, and not everything is written down for us.

18   Q    What does the safety coordinator position of today do

19        differently than the safety specialist position of

20        yesterday?

21             MS. ZOBEL:  Safety specialist or.....

22             MR. COVELL:  I'm sorry.  Thank you.  Thank

23        you.

24        (By Mr. Covell)  Safety supervisor position.

25   A    They have more hands-on assignments.  They are ask --

          asked to actually be solely responsible for, for

1    example, all UA collections.  We no longer use a third

2    party as we were at the time.  They've got a lot more

3    duties that are routine, nonsupervisory, non-directing

4    role.

Q    What directing actions did the safety supervisor do?

A    It was within their scope of authority to redirect

7    resources.  For example, if we had a job that day that

8    needed extra assistance from one of their specialists,

9    they would have the authority to ask for and redirect

10   people to assist and coordinate when we had the

11   abnormal conditions.

Q    Okay.  But do you know if the safety supervisor ever

13   actually directed somebody to, say, get off that pad

14   and go to this one?

A    Yes.

Q    And who, what, when, where, why and how?  Can you tell

17   me?

A    No.  I had, of course, my scope of activity and the

19   supervisor had their scope.

Q    Right.

A    So the only way for me to quantify how much directing

22   took place was to speak specialists that were employed

23   then, that are still employed now and gauge what their

24   perception was of the supervisor's positions and how

25   much direction they felt they received from that role.

Q    Uh-huh.

1    A    And that's how I derive my opinion that there was

2         quite a bit of directing or coordinating that went on

3         from that position, as I expected it to.

4    Q    Okay.  Well, let me.....

5    A    And in my absence, it was the sole managerial position

6         left on the site.

7    Q    Let me sort of work on the coordinating versus

8         directing issue here for a little bit.  I mean, -- and

9         I'm asking for examples, I'm not suggesting this

10       happened, but, for instance, were ever in the office

11       with Mr. Gilbert or Mr. Kirk, and you hear them on the

12       phone saying, safety special Smith, you leave pad 19

13       and you go to pad 20 now and perform hot work permit?

14    A   In the back of my mind I want to say, yes, I've heard

15       those conversations, but I could not give you exactly

16       who, what, when, where at this late stage of the.....

17    Q   And to that same type of situation, have you had a

18       safety specialist come to you and say, yesterday Mr.

19       Kirk called me and said I have to go from pad 19 to

20       pad 20, and do a hot -- and explain that to you or

21       complain about it or whatever they might communicate

22       about it?

23    A   No, I can't recall that exact line of communication,

24       and I don't think it would have been something I would

25       have normally heard.

     Q    Okay.  If this is coordinating the work, is that more

1    of a collegial or peer coordination type of thing
2    where the men go to work in the morning and say, okay,
3    here are the jobs.  We've got this extra job here to
4    do today, because this is a special project or
5    something, how are we going to divide this up, and
6    they sort of put their input in and share and decide
7    who can do which and what, and get it covered that
8    way, versus the boss man coming in and say, you go
9    here today, you go here today and you go there today?
10   If you can say.
11   It was certainly not a democracy.  And in my position,
12   I looked to the supervisor to be the second in
13   command, and they had authoritative capability to
14   direct work and -- but in these embedded employees,
15   you need to understand what they're doing that day,
16   what their priorities are before you make a decision
17   who's best available to be redirected.  So even though
18   there would be conversation, it was not up for a vote
19   who wanted to go do which activity.
20   Okay.  Did you ever confer with Mr. Gilbert when you
21   were considering reclassifying the safety supervisor
22   job or eliminating it as the case may be, as to what
23   he did on a day-to-day basis?
24   I don't think John and I sat down and went through any
25   specific classification question and answer of his
     position.

Q      Okay.  Giving examples to the extent you possibly can,
2      can you tell me what you understood he did on a day-
3      to-day basis?
4      Yeah.  I think my understanding of his job duties was
5      to be a second tier supervisor in the department, help
6      us, you know, formulate a better department, and
7      provide, you know, direction and oversight and growth
8      in the department from procedure writing to employee
9      development.
10     Okay.  But like if you can give it to me by task, so
11     say on a typical day I would expect he would go and
12     conduct a meeting for the first hour, go out and do a
13     hot space entry permit, come back for an hour, or come
14     back, work two hours on PP&G revision, maybe eat, you
15     know, then routine at 1:30 you have to go out to pad
16     so and so or go supervise somebody at pad so and so
17     for about an hour, you know, and like that.  Can you
18     break it down like that for me?
19     I cannot, and the only reason not is because our days
20     were never typical.  They were very untypical, and we
21     responded to the needs as they arose, but on a
22     typical, uninterrupted day.....
23     On a typical untypical day?
24     .....you would focus on -- a great deal of the time we
25     were spending the time on policy/procedure
       development, be a resource to both the client and our

1   other department staff on direction, questions,

2   answers, supporting them in a way to complete their

3   activities.  And what we had is a lot of -- the nature

4   of our business is the unplanned events take place and

5   then you get engaged in those.  There might be an

6   incident -- might be a lead -- a lead issue, or a

7   number of things.

8   Q   Sure.  You might have to go out and investigate an

9   accident, you might have a lead meter go out somewhere

10  I take it or --

11  A   You may have a question on where you remove some

12  paint, how much area do I need to pull, who's going to

13  coordinate the sampling at the lab, and, you know, so

14  -- and those functions came up quite frequently.

15  Q   Okay.  And of those duties you just described in that

16  answer to that last question, how many of those

17  duties, if any, are different from the duties a safety

18  specialist would have performed?

19  A   The specialist -- let's take lead for example, lead

20  paint.  His job might have been to identify that we're

21  going to do some paint removal somewhere, and it could

22  have lead in it.  His job may be to work with someone

23  to remove the paint product, and then get it into the

24  department for disposition and review.  We -- John's

25  position oftentimes, the supervisor position, would

    help coordinate the disposition of that lead-potential

1    pain to a lab, receive results, interpret those

2    results, and determine if we had an issue with lead.

3    Q    Okay.  So the guy in the field might get the paint

4    samples, bring them into John; John might mail them

5    off to the lab in Colorado, which is one of the ones

6    you used I think and then Colorado might send them

7    back and say, here's your level, is that.....

8    A    That's correct.  And based on the level,

9    interpretating [sic] that data, we would say, we need

10   to be in respirators or not, and provide that

11   direction back to the field and send them on their

12   way.

13   Q    Okay.  And when you get the -- is it correct that when

14   you get the test result from Colorado of parts per

15   million or whatever it is, there's some manual that

16   dictates whether or not if the test result is in a

17   certain range, you -- I don't know if you classify

18   them as level 1 remediation, 2, 3, but whether or not

19   it's respirators or suits or, you know, wash downs or

20   whatever the appropriate treatment is?

21   A    Yeah, there's a lead standard from OSHA that we go by.

22   Q    Okay.  Okay.  All right.  So then the coor -- or the

23   supervisor might look in the manual and say, okay, we

24   have a level 19, therefore you need to use procedure 3

25   kind of thing?

A    In context, that's correct.  Yes.

Q    Okay.  All right.  Okay.  And might also a safety
2    specialist make those same kinds of -- or might not
3    also a safety specialist do that same work vis-a-vis
4    looking at the sample and deciding what type of
5    remediation procedure was necessary?
6    Not usually, because we tended to want to have
7    oversight of those kind of exposure levels from this
8    -- from the supervisory positions to ensure we were in
9    compliance.
10   Okay.  Did specialists fill the supervisory role when
11   there was no safety supervisor on a hitch?
12   If there was an absence from any position, the next
13   most qualified person was stepped up to that role as a
14   fill-in if we had available personnel.  But when they
15   went to the new role, they assumed those duties and
16   responsibilities, and it was a temporary step up.
17   Okay.  And when that happened, did they get a letter
18   saying you're -- for these two weeks, you're
19   temporarily supervisor or not?
20   Email transmission to indicate to the staff who was in
21   what position so they would know whom to call.
22   Okay.  Did anything go into their personnel folder in
23   that regard, if you know?
24   No.
25   Did they get more money?
A    Not if it was temporary assignment.

**METRO COURT REPORTING**
*745 West Fourth Avenue, Suite 425*
*Anchorage, Alaska 99501*
*(907) 276-3876*

Q    Okay.  Okay.  As far as -- and this dovetails nicely.
2     As far as your comments regarding Mr. Gilbert filling
3    in -- well, okay.  Let's not go there yet.  Did Mr.
4    Gilbert ever have the authority to hire and fire
5    people?
A    He never had to fire anyone, but I would say that not
7    -- not by himself as nor did I as the manager.  It
8    would have taken consultation with HR and Gary
9    Buchanan as the business unit manager to actually
10   terminate employees.
Q    Okay.  So if there's a piece of paper terminating a
12   guy, would Gary Buchanan be the guy who signed it?
A    He would -- yes, and the one termination I was
14   involved with early on in the -- my tenure there, it
15   required Gary's signature and HR approval to process
16   it.
Q    Okay.  And then is the converse true as to hiring,
18   that Gary would sign it, and HR would.....
A    That's correct.
Q    .....approve it?  Okay.  All right.  So position-wise
21   in the organizational chart, he's two steps away from
22   Gary?
A    That's correct.
Q    Okay.  When he stepped up as you put it to the HSE
25   position -- that was your job, is that right?
A    No.  HSE manager.

Q    HSE manager.  He would get an email then saying you're

2    HSE manager for this time frame?

3    Because I was on a standing four and three rotation I

4    was there Monday through Thursday.

5    Uh-huh.

6    Anytime I was absent, it was a standing order that

7    they were the next step up in point of contact for my

8    position.

9    Okay.  And what additional authority would he have to

10   exercise in that position?

11   That position as a step-up into my absence has the

12   same authority as I have in the position with a degree

13   of consultation by phone on any significant matters.

14   But if un -- if unreachable, that position has the

15   full -- the full authority.

16   And when you say consultation by phone, you mean that

17   Mr. Gilbert in the HSE -- acting HSE manager position

18   would call you and consult with you?

19   Not on every decision, but if we had a significant

20   incident, we have a company policy of notification to

21   the next level, and I would always get notified of a

22   major event in my absence as I would if I was in town

23   for a meeting, I would get called.  Or if I was

24   actually on my R and R days, I would be called, so --

25   This job follows you around whether you're off or not?

A    And it's just a matter of company reporting policy.

1    It's not a matter of asking permission to proceed.

2    It's a matter of notification.

3  Q  And what kind of issues might you get a phone call

4    about when you were on R and R?

5  A  Company policy required notification up the chain of

6    command for a lost time accident.

7  Q  Okay.

8  A  Significant spills.

9  Q  Okay.

10    That's always in our policy requirements is

11    notification on incidents.

12  Q  What kind of decisions might Mr. Gilbert have made as

13    HSE acting manager that he wouldn't have called you

14    about, and he wouldn't have made as safety supervisor?

15  A  More -- I think more of it's decisions that might have

16    been discussed or progressed and staff meetings that I

17    would normally been the primary attendee that in my

18    stead Ron or John would have attended.  We had a

19    senior staff meeting that they would attend in my

20    absence, and there was always progress on action items

21    that would need to be relayed or discussed, or some

22    degree of decisionmaking took place in my absence that

23    normally I would have been the primary attendee to

24    those meetings and been involved with those decisions.

25  Q  Okay.  So they'd go to these meetings.  They'd

     disseminate that information, and it's a little

1    unclear about the decisionmaking.  Are you saying

2    decision making within this sphere of those meetings,

3    and the issues that are being discussed there, or do

4    you mean independent of that?

5  A    The most -- most frequently decisions would have had

6    to have been made to keep things progressed, like at

7    those meetings, and also if other issues came up, I

8    can't think of one specifically, but it could have

9    been an HR-related matter, could have been someone

10    needing additional time off, shift change, problems

11    with someone's performance in the field of a given day

12    that needed to be addressed or other managerial

13    matters that I would have normally maybe been -- been

14    addressing.

15  Q    Okay.  Well, for instance, I think yesterday we heard

16    about apparently the administrative staff, Kim and

17    somebody else, seemed to be going at it as it were.

18    Is that a situation that you eventually dealt with and

19    got resolved?

20  A    Initially it was dealt with by Ron Kirk, which John's

21    alternate.

22  Q    Uh-hum.

23  A    And the resolution that he came up with wasn't

24    satisfying to the two people that had issues, so we --

25    it eventually made it to me, and we took a different

    action.

Q    And was that letting one of them go or.....

A    Actually, no, we had a discussion of working more
     collaboratively together and fixing some problems.
     Eventually there was a reduction in force that
     eliminated one of those positions, but it was not
     associated with this performance issue.

Q    Okay.  All right.  And so as far as specific examples
     of what a safety supervisor, or Mr. Gilbert might have
     done as safety supervisor, outside of what we've
     already discussed, do you have any other examples you
     can give me?

A    If I was on shift, I would normally have been the
     facilitator on some of the safety meetings.  And in my
     absence, I expected those to continue to be held, and
     the facilitator role of that fell to the supervisory
     position.

Q    Okay.  If there was a -- and I don't know if this
     happened or not, and you can comment in that regard,
     but if there was a time when you're not there, and
     there's no safety supervisor there, then would a
     safety specialist be the facilitator for the meeting?

A    Only if they're stepped up into that supervisory role.

Q    Okay.  When Mr. Gilbert was a safety specialist, do
     you know if he ever was stepped up into safety
     supervisor?

A    Not during my tenure, no.

Q    Okay.  Had he been, would he have received an email in
2    that regard?

A    There should have been an email designating who was
4    assuming the role of supervisor or manager in their
5    absence.

Q    Okay.  And who -- I would assume that when you're HSE
7    manager and you're gone, you're saying you didn't send
8    an email, because that was a routine thing, right?

A    Between my position as manager and the supervisor
10   position, it was an on-going basis of my schedule that
11   required them to be stepped up in my absence, so there
12   was not an email, but on the vacation coverage or
13   other unscheduled coverage issues, if someone was
14   stepped up, the person departing, supervisor or
15   manager, would put out an email who was going to be
16   their step up and their points of contact.

Q    Okay.  So it would either come from you or the safety
18   supervisor.....

A    Yes.

Q    .....that -- the email?

A    That's correct.

Q    Okay.  All right.  Is it right or wrong that the
23   safety -- well, let me just ask it this way.  You have
24   -- and you have had safety specialists, safety
25   supervisor, and safety coordinator -- is that the name
     of the coordinator job?

A     The new position is called a safety coordinator.

Q     Okay.  What activities are co-extensive to all those

3     positions, if any?

A     Ones that bridge all those positions?

Q     Yeah.  In other words, what jobs, what tasks do each

6     one of those guys do that are the, you know, if you do

7     -- for instance, does each one of those jobs do hot

8     work permits?

A     We're talking routine tasks or what tasks you may do?

Q     Well -- yeah.  Well, let's start with may.  Do each

11    one of those jobs do hot work permits?

A     Any of our positions may do a hot work permit.

Q     Okay.  And each one -- okay.  And the same as to

14    confined space entry?

A     That's correct.

Q     Okay.  The same as to walk-downs or audits?

A     That's correct.

Q     The same as to PP&G revision and update?

A     No.

Q     Okay.  Who would or wouldn't be doing that?

A     The specialist may have input into the language of a

22    particular policy or procedure but final authority

23    over the final content and for regulatory compliance

24    and final approval would come from a higher authority,

25    supervisor or manager's position.

Q     Okay.  Did the supervisors routinely sign off on the

1       revised PP&G?

2   A   There is not a particular sign-off location on any of

3       those policies.

4   Q   If there's a new P -- a newer, revised PP&G, wouldn't

5       that be something that's passed by you and got your

6       approval in one form or another?

7   A   Ultimately it would have to go to corporate for

8       approval.

9   Q   Okay.  All right.  Besides those tasks I mentioned to

10      my recollection and thinking, that comprises a large

11      portion of what a safety specialist does, and I think

12      you're telling me you don't -- or is that so?

13  A   That's only a portion of what they do.  Permitting is

14      actually probably only 20 percent of their activity.

15  Q   Okay.  So beyond that -- well, there's permitting and

16      auditing -- okay.  What else would you expect the

17      safety specialist to be doing?

18  A   From an auditing perspective, that does cover the

19      field presence of going out and being visible to

20      employees, looking for compliance, coaching of

21      employees in safe practices, just insuring that people

22      are working in a safe manner, is a larger portion of

23      their day, being visible and present for a resource to

24      those field employees.

25  Q   Okay.  And what else, if anything?

A   They would complete required paperwork associated with

1     injuries, to include worker's comp forms, incident

2     reports.  They may be an attendee or a participant in

3     an investigation committee or team.

Q     Okay.  Anything else?

A     They would provide assistance with UA collections when

6     they were being done post accident or reasonable

7     cause, suspicion test.

Q     Okay.  All right.  And then that's the list?

A     That's pretty much it.

Q     All right of those additional activities we just

11    talked about, are any of those activities something a

12    safety supervisor would not do?

A     They would not do those routinely, but the manager and

14    the supervisor may be required to do those

15    occasionally.

Q     Okay.  And then of all those things we talked about,

17    are any of those things the safety -- you -- a safety

18    coordinator would not do?

A     The safety coordinator position as it currently exists

20    does not routinely engage in the permitting process.

21    they are more focused on special projects, the drug

22    and alcohol program administration, and they have been

23    used to take on duties to alleviate some of the daily

24    duties from a specialist to allow them to concentrate

25    more on auditing and field presence.

Q     And when you say daily duties, what's contained in

1     that?

2     Paperwork.  For instance, now if there is an incident,

3     the injury paperwork is completed by someone other

4     than the specialist, so that paperwork is now

5     completed  by the coordinator whereas in the past it

6     was -- the paperwork kept out specialists in the

7     office too much.

8     Okay.  It sounds to me like this is a very paperwork

9     intensive job, is that so?  In other words, that.....

10    There's a lot of forms to complete, and in the -- in

11    the -- in an incident event.  Daily -- daily their

12    paperwork load is probably 15 or 20 percent of their

13    activity in the coordinator role.

14    Okay.

15    The rest of it, some hands-on activity.  They may pro

16    -- they provide respiratory fit tests.  They provide

17    hearing tests.  They provide documentation and

18    coordination of -- of post-offer medical reviews for

19    people being hired.  So there's a -- they have a

20    different set of activities that they're conducting

21    that are -- some are new for the coordinator role.

22    Some were inherited from the specialist.

23    From the specialist or supervisor?

24    From the specialist.

25    Okay.

A     They no longer do any of the -- well, in my opinion,

1    they no longer do the supervisory capacity.  There's

2    -- all -- we have now have a full-time supervisor, a

3    manager on the position whereas where I did not have

4    an alternate and worked four and three, when we went

5    to a full-time manager's role, that second tier

6    position was not as critical, because there's someone

7    there all the time.

8   Q    Okay.  Of those activities you said the coordinator

9    does, are those activities that the safety supervisor

10    would have done when Mr. Gilbert was in that job?

11 A    Not routinely, but some of the activities could have

12    been done by the safety supervisor position.

13 Q    Okay.

14 A    Just not as a routine duty expectation.

15 Q    Okay.  Well, Mr. Gilbert's represented that among the

16    things he did as safety supervisor was that if a man

17    was injured in the field, the field specialist would

18    bring him in and sort of hand him off.  He'd fill the

19    paperwork out and make sure he got to the medic and on

20    a plane if he needed to do that, that he would receive

21    client calls on safety issues, that he would fill out

22    paperwork, that he would coordinate coverage of safety

23    specialists.  Would you agree or disagree that he

24    would do those duties routinely as safety supervisor?

25 A    I would agree to those duties with an exception.

   Q    Uh-hum.

1    The exception being that we did not have a centralized

2    expectation of completion of injury paperwork at that

3    position.  We actually did have centralized injury

4    paperwork completion for a period of time happening in

5    a different position which was filed by two other

6    employees, which was the trainer's position, and we

7    eventually through reorganization moved that

8    centralization back into the specialist role to

9    complete their paperwork.

10    Okay.  So a supervisor might have hands on the

11    paperwork for a while and pass it back to the

12    specialist, is -- am I understanding that right?

13    We typically -- that position on line would have a

14    review opportunity on completed paperwork.

15    Okay.

16    And to help to determine if it was -- the OSHA

17    reportability status of that event.

18    Let me hand you the exhibits from this morning's

19    deposition, and we'll go off record.  I'm going to ask

20    you to look at them for a few minutes.  I'm going to

21    take a break.  And then I'm just going to ask you if

22    you're familiar with them or not.  My expectation is

23    you might not be.  Okay.  Thank you.

24    (Off record)

25    (On record)

              COURT REPORTER:  We're back on record at

12:26.

2    Q    (By Mr. Covell)  You've had a chance to look at the

3         exhibits that are I think -- those stickers have all

4         B's, B-1 through 6 or something.  Are any of those

5         documents familiar to you?

6    A    Not in their current context.  The exhibit marked B-1

7         has the attachment of the Alaska statutes regarding

8         exempt versus non-exempt, and I am familiar with that

9         documents, but not as an attachment to this document.

10   Q    Okay.  All right.  And is that something you used when

11        you did this review of the positions around March of

12        2003?

13            MS. ZOBEL:  I think it's 2002.

14   A    2002.  And, no, the document I used is the -- was the

15        federal question and answer guideline put out as a

16        tool of evaluation.  But I was aware of and had read

17        this language prior to that.

18   Q    In the context of doing the review of the positions in

19        '02 or '03 -- '02 into '03?

20   A    I did the review in 2002.

21   Q    Okay.  And am I correct that you either saw papers --

22        those papers or ones like them, or at least were

23        familiar with the concepts in those papers in doing

24        that review?

25   A    I was familiar only in the concept of the paper

         attached to exhibit B-1, which is the Alaska statutes.

1    Q    Okay.  Great.

2         MR. COVELL:  We're going to give those all

3    back to Madam Clerk right now to keep those out of

4    circulation.

5         COURT REPORTER:  Uh-huh.

6    Q    (By Mr. Covell)  All right.  Okay.  In regard to --

7    I'm going to go backwards just for a minute.  In

8    regard to taking -- Kuparuk is 40 miles or so from

9    Prudhoe, is that right?

10   A    Uh-huh.  Approximately, yes.

11   Q    Okay.  So if a safety specialist or supervisor had to

12   take an injured party to the medic, would they have to

13   go all the way to Prudhoe for that?

14   A    No.

15   Q    Okay.  Where would they go?

16   A    Down the hallway to the clinic at Kuparuk.

17   Q    Okay.  Were there injuries or conditions that would

18   require taking somebody to Prudhoe?

19   A    Occasionally we would take someone to the clinic in --

20   in Deadhorse.

21   Q    Okay.

22   A    Which is approximately 45 miles away, but it was a

23   rare exception.

24   Q    Okay.  And then if somebody was going to fly out, do

25   you get air service into Kuparuk, or do they fly out

     Prudhoe/Deadhorse?

1    We have both, but the primary air service was in and
2    out of Kuparuk.
3    Q    If somebody's injured and want to go home sooner, they
4    might ride to Prudhoe and go home?
5    A    There's a bus service that goes there daily to those
6    flights that leave out of Prudhoe, and occasionally we
7    as a company may have someone transport them.
8    Q    Okay.  And I would take it you're less likely to put
9    an injured person on a bus and more likely to give
10    them a ride obviously, depending on the degree of
11    injury?
12    A    Depending on the degree of injury and type, yes.
13    Q    Sure.  Okay.  All right.  As far as the emails that
14    give people their step-ups, would you expect that Mr.
15    Gilbert would have issued emails of that nature?
16    A    If he was going to be absent without an alternate, and
17    I was not assuming responsibilities for the management
18    of the department, if in his absence and my absence,
19    he was going to be gone, or Ron was going to be gone,
20    they like everyone else would need to identify someone
21    to step up in their position.
22    Q    Let's say he was going to be gone, but you were going
23    to be there, then would he be expected to sending an
24    email?
25    A    No, John and I did not as a routine basis transfer
     emails back and forth about the two of us being --

1    covering for one another unless we were both going to

2    be gone, because we were kind of in a standing mode of

3    -- of department leads in the absence of one or the

4    other.

Q    Okay.  In -- let's see.  What's your background,

6    education and training?

A    I have 10 years in the military, military courses

8    associated with safety and QC.  I have an associate's

9    degree from University of Alaska, and on-going

10   education, safety-related education and a CSP.

Q    Okay.  You indicated that you'd done evaluations of

12   the safety specialist position at another employer?

A    Not the specialist position in particular.  We had

14   actually an issue with hourly involving quality

15   assurance personnel.

Q    And was that at Veco or.....

A    It was at a prior employer.

Q    Who might that have been?

19            MS. ZOBEL:  Is it relevant?

20            MR. COVELL:  Sure.

A    Can I say?

22            MS. ZOBEL:  Yeah, you can say.

A    Yeah, Veco.

Q    (By Mr. Covell)  Okay.  All right.

A    It's a case -- there's case law about that.

Q    And you evaluated -- and that was evaluating quality

1    control people for overtime?

2    It -- it was, and as a correlation to the evaluation

3    of the quality control positions, we decided that

4    there was enough similarities in the safety specialist

5    positions to change them at the same time.

6    Okay.  And what was your role in doing that

7    evaluation?

8    At the time.....

9         MS. ZOBEL:  At Veco?

10         MR. COVELL:  Yeah.

11    At the time at Veco, I was the HSE manager in Prudhoe,

12    and we had a number of specialists that worked in our

13    department.

14    Okay.  And you made the decision to change it from

15    exempt to non-exempt, is that right?

16    The company -- at the time Veco made the decision

17    above me to -- to change the hourly.  We had employees

18    working at different contracts, and some were day

19    rates, some were already hourly, so we went -- went a

20    consistent hourly rate for specialists.

21    Okay.  Did you do the analysis on those checklists or

22    tests at.....

23    The analysis were -- was performed, and I was a

24    participant in answering questions from the analysis.

25    All right.  So is it correct to understand that they

said, Mr. Smith, what do these guys actually do kind

1    of type questions?

2    A    That's correct.

3    Q    Okay.  All right.  And you gave that input and they

4    did the analysis and made the decision, is.....

5    A    Yeah.

6    Q    .....that fair?

7    A    Yes, corporate HR and counsel made the review and

8    final determination.

9    Q    Okay.  All right.  And the process you did at APC

10    contrary to what you did at Veco, was you did the

11    entire process, is that right or wrong?

12    A    I did not do the entire process.  My personal

13    involvement was arriving on site and inheriting a

14    department that had specialists working at day rates,

15    and bringing that to the attention of my manager that

16    we should probably review that.

17    Q    Okay.  And it's because you did it at the last place,

18    and you said, gee, maybe we should at this here?

19    A    There was definitely an anomaly between the two and

20    thought we should be consistent.

21    Q    Okay.  All right.  And then when you did the review

22    with APC, did you serve in the same role where they

23    were saying, Mr. Smith, what are these guys doing, or

24    did you do the whole thing?  Did you make the

25    evaluation, do the analysis with or without the

assistance say of Mr. Boyle?

**METRO COURT REPORTING**
*745 West Fourth Avenue, Suite 425*
*Anchorage, Alaska 99501*
*(907) 276-3876*

1       At the time, my input was much shorter and more
2       direct.  It was to Mr. Buchanan that based on prior
3       knowledge that I had became aware of these positions
4       should be probably moved to hourly positions.
5       Okay.  And then -- I'm just trying to understand how
6       this all went mechanically so to speak, and then did
7       Mr. Buchanan come back and say, yeah, you're right,
8       we're changing them, or did -- I thought you said you
9       sat down and did the check list or something?
10      We -- I did with Gary so he would understand why I
11      felt the way I did.  I took him through the process
12      very shortly, in the matter of an hour, what we spent
13      weeks on at my prior employer.
14      Okay.  Because you changed the brake shoes once and it
15      took 10 hours, and you changed brake shoes this time,
16      and it only took an hour?
17      That's correct.
18      Okay.  Okay.  All right.  And so you learned from the
19      Veco experience how to do the -- this analysis, and
20      you participated greatly in it the second time, is
21      that fair?
22      I would say that my participation the second time was
23      much shorter than the first time, and that it was more
24      of an informing my new employer what I felt about
25      these positions' compensation.
Q       Okay.  All right.  And they went along with you?

1    There's a process to make the change.

2    Q    Okay.  Tell me about that?

3    A    Okay.  This change is dependent upon a contract
4    change.  Our contract did not have hourly rates for
5    these positions in the context of our contract with
6    ConocoPhillips.

7    Q    All right.  Okay.

8    A    Our contract re -- would require amendment and
9    development of rates to make this change.  The
10   amendment process and the rate development process
11   took quite a bit of time.

12   Q    Okay.  All right.  Was counsel involved in the
13   decisionmaking, if you know?

14   A    Not to my knowledge.

15   Q    Okay.  Is it correct for me to understand that
16   basically you and Mr. Buchanan got together, knocked
17   heads and reached that conclusion?  That.....

18   A    I don't think that conclusion was reached as a basis
19   of our discussion, but I'm not sure what discussions
20   took place after that.

21   Q    All right.  So you don't know what happened up the
22   food chain from that?

23   A    I -- I actually don't know, no,

24   Q    Okay.  All right.  Okay.  In the course -- okay.
25   Besides doing the Veco thing with exempt and this
     instance, have you had other occasion to deal with the

**METRO COURT REPORTING**
*745 West Fourth Avenue, Suite 425*
*Anchorage, Alaska 99501*
*(907) 276-3876*

1    exempt/non-exempt issue?

2    Yes.

3    Okay.  Can you -- lots of times or a few times?

4    Just a few times.

5    Can you tell -- just tell me what each one was for

6    starters?

7    We evaluated a position, a safety position that we

8    placed at Fort Greeley under a government contract

9    that had -- it was a single position that operated as

10   a member of management with oversight of

11   subcontractors, but also had some of the specialist

12   type activities in their daily routine.  So we had to

13   evaluate what type of position that was and make a

14   determination.

15   Okay.  And when was that?

16   That was done in 2004.

17   Okay.  And what did you decide to do, or what was your

18   conclusion?

19   Hmm?

20        MS. ZOBEL:  Yeah.  You can tell.

21   We decided that position was exempt hourly, and it was

22   compensable for all hours worked, and was placed on

23   that contract in that way, and it was within the terms

24   of our contract with the government.

25   And why did you decide it was exempt hourly?

A    Just based on the percentage and mix of duties that

**METRO COURT REPORTING**
*745 West Fourth Avenue, Suite 425*
*Anchorage, Alaska 99501*
*(907) 276-3876*

1    the position was required to perform.

2    Q    Okay.  And did you look at the 20 percent test as to

3    whether or.....

4    A    Yes.

5    Q    .....not that -- okay.  And how did you decide what

6    percentage of the time was -- was going to be spent on

7    non-exempt duties?

8    A    Looked at all the routine duties that may be focus of

9    that position, determined they were less than 20

10    percent, but that the position was going to be

11    required to work some weekend time, potentially be

12    called out.  Some kind of an on-call position of

13    management and it could be seen as getting a lot of

14    after-hours interruptions.

15    Q    Okay.

16    A    And we wanted to make sure that they were compensated

17    for time spent after the normal duty day.

18    Q    Okay.  All right.  And so then that position would get

19    paid for -- let's say they had a routine -- would it

20    have a routine 12-hour day?

21    A    They were working 6-10's was a routine there at that

22    government contract.

23    Q    So then if a guy worked 12 hours, he'd get two more

24    hours of straight time pay, right?

25    A    That's correct.

Q    Okay.  All right.  So there's that one.  What other

1    ones did you do?

2    A    Let me think for a second here.  We evaluated a couple

3    of offshore safety positions in the Gulf that we were

4    asked to fill.  And the.....

5    Q    Of Mexico?

6    A    Yes.

7    Q    Okay.

8    A    And we have operations from out of New Iberia, and

9    they were client representative positions, and

10    initially were recommended or wanted to be compensated

11    by the client on a day rate, and we looked at what

12    their re -- their tasks were and decided that they

13    were doing a lot of routine specialist type functions,

14    and we supplied them only under agreement that they

15    would be paid hourly with overtime.

16    Q    Okay.  Okay.  Coming back to the Fort Greeley job,

17    you're familiar with the issue of paying certain

18    positions a -- paying them for all hours worked, is

19    that so?

20    A    I'm not an expert, but I -- every time I look at the

21    documents, I try to digest them properly.

22    Q    Every time you do this, you learn more and more,

23    right?

24    A    Yes.

25    Q    Okay.  All right.  Are you aware of APC within the

context of safety specialists working on the North

1    Slope or at Kuparuk or possibly Prudhoe Bay if you've

2    got people there, ever compensating any employee in

3    that similar manner, i.e., that they would be

4    compensated for all hours worked, even if they were

5    exempt?

6    I'm not aware of any positions that were exempt hourly

7    positions.

8    Vis-a-vis the safety supervisor position, why wouldn't

9    a safety supervisor be entitled to be paid for all

10   hours worked in excess of their normal shift in this

11   -- particular if they're called out or something, just

12   like the Greeley position?

13   In my opinion, the Greeley position was one deep with

14   no supervisory or directing responsibilities.  There

15   was no one reporting in an organization to that

16   position.

17   Let me stop you.  What does one deep mean?  I.....

18   One person, no other -- they were only -- there was

19   only one person in the safety department at Fort

20   Greeley versus having a department of personnel to

21   direct and administrate over.

22   Okay.

23   So my interpretation and looking at the positions, the

24   differential is the supervisor position in Kuparuk was

25   in the chain of command over a department, and it

     provided administrative oversight and was a step up

1    for the manager position and a member of the senior

2    management team in my absence, so they were very

3    different in nature from my opinion.

Q    And so because of that then, they wouldn't be entitled

5    to be paid for every hour worked without the overtime

6    premium?

A    More based on my interpretation of the -- kind of the

8    80/20 rule of how much percentage of time that

9    position would routinely perform duties that would

10   fall into a non-exempt category.

Q    Okay.  So the reason why the safety supervisor

12   wouldn't get paid for every hour worked was because in

13   your opinion they weren't spending 20 percent of their

14   time doing non-exempt work?

A    That's the largest component with the additional

16   component being that I viewed them to be more

17   supervisory in nature because of the department

18   configuration of the organization.

Q    Okay.  I think you've already told us you're not aware

20   of Carr's letter.

21         MR. COVELL:  But let's go ahead and get that,

22   Madame Clerk, out of the B exhibits.

23         MS. ZOBEL:  I'm going to object to questions

24   in which you're asking him to draw legal conclusions with

25   regard to these payments.  I think that's for the court to

decide in this case.

1          MR. COVELL:  Okay.  That's fine.  Objection's

noted.

3          COURT REPORTER:  So the last two look like the

Randy Carr letters.

5          MR. COVELL:  Okay.  Thank you.

6          COURT REPORTER:  You're welcome.

7          MR. COVELL:  I'm just taking 6 here, I'm

giving you the rest back.

9          COURT REPORTER:  Very good.

10     Do you have a copy of it?

11     (By Mr. Covell)  Yeah, I'm going to.....

12          MS. ZOBEL:  He's going to.....

13     .....give you this one.

14          MS. ZOBEL:  .....give you that.

15     You already looked at this.  And I believe you

16     indicated you're not familiar with it, but -- and I'm

17     not suggesting one way or the other that you are or

18     you aren't, but just looking at it again, is that --

19     that letter is not familiar to you, is that correct?

20     That's correct.

21     Okay.  Would you look at the last page of the

22     document, and go ahead and read the second and third

23     to last paragraphs.

24          MS. ZOBEL:  I'd ask that he read the third,

25 fourth and fifth -- the -- starting at the top of the page.

          MR. COVELL:  That's fine with me.

1      Q      (By Mr. Covell)  All right.  I guess now that we've

2      got you reading, why don't you go ahead.....

3      A      Well.....

4      Q      .....and read -- read aloud for us.....

5      A      Yes.  Would you like for me to start at exempt?

6                  MS. ZOBEL:  Why don't we -- we could go off

7      the record and let him read it to himself.

8      A      I don't mind reading it.

9                  MS. ZOBEL:  I mean, is there any reason that

10     we need to have this.....

11                 MR. COVELL:  That's fine.  Go ahead.

12                 MS. ZOBEL:  .....read into the record?

13                 MR. COVELL:  Let's go off record.  Go ahead

14     and read it.

15     (Off record)

16     (On record)

17                 COURT REPORTER:  We're back on record at

18     12:47.

19     Q      (By Mr. Covell)  All right.  Mr. Smith, you've been

20     looking at the last two pages of what was marked this

21     morning as B-6, and we're going to get that marked

22     again for this deposition.

23                 MS. ZOBEL:  I think he looked at the last page

24     of B-6.

25                 MR. COVELL:  Okay.  That's fine.

                   MS. ZOBEL:  If you want him to read the first

1  page, he can do that, too.

2            MR. COVELL:  No, that's okay.  In any event,

3  we'll get that marked for this deposition, make it an exhibit

4  to this deposition.

5            MS. ZOBEL:  Just the last page, or the whole

6  exhibit?

7            MR. COVELL:  Might as well mark the whole

8  exhibit for.....

9            MS. ZOBEL:  That's fine.

10            MR. COVELL:  .....continuity's sake.

11            MS. ZOBEL:  Then let's let him review the

12  whole exhibit.

13            MR. COVELL:  Okay.  Let's go off record then.

14       (Off record)

15                    **(Deposition Exhibit S-1 marked)**

16       (On record)

17            COURT REPORTER:  We're back on record at

18  12:53.

19  Q  (By Mr. Covell)  Mr. Smith, you looked at this B-6

20       which is now also D.....

21            MS. ZOBEL:  S.

22  Q  I'm sorry, S-1, right?

23  A  That is correct.

24  Q  Okay.  And you read the whole document, and you also

25       read that last page?

A       That's correct.

Q    Okay.  Is the direction that appears on the last page
2    about paying an employee for all hours worked the type
3    of guidance that you followed in deciding that the
4    Fort Greeley position out to be paid for all hours
5    worked?
A    It was not the guidance that I was provided, and was
7    not -- this -- this is the first time I've seen this
8    document, and did not use this document or language of
9    that particular type by Mr. Carr in making that
10   evaluation.
Q    Okay.  But is it the same issue?  In other words, you
12   look at these positions and say, this person is
13   exempt, but still needs to be paid for all hours
14   worked?
A    I think we solved the problem, but unfortunately I
16   didn't use this as the issue to resolve the problem.
17   I was not aware of this opinion.  Because of the
18   difficulty in determining this, based on what Mr. Carr
19   states as needing to piece it together from statutes
20   and prior rulings, our approach on that was -- the
21   position at Fort Greeley was more based around the
22   expectation, since that was a singular position, that
23   it would likely be experiencing a lot of call-out
24   time.
Q    If somebody's exempt and they get a call out, from
     what you understand and what the rule is from doing

1    the Greeley case, should they get paid for every hour

2    worked?

3    A    I believe they should if it's a routine expectation.

4    Q    Okay.  What if they routinely worked -- if their

5    scheduled shift was 12 hours and they routinely worked

6    in excess of 12 hours, should they expect to get paid

7    for every hour worked?

8         MS. ZOBEL:  Are you -- are you talking about

9    in the context of people who are exempt under administrative/

10   executive, or are you talking about under the supervisory?

11        MR. COVELL:  Either.

12   A    Could I get a definition of routine?  What you would

13   consider routinely working over.....

14   Q    (By Mr. Covell)  More than once.....

15   A    .....the scheduled.....

16   Q    .....more than once a week.

17   A    I think if you were routine -- routinely working more

18   than once a week, you would have to look at what are

19   the tasks that time's being spent on.  If those tasks

20   do not fit within the exempt status, you would need to

21   compensate those employees.

22   Q    Okay.  Should the safety supervisor position have been

23   compensated for every hour worked under that standard

24   if they worked in excess of 12 hours a day and were

25   engaged in non-exempt duties?

          MS. ZOBEL:  I'm going to object to the extent

it calls for a legal conclusion.

2          MR. COVELL:   Thank you.

3     Q    (By Mr. Covell)  You can go ahead and answer.

4     A    I -- when I did the -- my personal review of that

5          position, I did not feel that that position engaged in

6          duties and the overtime expectation of call-out and

7          routine functions to be classified as non-exempt.  So

8          that job at that location with that title, no, I don't

9          feel that position was a non-exempt position.

10         Okay.  And I'm saying for the purposes of this

11         question, it's a non-exempt position.  Okay.  Agreeing

12         with you.  And then saying, if they're.....

13         Non -- let me rephrase that.  I want to make sure that

14         it was -- it was a -- it was not a non-exempt position

15         of my opinion at that location at that time, that the

16         duties involved and the hours expected to be on the

17         job did not in my opinion make it a non-exempt

18         position, that I felt like even with this letter of

19         new information for me, I would not have made a

20         suggestion to reclassify that job hourly at that time.

21         And you're saying the safety special -- safety

22         supervisor position in Kuparuk when Mr. Gilbert was

23         there?

24         That's correct.

25         Okay.  All right.  And I'm saying for purposes of this

           questioning, assume that's so, assume that that safety

1    specialist position is not entitled to overtime.

2    A    The safety supervisor position.

3    Q    Safety supervisor, thank you.  They're exempt from

4    overtime.

5    A    Okay.

6    Q    Okay.  As your Greeley position is, right?

7    A    It's exempt from overtime, but not exempt from all

8    hours worked.

9    Q    Okay.  All right.  So I'm saying they're both exempt

10    from overtime, and I'm saying, shouldn't -- if the

11    safety supervisor worked hours in excess of a 12-hour

12    day, shouldn't they have been compensated for all

13    hours worked, or in other words, got that additional

14    straight time?

15         MS. ZOBEL:  I'm going to jump in here, because

16    I don't agree with your interpretation that you're following

17    here.  I think the question is whether or not you believe that

18    he is exempt as an administrative, executive or professional

19    employee, in which case he gets his salary, his salary only,

20    and he doesn't get any extra hours paid.  And you're trying to

21    assume that even if he's exempt under those classifications,

22    he still should get every hour paid.  And I don't agree with

23    that interpretation.

24         MR. COVELL:  Okay.  That's fine.  And are you

25    telling me that it's APC's position that the safety supervisor

was exempt only as an administrative position?

1        MS. ZOBEL:  We're taking the position that he
was exempt as an administrative position.

3        MR. COVELL:  And.....

4        MS. ZOBEL:  I agree with you that if the court
were to find that he was a supervisor as is defined in this,
that he would get compensated for the hours worked at straight
time.  But that's the basis for my objection, that this is an
issue for the court, this is not an issue for this witness.
He can tell you how he would classify them, but it would not
be a question of if he's exempt as administrative that he'd
get extra hours.....

12        MR. COVELL:  Okay.  Let.....

13        MS. ZOBEL:  .....which is I think where you
were going.

15        MR. COVELL:  Let's finish this colloquy here.
So then APC is not taking the position that he was exempt
under any supervisory or other category?

18        MS. ZOBEL:  That's correct.  And that will be
the subject of a motion that we're going to bring, and if it
if you want to do a fall-back position, or we may even do a
fall-back position, that he was supervisory.  But it's for the
court to make that determination.

23        MR. COVELL:  Well, wait a minute, wait a
minute.  At one point during discovery I asked.....

25        MS. ZOBEL:  And I told you that it was
administrative or supervisory.

1          MR. COVELL:  I think I lost.....

2          MS. ZOBEL:  I think it was a phone
conversation we had.

4          MR. COVELL:  Well, I think in the discovery I
have re -- well, I know in discovery I have responses
saying.....

7          MS. ZOBEL:  Uh-huh.

8          MR. COVELL:  .....he's under all the
categories, okay?

10         MS. ZOBEL:  That was -- that may have been
discovery.

12         MR. COVELL:  Okay.  So, you know, to me that's
the -- that over-the-phone conversation, that's the same piece
of paper, that's the position, A, B, C.

15         MS. ZOBEL:  Okay.

16         MR. COVELL:  If you're telling me now -- are
you telling me now it's solely administrative, or it's
administrative and supervisory, or administrative or
supervisory?  Or what are you telling me now?

20         MS. ZOBEL:  Why don't you wait for my motion.

21         MR. COVELL:  Because I'm asking the man the
question during the depositions, and you're objecting on the
basis that I'm.....

24         MS. ZOBEL:  Well, I -- let's.....

25         MR. COVELL:  .....using the other category.

           MS. ZOBEL:  Let's go off the record for a

second.

2          MR. COVELL:  Okay.

3      (Off record)

4      (On record)

5          COURT REPORTER:  We're back on record at 1:05.

6          MR. COVELL:  We've had an off-the record
7  discussion here, and APC has clarified their position as to
8  their assertion as to the safety supervisor's position
9  exemption,and their position is that either (a) it is exempt
10 as an administrative position, or (b) that if it's not exempt
11 as an administrative position, it's exempt as a supervisory
12 position.

13         MS. ZOBEL:  That's correct.

14         MR. COVELL:  Okay.  All right.  So that's what
15 we've said and that's.....

16         MS. ZOBEL:  And that's where we stand.

17         MR. COVELL:  That's where we stand.

18         MS. ZOBEL:  That is correct.

19         MR. COVELL:  Okay.  And furthermore it -- Ms.
20 Zobel is objecting to this ques -- or this line of questions
21 and the court may rule on this at a latter date.

22         MS. ZOBEL:  That's correct.

23         MR. COVELL:  Okay.

24         MS. ZOBEL:  And it's a standing objection so I
25 don't interrupt you.

           MR. COVELL:  I -- that's fine with me.  Thank

you.  Okay.

Q        (By Mr. Covell)  So in regard to the safety supervisor
2        position, if the safety supervisor worked hours
3        routinely in excess of their regular shift, wouldn't
4        it seem that this directs APC to pay the safety
5        supervisor for all hours worked?
6
A        If we had determined at the time that it was
7        supervisory, and I was aware of this letter, yes, but
8        I did not feel that -- I felt the position at the time
9        met the exemption, and was not entitled to all hours
10       worked or overtime.
11
Q        Okay.  So with this information, would that answer
12       change then, if I understood what you told me in your
13       answer?
14
A        No.
15
Q        Okay.  And.....
16
A        Not from my personal position, no.
17
Q        Okay.  And why is that?
18
A        The -- just as my position as the HSE manager I
19       believe was clearly exempt, because of the routine
20       step-up into that role with same functionality, and
21       the administrative direction in the department that
22       went on, and the amount of time spent administrating
23       versus routine task working, that that position,
24       unlike Fort Greeley, would be an exempt role.
25
Q        Did the safety supervisor supervise or did the safety

1    supervisor administer?

2    You'll have to give me your definition of supervise

3    versus administer.

4    Well, the definition of supervi -- or administrative

5    is in the regulations you talked about, which you're

6    familiar with?

7    That's correct.

8    Okay.  So are you saying that the safety supervisor

9    met the administrative test?

10   I believe at the time that that position did meet --

11   did meet the test.

12   All right.  And are you familiar with the supervisory

13   test?

14   I haven't looked at them in the last few months, but I

15   have looked at them in the past.

16   Okay.  Let's look at the first page of Mr. Carr's

17   letter there.  Does that seem in that first indented

18   paragraph referencing 8 AAC 15.910(14) seem to set out

19   the supervisory test?

20   This supervisory test as spelled out here with these

21   embedded employees mainly getting their daily task

22   direction from their, as we called them at the time,

23   clients that they were assigned to.  Even though they

24   were internal APC personnel, we've referred to them as

25   our clients from the safety department.  Their daily

     direction was determined a lot by their activities and

1    direction, so our functionality was less daily

2    direction and more administration facilitation,

3    scheduling, the HR functionality, department

4    directions, implementation of policy and procedure.

5    Q   Okay.  Thank you for that answer.  Does this seem to

6    set out what the test for a supervisory employee would

7    be?  That is, an exempt supervisory employee?

8         MS. ZOBEL:  To the extent you're asking for a

9    legal conclusion, I object.

10         MR. COVELL:  Thank you.

11    So what you're asking me, just for clarification is

12    the first.....

13         MR. COVELL:  Let me withdraw the question.

14    .....the first indented paragraph?

15    Q   (By Mr. Covell)  Is this -- is this the test for a

16    supervisory employee exemption?

17    A   As I know of it, yes.

18    Q   Okay.  All right.  All right.  And then did the

19    position of safety supervisor that Mr. Gilbert

20    occupied meet this test for exemption?

21    A   so for clarification, you're asking me if that

22    position met the exemption per this test as

23    supervisory?

24    Q   Right.

25    A   I -- I feel like it does not meet supervisory, that it

     meets administrative more than supervisory based on

**METRO COURT REPORTING**
*745 West Fourth Avenue, Suite 425*
*Anchorage, Alaska 99501*
*(907) 276-3876*

1    the context of this paragraph.

2  Q    Okay.  And which elements of this paragraph doesn't

3    the safety supervisor position meet?

4  A    The being employed solely for the purpose of regularly

5    assigning the activities, directing activities of

6    other employees.  So -- and the regularly assigning,

7    that regularly assigning component is more of a

8    functionality that took place at the embedded site.

9  Q    Okay.  Okay.  And then -- let's see.  And then would

10    you say the safety supervisor was responsible for

11    results of the work performed of other employees?  I

12    guess would you -- okay.  Would you say that's so or

13    not, the safety supervisor is responsible for the

14    results of the work performed by other employees?

15  A    Not directly.  The specialists were more responsible

16    for their performance at their embedded location than

17    transferred to supervisor.

18  Q    Okay.  So if the specialist was having a product -- or

19    a work product problem, you'd go talk to the

20    specialist and not Mr. Gilbert and say -- is that

21    fair?

22  A    No, John or I both may talk to that person.  The

23    supervisor or the manager may speak to that person on

24    performance, but as I read -- understand, this is to

25    be more of an accountability perspective, that the

    supervisor would be accountable for the performance of

1    his employees working under him.

2    Q    Okay.  And it's -- am I correct in understanding that

3    you never did an analysis of any other positions

4    besides Fort Greeley for APC or otherwise that

5    entailed this -- the issue of whether or not an

6    individual would get paid for, quote, all hours

7    worked, unquote?

8    A    That's correct.

9    Q    Okay.  All right.  There are numerous people in the

10   safety specialist and supervisor position, and

11   numerous people have gone through those jobs.  Do you

12   think as a whole that they would agree or disagree

13   with the proposition that largely the safety

14   supervisor did the same work as the safety specialist?

15   A    I can't draw that conclusion on the whole.  I can only

16   speak to discussions with one or two employees about

17   their perception of the position.

18   Q    Okay.  And why don't you tell me about those one or

19   two -- name the employees and tell me about the

20   discussions?

21   A    I spoke with Robert Carrier and Tom Mannix who were

22   both specialists at the time, and continue to be

23   specialists at Kuparuk, and asked them what their

24   perception was of the supervisor position in meeting

25   the activities that I felt made it exempt, and then

     their -- and their response to me was that they did

1    see that position as a position of authority with

2    administrative responsibilities, and it seemed to meet

3    the intent of what I presumed their perception would

4    be, to make it an exempt position.

5  Q    Okay.  But coming back to the question, would whether

6    or not -- coming back to the question, would they

7    agree or disagree with the proposition that the safety

8    supervisor largely did what a safety specialist did

9    and vice versa?

10         MS. ZOBEL:  You're asking him to tell you what

11  other people would think?  If so, you're asking for

12  speculation.

13         MR. COVELL:  Well, I think he just partially

14  answered the question as to two individuals.

15         MS. ZOBEL:  Well, two individuals that he

16  talked to about whether it was -- whether it was exempt or

17  not.

18  A    Correct.

19         MS. ZOBEL:  You're.....

20         MR. COVELL:  Well, I'm -- and in analyzing

21  whether it's exempt, part of the analysis is whether or

22  not.....

23         MS. ZOBEL:  If.....

24         MR. COVELL:  .....you do the same job or not.

25         MS. ZOBEL:  If you're asking whether these two

people believed believe that they did the same job, then he

**METRO COURT REPORTING**

*745 West Fourth Avenue, Suite 425*
*Anchorage, Alaska 99501*
*(907) 276-3876*

1   has a basis for answering.  If you're asking for all the

2   people, then he has -- it lacks foundation.

3           MR. COVELL:  Well, I asked for all the people,

4   and he told me he couldn't answer as to most of them, but as

5   to two he could.

6           MS. ZOBEL:  Okay.  So is this question.....

7           MR. COVELL:  And he was proceeding.....

8           MS. ZOBEL:  .....as to two or is this as to

9   all?

10          MR. COVELL:  I -- and this question is in

11  clarification of the last question or two.

12          MS. ZOBEL:  All right.

13          MR. COVELL:  Okay.  It's.....

14      Okay.  In regards to the two people I spoke with.....

15  Q   (By Mr. Covell)  Right.

16      .....their perception was that the position did not do

17      safety specialist work as a routine function.

18  Q   Okay.  Okay.  As far as keeping records of hours that

19      Mr. Gilbert may have worked -- oh we don't need to do

20      that.  Never mind.

21          MR. COVELL:  Withdraw that.

22  Q   You didn't -- you did look at those pay records,

23      right?

24          MS. ZOBEL:  No, you've not shown him.....

25          MR. COVELL:  Okay.

            MS. ZOBEL:  .....the pay records.

1           MR. COVELL:  All right.

2    (By Mr. Covell)  I'd represent to you in discovery we

3    have pay records for Mr. Gilbert.  Some have indicated

4    consistently 10 hours a day and some indicate one day

5    worked.  Are you aware of any other records that might

6    indicate hours worked by Mr. Gilbert different than

7    those, or would indicate things different than those?

8    Not at this time, no.

9    Okay.  Mr. Gilbert submitted to the company what might

10   be called a daily log which is sort of a day planner

11   and has some notes about what he did each day and then

12   has a notation of hours, 12, 13, 14 and a half.  Do

13   you have any informa -- assuming he represents that

14   those are the hours he worked those days, do you have

15   any information that would dispute that -- whether or

16   not he actually worked those hours?

17   No.

18   Okay.  And is it true that when he worked as both

19   safety specialist and safety supervisor, that is, the

20   hours he worked varied?

21   That is true.

22           MR. COVELL:  Let's go off for just a minutes

23   here.

24   (Off record)

25   (On record)

             COURT REPORTER:  We back on record at 1:20.

**METRO COURT REPORTING**

*745 West Fourth Avenue, Suite 425*

*Anchorage, Alaska 99501*

*(907) 276-3876*

Q        (By Mr. Covell)  Mr. Smith, I've handed you a copy of

2        APC's response of February 17, '06 discovery request,

3        and I'd direct you to the second page there under

4        response.  And there's a list of plaintiff's job

5        duties.  We talked about the plaintiff's job duties,

6        and I just want to go through these and see if there

7        are consistencies with what we already talked about.

8        I think we already talked about developed, wrote and

9        implemented HSE department procedures.  You agree he

10       did that, right?

11       I agree.

Q12      And then supervision and general oversight of the

13       safety specialists to determine work needs and took

14       steps necessary to facilitate department

15       functionality.  Do you maintain that's something Mr.

16       Gilbert did as safety supervisor?

17       I think that's generally correct.

Q18      Okay.  Briefly, I don't want to go on this a long

19       time, what does facilitate department functionality

20       mean, if you know?

21       Yeah, that would be to, for example -- one example,

22       receive say a regulatory change or a policy change

23       from Conoco that would require implementation into our

24       practices, so we would interpret, place into

25       department functionality and institute those changes.

Q        And that would be sort of part of the first one, too,

1    then, changing the book about it?

2    It could be.  The department functionality could maybe

3    be better described by shift scheduling, making sure

4    we had coverage at all locations.

5    Okay.  And the next one, interpret testing results?

6    That's correct.

7    Okay.  Devise and implemented changes to department on

8    an on-going basis and as needed.  Do you agreement

9    with that as a duty?  And I'll let you know right now

10   the next question I'm going to ask you is what does

11   that mean.

12   Yeah.  I think that's maybe a repeat of some of the

13   prior statements.  So, you know, implemented changes

14   could be those procedural changes due to regulatory

15   changes or policy changes.  Changes might also include

16   maybe we have night shift activities that are sporadic

17   and meet coverage, you know, changes implemented,

18   devised, who's going to cover the night shift, and

19   when.

20   All right.  Is it right that sort of your day, the

21   hope (ph) of your day was 12 hours and there wasn't a

22   night shift, but oftentimes your department had to

23   cover nighttime duties?

24   We would typically only do that with additional

25   personnel or changing of work hours.  So if a

     specialist needed to cover night, he may work noon to

1    midnight and split the shifts, or be transferred to

2    the night shift.

Q    All right.  But it's not like the police station,

4    there's no midnight shift in.....

A    That's correct.

Q    .....safety, right?  Okay.  All right.  Hiring input

7    and veto rights.  We already talked about that.  I

8    think we covered that ground as to what you thought he

9    could or couldn't do in that regard, right?

10   I don't think entirely.  I think you asked me if he

11   performed any disciplinary action or had hire and fire

12   authority correct?

Q13  Right.

A14  And in -- as I look to that position, when we were

15   making changes to a department, when -- and the

16   organization when through a metamorphosis quite a bit

17   during John's tenure, that that position was -- was

18   consulted with on who was our top performers as we

19   were reducing personnel.  You know, who were the

20   keepers and who were the guys who were at the bottom

21   of performance level.

Q22  Okay.  All right.  And we talked about -- well, did he

23   ever discipline anybody that you know of?

A24  Not in my recollection was there any disciplinary

25   action handed out from that position.

Q    Okay.  All right.

1    I'd like to clarify one thing.

2    Sure.

3    That in my whole tenure there, I only took one

4    disciplinary action in the whole time, so it wasn't

5    very frequent.

6    Okay.  Okay.  Approval of timesheets and other

7    employee/management functions.  Did the safety

8    supervisor approve timesheets?

9    Yes.

10   And was there a line on them for him to sign off on

11   them or --

12   There was.

13   Okay.  All right.

14   (Pause)

15   All right.  That's all I should have on that one.

16       MS. ZOBEL:  Do you want your copy back?

17       MR. COVELL:  Sure.  Thanks.

18   (By Mr. Covell)  Are you aware that the company's

19   asserting a good faith defense in this case?

20   Yes.

21   Okay.  Are you aware of any paperwork that the company

22   intends to rely upon in asserting its good faith

23   defense?

24   No.

25   Okay.

         MR. COVELL:  Let's go off record.

**METRO COURT REPORTING**

*745 West Fourth Avenue, Suite 425*

*Anchorage, Alaska 99501*

*(907) 276-3876*

1    (Off record)

2    (On record)

3          COURT REPORTER:  We're back on record at 1:28.

4          MR. COVELL:  That's all I have.  Thank you.

5          MS. ZOBEL:  And I'm just looking at my notes.

6  Probably go off record for a moment.

7          COURT REPORTER:  All right.

8    (Off record)

9    (On record)

10          COURT REPORTER:  We're back on record at 1:28.

11          MS. ZOBEL:  I have no questions.

12          MR. COVELL:  No questions.  I can't.

13          MS. ZOBEL:  No questions.

14          MR. COVELL:  Yeah.

15          COURT REPORTER:  All right.  This concludes

16  the deposition at 1:29.

17    (Off record)

18    (On record)

19          COURT REPORTER:  We're back on record at 1:30.

20    (By Mr. Covell)  I'm handing you B-2.....

21          MR. COVELL:  .....which I think we'll go ahead

22  and make whatever subsequent S it will be here.

23          COURT REPORTER:  S-2.

24          MR. COVELL:  S-2.

25    Are you familiar with that document?

A      Yes, I am.

Q      All right.  And that's a job description for safety
2      supervisor, is that right?
A      That's correct.
Q      Do you -- where did it come from?
A      This description was in place when I arrived, and it
6      was the position being held by Ron Kirk.
Q      Okay.
A      And I reviewed the description prior to making a
9      decision to place an alternate opposite of Ron Kirk.
Q10    Okay.  And.....
A11    And I felt that generally it was correct in its
12     content.
Q13    Okay.  And was that in a file folder on the Slope?
A14    There was a list of job descriptions that were there
15     in a binder, along with ergonomic assessments.
Q16    Okay.  So do you know when that was generated or who
17     generated, its history or anything?
A18    I do not know the history or the date of generation.
Q19    Okay.  And you just came across it when you started up
20     there more or less?
A21    Yeah, I went looking for the -- the company's -- I was
22     new to the company, I went looking for their job
23     description for that position, and that the -- this is
24     what I was -- located, and at that time, you know, it
25     was -- is in the right context.  Now, this document
       has been revised after that time frame.  And in fact

1    it shows the -- one of the updates, like the Phillips

2    Alaska I think was a terminology change, because prior

3    it was listed in there as Arco Alaska.  And so we made

4    a couple terminologies.  But the job description, the

5    duties entailed have -- are substantially, exact same

6    as when I reviewed that in 2002.

7    Q    Okay.  All right.  Thank you.

8            MR. COVELL:  I'd like.....

9            MS. ZOBEL:  Don't give it to him.

10           MR. COVELL:  Yeah, make that an exhibit.

11   That's all I have.

12           COURT REPORTER:  Are we off record?  Is this

13   the conclusion?

14           MS. ZOBEL:  Yes.

15           COURT REPORTER:  Okay.

16           MR. COVELL:  Yeah.

17           COURT REPORTER:  1:32  We're off record

18   (Off record)

19                   **(Deposition Exhibit S-2 marked)**
         **\* \* \* END OF PROCEEDINGS \* \* \***
20

21

22

23

24

25

**METRO COURT REPORTING**
*745 West Fourth Avenue, Suite 425*
*Anchorage, Alaska 99501*
*(907) 276-3876*

## S I G N A T U R E

1
STATE OF ALASKA          )
2                        ) ss.
THIRD JUDICIAL DISTRICT )
3

4          I, **DOUGLAS L. SMITH**, have read the foregoing

5 deposition and have made corrections thereto.  Any and all

6 changes, explanations, deletions and/or additions to my

7 testimony may be found on the correction sheet(s) enclosed

8 with this transcript.

                        _____

9                        **DOUGLAS L. SMITH**

10
STATE OF ALASKA          )
11                       )ss.
THIRD JUDICIAL DISTRICT )
12

13          THIS IS TO CERTIFY that on this _____ day of

14 _____ 2006, before me appeared **DOUGLAS L. SMITH**,

15 to me known and known to be the person named in and who

16 executed the foregoing instrument, and acknowledge voluntarily

17 signing and sealing the same.

18                        _____
                         Notary Public in and for
19                       State of Alaska, at Anchorage
                         My Commission Expires:_____
20

21

22

23

24

25

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

# C E R T I F I C A T E

UNITED STATES OF AMERICA     )
                             ) ss.
STATE OF ALASKA              )

      I, Jerri Young, Notary Public in and for the State of Alaska and Reporter with Metro Court Reporting, do hereby certify:

      THAT the annexed and foregoing Deposition of **DOUGLAS L. SMITH** was taken before Cheri Tabor on the 1st day of June, 2006, commencing at the hour of 11:30 a.m., at the offices of DeLisio moran Geraghty & Zobel, 943 West Sixth Avenue, Anchorage, Alaska, pursuant to Notice to take said Deposition of said Witness on behalf of the Plaintiff;

      THAT the above-named Witness before examination, was duly sworn to testify to the truth, the whole truth, and nothing but the truth;

      THAT this Deposition, as heretofore annexed, is a true

**METRO COURT REPORTING**
*745 West Fourth Avenue, Suite 425*
*Anchorage, Alaska 99501*
*(907) 276-3876*

and correct transcription of the testimony of said Witness
taken by Cheri Tabor and hereafter transcribed by Meredith
Downing;
2
    THAT the original of the Deposition transcript will be
lodged in a sealed envelope with the attorney requesting
transcription of same, as required by Civil Rule 30(f)(1)
amended, that attorney being:

5    **MR. KENNETH COVELL**, Attorney at Law, 712 Eighth
    Avenue, Fairbanks, Alaska;
6
    THAT I am not a relative, employee or attorney of any
of the parties, nor am I financially interested in this
action.
8
    IN WITNESS WHEREOF, I have hereunto set my hand and
affixed my seal this 3rd day of July 2006.

10

11                _____
                Jerri Young
12                Notary Public in and for Alaska
                My Commission Expires: 11-03-07
13

14

15

16

17

18

19

20

21

22

23

24

25

**METRO COURT REPORTING**
*745 West Fourth Avenue, Suite 425*
*Anchorage, Alaska 99501*
*(907) 276-3876*