*Payroll Legal Alert*

tions (MMREF-1), which consist of a single record format. It will be pilot tested in 1998. Mag media filers will then have several years to transition over to the new specs. [62 F.R. 1947, 1-14-97.]❖

## If the Check's in the Mail, Don't Withhold...Yet

Think that withholding income and FICA taxes from employees' pay only matters each actual payday? It's not always that cut-and-dried. Your duty to withhold kicks in when employees are actually or *constructively* paid. Constructive receipt means employees have unfettered control over their money. And the IRS has a long-standing rule on mailing checks: Checks sent through the mail never fit the constructive receipt category; they must be actually received. *Result:* Checks which are mailed may disrupt the timing of your year-end or quarter-end withholding and reporting.

Affirming this rule, the IRS concluded in a private letter ruling that an employee didn't have constructive receipt of two checks mailed by his employer in one year, but received in the next. [PLR 9651020.] *Warning:* PLRs are advice from the IRS to the requesting party. They may be used for informational purposes only; they may not be used or cited as precedent.

**A tangled web.** An employer agreed to settle an employee's discrimination claim. It electronically transferred his remaining pay, but mailed two checks representing the settlement and unused vacation pay. The checks were mailed at the end of one year, but weren't received by the employee until early the next year. On his W-2, the employer included his wages and the amounts of the checks. The IRS ruled that he didn't have constructive receipt of the two checks until the year they were actually received. *IRS:* The employer had sole control over the timing of the payment and didn't indicate to the employee that the checks were available to him in the previous year.

➯ **FIXING THE MESS:** Although the IRS didn't mention it, this is probably what this unlucky employer had to do. It reissued the checks, with taxes withheld at the new year's rates. It then backed the checks out of his W-2 and issued a W-2c. It would also have to issue a W-2 for the checks in the current year, even though that worker was no longer employed. If you want to avoid a similar mess, simply give employees the choice of picking up their checks. Once this option is on the table, employees have constructively received their pay, whether they pick the checks up or not.❖

## More Ex-Workers Join The Severance Pay Fray

Last July, PAYLA reported that about 750 ex-employees who received severance payments were suing the IRS for refunds of the income and FICA taxes which their former employer had withheld. These ex-employees have won an important early-round victory in their battle against the IRS. In a related move, more ex-employees of the same company filed refund suits in another federal court.

➯ **SMALL AMOUNTS, LARGE IMPACT:** The individual FICA refunds are small, averaging $1,500 per employee. But the larger impact should interest you. If these ex-employees eventually prevail, and you face a similar situation, you could save a bundle in FICA and FUTA taxes.

**David, meet Goliath.** These ex-employees asserted in their refund suit that their severance wasn't taxable because it was paid to settle potential physical injury claims, which the company anticipated before it made its severance offer. These injuries included insomnia, weight gain, headaches, hypertension, heart trouble, and other stress-related ailments. The IRS moved to dismiss the case. *IRS:* The company made the payments to persuade them to leave. There's no evidence suggesting that specific amounts were paid to encourage them to release personal injury claims.

"No evidence" was the problem, according to the federal trial court, which refused to dismiss the employees' case. *Court:* The company's intentions were ambiguous. The employees should be given the time to gather evidence and make their case. Judgment on whether to dismiss the case will come later. [Abbot v. U.S., No. 3:96CV510 TJM/DNH, D.C. N.N.Y. (1996).]

**Breaking up is hard to do.** Another refund suit filed on behalf of 2,139 more ex-employees of the same company is now pending in the Court of

Federal Claims, which has nationwide jurisdiction. *Potential refund:* over $46 million. Although the tax issues are identical, the Court of Federal Claims isn't bound by the other trial court's decision. [Abrahamsen v. U.S., 1996.]

⊃ THE FALLOUT: If you must handle a severance payment, your best bet is to withhold income and FICA taxes, and pay the employer's share of FICA and FUTA for now. ✧

### WAGES AND HOURS

## Flexing Your Pay Policy Won't Muscle Out Exempt Status

Employees who are exempt from the Fair Labor Standards Act (FLSA) must be paid on a "salary basis." Generally, this means they must receive their full salaries in any week they perform any work. But the Department of Labor (DOL) has issued some opinion letters to employers which conclude that you can flex your exempt pay policy to accommodate some special situations.

**Overtime pay is OK.** The DOL says that you may pay exempts overtime without jeopardizing their exempt status. FLSA regs, noted the DOL, clearly state that exempt employees may receive pay in addition to their salaries. So exempts who log lots of overtime can be rewarded where it means the most — in the pocketbook. *Even better:* The DOL also says that you can pay exempts overtime on any basis. So you don't necessarily have to pay them time-and-a-half. Overtime may be at straight-time rates, a flat sum, or on another basis, including compensatory time off.

**Deductions from leave banks are OK, too.** Because of the salary test, you generally must continue to pay exempts their full salaries, even if your business is closed, provided they're ready, willing, and able to work. But even here, the DOL is willing to be reasonable. *DOL:* Deductions from exempts' leave banks for days when they're told not to show up for work because of budgetary constraints won't jeopardize their status if the deductions don't cut into their salaries.

---

### When Clocks Spring Forward, Make Sure Employees Do Too

At 2:00 a.m. on Sunday, April 6, 1997, daylight saving time goes back into effect. This means that graveyard-shift workers will actually work only seven hours. If you pay them for a standard eight-hour shift, don't include the extra hour's pay when calculating their regular rate to determine the overtime pay rate. The extra hour's pay also isn't included when calculating the number of hours worked.

---

⊃ COURTS REACT DIFFERENTLY: Courts aren't bound by opinion letters. And some have denied employees' exempt status if they were paid overtime. *Proactive step:* If you don't want to take a chance in court, pay them a bonus instead. Other courts have ruled that exempts who have their leave banks docked, instead of their pay, are no longer exempt. *Option:* You can add the deducted days back into their banks, once the business is up and running again. ✧

### UNEMPLOYMENT INSURANCE

## Benefits Report Card: Employers Get Failing Grades

Discipline policies are good. Not enforcing them consistently is bad. Disputing an employee's claim for unemployment benefits is good. Not presenting credible witnesses is bad. In these two cases, employers had the means to protect their accounts from unnecessary benefits charges, but lacked the will. You should learn from their mistakes.

**Case #1 — No to discipline, yes to benefits.** A long-term employee with an exemplary work record occasionally left work early, and worked at home. His time cards, however, didn't reflect this. *Worse:* His supervisor knew he did this and never disciplined him, even though company policy prohibited both actions. He was summarily fired after the company claimed he falsified his time cards. His application for benefits was initially denied on the basis that he was fired for misconduct.

The Rhode Island Supreme Court eventually ruled that he wasn't fired for misconduct, since he wasn't

### Are You Experienced? Check These State Unemployment Rates

By April 30, your first installment of state unemployment taxes is due. States base your tax rate on a taxable wage base and your experience rating. *Vigilance pays:* The fewer benefits charged to your account, the lower your tax rate will be. *Here's proof:* In Colorado, Kansas, Missouri, North Carolina, and Tennessee, employers with the best experience pay zero dollars. And that's money which can be put to more productive uses.

The FUTA wage base is $7,000, but many states have higher wage bases. Taxes also vary among states. The chart on Page 8 lists the states' wage bases and rate ranges for experience-rated employers. As PAYLA goes to press, some states haven't released their 1997 rates; they're marked "Not Available." PAYLA will post the rates from these latecomers on our website at http://www.ahipubs.com in "HR Talk" under the discussion titled "1997 Unemployment Rates."

➲ WHAT'S THE DIFFERENCE: Compared to last year, 17 states fiddled with their wage bases — two down (which means you pay less tax, even if your rate is the same), and 15 up (which means you pay more). And six states are in such good shape they've lowered their minimum and maximum rates.

---

warned or disciplined for his actions. *Court:* Without warnings, he had no way to know that his actions could lead to discharge. *Result:* benefits granted. [Cardoza v. Dept. of Employment and Training, 669 A.2d 1165 (1996).]

**Case #2 — He said, she agreed.** An employee was fired for allegedly creating two disturbances, which disrupted other employees. The company disputed her claim for benefits, and presented three witnesses at the unemployment hearing. *Problem:* They didn't testify that the employee's outbursts disrupted the other employees. *Worse:* The employee presented witnesses who corroborated the statements of the three other witnesses. Based on the credibility of the witnesses, the unemployment commission granted her benefits.

A South Carolina appellate court overturned the commission's decision. But the state supreme court reversed and reinstated the benefits. *Court:* Assessing the credibility of witnesses at unemployment hearings is a job for the commission, not the appellate court. [Milliken & Co. v. Employment Security Comm., 468 S.E.2d 638 (1996).]

➲ GET AN "A" FOR EFFORT: Dust off the employee handbook and make sure managers know the company's rules and enforce them. If you get to an unemployment hearing, make sure you know what your witnesses are going to say beforehand. ◆

---

**BENEFITS**

## Auditing Your 401(k) Plan Makes Dollars and Sense

If some employees who could participate in your 401(k) plan fell through the cracks, or others contributed too much, your 401(k) plan doesn't have to pay the ultimate price for these so-called operational errors. Instead of disqualification, the IRS has a new administrative policy, which allows plan administrators and plan sponsors to correct these violations without incurring penalties. The policy is called Administrative Policy Regarding Self-Correction, or APRSC, and is effective immediately.

**Eligibility to participate in APRSC.** The IRS's national office released the APRSC guidelines, but eligibility to participate is at the discretion of IRS district offices. The guidelines note that you can't participate if you fall into one of these categories.

- The plan correction requires an amendment, either to comply with law changes, or to accommodate demographic changes in your work force.
- The violation doesn't involve the exclusive benefit rules (i.e., misuse or diversion of plan assets).
- The IRS isn't auditing the plan.

**When to use APRSC.** The IRS says you can use the new guidelines to correct operational errors,

---

### For Additional Information...

If you have any questions or comments, please contact the PAYLA Hotline by phone at (201) 825-3377 Ext. 252, by fax (201) 825-8696, by mail to PAYLA c/o AHI, 70 Hilltop Road, Ramsey, NJ 07446, by e-mail at PAYLA@ahipubs.com, or visit our website at http://www.ahipubs.com.

which are violations that occur only because the plan's terms weren't followed.

*Examples.* Eligible employees were inadvertently excluded from participating; the plan had to make a top-heavy contribution but didn't; or employees' pre-tax deferrals exceeded the IRS limit.

*Added responsibility:* You must also establish and follow formal or informal procedures which are reasonably designed to promote compliance. Don't, though, rely on plan documents alone as evidence of procedures. *Proactive step:* Use a check sheet to track allocations, with indications of whether an employee was a key employee for purposes of the top-heavy rules.

**Audit now.** APRSC gives you a big break by allowing you to correct all violations for all plan years. You should audit your 401(k) plan at least annually, since corrections must be made by the end of the plan year following the plan year in which the violations occurred. *Goal of corrections:* to make participants and beneficiaries whole.

*Example.* Metrix Co. established a 401(k) plan in 1986. In 1995, while self-auditing the plan's operation for the 1994 plan year, Beth, the plan administrator, discovered that despite the existing practices and procedures, the top-heavy rules were violated. She also uncovered other violations.

• Harry and Jennifer were eligible to participate, but were excluded from participation.

• Brian, David, and Lydia's pre-tax contributions exceeded the annual limit.

During the 1995 plan year, Beth took immediate corrective action by making contributions on Harry's and Jennifer's behalf. She distributed the excess deferrals to Brian, David, and Lydia. And she made a top-heavy minimum contribution to all participants who were entitled to such contributions. Each corrective contribution and distribution was credited with earnings at a rate of interest which made employees whole. Beth's self-correcting actions satisfy APRSC's requirements. ❖

---

**Employer's Business Tax Calendar for April, 1997**

➲ NOTE: Saturdays, Sundays, and federal legal holidays are taken into account to determine due dates. A state legal holiday delays a due date for a federal tax deposit *only* if the IRS office where you're required to file is located in that state. Under the federal deposit rules, you're allowed a deposit shortfall of the greater of $100 or 2% of your tax liability.

Semiweekly and monthly deposits are for the deposits of FICA and withheld income taxes due on wages paid during the time periods indicated.

April 2   Semiweekly deposit for wages paid on March 26, 27, and 28.
April 4   Semiweekly deposit for wages paid on March 29, 30, 31, and April 1.
April 9   Semiweekly deposit for wages paid on April 2, 3, and 4.
April 10  Employees who work for tips. If employees received $20 or more in tips during March, they should report them to you on Form 4070.
April 11  Semiweekly deposit for wages paid on April 5, 6, 7, and 8.
April 15  Monthly deposit for wages paid in March, if the semiweekly deposit rule didn't apply.
          Partnerships. File a 1996 Form 1065 and provide each partner with a copy of Schedule K-1. If you want an automatic 3-month extension, file Form 8736. Then file Form 1065 by July 15. If you need an additional 3-month extension, file Form 8800.
          Corporations. Deposit the first installment of estimated income tax for 1997. A worksheet, Form 1120-W, is available to help you make an estimate of your tax for the year.
April 16  Semiweekly deposit for wages paid on April 9, 10, and 11.
April 18  Semiweekly deposit for wages paid on April 12, 13, 14, and 15.
April 23  Semiweekly deposit for wages paid on April 16, 17, and 18.
April 25  Semiweekly deposit for wages paid on April 19, 20, 21, and 22.
April 30  Semiweekly deposit for wages paid on April 23, 24, and 25.
          All employers. File Form 941 for the first quarter of 1997. Deposit any undeposited tax. If the total is less than $500 and not a shortfall, you can pay it with the return. If you deposited the tax for the quarter in full and on time, you have until May 12 to file the return. Deposit any FUTA tax owed through March, if more than $100.

### All-States Chart on '97 Experience Rates

| State | Taxable Wage Base | Contribution Rate Range | State | Taxable Wage Base | Contribution Rate Range |
|---|---|---|---|---|---|
| Ala. | $8,000 | 0.2% - 5.4% | Mont. | $16,000 | Not Available |
| Alaska | $24,200 | 1% - 5.4% | Neb. | $7,000 | 0.1% - 5.4% |
| Ariz. | $7,000 | 0.1% - 5.4% | Nev. | $17,200 | 0.25% - 5.4% |
| Ark. | $9,000 | Not Available | N.H. | $8,000 | Not Available |
| Calif. | $7,000 | 1.1% - 5.4% | N.J. | $18,600 | 0.5% - 5.8% |
| Colo. | $10,000 | 0% - 5.4% | N.M. | $14,200 | Not Available |
| Conn. | $12,000 | 2.0% - 6.9% | N.Y. | $7,000 | Not Available |
| Del. | $8,500 | Not Available | N.C. | $12,100 | 0% - 5.7% |
| D.C. | $10,000 | Not Available | N.D. | $14,200 | 0.1% - 5.4% |
| Fla. | $7,000 | 0.11% - 5.4% | Ohio | $9,000 | 0.1% - 6.5% |
| Ga. | $8,500 | 0.05% - 6.75% | Okla. | $11,100 | Not Available |
| Haw. | $26,000 | 0.2% - 5.4% | Ore. | $20,900 | 1.0% - 5.4% |
| Ida. | $22,800 | 0.5% - 5.4% | Penn. | $8,000 | 1.5% - 9.2% |
| Ill. | $9,000 | Not Available | R.I. | $17,600 | 2.3% - 8.4% |
| Ind. | $7,000 | Not Available | S.C. | $7,000 | 1.3% - 5.4% |
| Iowa | $15,200 | 0.05% - 7.05% | S.D. | $7,000 | Not Available |
| Kan. | $8,000 | 0% - 6.0% | Tenn. | $7,000 | 0% - 10% |
| Ky. | $8,000 | Not Available | Tex. | $9,000 | Not Available |
| La. | $7,700 | 0.3% - 6.01% | Utah | $17,800 | 0.2% - 9% |
| Me. | $7,000 | 1.9% - 7.0% | Vt. | $8,000 | 0.6% - 5.9% |
| Md. | $8,500 | Not Available | Va. | $8,000 | 0.1% - 6.2% |
| Mass. | $10,800 | Not Available | Wash. | $21,300 | |
| Mich. | $9,500 | 0.04% - 13% | W.V. | $8,000 | Not Available |
| Minn. | $16,300 | 0.2% - 9.1% | Wis. | $10,500 | 0.02% - 9.75% |
| Miss. | $7,000 | Not Available | Wyo. | $12,200 | 0.3% - 8.8% |
| Mo. | $8,000 | 0% - 7.8% | | | |

SAMPLE ISSUE

# QUINLAN BULLETIN ON
# WAGES AND SALARY COMPLIANCE

Vol. 2, No. 4   April 10, 1997

## IN THIS ISSUE:

- **Equal Pay**
  — Employer 'accidentally' bumps male worker's position to higher level ................... page 2

- **Severance Pay**
  — Employer claims early-retirement payments count as 'wages' ................... page 3

- **Vacation Pay**
  — Employee says vacation pay should count for current year's average weekly wage ........... page 4

- **Commissions**
  — Real estate broker finds tenant for an insolvent partnership ................... page 4

- **Overtime Exemptions — State Employees**
  — Federal court refuses to hear state employees' FLSA claim ................... page 5

- **Salary Schedules**
  — Officers claim city misrepresented starting salary ................... page 6

- **Premium Pay**
  — City claims union 'disguised' proposals as mandatory bargaining subjects ................... page 7

## IN FUTURE ISSUES:

- EQUAL PAY — Woman says three male managers were paid more than she.



NORTHEAST Publishing Group

APC0192