*Equal Pay*

# Employer 'accidentally' bumps male worker's position to higher level

Citation: *Timmer v. Michigan Department of Commerce*, Sixth Circuit U.S. Court of Appeals, Docket No. 95-1706 (Michigan) 1997

Timmer worked for the Michigan Department of Commerce as a "Department Specialist VII." Her job, as a liquor-liability analyst, was to review and approve forms and rates submitted by insurance companies.

Esser also worked as a Department Specialist VII. He reviewed life insurance and credit-card rates. In 1989, the department decided life insurance policies were more complex than other policies (like the ones Timmer reviewed) and reclassified Esser's position as Department Specialist VIII, one step higher than Timmer's. Esser got a raise.

Timmer applied to have her position reclassified as an VIII, too. After reviewing her's and Esser's jobs, the department decided it had made a mistake in changing Esser's position; it had been "overly optimistic" and should never have made it an VIII at all. The department notified the Department of Civil Service.

The civil service agreed Esser's position was over-classified, and "restricted" it under its restriction policy: The department would continue to pay Esser at the higher level and give him raises accordingly, but the next person to move into the position would be a level VII.

Under the Equal Pay Act, an employer was not allowed to reduce the pay of any employee for purposes of complying with the Act.

Timmer sued the department under the federal Equal Pay Act. She said that despite the fact her's and Esser's positions were substantially the same, the department paid Esser, a man, more. She also claimed the department continued to violate the Act through its restriction policy, even though it knew about the misclassification. She asked for judgment without a trial.

The Act prohibited employers from paying differently men and women who had substantially the same jobs. However, employers did not violate the Act if they proved the pay disparity resulted from a seniority system, a merit system, a system that measured earnings by production quantity or quality, or any other factor other than gender.

The department asked for judgment without a trial. It admitted Esser's and Timmer's jobs were substantially the same, and that Esser was paid more. However, it said, the pay disparity resulted from an inadvertent

*(see Accidental Promotion, next page)*

> **Action plan:**
> - If you realize you may be violating the Equal Pay Act by paying different salaries for the same job, be careful how you fix the situation. The Act prohibits lowering the salary of the higher-paid employee as a remedy for an equal-pay violation. Raise the other worker's salary — the costs will be far less than any legal fees you may have to spend later on.

Publisher: *E. Michael Quinlan, Esq.*   Managing Editor: *Stephanie Federico*
Legal Editors: *Carol Johnson Perkins, Esq., Michael R. Jung, Esq., Joanne Belasco, Esq.*
Editors: *Elin Dugan, Jennifer Kavanaugh*   Editorial Assistants: *Heather Murray, Anil Adyanthaya, Esq., Konstantine Kyros, Esq.*
Contributors: *W.B. McDiarmid, Esq., David Braithwaite, Esq., Ann Marie Stoica, Michael C. Hagerman*

The entire content of this newsletter is copyrighted by the publisher and may not be copied without prior permission. Contact Copyright Clearance Center (508) 750-8400 for permission to photo-copy for internal use. Contact publisher for other reprint requests. The publisher is not engaged in rendering legal or other professional advice, and assumes no responsibility for the statements and opinions advanced by any of its writers or contributing editors. Case law and statutes change without notice from time to time and are often specific to one jurisdiction only. The information herein is not intended to be, nor should it be considered, a substitute for legal or other professional advice rendered by a competent attorney or other professional. If you have any questions about the application of issues raised herein to your particular situation, seek the advice of a competent attorney or other professional.

This bulletin is available on microfilm from University Microfilms International, Ann Arbor, MI



**NORTHEAST** Publishing Group   Marine Industrial Park, P.O. Box 1659 Boston, MA 02205-1659   ISSN 1086-6817   Copyright © 1997
(617) 542-0048 Fax: (617) 345-9646 e-mail: quinlanp@quinlan.com   Annual subscription rate: $99 plus s&h.

APC0193

# Accidental Promotion

(continued from page 2)

misapplication of the job classification system, which was gender-neutral. It also said that continuing the disparity under its restriction policy didn't violate the Act because the initial misclassification fell under the merit-system exception and was not based on gender.

The court granted the department judgment without a trial. Timmer appealed. She said the department couldn't say it made a mistake or use its restriction policy to defend itself against her claim.

**DECISION: Affirmed.**

The department was entitled to judgment without a trial because the pay disparity was not based on gender.

Although the department admitted it should not be paying Timmer and Esser differently, it didn't violate the Act. The department's saying it made a mistake was enough to prove the pay disparity was not based on gender — it was an accident. As the court said, "[A]s long as such errors are sex-neutral, they are not violations of the Act." Timmer presented no evidence the mistake was based on sex.

As soon as the department realized its mistake, it took steps to remedy the situation under its restriction policy. The restriction policy was gender-neutral, so the department didn't violate the Act by using it to keep Esser at his higher pay level.

see also: *Brennan v. Owensboro-Daviess County Hospital*, 523 F.2d 1013 (1975).

---

*Severance Pay*

# Employer claims early-retirement payments count as 'wages'

Citation: *Commonwealth of Virginia/Department of Transportation v. Swiney*, 477 S.E.2d 777 (Virginia) 1996

For 19 years, Swiney worked for the Virginia Department of Transportation. He was injured at work and filed for workers' comp benefits. The Workers' Compensation Commission found the injury was compensable and awarded benefits.

Swiney's employer then offered "early separation" under the state Workforce Transition Act. Swiney, at age 55, would get $5,000 up front, plus $18,554, which would be paid weekly in the amount of $515.38. Swiney agreed to resign.

Later, the commission issued a further award for temporary total disability resulting from Swiney's earlier injury. The amount was based on Swiney's former average weekly wage.

The employer asked for a hearing to contest the award. It claimed Swiney already was receiving wages as part of the early separation offer, so he could not also receive added workers' comp payments.

The commission found the early separation payments were not "wages" for purposes of the Workers' Compensation Act. It denied the employer's request for a hearing.

The employer appealed.

**DECISION: Affirmed.**

The early separation payments were not "wages," so the commission properly issued the second workers' comp award.

Virginia's Supreme Court had adopted a definition of "wages" as "a compensation given to a hired person for his or her service." *Black's Law Dictionary* stated wages were "compensation of employees based on time worked or output of production." In contrast, Swiney's early separation payments were not paid for work or services, but as an inducement not to work for the employer.

see also: *Roanoke Belt Inc. v. Mroczkowski*, 455 S.E.2d 267 (1995).

(see Retirement Payments, next page)

> **Action plan:**
> - Don't assume *any* payments you make to an employee (e.g., death benefits, workers' comp) are considered "wages" that will allow you to reduce his or her salary or retirement plan. Payments are considered wages only when made in return for "time worked or output of production."

## Retirement Payments

(continued from page 3)

*Editor's note: The employer pointed to another case (see citation above) to support its arguments against Swiney. In that case, unemployment benefits were deemed "income" for purposes of death-benefits ineligibility. Income, however, was not the same as wages, so the case did not help the employer's argument.*

### Vacation Pay

## Employee says vacation pay should count for current year's average weekly wage

Citation: *Corning Inc. v. Workmen's Compensation Appeal Board (Bryner), 684 A.2d 244 (Pennsylvania) 1996*

In June 1992, an employee of Corning Inc. injured his back and neck while working, and sought workers' compensation benefits. Corning determined for the employee's workers' comp claim that his average weekly wage was $1,032.65. The employee disagreed and appealed to a workers' comp judge, claiming Corning incorrectly calculated his wages.

In addition to his hourly wage, the employee received an annual, lump-sum vacation payment of $3,667.96. Corning paid the vacation money to its employees during the first half of the year when the employee took any vacation time, regardless of the duration. The amount of vacation pay was based on the employee's previous year's earnings.

The employee argued the vacation pay he received in the first half of 1992 should count toward the calculation of his average weekly wage for 1992. With that vacation pay included, the employee's average weekly wage would be $1,270.53. In calculating the employee's average weekly wage, Corning had prorated the vacation pay over 1991, which resulted in a lower average weekly wage.

The judge agreed with Corning, finding the vacation pay should be prorated over 1991. The employee appealed to the Workmen's Compensation Appeal Board. The board reversed and ruled the employee's 1992 vacation pay should have been included when calculating his 1992 average weekly wage. Corning appealed.

**DECISION: Reversed.**

Corning based each employee's vacation pay on his or her previous year's earnings. Therefore, when calculating the employee's average weekly wage for 1992, the vacation pay the employee received in 1992 had to be prorated over 1991. The employee's average weekly wage was $1,032.65.

see also: *Eljer Industries v. Workmen's Compensation Appeal Board (Johnson), 670 A.2d 203 (1996).*

> **Action plan:**
> • If you pay employees lump-sum benefits, like vacation pay, be clear about how those benefits are applied. Do they count toward the previous year's work, or toward next year's? The answer could influence salary calculations and benefit payments.

### Commissions

## Real estate broker finds tenant for an insolvent partnership

Citation: *Schenck v. HJI Associates, 685 A.2d 481 (New Jersey) 1996*

HJI Associates was a partnership with one asset: some vacant land. The property's market value dropped to below $800,000 while the mortgage balance grew to $1.8 million. HJI's bank began foreclosure proceedings.

(see Broker, next page)

# Broker

(continued from page 4)

Schenck was a real estate broker and found possible tenants for HJI's property. The tenants said they would lease the property if they first got financing and municipal approval to build.

Schenck wanted to collect a commission on the lease. HJI claimed it could not pay until it received rent from the tenant. Schenck and HJI signed an agreement that made commission conditional on HJI getting continued financing. The agreement also made the commission payable according to a schedule that coincided with the expected lease payments. And if HJI became insolvent, the agreement stated the entire commission became immediately payable. When the agreement was signed, both HJI and Schenck knew HJI was already insolvent.

The tenants never got the proper financing and municipal approval. The bank foreclosed and Schenck was not paid.

Schenck sued HJI. He argued his commission was immediately payable under the agreement because HJI was insolvent. An arbitrator dismissed Schenck's claim, and the court agreed.

Both the court and the arbitrator found HJI owed no commission because the possible tenants never got the financing, and a building was never erected. Also, because no rents had been collected, the payment schedule could not be met. Both HJI and Schenck had signed the agreement, they knew its terms and intended to be bound by it.

Schenck appealed, arguing that despite their intentions, the agreement stated the entire payment was due if HJI became insolvent. He argued HJI was insolvent, so the commission was payable.

DECISION: Affirmed.

Schenck and HJI showed their joint intent, by signing the agreement, that no commission would be paid unless the construction moved forward and rents were paid. Although Schenck focused on one part of the agreement about commission, the entire spirit and language of the agreement as a whole showed what the parties intended. He could not claim that one clause in the agreement was more important than the contract as a whole.

Schenck knew by the terms of the agreement that he would not be paid unless the tenants received financing. Therefore, the conditions of the agreement were not met, and Schenck was not entitled to the commission.

see also: *Temple v. Clinton Trust Co.*, 62 A.2d 690 (1948).

see also: *Marchak v. Claridge Commons Inc.*, 633 A.2d 531 (1993).

**Action plan:**
- If a commission is conditioned on several different factors, all those factors must be met before the commission agreement will be enforced. If you feel one factor carries more weight than others, make that clear from the outset in the commission agreement.

---

*Overtime Exemptions — State Employees*

# Federal court refuses to hear state employees' FLSA claim

*Citation: Rehberg v. Department of Public Safety, 946 F.Supp. 741 (Iowa) 1996*

Several employees of the Iowa Department of Public Safety worked overtime. They complained they did not get paid for their overtime work.

The employees sued the partment in federal court. They claimed the department's refusal to pay overtime wages violated the Fair Labor Standards Act (FLSA).

The employees asked for overtime compensation plus interest.

The department claimed federal court was not the proper place for the employees to file suit. It argued the 11th Amendment of the federal Constitution prevented individuals from suing a state that had not agreed to be sued in federal court. The department asked the court to dismiss the employees' claims because the federal court did not have the authority to hear the case.

The employees argued their case should not be dismissed. They claimed the 11th Amendment prevented the federal court only

(see FLSA Claim, next page)

## FLSA Claim

(continued from page 5)

from hearing citizens' claims against *other* states, and thus did not prevent the court from hearing claims against their own state. They also argued the FLSA rule preventing state employees from suing their state employers in federal court violated the 14th Amendment's Equal Protection Clause. They claimed the FLSA treated state employees differently than private employees by allowing private workers to sue in either state or federal court.

**DECISION: Case dismissed.**

The federal court did not have the authority to hear the employees' claims against their state.

The employees' argument that the 11th Amendment did not prevent the federal court from hearing their case was incorrect based on a prior Supreme Court decision. The Court had previously interpreted the 11th Amendment to prevent state citizens from suing *even their own state* in federal court without their state's consent, though this was not expressly written in the amendment itself.

The FLSA rule stating state employees could not sue under its provisions in federal court did not violate the Equal Protection Clause. To succeed on this claim, the employees had to show Congress passed the FLSA under the 14th Amendment. Federal laws passed under this amendment related to only race or gender discrimination. The FLSA was not one of these laws because Congress passed it under the Interstate Commerce Clause. As a result, the federal court could not hear the case without the state's consent.

The employees' claims were dismissed from federal court, but the employees could bring their FLSA claim to state court. Though the employees had to bring this federal claim to their own state court, that court still had to enforce the FLSA because of the U.S. Constitution's Supremacy Clause.

**Action plan:**
• Before spending a fortune on legal fees trying to defend against employees' claims, determine whether you'll need to defend yourself at all. If the employees' lawyers haven't filed their claims in the correct court, you may be (temporarily) off the hook.

see also: *Seminole Tribe of Florida v. Florida*, __ U.S. __, 116 S.Ct. 1114, 134 L.Ed.2d 252 (1996).

see also: *Wilson-Jones v. Caviness*, 99 F.3d 203 (1996).

---

*Salary Schedules*

## Officers claim city misrepresented starting salary

Citation: *Williams v. City of Midland*, 932 S.W.2d 679 (Texas) 1996

The city of Midland, Texas, recruited Miller and Williams (officers) to work as police officers. The city sent them brochures outlining, among other things, job qualifications and a step scale. The brochure stated recruits would start at $1,743 per month and, upon completed training and promotion to police officers, would be paid $2,578 per month.

The officers were hired and began the training. About halfway through the course, Sergeant Nicks informed the recruits the salary information in the brochure was wrong, and that it would take recruits 10 to 12 years to reach a salary of $2,578. Nicks noted part of the brochure was "sort of misleading."

After the department sent out 1,000 brochures to recruit applicants, Nicks decided there was a "significant chance" applicants would misinterpret the salary provisions. Chief of Police Czech told Nicks to send out the erroneous brochures anyway but to

**Action plan:**
• Potential employees will pay particular attention to any information you give about starting salaries and pay schedules, so be careful what you promise. Unless you're certain before hiring someone that you can follow through on a specified amount, don't set one at all.

(see Starting Salary, next page)

# Starting Salary

(continued from page 6)

correct the next group.

The two officers didn't challenge the reduced salary until after they graduated from the training program, when they submitted a claim for the $2,578 salary contained in the brochure. Czech denied the claim. The department changed the brochure's incorrect salary information after the officers filed their claim.

After Czech's denial, the officers sued the city, alleging it breached its contract by not paying the salary stated in the brochure. They also claimed the city's failure to correct the brochure, or notify them of the true salary before they joined the training program, was negligent misrepresentation.

A jury found the city negligently misrepresented the officers' starting salary, and awarded each officer $17,500. The city asked the judge to overrule the jury's award. The judge granted the city's request, and revoked the jury's damage award without comment.

The officers appealed. They claimed sovereign immunity didn't protect the city from a negligent misrepresentation claim, and that they had proved a negligent misrepresentation claim against the city. Finally, they argued they had not been awarded sufficient damages.

**DECISION: Affirmed.**

The officers weren't entitled to damages for the misrepresentations regarding their salary in the brochure.

The officers correctly argued the city wasn't immune, because the city's actions in recruiting police officers involved local citizens, rather than the public in general. Therefore, the city wasn't entitled to governmental immunity.

The officers properly stated a claim for negligent misrepresentation. The city, in the course of its business, made an error regarding the salary. It supplied the false information to potential applicants. By not making corrections, the city failed to use reasonable care in communicating the information. The officers lost money by justifiably relying on the incorrect information.

However, the officers waived their right to sue the city when they completed the training course before suing. They should have immediately filed suit to protect their rights.

By continuing the training after they learned of the error, the officers in effect accepted the city's fraudulent act and couldn't complain later. Having accepted the benefits of the agreement after finding out about the incorrect information, they couldn't then sue.

This waiver was enough to overrule the jury's decision.

see also: *Dillard v. Austin Independent School District*, 806 S.W.2d 589 (1991).

see also: *Caldwell v. Callender Lake Property Owners Improvement Association*, 888 S.W.2d 903 (1994).

---

*Premium Pay*

# City claims union 'disguised' proposals as mandatory bargaining subjects

Citation: *Iowa City Association of Fire Fighters, IAFF Local 610 v. Iowa Public Employment Relations Board*, 554 N.W.2d 707 (Iowa) 1996

The Iowa City (Iowa) Association of Fire Fighters, IAFF Local 610, was the bargaining representative for all Iowa City firefighters ranked captain or below. The union asked the city to include what it called an "hours proposal" in its contract with the city.

The union proposed dividing firefighters' workdays, excluding breaks and lunch, into scheduled "active" and "ready" work time. During active time, firefighters would be on duty and ready for routine jobs such as station duties, apparatus checks, inspections, training and equipment maintenance. Ready time would be the normal workday hours not included in active time, during which firefighters would remain on duty, in uniform and ready to respond to emergencies. Ready duties would include emergency response and other duties needed

(see Bargaining, next page)