# Bargaining

(continued from page 7)

to immediately return a fire company to ready status, including reloading hoses, refilling tanks and replacing equipment.

The city asked the Iowa Public Employment Relations Board to declare the city did not have to bargain over the union's proposal. It argued that under state law the hours proposal was a *permissive*, not *mandatory*, subject of collective bargaining. The board found the hours proposal was a permissive bargaining subject, and the union appealed to court.

Meanwhile, the union again gave the city the hours proposal, this time including a new "premium pay" proposal. The premium pay clause stated the city would pay firefighters a 25% premium for ready time hours when the department exercised its right to assign active time duties during ready time.

The city rejected the union's premium pay proposal and argued it also was a permissible subject of collective bargaining.

The city asked the board to declare this proposal as a permissive subject, arguing it would infringe on its exclusive managerial rights under state law, as did the hours proposal. The board declared the premium pay proposal was permissive.

The union again appealed, and the court heard both appeals. The union argued both proposals were mandatory bargaining subjects because one dealt with hours and the other dealt with pay.

The union claimed the premium pay clause was a mandatory subject of negotiation because it concerned wages, shift differentials or overtime pay.

The city, however, argued the union's proposals infringed on its exclusive managerial rights. The city admitted that though hours and pay issues were usually mandatory bargaining subjects, the union's proposals were not because the union had merely disguised them only to get city approval.

The court ruled the hours proposal was a permissible bargaining subject, concluding it infringed on the city's management rights. However, the court reversed the board's ruling on the premium pay proposal, concluding it was a mandatory bargaining subject.

The union and the city appealed.

**DECISION: Reversed in part; returned with an order.**

The lower court should have concluded *both* proposals were permissive bargaining subjects. The case was returned for the lower court to affirm the board's decision in favor of the city.

The union's "hours proposal" could not be a mandatory bargaining subject because it limited the duties firefighters could perform during each period, which infringed on the city's right to direct the work of its firefighters. Allowing the union's hours proposal would have taken away from the city's exclusive managerial powers.

The union's "premium pay" proposal was also not a mandatory subject of collective bargaining. Although the proposal appeared to uphold the city's exclusive right to assign work, it too could not be

---

**Action plan:**

- Don't jump immediately into union negotiations without first determining whether you are required to do so.

Some states differentiate between mandatory and permissive bargaining subjects. In this case, a union proposal to create "types" of duties infringed on the employer's right to manage its employees, so it was not a mandatory bargaining subject. If a subject could infringe on employers' managerial rights, it is deemed permissive and therefore need not be addressed in negotiations.

---

considered a mandatory bargaining subject. Making the city pay a 25 percent premium when it assigned firefighters active duty work during ready time had the effect of designating what duties would normally be done during the workday. Thus, this proposal also infringed on the city's management rights.

The union's pay proposal was also not a shift differential because it applied to work within a single shift. Nor did the proposal provide for overtime because it covered only regular work hours.

see also: *Charles City Community School District v. PERB*, 275 N.W.2d 766 (1979).

see also: *State v. PERB*, 508 N.W.2d 668 (1993).

# Alaska EMPLOYMENT Law Letter

A monthly newsletter designed exclusively for Alaska employers

Thomas M. Daniel, Katherine C. Tank, Helena L. Hall, Editors

Vol. 2, No. 12
December 1997

## WAGE AND HOUR

### Ninth Circuit approves overtime pay for exempt employees

*In the last few years, employers have been confronted with various rulings that underline how carefully they must administer pay practices to avoid jeopardizing the overtime exemption applicable to salaried professional, administrative, and technical employees.*

*In a recent decision that will be reassuring to many employers, the United States Court of Appeals for the Ninth Circuit (which includes Alaska) has clarified that employees who are exempt from overtime requirements under the Fair Labor Standards Act (FLSA) may be paid hourly overtime pay in addition to a fixed salary without destroying their exempt status. The court rejected as "dictum" (non-binding) language from an earlier case, Abshire v. County of Kern, 908 F.2d 483 (9th Cir. 1990), that had previously cast doubt on the practice of paying hourly overtime compensation to exempt employees.*

### Facts of the case

Five current and former Boeing employees claimed that they were entitled to full one and one-half time overtime compensation for all hours worked in excess of 40 in a workweek. The employees included professional engineers and managers who were paid a fixed salary and also received overtime pay in some, but not all, circumstances when they worked over 40 hours in a week. The overtime pay rate was not one and one-half times the straight time rate, but rather their straight time rate plus $6.50 per hour.

In order for employees to be deemed exempt from overtime under the FLSA, they must satisfy both a "duties test" and a "salary basis test." Because the employees were professionals and managers, there was never a question that their work duties met the requirements for exemption. The employees argued, however, that the hourly overtime compensation paid to them by Boeing in certain circumstances violated the salary basis test and rendered them nonexempt employees. Nonexempt employees would be entitled to time and one-half for all hours worked in excess of 40 hours per week.

A Department of Labor (DOL) regulation provides that "a salary may consist of a predetermined amount constituting all or part of the employee's compensation. In other words, additional compensation besides a salary is not inconsistent with the salary basis of payment." 29 C.F.R. § 541.118(b) In a series of opinion letters, the DOL has interpreted this regulation to mean that hourly overtime compensation does not violate the salary basis test and, accordingly, does not destroy exempt status.

### Court's decision

The court deferred to the DOL's interpretation of 29 C.F.R. § 541.118(b) in holding that hourly overtime pay does not violate the salary basis test or convert an otherwise exempt employee into a nonexempt employee. The court also observed that "[t]he plain language of the regulation . . . supports the Secretary [of Labor]'s conclusion that overtime compensation, by itself, does not spoil exempt status."

## In this issue

- Ninth Circuit approves overtime pay for exempt employees — 1
- Officers not entitled to overtime for off-duty physical training — 2
- Employer may enforce neutral application guidelines — 3
- Court expands liability for derogatory remarks — 4
- Court expands liability for derogatory remarks even further — 4
- FMLA advisory opinions — 5
- What's an employer to do? — 7

Perkins Coie

APC0205

The employees also brought a claim under the Washington Minimum Wage Act (MWA). In response to a Washington Court of Appeals decision, the Washington Legislature amended the MWA in 1995 to make clear that hourly overtime pay did not destroy exempt status. The legislation specifically applied the amendment to all lawsuits filed on or after February 1, 1995.

The Boeing employees had filed their suit after February 1, 1995, and thus the only question under state law was whether the Legislature had exceeded its authority in amending the MWA. The court held that the Washington Legislature had not violated the constitutional rights of the employees by amending the MWA. Hence, the amendment was valid and extinguished the employees' claims under the MWA. *Boykin v. Boeing Co.*, ___ F.3d ___, 1997 U.S. App. LEXIS 22,277 (9th Cir. Oct. 23, 1997).

### Tips for employers

There is not a similar statutory provision under the Alaska Wage and Hour Act (AWHA) with regard to paying exempt employees overtime pay. However, because the AWHA is based on the FLSA, Alaska courts look to federal case law in interpreting the AWHA. Therefore, an Alaska court may follow this case in construing the AWHA.

Nevertheless, there are many common misunderstandings about the validity of certain pay practices for exempt employees (e.g., treatment of partial day/partial week absences, informal systems of "comp time"). You should obtain good advice before establishing pay practices for exempt employees that vary from standard payment of salary.

## WAGE AND HOUR

# Officers not entitled to overtime for off-duty physical training

*Is off-duty physical fitness training conducted by police officers in order to maintain physical fitness standards required by their employer "work" such that the employer is required to pay them overtime for the time spent so engaged? The federal Fair Labor Standards Act (FLSA) requires covered employees to work no more than 40 hours per week without receiving one and one-half times their regular rate of pay for the overtime hours.*

*The key question, then, is what counts as "work." Although the question may seem simple, it can become complex when the activity is not performance of traditional on-the-job tasks, but is related to, or required for, performance of the job.*

### Facts of the case

The United States Court of Appeals for the Eleventh Circuit attempted to answer this question with respect to the off-duty physical fitness training performed by members of Florida's Metro-Dade Police Department's Special Response Team (SRT). The SRT is a specialized unit of the police department whose officers are highly trained in the use of special weapons, equipment, and techniques designed to minimize the risk of harm to officers and civilians in situations involving barricaded subjects, snipers, hostages, and high-risk search and arrest warrants.

Because SRT call-outs often require extreme physical exertion, involve serious risk to human life, and can last as long as 24 hours, the SRT's standard operating procedures provide that "good physical fitness is recognized as a vital and necessary quality for individuals assigned to SRT."

Prospective SRT personnel must pass a physical fitness examination, after which they undergo rigorous cardiovascular and strength training in the SRT training school. Once they are members of the SRT, individuals are monitored to ensure that they are physically capable of performing SRT functions; individuals who fail fitness exams are subject to reassignment outside the SRT.

SRT officers rotate between two weeks on primary status, during which they train in SRT tactics and respond to calls for SRT assistance, and two weeks on warrant status, in which they serve felony arrest warrants on high-risk individuals. When on primary status, SRT officers are allotted two hours of on-duty physical fitness training each day, which they use for long-distance runs, weight training, and calisthenics.

Prior to 1990, SRT members also were permitted to train twice a week while on duty during the warrant cycle. Since 1990, however, the SRT has not allotted any on-duty physical training time for officers on warrant status.

### District court decision

Several current and former SRT officers filed a lawsuit in federal court, claiming that they were entitled under the FLSA to overtime pay for off-duty hours spent performing physical fitness training. The district court concluded that the off-duty training was compensable work after the jury made the following factual determinations:

(1) The off-duty physical training or exercise is required or controlled by their employer.
(2) The off-duty physical training or exercise is performed predominantly for the benefit of the employer.
(3) The off-duty physical training is an integral and indispensable part of their principal activities as SRT officers.

### Judicial and statutory guidance on what equals 'work'

The Eleventh Circuit reviewed and reversed the district court's conclusion. The court first observed that because Congress did not define "work" or "employment" in the FLSA, it has been left to the courts to determine which employment-related activities are compensable. The court then reviewed the guidelines that have emerged from court opinions.

Generally, courts have construed work to mean all activities "controlled or required by the employer and pursued necessarily and primarily for the benefit of his employer and his business." Whether an off-duty activity is conducted predominantly for the benefit of the employer depends on the degree to which an employee's freedom is undermined by the work-related activity. One court said that "[i]t is clear that an employee's free time must be severely restricted for off-time to be construed as work time for purposes of the FLSA."

The Eleventh Circuit also pointed out that the Portal-to-Portal Act provides that employers are not liable under the FLSA for activities that are "preliminary to or postliminary to" the principal activities the employee is employed to perform. As a result, activities performed before or after a shift are compensable work only if they "are an integral and indispensable part of the principal activities for which covered workmen are employed."

## Department of Labor's viewpoint

After reviewing these judicial guidelines, the Eleventh Circuit looked to regulations issued by the Department of Labor (DOL) with respect to employment-related training activities. These regulations provide that training programs need not be counted as work if:

(1) attendance is outside the employee's regular working hours;

(2) the employee does not perform productive work during the program;

(3) attendance is voluntary; and

(4) the program is not directly related to the employee's job.

The court also discussed an opinion letter issued by the former DOL wage and hour administrator in which she applied these regulations to a similar case and concluded that officers' off-duty training was not compensable work because it was not required for, or directly related to, the officers' jobs.

## Off-duty training is not work

Applying these factors to the SRT training situation, the court concluded that the off-duty time spent by the SRT officers maintaining physical fitness standards mandated by their job is not compensable work under the FLSA. First, the off-duty training was conducted outside of regular work hours. Second, the officers did not perform any productive work (e.g., responding to life-threatening situations) while they were exercising. Third, the off-duty training was voluntary. The court reasoned that the supervisors required only that the officers pass fitness exams; the officers were given the freedom to select their off-duty activities and to train at any location, at any time, and for any duration.

December 1997

Finally, the court concluded that the officers' off-duty training was not directly related to their SRT employment. Although they were required to maintain a certain level of fitness, they were not required to develop a skill unique to the SRT job. Also, the training provided benefits to the individual officers that extended beyond their employment position. *Dade County v. Alvarez*, 1997 U.S. App. LEXIS 28604 (11th Cir. Oct. 16, 1997).

## Practical advice

The case of the SRT officers demonstrates that a fact-specific analysis is required to determine whether off-duty activities performed by employees should be considered "work," for which you must compensate them. If the nature of a particular job is such that employees engage in off-duty training (whether physical or another type of training) in order to perform job duties, you should carefully consider the guidelines developed by the courts and DOL to determine whether you are required to pay employees for that training time.

> The officers did not perform any productive work (e.g., responding to life-threatening situations) while they were exercising.

## LABOR RELATIONS

## Employer may enforce neutral application guidelines

*During 1996, we reported on cases involving an employer's duty not to discriminate against union organizers, or "salts," who are applying for jobs to attempt to organize from within. A recent case from the U.S. Court of Appeals for the District of Columbia indicates that if you reject such applicants based on neutral guidelines, uniformly applied, you will not be liable for anti-"salt" discrimination. The decision is likely to be given weight because it was authored by Chief D.C. Circuit Judge Harry T. Edwards, an acknowledged expert in issues of labor law.*

## Facts

The case involved the court's review of an order by the National Labor Relations Board (NLRB) that an employer had violated the National Labor Relations Act by failing to consider the applications of individuals who had written "union organizer" on the forms they submitted. The court declined to enforce the NLRB order, finding that there was no substantial evidence that the employer's reason for rejecting the applications was anti-union sentiment.

The employer had written application guidelines on file with the state employment office. Under the guidelines, applicants were to fill in applications in ink on special application forms at the state employment offices. Applicants were instructed to refrain from adding extraneous notations such as "vet," "boy scout," or "union organizer."

The union organizers whose forms had been rejected by the employer were filled out on photocopies, were not completed at the state employment office, and contained the specific notation "union organizer." The employer's refusal to consider these nonconforming applications was held consistent with its neutral and uniformly applied procedure. *TIC-The Industrial Companies Southeast, Inc. v. NLRB,* ___ F.3d ___, 1997 U.S. App. LEXIS 27284 (D.C. Cir. Oct. 7, 1997).

### Lesson

This case does not change the general proposition that employers covered by the National Labor Relations Act or the Public Employees' Collective Bargaining Act may not discriminate against applicants for employment because of their status as union organizers. However, the case does permit use of neutral application guidelines, uniformly applied, even if avowed union organizers are thereby screened out of the process.

## DISCRIMINATION

## Court expands liability for derogatory remarks

In a recent case, the Ninth Circuit Court of Appeals (which hears appeals from Alaska cases) held that an employee could bring a lawsuit against her employer based on a supervisor's derogatory remark about a member of her protected class, even though the derogatory remark was not directed at her.

### Facts of the case

Cordova, a Mexican American woman, was employed by an insurance company as a claims representative off and on for five years. She applied for a position as a trainee agent and was one of four finalists. All of the four were either minorities or women, protected classes under the Idaho Human Rights Act and Title VII of the Civil Rights Act.

The agency manager first offered the job to a Native American male, who turned it down. He then offered the job to a woman, who accepted. Neither of these candidates had ever worked for the company and had no insurance experience.

Cordova attempted to find out why she was not hired. She was told that the male had sales experience and educational qualifications and the female who was ultimately selected was a single mother who had worked her way through college.

### Dumb remark

Cordova did not believe these were the true reasons and filed a suit alleging that she had been a victim of discrimination on the basis of her sex and national origin. The woman who had been hired gave a sworn statement that she had heard the manager refer to a male Mexican American agent as a "dumb Mexican." She also said that this same supervisor had said he was required to hire the male agent because of his minority status.

Note that there was no evidence that the supervisor had made derogatory remarks *about Cordova and her minority status.* The district court found, based on this evidence, that Cordova had not met the threshold test which would allow her to go forward with her lawsuit. The Ninth Circuit disagreed.

### Threshold test

Most readers will recall that an employee who asserts a discrimination claim under federal law has to show at the outset that:

> (1) she belongs to a protected class; (2) she applied for and was qualified for a job for which the employer was seeking applicants; (3) she was rejected despite her qualifications; and (4) after her rejection, the position remained open and the employer continued to seek applications from persons with comparable qualifications.

If the employee can provide some evidence on each of these elements, the employer then has to come forward with a nondiscriminatory reason for its actions. Once the employer does this, the burden shifts to the employee to provide evidence that the employer's reasons were a pretext for a discriminatory reason.

In Cordova's case, the Ninth Circuit found that the supervisor's comments about another agent created an inference that the employer had rejected Cordova for discriminatory reasons. Although the employer argued that a "stray remark" should not be evidence of discrimination, the Ninth Circuit found that since the one who allegedly made the remark decided who got the job, Cordova was entitled to go forward with her suit. *Cordova v. State Farm Insurance Companies,* ___ F.3d ___ 1997 WL 546185 (9th Cir. September 8, 1997).

> There was no evidence that the supervisor had made derogatory remarks about Cordova and her minority status.

## DISCRIMINATION

## Court expands liability for derogatory remarks even further

Another court has expanded the liability for derogatory remarks even beyond that of the protected class which is the subject of the remark. In one recent case, the court held that white male employees can bring a lawsuit against their employer for its discrimination against female and black employees.

## Conduct

In the case, seven white male police officers brought a lawsuit against their employer, the city of Richmond, Virginia, claiming the existence of both a sexually and racially hostile work environment in violation of Title VII of the Civil Rights Act. The white males had not been subject to discrimination in the traditional sense — they did not claim to be the object of discriminatory conduct. Rather, they challenged the conduct of their immediate supervisor, Lt. Carroll, toward black and female police officers with whom they worked.

Over a period of approximately two months, Lt. Carroll made several very profane, disparaging, and angry remarks to and about the female and black members of the police force. These statements were vulgar and obviously directed at females and blacks. They could not be construed in any manner to be directed at the white males. Some of these profane comments were made only in the presence of the white male officers, some were made in the presence of all officers, including black and female officers, and some were merely overheard by non-employees.

In response to these disparaging remarks, several officers, including white male officers, submitted a letter to their employer complaining about Lt. Carroll's profanity and outbursts of temper. Although the employer did investigate the complaints, it unfortunately failed to take action against Lt. Carroll.

To make matters worse, several officers believed they were subjected to a series of retaliatory actions by their employer for complaining about Lt. Carroll. These actions included unfavorable shift changes, transfers, and performance evaluations.

After receiving right-to-sue letters from the Equal Employment Opportunity Commission, the white male officers filed a lawsuit against their employer based on Lt. Carroll's disparaging remarks about women and blacks. Even though they were not within any protected class, the white male officers claimed they had been subjected to both a racially and sexually hostile work environment. They claimed the hostile environment acted to destroy the precinct's "teamwork" mentality between officers of different sexes and races.

## Consequences

Predictably, the trial court summarily dismissed the white male officers' claims of a sexually and racially hostile work environment. It held that the white male officers could not assert the rights of female and black officers. The core of its reasoning was that the employer was discriminating against blacks and females *in favor of* the white male officers, so they had no basis to bring a lawsuit.

Unpredictably, however, the appellate court overturned the trial court's ruling and held that white male officers could assert hostile work environment claims even though the discriminatory conduct was not directed at them and was instead directed at blacks and females. It reasoned that despite the fact that the white male officers were not the subject of discrimination, they could still be "aggrieved" within the meaning of Title VII. As a result of this decision, the case was sent back to the trial court, where it will either be tried or, perhaps, settled. *Childress v. City of Richmond, Virginia*, ___ F.3d ___, 1997 WL 434878 (4th Cir. August 5, 1997).

## Practical application — do we have to say it again?

There is no place in the work environment for derogatory remarks. And the assumptions that there is no right to assert the civil rights of another person and that the individual seeking relief must allege that he himself suffered harassment or discrimination are no longer safe.

To avoid the ever-expanding liability for discriminatory or harassing conduct, employers must take steps to educate supervisors because the courts will not overlook derogatory comments made by individuals who are in positions of power. Taking steps to avoid discrimination in the workplace is essential and includes the following:

> There is no place in the work environment for derogatory remarks.

- ✓ Have a strong, well-drafted policy against harassment or discrimination of any kind.
- ✓ Publish that policy and have employees acknowledge their receipt and understanding of the policy.
- ✓ Conduct employee training about recognizing and avoiding discriminatory or harassing conduct.
- ✓ Provide employees with more than one non-threatening means of reporting the offensive conduct.
- ✓ Assure employees that they will not be retaliated against for reporting any conduct.
- ✓ Promptly investigate any reported complaints of harassment or discrimination.
- ✓ Promptly investigate any inappropriate conduct of which you are aware, regardless of whether it has been reported or not.
- ✓ Take prompt, effective remedial action.
- ✓ Review policies on a regular basis to ensure compliance with the most recent changes in the law. ■

## FMLA

# FMLA advisory opinions

The United States Department of Labor is charged with the enforcement of the Family and Medical Leave Act