(FMLA). The FMLA has been the subject of much confusion and subject to some conflicting court opinions over certain definitions of terms used in the statute. Recently, the Department of Labor issued advisory opinions concerning certain issues that appear to be recurring problems in the enforcement of the FMLA.

## Common colds and flu as serious health conditions

The FMLA defines a "serious health condition" as one requiring "incapacity of more than three days and continuing treatment by a health care provider." Ordinarily, common colds, the flu, and upset stomachs do not seem to meet the definition of a serious health condition. This is because such conditions are generally treated with over-the-counter medications, bed rest, and intake of fluids.

Under a prior opinion letter, the Wage and Hour Division of the Department of Labor had issued an opinion stating that minor illnesses, including earaches, minor ulcers, headaches other than migraines, routine dental or orthodontic problems, and periodontal disease, would not be converted to serious health conditions unless there were complications. From this opinion, most employers and courts had understandably taken the view that common colds, the flu, and upset stomachs were not serious health conditions.

The Wage and Hour Division recently withdrew this opinion and issued a new opinion which stated that if any of these abovementioned conditions exist, then a serious health condition may exist. In order to be considered a serious health condition, however, an employee must be incapacitated for more than three consecutive days and be under a course of continuing treatment by a health care provider for the ailment.

Note: This is going to further complicate employers' decisions regarding absenteeism for these ordinary "run of the mill" symptoms that every person will have at some point during his or her working life. It is going to require employers to make the decision of whether a particular absence based on "ordinary" symptoms will trigger FMLA coverage. The advisory opinion does nothing to assist employers in making this determination. Continued care should be maintained when an employer is contemplating discipline based upon consecutive days of absences. FMLA Advisory Opinion Letter No. 86.

## Bronchitis exception clarified

The wage and hour administrator had also previously issued an opinion stating that serious health conditions can be created when an ordinary condition becomes complicated. The example used by the administrator in this opinion letter was "bronchitis that turns into bronchial pneumonia."

The administrator has withdrawn this opinion and stated that bronchitis does not ordinarily qualify as a serious health condition but would qualify under the standards listed above if it incapacitates an employee for more than three days and requires continuing treatment by a health care provider. This opinion letter states that any question regarding whether a serious health condition exists and when it commenced "may be" resolved by obtaining a medical certification from the employee's health care provider.

Note: Again, this does nothing but further complicate the lives of employers trying to make a determination about what may well be chronic absentee issues. FMLA Advisory Opinion Letter No. 87.

## FMLA leave for separate reasons

One of the issues that continues to arise under the FMLA is whether an employee can take FMLA leave during a designated 12-month period for separate reasons. It has generally been assumed that during the designated 12-month period, an employee may take up to 12 weeks of FMLA leave.

> Any paid leave must be both earned and available to the employee.

However, many employers have begun designating what is known as a "rolling" 12 months as the time period for measuring FMLA. A "rolling" period is the 12 months measured forward from the date the employee first took FMLA leave. This is permissible under the regulations.

Thus, if an employee takes one week of leave for bronchial pneumonia commencing July 1 of a "rolling" period, then that employee would have 11 weeks of FMLA leave available until the following July 1. However, if an employer designates a calendar year method for measuring the 12 months of availability, then the situation may change. Under a calendar year designation, an employee can take two weeks of FMLA leave commencing December 1 and then be eligible for 12 more weeks of leave commencing the following January 1.

Employers should take care that they understand clearly the periods for which they have designated the taking of FMLA leave. FMLA Advisory Opinion Letter No. 88.

## Sick leave for FMLA leave

Two opinions were issued by the wage and hour administrator dealing with the issue of applying sick leave to FMLA leave. First, employers may mandate or employees may substitute accrued paid leave for the unpaid leave provided by the FMLA. However, the administrator's opinion makes it clear that any paid leave must be both earned and available to the employee. Further, an employer may also "advance" such leave to an employee during an FMLA absence but is not required to do so. FMLA Advisory Opinion Letter No. 81.

In the second situation, an opinion was addressed to an employee seeking to have paid sick leave substituted for unpaid FMLA leave to care for newly adopted children. The administrator opined that the decision to substitute paid leave for unpaid leave in that situation is discretionary by the employer and is not mandated by the FMLA.

In the situation before the administrator, the employer's health care policy allowed sick leave for employees who gave birth. The employee was not allowed to use sick leave to care for newly adopted children. The administrator held that this practice was permissible under the FMLA since the FMLA does not require an employer to provide sick leave or to allow the use of sick leave when the employee is not ill. As with Opinion No. 81 above, an employer is certainly free to allow sick leave in that situation if it wishes to do so or to allow an employee to take any other paid leave, such as vacation leave, but is not required to do so. FMLA Advisory Opinion Letter No. 85.

## LEGISLATIVE UPDATE

## What's an employer to do?

*In 1996, Congress passed three significant pieces of health care reform legislation — the Health Insurance Portability and Accountability Act (HIPAA), the Mental Health Parity Act (MHPA), and the Newborns' and Mothers' Health Protection Act (NMHPA). Employers that sponsor group health plans for their employees have spent much of 1997 trying to understand and implement HIPAA, the most comprehensive of the three laws and the only one that went into effect this year. Employers now must prepare to implement the other two laws, which go into effect as of the first plan year beginning on or after January 1, 1998.*

### Beware of potentially conflicting laws

In implementing each of these new health insurance laws, you must be careful not to violate other laws, including federal civil rights laws such as the Americans with Disabilities Act (ADA) and Title VII of the Civil Rights Act. In comments recently submitted to the federal Department of Labor (DOL) on the trilogy of health care laws passed in 1996, the Equal Employment Opportunity Commission (EEOC) urged the DOL to issue regulations that clarify potential conflicts between federal health care laws and civil rights laws. Without such clarification, the EEOC noted, you could inadvertently violate one law when implementing another.

While you await such clarification (in DOL regulations to be issued in the near future), it may be helpful for you to take a look at the potential areas of conflict pointed out by the EEOC in its comments to the DOL earlier this year.

### HIPAA vs. ADA

**HIPAA.** Of HIPAA's many mandates, perhaps those that remain the foggiest for employers with health plans that must implement HIPAA are the nondiscrimination rules.

HIPAA imposes nondiscrimination rules for group health plans in two areas: eligibility to enroll in the plan and premium rates. In general, HIPAA prohibits a plan from establishing eligibility rules, or imposing a higher premium rate than the premium for similarly situated individuals, based on a "health status-related" factor. Such factors include health status, medical condition (physical or mental), claims experience, receipt of health care, medical history, genetic information, evidence of insurability (including conditions arising out of acts of domestic violence), and disability.

Interim final regulations issued earlier this year provide only minimal guidance for employers in interpreting HIPAA's nondiscrimination rules. However, the three federal agencies responsible for implementing HIPAA plan to issue further regulations in this area in the near future (read 1998).

**HIPAA vs. ADA.** As you know, the ADA broadly prohibits employment discrimination against qualified individuals with disabilities. This prohibition, the EEOC noted in its comments to the DOL, extends to employer-provided health benefits. Thus, the two sets of rules overlap with each other. What does that mean for employers responsible for complying with both laws?

According to the EEOC comments, while there are areas of overlap between HIPAA and the ADA, each law covers aspects of employer-provided health benefits that are not covered by the other, and compliance with one does not necessarily ensure compliance with the other. For example, the HIPAA rules prohibit discrimination (in eligibility to enroll and premium rates) based on conditions that may not be considered disabilities under the ADA. The ADA, on the other hand, while it applies only to individuals with ADA-defined disabilities, prohibits disability-based discrimination in areas beyond enrollment and premiums — it generally extends to all aspects of employer-provided health benefits, including limitations or restrictions on the nature or level of benefits or coverage for similarly situated individuals.

**HIPAA nondiscrimination regs coming soon.** Confused? That's why the EEOC has asked the DOL to clarify the relationship between HIPAA's nondiscrimination rules and the nondiscrimination provisions of the ADA. It is hoped that the second round of HIPAA nondiscrimination regulations that the DOL has promised to provide will clarify what an employer must (and must not) do to comply with *both* HIPAA and the ADA.

### Mental Health Parity Act vs. ADA

**Mental Health Parity Act.** This law generally requires employer-sponsored group health plans that provide mental health benefits to maintain parity between those benefits and medical/surgical benefits in the application of

lifetime and annual dollar limits. That is, the law prohibits a health plan from setting either annual or lifetime dollar its on plan coverage for mental health benefits *unless* plan sets the same limits on "substantially all" medical and surgical benefits.

**MHPA vs. ADA.** Under the MHPA, the term "mental health benefits" means benefits with respect to mental health services, *as defined under the terms of the plan*. The ADA (which, as you recall, also applies to employer-provided health benefits) also allows a plan to define mental health benefits, *but*, subject to a very narrow exception, it does not permit the plan to make a disability-based distinction in the definition.

A plan term or provision is disability-based if it singles out a particular disability (e.g., AIDS, schizophrenia), a discrete group of disabilities (e.g., cancers, kidney diseases), or disability in general (e.g., no coverage of any condition that substantially limits a major life activity).

**MHPA and NMHPA regs expected this fall.** Regulations to implement both the MHPA and the NMHPA are expected this fall. The EEOC has recommended to the DOL that those regs contain a warning that the ADA generally prohibits disability-based distinctions in employer-provided health plans as well as an explanation of disability-based criteria.

## Newborns' and Mothers' Health Protection Act vs. Title VII

**Newborns' and Mothers' Health Protection Act.** This law generally requires employer-sponsored group health plans that provide hospitalization benefits in connection with childbirth to provide coverage for at least a minimum hospital stay after childbirth. Specifically,

- *after a normal, vaginal birth*, the plan must provide coverage for both mother and newborn for at least a 48-hour hospital stay; and
- *after a cesarean section*, the plan must provide coverage for both mother and newborn for at least a 96-hour hospital stay.

The law provides for *one exception* to the minimum stay requirement. If the attending health care provider, in consultation with the mother, decides that an earlier release for the mother and/or the newborn is appropriate, then the plan may limit its coverage to that shorter period. However, the law contains several safeguards designed to prevent plans and insurers from attempting to induce providers or mothers to agree to a stay shorter than the required minimum.

**NMHPA vs. Title VII.** Although the NMHPA does not require plans to offer hospitalization benefits in connection with childbirth, employers that sponsor health plans should know that Title VII of the federal Civil Rights Act may require such benefits. Title VII generally requires that the same plan terms and provisions that apply to costs incurred for medical conditions unrelated to pregnancy *also* apply to costs incurred for pregnancy-related conditions. Specifically, Title VII prohibits a plan from excluding hospitalization benefits for childbirth *if the plan provides hospitalization benefits for other medical conditions*.

Once again, look for the regs. The EEOC has recommended that the portion of the DOL regs dealing with the NMHPA include a cautionary statement that Title VII prohibits pregnancy discrimination in employer-provided health plans. According to the agency, this means that a plan's terms and provisions (including those related to hospital benefits) must be applied to pregnancy, childbirth, or related medical conditions on the same terms and conditions as they are applied to other conditions. ∎

ALASKA EMPLOYMENT LAW LETTER (ISSN 1085-9144) is published monthly for $137 per year for Perkins Coie by M. Lee Smith Publishers LLC, '01 Virginia Way, P.O. Box 5094, Brentwood, TN 37024-5094, 1-800-274-6774 or custserv@mleesmith.com or http://www.mleesmith.com. Copyright .97 M. Lee Smith Publishers LLC. Photocopying or reproducing in any form in whole or in part is a violation of federal copyright law and is strictly prohibited without the publisher's consent. Editorial inquiries should be directed to Thomas M. Daniel at Perkins Coie, 1029 West Third Avenue, Suite 300, Anchorage, AK 99501, (907) 279-8561. ALASKA EMPLOYMENT LAW LETTER is not intended to be and should not be used as a substitute for specific legal advice, since legal opinions may only be given in response to inquiries regarding specific factual situations. If legal advice is required, the services of counsel should be sought.

# JOB #626

## APC JOB DESCRIPTION

### DIVISION CLASS -- Safety Department

**JOB TITLE: Safety Specialist**

**SUMMARY:** The Safety Specialist works in conjunction with the Safety Supervisor to Provide field support of the APC Health, Safety, and Environmental Program. This includes Permit issuance, Job Safety Auditing and Employee/Supervisor/Client relations.

**ESSENTIAL DUTIES AND RESPONSIBILITIES** include the following: Must first and foremost be able and willing to comply with the APC safety policy and the Alaska Safety Handbook. Must be willing and able to lead and educate employees in safe work ethics, practices, and behaviors. Must understand the prioritization of safety, quality, and production, and be willing to work accordingly.

The candidate must be able to conduct confined space testing for entry and permit issuance. Candidate must understanding the use of Industrial Hygiene instruments used to gather qualitative and quantitative information. Candidate must be able to use these instruments in the issuance of hot work, unit work, and confined space entries. Candidate must understand the basis for an industrial hygiene program and methods to implement the program. Candidate must have basic understanding of numerous job tasks and a working understand of how individual craft employee's safety ties into each job. Candidate must have a working knowledge of; incident review, investigation and implementation of corrective actions. Candidate must have a working knowledge of computer databases including; Microsoft Office, Windows, and be able to adapt to existing databases. The candidate must also be able to learn or have a basic understanding of Alaska Worker's Compensation law, and be able to communicate relevant injury information to management. Candidate must be able to effectively use written and verbal communication skills to convey APC/Client Safety policies and procedures. The candidate must be able to implement working solutions to aid supervision in mitigating identified hazards.

May have other duties as assigned.

**QUALIFICATION REQUIREMENTS:**

To perform this job successfully, an individual must be able to perform each essential duty satisfactory. The requirements listed below are representative of the knowledge, skill, and/or required. Reasonable accommodations may be made to enable individuals with disabilities to perform the essential functions.

**EDUCATION and/or JOB-RELATED EXPERIENCE:**

Qualifications for this position include a Bachelor's degree in a safety related field from an accredited school or an Associates degree in a safety related field and two years experience in safety. Otherwise, 8 years experience in a safety related field.

APC0145

**COMPREHENSION SKILLS:**

Ability to read and comprehend ARCO/BP Safety Handbook, documents and P&IDs, and other drawings. Ability to interpret OSHA, ANSI, NFPA, DOT and other safety related standards. Write routine weekly and monthly reports, complete timesheets, update progress reports and computer spreadsheets, and manage and conduct the submission of safety audits.

**MATHEMATICAL SKILLS:**

Comprehensive understanding to the level of College Algebra and basic Trigonometry.

**CERTIFICATES, LICENSES, REGISTRATION: (PRE-REQUISTIE FOR HIRE)**

A valid drivers license and MAPTS 16hr Oilfield health and safety training are required for employment in this position. OSHA requires that all foreman and supervisory personnel hold current certification in Red Cross CPR and First Aid.

**ERGONOMIC STATEMENT:**

The Arctic work environment incorporates cold-related hazards, and an employee may encounter other hazards in his day-to-day activities. The attached ergonomic analysis should be read carefully to determine a candidate's suitability for this position.

8