Case 3:03-cv-00174-RRB   Document 58-5   Filed 08/11/2006   Page 1 of 7

Case No. A03-0052 CV (RR...)   CondenseIt!™   Zuber v. APC Natchiq, Inc.

## Page 26

1  aside for a second and talk about your memory and then
2  maybe we'll come back to this. What do you recollect
3  after going through those steps you did next in relation
4  to classifying these positions as exempt or nonexempt?
5  A  I furthered the study and ultimately talked with the State
6  and came to the conclusion about the positions that I was
7  concerned about, and — and made some adjustment to some
8  of the positions.
9  Q  Okay, and do you recollect which positions and what
10  adjustments you might've made?
11  A  The one that I ended up telling the superintendents to
12  change were the warehouse, its foremen and warehousemen.
13  Q  And they got changed from?
14  A  Exempt to nonexempt.
15  Q  All right, and ultimately you reviewed the safety
16  supervisor and decided not to change that, is that
17  correct?
18  A  Safety — I don't know that I.....
19  Q  I'm sorry, safety specialist.....
20  A  .....supervisor.....
21  Q  .....I misspoke.....
22  A  .....I did the specialist, yes.
23  Q  Okay, all right. This is an aside, now. Have you ever
24  done a review of the safety supervisor position from 1996
25  to today to consider whether or not it ought to be exempt

## Page 27

1  or nonexempt?
2  A  A review in the sense of a formal review or a mental
3  process review? Either/or?
4  Q  Either way.
5  A  Yes.
6  Q  All right, and when was that?
7  A  Periodically either a contract — when we — When we come
8  out with a new contract with our clients, the clients in
9  Alaska, BP, Conoco Phillips, by and large continue to come
10  out, even after this is gone our figures will continue to
11  come out and — and request rates for positions that are
12  nonexempt to be quoted as a exempt status. So we are
13  constantly reviewing contractually — I say constantly,
14  it's not a daily thing, but when a contract comes out we
15  will review that. So we also — it also triggers us to
16  ask HR a number of times or Chris Boyle's department to
17  print out — I don't know if it's every — twice a year to
18  a year, but periodically to print out who we have
19  classified as exempt, so I do — actually do a personal
20  review of that with my staff and question is this person -
21  - should this person be exempt.
22  Q  Okay, and when you say with your staff, who would that
23  involve, yourself and?
24  A  My direct reports.
25  Q  Okay. And would that involve Mr. Boyle or not?

## Page 28

1  A  No.
2  Q  Okay. Besides those reviews have there been any other
3  reviews — a more formal review of the position of safety
4  supervisor for exempt/nonexempt status?
5  A  For me personally? No, I — I haven't done a more
6  formal — has HR — have we referred a lot of positions or
7  a lot of questions to our HR department over time to
8  review? Yes. Is a formal review done at that level, I
9  don't — I don't — I assume so, but I don't know that.
10  Q  Okay. Would HR generally be the party or the section of
11  the company that would do the review for exempt/nonexempt?
12  A  Well, I think the first step is the hiring official, so
13  the hiring official should be basically aware of the
14  exempt versus nonexempt review before they ever hire
15  somebody so we don't get into the situation they're hired
16  and then a week or a month or a year down the road we're
17  trying to change it on them. So it should be the hiring
18  official. If there's an issue down the road, then we
19  would involve an HR to make sure we're fair back with the
20  employee if the rate's changed, or they're reclassified.
21  Q  Okay, coming back to the comment you made earlier about
22  the contracts you have with the, I take it, ARCO, BP
23  saying we want a quote for, I think you said, a nonexempt
24  employee at an exempt rate, is that how you put that?
25  A  They'll come out with a spreadsheet that maybe has --

## Page 29

1  let's use plumber, for example. We want a rate for a
2  plumber. And they'll put the category, day rate, they
3  want a quote for a day rate. We have to go back and say,
4  look, plumber is a nonexempt, we can't quote you a day
5  rate. We can quote you a rate that has all the appearance
6  of a day rate, but we're going to end up paying this guy
7  eight and 40 and overtime at this rate, and so we can't
8  exceed so many hours so we can ask it as a day rate. But
9  we come — but for this person or this position is a
10  nonexempt position. And so we end up negotiating back and
11  saying, and — back to that, we can't give you a quote
12  like that.
13  Q  Okay, because basically for their purposes of bidding a
14  job or getting a job done they want a hard fixed number to
15  deal with?
16  A  They want to be able to define their costs, they want to
17  know if they work a plumber a day it's going to cost them
18  X. They don't — they don't — the way they work is they
19  don't want to know it's going to be between A and Z, they
20  want to know X so they can calculate their costs daily.
21  Q  And your problem is to say, well, we're sorry, we can't
22  give you that number because it's going to depend on the
23  number of hours the guys works?
24  A  Sure.
25  Q  How do you resolve that? Or do you?

Case 3:03-cv-00174-RRB   Document 58-5   Filed 08/11/2006   Page 2 of 7

Case No. A03-0052 CV (RK...)   CondenseIt!™   Zuber v. APC Natchiq, Inc.

Page 30

1 A   We don't quote -- we -- we can't quote. We don't say.....
2 Q   Okay, so you put it back in their lap and let them work it
3     out, then?
4 A   If you want to take the liability, go for it, but we don't
5     -- we're not willing to do that, sure.
6 Q   All right. Do you ever end up supplying those services
7     and then getting a cost-plus reimbursement on them?
8 A   The exempt/nonexempt positions?
9 Q   Right. Let's say that you got to have a plumber, so you
10    give them a plumber.....
11 A  Right.
12 Q  .....then does your -- the payment under your contract
13    vary dependent upon the number of hours the plumbers or
14    groups of plumbers worked?
15 A  Yeah, the vast majority of our contracts are cost-plus, so
16    if the guy works one hour there's a percentage -- well, I
17    should say the contract like Kuparuk that this case has,
18    or centers around, we supply a plumber and if the cost is
19    X they reimburse us X. Doesn't matter if it's $10 or it's
20    $1,000, they reimburse us that actual cost. Then on the
21    side there's a management fee and we bill a management
22    fee. That breaks the incentive, if you will, of the
23    contractor to try and bill more hours, if you will.
24    There's no -- there's no more incentive for me to bill
25    more hours, say, on a Kuparuk contract. If I bill 10

Page 31

1    hours for what we did or 100 hours, we make the same
2    profit, if you will, as a -- as a company.
3 Q   So you might get -- this is just to help us possibly
4     understand. You have a plumber, whether he works eight or
5     12 you might get a percentage of eight hours a day
6     management fee for him whether he works eight or 12, is
7     that.....
8 A   We would get the same -- typically the same management fee
9     to manage the contract whether there was five plumbers or
10    100 plumbers.
11 Q  Okay.
12   REPORTER: Steve Jones?
13 Q  And you had a conversation, you said, with Mr. -- well,
14    with the Department of Labor. Would that have been with
15    Randy Carr. which is indicated by some of these
16    latter.....
17 A  Yes.
18 Q  .....letters? All right. and how many conversations did
19    you have with Mr. Carr, if you recollect? Was it one or
20    two or three?
21 A  Oh, maybe say on the order of magnitude of, I would guess,
22    four. Four, maybe five.
23 Q  Okay, and part of those, I take it, concerned the day rate
24    issue? Or, yes, the day rate issue?
25 A  Yes.

Page 32

1 Q   Did Mr. Carr also provide you with checklist sheets and
2     information concerning classification of exempt and
3     nonexempt employees, if you recollect? And I'd also draw
4     your attention, I guess, to Plaintiff's Exhibit 4, Pages
5     184 to 191.
6 A   Are you asking me did Mr. Carr.....
7 Q   Did you get these from Mr. Carr, if you recollect?
8 A   I -- I don't recollect.
9 Q   All right, do you know where you got them? I realize that
10    sounds redundant, but.....
11 A  I don't recall.
12 Q  All right, okay. Did you discuss directly with Mr. Carr
13    the position of safety specialist and whether or not that
14    ought to be classified as exempt or nonexempt, if you
15    recall?
16 A  Yes.
17 Q  And did he give you an opinion as to whether or not that
18    ought to be classified exempt or nonexempt or did he --
19    or, in the alternative did he give you information as to
20    how you might do it?
21   MR. YOUNGMUN: Object, compound question.
22   MR. COVELL: Okay, well, let me ask the first part of the
23   question, then.
24 Q  Did he give you an opinion as to whether or not the safety
25    specialist was exempt or nonexempt?

Page 33

1 A   Yes.
2 Q   And what was that opinion?
3 A   That the safety specialists were exempt, as I had
4     described the position to you.
5 Q   Okay, did you send him a position description?
6 A   I don't believe so.
7 Q   Do you recollect what you told him the position was? Did
8     you tell him the safety specialist is the eyes and ears of
9     management, or do you recollect what you told him?
10 A  I don't really recall the data -- the actual details of
11    that conversation.
12 Q  Did you get an opinion letter from Mr. Carr, or a letter,
13    something in writing from Mr. Carr indicating that he was
14    expressing that opinion to you and/or APC?
15 A  No. Regarding safety specialists?
16 Q  Right.
17 A  No.
18 Q  Okay, you did get one that concerned a different position,
19    right?
20 A  Yes.
21 Q  The -- is that the materials supervisor, I believe?
22 A  Right.
23 Q  Okay, why didn't -- and you also sent the materials
24    supervisor position description to Mr. Carr, right?
25 A  Yes.

Case 3:03-cv-00174-RRB   Document 58-5   Filed 08/11/2006   Page 3 of 7

Case No. A03-0052 CV (RRB)   CondenseIt!™   Zuber v. APC Natchiq, Inc.

### Page 34

1  Q  Why didn't you do the same for the safety specialist?
2  A  At the time this was taking place I had concerns about a
3     few positions. When I spoke with the safety specialists
4     or safety supervisors -- and you've got to envision this,
5     how this works up there. We live and eat and work in the
6     same camp, so this isn't -- it's not a real formal
7     setting. I've had meals with Mr. Zuber dozens and dozens
8     of times, so it's not -- it's not a formal setting. So
9     the conversation with the -- when I was talking with the
10    supervisor, at the time Mr. Cannon, I believe was on the
11    position, those guys, getting information out of them,
12    and, of course, they ask, why do you want to know, what's
13    the basis of the question. Well, I'm concerned about
14    this, you know, I don't know whether you're exempt, you're
15    nonexempt, what do you do. You know, I know what you do,
16    work day to day, but help me with this, you know, let's
17    kind of work through, there -- maybe there's some
18    spreadsheets at the time, we ticked and tied to -- or,
19    checked through them. The distinction is when I spoke
20    with the safety supervisor there was no question in my
21    mind that he was very professional, wanted to remain
22    professional, wouldn't even bear of the -- being a
23    nonexempt, if you will, because of the type of duties and
24    whatnot, the type of classification. When I spoke with
25    the materials supervisor and talking with him, it was

### Page 35

1     virtually the same kind of an interesting conversation,
2     because they did not want to be thought of as nonexempt.
3     And so -- but I had -- when I had -- was having the
4     conversation my alarm bells were going off, I'm thinking,
5     well, maybe -- I actually think you are nonexempt, by
6     based on what you're telling me, what I could find out.
7     And so I asked these materials supervisor for additional
8     detail around what they did. I really wanted to get more
9     into it because everything I could come up with just in
10    the general conversation was, no, you're nonexempt, so I
11    need more on this information. And so then I asked them
12    for additional information, which they provided, and may
13    be in your packet, I don't know, I don't remember.
14 Q  Okay, there's -- I think there might be their job
15    description in there. All right, but you didn't -- is it
16    correct to say that you didn't have the same types of
17    concerns about the safety specialist? You didn't have the
18    warning bells going off in your head.....
19 A  No.
20 Q  .....as it were?
21 A  No.
22 Q  Okay, you said you talked to somebody that was, I believe
23    you said, safety supervisor, who essentially was saying,
24    yes, I want to be exempt. Do you recollect who that was?
25 A  Well, I don't know that he said the words "I want to be

### Page 36

1     exempt", I am a professional in my trade or my craft.
2     That person knew mostly -- at the time it was Bob Cannon
3     was the supervisor.
4  Q  Okay. Did it occur to you to -- okay, let's see, let me
5     withdraw that. You spoke to Nancy Williams at ARCO about
6     classification issues, you notified Anne Hippe and the CFO
7     about your concern of these issues, you spoke to Mr. Carr
8     on a number of conversations, and based on -- okay, okay.
9     Spoke to Mr. Carr a number of times. Outside of those
10    external resources, as it were -- well, and you used these
11    checklists. Outside of those resources did you use
12    anything else to make your decision concerning the
13    classification of safety specialists as exempt? If you
14    recollect. And I.....
15 A  I don't believe so.
16 Q  And, I mean, you're free to look at these materials
17    because I think this is all we've got and I think that
18    covers it. And your recollection.....
19 A  I'll take your word for it.
20 Q  Well, I'm -- you're testifying, not me, so.....
21    MR. YOUNGMUN: Go through the materials.
22 Q  Okay, why don't you go ahead and take a minute to do that.
23    I'm just.....
24 A  Well, my recollection is no, when I -- when I talked with
25    the State in my mind that was the highest authority that I

### Page 37

1     could find, that I could easily talk with and when I spoke
2     with the State -- And I had met Mr. Carr prior at one of
3     the seminars, he spoke at a -- some type of an Alaska
4     legal review kind of -- he does that. I think I had heard
5     him speak a couple times, I felt very comfortable with
6     him, his interpretation, he's a -- he's a very open guy,
7     if you've never talked with him. He's -- he'll pick up
8     the phone, you call him, he calls you back. My
9     recollection, a couple conversations with him and I felt
10    after talking with him I was very comfortable with our
11    determination and where we were headed. The reason I
12    asked him for the determination letter for warehouseman,
13    which -- got you off on a side track there for a second --
14    was because when I talked with the warehousemen they were
15    very adamant that they were also professionals in their
16    tasks. I said, guys, you aren't -- and I got 'em all
17    together, and you aren't -- not that you're not
18    professional, you're very professional in what you do, but
19    you -- I don't believe you meet the criteria. They wanted
20    to talk with Randy Carr personally. I said, hey, he's a
21    State employee, you guys can call him. I actually think
22    one of the supervisors eventually did talk with them. But
23    when it all came down, I said, look, I asked Mr. Carr
24    for -- I believe I wrote him a letter, that may be in
25    here, but I wrote him a letter and said I actually need

Case 3:03-cv-00174-RRB    Document 58-5    Filed 08/11/2006    Page 4 of 7

Case No. A03-0052 CV (RR..)   CondenseIt!™   Zuber v. APC Natchiq, Inc.

Page 38

1  you to put it in writing because these guys do not believe
2  that they don't fit the — into the exempt category.
3  Which subsequently came out this letter that he sent me.
4 Q All right, but you -- in regard to safety specialists you
5  don't recollect what you told Mr. Carr the safety
6  specialists did?
7 A Well, I would -- I would've describe their -- their day to
8  day duties to Mr. Carr and had a conversation back and
9  forth, which he offered the -- he actually offered a
10  verbal opinion about every one. It was really only the
11  warehousemen that I said, look, I got a problem here with
12  the morale and the issue of my employees, I need you to
13  put it in writing because they don't believe it.
14 Q Let me draw your attention here to -- why don't we look at
15  Page 163, we see the third or fourth paragraph, depending
16  on what you do with the bullets, it says, "One of the more
17  complex areas of", could you read that paragraph for us?
18 A Want me to read it out loud?
19 Q Yes, please.
20 A "One of the more complex areas of the FLSA is its
21  classification of certain employees as exempt or excluded
22  from coverage by the overtime requirements of the law. An
23  employee is presumed to be nonexempt", parentheses,
24  "covered by the law and entitled to receive overtime pay",
25  comma, "unless the employee (sic) can show that the

Page 39

1  employee's job duties and pay meet certain criteria".
2 Q Did you review that material when you were doing this
3  review back in '96, '97? Did you read this paper, 163?
4 A I -- I'm sure I did, sure.
5 Q Okay. And you — and you did read the Forbes article,
6  which is perhaps — would you agree, to paraphrase it it
7  sort of says this area is a quagmire? That a fair way to
8  characterize that article?
9 A Don't really recall, I haven't read it recently, but.....
10 Q Okay, well, it's kind of like a watch-out article, isn't
11  it?
12 A Oh, sure, that was my — set my alarm bells off, yes.
13 Q All right. And then I draw your attention to Page -- I
14  think it's -- I've probably gone by it here -- 154 and
15  155. Is that your handwriting on 154?
16 A Yes.
17 Q All right, and did you use this checklist to make your
18  determination concerning -- or, what did you use this
19  checklist for?
20 A Checklist was the basis that I went through, I don't know
21  that I ever truly completed it per se, it's not obviously
22  formal by any means in the sense that I formalized it or
23  signed it. It is my handwriting and I did use it to
24  formulate the basis for classification of our employees.
25 Q Okay, do you know if you filled this out when you were

Page 40

1  talking to Mr. Carr or if you did it at another time, if
2  you know?
3 A I don't recall, it was part of the file and it was
4  something that would've been part of the overall
5  determination.
6 Q Okay, you checked off there under administrative test
7  "performs office or nonmanual work directly related to
8  management policies or general business operations", and
9  you checked that. I take it that that means that you felt
10  that a safety specialist does that, is that so?
11 A Yes.
12 Q All right, let me draw your attention to the other set of
13  checklists, which is Page 166, and up towards the binding
14  there there's some notations -- well, out here. Is that
15  your handwriting on the right-hand side of that paper?
16 A Yes.
17 Q All right, and that says "directly related to management
18  policies, this means to affect" with an A "these
19  policies", slant, "change the".....
20 A Change them.
21 Q "Change them, not work with (sic) . . . policies", and
22  that's to the right of an arrow that comes off of "primary
23  duty is office or nonmanual work directly related to
24  management policies or general business operations of the
25  employer or" the "employer's customers". Do you recollect

Page 41

1  making that now?
2 A It's my writing, so I -- I'm sure I did, yes.
3 Q And do you know where you got that information from in the
4  note?
5 A I can't say verbatim, it -- it could have been from my
6  discussions with Randy Carr. At the time I viewed him as
7  the chief specialist, if you will, but I -- I can't say
8  that.
9 Q Okay, what duties does a safety specialist have that
10  affects or changes policy?
11 A What duties?
12 Q What does a safety specialist do that fulfills that
13  requirement as it was to be exempt?
14 A You mean beyond the — okay, you're at what does a safety
15  specialist did that affects policy?
16 Q Sure, affects policy, yeah.
17 A Well, the safety specialist is one who — who actually --
18  in the oilfield a big piece of our work is safety, right?
19  So it's a little bit hard to imagine, maybe, if you don't
20  work, there's a policy for everything, especially back in
21  '96 when — when maybe this was going -- but in '96 we
22  were very light on policy, if you will. Safety
23  specialists at that time were -- were formulating,
24  writing, coaching, everything to do with those — those
25  policies and procedures that were being formulated at the

Case 3:03-cv-00174-RRB   Document 58-5   Filed 08/11/2006   Page 5 of 7

Case No. A03-0052 CV (RR) — CondenseIt!™ — Zuber v. APC Natchiq, Inc.

### Page 42

1  time. So when you say affect, to a certain extent writing
2  them, input, change, were -- how were -- well were they
3  being implemented, did they work, didn't they work,
4  there's, I should say, binders on it.
5  Q  Okay, so these are policies that safety specialists
6  generated and then were eventually adopted by APC, is
7  that.....
8  A  Yes.
9  Q  .....what you're telling me?
10 A  Sure.
11 Q  All right. And these would be in writing, then? The
12    policies?
13 A  Oh, yeah, yes.
14 Q  Who would eventually approve those policies?
15 A  The ultimate approver?
16 Q  Sure.
17 A  At the time would probably be -- there would probably be
18    more than one approver, but you would likely have the --
19    because the intent of the policy is that you -- it's not
20    just to come out with a policy and everybody has to live
21    with it, you want buy-in. So you get -- you get buy-in
22    through -- so you get -- if the safety specialist came --
23    let's say, came up with a procedure or policy, then they
24    would look for maybe the construction manager or the
25    superintendent or the operations manager to also approve

### Page 43

1  these. Typically over a period of time, it's not
2  something that was done with rubber stamp, bingo, this is
3  the day, it's done, but over time and the policies and
4  procedures evolved. They still evolve today, call them
5  living procedures or living -- whatever you want to call
6  them. They continue to evolve. A lot of people,
7  certainly, especially the specialists, can affect those
8  policies. And do.
9  Q  On a day to day basis does a safety specialist affect or
10    change safety policy?
11 A  An -- an established -- well, day to day, I'm not sure --
12    yes. I mean, day to day if they're out there, the eyes
13    and the ears of management, and there is a need for a
14    change or need to be effected, yes, that could -- would
15    be, likely could be, would be initiated by a safety
16    specialist.
17 Q  Okay, and how -- what would they do to affect change in
18    policy? And would they call the safety supervisor, would
19    they write a memo, how mechanically would they go about
20    doing this?
21 A  Maybe if the policy was -- they wanted to affect it, they
22    could say I don't -- I think this should be changed in
23    this way, they'd go into the policy, make -- make the
24    change. I mean, there's lots of mechanisms for it,
25    because they -- they could take that to, then, the -- the

### Page 44

1  area or group that they're working with, what do you guys
2  think. You know, his -- his or her people that work
3  within that and say what do you think, how does this
4  affect us. And then is this what we want to do. And then
5  -- and then get buy-in to maybe the operations manager at
6  the time, it would go into -- would make the changes to
7  the policy.
8  Q  Would the safety specialist go to the operations manager
9  with the proposed change in policy or would the safety
10    supervisor do that?
11 A  Typically it would be the specialist would get the buy-in
12    of the supervisor, or his peer group, the other
13    specialists. They'd say, what do you guys think, how does
14    this effect your areas or your work. You know, you're
15    dealing with people here that it's not a real structure.
16    They're out working a lot on their own, so they come
17    back -- they come back, they have certainly some buy-in
18    from the supervisor, from the operations side and that's
19    how a policy would get changed or affected. In the time
20    frame of '96, '97 we were very -- we have very few
21    policies and procedures, we were really developing a lot
22    of them. And so there were a lot of policies being
23    written from -- from scratch, if you will.
24 Q  By the time frame of September of '99 to January 2001 was
25    there much of that activity?

### Page 45

1  A  From -- say -- repeat the question?
2  Q  September of '99 to January 2001 was there much activity
3    of writing, initiating policies?
4  A  Well, a lot of policy had been developed. Did we continue
5    to affect it? Yes. Are we continuing to write even more
6    detailed policy down to job tasks? Yes.
7  Q  When a safety specialist -- and I take it when you said
8    the specialist would go in and change the policy, what
9    you're talking about is changing a draft of the policy and
10    not changing the actual policy, is that so? In other
11    words, when he starts the task he says, okay, here's a
12    policy, I -- he might change -- make up a draft and say,
13    I'd like to see a policy or procedure in this manner.
14    He's not going in the book and changing the book and
15    saying we're going to do this now.
16 A  Well, if there was an established policy, sure, he can't
17    go in and just make a change, an arbitrary change, sure.
18    If there was no policy for it, he could -- he could start
19    the draft, sure. Let me -- I could use an example maybe
20    near to Ron in the sense that we started training,
21    specific -- around specific kind of training. He may have
22    developed that policy specific to training and buy-in from
23    his peers, got the buy-in from the supervisor, maybe from
24    myself at the time, and then if that was what the
25    specialist said is the policy and we all felt we could buy

Case 3:03-cv-00174-RRB   Document 58-5   Filed 08/11/2006   Page 6 of 7

Case No. A03-0052 CV (RRb)    CondenseIt!™    Zuber v. APC Natchiq, Inc.

## Page 46

1  into it, then that became the -- the policy, if you will,
2  and it was rubber stamped.
3 Q  Okay, and as operations manager you'd be involved in that
4  process?
5 A  Sure, a review of that, yeah. Typically not drafting.
6 Q  All right. Can you tell me what policy or policies Ron
7  Zuber as a safety specialist affected in the manner we
8  just described?
9 A  Can I think of.....
10 Q  Can you give me any specific examples?
11 A  Ron Zuber, champion of champion trainers, SIMS training,
12  safety in motion. I mean, out of state, went to out of
13  state training, was a champ -- what we call a champion
14  trainer, champion expert. He not only trained in SIMS,
15  which stands for safety in motion, he trained the trainer,
16  if you will. He's our -- he's our expert, beyond our
17  expert. I mean, he is -- he was the guy. Did Ron Zuber
18  have a tremendous amount of effect, if in fact he didn't
19  write it? I don't know for a fact, but the APC policy
20  around SIMS I -- I suspect he had a tremendous amount of
21  influence, if he didn't write it, over that policy.
22 Q  Okay, so it's your impression, as it were, that he.....
23 A  Yeah, I can't say.....
24 Q  .....he wrote or contributed to the policy?
25 A  Yeah.

## Page 47

1 Q  Okay, any others?
2 A  He would've had to. I mean, you know, he was the guy.
3 Q  Okay. How long was this SIMS training for, do you know?
4  Was it like 40 hours or five days or two weeks or do you
5  recollect?
6 A  SIMS training was a series of training, I can't even tell
7  you the time. I went through it myself years ago, been
8  through refreshers, but it's not a two-week training, it's
9  a over the course of a -- over the course of a day,
10  something like that.
11 Q  Okay, all right. Do you know whether or not -- if there
12  were procedures implemented in relation to SIMS, if they
13  were taken essentially wholesale from the training
14  materials and adopted as an APC procedure?
15 A  I don't know.
16 Q  Okay. Besides the SIMS training being an example of
17  perhaps where Mr. Zuber might've affected policy do you
18  have any other examples for us?
19 A  Verbatim to Mr. Zuber, you mean, or.....
20 Q  To mister -- sure. For starters.....
21 A  No, not -- not -- I don't recall, you know, Ron working a
22  specific policy and procedure, but I can't relate to any
23  specific one at some point he did.
24 Q  All right, if he had been involved in doing that to a
25  substantial degree would there be some kind of paper trail

## Page 48

1  out there that would document it?
2 A  Today?
3 Q  Sure.
4 A  I doubt it. Because the author, author or those who
5  affect a policy today, there's not a -- you know, at the
6  bottom of the procedure it doesn't say contributions made
7  by Mark Nelson. It's not there.
8 Q  We just don't get our names on these papers like we
9  should?
10 A  No -- no recognition for that type.
11 Q  Okay. Looking back to Page 154, the second factor in the
12  administrative test says "customarily and regularly
13  exercises discretion and independent judgment." Can you
14  tell me what a safety specialist does where they
15  customarily and regularly exercise discretion and
16  independent judgment?
17 A  Well, a safety specialist, unlike a lot of jobs, doesn't
18  have a supervisor who stands over them and says at 6:00
19  o'clock you will do this, 7:00 o'clock, you'll do that,
20  you better have this out, you know, by the end of the
21  week, here's your schedule, here's your time frame. A
22  safety specialist is very independent in their work, day
23  to day work, for a large part they're left to their own --
24  own direction, recognizing what's -- what their tasks
25  should be on a day to day. And so that's about as close

## Page 49

1  as I can describe discretion and independent judgment for
2  you. He -- he was out -- or, in this case Ron was out
3  really every minute of every day with independent judgment
4  and discretion.
5 Q  One of the things a safety specialist does is confined
6  space entry permits, or permitting, I should say, is that
7  right?
8 A  Sure.
9 Q  Okay. And in doing that one of the tasks is to sniff a
10  vessel or a tank with a -- some nature of a industrial
11  hygiene instrument, I guess?
12 A  Sure.
13 Q  Okay. When a safety specialist does that they're checking
14  for toxic gases, right? Is that what they're checking
15  for?
16 A  Permissible levels, right.
17 Q  Okay, and in -- if Mr. Zuber were to check a tank, if
18  there's a permissible level, that criteria for permit
19  issuance is met, right? I mean, there are other steps. I
20  assume, in issuing a permit for hot work or confined space
21  entry.
22 A  Say that again?
23 Q  When you issue a confined space entry permit.....
24 A  Yes.
25 Q  .....I assume there's a number of criteria that have to be

Case 3:03-cv-00174-RRB   Document 58-5   Filed 08/11/2006   Page 7 of 7

Case No. A03-0052 CV (RR    CondenseIt!™    Zuber v. APC Natchiq, Inc.

### Page 50

```
 1     met before the permit's issued?
 2 A   Yes.
 3 Q   Among them would be sniffing for permissible levels?
 4 A   Would be one step, sure.
 5 Q   and you -- I at least understand in some instances you
 6     might need to have oxygen tanks for the people going in
 7     and you might need ventilation and you might need a rope
 8     to the person going in, is that.....
 9 A   Well, I -- yeah, I hope it's not so simple as that, but
10     yes, there's -- there's a tremendous amount of.....
11 Q   Okay.
12 A   .....of -- yes, right.
13 Q   Right, I don't -- don't expect it's that simple, but for
14     me to try to digest. But if he were to sniff a tank, if
15     it's a permissible level then that particular criteria for
16     permitting is met and they can go on to the other issues
17     that are -- presented themselves, or needed to be explored
18     to get the permit going, right?
19 A   They being?
20 Q   Mr. Zuber, the.....
21 A   Yes, then they would -- yes, that's one -- one step, if
22     you will.
23 Q   If the level of gas is higher than a certain standard,
24     then they can't issue the permit, right?
25 A   Lots of reasons they wouldn't issue a permit. That's one
```

### Page 51

```
 1     reason, yes.
 2 Q   A safety specialist doesn't have any discretion to say,
 3     well, this gas almost meets the level and therefore in
 4     this particular instance I'm going to decide to have the
 5     permit issued, does he? In other words, if the standard
 6     is you have to have below a .030 of some molecule in the
 7     tank and you have a .032 or 035, the safety specialist
 8     can't say that's close enough, go ahead?
 9 A   Right, the safety specialist -- let's say the permissible
10     level for oxygen is -- boy, whatever, point, whatever, 18
11     or something like that. But that's a no brainer. You or
12     I could easily make that determination. That's not where
13     we need, in this case, Mr. Zuber's judgment and
14     independent thought processes to make that determination.
15     It's clearly not on the black and white stuff like that,
16     absolutely. If that answers your question.
17 Q   That's not a -- okay, so in instances like that.....
18     REPORTER: This is a suspicious one, can you just.....
19     MR. COVELL: All right, you bet.
20                (OFF THE RECORD)
21                (ON THE RECORD)
22 Q   Okay, I think we were sniffing tanks before we got on the
23     telephone. And so in that instance Mr. Zuber's applying
24     facts to a known standard and has no discretion, is that
25     fair to say? That's essentially what you told me, right?
```

### Page 52

```
 1 A   Yes.
 2 Q   Okay, all right. When a safety specialist is doing his
 3     job he has various policies to refer to to insure that
 4     work is being done safely, is that correct?
 5 A   Yes.
 6 Q   Okay, when you did his review -- I think we pretty much
 7     covered this, we talked about the resources you used in
 8     doing it, but to beat the dead horse, did you look at or
 9     consult either -- well, did you look at or consult the
10     Code of Federal Regulation that interprets issues such as
11     what regularly exercises discretion and independent
12     judgment means?
13 A   Not beyond my conversation with Randy Carr, no. I didn't,
14     right.
15 Q   Okay. Let me read you a portion of 29 CFR 541.207. "The
16     term discretion and independent judgment "as used in the
17     regulations of subpart A of this part, moreover, implies
18     that a (sic) person has the authority or power to make an
19     independent choice free from immediate direction of
20     supervision . . . with respect to matters of
21     significance". Then I've got a break in it there, just
22     for the record, moving on to small (b) in parens, "The
23     term must be applied in the light of all the facts
24     involved in the particular employment situation in which
25     the question arises. It has been most frequently
```

### Page 53

```
 1     misunderstood and misapplied by employers and employees of
 2     (sic) cases involving the following", colon, "1, confusion
 3     between the exercise of discretion and independent
 4     judgment and the use of skill in applying techniques,
 5     procedures or specific standards; and, 2, misapplication
 6     of the term to employees making decisions relating to
 7     matters of little" importance. And then this is under
 8     (c)(1), "An employee who merely applies his knowledge in
 9     following prescribed procedures or determining which
10     procedure to follow, or who determines whether specified
11     standards are met or whether an object falls into one or
12     another" -- "one or another of a number of definite
13     grades, classes or other categories, with or without the
14     use of testing or measuring devices, is not exercising
15     discretion and independent judgment within the meaning of
16     Section 541.2. This is true even if there is some leeway
17     in reaching a conclusion, as when an acceptable standard
18     includes a range or a tolerance above or below a specified
19     (sic) standard". If -- in hearing that does that change
20     your thoughts about whether or not a safety specialist
21     exercises independent -- exercised -- regularly exercises
22     discretion and independent judgment?
23 A   No. You want me to relate that -- I mean, help you with
24     my -- I just keep -- I'm -- because -- I just want to ask
25     you the -- you relate sniffing a tank, right, where we
```