Case 3:03-cv-00174-RRB   Document 59   Filed 08/11/2006   Page 1 of 7

Case No. A03-0052 CV (RRB)    CondenseIt!™    Zuber v. APC Natchiq, Inc.

Page 54

1  were talking about sniffing a tank, and I'm just -- I'm
2  trying to understand. The process of a permit or the
3  process of a confined space, it's very -- certainly a
4  process you work through. That's one -- one piece of it.
5  There's a lot of pieces to that -- to that puzzle where
6  you exercise discretion and independent judgment. So to
7  sniff the tank, the actual sniff itself, is a very quick
8  minute or two minutes, stick the probe in the tank and get
9  a -- get a reading.
10 Q Okay, so what -- I'm sorry. What portions of a confined
11   space entry do involve a safety specialist exercise --
12   regularly exercising discretion and independent judgment?
13 A This person is the person that sign -- put their life on
14   the -- we as a company, we have already had a fatality,
15   and, you know, we're very near and dear to us around us,
16   so it's not something we take lightly. This person does
17   the sniff, if you will, that's a very small piece of it.
18   But they have to exercise as the management on the job, to
19   look at the overall job, see that the people that are out
20   there to do the job, the PPE on the job, the people, have
21   the training, can question that training. Just because
22   you necessarily have, say, a card that says you're trained
23   or have been trained, we have the specialists standing
24   behind to say -- part of the process is always that they
25   give some kind of a -- they have to be comfortable, they

Page 55

1  have to be independent, there's no checklist that they can
2  go through and say, I am comfortable that Mark Nelson is
3  competent necessarily to go into that tank. There's
4  indicators, there should be training, they should be --
5  but they have to be -- they have to be able to look at a
6  Mark Nelson, give me some -- feel comfortable that I am
7  trained and competent to go into tank. From -- from A to
8  Z there's -- from the start of the set-up of the job to
9  the end of the job. And so when I say back there my
10  earlier statement that they're the eyes and ears of
11  management, we would want them to be comfortable with that
12  process before the permit was ever signed. Because the
13  permit itself is another two-minute function of just doing
14  the check -- checklist. But it's not -- you can't have a
15  checklist for everything that's part of that process.
16 Q Okay, so you're saying that a safety specialist would be
17   exercising discretion and independent judgment by being
18   assured that they were comfortable with the particular
19   people that were executing the job task of confined space
20   entry, is that what you just said?
21 A Part of it, yes.
22 Q Okay, now, if somebody -- and you mentioned the PPE, what
23   does that mean?
24 A Personal protective equipment.
25 Q Okay, and that's something that's, in some instances,

Page 56

1  required to do confined space entry, I take it? Either
2  your coveralls or your oxygen mask or something of that
3  nature?
4 A Yes.
5 Q Okay, all right. All right, and the people that use those
6   have to be trained and have nature of certificate or
7   qualification in that regard?
8 A Should be, yes. You'll almost always go to a job, people
9   at the job site are saying we're ready to go, right?
10  Almost always ready to go. Even the supervisors, we're
11  ready, we've got a job to do, we got to get going. We
12  have to have that person there that says no, you're not,
13  you're not -- you don't have the right qualified people, I
14  don't think you know what the -- what you're talking
15  about, even though you've got a certification card, I
16  don't feel comfortable with this set-up, there's other
17  outside factors you guys don't -- you don't know about, or
18  that I'm aware of, or that I come here as a senior manager
19  on the job that I can't allow this to go forward, or that
20  I want you to change the set-up of this job. You're not
21  going forward, job can't go forward without the final
22  approval. Which is the expert on the job.
23 Q Backing up here on these permits, and I've seen one, but
24   it's my recollection there are multiple signatures on
25   them, the safety specialist, the foreman or

Page 57

1  superintendent, perhaps some others. Is that your
2  recollection of how.....
3 A Depending upon the permit, sure, whether it's hot work or
4   whether it's confined space or it's a unit work permit or
5   whatever the permit, sure.
6 Q All right, but besides the safety specialist there are
7   always additional signatures on a permit, is that.....
8 A Typically.
9 Q Okay, and that would involve the foreman or
10  superintendent, is that right?
11 A Typically not the superintendent, but the -- whoever the
12  key operations set-up person is on the job, right, whether
13  it be a foreman or lead or.....
14 Q Okay, and perhaps additional signatures as well?
15 A Could be.
16 Q Okay. If the safety policy or the Alaska Safety Handbook
17  requires some nature of PPE, training or a certificate for
18  a person to enter a tank, and they don't have it, whether
19  or not the safety specialist is comfortable with their
20  knowledge, skills and other abilities, the safety
21  specialist doesn't have the discretion to sign off on that
22  permit, is that correct?
23 A I'm sorry, I.....
24 Q I'm trying to give you the contrary of what you gave me.
25  You said.....

Case 3:03-cv-00174-RRB    Document 59    Filed 08/11/2006    Page 2 of 7

Case No. A03-0052 CV (RR    Condenselt!    Zuber v. APC Natchiq, Inc.

Page 58

1  A  Um-hm.
2  Q  .....well, look, whether or not these guys are all signed
3     off and all stamped, sealed, delivered, ready to go.....
4  A  Okay.
5  Q  .....if the safety specialist doesn't like it they can --
6     and I guess this'll be a follow-up question in a minute --
7     ask or tell them to change it.
8  A  They can ask or tell them or stop the job, so to speak.
9  Q  Are you aware of a safety specialist ever stopping a
10    confined space entry or other type of permit when all the
11    criteria required by the safety policies were met?
12 A  Not in my recollection. Has -- it is likely that it's
13    happened? Sure. Can I point to you a specific that I was
14    involved with directly that wasn't corrected at the safety
15    specialist level? No.
16 Q  Would that be -- you're saying you're -- I think you said
17    you're confident that happened. Would that be a regular
18    event or something of a rare event?
19 A  I think it would be an event that would happen where you -
20    - you don't have a day to day process. If you're doing
21    the same, similar routine, like anything -- to a brain
22    surgeon -- you do the same thing day after day, it becomes
23    routine. May not just want anybody step in and doing
24    that, but whatever the -- if you can do it over and over
25    again, it does -- it becomes routine. It's typically

Page 59

1     the -- it's typically the jobs that are set up that are
2     new or unique, there's been a change, there's been a
3     factor that can affect that, different chemicals,
4     different tanks in this case, maybe, that would make a
5     change to the day to day routine or process. New people
6     on the job always a concern for anybody in management
7     because new people come -- even though a new person always
8     says I can do it, I can do it, I can do it, fact is a lot
9     of times the new people that end up getting injured. So
10    we always want that final check, that final competency, if
11    you will, of that person exercising the discretion and
12    judgment that this job is -- believe it's ready to go and
13    I feel comfortable with it.
14 Q  Now, take the contrary of that, have the safety specialist
15    be comfortable and confident with the personnel, the
16    equipment and everything else, but there not being a
17    particular criteria met for doing the permit. For
18    instance, if the individual needs some nature of PPE
19    certification, and they don't have it. Even though the
20    safety supervisor's comfortable knowing that the guy can
21    do the job and do it safely, does the safety supervisor
22    have the discretion to say, yeah, go ahead and do it?
23 A  If the -- can you give me a -- an example?
24 Q  Well, unfortunately I don't do the job so it's a little
25    difficult for me, but I -- I would presume that for an

Page 60

1     individual go into a tank with protective gear and a mask
2     on, they would have to have some type of training or
3     certificate to do that. Is that so, to your knowledge?
4  A  Yes.
5  Q  Okay, so one day Zuber or a safety specialist goes to the
6     job, everything's set up, everything's all set for
7     permitting, they got the guy, they got his coveralls, they
8     got the mask, Zuber or the safety specialist knows the
9     man, they know they've done confined space entry in the
10    past, they know how to do the job, they trust their
11    judgment but they don't have the required certificate to
12    go in the tank under those circumstances. Does the safety
13    specialist have the discretion to say, go ahead and do the
14    job anyway?
15 A  Sure, that -- that's the ultimate signature.
16 Q  So he as the safety specialist could say this permit is
17    required for you to go in the tank, you don't have it, you
18    can go ahead and go in the tank anyway?
19 A  Would there be a procedure that says you should have all
20    these things, if -- I think the example you use, if Zuber
21    had been on the job and the person came and didn't have
22    his certification card or something, but he was -- he was
23    comfortable with this thought process, his judgment,
24    whatever, that this person could do the job for whatever,
25    as a specialist, his background dictated to him, could he

Page 61

1     allow the job to go on? Yeah, because he's the guy that
2     would be there to stop it.
3  Q  Okay, let's just change that hypothetical you gave me by
4     -- just to make it clear, you said doesn't have his
5     certificate, and the inference might be not have it with
6     him. The hypothetical is the guy does not have the
7     certification, he's not certified. Can Zuber still then
8     say, yeah, sure, go ahead and do it?
9  A  Well, I would hope as a specialist he used good judgment
10    to say, Bubba, if you don't have your certificate, you
11    haven't been trained, in my judgment I can't allow you to
12    go in there. You need to go get trained, we need to get
13    you trained first. I would hope that that would be what
14    his judgment would conclude. Does he have to call Mark
15    Nelson and say, can I let this guy in the tank? No. He
16    -- he's the final authority on the -- on the job. His
17    judgment might indicate that, holy smokes, should I let
18    this guy go in or not, it should never come to that. He
19    should say -- would think in his judgment and discretion
20    that this guy probably -- obviously doesn't have the
21    training required so I shouldn't let him in the tank.
22 Q  And he reaches that conclusion by reference to the known
23    standard that says you got to have the certificate, right?
24 A  There's a -- there's a standard that would say this is a
25    minimum standard, sure. Minimum training, right.

Case 3:03-cv-00174-RRB   Document 59   Filed 08/11/2006   Page 3 of 7

Case No. A03-0052 CV (RR..)     CondenseIt!™     Zuber v. APC Natchiq, Inc.

Page 62

1  Q  Besides these things we've just talked about, any other
2     examples you can -- besides the ones you've given me
3     already, any other examples of instances where you can --
4     of safety specialists regularly exercising discretion and
5     independent judgment? Do you have any for me?
6  A  You want a -- you want more -- you want me to just give
7     you more examples of what they have.....
8  Q  Yes, if you have them, yes.
9  A  In the day to day -- Well, I guess I -- because their day
10    to day isn't dictated by a policy, so when -- when a
11    safety specialist wakes up in the morning, okay, you wake
12    up, if there's a safety meeting and they go -- maybe they
13    conduct that safety meeting, they pick their topic.
14    Nobody's telling them what topic or what -- what's on
15    their minds. I've heard Mr. Zuber a number of times at
16    safety meetings talk about his past and military
17    experience, maybe, and relate that to safety, and he uses
18    his own judgment. I've never told him what to talk about,
19    or the supervisor. He -- he wants to impress upon his
20    people, his guys, through his own -- his own judgment and
21    discretion what he -- where he thinks the hazards and
22    concerns are of the day or of the week or whatever, so
23    he's going to use that judgment and discretion first thing
24    out of the chute, toolbox meeting or safety meeting. He
25    leaves the -- leave the meeting, he's got an area, but

Page 63

1     unless -- I know -- most of the time there's not a
2     checklist, I've got to go here, I've got to be to CPF 1 at
3     8:00, holy smokes, and do this, and then be at -- you
4     know, certainly there's day to day functions where maybe
5     there is a confined space or a permit to be issued or
6     something like that, and that's a piece of the work, but
7     left day to day they have discretion and independent
8     thought of what they're going to do, what -- where do they
9     see the hazards. I could not tell him what's -- or, his
10    super -- what the hazards were unless I was out doing my
11    own observation or walk-through and I might -- then I
12    could. If I had him accompanying, we might jointly
13    discover it, or something, and then we'd say this -- but
14    day to day as the eyes and ears they're out to find those
15    types of hazards. And in -- either in behaviors or in
16    conditions, and that's their -- so I guess every minute of
17    every day really they're -- they're -- hopefully they're
18    demonstrating that judgment.
19 Q  Okay. Looking at Page 155 in the professional test, box
20    one there -- or, check 1 is "Primary duty requires
21    knowledge of an advanced type in a field of science or
22    learning customarily acquired by . . . prolonged course of
23    specialized instruction and study." Does -- do safety
24    specialists have knowledge of an advanced type in a field
25    of science of learning customarily acquired by a prolonged

Page 64

1     course of study -- prolonged course of specialized
2     instruction and study?
3  A  You're asking.....
4  Q  That's the question yes.
5  A  What -- I believe so, yes.
6  Q  Okay, in Mr. Zuber's instance in particular what field of
7     science did he have a prolonged course of specialized
8     instruction and study, science or learning?
9  A  Are you asking me for a formal background or -- or
10    learning customarily acquired by a long course of
11    specialized instruction and study?
12 Q  I think they're the same thing, but what -- for a safety
13    specialist, I guess my first question -- let's go back.
14    My first question is would you consider safety to be a
15    field of science or learning customarily acquired by a
16    prolonged course of specialized instruction and study?
17 A  I do, yes.
18 Q  Okay, I'd refer you here to an example, Exhibit 1,
19    education and job-related experience, this indicates that
20    you can have a BA in safety from an accredited school, an
21    associate's degree in safety and two years experience, or
22    four years experience at safety. So it appears that you
23    can substitute four years of experience for education in
24    that instance, does that seem fair to say?
25 A  By this job description?

Page 65

1  Q  Yes.
2  A  Yes.
3  Q  And in Mr. Zuber's instance do you know how he obtained
4     his knowledge of the safety field? In other words, was it
5     by going to college and getting a degree, a four-year
6     degree in safety, or was it by learning on the job or
7     being self-taught?
8  A  I -- I don't recall at the time Mr. Zuber was hired what
9     -- what the determination was was to hire him.
10 Q  And Mr. Zuber, when he taught classes, didn't teach
11    classes -- taught classes for APC, he didn't teach classes
12    at a university or school, he taught them in the
13    industrial setting, as it were, the workplace, is that
14    right?
15 A  I -- I think Ron taught at a university before he came to
16    us, because I recall something to that.....
17 Q  And.....
18 A  .....but for APC he taught primarily for our employees,
19    yes.
20 Q  And when he taught at the university do you know if he was
21    teaching safety or not?
22 A  I don't recall, I just recall him.....
23 Q  All right.
24 A  .....something about it.
25 Q  And I assume, looking at the box number 2 under

Case 3:03-cv-00174-RRB   Document 59   Filed 08/11/2006   Page 4 of 7

Case No. A03-0052 CV (RR    CondenseIt!™    Zuber v. APC Natchiq, Inc.

Page 66

1  professional, that's the requires consistent exercise of
2  discretion and independent judgment. If I asked you about
3  that under the professional test I'd get the same answers
4  that I got for the administrative test, is that self.....
5 A  That's right.
6 Q  Okay, all right. Sometimes I got to ask these questions
7  just for the record here. So looking at category number
8  3, "performs work which is predominantly intellectual and
9  varied and is of a character that the output or result
10  cannot be standardized in terms of time." Would you say
11  the safety specialist's job is predominantly intellectual
12  and varied?
13 A  I think it takes intellect to do it, and variation and
14  character -- and I think I may have checked that, "or
15  results cannot be standardized in terms of time" is
16  probably why I checked that at the time. The question
17  mark there, I don't know if I -- if you're asking me why I
18  checked it, I don't know if the -- how I may have
19  finalized the determination, but definitely you can't
20  standardize, measure, safety specialist's performance in
21  time.
22 Q  Would a safety specialist with an assignment to cover wash
23  bay be expected to be able to complete a certain number of
24  permits per day at the wash bay?
25 A  You mean like a factory, the more you can do the better

Page 67

1  you are, or as the need arises would the safety specialist
2  be there -- be a final approver on?
3 Q  No, in other words, say, well, we have a wash bay on Job
4  626, or 62 -- whatever it is, 626 or 626, whatever it was,
5  and we're going to need at least two confined space entry
6  permits at the wash bay every day you work. Could that be
7  a requirement of the job of a safety specialist?
8 A  Would it be the requirement?
9 Q  Could it be?
10 A  To finalize the permit?
11 Q  Among your other duties we need two permits for confined
12  space entry at wash bays -- wash bay every day.
13 A  I'm not sure I under -- is that a -- was that a
14  requirement of the safety specialist at the time?
15 Q  Well, why don't you go ahead and answer that question.
16  Was it?
17 A  Yes.
18 Q  Okay, to have two done a day?
19 A  I don't know about two.
20 Q  A certain number.
21 A  A certain -- as the requirement, whether it was zero or
22  whether it was one, two or three, yes.
23 Q  Okay. So it's your position to this day -- or, I mean, is
24  it your position to this day that the safety specialist is
25  exempt both under the administrative and professional

Page 68

1  tests?
2 A  I don't know that I came to the conclusion of both. I
3  came to the conclusion at the time that they were -- that
4  they met the exempt -- exemption.
5 Q  The exemption, and then did you make a determination as to
6  whether it was under one or other or both or.....
7 A  I really felt at the time that they qualified under both
8  at the time. They had strong elements of both, so.....
9 Q  And as of today has that opinion or position changed?
10 A  No.
11 Q  Okay. Is it correct that now you classify your safety
12  specialists as nonexempt?
13 A  Yes.
14 Q  Okay, and that's, we've been told, since perhaps March of
15  '03?
16 A  Yes, I made everybody -- I had everybody change just a few
17  months ago.
18 Q  All right. What -- did this law suit precipitate that
19  change?
20 A  Not this particular law suit, but this type of -- this
21  type of action. I think there's too much ambiguity --
22  well, this is the only one, this case, Mr. Zuber. There's
23  one other here that was taking place, but as I say, I want
24  to get away from any gray area. I don't like gray areas.
25  I didn't like it then, I don't like it now. And I -- when

Page 69

1  I say, it's not a gray area on my part, but it obviously
2  seems to be.
3 Q  Okay, looking at Page 155, I refer you to that box at the
4  bottom of the right-hand column, it says, "Note, the
5  distinction between exempt and nonexempt can be very
6  difficult to discern in certain cases. If you have any
7  doubt consult the U. S. Department of Labor and your
8  attorney." You indicated that you consulted the State
9  Department of Labor. You didn't consult U. S. Department
10  of Labor, is that right?
11 A  No.
12 Q  Okay, and did you consult an attorney?
13 A  No.
14 Q  Okay. And then I'd refer you to Page 182, which is the
15  third page of a letter from Mr. Boyle to you dated April
16  4, '97. That last about inch-long paragraph indicates "I
17  know this information may be more than what you were
18  looking for, but determining proper procedures under
19  federal and state wage and hours laws is very complex. In
20  speaking with the department, they are often unclear on
21  many issues related to exempt status. It appears case law
22  rulings are often contradictory resulting in the uncertain
23  application of the regulations. Of course, this creates
24  even more uncertainty for employers." Do you recollect
25  this letter and that phrase there being communicated to

Case 3:03-cv-00174-RRB   Document 59   Filed 08/11/2006   Page 5 of 7

Case No. A03-0052 CV (RR.    CondenseIt!    Zuber v. APC Natchiq, Inc.

Page 70

1  you by Mr. Boyle?
2 A  I was copied on it, right, or sent to me. Yes.
3 Q  Sent to you.
4 A  Sure.
5 Q  Okay. All right, and then I'd refer you to Page 184,
6    there's a Paragraph Number 9 there near the top of the
7    page and it says, "One of the most common and most
8    expensive mistakes that employers make is to improperly
9    label employees covered by the Alaska Wage and Hour Act as
10   exempt. The Alaska Wage and Hour Act contains numerous
11   exemptions for certain employees, such as agricultural
12   workers", et cetera. Would you view those statements, and
13   if there are any additional similar ones within these
14   pages, as a warning that you ought to be very careful in
15   classifying employees as exempt or nonexempt?
16 A  That's the way I interpret it, yes.
17 Q  Okay, do you think, given those warnings, that it would've
18   been prudent at the time this review was done in 1997 to
19   consult an attorney about the classification of these
20   employees, of the safety specialist job?
21 A  Not beyond -- at the time I didn't feel that, beyond what
22   -- when I talked with the State, Mr. Carr, and had heard
23   him, and I know he was the authority for the State, I felt
24   comfortable with what I -- my discussions with him, the
25   direction that we were going. I didn't -- I wouldn't have

Page 71

1  gone to a labor attorney beyond that, no.
2 Q  In reclassifying the -- is it materials supervisor?
3 A  And foremen, or supervisors, yes.
4 Q  Okay, the one.....
5 A  It wasn't super -- they were, yes, foremen, supervisor.
6 Q  What was the name of the position you got the letter on
7    from Mr. Carr, is that materials supervisor? Right,
8    that's Page 203 of Exhibit 4. Mr. Carr's letter. It says,
9    I reviewed the information documenting the duties of
10   materials supervisor. In that instance you got that
11   letter in order to show to those particular materials
12   supervisor employees, right? Isn't that what you told us?
13 A  Yes. Yes.
14 Q  Okay. In the instance of the safety specialist you felt
15   comfortable about doing that classification without a
16   letter from Mr. Carr, but to the contrary, I guess
17   you've -- well, let me rephrase this. You got the letter
18   about the materials supervisors to satisfy the, I guess,
19   ire of the materials supervisors? Let me rephrase this.
20   Why'd you get the letter from Mr. Carr about the materials
21   supervisor?
22 A  I asked for the -- the actual letter from Mr. Carr
23   specific to materials supervisors, which wasn't just the
24   supervisors at the time, there were -- there were a number
25   -- there were other positions, I think, that were

Page 72

1  classified. But because they were adamant that they were
2  not -- I involved them in the process, I wasn't making a
3  wholesale change without involving them, because it
4  affected their pay, their -- whether they were exempt or
5  nonexempt. I wanted to involve them in the process. And
6  so when I involved them they were adamant that they were
7  not nonexempt, period. And so I said, look, guys, I've
8  talked -- I've talked to Mr. Carr, guys, I, you know, want
9  to do the right thing in good faith, but I need to change
10 this. And they -- you know, it was a -- it was a problem,
11 because -- and it's a different, a little different
12 environment. We all work -- like I said earlier, we all
13 certainly live in the same camp, we eat together and all
14 that, we're -- certainly some friendships that have
15 developed over the years. And said -- so I went back to
16 Mr. Carr and said, could you put that in some kind of
17 letter that I can show these guys and say, look, unless
18 you can show me something to the contrary, I've got to do
19 this. I didn't have that in the case of safety specialist
20 because I wasn't changing their classification.
21 Q  Did it occur to you that some day you might have a safety
22   specialist who was going to be adamant that they were
23   nonexempt from the wage and overtime laws, and that you
24   might want to have a letter -- similar letter for that
25   instance?

Page 73

1 A  I would've hoped, if I had a safety specialist who felt
2    that way in the process, we -- could've come to me before
3    and said that, because it would've been a different
4    situation.
5 Q  When you talked to Mr. Cannon about his feeling or input
6    on being exempt or nonexempt, Mr. Cannon was a safety
7    supervisor, right?
8 A  Yes.
9 Q  Okay. Did you talk to safety specialists about the
10   question of whether or not they ought to be classified
11   exempt or nonexempt?
12 A  I don't recall. I think they could have been -- I had a
13   lot of informal, if you will, discussions, it's a daily
14   thing, walk into people's office, safety specialist
15   standing around with the supervisor kind of thing. I
16   honestly don't recall.
17 Q  And probably your prior answer answered this one, but just
18   for the record, did you talk to Mr. Zuber about
19   classification as a -- exempt or nonexempt as a safety
20   specialist?
21 A  I don't recall. I -- I don't believe so.
22 Q  As far as travel days go for safety specialists did APC
23   and the safety specialists have an agreement that if they
24   traveled and worked they would get their one day's pay?
25 A  Do -- if they traveled and worked -- if any exempt

Case 3:03-cv-00174-RRB    Document 59    Filed 08/11/2006    Page 6 of 7

Case No. A03-0052 CV (RRB)    CondenseIt!™    Zuber v. APC Natchiq, Inc.

### Page 74

1 employee worked any time of the day — I mean, not five
2 minutes, but if they worked a half hour — and a lot of
3 times there was a change-out done which would warrant only
4 a half, maybe in the case of Mr. Zuber where he flew up
5 from the Lower 48, he's a non — or, out of state, comes
6 in, did a change-out with his alternate, if he worked a
7 half hour he was paid for the day undiminished. We had
8 one day, not quarters or halves or anything less than it
9 was a one day.
10 Q And typically on change-out day would it be that a safety
11 specialist would be on duty, the airplane comes in, the
12 new safety specialist comes and meets the old safety
13 specialist, they spend half an hour or so discussing
14 what's happening, the old safety specialist takes his bag,
15 walks over, gets on the airplane and goes home?
16 A Bags checked previous, but yes, runs — yeah, typically
17 they have a quick change of — really the way it works is,
18 yes, they would have a quick discussion, anything, hot
19 topics, typically the specialist leaves — with almost all
20 positions, including my own as operation man, would leave
21 change-out notes, pertinent, kind of a what happened
22 during the week, any issues, concerns, maybe in their
23 case, safety specialist, it would be areas of potential
24 hazards, education, training, things that are going on in
25 their position that needs — that knowledge needs to carry

### Page 75

1 over.
2 Q And that applies to a lot of positions on the Slope,
3 doesn't it? At change-out they.....
4 A Well, but typically not a — maybe a nonexempt where
5 you're — if you're setting up scaffolds, well, you're
6 setting up scaffolds. There's not a — it's not a change-
7 over other than maybe.....
8 Q You don't have to tell the new guy.....
9 A .....my foreman pissed me off this week. I mean, you
10 don't leave those kind of change — you might tell them at
11 change-overs, but.....
12 Q And in sort of the normal course of affairs would a safety
13 supervisor do any and all of the duties of a safety
14 specialist?
15 A Could they do all of them or did they do all of them?
16 Q Did they.
17 A No. Certain specialists, in the case of maybe Ron, were
18 higher qualified than the supervisors. In the case of Ron
19 Zuber was the champion or supreme, if you will, trainer in
20 SIMs, so he was our — by far the specialist in that, so
21 he was more qualified than the supervisor, and that's a —
22 for an example.
23     MR. COVELL: Why don't we go off record for a minute.
24     (OFF THE RECORD)
25     (ON THE RECORD)

### Page 76

1 Q Have you seen, Mr. Nelson, the documents that — I'm
2 sorry. Have you seen in documents that Mr. Zuber provided
3 to the Defendant in this case in discovery that he
4 describes as his daily logs?
5 A No.
6 Q Okay. Do you understand that in this case Mr. Zuber's
7 represented he worked a varying range of hours, oftentimes
8 in a range of, say, 11 and a half to 15 hours a day?
9 A You asked me did he or is he asserting that?
10 Q The first question is do you understand that he is
11 asserting that?
12 A Okay, I believe you.
13 Q Okay, the second question is do you have a way of
14 disputing any of those particular claims for the hours
15 worked on those days?
16 A What — which day?
17 Q Well, he represents on August 20th — or, rather August
18 2nd, 1999, he worked 13 hours.
19 A Can I look at what you're.....
20 Q Sure, you bet. And just for the record I'm showing you
21 Zuber's — or, Plaintiff's disclosure Bates stamp page
22 373, which represents the August 2nd, 1999, daily log for
23 Zuber.
24 A I don't know, you've just got 13 written here. I don't —
25 I don't know if that included the hours worked, the lunch

### Page 77

1 breaks, I don't know. I can't — I can't — I don't
2 recall August 2nd, '99.
3 Q Okay. As far as the duties of the safety specialist
4 during mealtime, if a safety specialist was called at
5 mealtime would they be expected to abandon their meal and
6 go out in the field and take care of whatever problem
7 there might be in the field?
8 A What kind of problem?
9 Q Permitting.
10 A It would be at their discretion. They could say, look, I
11 just sat down for dinner, give me — give me a half hour
12 and I'll be out. If they got a radio call and said
13 there's been a catastrophe and employee Z got his head
14 blown off, I would think the discretion they would use is
15 I'll be right there.
16 Q Okay, would a situation where a crew was all ready to go
17 and do some work in a confined space entry, say, and the
18 only thing they needed was the safety specialist to do his
19 portion of the permitting process, would that be
20 considered enough of an emergency or urgent situation to
21 cause the safety specialist to abandon their meal and
22 attend to business?
23 A Depending upon the job, I would hope the — I can't give
24 you a specific incident. If — from the practice it would
25 be if the job was set up, if there was, you know, a —

Case 3:03-cv-00174-RRB    Document 59    Filed 08/11/2006    Page 7 of 7

Case No. A03-0052 CV (RR)    CondenseIt!    Zuber v. APC Natchiq, Inc.

### Page 78

maybe a crew standing around, why they didn't — typically they should give the safety specialist advance notice, obviously. We're doing this job, he should be aware of it anyway, because it's within his confines of his — of his work area or the group that he's watching over, so he should know what work is coming. But if they called and said, could you come over and, you know, walk the job with us, give us your judgment, or are we ready to go, you see any, you know, whatever, sign off on a permit, it's up to him. He could say, look, guys, give me 15 more minutes, I'll be over there, I'll come over right now, because this is a free cafeteria, so to speak, leave his tray there, go over and — and do whatever they request and come back in 20 minutes and go back and get a whole new meal. Could he do — absolutely.

Q So a safety specialist, absent an emergency, could say, no, I'm going to eat and then I'll be out there? Is that what you're telling me?

A Well, could. Have we ever reprimanded a safety specialist for not going out immediately for some — no.

Q Okay. Do you have with APC or your AES a position called a field inspector?

A Not that I'm — a field inspector? Not that I'm aware of. As it relates to?

Q I understand it was a job that Alyeska had at some point

### Page 79

which struck me as being something sort of between an engineer and a quality control guy.

A Oh, the QC inspectors.

Q Well, something.....

A Mechanical, electrical, that type.....

Q Something between the two is what my drift on it was.

A I — I don't know what you're — I don't know.

Q That's fine. Did the safety specialists, or did some safety specialists receive a bonus around January of 2001?

A I don't remember the time frame. Are you referring to the annual bonus that Ron was so upset about in this?

Q Right.

A Yes, if they were employed they would've got the — they would've got the bonus.

Q What were the criteria for getting the bonus, if any?

A Criteria were that, A, you were working and you didn't have any infractions, a variety of infractions, safety as well as disciplinary actions, and if you were employed at the time that the determination was made to pay out the bonus then you would receive it.

Q Okay. And do you know when that determination was made in the year 2000?

A I don't know. 2001 you mean?

Q 2001.

A It would've been made after the end of the year, after

### Page 80

risk free work projects would've been completed and, you know, it would be sometime maybe — do you know when it was paid out? Would've been.....

Q I — I don't, no.

A .....as soon as we make the determination, very quickly we pay it out.

Q I understand it might've been January or February, but I don't know.

A Yeah, okay, that's — that's right. I mean, as soon as a determination's made. If — if the payout was in April, we probably made it two weeks before then.

Q Was that based on the performance of the safety specialist in the year 2000?

A It was — was the bonus?

Q Yes.

A Was it based on their individual performance?

Q Yes.

A No.

Q Was it based on safety specialists as a group?

A No.

Q Okay, well, in part you told me that you had to have no infractions and some other criteria, right?

A You could lost your bonus if you had — if you didn't — if you had infractions, yes.

Q Okay. Are the criteria for receiving a bonus written down

### Page 81

anywhere?

A No.

Q Okay. Do you know if.....

A It's.....

Q I'm sorry, go ahead.

A Oh, I say it's a discretionary bonus.

Q And at whose discretion?

A At the company's discretion.

Q Is that some kind of pass-through thing that comes from ARCO or somebody or is that just an APC program?

A Partially funded by the client. It's varied year to year, you'd have to really say the year. Some years we didn't have — you know, we'd hoped to give more of a bonus than others, some years not, and so we combined a couple of years the two different type of jobs, the operations and maintenance jobs with the construction jobs, robbed money, if you will, from — really from the profits of the company to put back in the pool to where we would have more monies available to pay out to the — to the current employees.

Q When it came, at least in part, as a pass-through from ARCO or whomever did they designate that as being tied to a particular year or a particular year's performance?

A Part of it and part of it was tied to projects, which project could range over a period of months or years.