IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF ALASKA

RONALD E. ZUBER, )
Plaintiff, )
vs. )
APC NATCHIQ, INC., )
Defendant. )

Case No. A03-0052 CV (RRB)

DEPOSITION OF JAMES RAND CARR

APPEARANCES:

For the Plaintiff: Kenneth L. Covell, Esq.
712 Eighth Avenue
Fairbanks, Alaska 99701

For the Defendant: Gregory L. Youngmun, Esq.
DeLisio, Moran, Geraghty & Zobel
943 West Sixth Avenue, Suite 110
Anchorage, Alaska 99501

Also Present: Mark Nelson

* * * * *

Pursuant to Notice, the Deposition of JAMES RAND CARR was taken on behalf of the Plaintiff before Teresa E. Mielke, Notary Public in and for the State of Alaska and Reporter for Gemini Reporting Services, at the Offices of Gemini Reporting Services, 943 West Sixth Avenue, Suite 110, Anchorage, Alaska, on the 8th day of September, 2003, commencing at the hour of 11:00 a.m.

* * * * *

INDEX TO PROCEEDINGS

| | PAGES |
|---|---|
| EXAMINATION BY MR. COVELL: | 3-35 |
| EXAMINATION BY MR. YOUNGMUN: | 35-53 |
| EXAMINATION BY MR. COVELL: | 53-58 |
| EXAMINATION BY MR. YOUNGMUN: | 58 |
| EXAMINATION BY MR. COVELL: | 58-59 |

EXHIBITS

| NUMBER: | |
|---|---|
| 6: Mr. Carr's file on WHOL 122 | 10 |

PROCEEDINGS

(Oath administered)

MR. CARR: I do.

JAMES RAND CARR,

having first been duly sworn under Oath, testified as follows:

REPORTER: And for the record would you please state your full name?

A James Rand Carr.

REPORTER: And spell your last name for me?

A C-A-R-R.

REPORTER: And what is your mailing address?

A P. O. Box 107021, Anchorage, 99510.

REPORTER: And your occupation?

A I'm the chief of labor standards with the Alaska Department of Labor.

REPORTER: Thank you.

BY MR. COVELL:

Q Mr. Carr, good morning, how are you today?

A Fine, thanks.

Q Good. Have you ever been deposed before?

A Yes.

Q Lots of times?

A More than a few, less than a dozen.

Q Okay, all right, and were those generally in conjunction with your employment?

A Yes.

Q In regard to your employment, you said you're chief of the labor standards division. What does that mean?

A I manage the two sections of the labor standards and safety division, which is comprised of three sections, but I am in charge of the wage and hour and the mechanical inspection sections.

Q Okay, and could you just brief tell me what the mechanical inspection portion of your job is?

A The mechanical inspection section is comprised of professional-level inspectors, electrical, plumbing, elevator, boiler inspectors, and these folks have responsibilities for providing the inspection services across the state, and I manage and supervise the group of people in that area.

Q Okay, so for instance a boiler inspector comes to my office in Fairbanks and checks my boiler, he's one of your subordinates?

A Most often, yes.

Q Okay, assuming he's a State boiler inspector?

A Correct.

Q Okay, and then are there intermediary supervisory levels between you and those....

A I have an assistant chief over mechanical inspection.

Q And that would include electrical, plumbing and, I don't

know, what else.....

A Electrical, plumbing, elevators, boilers, amusement rides.

Q All right. And you're here in response to a subpoena today?

A Yes, I am.

Q If you don't understand my question, say so. If you need to take a break, say so. We're hoping to be brief today, I think. In response to the subpoena did you bring some documentation today?

A Yes, I did.

Q All right, and could you briefly describe what you have there?

A Essentially it's three separate documents. There's a June 19th letter from Mark Nelson of Alaska Petroleum Contractors with attachments, a job description for materials supervisor a nd a sample notice of wage payments, and some other attendant documents relative to the materials supervisor position. There is another letter dated June 25th from Mr. Nelson to me. And my response to him dated June 26th, which is also fashioned as wage and hour opinion letter Number 122.

Q Okay, and just for some housekeeping here trying to keep straight what we have to what you have, I'm going to hand you a letter dated June 19 entitled determination letter to you from Mr. Nelson. Our copy says APC 201 and I'd

represent that this is an exact copy of Exhibit 4, Page 201 of our Exhibit 4. And could you compare that to your June 19th letter?

A Yes, that's the same letter.

Q And does that appear -- other than I note on your copy there's a received stamp, June 19, '97, labor standards, is on your copy, and the APC number isn't on your copy. Other than that, they -- and there's a fax information on the top of yours?

A Correct.

Q Other than that they appear identical?

A That's correct.

Q Okay. And then I'll hand you what I represent is APC Page 202 of Exhibit -- our previous Exhibit 4, which is a June 25 letter to you, Mr. Carr, from Mr. Nelson. Could you make the same comparison as previous -- on the previous letter?

A Same document. My copy has the fax chatter on top, your copy has the APC number on the bottom. Otherwise they're -- they're identical.

Q And when does it indicate the fax was sent from who to who?

A June 25th, '97, from APC to our number in our office.

Q Okay, and then, let's see, why don't we -- well, as long as we're on that June 25 letter, that had attachments,

right?
A No, I believe the June 19th letter had attachments. I don't think there's anything on the June 25 letter.
Q Okay, let's go to the June 19 letter attachments, so the second page. And it appears the next two pages there are a job description for materials supervisor?
A Yes, it's captioned two -- Job Number 626, APC job description, warehouse, division, construction/ maintenance, job title, materials supervisor.
Q Okay, and I'll show you what I represent is Exhibit 4, 143 and 144 of our prior Exhibit 4, and could you make the comparison of those documents, those two pages as well?
A With the exception of the aforementioned additions of the APC numbers on yours and the fax chatter on mine, there's also what either may be a scribble or an initial on the second page of yours, they're the same document.
Q Okay, very good, thank you. And then subsequent to that you have -- why don't you count off how many pages you have there for us?
A Excluding the two we just looked at?
Q Right.
A Five pages.
Q Okay, and why don't you just read the titles of each those pages, it'd be the first page subsequent to the job description?

A The first page, with the heading of Alaska Petroleum Contractors, Inc., notice of wage payments. The next page is "Roles and Responsibilities Form" for the position title materials supervisor, APC. And that would appear to continue for the next three pages as there's lists of duties and responsibilities for the materials supervisor.
Q Okay, and that's a total of four pages.....
A Yes.
Q .....that last document? Okay, and did you make a search of your files concerning correspondence between you and Mark Nelson and/or APC concerning classification of jobs as exempt or nonexempt prior to coming to the deposition?
A There's no file per se as you have described it. What I looked at was the State's record copy of the opinion letter, wage and hour opinion letter 122, and the back-up documentation for that opinion letter, which are the documents we've so far identified. They would be attached together as a historical record for the opinion letter.
Q Okay, and are those kept in a binder somewhere?
A Yes, they are.
Q And are those available to the public?
A Yes, they are.
Q And the pages you've brought with you, then, were attached to that. Does the Department, to your knowledge, have any other papers that might pertain to classification of

employees of APC as exempt or nonexempt from that -- from that time period, for starters?
A Unless it was issued as a formal opinion letter and assigned an opinion letter number, it would've gone into general correspondence, which would've been destroyed after a year.
Q Okay, as far as the June 19th letter -- I'm sorry, the June 19th letter, why is that with your papers instead of in general correspondence, if you can answer?
A Because it's part and parcel of the back-up for wage and hour opinion letter 122.
Q Okay, if in general you had an employer -- well, let's back up. And employer can call you or contact your office and request an opinion as to whether a job is exempt or nonexempt from overtime, is that correct?
A Yes.
Q And that's part of the service you provide to the public?
A Yes.
Q Okay, if an employer was to make that nature of inquiry to you -- well, if they were to make that nature of inquiry to you in writing would that then result in it being stored in this binder as a WHOL?
A WHOL. If it was captioned as a WHOL. Not every document that goes out from our department is given the status of a wage and hour opinion letter. What these documents are

used for within the Department is sort of a historical record of the Department's opinion on -- on circumstances as they evolve over time. It is for the particular case an opinion for that snapshot in time. The opinion itself may change over time because the laws may change or the court interpretations of the laws may change. So when we issue a formalized opinion, when someone asks us for a formal Department opinion we issue it as an opinion letter. Then we'll keep all the back-up with it.
Q Okay, let me just back up and do something for the record here. These papers we just discussed about your correspondence with Mr. Nelson that we detailed here, are those kept in the regular course of business of the Department of Labor?
A Yes, they are.
Q All right, and to your knowledge are they true and accurate copies of what you have in your files?
A Yes.
MR. COVELL: All right, I'd like to get those marked now for the record.
(DEPOSITION EXHIBIT NUMBER 6 MARKED)
REPORTER: Do you want to put a paper clip on it?
MR. COVELL: All right.
Q Okay, and for the record, then, those papers you brought with you are now marked as Carr Exhibit 6, right?

A Right.
Q Going back to the WHOL -- and what does that stand for again?
A Wage and hour opinion letter. It might be useful to describe how that -- what this means in the context of the agency.
Q Sure, if you'd do that, please?
A We have three forms of historical documents that we maintain. Two of them are opinion letters, one is wage and hour opinion letter, such as this, another is an opinion letter given in the area of public contracts and that is fashioned as P-C-O-L, or public contracts opinion letters. And those two types of letters are, as I said earlier, a specific opinion to a specific employer on a specific set of facts, and they represent what the Department's opinion is that point in time given our understanding and interpretation of the law at that point in time. The third type of record that we would maintain is called a wage and hour policy letter, or W-H-P-L, which is, as opposed to the opinion letters which are generally directed externally, are internal documents used to provide policy to staff on the Department's position on certain issues, practices and procedures and administrative functions and things of that sort.
Q Okay. Would the WHPLS -- sometimes a little slow in

listening -- pertain to classification of employees as exempt or nonexempt for overtime?
A Not a specific employee, but they might address a generic issue dealing with classifications.
Q Are those maintained in -- well, did you say those are only available to -- internally in the Department?
A No, they are -- they are public documents, but their primary purpose is to convey policy to staff.
Q So they provide guidance to staff essentially?
A Correct.
Q Okay. All right, and so you said that the three kinds we have now are the WHPL, which is wage and hour policy letter, WHOL, which is wage and hour opinion letter, of which we have an example here, and the PCOL, which is something that probably doesn't concern wage and hour classification, right?
A Correct.
Q Okay. And those are the only types of opinions your Department issues, is that right or wrong?
A Those are the only types of formal opinions that we issue. We modeled this somewhat after the U. S. Department of Labor's administrative practice. And they have private letter rulings in some instances, like the IRS uses, and I imagine a lot of federal government agencies use those, that address specific situations as posed by someone,

maybe an employer, maybe an employee. And that's what our WHOLs and PCOLs are akin to would be private letter rulings. This -- this addresses only this set of facts. And the policy letters we developed in the early '80s to make sure that our offices were all getting the information relative to enforcement or interpretive practices of the management of the section.
Q If for instance in this instance where you were asked for a opinion as to the exempt status of the materials supervisor, if you had a WHPL, I guess, ruling, if that's -- or, opinion in regard to a materials supervisor, would you expect it to be referenced in your WHOL? Or what procedure would take place.....
A It could have. If there was a policy on point it might be referenced there. Occasionally, albeit rarely, an issue is a matter of first impression for our agency and in addition to answering the opinion to the inquiring entity we may also distribute the answer as a policy letter to staff, in which case it would be captioned with both a WHOL number and a WHPL, or WHPL number.
Q Given that this particular WHOL doesn't have a WHPL number on it and doesn't have reference to a WHPL in it, would you expect that there was a prior departmental WHPL that concerned this job position?
A No.

Q If -- How long have you been doing wage and hour -- chief? How long have you been a wage and hour chief?
A Well, I've had that title now since '96 but I've been performing these functions under various titles since 1983.
Q Okay, do you have historical knowledge of the WHOLs and WHPLs?
A Yes.
Q All right. Tell me what your routine would be if an employer approached you and requested an opinion as to whether or not a particular position was exempt or nonexempt from overtime?
A Let's say, for example, in this case. We receive a letter and it contains a job description, various other bits of information. If upon review of the back-up documentation we feel we can make a judgment as to an opinion, then we'll respond with a written opinion such as WHOL Number 122. Very frequently the question posed is either not clear or it actually poses several questions without the writer understanding it because they're not that familiar with our law. Then we make contact with them either on phone or perhaps by writing back and ask them for either clarification or talk to them about the issues they're asking to see if we can focus in on what it is they're really looking for. Sometimes the status of the law is

Page 15

sufficiently complex that we could simply answer the question that was posed but in doing so with a yes or a no it would leave so many other questions that you just have to have a discussion to be able to ask further questions of them and answer and provide the information as necessary in order to flesh it all out and not given misleading information. So we usually are contacted in one of two ways, telephonically or via the mail. If someone calls up and says, well, here's what I've got and I'd like to have an opinion, what's your opinion? I'd say, well, I need you to put it all in writing. I may discuss it with them on the phone to try and find out exactly what it is they're talking about and what the facts are that they're -- that they're putting forward. But bottom line our experience, unfortunately, in the 20 years I've been doing this is that sometimes the facts are not represented accurately for a variety of reasons. Not necessarily through maliciousness or deceit, it's just that there's a different perception of things and many times the managers or the human resource people that are making the request haven't been given all the information form the field folks. So we kind of try and hold their feet to the fire and say, this is what we need. You can give us your job description and that's fine, it's a good place to start, but it's generally not enough. Because

Page 16

most exemptions that we deal with have a -- one or sometimes a couple of percentage of duties tests. So we ask them to go back and break down the job description into finite duties that are performed within these various broad categories that are described in the job description, and assigning to those duties percentages of time spent performing them in an average work week, so that we can make the analysis as to whether there's a 20% test that's passed, or a 40% test that's passed, or failed. Because those are usually key to establishing whether an exemption applies. So there's very often some feedback back and forth before we get everything in on our desk that we can then examine and reach some sort of conclusion and issue an opinion.

Q Okay. Now, the WHOL is wage and hour opinion letter. Does the Department give oral opinions as to whether or not an employee or a position would be exempt or nonexempt?

A It is not our practice. That is not to say that someone in my office or even myself in discussing something with somebody might say, "well, you know, that doesn't sound like it's exempt", or "that sounds like might nonexempt -- might be exempt." but the practice is if somebody wants to pursue that then they need to give us the facts in writing because we want to make sure that the facts

Page 17

they're representing to us are on paper so that we can -- we can point to the document six years later and say, these are the facts upon which we based that opinion. And most of our opinions contain a caveat -- I see this one doesn't, but most of our opinions contain a caveat that this is in fact limited to this facts and this fact pattern and this position and shouldn't be applied to any other.

Q Okay, and when you say this one, you're referring to your WHOL 122?

A 122, yes.

Q That does in the first paragraph indicate you reviewed the information submitted documenting the duties of a materials supervisor, right in.....

A Yes.

Q .....the first sentence. And would you be referring there to the job description plus the four additional pages that's in Exhibit 6 that describe the materials supervisor's job?

A Yes.

Q Let me just ask you this question while I'm thinking of it. This is Exhibit 4, Pages 150 to 151, it's entitled test for exemption from employee provisions. First of all, and I don't believe it is, but that's not in the -- amongst the papers you brought here?

Page 18

A No.

Q And as far as the handwriting on this paper, that's not your handwriting, is it?

A No. I've not seen these documents before, to my knowledge.

Q Okay, have you ever seen this form in blank before?

A I don't believe I've seen this form in this format. I've seen things similar to this that some employers use for kind of a quick analysis by people who aren't that familiar with the exemptions to go through as a checklist. Not this document, however.

Q And just to be clear, this is something that we got from APC and in trying to figure out where it came from we speculated it might've been from the Department of Labor, but it's your testimony that this isn't a form that you're familiar.....

A This would not have come from the State Department of Labor because this is applying the federal standards because they're -- in the reference to the executive, administrative and professional tests they're applying short tests, which are federal standards nonexistent in State law.

Q If you had done a WHOL for APC about this time frame in regard to a warehouseman or a warehouseman supervisor, would you have come across that in coming here today and responding to this subpoena?

Page 19

A Probably not, 'cause I didn't look through all of the -- through the index to check every single one. 'Cause I was referenced to just 122 and that was all I focused on when I was looking through the records.
Q That's says Number 122 on it. Did you start at some particular time, 1980 or.....
A Started at one back in -- We put these into effect roughly '83, '84 when I first came on board as supervisor.
Q Okay, and then you maintain a binder here in Anchorage of these. Are they available in other offices of the Department?
A Yes, each of our office has copies of the opinion letter themselves. The backup documentation is not always attached to the copies that are sent to the field offices. If it's a very unique question or the facts are rather unique and it's -- we think it's instructive to staff, we may attach the back-up. But in most cases we don't.
Q Okay, would the WHOLS as you describe them be available in Fairbanks?
A Yes.
Q And who would the contact be there?
A Ms. Monte Jordan.
Q Okay, I take it -- well, I
A I believe -- oh, by the way, I believe the index for all of these is available on line on our web page.

Page 20

Q Okay, and why don't you.....
A But not the documents themselves but the index.
Q Why don't you recite that for us slowly, if you would? If you can.
A All right, I'm not sure I can give you the syntax, but I can tell you how to get there. Www.labor.state.ak.us. That should bring up the Department of Labor home page. From there there is a pick for divisions, and you would select the labor standards and safety division. Within the division home page there is a pick for sections -- actually there are paragraphs and each paragraph has a hypertext titling for the sections, and wage and hour administration is the section you would pick. Within that page then when that comes up there should be a pick list on the left-hand side that has a variety of things dealing with programs, and I believe on the left-hand side of that page, although I'm not positive, but I think it's on the left-hand side of that page there's an index selection for WHOLS, W-H-O-Ls, PCOLS, P-C-O-Ls, and WHPLS, W-H-P-Ls.
Q All right, and then how many from number one to number what do we go, roughly speaking, with WHOLS these days?
A I think we're probably up in the 130, 140 range on WHOLS, probably 180 to 190 in WHPLS, and something less than that in public contract opinion letters.
Q And when you call these up on the web, then, is the job --

Page 21

when you -- let me be more clear. When you call up the WHOLS on the web in the index, are the job descriptions mentioned somehow or listed in the index?
A They generally are because that's the only thing that makes sense in terms of a reference. If someone wanted to -- was asking about a materials supervisor then it would generally be something like APC materials supervisor. But unfortunately, since I've had six secretaries in that 20 years, and they've been primarily responsible for doing the index, I can't swear that it's always going to be a sensible relationship to the document.
Q Do you ever suggest to -- well, okay. When you do a formal opinion letter do you think it's reasonable for an employer to rely upon that determination in paying an employee as exempt or nonexempt?
A A formal opinion letter such as WHOL 122?
Q Sure.
A Yes. I fact, I think that's the type of document that the legislature was -- had in mind when they wrote the expanded language dealing with liquidated damages here about four years ago. And they -- they specifically indicated that there would be a good faith consideration in liquidated damages, and if an employer could make a good faith showing that they acted upon some advice from the Department of Labor, this being an excellent way of

Page 22

showing that, that they could be held not liable for liquidated damages if they were in fact found guilty of an overtime violation. As opposed to certainly the opposite end of the continuum, which is not bothering to ask, just thinking, well, that was our understanding of the law. And I remember the context of some of the testimony in the legislature when they were considering that legislation. and those were the two ends of the continuum they were looking at, and certainly an opinion, formal opinion from the Department of Labor was something they thought would be satisfactory in terms of mounting an adequate defense.
Q What involvement did you have in that good faith defense being adopted, as you said, approximately.....
A Not a great deal at that point, that was handled almost primarily by the commissioner at that time.
Q Okay, based on your testimony, obviously you had an opportunity to listen in to some testimony?
A Oh, yes, I listened in to be able to answer questions from the legislators if they had them during the various hearings.
Q So were you available as a resource for the legislatures during the course of the hearings? Or were you expecting phone calls or something?
A It happened both ways -- or, it happens both ways, and I can't recall now whether in that particular case --