## Page 23

1  because they didn't always make the hearings available by
2  teleconference. If they were available by teleconference
3  I was generally available as a resource. If they were
4  not, I was on hand should someone have a question to call
5  about.
6 Q  All right, you work out of Anchorage, right?
7 A  Correct.
8 Q  You get lots of phone calls from Juneau?
9 A  Less and less these days.
10 Q  All right. Would it be reasonably for an employer to --
11  Well, is there such a thing as a nonwritten wage and hour
12  opinion concerning exempt and nonexempt status for
13  overtime?
14 A  It's possible to call up, I suppose, and talk with an
15  investigator, or even myself, kind of colloquially about a
16  circumstance. And it happens very frequently. I'll get
17  calls from attorneys that say, well, this is what I have
18  and I'd just like to feel you out and find out what you
19  think about this before I go to the problem of writing a
20  letter and charging my client for the time, so let me know
21  what you think. And we'll discuss it and bounce things
22  back and forth and I'll -- they'll play what if, and I'll
23  say if then, and -- and at the end of the conversation
24  they usually say, well, let me think about it, or, I'll
25  write you a letter and we'll reduce this to writing 'cause

## Page 24

1  I think I want a formal opinion letter on this. Or
2  they'll say, well, let me talk to my client and see if
3  they want a formal opinion letter on this.
4 Q  Okay, so not meaning to be obstreperous here, but then is
5  the answer to my question, yes, there is an opinion other
6  than a written opinion?
7 A  Well, I guess I didn't complete my answer. I would not --
8  and try to convey to whoever I'm talking to that that
9  verbal discourse is not a formal Department opinion
10  because until I see the facts as they're going to
11  represent them to me in writing, anything I say is nothing
12  more than just theoretical.
13 Q  Okay. Turning to this particular case here, first of all,
14  just so you understand, I think you do, but the materials
15  supervisor isn't the job in question here, it's a position
16  called safety specialist. Do you recollect in this time
17  frame of whatever it is, June of '96, having -- or,
18  rendering what might be called an oral opinion concerning
19  a safety specialist position to Mr. Mark Nelson?
20 A  No, I'm sorry. I deal with hundreds of calls a year and a
21  lot of them deal with this kind of issue because the --
22  the opinion letters are almost solely my domain. So I --
23  I certainly don't recall a conversation of that nature.
24 Q  Okay. Would it be reasonable for an employer to rely upon
25  a what might be called oral opinion from you in saying a

## Page 25

1  position is or isn't exempt and then pay the employee
2  accordingly?
3  MR. YOUNGMUN: Object, calls for a legal conclusion.
4 Q  You can go ahead and answer.
5 A  I think it would be at some risk to do so, which is why we
6  try to make it very clear when we have -- both me and my
7  staff, when we have these conversations that, you know,
8  this is only based on what we're talking about and right
9  now we're just talking 'cause I don't know what the facts
10  are. And I won't give you a formal opinion. My practice
11  is to say I won't give you a formal opinion until I see it
12  in writing. Because I've had instances where people have
13  turned around and I hear it coming back at me years later,
14  well, so and so told me that this was so. Well, I may
15  have told you that, but my recollection of the facts or my
16  notes indicate that they're not the facts that we have
17  before us today. So in some circumstances where I've
18  been, I feel, misquoted or quoted out of context in
19  discussions of these natures, it's been my practice to
20  say, you know, if you want it in writing, if you want to
21  formalize this opinion to have something -- particularly
22  since the amendment to the liquidated damages statute. If
23  you want to have something that you can take to court and
24  use as a defense, then it'll only be a formal opinion
25  letter and you only get that when you put in writing and

## Page 26

1  give me your facts.
2 Q  Okay. Does the Department of Labor from time to time do
3  workshops for employee -- employers?
4 A  Yes.
5 Q  All right, are some of the issues addressed there exempt/
6  nonexempt status?
7 A  Yes.
8 Q  Okay, and do you conduct those?
9 A  I do, and some members of my staff do.
10 Q  Okay, do you ever suggest to employers who are seeking
11  wage and hour opinions that they seek the advice of legal
12  counsel?
13 A  Yes.
14 Q  Is that something you do regularly?
15 A  Yeah, i think that's generally a part of our patter, along
16  with saying if you want -- if you have a situation that
17  you want formal -- a formal opinion from the Department
18  on, this is how you go about getting it. And other
19  circumstance -- it depends upon how the question is posed,
20  but very frequently I will refer people to legal counsel,
21  advise them to find a good competent employment law
22  attorney.
23 Q  Okay. Your prior testimony indicated that you wanted to
24  have writings from the employer describing the job in
25  order to do a WHDL. Do you require the employer to give

## Page 27

1  you some type of verity to that? In other words, give you
2  a sworn statement saying this is what the job and the job
3  duties?
4  A  No. Our opinion is -- that's why our opinions in writing
5  are based on those documents. And if they -- they turn
6  out to be wrong, it's their problem to deal with because
7  we're asking them for facts.
8  Q  Okay. Do you have any written guidelines as to how each
9  letter inquiry about wage and hour classification is
10  supposed to be researched issue -- researched and then
11  issued?
12  A  No.
13  Q  And who can ask for a wage and hour opinion letter?
14  A  Anybody can, an attorney, an employer, an employee.
15  Q  Union?
16  A  Union.
17  Q  Schoolkid?
18  A  (Witness nods affirmatively)
19  Q  And when you or -- and/or others who may do this, draft
20  these WHOLs, do they confer regularly or ever with an
21  attorney general in the Department of Law?
22  A  Occasionally, if it's an issue that we may not have --
23  have had any history with, or if it's an issue dealing
24  with a new variation of the law, either through a court
25  interpretation or perhaps a newly written statute.

## Page 28

1  Q  Does the attorney -- are you familiar with attorney
2  general opinions?
3  A  Yes.
4  Q  Does the attorney general ever issue opinions that concern
5  Department of -- well, in a broad sense let me ask you
6  first, Department of Labor issues?
7  A  Yes.
8  Q  Okay, could you give me a couple examples?
9  A  Oh, about 1982 when the intertie was just getting started
10  between Anchorage and Fairbanks, our attorney general then
11  was -- our assistant attorney general assigned to the
12  Department was Robert Landau and he issued a lengthy
13  opinion on the coverage of Title 36, which is the public
14  contracts law, to that particular project.
15  Q  Okay, are there any that you're aware that deal with
16  exemption issues?
17  A  I'm not aware of any formal attorney general opinions that
18  are numbered and archived in the AG's office that deal
19  with those issues, but we have received memoranda over the
20  years. My file of attorney general opinions goes --
21  contains documents back to the '60s. And I know that
22  we've received informal advice in the form of memoranda
23  that we colloquially in the office refer to as AG
24  opinions, but they're not issued over the AG's signature.
25  the Attorney General signatures. They're a memorandum

## Page 29

1  from an assistant AG saying such and so would be the case.
2  And I know we have received issue -- opinions on those on
3  occasion. One that comes to mind dealt with helicopter
4  pilots and the professional exemptions.
5  Q  Is it Dahoff v. Tactical Helicopter (ph)?
6  A  Actually it precedes Dahoff by about 10 years.
7  Q  And those opinions are internal to the Department, then,
8  or are they available somehow, if you know?
9  A  A little bit of yes on both of those, but some have been
10  fashioned as attorney/client privilege and so would not be
11  generally available to the public.
12  Q  As far as being available to an individual or company to
13  rely upon as authority for their action in regarding
14  asserting a position to be exempt or nonexempt, which
15  carries more weight, an attorney general opinion or a
16  WHOL?
17  A  If you had two existing.....
18  MR. YOUNGMUN: Just pose an objection that it calls for
19  speculation and a legal conclusion.
20  Q  Okay, you can answer.
21  A  If you had two existing at the same time on the same
22  subject, one from the AG's office to us and one from us to
23  an employer, there would have to be a reason for the
24  difference in the opinions. If -- if we had received an
25  AG opinion that said in our opinion this position is not

## Page 30

1  exempt, and the Department after receipt of that and
2  knowledge of that issued an opinion saying in our belief
3  it is exempt and here's an opinion letter -- and, by the
4  way, I don't know if that circumstance ever occurred --
5  there would've been a policy call made at a desk higher
6  than mine.
7  Q  Okay, let me ask you this question. If you have an
8  attorney general opinion saying this particular position
9  is exempt and then an employer inquires of you concerning
10  that position, is it your policy to follow the attorney
11  general's decision?
12  A  Absent some guidance otherwise from my superiors, yes,
13  that would be the case.
14  Q  As far as the availability of these resource documents
15  we've been talking about, if they're available to the
16  public are they listed on the web?
17  A  No.
18  Q  They're generally not?
19  A  No, what I refer to when I use the term AG opinions is
20  actually a body of documents that's everything -- that
21  includes everything from what preceded the modern-day wage
22  and hour policy letter, policy letters from management
23  above my level in the 20 years before I came to the
24  Department that were gathered together when we started
25  maintaining some reference documents to informal AG

Page 31

1   advisory memos as I've discussed to formal numbered AG
2   opinions over the Attorney General's signature to court
3   decisions. And the court decisions could be U. S. Supreme
4   Court, State Supreme Court, Federal District Court,
5   depending upon the type of issue that has come up. So
6   it's a rather -- I think there's three three-inch binders
7   of this stuff that's been maintained chronologically by
8   year, and it -- mostly it's internal reference and
9   historical reference to see where we were and are we still
10  there or if we're not there any longer why has it changed.
11 Q Have you ever testified in court regarding issues
12  concerning wage and hour?
13 A Yes.
14 Q All right, how many times? Roughly.
15 A Half a dozen.
16 Q And have you -- and doing that have you ever been
17  qualified as an expert witness?
18 A Yes.
19 Q And in regard to what issues?
20 A Interpretation of wage and hour law and regulations and
21  application of those to a given set of facts.
22 Q And can you name some of the case names and judges, if you
23  have some?
24 A I believe -- I testified in a case before Judge -- then
25  Judge Fabe that involved a travel agency on the North

Page 32

1   Slope, and the name of the company was an acronym of
2   letters that doesn't make any sense to me, but it was like
3   PNWC, I think, or something like that. And they were the
4   defendant in an overtime case. I believe I testified in a
5   case involving Delta Western out in the Aleutian Chain,
6   Unalaska. I testified -- no, I did not testify. I was
7   excused by the judge in the Barrios case on the North
8   Slope, B-A-R-R-I-O-S, which eventually went to the Supreme
9   Court. I was qualified as an expert witness but the
10  questions that were being posed were objected to in the
11  terms of asking me to make a conclusion of law and the
12  judge determined that he could do that himself without my
13  help, thank you.
14 Q As judges will do.
15 A Oh, yes, they're aggravating when they do that. Those are
16  three that come to mind. I know that there have been
17  others.
18 Q Okay, do you know if the trial -- like the Delta Western
19  case, do you know if that was an Anchorage case as opposed
20  to a Bethel case?
21 A I believe Delta Western was Anchorage.
22 Q All right, and do you know if State or federal court?
23 A State.
24 Q And then the Barrios case was?
25 A State court. Anchorage.

Page 33

1 Q Anchorage.
2 A All of those were Anchorage court cases.
3 Q Okay, in regard to any conversation you might have had
4   with Mark Nelson back in 1996 or thereabouts.....
5 A '97?
6 Q '97, if be did speak -- I'm going to withdraw that
7   question.
8   MR. COVELL: Why don't we go off record for just a second,
9   I think I'm done, and then Mr. Youngman likely will have some
10  questions for you.
11       (OFF THE RECORD)
12       (ON THE RECORD)
13 Q In regard to your -- the June 25th letter from Mr. Nelson
14  to you -- let me withdraw that. You have the June 25th
15  letter, the June 19th letter and your letter of June 25.
16 A 26.
17 Q 26, thank -- well, dictated June 25.....
18 A Dictated on the 25th.
19 Q .....I'm sorry. And, okay, and there's the June 26th.
20  Okay, well, that may answer my question right there. If -
21  - What I'm trying to ascertain is if you can tell me by
22  looking at the documents if your letter of June 25/26 is
23  in response to both his June 19 and June 25 letter or not?
24 A It probably is, and the reason I say that is in reviewing
25  the documents, and particularly my response to the June 19

Page 3..

1   letter, I can see what more than likely happened here was
2   that he was asking a question about a really craftily
3   unique area of the law in the supervisory exemption, and I
4   knew he wanted to find out about the exempt status but I
5   was not sure that he understood the implications with
6   regard to all hours worked. So I -- I believe that I
7   called him, initiated a phone call, discussed those
8   issues, asked some more questions, explained exactly what
9   the differences were and what the pitfalls were here, and
10  as a result of that call he then faxed over the June 25th
11  letter, which means I probably called him early in the
12  morning on the 25th, this was sent over on -- 9:30 on the
13  25th, and upon receipt of that later that I day I dictated
14  the letter that we have as wage and hour opinion letter
15  122.
16 Q Okay, and looking at the fax imprint on top of the June
17  25th letter, you -- that indicates it's sent at 10:34 on
18  the -- June 25, '97?
19 A Correct.
20 Q And then which one of these two letters -- excuse me, the
21  June 19 letter was the one with the attachments, is that
22  right?
23 A Correct.
24 Q Okay. And then so it makes sense, then, at the conclusion
25  of your conversation on the morning of the 25th you would

Page 35

1  dictate your June 26 letter while it's fresh in your mind?

2  A  Yes.

3  MR. COVELL: That's all I have.

4  MR. YOUNGMUN: Could we take about a five-minute break?

5  MR. YOUNGMUN: Sure.

6       (OFF THE RECORD)

7       (ON THE RECORD)

8  BY MR. COVELL:

9  Q  Good morning, Mr. Carr, my name is Greg Youngmun, I

10     represent APC Natchiq in this case, and I just have some

11     follow-up questions. You indicated in your testimony that

12     you frequently -- you or other staff members in your

13     office would frequently give out oral opinions on whether

14     or not a particular position was exempt or nonexempt, is

15     that right?

16  A  To make that absolutely accurate -- I may have said, but

17     what I want to convey here is I have three regional

18     offices and depending upon where the call comes in,

19     whoever takes that call will talk to people and answer

20     their questions and give a little repartee back and forth

21     about this is what the law requires and if you have this

22     then that might be the case, but to my knowledge all of my

23     field folks are going to say "but if you want a formal

24     opinion from the Department you need to put it in writing

25     and send it to Randy Carr."

Page 36

1  Q  I understand that's the process if you want a formal

2     opinion, but if I understand your testimony you indicated

3     that you yourself would frequent provide an oral opinion

4     on the exempt status of a particular position, is that

5     right?

6  A  Um-hm.

7  Q  Now, when you would provide an oral opinion to an employer

8     on the exempt status of a particular position, would you

9     keep any written record or notes of that discussion?

10  A  No.

11  Q  Do you know whether any of your staff members would keep

12     notes of a discussion where they rendered an oral opinion

13     on the exempt status of a particular position?

14  A  I don't think they would, 'cause I don't think my staff

15     would really characterize it as an opinion. You know, I

16     think there would always be that caveat, "that sounds like

17     it might be, but".

18  Q  Okay, now, do you know Mark Nelson?

19  A  I've met him again today and he represents that we've met

20     before, but I -- I don't recall.

21  Q  Do you have any recollection of any telephone discussions

22     with Mr. Nelson?

23  A  No specific recollections. I can -- as I testified

24     earlier, I believe I can reconstruct that we had some

25     telephone conversations relative to this -- these

Page 37

1  documents before us today, but I don't recall the

2  conversation verbatim by any stretch of the imagination.

3  Q  Okay, so you don't have any specific recollection of

4     telephone discussions with Mr. Nelson about this materials

5     supervisor position which is the subject of the Exhibits

6     to your deposition?

7  A  Other than I know that we -- that I would've called him

8     because the uniqueness of the supervisory position and the

9     issues that his inquiry presented would've given me enough

10     concern that I wanted to talk with him and make sure he

11     understood the other obligations outside of the overtime

12     implications for his letter.

13  Q  But you don't have any specific recollection of that

14     discussion?

15  A  No.

16  Q  And I think you indicated that you don't have a

17     recollection of any discussions with Mr. Nelson relating

18     to a safety specialist position back in this spring or

19     summer of 1997, is that right?

20  A  No, I don't recall any conversation like that.

21  Q  It's possible that you did, but you just don't recall?

22  A  That's correct.

23  Q  And if Mr. Nelson were to testify that he had a discussion

24     with you about a variety of positions including the safety

25     specialist position, would you have any reason to doubt

Page 38

1  his testimony?

2  A  No.

3  Q  You indicated that these formal opinion letters were --

4     or, was one good way of showing this good faith defense,

5     as I recall. What other ways -- what other things or what

6     other ways can an employer demonstrate this good faith

7     defense, in your opinion?

8  A  Of course this is only my opinion, it's not necessarily

9     sure about those five people that wear the black robes and

10     make the big decisions, but if I were brainstorming with

11     someone I would say, well, if you had an opinion from the

12     U. S. Department of Labor that might be useful, although

13     their definitions are different than ours. So it depends

14     upon to some extent what forum the allegations are coming

15     in. Trying to remember the exact testimony with regard to

16     the changes in the liquidated damages statute. It seemed

17     to me that the primary concern was that they wanted to

18     somehow overcome what was -- the perception that a lot of

19     employers would simply say, "well, I didn't know" and try

20     and assert that as an affirmative defense for good faith.

21     And that the best and probably the only substantive way of

22     proving that you in fact have exercised good faith was to

23     show that you had consulted the enforcement authority.

24  Q  And when you say consulted with the enforcement authority,

25     what do you mean by that?

## Page 39

1 A    In some manner that the facts of the particular situation
2      had been conveyed to, in this case, the Department of
3      Labor, the State Department of Labor, and an opinion
4      rendered by the State Department of Labor that was then
5      relied upon and found later by the court to be incorrect.
6 Q    Would this include any oral opinions that you may have
7      rendered or that somebody in your office may have
8      rendered?
9 A    My recollection of the testimony was that the -- and
10     again, this was not my testimony but I was present at the
11     hearings, or present at the telecommunication conferences
12     for the hearings, and I believe there was an attorney
13     there -- I'll think of his name as I'm talking here.
14     There was an attorney who was testifying as to this issue
15     and my recollection was that he was pointing out to the
16     committee that the Department of Labor issued formal
17     written wage and hour opinions to anyone who -- who
18     required them if they would simply go through this
19     process, and that that would be an excellent method of
20     establishing that they've gone through the steps to show
21     that they were trying to do what was right,
22 Q    Are there other steps an employer can go through.....
23 A    I suppose they can contact an attorney and they could get
24     the attorney to write them an opinion. That's untested
25     yet as far as I know as to whether the court would find

## Page 40

1      that to be good faith.
2 Q    Any other thing -- Any other ways or things that you can
3      think of that would be prudent for an employer to do to
4      determine whether or not a position is exempt or
5      nonexempt?
6 A    Well, certainly I suppose it goes without saying that just
7      to simply ask the Department of Labor in a conversational
8      manner, a telephone call, here's what I've got, what do
9      you think, but the problem that I see that presenting is
10     apparently what's before us here today is that when
11     everything's oral there are -- there's no promises that
12     that's going to be binding. The Department certainly
13     would not feel bound by incorrect or incomplete or
14     inaccurate advice given by one of our staff to a set of
15     facts that may or may not be proven to be accurate later
16     on down the road. If a case came forward, a claim were
17     filed with us, we would pursue it unless we had an opinion
18     on those facts in writing that said this -- this is in
19     fact what the Department's opinion is. And then we would
20     have to make sure that the -- of course, the status of the
21     law hadn't changed. That's one of the serious flaws with
22     the opinion letter system and one that we recognized when
23     we initiated it was that it only establishes that snapshot
24     in time, and as soon as these documents start becoming
25     formalized and become available to the public, someone

## Page 41

1      who's not doing due diligence can grab an opinion letter
2      from six years ago and say, well, this is the Department's
3      opinion, I'm relying on this, without bringing it forward
4      and shepherdizing it, if you will, with the Department's
5      records to insure that it's still an accurate opinion
6      today. And that's -- that's a concern, we've been
7      more or less compelled to make them available, they are
8      public records. Have to make them available to the public
9      but we try at every corner to assure that whoever's
10     accessing them has that caveat that you need to make sure
11     that what you're relying on is the current status of the
12     law or the current opinion.
13 Q   Now, correct me if I'm wrong, but it's my understanding
14     that these -- these opinion letters might ultimately turn
15     out not to be true, is that right?
16 A   It could be. An example that comes to mind is -- I'm not
17     positive but I wouldn't be at all surprised to find a few
18     opinion letters in the early records dealing with return
19     transportation costs. The Department had a policy and a
20     position with regard to what all was incorporated into
21     calculating return transportation costs, and in the early
22     '80s, about 1983, 1984, those aforementioned five people
23     that wear the black robes disagreed with the Department's
24     opinion and issued a court decision, the finding, in fact,
25     what those costs -- or, what the transportation costs are,

## Page 42

1      which was substantially different than what the
2      Department's previous posture had been.
3 Q    Okay, but in terms of whether these opinion letters are
4      legally binding, a court could determine that the opinion
5      letter was legally incorrect, is that right?
6 A    Yes, absolutely.
7 Q    And so these opinion letters are given as guidance to
8      employers who would request an opinion from the Department
9      of Labor, correct?
10 A   And they are -- they are given with the understanding that
11     this is the Department of Labor's position on this issue.
12     If this fact pattern came before us we would or would not
13     act on it based on these facts. This is how we would act.
14 Q   So if the Department of Labor, either you or somebody in
15     your office, gave either a formal written opinion or gave
16     an oral opinion which an employer relied upon to make its
17     decision whether a position was exempt or nonexempt, that
18     didn't necessarily mean that ultimately that position was
19     exempt or nonexempt if it was determined otherwise by the
20     court, right?
21 A   That's correct.
22 Q   So if I understand when -- if I understand your testimony,
23     then, one way to show good faith is to call your office
24     and ask you about a particular position as to whether it's
25     exempt or nonexempt, right?

Page 43

1 A    That would be a -- that would be the very minimum, I would
2      think. And again, so far that level of good faith
3      argument hasn't been tested in the courts, to my
4      knowledge.
5 Q    But you think it'd be prudent -- If an employer had a
6      question about whether or not a particular position was
7      exempt or nonexempt, it would be reasonable and prudent
8      for an employer to contact your office to ask.....
9 A    Yes.
10 Q    .....don't you think?
11 A    Yes.
12 Q    Would it be reasonable and prudent for the employer to
13      review federal and State regulations that define the
14      exempt status to determine whether or not a particular
15      position is exempt or nonexempt?
16 A    It would be instructive to do both, although in most cases
17      dealing with the white collar exemptions the State
18      regulations are going to provide a more stringent
19      requirement than the federal requirement. So to the
20      extent that they would expand their understanding of how
21      the exemption works, looking at the federal guidelines
22      would be useful. But not necessarily -- in State court,
23      at least, or under State law not necessarily
24      determinative.
25 Q    Okay, but you would agree, then, that it would be prudent

Page 44

1      for -- reasonable and prudent for an employer to consult
2      with State regulations on whether or not a particular
3      position was exempt or nonexempt in Alaska?
4 A    Yes.
5 Q    Would it also be prudent for an employer to consult with
6      legal and other resources regarding wage and hour
7      compliance?
8 A    Absolutely.
9 Q    Would it also be prudent for an employer to review the job
10      description for a particular position in determining
11      whether or not a position is exempt or nonexempt?
12 A    Yes.
13 Q    Would it also be reasonable and prudent for an employer to
14      talk to people out in the field that are actually either
15      performing or observing the performance of duties with
16      regard to determining whether or not a particular position
17      is exempt or nonexempt?
18 A    That would be necessary.
19 Q    I was going to ask you about one of the Exhibits.
20      MR. YOUNGMUN: I'm looking for the.....
21      MR. COVELL: There's a whole clean set here.
22      MR. YOUNGMUN: Okay.
23      MR. COVELL: Came into play.
24      MR. YOUNGMUN: My mind was starting to play tricks on me.
25 Q    Okay, I think this is part of Exhibit 4. Mr. Covell asked

Page 45

1      you if you had recognized what appears to be a test for
2      exemption of employees from the provisions of the Fair
3      Labor Standards Act for materials supervisors. That
4      appears to be a form of a checklist, is that right?
5 A    Yes.
6 Q    And I think you indicated that this was a checklist based
7      on the short test under the Fair Labor Standards Act,
8      correct?
9 A    Correct. Well, long and short tests both. It contains
10      both.
11 Q    Okay, so it does contain both the long test and the short
12      test?
13 A    Correct.
14 Q    Does the State have a checklist type form that is similar
15      to this document?
16 A    No.
17 Q    And as I recall you testified that you have seen
18      checklists that are similar in format to this?
19 A    Yes.
20 Q    Just not this particular form?
21 A    I think so.
22      MR. COVELL: Just for the record, that was Exhibit 4, APC
23      150, 151 we were talking about.
24      MR. YOUNGMUN: Correct.
25 Q    I want to make sure I understand your testimony about this

Page 46

1      good faith issue. I think you indicated that after the
2      change in State law in 1999, correct me if I'm wrong, that
3      you would preface your discussions with persons seeking
4      information about the exempt status with regard to the
5      good faith defense that it would prudent to get a formal
6      opinion letter?
7 A    Actually what I said was that it was -- it's my practice
8      even prior to that time, but I was particularly sensitized
9      to it after the change in the statute, because what
10      happened, as soon as the law changed, we started getting a
11      lot more requests for opinions. We started getting a lot
12      of contacts for opinions, telephone calls and so forth.
13      And in light of the law and in light of the recent
14      testimony on the statute, it was in the forefront of my
15      mind that it'd be very crucial to employers to go through
16      the full step and get a formal opinion from the Department
17      in writing and give us everything in writing that we can
18      rule upon. But I was doing that as my general practice
19      even prior to that.
20 Q    Okay, so with regard to any discussions that you had with
21      Mr. Nelson back in 1997, at that time Alaska had not
22      adopted this good faith defense, is that right?
23 A    I'm pretty certain it wasn't in effect then, yes.
24 Q    Mr. Carr, I assume that over the years you had many, many
25      telephone calls from a variety of people regarding your

## Page 47

1  views on a particular position as to whether it's exempt
2  or nonexempt, is that right?
3  A  Yes.
4  Q  And I assume this includes discussions with attorneys?
5  A  Yes.
6  Q  On average can you give me an estimate of how many — how
7  many telephone calls a week do you field on exempt-type
8  questions?
9  A  I'd probably say it's not unusual to get three or four a
10  week.
11  Q  Three or four a week. And has that generally been the
12  case since you became the chief of labor standards?
13  A  More so earlier on. As I'm slowing starting to wind down
14  my career, I'm trying to push more of that off on my
15  subordinates to give them more exposure and training to
16  this. But as a general rule those — those sorts of
17  activity were gladly pushed uphill to me by my staff.
18  Q  So in that 1996, 1997 time frame when you first became the
19  chief, then, you would've — your recollection is that you
20  would've on an average received more telephone calls from
21  employers or attorneys than more recently?
22  A  Yes.
23  Q  So you get calls from attorneys about exempt status
24  questions?
25  A  Yes.

## Page 48

1  Q  And telephone calls from human resource people?
2  A  Yes.
3  Q  Do you get telephone calls from business managers or
4  business executives?
5  A  Yes.
6  Q  And I assume that one of your functions as the chief of
7  labor standards is to give — provide guidance and
8  education to employers about wage and hour laws, is that
9  correct?
10  A  Yes.
11  Q  And also with regard to issues that may affect the exempt
12  status of a particular position, is that also true?
13  A  That's one of the components of our overall body of wage
14  and hour laws, yes.
15  Q  And so do you — would you agree that one of your roles as
16  the chief of labor standards is to coach employers on wage
17  and hour practices?
18  A  I've not ever really thought of it that way. I guess it
19  could be characterized in that manner, yes.
20  Q  Okay. And in fact when you talk to employers who may have
21  questions about whether a position is exempt or nonexempt
22  do you not try to extract information from employers when
23  they're asking you questions about the exempt status?
24  A  Yes, I do.
25  Q  And if there's a gray area — when you talk to an employer

## Page 49

1  and there's a gray area about whether a particular
2  position is exempt or nonexempt what types of information
3  would you ask for?
4  A  Usually what's proffered at the beginning is some
5  variation of the job description, which I tell folks that
6  we like to see job descriptions because we enjoy reading
7  fiction, but what we need is, from someone on the ground,
8  a detailed explanation of what that job description really
9  means, and broken down by duty, and then those duties
10  broken down by time. Particularly important in the white
11  collar exemptions because of the time element tests.
12  Q  And would it be common to have -- to obtain this type of
13  information by telephone in discussions with the....
14  A  No.
15  Q  ....employer?
16  A  No, when we get into the breaking things down by time, I
17  -- I will not issue any sort of an opinion on -- well, to
18  my recollection I don't think I've ever had a case where
19  people could tell me on telephone how much time they spend
20  doing this or how much time they spend doing that. They
21  might hypothesize, let's assume that they're spending 60%
22  of their time doing this. Well, if in fact they are then
23  you would meet the standard if it were a retail or service
24  establishment, for example, where you wouldn't meet the
25  standard if it wasn't a retail or service establishment

## Page 50

1  and you were looking at, say, the administrative
2  exemption. And we can talk about what ifs and if thens,
3  but it's purely theoretical at that point.
4  Q  Okay, and then if you were asked to render a formal
5  opinion letter, then you would -- you would follow that up
6  with a request in writing?
7  A  Yes.
8  Q  With a breakdown of times and duties, correct?
9  A  Yes.
10  Q  Would it be fair to say that sometimes job descriptions
11  don't mean anything in terms of determining whether or not
12  a position is exempt or nonexempt?
13  A  I've found that the job description sometimes has very
14  little relationship to the actual duties being performed.
15  Q  And those would be the occasions where you would follow up
16  with the employer and ask for additional information about
17  what was actually being done on the job?
18  A  Yes.
19  Q  Do you do -- I assume that you do training of staff with
20  the Department of Labor internally?
21  A  Yes.
22  Q  And do you also provide training or educational
23  opportunities for employers in an external setting?
24  A  Yes.
25  Q  Can you give me some examples of where you might provide