

# PAYROLL LEGAL Alert

ALEXANDER HAMILTON-INSTITUTE INCORPORATED

## TAXES AND COMPLIANCE

### High Court Takes 'Payroll' Route for Title VII

You've always known "payroll" as an activity — whether you modem numbers to a service bureau or actually withhold taxes, cut paychecks, and file tax returns. But according to a U.S. Supreme Court decision, payroll is now a measurement as well — how you count employees to comply with Title VII of the Civil Rights Act of 1964. *Impact:* Your record-keeping burden may increase as Personnel taps Payroll for more detailed head counts. [*Walters v. Metropolitan Educational Enterprises, Inc.*, U.S. S.Ct., No. 95-259 (1997).]

**Numbers game.** An employee sued for retaliatory discharge after she was fired for filing a sex discrimination charge against her employer. *Employer's defense:* The company didn't come under Title VII because it didn't meet the law's threshold: whether an employer has at least 15 employees on each working day in 20 or more weeks in the current or preceding year.

➲**COUNTING METHODS:** This employer used a Title VII counting method called the day-to-day method. This method counts all exempt employees, whether or not they're at work on any day. But it counts non-exempts only if they're actually at work or on paid leave. A competing counting method, the payroll method, counts all active employees on the payroll, regardless of their status or whether they're working on any given day.

**Payroll method: easiest and fairest.** Using the day-to-day method, a federal appeals court upheld the dismissal of the employee's case. The High Court reversed, ruling that the payroll method comes closest to Title VII's intent that all workers with an ongoing employment relationship be counted, even if they don't work on some days. *Court:* Under the payroll method, all one needs to know to count an employee for the 20-week test is whether he/she started or ended employment during that year and, if so, when.

➲**BEYOND TITLE VII:** This case covers Title VII. But other laws, including the Family and Medical Leave Act, the Age Discrimination in Employment Act, and the Americans with Disabilities Act, have similar counting requirements. And it's unlikely that the High Court would sanction a different counting method. *Result:* Only the smallest employers are now exempt from Title VII, and would be exempt from these other laws. ✦

### Damage Control — IRS Rules Discrimination Awards Are Taxable

It's not bad enough that a discrimination claim against your company could make it liable for back pay and damages for emotional distress. Now you have to worry about handling it correctly from a tax standpoint, so you don't land in hot water with the IRS. And it hasn't always been easy knowing how the IRS would rule. *Confusion reigns:* While it had

## IN THIS ISSUE

| | |
|---|---|
| High Court Takes Payroll Route for Title VII...........................1 | Flexing Your Pay Policy Won't Muscle Out Exempt Status..........5 |
| Damage Control — IRS Rules Discrimination Awards Are Taxable.........................1 | When Clocks Spring Forward, Make Sure Employees Do Too.....5 |
| W-2s: In the News Again...........................2 | Benefits Report Card: Employers Get Failing Grades.................5 |
| It's March! Do You Know Where Your Corrected W-2s Are?........3 | Are You Experienced? Check These State Unemployment Rates...6 |
| If the Check's in the Mail, Don't Withhold...Yet.......................4 | Auditing Your 401(k) Plan Makes Dollars and Sense...................6 |
| More Ex-Workers Join The Severance Pay Fray.........................4 | Employer's Business All-States Chart on ¶ |

ruled in 1993 that these awards weren't taxable, it changed its mind nearly two years ago, and put the issue on hold. Further complicating the tax picture is last year's Small Business Job Protection Act (SBJPA), which changed the definition of tax-free damages. *Final words*: The IRS has settled the issue by ruling that both back pay and damages are taxable. [Rev. Rul. 96-65, IRB 1996-53.]

**Taxable, yes, but subject to withholding?** According to the ruling, back pay issued to satisfy an employee's claim that he/she was denied a promotion due to disparate treatment employment discrimination under Title VII is both taxable and subject to income tax withholding, FICA, and FUTA.

But whether damages for emotional distress arising from the same Title VII claim are subject to FICA and FUTA is a stickier issue. Under the SBJPA, damages are excludable from gross income only in cases of physical injury or sickness. And emotional distress alone isn't considered an injury. *Taxing result*: Damages for emotional distress alone (i.e., without damages for medical care resulting from the distress), are includable in an employee's gross income, but *aren't* subject to income tax withholding, FICA, and FUTA. *W-2 result*: These damages are shown only in Box 1 of the employee's W-2.

**Allocate properly.** The IRS told PAYLA that damages for emotional distress aren't subject to income tax withholding, FICA, and FUTA, *provided* the entire damage award or settlement is properly allocated between back pay and damages. The IRS, of course, reserves the right to reallocate awards which it deems unreasonable. *Beware*: Absolutely no authority defines "reasonable" in this context.



➤ **WHAT'S A PAYROLL PERSON TO DO?** First make the top brass in your company aware of this new IRS position, since it may influence how they handle these Title VII claims. And while you probably won't be involved in the litigation or settlement discussions, you *must* be involved in the allocation decision, since these awards have a definite impact on payroll. ◆

## W-2s: In the News Again

It's never too early in the year for the IRS and the Social Security Administration (SSA) to issue W-2 news. With that in mind, here are the latest pronouncements you need to know from both agencies.

**1. Automatic extensions for final W-2s.** Last year, the IRS issued regulations for filing final W-2s if you go out of business. Under these regs, beginning this year, you must give employees their final W-2s when you file your final 941 form (forms are filed quarterly on April 30, July 31, October 31, and January 31). Final W-2s and a W-3 form must then be filed with the SSA one month after your final 941 is filed.

In requiring you to file final W-2s on this expedited basis, the IRS recognized that magnetic media filers would have a computer programming problem if forms were due before the year's mag media specifications were released. *Solution*: The regs provide for an automatic extension of time, so computers can be adjusted to the year's specs. The extension also applies to the time you have for giving employees their final W-2s.

The IRS has ruled that for mag media filers, the deadline for providing employees with forms under the automatic extension is October 31 of the year final forms are due. The SSA filing deadline is November 30. [Rev. Proc. 96-57, IRB 1996-53.]

➤ **FOURTH-QUARTER FINALS:** If you must provide expedited W-2s during the fourth calendar quarter of a year, follow the regular W-2 rules: Provide employees with their copies by January 31 of the next year and file with the SSA by the last business day of February.

**2. W-2s, W-4s, and 941s when a business is sold.** If you buy a business
FICA and FUTA dollars b[y]
which allows you, as th[e]

# Alaska EMPLOYMENT Law Letter

A monthly newsletter designed exclusively for Alaska employers

Thomas M. Daniel, Katherine C. Tank, Helena L. Hall, Editors

Vol. 2, No. 12
December 1997

## WAGE AND HOUR

## Ninth Circuit approves overtime pay for exempt employees

*In the last few years, employers have been confronted with various rulings that underline how carefully they must administer pay practices to avoid jeopardizing the overtime exemption applicable to salaried professional, administrative, and technical employees.*

*In a recent decision that will be reassuring to many employers, the United States Court of Appeals for the Ninth Circuit (which includes Alaska) has clarified that employees who are exempt from overtime requirements under the Fair Labor Standards Act (FLSA) may be paid hourly overtime pay in addition to a fixed salary without destroying their exempt status. The court rejected as "dictum" (non-binding) language from an earlier case, Abshire v. County of Kern, 908 F.2d 483 (9th Cir. 1990), that had previously cast doubt on the practice of paying hourly overtime compensation to exempt employees.*

### Facts of the case

Five current and former Boeing employees claimed that they were entitled to full one and one-half time overtime compensation for all hours worked in excess of 40 in a workweek. The employees included professional engineers and managers who were paid a fixed salary and also received overtime pay in some, but not all, circumstances when they worked over 40 hours in a week. The overtime pay rate was not one and one-half times the straight time rate, but rather their straight time rate plus $6.50 per hour.

In order for employees to be deemed exempt from overtime under the FLSA, they must satisfy both a "duties test" and a "salary basis test." Because the employees were professionals and managers, there was never a question that their work duties met the requirements for exemption. The employees argued, however, that the hourly overtime compensation paid to them by Boeing in certain circumstances violated the salary basis test and rendered them nonexempt employees. Nonexempt employees would be entitled to time and one-half for all hours worked in excess of 40 hours per week.

A Department of Labor (DOL) regulation provides that "a salary may consist of a predetermined amount constituting all or part of the employee's compensation. In other words, additional compensation besides a salary is not inconsistent with the salary basis of payment." 29 C.F.R. § 541.118(b) In a series of opinion letters, the DOL has interpreted this regulation to mean that hourly overtime compensation does not violate the salary basis test and, accordingly, does not destroy exempt status.

### Court's decision

The court deferred to the DOL's interpretation of 29 C.F.R. § 541.118(b) in holding that hourly overtime pay does not violate the salary basis test or convert an otherwise exempt employee into a nonexempt employee. The court also observed that "[t]he plain language of the regulation . . . supports the Secretary [of Labor]'s conclusion that overtime compensation, by itself, does not spoil exempt status."

## In this issue

| | | |
|---|---|---|
| ■ | Ninth Circuit approves overtime pay for exempt employees | 1 |
| ■ | Officers not entitled to overtime for off-duty physical training | 2 |
| ■ | Employer may enforce neutral application guidelines | 3 |
| ■ | Court expands liability for derogatory remarks | 4 |
| ■ | Court expands liability for derogatory remarks even further | 4 |
| ■ | FMLA advisory opinions | 5 |
| ■ | What's an employer to do? | 7 |

Perk

APC0205

EXHIBIT 14
Page 1 of 5

The employees also brought a claim under the Washington Minimum Wage Act (MWA). In response to a Washington Court of Appeals decision, the Washington Legislature amended the MWA in 1995 to make clear that hourly overtime pay did not destroy exempt status. The legislation specifically applied the amendment to all lawsuits filed on or after February 1, 1995.

The Boeing employees had filed their suit after February 1, 1995, and thus the only question under state law was whether the Legislature had exceeded its authority in amending the MWA. The court held that the Washington Legislature had not violated the constitutional rights of the employees by amending the MWA. Hence, the amendment was valid and extinguished the employees' claims under the MWA. *Boykin v. Boeing Co.*, ___ F.3d ___, 1997 U.S. App. LEXIS 22,277 (9th Cir. Oct. 23, 1997).

### Tips for employers

There is not a similar statutory provision under the Alaska Wage and Hour Act (AWHA) with regard to paying exempt employees overtime pay. However, because the AWHA is based on the FLSA, Alaska courts look to federal case law in interpreting the AWHA. Therefore, an Alaska court may follow this case in construing the AWHA.

Nevertheless, there are many common misunderstandings about the validity of certain pay practices for exempt employees (e.g., treatment of partial day/partial week absences, informal systems of "comp time"). You should obtain good advice before establishing pay practices for exempt employees that vary from standard payment of salary.

## WAGE AND HOUR

# Officers not entitled to overtime for off-duty physical training

*Is off-duty physical fitness training conducted by police officers in order to maintain physical fitness standards required by their employer "work" such that the employer is required to pay them overtime for the time spent so engaged?* The federal Fair Labor Standards Act (FLSA) requires covered employees to work no more than 40 hours per week without receiving one and one-half times their regular rate of pay for the overtime hours.

The key question, then, is what counts as "work." Although the question may seem simple, it can become complex when the activity is not performance of traditional on-the-job tasks, but is related to, or required for, performance of the job.

### Facts of the case

The United States Court of Appeals for the Eleventh Circuit attempted to answer this question with respect to the off-duty physical fitness training performed by members of Florida's Metro-Dade Police Department's Special Response Team (SRT). The SRT is a specialized unit of the police department whose officers are highly trained in the use of special weapons, equipment, and techniques designed to minimize the risk of harm to officers and civilians in situations involving barricaded subjects, snipers, hostages, and high-risk search and arrest warrants.

Because SRT call-outs often require extreme physical exertion, involve serious risk to human life, and can last as long as 24 hours, the SRT's standard operating procedures provide that "good physical fitness is recognized as a vital and necessary quality for individuals assigned to SRT."

Prospective SRT personnel must pass a physical fitness examination, after which they undergo rigorous cardiovascular and strength training in the SRT training school. Once they are members of the SRT, individuals are monitored to ensure that they are physically capable of performing SRT functions; individuals who fail fitness exams are subject to reassignment outside the SRT.

SRT officers rotate between two weeks on primary status, during which they train in SRT tactics and respond to calls for SRT assistance, and two weeks on warrant status, in which they serve felony arrest warrants on high-risk individuals. When on primary status, SRT officers are allotted two hours of on-duty physical fitness training each day, which they use for long-distance runs, weight-training, and calisthenics.

Prior to 1990, SRT members also were permitted to train twice a week while on duty during the warrant cycle. Since 1990, however, the SRT has not allotted any on-duty physical training time for officers on warrant status.

### District court decision

Several current and former SRT officers filed a lawsuit in federal court, claiming that they were entitled under the FLSA to overtime pay for off-duty hours spent performing physical fitness training. The district court concluded that the off-duty training was compensable work after the jury made the following factual determinations:

(1) The off-duty physical training or exercise is required or controlled by their employer.

(2) The off-duty physical training or exercise is performed predominantly for the benefit of the employer.

(3) The off-duty physical training is an integral and indispensable part of their principal activities as SRT officers.

### Judicial and statutory guidance on what equals 'work'

The Eleventh Circuit reviewed and reversed the district court's conclusion. The court first observed that because Congress did not define "work" or "employment" in the FLSA, it has been left to the courts to determine which employment-related activities are compensable. The court then reviewed the guidelines that have emerged from court opinions.

lifetime and annual dollar limits. That is, the law prohibits a health plan from setting either annual or lifetime dollar limits on plan coverage for mental health benefits *unless* the plan sets the same limits on "substantially all" medical and surgical benefits.

**MHPA vs. ADA.** Under the MHPA, the term "mental health benefits" means benefits with respect to mental health services, *as defined under the terms of the plan*. The ADA (which, as you recall, also applies to employer-provided health benefits) also allows a plan to define mental health benefits, *but*, subject to a very narrow exception, it does not permit the plan to make a disability-based distinction in the definition.

A plan term or provision is disability-based if it singles out a particular disability (*e.g.*, AIDS, schizophrenia), a discrete group of disabilities (*e.g.*, cancers, kidney diseases), or disability in general (*e.g.*, no coverage of any condition that substantially limits a major life activity).

**MHPA and NMHPA regs expected this fall.** Regulations to implement both the MHPA and the NMHPA are expected this fall. The EEOC has recommended to the DOL that those regs contain a warning that the ADA generally prohibits disability-based distinctions in employer-provided health plans as well as an explanation of disability-based criteria.

## Newborns' and Mothers' Health Protection Act vs. Title VII

**Newborns' and Mothers' Health Protection Act.** This law generally requires employer-sponsored group health plans that provide hospitalization benefits in connection with childbirth to provide coverage for at least a minimum hospital stay after childbirth. Specifically,

- *after a normal, vaginal birth*, the plan must provide coverage for both mother and newborn for at least a 48-hour hospital stay; and
- *after a cesarean section*, the plan must provide coverage for both mother and newborn for at least a 96-hour hospital stay.

The law provides for *one exception* to the minimum stay requirement. If the attending health care provider, in consultation with the mother, decides that an earlier release for the mother and/or the newborn is appropriate, then the plan may limit its coverage to that shorter period. However, the law contains several safeguards designed to prevent plans and insurers from attempting to induce providers or mothers to agree to a stay shorter than the required minimum.

**NMHPA vs. Title VII.** Although the NMHPA does not require plans to offer hospitalization benefits in connection with childbirth, employers that sponsor health plans should know that Title VII of the federal Civil Rights Act may require such benefits. Title VII generally requires that the same plan terms and provisions that apply to costs incurred for medical conditions unrelated to pregnancy *also* apply to costs incurred for pregnancy-related conditions. Specifically, Title VII prohibits a plan from excluding hospitalization benefits for childbirth *if* the plan provides hospitalization benefits for other medical conditions.

Once again, look for the regs. The EEOC has recommended that the portion of the DOL regs dealing with the NMHPA include a cautionary statement that Title VII prohibits pregnancy discrimination in employer-provided health plans. According to the agency, this means that a plan's terms and provisions (including those related to hospital benefits) must be applied to pregnancy, childbirth, or related medical conditions on the same terms and conditions as they are applied to other conditions. ∎

ALASKA EMPLOYMENT LAW LETTER (ISSN 1085-9144) is published monthly for $137 per year for Perkins Coie by M. Lee Smith Publishers LLC, 5201 Virginia Way, P.O. Box 5094, Brentwood, TN 37024-5094, 1-800-274-6774 or custserv@mleesmith.com or http://www.mleesmith.com. Copyright 1997 M. Lee Smith Publishers LLC. Photocopying or reproducing in any form in whole or in part is a violation of federal copyright law and is strictly prohibited without the publisher's consent. Editorial inquiries should be directed to Thomas M. Daniel at Perkins Coie, 1029 West Third Avenue, Suite 300, Anchorage, AK 99501, (907) 279-8561. ALASKA EMPLOYMENT LAW LETTER is not intended to be and should not be used as a substitute for specific legal advice, since legal opinions may only be given in response to inquiries regarding specific factual situations. If legal advice is required, the services of counsel should be sought.

EXHIBIT (4
Page 3 of 3

Attachment 6 to Exhibit B
Page 24 of 24

APC021

# JOB #626

## APC JOB DESCRIPTION

### DIVISION CLASS – Safety Department

**JOB TITLE:** Safety Specialist

**SUMMARY:** The Safety Specialist works in conjunction with the Safety Supervisor to provide field support of the APC Health, Safety, and Environmental Program. This includes Permit issuance, Job Safety Auditing and Employee/Supervisor/Client relations.

**ESSENTIAL DUTIES AND RESPONSIBILITIES** include the following: Must first and foremost be able and willing to comply with the APC safety policy and the Alaska Safety Handbook. Must be willing and able to lead and educate employees in safe work ethics, practices, and behaviors. Must understand the prioritization of safety, quality, and production, and be willing to work accordingly.

The candidate must be able to conduct confined space testing for entry and permit issuance. Candidate must understanding the use of Industrial Hygiene instruments used to gather qualitative and quantitative information. Candidate must be able to use these instruments in the issuance of hot work, unit work, and confined space entries. Candidate must understand the basis for an industrial hygiene program and methods to implement the program. Candidate must have basic understanding of numerous job tasks and a working understand of how individual craft employee's safety ties into each job. Candidate must have a working knowledge of; incident review, investigation and implementation of corrective actions. Candidate must have a working knowledge of computer databases including; Microsoft Office, Windows, and be able to adapt to existing databases. The candidate must also be able to learn or have a basic understanding of Alaska Worker's Compensation law, and be able to communicate relevant injury information to management. Candidate must be able to effectively use written and verbal communication skills to convey APC/Client Safety policies and procedures. The candidate must be able to implement working solutions to aid supervision in mitigating identified hazards.

May have other duties as assigned.

**QUALIFICATION REQUIREMENTS:**

To perform this job successfully, an individual must be able to perform each essential duty satisfactory. The requirements listed below are representative of the knowledge, skill, and/or required. Reasonable accommodations may be made to enable individuals with disabilities to perform the essential functions.

**EDUCATION and/or JOB-RELATED EXPERIENCE:**

Qualifications for this position include a Bachelor's degree in a safety related field from an accredited school or an Associates degree in a safety related field and two years experience in safety. Otherwise, 8 years experience in a safety related field.

EXHIBIT 15
Page 1 of 2

Attachment 7 to Exhibit B
Page 1 of 2

**COMPREHENSION SKILLS:**

Ability to read and comprehend ARCO/BP Safety Handbook, documents and P&IDs, and other drawings. Ability to interpret OSHA, ANSI, NFPA, DOT and other safety related standards. Write routine weekly and monthly reports, complete timesheets, update progress reports and computer spreadsheets, and manage and conduct the submission of safety audits.

**MATHEMATICAL SKILLS:**

Comprehensive understanding to the level of College Algebra and basic Trigonometry.

**CERTIFICATES, LICENSES, REGISTRATION: (PRE-REQUISTIE FOR HIRE)**

A valid drivers license and MAPTS 16hr Oilfield health and safety training are required for employment in this position. OSHA requires that all foreman and supervisory personnel hold current certification in Red Cross CPR and First Aid.

**ERGONOMIC STATEMENT:**

The Arctic work environment incorporates cold-related hazards, and an employee may encounter other hazards in his day-to-day activities. The attached ergonomic analysis should be read carefully to determine a candidate's suitability for this position.