Kenneth L. Covell
LAW OFFICE OF KENNETH L. COVELL
712 Eighth Avenue
Fairbanks, Alaska  99701
(907) 452-4377 telephone
(907) 451-7802 fax
e-mail:  kcovell@gci.net

## IN THE UNITED STATES DISTRICT COURT

## FOR THE DISTRICT OF ALASKA

| | |
|---|---|
| JOHN GILBERT, ) | |
| ) | |
| Plaintiff, ) | |
| ) | |
| vs. ) | |
| ) | |
| APC NATCHIQ, INC. ) | |
| ) | |
| Defendant. ) | |
| _____ ) | Case No. 3:03-CV-00174 RRB |

**RESPONSE IN OPPOSITION TO DEFENDANT'S MOTION FOR
PARTIAL SUMARRY JUDGMENT TO DISMISS OVERTIME CLAIMS UNDER
THE ADMINISTRATIVE EXEMPTION, filed at Docket No. 38**

### I.      Introduction and Summary

APC does not carry its burden to demonstrate that Gilbert is exempt from

overtime.   APC has shown that Gilbert had ancillary duties that might qualify as

administrative.  These duties were not Gilbert's primary duties and occupied only a small

amount of his workweek.  APC's claim to the federal exemption must fail.

APC's citation to the John Gilbert and Doug Smith depositions requires extensive presentation of the actual deposition testimony to illustrate how APC spins the language in an attempt to meet the requirements in the federal and Alaska regualations. Gilbert will discuss these deposition citations before explaining the application of those facts and legitimate inferences to the law.

Defendant APC Natchiq, Inc. (APC) seeks summary judgment that Plaintiff John Gilbert (Gilbert) was exempt from the overtime requirements of the federal and Alaska wage and hour laws. APC's claim that Gilbert was a *bona fide* administrative employee. APC faces a presumption that Gilbert was entitled to overtime and an elevated burden of proof ("beyond a reasonable doubt" in Alaska and "plainly and unmistakably" in the federal court). Moreover, in Alaska the final determination whether an employee is exempt is left to the jury. Unless APC can show that no reasonable jury could decide other than that Gilbert was exempt, applying the elevated burden of persuasion and the presumption of non-exemption, APC must lose.

Gilbert says that his primary duties could have been, and mostly were, done by safety specialists. Much of what Gilbert did was safety specialist work done in the office, the same tasks and functions that the specialists did in the field.

APC's suggestion that Gilbert's sworn testimony is not evidence sufficient to avoid summary judgment is wrong. Gilbert's testimony about his duties is direct evidence and is corroborated by his contemporaneous daily logs. APC has no evidence to disprove Gilbert's version of the facts.

The federal regulations require APC to prove each of the following factors to support the administrative exemption:

> a)    . . . compensated on a salary basis at a rate of at least $250.00 per week;
>
> b)    . . . primary duty consists of the performance of office or non-manual work directly related to management policies or general business operations of his employer or his employer's customers; and
>
> c)    . . . duties include work requiring the exercise of discretion and independent judgment.

29 CFR §541.2

The Alaska regulations define and administrative employee as follows:

> (1) an "administrative employee" mean an employee
>
> (A) whose primary duty consists of work **directly related to management policies or supervising the general business operation of the employer;**
>
> (B) who **customarily and regularly exercises discretion and independent judgment;**
>
> (C) who performs work **only under general supervision**;
>
> (D) who is paid on a **salary** or fee basis;
>
> (E) who **regularly and directly assists the proprietor or an exempt executive employee** of the employer; **and**
>
> (F) who **performs work along specialized or technical lines** requiring special training, experience or knowledge **and does not devote more than 20 percent**…. of the employee's weekly hours **to activities that are not described** in this paragraph or (7) or (11) of this section [executive or professional employee duties].

8 AAC 15.910(a)(1)(emphasis added).

After examining what was really said at the depositions, Gilbert is confident that this Court will apply the presumptions and elevated burden of proof to the scant facts APC presents, and Gilbert's contrary evidence, to deny APC's summary judgment motion.

## II.     Summary Of Argument

Gilbert is presumed to be entitled to the overtime pay required by 29 USC §207 and AS 23.10.060(b).   A *bona fide* administrative employee may be exempt from overtime pay. 29 USC §213 and AS 23.10.055(9). To prove entitlement to the exemption the employer must demonstrate the entitlement by an elevated burden of proof in both the federal and Alaska courts.

When seeking to support an exemption determination under federal law the 9th Circuit has said that, "exemptions are "narrowly construed" and require employers to prove that the allegedly exempt employees "fit **plainly and unmistakably** within [the exemption's] terms." *Magana v. Commonwealth of the Northern Mariana Islands*, 107 F.3d 1436, 1445-46 (9th Cir. 1997), *quoting Abshire v. County of Kern,* 908 F.2d 483, 485-86 (9th Cir. 1990), *cert. denied*, 498 U.S. 1068, 112 L. Ed. 2d 848, 111 S. Ct. 785 (1991), and *Service Employees Int'l Union, Local 102 v. County of San Diego,* 60 F.3d 1346, 1350 (9th Cir. 1994), *cert. denied,* 516 U.S. 1072, 116 S. Ct. 774, 133 L. Ed. 2d 726 (1996)(emphasis added).

The Alaska Supreme Court said: "The burden is on the employer to prove **beyond a reasonable doubt** that the employee is exempt. And we [the Alaska Supreme court] have determined that "exemptions are to be narrowly construed against the employer." *Fred Meyer of Alaska, Inc. v. Bailey*, 100 P.3d 881, 884 (Alaska 2004), *citing, Dayhoff v. Temsco Helicopters, Inc.,* 848 P. 2d 1367, 1372 (Alaska 1993)(internal citations omitted)(emphasis added).

Attempting to meet this strict and difficult burden, APC picks through Gilbert's deposition and the deposition of Doug Smith (APC's parent companies' HSET director, who was APC's safety manager when Gilbert worked there,) to find language it can try to fit to the regulations. This language is spun to make it fit and Gilbert will contest this spin.

Recognizing that APC cannot prevail if there is a genuine issue of fact, APC tries to devalue Gilbert's contrary testimony and evidence by calling the testimony "mere allegations." (Motion For Summary Judgment Re: Exemption at 29, Docket 38-1)(Motion) APC misleads us by using only a partial quote from its submitted authority. What the Ninth Circuit actually said in *Gasaway v. Northwestern Mut. Life. Ins. Co.*, 26 F.3d 957, 959-960 (9th Cir. 1994) is:

> Once the moving party demonstrates the absence of a genuine issue of material fact, the burden shifts to the nonmoving party to produce evidence sufficient to support a jury verdict in her favor. This requires the nonmoving party to "go beyond the pleadings and show 'by her own **affidavits, or by the depositions, answers to interrogatories, or admissions on file**,' that a genuine issue of material fact exists." An adverse party may not rest upon the mere allegations or denials of her pleadings.

Gasaway, 26 F.3d at 959-960 (emphasis added).

Gilbert says that more than 20% of his time (actually about 80%) was spent on non-exempt work in sworn deposition testimony, and his declaration with reference to his daily logs. All of this is direct evidence and not "mere allegations" as APC would like to characterize it.

APC makes another mistake when it claims that the FLSA and many of its regulations have been amended since 2003. (Motion at 12-13) The statute at 29 USC §213 has not been changed. Only the regulations were changed in 2004.     APC     was party to the companion case involving an employee (Zuber) who was terminated before the new regulations became effective. The Ninth Circuit, in its unpublished opinion, applied the 2004 interpretation by the Department of Labor (DOL). The regulations interpret the statutes. A later interpretation of the statute has the same weight as an earlier interpretation because the statute has not changed. This Court is required to apply that interpretation jut as the Ninth Circuit did in Z*uber*. *Webster v. Public School Employees of Washington*, 247 F.3d 910, 914 (9th Cir. 2001)[1].

Gilbert will examine APC's propounded evidence and show that, when complete, APC's proffered evidence actually supports the conclusion that Gilbert was exempt.

---

[1] Although *Zuber v. APC Natchiq, Inc*., 144 Fed. Appx. 657, 658 (9th Cir. 2005) is an unpublished opinion and is not being cited here as having precedential value, Gilbert would be remiss not to bring this Court's attention to its language since the case reversed this Court's decision that Zuber was exempt and applied the identical law to an employee of APC.

Gilbert will offer evidence that his primary duties were largely the same as the safety specialist's. Gilbert was the man who did the specialist functions when assigned to the office, just as the specialists did from their assigned geographical area.

Because APC has not met its heavy burden to prove that no jury could rationally find, applying the elevated burden of persuasion, that Gilbert met the requirements of the administrative exemption, APC must lose this motion.  Even if APC could make the required *prima facie* showing, it would lose because Gilbert provides admissible contrary evidence, making Summary Judgment unavailable.

As for the Alaska claim, so long as there is a dispute of fact, no matter how much proof APC can muster, the application of AS 23.10.055(d) to the facts is a question reserved for the jury. *American Restaurant Group v. Clark*, 889 P.2d 595, 598-599 (Alaska 1995).

### III.    The General Facts

John Gilbert was hired as a Safety Specialist by APC on January 30, 2001 and remained in that position until January 1, 2002 when he was designated as the "safety supervisor" and kept that position name until about August 15, 2002 when he was informed that his new job title was "Safety and Industrial Hygiene."  (Gilbert Declaration at ¶8, log entry from 8/15/02)(Exhibit 1)[2] Nothing changed, but Gilbert had a new title that omitted the "supervisor" language.  Gilbert left APC on April 22, 2003.

---

[2] Neither the parties, or their employees and attorneys, recalled this fact until Gilbert noted the entry in his logs.

During Gilbert's entire employment with APC, APC never paid him overtime. Not until a year after the Ninth Circuit decided the *Zuber* case did APC concede that Gilbert was entitled to overtime for the period when he was designated a safety specialist. APC still maintains that Gilbert was a supervisor and exempt after January 1, 2002.

### A.    APC's Selections From Gilbert's Deposition

Gilbert has a B.S. degree in Environmental Engineering, and a M.S. in Mining Engineering.[3] Gilbert does not dispute that he is educated and has had on-the-job training as an industrial safety worker.  He testified that his education and experience qualified him as a safety specialist for APC.  (Gilbert Depo. at pp. 18, lines 13-25 and pp. 19, line 1)(Exhibit 2)

APC concludes its recitation of Gilbert's education by saying that Gilbert said his job as a "safety supervisor" required his experience and specialized education. (Motion at 4)  What Gilbert really said was:

> Q    And the kind of work that you were doing, **both as a specialist and as a supervisor**, did it require experience and use of your education?
>
> A    Yes.

Gilbert Depo. at 27, lines 4 – 7 (Exhibit 2)

Much of APC's Motion at 4 discusses Gilbert's testimony that he did certain things mentioned in the job description.  What the discussion omits is Gilbert's hesitation

---

[3] This is not a professional exempting case.  Having a degree in rocket science is unnecessary when the task is to sweep the floors.  Gilbert's formal education is irrelevant to whether he was an administrative employee.

about saying he "supervised" specialists. Gilbert Depo. at 33, lines 23-25 and 34 at lines

1 – 9 (Exhibit 2)

What Gilbert really said about his job when designated as "safety supervisor" was

that:

> Q     Okay.  How about the safety supervisor position after working for APC and with your background, did you believe that you had the background and education to be able to carry out the responsibilities of that position?

> A     Yes.  I don't believe that the responsibilities of that position were any different than the responsibilities of the safety specialist.

> Q     Okay.  Do you think it's the same job?

> A     Pretty close.  Yes, any of the safety specialists could have done the same job that I was doing as the safety supervisor.  And, in fact, we did at times rotate through and other guys filled in.  So I think it was just an equal level job with maybe a few more caveats

Gilbert Depo. at 18, lines 2 – 15. (Exhibit 2)

When discussing Gilbert's duties, APC makes much of his "pulling together

special environmental programs and permits and that this took much of his time.  (Motion

at 4)  Look what Gilbert really said:

> Q.  Okay.  For example, it says you maintained and developed special environmental programs and permits, you've set up environmental programs within or a specialized safety programs within APC, did you not, as a supervisor?

> A   I don't know quite what you mean by specialized safety programs.  The programs that we had in place at APC were fairly nonexistent when -- when I first got there in 2001 and by the time I left they were coming together.  But, again, **they're just a reiteration of the -- of the OSHA standards kind of custom fit for the work that's done up on the North Slope.**

Q    And you were involved in putting together those programs -- pulling them together, is that correct?

A    Yes.

Q    Okay.  And that was part of your job?

A    Yes.

Q    Yes.  Was it a large part of your job?

A    Towards the end there I spent some considerable time on it.  **I think we all did.**  It was unfinished when I left, but it was a pretty good chunk of the work, yes.

Gilbert Depo. at 24, lines 5-25 (Exhibit 2)(emphasis added)

APC tries to characterize Gilbert's "supervisory" duties as "interpreting written regulations and applying independent judgment.  (Motion at 5)  This is the same as what the specialists did.  Examine Gilbert's testimony in full.

Q.    Okay.    And within the job you had to take CFR's and OSHA requirements and you had to translate what's on paper requirements into actual programs as to how they would be performed in the field?

A    I would say that we took what was written in the CFR's and implemented those words into the field.

Q    Okay.  And sometimes that took translation?

A    Of course, yes.

**Q    And that's the kind of work that you were doing when you were a safety supervisor, is that correct?**

**A    A safety supervisor or a safety specialist, they were one in the same there.**

Q    Okay.

A      Using the CFR's the same way so –

Q      And you were required to exercise your own judgment as to what those meant?

A      I don't know what you mean by exercise my own judgment as to what they meant.  I mean.....

Q      Well you used.....

A      .....they're laid out in the CFR's so you just basically read them and –

Q      Interpret them.

A      Interpret them I suppose, yes.

Gilbert Depo. at 29, lines 22-25 and 30, lines 1-19 (Exhibit 2) (emphasis added)[4]

APC tries to say Gilbert trained or assisted training the safety employees, implying those he "supervised."  Gilbert's actual testimony refutes this inference.

Q.      Okay.  And within the job that you had as to -- let me rephrase that. You had responsibilities also to train other people who did have your level of expertise and in understanding the health and safety responsibilities?

A      Yes and no I suppose.  We had a training department if that's what you mean.  Other employees -- we had a training department that would provide training and at times I assist them because **I would fill in for those guys providing general safety training to the employees.  I don't know if I gave any specific training to any of the safety specialists.**

Q      Okay.

---

[4]   A DOL opinion letter lays to rest APC's assertion that interpreting how app licable laws apply is not sufficient to make an employee exempt**.**  "Fire/Life Safety Coordinator - **develops and updates, as necessary, ordinances for administering the Uniform Fire Code, the State Fireworks law and other fire-related regulations; interprets, inspects and enforces such ordinances."** 1998 DOLWH Lexis 31 (1998)(emphasis added) (Discussed further *infra.*)

A      If that's what you're asking, I'm not sure.

Q      Well that -- **how about lay people?  Did you do any of the training at all, outside of the training department?  Do you train the trainers, for example?**

A      **No.  No.**

Q      Okay.  Did you help determine what the trainers would be training?

A      (No audible answer)

Q      Does that make sense?

A      I think I understand.

Q      Were you setting part of the agenda that the trainers would follow?

A      Not necessarily, no.

Gilbert Depo. at 30, line 25 and 31, lines 1-25 (Exhibit 2) (emphasis added)

APC makes much of Gilbert's being involved in equipment replacement and purchase.  (Motion at 5)  Gilbert testified that he asked everyone that they needed and wrote up a list. Gilbert Depo at 86, lines 20-25 and 87, lines 1-2(Exhibit 2)   Gilbert's response to the question whether he could purchase equipment is confusing. Gilbert Depo. at 86(Exhibit 2): "It may have had authority to opera- -- to authorize the purchase or -- or get it."  Gilbert's Declaration makes it clear that Gilbert never had authority to authorize a purchase.  He would send the request or suggestion up to Doug Smith, the manager, who would likely send it on to Gary Buchanan, the project manager, at an even higher level.  (Gilbert Declaration at ¶2).

APC then addresses the department "Policy, Procedure and Guidelines Manual" (PP&G). This was a compilation of procedures in written form for use on the Slope. Mr. Gilbert testified that it wasn't his responsibility to modify the manual, but that he jumped in to update it with what was already there.  Gilbert Depo. at 84, lines 3-14 (Exhibit 2) and Gilbert Declaration at ¶6. Gilbert described the PP&G project as a group effort of the department where he gathered the material as it was completed and fitted it into the binder where the particular item belonged.

> Q.    Okay.  There was -- let me see if I can find that.  One of the projects that it looked like you were assigned to early on was to rewrite some sort of a policy handbook, is that jogging your memory?  Can you tell me what that was?
>
> A    Yes, **the department was a whole, we all chipped in and tried to rewrite the policies, procedures and guidelines manual.  We all took different sections of it.**  That thing's a huge document.  I forget how many pages.  No, it wasn't complete when I left.  So, I don't know if it ever got finished, but it's a big document.
>
> Q    Were you the point of coordination for that document?
>
> A    Yes, **I was the guy that was taking everybody's papers and putting them in the notebook**, so –
>
> Q    Did you write some procedures for different policies?
>
> A    It's possible.  Either wrote them or rewrote them.

Gilbert Depo at 100, 7-18 (Exhibit 2) (emphasis added)

Gilbert's deposition testimony actually shows that, except for collecting the revised procedures from everyone doing safety duties, including himself, and putting

them into a binder and digitalizing the paper in the binder, clerical work essentially, Gilbert was doing precisely the same thing as the specialists.

Q.    When you got a section like this from somebody else, did you read them over, and check them over for accuracy?

**A    Yes, we all swapped back and forth.  I mean, there was -- I don't know -- recall right offhand how many different sections there are of this thing.  It's a huge document.  So every time somebody would develop more, we'd all take turns redlining it for each other.**

Q    I saw a -- I don't know where it is now.  I saw a memo that you sent out to people about the procedure of putting together this manual, and you noted in that manual -- in that thing, that this was going to be a quote daunting task, is that an accurate description of what you believe this task was?

A    Yes.  It was a huge task, absolutely.

Q    What was the goal, what were you doing?
. . .

A    My role is simply to get an updated policies and procedures manual for the company.

Q    As it applied to safety?

A    Yes, it's just strictly safety -- it's, again, **it's a regurgitation of the federal and state and applicable Slope work procedures as they apply to OSHA regulations**. And it's been done before. This was just updating a previous version that hadn't been done for years.

Q    And this would be because of changes in regulations and procedures that were followed except for.....

A    Sure.

Q    Okay.  And what percentage of your time do you think you dedicated to doing this?

A    A lot at the end.  I mean, **we were all working feverishly to get this thing together.  I spent a significant amount of time before I was let go, working on this document, you know, as we all did so** –

Q    **Comparing your work with the people who were the safety specialists, were you spending a larger amount of your time doing this than they were?**

A    **Not necessarily, no.**

Q    So, they -- **we had safety specialists and you spending as you described it a huge amount of your time doing just this?**

A    **Correct.**

Q    Okay.  And your job what -- within the grand scheme of things was to coordinate it all?

A    Yes.  **I was the point of contact to take it all and get it electronically into one spot and then, you know, I just had 3-ring binders, so I'd grab them and throw them  in there and assemble everything -- get it in one spot.**

Gilbert Depo. at 105, lines 21-25 through 108, lines 1-6 (Exhibit 2)(emphasis added).

APC singles out the NORM (Naturally Occurring Radioactive Material procedure because Gilbert contributed this section to the PP&G manual.  Gilbert explained how he did this in his deposition when he said,

A    I took what was passed down from Tom Sanchez' PAI, regurgitated that in the memo G-12, and then took it and cut and pasted into the 2002 HEST and P and P manual, G-13.  So the verbiage should be.....

Q    Well I don't see on G-12 where it says how to do the calibration or what the action levels were, et cetera.

A    That just comes right off of the -- the Ludlum meters operators manual.

Gilbert Depo. at 103, lines 5-12 (Exhibit 2)

Q     But you wrote this?

A     Yes, this is just one section of many that go into the overall P and P manual.

Q     Okay.

A     But this is -- did I develop all these levels and action levels and what to do with the source and all that?  Absolutely, not.  This is just a regurgitation straight from the Ludlum meter instructions.

Q     Okay.  But you went to the instructions, you found them, you set up the procedure -- you put it together as a procedure for people to use?

A     Yes, except for the action levels which were set by PAI.

Gilbert Depo at 104, lines 12-24 (Exhibit 2)

The examples continue, but they all support Gilbert's description of his job as the same as the specialists except that his assigned area was the office instead of some other discrete location. APC cannot show that Gilbert's primary duties required significantly different activities from the specialists, save that Gilbert performed tasks which might be best characterized as clerical in nature, *to wit*, compiling a manual and digitalizing the pages. Otherwise Gilbert, like all the specialists, applied his familiarity with the Alaska Safety Handbook, the CFR's, and the OSHA rules, together with his familiarity with the equipment used by the trades, and provided guidance about how to work safely on the North Slope (Slope) oil fields. This is what APC's entire business was about and specifically what the specialists did. Guiding the workforce to work safely and to comply with applicable rules, laws and procedures was the stock and trade of APC. And – that is what Gilbert did at work.

APC says Gilbert drafted "change out notes" to let his alternate know what happened. Just about every worker will advise his alternate about what happened during his shift. This is not a "supervisory" or "administrative" task. Monitoring accidents and suggesting how to avoid accidents is specialist work. Contrary to APC's claim that it might be supervisory in nature, Mr. Gilbert testified:

> Q      When you did the review of these accident reports, was it as a representative of the department as a whole of APC or what capacity was it?
>
> **A      I guess it would just be another comment or I'm not so sure it would be as a whole because there might be two other safety specialists, you know making comments at the same time, so it'd just be another comment or – to the investigation.  I mean, my comments were not the last word.**
>
> Q      Well I guess what I'm getting at is why did they send it to you if safety specialists have already looked at it, if they didn't need somebody from corporate to look at it, or from whoever was a representative of the department?
>
> A      I think it's to get more eyes on it, personally.  I have no good answer for you there.  I mean, why did they send it to the safety specialist?  So it could be the opposite question, so we had several people involved in all of these investigations so –

Gilbert Depo at 76, lines 18-25 and 77, lines 1-11 (Exhibit 2)

APC implies that Gilbert had special involvement in the hiring process. Examining the testimony APC cites reveals that he had little more involvement than any other specialist and that the decision was the manager's, Doug Smith.

> Q.      Okay.  Did you have some hand in reviewing or getting JVA's or the hiring process?

A      No, I simply would take the phone call, gather up – if somebody sent a resume we'd gather it up, if we were hiring.  And then we -- we would as a department, . . . So as a group we'd all call who we knew and they would send a resume or some other form of information and we'd all kind of just look through them and then a final decision would be made as to -- if they're going to hire them or not.

Q      Who would make the final decision?

A      Doug in this particular instance.

Q      Okay.  And would Doug be looking to you to give him your input as to who would be hired?

A      Myself and others, yes.

Q      Who would the others be?

A      All the safety specialists.

Gilbert Depo. at 80, lines 15-25 and 81, lines 1-11 (Exhibit 2)

Gilbert, together with Doug Smith, the Safety Manager, and Gary Buchanan, the project manager, the next man up the line of authority, did receive complaints about the specialists in the field. (Motion at 6) Gilbert Depo at 83, lines 3-23 (Exhibit 2)

It was outside of Gilbert's authority to take disciplinary action in response to a complaint. APC misapprehends Gilbert's testimony about handling employee problems when it says that Gilbert problem solved with discontented employees.  Look what Gilbert really said:

Q      **Did you have responsibilities to deal with unhappy employees within the department?**

A      **No, I -- Doug handled all that.**

Q     **Well if Doug wasn't there did you just blow them off and say wait until Doug's there or what did you do?**

A     **Pretty much.**

Q     Oh.  Did you ever problem solve with people who were unhappy?

A     Yes, sure.

Q     All right.  It says I've not talked with blank and there's always two sides to the story, would you do the two sides to the story?  Would you investigate?

A     I know what this is all about here.  This is Kim and Amanda were not -- they were butting heads and, you know, **I just deferred all this to Doug.**

Q     **Is that because it wasn't your responsibility or because you just didn't want to deal with the personnel issues in the admin office?**

A     **I don't think it was my responsibility so –**

Gilbert Depo. at 82, 1-20 (Exhibit 2)  (emphasis added)

APC says that Gilbert interfaced with the client and in this capacity was a spokesperson for APC. (Motion at 9)  Remember that it is the identification of hazards, accident prevention, and compliance with safety laws, rules, procedures and policies that APC's safety department sold to the client as its front line product.  APC supplied personnel who were familiar with this body of information and the personnel made sure that the various trades on the Slope complied with the requirements.  "Interfacing" with the client is what APC sold to the client, and Gilbert, just like the specialists, "interfaced" with the client to tell them "how to" and "what the client must" do.  Examine APC's cited testimony from Gilbert's deposition:

Q      And how would you work with the client?  Explain that to me.  What were your interfaces?

**A      I might go to a drill pad and meet with one of the client's safety specialists or their super- -- supervisory personnel and walk down a job.**

Q      Meaning walk down a job -- what's that mean?

A      Just walking down for safety issues -- safety problems.

**Q      And what would happen if there were safety issues discovered?**

**A      Put our heads together and come up with a way to mitigate them.**

**Q      Okay.  And you were one of the people that was designated to do this with the client?**

**A      You could say that as well as all the guys in the department, every safety specialist, the manager, the -- everybody was designated to do that to work with the client and provide them with what they needed.**

Gilbert Depo. at 95, lines 18-25 and 96, lines 1-9 (Exhibit 2) (emphasis added)

### 1.      Gilbert's Testimony Summary

Gilbert's deposition testimony, together with his explanations by Declaration, does not, and cannot, support APC's claim that he was more than the "Glorified Safety Specialist" he says he was. Almost everything Gilbert did was done in conjunction with the other specialists.

"Pulling together programs and procedures" actually was collecting material from other supervisors, contributing his share of what the specialists were writing, and then putting it all in a binder and digitalizing it.

"Interpreting" actually meant comparing the data to published guidelines and directing the action required by published materials. No independent thought, besides that inherent in looking up information, was used and the task was identical to what all the safety specialists did every day.

APC wrongly contends that Gilbert trained others, could purchase equipment, and was involved in hiring, firing and discipline.

APC cannot support its claim that Gilbert is exempt with this evidence. It is APC's enhanced burden to prove entitlement to the exemption and this testimony cannot meet that burden. At best this estimony might lead to trial of disputed facts, but Gilbert thinks it leads to the conclusion that, as a matter of law, Gilbert was non-exempt.

### B.    APC's Selections From Doug Smith's Deposition

APC spins Doug Smith's deposition testimony to imply that Gilbert had far more importance, autonomy and authority than he actually had. In fact, Smith's deposition testimony sometimes contradicts itself. APC says that Gilbert supervised and directed the Specialist's work, citing to Smith's testimony where he uses the words "oversight and direction" (Motion at 7) and where Smith says that Gilbert filled in for him when Smith was off the Slope. (Motion at 7)  Gilbert will examine Smith's deposition testimony and show that the only cognizable evidence of possibly administrative work is approving the time cards, attending a few meetings each week, and spending an hour each week plugging data into a spreadsheet for the schedule.

APC claims that Gilbert directed the actions of the specialists. (Motion at 8-9) At Smith's deposition Smith confirmed that each specialist had an area of responsibility and that the specialist's direction actually came from the client.

> Q      So they were the coordinator of the other specialists. **These other specialists generally had** – I don't know if duty stations is the right word, but generally had **a routine set of work that they were going to do, or expect to do, is that right?**
>
> A      **That's correct**.

Smith Depo. at 15, lines 4-9 (Exhibit 3)(emphasis added)

> Q      What directing actions did the safety supervisor do?
>
> A       It was within their scope of authority to redirect resources.  For example, if we had a job that day that needed extra assistance from one of their specialists, they would have the authority to ask for and redirect people to assist and coordinate when we had the abnormal conditions.
>
> Q      **Okay.  But do you know if the safety supervisor ever actually directed somebody to, say, get off that pad and go to this one?**
>
> A      **Yes.**
>
> Q      **And who, what, when, where, why and how?  Can you tell me?**
>
> A      **No.  I had, of course, my scope of activity and the supervisor had their scope.**

Smith Depo. at 18, lines 20-25 and 19, lines 1-9 (Exhibit 3)(emphasis added)

Smith was questioned abut the "supervisory exemption" which APC does not assert to support its claim that Gilbert was exempt from the overtime requirements.  In the course of that questioning, Smith testified:

A      . . . This supervisory test as spelled out here with **these embedded employees mainly getting their daily task direction from their, as we called them at the time, clients that they were assigned to.** Even though they were internal APC personnel, we've referred to them as our clients from the safety department. Their daily direction was determined a lot by their activities and direction, so our functionality was less daily direction and more administration facilitation, scheduling, the HR functionality, department directions, implementation of policy and procedure.

Q      . . . [W]hich elements of this paragraph doesn't the safety supervisor position meet?

A      The being employed solely for the purpose of regularly assigning the activities, directing activities of other employees. So – and **the regularly assigning, that regularly assigning component is more of a functionality that took place at the embedded site.**

Q      Okay. Okay. And then – let's see. And then would you say the safety supervisor was responsible for results of the work performed of other employees? I guess would you – okay. Would you say that's so or not, the safety supervisor is responsible for the results of the work performed by other employees?

A      **Not directly. The specialists were more responsible for their performance at their embedded location than transferred to supervisor.**

Smith Depo. at 64, lines 3-13, 65, lines 12-25 and 66, line 1 (Exhibit 3)(emphasis added)

Smith's deposition testimony is contradictory. When he wants to characterize Gilbert as exempt from overtime because the administrative exemption applies, Smith has Gilbert "supervising and directing." But, when the questioning turns to whether the "supervisory exemption" might apply, suddenly the specialists took their direction from the clients. Gilbert, was not responsible for the result. When the testimony is read most favorably to Gilbert, as it must be, Gilbert did little to actually supervise or direct the daily activities of the specialists.

APC asserts that Gilbert had "oversight and direction" responsibilities, Smith's deposition is again favorable to Gilbert.  Mr. Smith testified that a safety specialist filled in for Gilbert when Gilbert was unavailable.  "Q -- Did specialists fill the supervisory role when there was no safety supervisor on a hitch?  A -- If there was an absence from any position, the next most qualified person was stepped up to that role . . ." Smith Depo. at 25, lines 6-12 (Exhibit 3).  Gilbert couldn't hire and fire.  In fact, neither could Mr. Smith hire and fire. Smith Depo. at 26, lines 1-20 (Exhibit 3). Gilbert couldn't even discipline anyone. "Q . . . [D]id he ever discipline anybody that you know of?  A Not in my recollection was there any disciplinary action handed out from that position." Smith Depo. at 73, 14-18. (Exhibit 3)

Smith is careful when saying Gilbert did "schedule coordination.  (Motion at 8.) Gilbert actually plugged peoples names into an Excel spreadsheet which became the schedule.  There were only 12 persons in the team.  Mr. Smith decided who worked with whom and when. There was little change because the hands were scheduled for two weeks on / two weeks off or three weeks on / three weeks off schedules. Gilbert estimates that he spent less than an hour a week on the task.  (Gilbert Declaration at ¶3)

Gilbert did collect and review the time cards for gross errors before giving them to the accountants.  Gilbert estimates that this entailed about 5 to 10 minutes a week. (Gilbert Declaration at ¶4)

APC says that Gilbert performed "data analysis." (Motion at 9-10)     Smith's testimony makes it clear that the analysis referred to is really just looking to see where a

result from a test falls in an established guideline that proscribes the action required for a

given value.

> Q      Okay.  And when you get the – is it correct that when you get the test
> result from Colorado of parts per million or whatever it is, there's some
> manual that dictates whether or not if the test result is in a certain range,
> you – I don't know if you classify them as level 1 remediation, 2, 3, but
> whether or not it's respirators or suits or, you know, wash downs or
> whatever the appropriate treatment is?
>
> A      **Yeah, there's a lead standard from OSHA that we go by.**
>
> Q      **Okay.  Okay.  All right.  So then the coor – or the supervisor
> might look in the manual and say, okay, we have a level 19, therefore
> you need to use procedure 3 kind of thing?**
>
> A      **In context, that's correct.  Yes.**

Smith Depo. at 24, lines 8-21(Exhibit 3)(emphasis added)

APC cannot claim that looking up a result in a book that informs Gilbert what

action to take for a given result is "interpreting data" in the manner that might make him

exempt from overtime. It is precisely this function that APC provides to its clients

through all of its safety employees, i.e., the specialist embedded in the field to respond to

safety matters and the specialist (designated supervisor) who is embedded in the main

office to respond to the identical safety issues presented to APC by telephone from the

clients when an on-site specialist is unavailable, or when, for some other reason, the

clients chooses to obtain the information over the telephone.

Next APC suggests that Smith's testimony that Gilbert filled in for him when he

was absent from the Slope supports the finding that Gilbert met the requirements of the

administrative exception.  (Motion at 10)  Filling in for Smith was not one of Gilbert's

primary duties and consumed little of Gilbert's weekly working time. We will examine

Smith's testimony about what Gilbert's responsibilities when acting in Smith's absence

would have been.

> Q    **What kind of decisions might Mr. Gilbert have made as HSE acting manager that he wouldn't have called you about, and he wouldn't have made as safety supervisor?**
>
> A    More – **I think more of it's decisions that might have been discussed or progressed and staff meetings** that I would normally been the primary attendee that in my stead Ron or John would have attended. We had a senior staff meeting that they would attend in my absence, and there was always progress on action items that would need to be relayed or discussed, or some degree of decision making took place in my absence that normally I would have been the primary attendee to those meetings and been involved with those decisions.
>
> Q    **Okay. So they'd go to these meetings. They'd disseminate that information, and it's a little unclear about the decision making.** Are you saying decision making within this sphere of those meetings, and the issues that are being discussed there, or do you mean independent of that?
>
> A    The most – most frequently decisions would have had to have been made to keep things progressed, like at those meetings, and also if other issues came up, **I can't think of one specifically, but it could have been an HR-related matter**, could have been someone needing additional time off, shift change, problems with someone's performance in the field of a given day that needed to be addressed or other managerial matters that I would have normally maybe been – been addressing.

Smith Depo at 28, lines 11 to 25 and 29, lines 1-14 (Exhibit 3)(emphasis added)

The only other duty Smith could describe that Gilbert would take over in Smith's

absence was facilitating at some meetings. Smith admitted that a specialist could do this

work as well, so long as he was "stepped up" into the "supervisor" role.

Q     Okay.  All right.  **And so as far as specific examples of what a safety supervisor, or Mr. Gilbert might have done as safety supervisor, outside of what we've already discussed, do you have any other examples you can give me?**

A     If I was on shift, **I would normally have been the facilitator on some of the safety meetings.  And in my absence, I expected those to continue to be held, and the facilitator role of that fell to the supervisory position.**

Q     Okay.  If there was a – and I don't know if this happened or not, and you can comment in that regard, but **if there was a time when you're not there, and there's no safety supervisor there, then would a safety specialist be the facilitator for the meeting?**

A     **Only if they're stepped up into that supervisory role.**

Smith Depo at 30, lines 8-23 (Exhibit 3)(emphasis added)

APC mentions the gathering of information into a new Policy, Procedure & Guidelines (PP&G) manual as an administrative task.  Gilbert testified that it wasn't his responsibility to modify the manual, but that he jumped in to update it with what was already there.  Gilbert Depo. at 84, lines 3-14 (Exhibit 2)  Smith's testimony supports Gilbert's version of the facts when Smith admits that specialists had input and that the final approval had to come from above both Smith's and Gilbert's head:

Q     Okay.  Who would or wouldn't be doing that?

A     **The specialist may have input into the language of a particular policy or procedure but final authority over the final content and for regulatory compliance and final approval would come from a higher authority**, supervisor or manager's position.

Q     Okay.  Did the supervisors routinely sign off on the revised PP&G?

A     There is not a particular sign-off location on any of those policies.

Q        If there's a new P – **a newer, revised PP&G, wouldn't that be something that's passed by you and got your approval in one form or another?**

A      **Ultimately it would have to go to corporate for approval.**

Smith Depo at 32, lines 23-25 and 33, lines 1-12 (Exhibit 3)(emphasis added)

Smith also testified about how he determined that Gilbert's position was exempt from overtime pay.  Smith says the limitation that an exempt employee cannot work more than 20% of his time on non-exempt tasks was an important consideration.

A       More based on my interpretation of the – kind of the 80/20 rule of how much percentage of time that position would routinely perform duties that would fall into a non-exempt category.

Q       Okay.  **So the reason why the safety supervisor wouldn't get paid for every hour worked was because in your opinion they weren't spending 20 percent of their time doing non-exempt work?**

A      **That's the largest component** with the additional component being that I viewed them to be more supervisory in nature because of the department configuration of the organization.

Smith Depo at 51, lines 3-14 (Exhibit 3)(emphasis added)

According to Smith the largest component of the decision to deny Gilbert overtime pay was the fact that Smith determined Gilbert spent less than 20% of his time on non-exempt tasks.  Amazingly, Smith made this critical determination without ever asking Gilbert what he did all day.  "**I don't think John and I sat down and went through any specific classification question and answer of his position.**"  Smith Depo. At pp 21, lines 12 to 18 (Exhibit 3)(emphasis added)

### 1.    Smith Testimony Summary

All that Smith's testimony will support is that Gilbert did both specialist type tasks and a few administrative type tasks, although the "administrative" type tasks that Smith describes could largely be described as clerical. Most all of the "duties" APC claims to justify its determination that Gilbert was an exempt employee were really duties he had in common with the specialists. The few duties not identical to those of the specialists, i.e., collecting time cards, attending a few meetings each week, and plugging information into the schedule, took less than 20% of his time each week. (Gilbert Declaration at ¶3)

Most instructive is Smith's testimony that, although his determination of how much time Gilbert spent on non-exempt work was the most important element in his determination that Gilbert was not entitled to overtime, Smith never talked to Gilbert about what he did each day.

### 2.    APC's Other Contentions

APC concludes its discussion of the evidence by quoting Gilbert's description of his job as being a "Glorified Safety Specialist." (Motion at 11)  Gilbert explained that he did the same kind of work as the specialists. The same kind of information was disseminated to the trades at work over the phone as was provided in person by the specialists on-site.  Gilbert Depo at 39, lines 22-25 and 40, lines 1-16 (Exhibit 2)[5]

APC says that Gilbert attended "supervisors meetings that were not attended by specialists." (Motion at 11)  Gilbert testified that specialists might attend these meetings.

---

[5] APC's reference to Gilbert's Depo at 41 appears to be an error.

Opposition To Defendant's Motion For Partial Summary Judgment To Dismiss Overtime Claims
*Gilbert v. APC Natchiq, Inc.,* Case No. 03-CV-00174  RRB
Page 29 of 49

(Gilbert Depo at 115, lines -15 and 116, lines 12.)(Exhibit 2)  APC says Gilbert put together "agendas" for meetings. (Motion at 11)  Gilbert denied putting together the agenda in the discussion APC cites. (Gilbert Depo at 115, lines 7-14.)(Exhibit 2) Contrary to APC's assertion, Gilbert actually denied participation in personnel issues. (Gilbert Depo at 81, lines 23-25, 82 and 83, lines 1-2.)(Exhibit 2)

APC says Gilbert used his judgment when determining how an injury should be reported. (Motion at 12)  What Gilbert really said was, "I would be exercising the requirements of the CFR  and the company's regulations.  Not my judgment – but the company's order, federal government's." (Gilbert Depo at 83, lines 14-16)

### C.    Gilbert's Daily Logs And Explanatory Declaration

APC claims that Gilbert's affidavits and testimony are "mere allegations." (Motion at 29) Gilbert explains his testimony and provides further relevant facts in his October 2, 2006 Declaration.

APC has Gilbert's daily logs.  Gilbert has gone back over these logs to estimate the amount of time he spent doing the work a specialist could, and often did, perform. Based upon this careful review, Gilbert declares that he spent about 80% of his weekly time doing the work a safety specialist did. (Gilbert Declaration at ¶7)

In the course of reviewing his daily logs Gilbert found an entry he had forgotten. It appears that his job title was changed from "safety supervisor" to "Safety and Industrial

Hygiene" on August 15, 2002. Gilbert was given no explanation for the change and nothing in his job was different than before the change. (Gilbert Declaration at ¶8)

## IV.    ARGUMENT

This Court must apply both the Alaska and federal wage and hour laws. In a motion for summary judgment this court must determine whether there are any genuine issues of material fact and whether the moving party is entitled to judgment as a matter of law. *See, Margolis v. Ryan, 140 F.3d 850, 852 (9th Cir. 1998)*. Where a reasonable jury could return a verdict for the non-movant, summary judgment must be denied. *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 248, 106 S. Ct. 2505, 91 L. Ed. 2d 202 (1986)

APC must prove in the federal claim that the allegedly exempt employees "'fit **plainly and unmistakably** within [the exemption's] terms.'" *Magana v. Commonwealth of the Northern Mariana Islands*, 107 F.3d at 1445-46. In the Alaska claim APC must prove **beyond a reasonable doubt** that the employee is exempt. The "exemptions are to be narrowly construed against the employer." *Fred Meyer of Alaska, Inc. v. Bailey*, 100 P.3d at 884.

As for the Alaska claim, so long as there is a dispute of fact, no matter how much proof APC can muster, the application of AS 23.10.055(d) to the facts is a question reserved for the jury. *American Restaurant Group v. Clark*, 889 P.2d at 598-599.

The Secretary of Labor's interpretation of the regulations is entitled to deference and is controlling unless plainly erroneous or inconsistent with the regulation. *Auer v.*

*Robbins,* 519 U.S. 452, 461, 117 S. Ct. 905, 137 L. Ed. 2d 79 (1997), 3 Wage & Hour

Cas. 2d (BNA) 1249 (1997)

### a.    Federal Labor Standards Act (FLSA)

To decide that Gilbert was exempt from the overtime pay requirements of the

FLSA, this Court must find -- applying the elevated standard of proof and the

presumption of non-exempt status -- that there remained no genuine issue of material fact

to be resolved at trial and that APC had proved each and every element necessary to bring

Gilbert "clearly and unmistakably" within the exemption.

The employer must prove every element of the applicable test for exemption

before a court may hold an employee to be exempt under the FLSA. *Bothell v. Phase*

*Metrics, Inc.,* 299 F. 3d 1120, 1125 (9th Cir. 2002)

### 1.    The 20% Rule

Both versions of 29 CFR §541.2(d), in effect when Gilbert was hired and when he

left APC, define the administrative exemption to include the 20% rule:

> d) Who does not devote more than 20 percent, or, in the case of an
> employee of a retail or service establishment who does not devote as much
> as 40 percent, of his hours worked in the workweek to activities which are
> not directly and closely related to the performance of the work described in
> paragraphs (a) through (c) of this section;

29 CFR §541.2(d) (2001 to 2003 versions)[6]

Previous discussion demonstrates that APC did little to determine how much of

Gilbert's day was spent doing exempt or non-exempt work, i.e., determining Gilbert's

---

[6] The new regulations has eliminated this subsection.

primary duties. APC is content to claim that Gilbert's evidence is "conclusory" and "mere allegations," citing to a case that says the contrary. (Motion at 30)  APC says that Gilbert's work requirements and duties didn't leave him time to spend 20% of his time on non-exempt work.  Now that is conclusory.  APC's claim that Smith didn't think Gilbert would be spending more than 20% of his time performing non-exempt work has already been discussed.  Smith never asked Gilbert what he did.

This issue, alone, is fatal for APC. APC has the burden to prove, by an elevated standard, that Gilbert did not perform non-exempt work for more than 20% of his time. APC has not, and it can not.

## 2. The 2004 Interpretive Regulations

The Department of Labor (hereinafter, DOL) has revised the interpretive regulation pertaining to the "administrative exemption" and published regulations that specifically address the administrative exemption. The DOL explained its purpose in revising the regulations as protective:

> The minimum wage and overtime pay requirements of the Fair Labor Standards Act (FLSA) are among the **nation's most important worker protections. These protections have been severely eroded**, however, because the Department of Labor has not updated the regulations defining and delimiting the exemptions for ``white collar'' executive, administrative and professional employees. . . **Revisions to both the salary tests and the duties tests are necessary to restore the overtime protections intended by the FLSA which have eroded over the decades**. . . .

69 Fed. Reg. 22122 (emphasis added).

The DOL specifically addressed the interplay between the state and federal rules when applying the administrative exception to the overtime requirement as follows:

New section 541.4 clarifies that the FLSA provides minimum standards that may be exceeded, but cannot be waived or reduced. **Employers must comply with State laws providing additional worker protections** (a higher minimum wage, for example). . . .

69 Fed. Reg. 22123 (emphasis added).

A number of states arguably have more stringent exemption standards than those provided by Federal law. The FLSA does not preempt any such stricter State standards. **If a State or local law establishes a higher standard than the provisions of the FLSA, the higher standard applies**. See Section 18 of the FLSA, 29 U.S.C. Sec. 218.

69 Fed. Reg. 22124,  n. 1. (emphasis added).

The new regulations contain a new example that includes public sector **inspectors** of various sorts and **specifically includes safety inspectors**.

[P]ublic sector **inspectors** or investigators of various types, such as fire prevention or **safety**, building or construction, health or sanitation, environmental or soils **specialists and similar employees**, generally **do not meet the duties requirements for the administrative exemption because their work typically does not involve work directly related to the management or general business operations of the employer. Such employees also do not qualify for the administrative exemption because their work involves the use of skills and technical abilities in gathering factual information, applying known standards or prescribed procedures, determining which procedure to follow, or determining whether prescribed standards or criteria are met.''

29 CFR §541.203(j)

The federal regulation applicable to this case, described as the "short test," defines

an employee employed in a *bona fide* administrative capacity as an employee who:

a)      is compensated on a salary basis at a rate of at least $250.00 per week;

b)      whose primary duty consists of the performance of office or non-manual work directly

related to management policies or general business operations of his employer or his employer's customers; and

c) whose duties include work requiring the exercise of discretion and independent judgment.

29 CFR § 541.2.

## B.    Applying the FLSA Short Test

### 1.    Salary

Gilbert's compensation was a daily salary greater than $250.00 per week.

### 2.    Primary Duty / Office Or Non-Manual Work

"There is a difference between one 'who merely works around the place' [and] one who has something to say about 'running the place.'" *Walling,* 5 Wage and Hour Cases (BNA) at 446. Gilbert "worked around the place" and **had no say** about how the "place" was run.

Gilbert spent the majority of his day doing, on the telephone and in the field, the same thing that those designated as "safety specialists" did. (Gilbert Declaration at ¶9) The product that APC sold was consulting about, and ensuring compliance with, the many safety rules, regulations, procedures, guidelines and publications that apply to oil field work and workers. That is what Gilbert primarily did – provide information to the people working in the field to facilitate and ensure compliance with the safety rules.

APC spins and stretches Gilbert's testimony to try to make it fit the exemption requirements. APC does not show that Gilbert actually supervised or managed any employee.

APC's briefing did not apportion Gilbert's duties and actually fails to explain what Gilbert did that a specialist did not do, except for a few ancillary tasks like collecting time cards, attending a few meetings a week, and plugging names into the schedule. APC tried to equate secondary duties with primary duties. FLSA primary duties are usually those performed for more than one-half the employee's time.[7] Gilbert identified hazards and gave advice to the trades about what was required by the laws, rules and procedures affecting the trades working on the Slope.  Gilbert did this by applying his skill and knowledge of what the safety regulations and procedures required.

### a.    *Bothell v. Phase Metrics* **Is Controlling Ninth Circuit Precedent**

*Bothell v. Phase Metrics, Inc.,* 299 F. 3d 1120 governs this analysis. In *Bothell* this Court considered an appeal from summary adjudication against an employee contesting his classification as administratively exempt. A key issue was whether the employee's work was directly related to the management policies or general business operations of the employer.

*Bothell* discussed the "management policies or general business operations" language, saying that the requirement is met if ". . . the employee engages in 'running the business or determining its overall course or policies,' not just the day-to-day carrying out of the business' affairs." *Bothell,* 299 F. 3d  at 1125, *citing, Bratt v. County of Los Angeles*, 912 F.2d 1066, 1070 (9th Cir. 1990), *cert. denied* , 498 U.S. 1086, 111 S. Ct. 962, 112 L. Ed. 2d 1049 (1991)

---

[7] 29 CFR §541.206, *citing,* 29 CFR §541.103 (50% is rule of thumb).

. . . [E]ven if we assume that Bothell's work was primarily non-manual, Phase Metrics still has the burden of demonstrating that Bothell's work related to management or general business operations. *See* 29 C.F.R. § 541.202(a) (work need not be "manual" or "repetitive" to be classified as routine, non-administrative work). In determining whether work relates to management or general business operations, the district court applied the "administration/production dichotomy" suggested by the Secretary of Labor's interpretive regulations. Those regulations state:

The phrase "directly related to management policies or general business operations of his employer or his employer's customers" describes *those types of activities* relating to the administrative operations of a business as distinguished from "production" . . . work. In addition to describing *the types of activities*, the phrase limits the exemption to persons who perform work of *substantial importance* to the management or operation of the business of his employer or his employer's customers. 29 C.F.R. § 541.205(a) (emphasis added)(footnote omitted).

*Bothell,* 299 F. 3d 1025-26. (emphasis in original)

*Bothell* discussed the requirement that the primary duty must be of substantial importance to the management or operation of the business or its customer. Noting that the record could support the conclusion that Bothell was essentially a highly-skilled repairman, the appellate court concluded that it was premature to decide if his work was "substantially important" to **management or operation** of Bothell's employer or the customer. *Bothell,* 299 F. 3d 1128 (emphasis in original).

The Court remanded the *Bothell* case to the District Court for trial because:

It is impossible to determine whether Bothell's work was exempt under 29 C.F.R. §§ 541.203, 541.205, and 541.206 until the nature of his daily activities is resolved by the factfinder. If Bothell's primary duty was to manage the Max Media account, creating policy for Phase Metrics or assisting Max Media in running its general business operations (rather than its production capabilities), his employment would satisfy the primary duty requirement of the "short test." If, however, the fact-finder concludes that Bothell was a highly skilled repairman whose primary duty was to install,

troubleshoot, and maintain production equipment, he would not qualify as exempt and would be entitled to overtime compensation. . . .

*Bothell,* 299 F. 3d at 1128 - 1129.

APC's evidence supports only a conclusion that, as a result of extensive on-the-job training, Gilbert has become a highly-skilled inspector whose services went to the very heart of APC's marketplace offering -- oil field services -- and that Gilbert had only a small and insubstantial part in the management or operation of the APC's, or its customer's, business itself.

### 3.    Discretion and Independent Judgment

To withdraw Gilbert from nonexempt status as an administrative employee APC must to show that, in performing his primary duties, Gilbert used discretion and independent judgment. If Gilbert did not use such judgment, then he is non-exempt as a matter of law.

> … The term [discretion and independent judgment] as used in the regulations of subpart A of this part, more over, implies that the person has the authority or power to make an independent choice, free from immediate direction or supervision and with respect to matters of significance. . . .

29 CFR § 541.207(a)

The exercise of discretion must involve the authority to make basic decisions that affect the fundamental operation of the enterprise in question, i.e., the business operations of APC. *Cf., Hashop v. Rockwell Space Operations Company,* 867 F. Supp. 1287, 1298 (S.D. Tex. 1994). APC produces no evidence that Gilbert had discretion to deviate at all from carefully proscribed parameters when doing his job as a "safety supervisor."

The DOL regulations specifically warn against confusing "the exercise of discretion and independent judgment" with "the use of skill in applying techniques, procedures, or specific standards." 29 C.F.R. §§ 541.207(b)(1) and (c). The regulations use inspectors to illustrate what is **not** discretion and independent judgment.

> . . . A typical example of the application of skills and procedures is ordinary inspection work of various kinds. **Inspectors normally perform specialized work along standardized lines involving well-established techniques and procedures which may have been cataloged and described in manuals or other sources. Such inspectors rely on techniques and skills acquired by special training or experience. They may have some leeway** in the performance of their work but only within closely prescribed limits. Employees of this type **may make recommendations** on the basis of the information they develop in the course of their inspections (as for example, to accept or reject an insurance risk or a product manufactured to specifications), but these **recommendations are based on the development of the facts as to whether there is conformity with the prescribed standards.** In such cases **a decision to depart from the prescribed standards or the permitted tolerance is typically made by the inspector's superior. The inspector is engaged in exercising skill rather than discretion and independent judgment within the meaning of the regulations . . .**

29 CFR § 541.207(c)(2)(emphasis added).

The new regulation uses **safety inspectors** to illustrate who is **not** an exempt employee.

> . . . **[I]nspectors** . . . such as . . . **safety** . . . **specialists** . . . **do not meet the duties requirements for the administrative exemption** . . . [and] . . . **because their work involves the use of skills and technical abilities in gathering factual information, applying known standards or prescribed procedures, determining which procedure to follow, or determining whether prescribed standards or criteria are met.**

29 CFR §541.203(j) (emphasis added)(edited for succinctness).

Simalarly, a DOL Wage & Hour Opinion Letter (the kind that APC could have, and should have, obtained) addresses the question of what product the business produces and whether the employee carries on the employer's day to day business, as opposed to determining the overall direction of the business.

The DOL discussed the process used to determine if an investigator is exempt.

In determining whether activities are "directly related to management policies or general business operations" of the employer, two factors must be assessed. First, it is important to distinguish between those types of activities related to the administrative or staff operations of a business and "production" or line activities. Second, in addition to describing the types of activities, this phrase limits the exemption to "persons who perform work of substantial importance to the management or operation of the business" of the employer or of the employer's customers. 29 C.F.R. 541.205(a).

With regard to these inquiries, there is a distinction between "those employees whose primary duty is administering the business affairs of the enterprise from those whose primary duty is producing the commodity or commodities, whether goods or services [inspections], that the enterprise exists to produce and market." . . . **[T]he test is whether the employees are engaged in carrying out the employer's day-to-day affairs rather than running the business itself or determining its overall course and policies** . . . While the regulations provide that "servicing" a business may be administrative, **"advising the management" as used in the regulations is directed at advice on matters that involve policy determinations, i.e., how a business should be run or run more efficiently, not merely providing information in the course of the customer's daily business operation.** . . .

. . . .

**[T]he firm that you have asked about has the conduct of investigations as its business function - the product it exists to produce - the specific investigation activities performed by the employees would appear to be more related to the ongoing day-to-day production operations** of the firm than to management policies or general business operations of the firm.

1997 DOLWH Lexis 43 (1997)(emphasis added)(citations omitted).

Gilbert carried on APC's day to day business.  Gilbert had nothing to do with running APC and the information that Gilbert transmitted was provided in the course of the daily operation of the business.  APC sells safety compliance and that is what Gilbert's primary duties were.

All of APC's evidence, when examined most favorably to Gilbert, points only to the conclusion that Gilbert was, indeed, only a "Glorified Safety Specialist" and that Gilbert did not have discretion or use independent judgment, but instead that Gilbert exercised skill and knowledge when doing his his job.

Another DOL Wage & Hour letter is helpful.  APC's claim that Gilbert was exempt because he collected regulations and then interpreted them, and that Gilbert provided information when asked questions from outside APC. is defeated by a DOL opinionletter  about Fire/Life Safety Coordinators and Soils Specialist Inspectors.

> . . . [O]pinion regarding the application of . . . FLSA to the job classifications of Fire/Life Safety Coordinator, Soils Specialist Inspector...
>
> **Fire/Life Safety Coordinator - develops and updates, as necessary, ordinances for administering the Uniform Fire Code, the State Fireworks law and other fire-related regulations; interprets, inspects and enforces such ordinances; answers public inquiries; and works cooperatively with county fire districts in preventing and investigating fires.**
>
> **Soils Specialist Inspector - processes and analyzes all applications for on-site sewage disposal; consults with private designers and analyzes on-site systems designed by them; and insures that construction procedures and methods of installed systems are in compliance with state and local codes.**
>
> . . . .

. . . [These jobs] . . . do not appear to meet . . . the administrative . . . duties tests because . .  **these jobs do not require the consistent exercise of discretion and judgment in making decisions in significant matters in the sense in which such terms are used in the regulations.**

. . .

[T]he employees are merely **applying their knowledge in following prescribed procedures or determining which procedure to follow, or determining what standards are met. This is true even though they may have some leeway in reaching a conclusion or performing their work.**

1998 DOLWH Lexis 31 (1998)(emphasis added).

This description is quite close to what the evidence demonstrates Gilbert did at work.    Absent contrary authority, this Court should analogize from the DOL interpretation in this opinion to find Gilbert non-exempt.  *CF., Auer,* 519 US at 461.

APC cannot meet its burden to demonstrate that Gilbert is exempt from overtime.  At best, APC has shown that Gilbert had ancillary duties that might qualify as administrative.  These duties were not Gilbert's primary duties and occupied only a small amount of his workweek.  APC's claim to the federal exemption must fail.

## V.    ALASKA STATE ARGUMENT

### A.    Alaska's Standard Of Proof

When applying Alaska law to the facts, this Court should use the standard of proof required in the Alaska courts, i.e., proof beyond a reasonable doubt that the employee is exempt. *Fred Meyer of Alaska, Inc. v. Bailey*, 100 P.3d at 884.

### B.    Wage & Hour Act (AWHA)

The AWHA can provide greater protection for employees than the FLSA. *Quinn v. A.S.EA*, 944 P.2d 468, 471 (Alaska 1997); s*ee also, Pacific Merchant Shipping v. Aubry,* 918 F. 2d 1409, 1418-19 (9th Cir. 1990), *cert. den.,* 504 U.S. 979, 112 S. Ct. 2956, 119 L. Ed. 2d 378 (1992), *sub nom, Tidewater Marine Suc., Inv. v. Aubry,* 504 U.S. 979, 112 S. Ct. 2956, 119 L. Ed. 2d 378 (1992)(California regulation of seamen overtime). FLSA's savings clause "explicitly permits states to set more stringent overtime provisions than the FLSA." *Aubry,* 918 F. 2d at 1419. AWHA provides exemptions from overtime for persons employed in "bona fide executive, administrative, or professional" positions. A.S. 23.10.055(9).

The Alaska state regulation defining administrative employees is 8 AAC 15.910(a)(1), which in pertinent part requires that

> (1) an "administrative employee" mean an employee
>
> (A) whose primary duty consists of work **directly related to management policies or supervising the general business operation of the employer;**
>
> (B) who **customarily and regularly exercises discretion and independent judgment;**
>
> (C) who performs work **only under general supervision;**
>
> (D) who is paid on a **salary** or fee basis;
>
> (E) who **regularly and directly assists the proprietor or an exempt executive employee** of the employer; **and**
>
> (F) who **performs work along specialized or technical lines** requiring special training, experience or knowledge

**and does not devote more than 20 percent**…. of the employee's weekly hours **to activities that are not described** in this paragraph or (7) or (11) of this section [executive or professional employee duties].

8 AAC 15.910(a)(1)(emphasis added).

### C.     Applying Alaska's Test

The Alaska standard for determining if an employee is exempt replicates the federal requirement that "exemptions are to be narrowly construed against the employer. In Alaska, if there is a reasonable doubt as to whether an employee meets the criteria for exemption, the employee should be ruled non-exempt." *Dayhoff v. Temsco Helicopters, Inc.,* 848 P. 2d 1367, 1372 (Alaska 1993), *citing, Adam v. U.S.,* 26 Cl. Ct. 782, [786], 1 Wage & hour Cas. 2d (BNA) 1585 (1992)(embedded citation omitted)[Applied to federal employees].

The AWHA is derived from the FLSA and interpretations of the FLSA are relevant to interpreting the AWHA. *McGinnis v. Stevens,* 543 P. 2d 1221, 1238-39 (Alaska 1975), *appeal after remand*, 570 P. 2d 735 (Alaska 1977).

One important difference between application of the FLSA and the AWHA is that in Alaska whether an exemption applies is a question of fact for the jury and not one of law for the court. *American Restaurant Group,* 889 P. 2d at 598.

Alaska's denies the exemption if a purported administrative employee spends more than twenty percent (20%) of his or her weekly hours performing non-exempt activities. *See,* 8 AAC 15.910(a)(1)(F). Put another way, if the employee does not devote at least 80% of the employee's weekly hours to the administrative activity, the employee

is entitled to overtime. The amount of time spent on exempt versus non-exempt activities is a factual determination in Alaska. *American Restaurant Group,* 889 P. 2d at 597 and 599.

Gilbert contends that a reasonable jury, applying both the presumption and the elevated burden of proof, could only decide that Gilbert exercised skill and applied knowledge when performing his primary duties and that Gilbert spent almost all of his time performing non-exempt duties identical to those performed by those with the title of "safety specialist." No reasonable jury can find Gilbert to be exempt when applying these facts to the Alaska regulation.

### 1.    Alaska Discussion

### a.    Primary Duty In Alaska

Alaska's primary duty analysis creates greater employee protection than the federal requirements for exemption. APC offers no evidence to contradict Gilbert's estimates of what percentage of his time the spent on various tasks.

### b.    Customarily And Regularly Exercised Discretion And Independent Judgment In Alaska

Alaska requires more of the employer than does the FLSA when assessing whether an employee used sufficient discretion and independent judgment to be exempt. Alaska requires that the employee use such discretion and judgment "customarily and regularly." 8 AAC 15.910(a)(1)(B) As was discussed in the context of the FLSA, APC has not proved that Gilbert exercised any discretion and/or judgment at all, let alone demonstrating a customary and regular activity.

Gilbert incorporates here his discussion of the "skill vs. discretion & judgment" dichotomy. Gilbert also reminds this Court that where a task could demonstrate either "skill" or "discretion," then it must be construed to be a skill and non-exempt. *Fred Meyer of Alaska, Inc. v. Bailey*, 100 P.3d at 884. This is consistent with Alaska's stricter "beyond reasonable doubt" test.

### c.    Salary

Gilbert was paid a daily salary.

### d.    Regularly And Directly Assist An Exempt Executive Employee In Alaska

The evidence APC said demonstrates that Gilbert assisted an exempt executive employee is that Gilbert covered for Smith when Smith was not there.  This was not Gilbert's primary duty. The discussion above makes clear that this task did no more than require attendance at a few meetings.  Gilbert says this took only a few hours a week. (Gilbert Declaration at 10)

### e.    Specialized Or Technical Work Requiring Special Training

Gilbert repeats that where a duty could be either the product of "skill and knowledge" or "discretion and independent judgment," it should be held to be of the character resulting in presumed non-exempt status. *Fred Meyer of Alaska, Inc. v. Bailey*, 100 P.3d at 884. Whether Gilbert was exercising "skill and knowledge" to apply known standards or engaged in specialized or technical work requiring special training, must be

resolved for Gilbert.  The discussion of the federal counterpart to this sub-section shows that APC cannot meet this test.

Recall that Gilbert's formal education was not specific to oilfield safety.  The education he had for the safety job was mostly on-the-job.   (Gilbert's Declaration at ¶11 and discussion *supra.*)  Just like those called "specialists". Gilbert collected sources of standards, reviewed established policies and procedures and then explained them to the workers in the field in order to assure safety and compliance.  (Discussion *supra.*)

### f.     Alaska Test: Less Than 20% Non-Exempt Work

Gilbert presents evidence that about 80% of his time was spent doing specialist work. APC must produce evidence that Gilbert did not spend more than 20% or his weekly hours doing non-exempt work. The only evidence APC offers is Smith's opinion, which opinion was arrived at without consultation with Gilbert.  APC does not meet its burden and, in fact, produced no evidence about how to apportion Gilbert's time.

## VI.    CONCLUSION

### APC Failed To Dispute Gilbert's Non-Exempt Status With Sufficient Evidence To Overcome That Presumption Under Either Federal Or Alaska Law.

#### A.    Discussion Of Both Federal and Alaska Standards

Both the FLSA and the AWHA create a presumption that Gilbert is entitled to overtime unless, and until, APC demonstrates "plainly and unmistakably" or "beyond a reasonable doubt" that it is entitled to avoid its obligation to pay Gilbert overtime because

he is an exempt administrative employee. In Alaska, only the jury can make the determination whether an employee is exempt.

There is pending a Motion for Sumary Judgment by Gilbert claiming that he is entitled to a determination that he is exempt as a matter of law because, unlike APC, he benefits from the presumption and elevated burden of persuasion which burdens APC. Unless APC can demonstrate that a reasonable jury might find it has evidence to prove, by the elevated standard of proof, that he meets every exemption requirement, Gilbert must be presumed entitled to ovetime. Gilbert can prevail as a matter of law, while APC cannot.

Both the FLSA and the AWHA have been interpreted to require that in order for the employer to succeed in proving an employee to be exempt, **the employer must present adequately compelling evidence that each and every element of the claimed exemption can be met.** If APC fails to show that it could support **any one** facet of its claim, then summary judgment must be denied. APC has not provided evidence that it can meet each element of either the FLSA or the AWHA by the requisite burden of proof, and therefore, APC's motion for partial summary judgment must be DENIED.

/

/

/

/

Opposition To Defendant's Motion For Partial Summary Judgment To Dismiss Overtime Claims
*Gilbert v. APC Natchiq, Inc.,* Case No. 03-CV-00174  RRB
Page 48 of 49

Respectfully submitted this 2nd day of October, 2006 at Fairbanks, Alaska.


LAW OFFICES OF KENNETH L. COVELL
Attorney for John Gilbert



s/Kenneth L. Covell

712 8th Ave.
Fairbanks, AK 99701
Phone:  907.452.4377
Fax:  907.451.7802
E-mail:  kcovell@gci.net
Attorney Bar #:  8611103


**CERTIFICATE OF SERVICE**
This is to certify that a copy of the foregoing has been
Electronically sent to the following attorney(s):

**Patricia Zobel**
**DeLisio Moran Geraghty & Zobel**
**943 W. 6th Ave.**
**Anchorage, AK 99501**

Dated: 10/2/06
By: ___/s/ Emily S. Ervin_____
      Emily S. Ervin for Kenneth L. Covell