Case 3:03-cv-00174-RRB   Document 86-3   Filed 10/02/2006   Page 1 of 15

JOHN GILBERT vs. APC NATCHIQ, INC.                      DEPOSITION OF JOHN D. GILBERT
CASE NO. 3:03-CV-00174-RRB                                              MAY 31, 2006

Page 1

```
 1              IN THE UNITED STATES DISTRICT COURT
 2                  FOR THE DISTRICT OF ALASKA
 3
    JOHN GILBERT,              )
 4                             )
              Plaintiff,       )
 5                             )
    v.                         )
 6                             )
    APC NATCHIQ, INC.,         )
 7                             )
              Defendant.       )
 8  _____)  Case No. 3:03-CV-00174-RRB
 9
                   DEPOSITION OF JOHN D. GILBERT
10                        June 7, 2006
11  APPEARANCES:
12          FOR THE PLAINTIFF:       MR. KENNETH L. COVELL
                                     Attorney at Law
13                                   712 West 8th Avenue
                                     Fairbanks, Alaska  99701
14                                   (907)  452-4377
15
            FOR THE DEFENDANT:       MS. PATRICIA ZOBEL
16                                   DeLisio Moran Geraghty
                                        & Zobel, P.C.
17                                   Attorneys at Law
                                     943 West 6th Avenue
18                                   Anchorage, Alaska  99501
                                     (907)  279-9574
19
            ALSO PRESENT:            MR. DOUGLAS SMITH
20
21                        * * * *
22
23
24                Exhibit 2  Page 1 of 3
25
```

Case 3:03-cv-00174-RRB   Document 86-3   Filed 10/02/2006   Page 2 of 15

JOHN GILBERT vs. APC NATCHIQ, INC.                    DEPOSITION OF JOHN D. GILBERT
CASE NO. 3:03-CV-00174-RRB                                        MAY 31, 2006

Page 18

```
 1        national labs.  Like where I currently work you have to
 2        have radiological one and radiological two training in
 3        order to work there.
 4   Q    And the training teaches you safety and how to deal
 5        with it?
 6   A    Correct.
 7   Q    Okay.  And you had that.....
 8   A    Evacuation procedures and so forth.
 9   Q    And Geoprobe, what is that?
10   A    That's just a small drilling rig.  It allows you to do
11        subsurface sampling of soil and water.  It's a tract
12        drilling rig is all it is.
13   Q    Okay.  At the time that you came to work with APC as a
14        safety specialist, which would have been back in
15        January of '01, did you believe that you had the
16        qualifications to work as a safety specialist as
17        described by APC?
18   A    I did after they hired me.  Yes -- yes, I did.
19   Q    Okay.  Did you feel competent in carrying out the job
20        in a safe and competent and professional manner?
21   A    Yes.
22   Q    Okay.  And you feel that you had had the prior
23        training, or they provided you with the training
24        necessary in order to do that?
     A    I felt that I probably had enough background to do it
```

Exhibit 2  Page 2 of 30

JOHN GILBERT vs. APC NATCHIQ, INC.
CASE NO. 3:03-CV-00174-RRB

DEPOSITION OF JOHN D. GILBERT
MAY 31, 2006

Page 19

```
 1            from my previous jobs.
 2    Q       Okay.  How about the safety supervisor position after
 3            working for APC and with your background, did you
 4            believe that you had the background and education to be
 5            able to carry out the responsibilities of that
 6            position?
 7    A       Yes.  I don't believe that the responsibilities of that
 8            position were any different than the responsibilities
 9            of the safety specialist.
10    Q       Okay.  Do you think it's the same job?
11    A       Pretty close.  Yes, any of the safety specialists could
12            have done the same job that I was doing as the safety
13            supervisor.  And, in fact, we did at times rotate
14            through and other guys filled in.  So I think it was
15            just an equal level job with maybe a few more caveats
16            thrown in.
17    Q       Why do you think you were paid over $100.00 a day more?
18    A       That, I don't know.  I think I was doing a good job for
19            them.  I don't know why they paid me $100.00 more a
20            day.
21    Q       You didn't mind did you?
22    A       Heck, no.
23    Q       Okay.  Do you believe that in carrying out your
24            position as a safety supervisor that you used your
              education and background and training?
```

Exhibit 2 Page 3 of 30

METRO COURT REPORTING
907.276.3876      745 West 4th Avenue, Suite 425, Anchorage, Alaska 99501      metro@nci.net

Case 3:03-cv-00174-RRB   Document 86-3   Filed 10/02/2006   Page 4 of 15

JOHN GILBERT vs. APC NATCHIQ, INC.                         DEPOSITION OF JOHN D. GILBERT
CASE NO. 3:03-CV-00174-RRB                                                   MAY 31, 2006

Page 24

| | | |
|---|---|---|
| 1 | A | I think again there's generic items that pass through |
| 2 | | all of these positions that I've had since I got out of |
| 3 | | school that would assist me in doing a safety position |
| 4 | | type job. |
| 5 | Q | Okay. For example, it says you maintained and |
| 6 | | developed special environmental programs and permits, |
| 7 | | you've set up environmental programs within or a |
| 8 | | specialized safety programs within APC, did you not, as |
| 9 | | a supervisor? |
| 10 | A | I don't know quite what you mean by specialized safety |
| 11 | | programs. The programs that we had in place at APC |
| 12 | | were fairly nonexistent when -- when I first got there |
| 13 | | in 2001 and by the time I left they were coming |
| 14 | | together. But, again, they're just a reiteration of |
| 15 | | the -- of the OSHA standards kind of custom fit for the |
| 16 | | work that's done up on the North Slope. |
| 17 | Q | And you were involved in putting together those |
| 18 | | programs -- pulling them together, is that correct? |
| 19 | A | Yes. |
| 20 | Q | Okay. And that was part of your job? |
| 21 | A | Yes. |
| 22 | Q | Yes. Was it a large part of your job? |
| 23 | A | Towards the end there I spent some considerable time on |
| 24 | | it. I think we all did. It was unfinished when I |
| | | left, but it was a pretty good chunk of the work, yes. |

Case 3:03-cv-00174-RRB   Document 86-3   Filed 10/02/2006   Page 5 of 15

JOHN GILBERT vs. APC NATCHIQ, INC.                    DEPOSITION OF JOHN D. GILBERT
CASE NO. 3:03-CV-00174-RRB                                         MAY 31, 2006

Page 27

1   A       Yes.
2   Q       And specialized knowledge?
3   A       Yes.
4   Q       And the kind of work that you were doing, both as a
5           specialist and as a supervisor, did it require
6           experience and use of your education?
7   A       Yes.
8   Q       And that education, is it specialized? I mean is that
9           something that I could walk out and do? I have a
10          different kind of specialized education, correct?
11  A       I guess, the answer is you'd have to have specialized
12          training, but anybody can get specialized training.
13  Q       Some people are more fit for certain kinds of things
14          than others.
15  A       Right.
16  Q       Was part of your job to interpret complex data --
17          testing data?
18                  MR. COVELL: Excuse me, I've got to object as
19  to when and where he's doing that.
20  Q       (By Ms. Zobel) As a safety supervisor was part of your
21          job to interpret complex data?
22  A       I'm not sure I would call it complex, but we did
23          interpret data.
24  Q       Okay. From testing that was done in the field?
25  A       Yes.

Exhibit 2 Page 5 of 30

Case 3:03-cv-00174-RRB   Document 86-3   Filed 10/02/2006   Page 6 of 15

OHN GILBERT vs. APC NATCHIQ, INC.
ASE NO. 3:03-CV-00174-RRB

DEPOSITION OF JOHN D. GILBERT
MAY 31, 2006

Page 29

```
 1   Q    Okay.  Was part of your responsibility though to see
 2        that they were carrying those out?
 3   A    Yes.
 4   Q    Within the different areas?
 5   A    Yes.
 6   Q    Okay.  And having the requirement of carrying out those
 7        kinds of activities, that carries with it
 8        responsibilities for people, does it not?
 9   A    Can you explain that to me?
10   Q    Yes, that was a backwards question.  I'm sorry.  The
11        job had responsibilities for people's health and safety
12        and to make sure that people were operating safely,
13        correct?
14   A    Correct.
15   Q    Okay.  And if you were wrong in the way that you
16        interpreted something, or the data, that responsibility
17        and somebody were injured, that responsibility would
18        come back to you?
19   A    I suppose if a person in a safety field made a gross
20        error then yes, you could be responsible for somebody's
21        injury or illness or what have you.
22   Q    Okay.  And within the job you had to take CFR's and
23        OSHA requirements and you had to translate what's on
24        paper requirements into actual programs as to how they
          would be performed in the field?
```

Exhibit 2 Page 6 of 30

Case 3:03-cv-00174-RRB   Document 86-3   Filed 10/02/2006   Page 7 of 15

JHN GILBERT vs. APC NATCHIQ, INC.
ASE NO. 3:03-CV-00174-RRB

DEPOSITION OF JOHN D. GILBERT
MAY 31, 2006

Page 30

| | | |
|---|---|---|
| 1 | A | I would say that we took what was written in the CFR's |
| 2 | | and implemented those words into the field. |
| 3 | Q | Okay. And sometimes that took translation? |
| 4 | A | Of course, yes. |
| 5 | Q | And that's the kind of work that you were doing when |
| 6 | | you were a safety supervisor, is that correct? |
| 7 | A | A safety supervisor or a safety specialist, they were |
| 8 | | one in the same there. |
| 9 | Q | Okay. |
| 10 | A | Using the CFR's the same way so -- |
| 11 | Q | And you were required to exercise your own judgment as |
| 12 | | to what those meant? |
| 13 | A | I don't know what you mean by exercise my own judgment |
| 14 | | as to what they meant. I mean..... |
| 15 | Q | Well you used..... |
| 16 | A | .....they're laid out in the CFR's so you just |
| 17 | | basically read them and -- |
| 18 | Q | Interpret them. |
| 19 | A | Interpret them I suppose, yes. |
| 20 | Q | All right. And the way in which they applied though to |
| 21 | | that particular situation you were using your judgment |
| 22 | | as to how they would best be implemented in the field? |
| 23 | A | Yes, you want to make sure you're trying to implement |
| 24 | | them as they're written. |
| | Q | Okay. And within the job that you had as to -- let me |

Case 3:03-cv-00174-RRB   Document 86-3   Filed 10/02/2006   Page 8 of 15

JOHN GILBERT vs. APC NATCHIQ, INC.  
CASE NO. 3:03-CV-00174-RRB

DEPOSITION OF JOHN D. GILBERT  
MAY 31, 2006

Page 31

| | | |
|---|---|---|
| 1 | | rephrase that. You had responsibilities also to train |
| 2 | | other people who did have your level of expertise and |
| 3 | | in understanding the health and safety |
| 4 | | responsibilities? |
| 5 | A | Yes and no I suppose. We had a training department if |
| 6 | | that's what you mean. Other employees -- we had a |
| 7 | | training department that would provide training and at |
| 8 | | times I assist them because I would fill in for those |
| 9 | | guys providing general safety training to the |
| 10 | | employees. I don't know if I gave any specific |
| 11 | | training to any of the safety specialists. |
| 12 | Q | Okay. |
| 13 | A | If that's what you're asking, I'm not sure. |
| 14 | Q | Well that -- how about lay people? Did you do any of |
| 15 | | the training at all, outside of the training |
| 16 | | department? Do you train the trainers, for example? |
| 17 | A | No. No. |
| 18 | Q | Okay. Did you help determine what the trainers would |
| 19 | | be training? |
| 20 | A | (No audible answer) |
| 21 | Q | Does that make sense? |
| 22 | A | I think I understand. |
| 23 | Q | Were you setting part of the agenda that the trainers |
| 24 | | would follow? |
| 25 | A | Not necessarily, no. |

Exhibit 2 Page 8 of 30

Case 3:03-cv-00174-RRB   Document 86-3   Filed 10/02/2006   Page 9 of 15

JOHN GILBERT vs. APC NATCHIQ, INC.
CASE NO. 3:03-CV-00174-RRB

DEPOSITION OF JOHN D. GILBERT
MAY 31, 2006

Page 33

1  A  Yes.
2  Q  Okay. So you didn't have to do a lot of tweaking
3     there?
4  A  No.
5  Q  Now it says you have development of site specific
6     policy and procedures, was that correct?
7  A  Let me catch up to you here.
8  Q  I'm sorry. I'm leaping ahead of you.
9          MR. COVELL: Last sentence of the second
10 paragraph there.
11 Q  (By Ms. Zobel) Responsibilities include.....
12 A  Oh, okay.
13 Q  Let's just take the whole paragraph or that sentence.
14    Let's start at the beginning of that paragraph.
15 A  Okay.
16 Q  Safety supervisor provides consultation to both
17    construction and maintenance operations, was that
18    correct?
19 A  Yes.
20 Q  Okay. Regarding compliance, company policies and safe
21    work practices?
22 A  Yes.
23 Q  Okay. And it says responsibilities include supervision
24    of six safety specialists?
25 A  Yes, there was six safety specialists working there.

Case 3:03-cv-00174-RRB    Document 86-3    Filed 10/02/2006    Page 10 of 15

JOHN GILBERT vs. APC NATCHIQ, INC.
CASE NO. 3:03-CV-00174-RRB

DEPOSITION OF JOHN D. GILBERT
MAY 31, 2006

Page 34

1  Q  And you had the responsibility to supervise them?
2  A  Yes, it's a gray area in my opinion, but -- yes.
3  Q  Okay. Development of site specific polices and
4     procedures?
5  A  Yes, we all did that.
6  Q  And risk assessments?
7  A  Yes.
8  Q  Incident investigations?
9  A  Yes.
10 Q  Audits and monitoring of ongoing activities?
11 A  Yes, I'm not quite sure what that means.
12 Q  For example, the activities of safety specialists, were
13    you auditing and monitoring ongoing activities by
14    safety specialties?
15 A  Auditing and monitoring?
16 Q  Yes or no?
17 A  No.
18 Q  Okay. How about auditing and monitoring of ongoing
19    activities such as the usage safety protocols?
20 A  Yes.
21 Q  Okay. Coordination of health surveys?
22 A  Coordination of health surveys, yes.
23 Q  Okay. Within this description, let me see if we can
24    establish some base line here. If I understand the way
      that APC has this put together, the safety specialist

Exhibit 2  Page 10 of 30

Case 3:03-cv-00174-RRB   Document 86-3   Filed 10/02/2006   Page 11 of 15

JOHN GILBERT vs. APC NATCHIQ, INC.
CASE NO. 3:03-CV-00174-RRB

DEPOSITION OF JOHN D. GILBERT
MAY 31, 2006

Page 39

```
 1   question, so --
 2              MS. ZOBEL:  All right.
 3   Q   (By Ms. Zobel)  I think your answer was that that did
 4   not happen daily.  It was something that could happen
 5   that you would be called on, but it happened
 6   intermittently, is that.....
 7   A   Correct.
 8   Q   All right.  In general, though your job was not to do
 9   those on site activities but to rather work from the
10   corporate side of the job of health, safety, and
11   environment?
12              MR. COVELL:  Technically that's not a question.
                MS. ZOBEL:   Is that correct?
14              MR. COVELL:  Okay.  Now, that's a question.
15              MS. ZOBEL:   He answers before I get to say, is
16   that correct.
17   A   Okay.  I'll quit.
18              MR. COVELL:  That's all right.
19   Q   (By Ms. Zobel)  Is that correct?
20   A   No.
21   Q   No?  Well --
22   A   I don't quite understand the corporate side.  I mean,
23   the way I look at my job as a safety supervisor, if I
24   may, it was not too much more than a glorified safety
25   specialist.  Somebody had to be in the office to take
```

Case 3:03-cv-00174-RRB   Document 86-3   Filed 10/02/2006   Page 12 of 15

JOHN GILBERT vs. APC NATCHIQ, INC.                        DEPOSITION OF JOHN D. GILBERT
CASE NO. 3:03-CV-00174-RRB                                                MAY 31, 2006

Page 40

```
 1              care of all the questions that were brought to the
 2              department each and every day by the rest of the field.
 3              Could I -- was I qualified to do that?  Yes.  Were the
 4              rest of the guys qualified to do that?  Absolutely.  We
 5              were all similarly qualified to do the same job.  So if
 6              I wasn't in the office somebody else would have to come
 7              in and fill in and do exactly what I was doing.  If I
 8              went to the field to get a confined space entry done,
 9              somebody would have to fill in for me in the office.
10              So we would just shuffle things around and make it all
11              work.  Does that answer your questions.
12      Q       That's helpful.  The position that you held though was,
                if I'm understanding what you just said, was something
14              that was necessary?  That it was a job that somebody
15              had to do in terms of being in the office to respond to
16              the Kuparuk project as a whole?
17      A       Yes.
18                      MR. COVELL:  Okay.  Now wait, if it's not a
19      question.....
20                      MS. ZOBEL:  There was a question mark at the
21      end of that one.
22                      MR. COVELL:  Was there?  Well if it's not a
23      question don't answer it.  Okay?  All right.  Think about
24      whether it's a question or not, if it's not a question don't
25      answer it.  All right.
```

Exhibit 2 Page 12 of 30

JOHN GILBERT vs. APC NATCHIQ, INC.
CASE NO. 3:03-CV-00174-RRB

DEPOSITION OF JOHN D. GILBERT
MAY 31, 2006

Page 76

| | | |
|---|---|---|
| 1 | | filed in the system, and that would be that. |
| 2 | Q | Okay. When you said comments in reviewing it, what sort of comments would you be making? |
| 4 | A | Well that's a pretty blanket statement, it could be anything. You know, like a spelling error. |
| 6 | Q | Oh. |
| 7 | A | To, you know, that's not the way I heard it type of comment, this is what I heard, you know. |
| 9 | Q | Would you be making any comments regarding this occurring in the future or implementing some change in procedure because of this accident? |
| 12 | A | It's potentially -- yes, you could make a comment that says, geez, I think that from now on we ought to not, you know, let guys drive 50 miles an hour on the Haul Road so -- |
| 16 | Q | Yes. |
| 17 | A | Maybe they need to drive 30, you know, so -- |
| 18 | Q | When you did the review of these accident reports, was it as a representative of the department as a whole of APC or what capacity was it? |
| 21 | A | I guess it would just be another comment or I'm not so sure it would be as a whole because there might be two other safety specialists, you know making comments at the same time, so it'd just be another comment or -- to the investigation. I mean, my comments were not the |

Exhibit 2 Page 13 of 30

Case 3:03-cv-00174-RRB   Document 86-3   Filed 10/02/2006   Page 14 of 15

OHN GILBERT vs. APC NATCHIQ, INC.
CASE NO. 3:03-CV-00174-RRB

DEPOSITION OF JOHN D. GILBERT
MAY 31, 2006

Page 77

1  last word.
2  Q  Well I guess what I'm getting at is why did they send
3     it to you if safety specialists have already looked at
4     it, if they didn't need somebody from corporate to look
5     at it, or from whoever was a representative of the
6     department?
7  A  I think it's to get more eyes on it, personally. I
8     have no good answer for you there. I mean, why did
9     they send it to the safety specialist? So it could be
10    the opposite question, so we had several people
11    involved in all of these investigations so --
12 Q  UA's, urinalysis?
13 A  Uh-huh (affirmative).
14 Q  And what was your responsibility there?
15 A  Let's see, we would bring the employees in for random
16    and then scheduled urinalysis and perform the entire
17    urinalysis procedure, you know.
18 Q  What was your role in the urinalysis program?
19 A  Same as everybody else's. You'd bring them in and
20    you'd sit them down. You'd have them fill out the
21    initial paperwork. You'd check them for contraband.
22    You'd take them in, give them the cup, watch them do
23    their thing in the cup, pull it back, make sure that
24    the temperature was correct on the cup and everything
25    looked okay. Then you would split the sample, load the

Exhibit 2 Page 14 of 30

METRO COURT REPORTING
metro@gci.net

JOHN GILBERT vs. APC NATCHIQ, INC.
CASE NO. 3:03-CV-00174-RRB

DEPOSITION OF JOHN D. GILBERT
MAY 31, 2006

Page 80

```
 1            MS. ZOBEL:  Sure.
 2       (Off record)
 3       (On record)
 4   Q   (By Ms. Zobel)  Going this list of areas that you're
 5       reporting on, it says safety department.  Let's go to
 6       page 299 of this exhibit.  The first bullet says blank
 7       called from Soldotna regarding the 624 Safety
 8       Specialist JVA.  Would that be about a job or why would
 9       he be calling?
10   A   That -- yes, it could be about a job, I'm not sure.  I
11       would -- it's hard to say.
12   Q   Okay.  Did people call you when they're looking for
13       employment within the safety department at Kuparuk?
14   A   They could have called me, yes.
15   Q   Okay.  Did you have some hand in reviewing or getting
16       JVA's or the hiring process?
17   A   No, I simply would take the phone call, gather up -- if
18       somebody sent a resume we'd gather it up, if we were
19       hiring.  And then we -- we would as a department, I
20       guess, if -- well there's a couple of different ways it
21       could have happened.  Sometimes guys would just show up
22       and say I'm working, and that would happen.  Other
23       times we'd be short a hand and the word would go out,
24       hey call everybody you know and see if we can get them
25       up here.  You know, if you know anybody.  So as a group
```

Exhibit 2 Page 15 of 30