Kenneth L. Covell
LAW OFFICE OF KENNETH L. COVELL
712 Eighth Avenue
Fairbanks, Alaska 99701
(907) 452-4377 telephone
(907) 451-7802 fax
kcovell@gci.net

## IN THE UNITED STATES DISTRICT COURT

### FOR THE DISTRICT OF ALASKA

| | |
|---|---|
| JOHN GILBERT, | ) |
| | ) |
| Plaintiff, | ) |
| | ) |
| vs. | ) |
| | ) |
| APC NATCHIQ, INC. | ) |
| | ) |
| Defendant. | ) |
| _____ | )     Case No. 3:03-CV-00174 RRB |

**REPLY TO RESPONSE IN OPPOSITION TO PLAINTIFF'S MOTION
FOR PARTIAL SUMARRY JUDGMENT ON THE ISSUE OF EXEMPTION, filed
at Docket Nos. 38 and 87.**

### I.     Introduction and Summary

Unless APC can eliminate all reasonable doubt that Gilbert was exempt, Gilbert is

entitled to summary adjudication that he was entitled to overtime. Once APC's lack of

foundation for Smith's testimony is considered, what little evidence APC advances to

contest Gilbert's summary judgment motion becomes none at all.

Gilbert moved for summary judgment claiming that APC cannot produce sufficient evidence to meet its elevated burden of proof to overcome the presumption that Gilbert is entitled to overtime. Gilbert supported this motion with admissible evidence, including deposition testimony, discovery responses, and his affidavit and declarations, sufficient to shift the burden to demonstrate the existence of a material issue of fact to APC. *Gasaway v. Northwestern Mut. Life. Ins. Co*., 26 F.3d 957, 959 (9th Cir. 1994)(Cited in Opposition at 3)

APC reverses the required analysis when it says, "the relevant inquiry . . . is whether the employee's job duties satisfy the statutory test for the administrative exemption." (Opposition at 2)  The "relevant inquiry" is whether APC has, when all inference are drawn in its favor, demonstrated to this Court that it can produce evidence that would permit a jury to find, "beyond a reasonable doubt" that Gilbert was exempt.

To the contrary, Gilbert is presumed to be entitled to the overtime pay required by 29 USC §207 and AS 23.10.060(b).  Applying federal law the Ninth Circuit has said that, "exemptions are "narrowly construed" and require employers to prove that the allegedly exempt employees "fit **plainly and unmistakably** within [the exemption's] terms." *Magana v. Commonwealth of the Northern Mariana Islands*, 107 F.3d 1436, 1445-46 (9th Cir. 1997)(emphasis added)  The Alaska Supreme Court said: "The burden is on the employer to prove **beyond a reasonable doubt** that the employee is exempt, and we [the Alaska Supreme court] have determined that "exemptions are to be narrowly

construed against the employer." *Fred Meyer of Alaska, Inc. v. Bailey*, 100 P.3d 881, 884 (Alaska 2004)(emphasis added)

APC's evidence does not carry its burden for many reasons, but it is dispositive that APC does not offer evidence apportioning the time Gilbert spent between his primary and ancillary duties, and because APC does not show that, it can support the "20% test" required by the Alaska Wage and Hour Act (AWHA) regulations. 8 AAC 15.910(a)(1)(F)

In fact, APC's determination of whether Gilbert was exempt did not even include asking Gilbert what he did each day. Smith Depo. at pp 21, lines 12 to 18 (Exhibit 1) Because APC cannot show it can present evidence that a reasonable jury might conclude meets its difficult burden to show that Gilbert meets the exemption tests, Gilbert is entitled to summary judgment that Gilbert was entitled to overtime and was not an exempt administrative employee.

## II.    Gilbert's Evidence Is Relevant, Admissible And Compelling

APC suggests that Gilbert's supporting evidence is inherently suspect, mere assertions, and insufficient to support Gilbert's motion for partial summary judgment. (Opposition at 2-3) APC disingenuously omits part of the language from its submitted authority. What the Ninth Circuit actually said in *Gasaway* is:

> Once the moving party demonstrates the absence of a genuine issue of material fact, the burden shifts to the nonmoving party to produce evidence sufficient to support a jury verdict in her favor. This requires the nonmoving party to "go beyond the pleadings and show 'by her own **affidavits, or by the** depo**sitions, answers to interrogatories, or**

**admissions on file**,' that a genuine issue of material fact exists." An adverse party may not rest upon the mere allegations or denials of her pleadings.

*Gasaway*, 26 F.3d at 959-960 (emphasis added).

One of APC's Alaska citations is helpful. The Alaska Supreme court said:

> This issue essentially comes down to a dispute **whether Brumbaugh's denial of liability on the part of Weaver Brothers "set[s] forth such facts as would be admissible in evidence and . . . . show[s] affirmatively that the affiant is competent to testify** to the matters stated therein." [Alaska] Civil Rule 56(e) is essentially a requirement that the allegations in an affidavit not be mere hearsay or conclusory declarations.

*Brock v. Weaver Bros.,* 640 P.2d 833, 835 (Alaska 1982)(footnotes omitted)(emphasis added)

Evidence is relevant if it has any tendency to support a material fact. (FRE 401 and ARE 401) Relevant evidence is admissible. (FRE 402 and ARE 402) APC relies heavily upon another employee, Doug Smith, to support APC's claim that Gilbert was exempt. Nowhere does Mr. Smith demonstrate how he knew what Gilbert's actual duties were and, in fact, testified that he never talked to Gilbert about what Gilbert did at work. Smith Depo. at 21, lines 12 to 18 (Exhibit 1) This is an example of a conclusory statement. Gilbert testifies about what he did at work and uses his contemporaneously generated daily logs to support his sworn testimony. Gilbert's testimony and logs are the epitome of relevant evidence.

### III.    It Is Smith's Testimony That Is Unsupported And Conclusory

APC's argument that Gilbert's testimony is mere conclusory statements and unsupported allegations (Opposition at 3) applies equally to Mr. Smith's testimony. APC does not show Smith's personal knowledge or competency to testify about the subject

matter.  Smith testified about how he determined that Gilbert's position was exempt from

overtime pay.  Smith says the limitation that an exempt employee cannot work more than

20% of his time on non-exempt tasks was an important consideration.

> A      More based on my interpretation of the – kind of the 80/20 rule of
> how much percentage of time that position would routinely perform duties
> that would fall into a non-exempt category.

> Q      Okay.  **So the reason why the safety supervisor wouldn't get paid
> for every hour worked was because in your opinion they weren't
> spending 20 percent of their time doing non-exempt work?**

> A      **That's the largest component** with the additional component being
> that I viewed them to be more supervisory in nature because of the
> department configuration of the organization.

Smith  Depo at 51, lines 3 to 14 (Exhibit 1)(emphasis added)

According to Smith the largest component of the decision to deny Gilbert overtime

pay was the fact that Smith determined Gilbert spent less than 20% of his time on non-

exempt tasks.  Smith testified that he made this critical determination without ever asking

Gilbert what he did all day.  "**I don't think John and I sat down and went through any

specific classification question and answer of his position.**"  Smith Depo. at 21, lines

12 to 18 (Exhibit 1)(emphasis added)

Smith does not demonstrate personal knowledge about what Gilbert's activities

were, what Gilbert's primary duty was, or how much time Gilbert spent on different tasks

during the workweek. Each of these issues is critical to deciding if an employee is exempt

from overtime or not.  Smith's testimony establishes his lack of personal knowledge

about these critical issues, making the testimony irrelevant and inadmissible. (FRE and

ARE 401 and 402) Once the lack of support for Smith's testimony is considered, what little evidence APC advances to contest Gilbert's summary judgment motion becomes none at all.

APC does not show that it can contest Gilbert's testimony and evidence. For this reason alone, Gilbert must prevail in this motion for summary judgment.

### IV.    Discussing The Parties Disputed Facts

John Gilbert was hired as a Safety Specialist by APC on January 30, 2001 and remained in that position until January 3, 2002 when he was designated as the "safety supervisor." Gilbert kept that position name until about August 15, 2002 when he was informed that his new job title was "Safety and Industrial Hygiene." (Gilbert Declaration at ¶3, log entry from 8/15/02)(Exhibit 3)[1] Gilbert's duties did not change, but Gilbert's new title omitted the "supervisor" designation. Gilbert left APC on April 22, 2003.[2]

### A.    Gilbert's Facts

Gilbert spent the majority of his day doing, on the telephone and in the field, the same thing that those designated as "safety specialists" did. (Gilbert Declaration at ¶4) The product that APC sold was consulting about, and ensuring compliance with, the

---

[1]  Neither the parties, or their employees and attorneys, recalled this fact until Gilbert rediscovered the entry in his logs.

[2]  It is troubling when the Reply is longer than both the opening and opposition briefs. The problem lies with APC's characterization of the deposition testimony.  The only adequate way to illustrate the difference between APC's spin, and what was actually said, is to provide the quote. These quotes cannot be omitted if the briefing is to assist this Court to understand the evidence without having to spend hours independently reviewing the transcripts to determine what passage supports which parties' position. Gilbert has taken the time to set it out as clearly as he can, but the price is a lengthy memorandum.

many safety rules, regulations, procedures, guidelines and publications that apply to oil field work and workers. That is what Gilbert primarily did – provide information to the people working in the field to facilitate and ensure compliance with the safety rules. Gilbert testified:

> Q    Okay. How about the safety supervisor position after working for APC and with your background, did you believe that you had the background and education to be able to carry out the responsibilities of that position?
>
> A    **Yes. I don't believe that the responsibilities of that position were any different than the responsibilities of the safety specialist.**
>
> Q    **Okay. Do you think it's the same job?**
>
> A    **Pretty close.** Yes, any of the safety specialists could have done the same job that I was doing as the safety supervisor. And, in fact, we did at times rotate through and other guys filled in. So I think it was just an equal level job with maybe a few more caveats

Gilbert Depo. at 18, lines 2 to 15. (Exhibit 2)(emphasis added)

Gilbert explained at his deposition that he did the same kind of work as the specialists. The same kind of information was disseminated to the trades at work by Gilbert using the telephone, as was provided in person by the specialists working on-site. Gilbert Depo at 39, lines 22 to 25 and 40, lines 1 to 16 (Exhibit 2)

APC had Gilbert's contemporaneously created daily logs when it deposed Gilbert and chose not to examine Gilbert about them. Gilbert has examined these logs to estimate the amount of time he spent doing the work a specialist could and often did, perform. Based upon this careful review, Gilbert declares that he spent about 80% of his

weekly time doing the work a safety specialist did. (Gilbert Declaration at ¶5)  Compare Smith's testimony that he looked at the job description and allocated the amount of time spent on different tasks without even consulting the employee, Gilbert. Smith Depo. at page 18, lines 20 to 25, page 19, lines 1 to 9 and page 51, lines 3 to 14 (Exhibit 1)  Unlike Smith's foundationless speculation, Gilbert has a rational basis for his testimony and estimates.

Gilbert's evidence will be further considered when contesting the slanted interpretations APC assigns to Gilbert's testimony in its attempt to create a factual dispute.   This court should consider that, "although production work cannot be administrative, it is not the case that non-production work must be administrative." *See, Martin v. Ind. Mich. Power Co.*, 381 F.3d 574, 584 (6th Cir. 2004)

## B.    APC's Facts And Gilbert's Actual Testimony

APC says that Gilbert, "testified that a significant responsibility while he was employed as a Safety Supervisor was the coordination of rewriting of all of the safety policies for the company." (Opposition at 5)  Let us see what Gilbert really said.

APC talks about the department "Policy, Procedure and Guidelines Manual" (PP&G). This was a compilation of procedures in written form for use on the Slope. It was not my sole responsibility to modify the manual; rather it was the responsibility of the department as a whole.  However, I jumped in to update it with what was already there. Gilbert Depo. at 84, lines 3 to 14 (Exhibit 2) and Gilbert Declaration at ¶7. Gilbert

described the PP&G project as a group effort by the department where Gilbert gathered the

material as it was completed, and fit it into the binder where the particular item belonged.

> Q.      Okay.  There was -- let me see if I can find that.  One of the projects that it looked like you were assigned to early on was to rewrite some sort of a policy handbook, is that jogging your memory?  Can you tell me what that was?

> A      Yes, **the department was a whole, we all chipped in and tried to rewrite the policies, procedures and guidelines manual.  We all took different sections of it.**  That thing's a huge document.  I forget how many pages.  No, it wasn't complete when I left.  So, I don't know if it ever got finished, but it's a big document.

> Q      Were you the point of coordination for that document?

> A      Yes, **I was the guy that was taking everybody's papers and putting them in the notebook**, so –

> Q      **Did you write some procedures for different policies?**

> A      **It's possible.  Either wrote them or rewrote them.**

Gilbert Depo. at 100, 7 to 18 (Exhibit 2) (emphasis added)

Gilbert's deposition testimony actually shows that, except for collecting the

revised procedures from everyone doing safety duties, including himself, and putting

them into a binder, clerical work essentially, Gilbert was doing precisely the same thing

as the specialists.

> Q.      When you got a section like this from somebody else, did you read them over, and check them over for accuracy?

> A      **Yes, we all swapped back and forth.  I mean, there was -- I don't know -- recall right offhand how many different sections there are of this thing.  It's a huge document.  So every time somebody would develop more, we'd all take turns redlining it for each other.**

Q      I saw a -- I don't know where it is now.  I saw a memo that you sent out to people about the procedure of putting together this manual, and you noted in that manual -- in that thing, that this was going to be a quote daunting task, is that an accurate description of what you believe this task was?

A      Yes.  It was a huge task, absolutely.

Q      What was the goal, what were you doing?

                                    . . .

A      My role is simply to get an updated policies and procedures manual for the company.

Q      As it applied to safety?

A      Yes, it's just strictly safety -- it's, again, **it's a regurgitation of the federal and state and applicable Slope work procedures as they apply to OSHA regulations**. And it's been done before. This was just updating a previous version that hadn't been done for years.

Q      And this would be because of changes in regulations and procedures that were followed except for.....

A      Sure.

Q      Okay.  And what percentage of your time do you think you dedicated to doing this?

A      A lot at the end.  I mean, **we were all working feverishly to get this thing together.  I spent a significant amount of time before I was let go, working on this document, you know, as we all did so** –

Q      **Comparing your work with the people who were the safety specialists, were you spending a larger amount of your time doing this than they were?**

A      **Not necessarily, no.**

Q      So, they -- **we had safety specialists and you spending as you described it a huge amount of your time doing just this?**

A    **Correct.**

Q    Okay.  And your job what -- within the grand scheme of things was to coordinate it all?

A    Yes.  **I was the point of contact to take it all and get it electronically into one spot and then, you know, I just had 3-ring binders, so I'd grab them and throw them  in there and assemble everything -- get it in one spot.**

Gilbert Depo. at 105, lines 21 to 25 through 108, lines 1 to 6 (Exhibit 2)(emphasis added).

APC says Gilbert testified that he analyzed, drafted and implemented HS&E policies and procedures. (Opposition at 5)[3]  This is the same document that was referenced in the prior sentence of the Opposition, the PP&G, and Gilbert explained his role as identical to the specialists, except for collecting the information and putting it in a binder, hardly an "administrative" task.

APC says Gilbert "supervised" six employees and directed their work. (Opposition at 5-6)   APC's own expert testified to the contrary. At Smith's deposition, Smith confirmed that each specialist had an area of responsibility and that the specialist's direction actually came from the client.

Q    So they were the coordinator of the other specialists.  **These other specialists generally had** – I don't know if duty stations is the right word, but generally had **a routine set of work that they were going to do, or expect to do, is that right?**

A    **That's correct**.

Smith Depo. at 15, lines 4 to 9 (Exhibit 1)(emphasis added)

---

[3] APC's citation to Gilbert's Depo. at 34 to 35 is mistaken and does not support this allegation at all.

Q      What directing actions did the safety supervisor do?

A      It was within their scope of authority to redirect resources.  For example, if we had a job that day that needed extra assistance from one of their specialists, they would have the authority to ask for and redirect people to assist and coordinate when we had the abnormal conditions.

**Q      Okay.  But do you know if the safety supervisor ever actually directed somebody to, say, get off that pad and go to this one?**

**A      Yes.**

**Q      And who, what, when, where, why and how?  Can you tell me?**

**A      No.  I had, of course, my scope of activity and the supervisor had their scope.**

Smith Depo. at 18, lines 20-25 and 19, lines 1-9 (Exhibit 1)(emphasis added)

Smith also testified:

A      . . . This supervisory test as spelled out here with **these embedded employees mainly getting their daily task direction from their, as we called them at the time, clients that they were assigned to.**  Even though they were internal APC personnel, we've referred to them as our clients from the safety department.  Their daily direction was determined a lot by their activities and direction, so our functionality was less daily direction and more administration facilitation, scheduling, the HR functionality, department directions, implementation of policy and procedure.

Q      . . . [W]hich elements of this paragraph doesn't the safety supervisor position meet?

A      The being employed solely for the purpose of regularly assigning the activities, directing activities of other employees.  So – and **the regularly assigning, that regularly assigning component is more of a functionality that took place at the embedded site.**

Q      Okay.  Okay.  And then – let's see.  And then would you say the safety supervisor was responsible for results of the work performed of other employees?  I guess would you – okay.  Would you say that's so or not, the

safety supervisor is responsible for the results of the work performed by other employees?

**A        Not directly.  The specialists were more responsible for their performance at their embedded location than transferred to supervisor.**

Smith Depo. at 64, lines 3-13, 65, lines 12-25 and 66, line 1 (Exhibit 1)(emphasis added)

Gilbert's testimony was consistent with Smith's testimony that the specialists were essentially independent and took their direction from the foreman and supervisors of the tradesmen on-site.

Q        Okay.  Within this description, let me see if we can establish some base line here.  If I understand the way that APC has this put together, **the safety specialist were, a term I'll use is embedded.   They were specifically assigned to a location facility and project, is that correct?**

A        **For the most part, that's correct.**

Q.        Okay.  So somebody would go every -- **you weren't handing out assignments each time this guy would show up at work, he'd go and work on pads, for example?**

A        **Sure, everybody kind of had their assigned area and then if somebody was absent there'd be fill-in, you know, somebody will go over and fill in.**

Q        **Okay.  All right.  And these guys actually were getting specific -- in addition to working independently and doing monitoring, and you agree with me, they worked independently?**

A        **Yes, oh yes -- definitely.**

Q        **And in addition to working independently they would also respond to whoever was the supervisor within control of that particular construction project or area of maintenance?**

A        **Well they reported to or had direct liaison with -- whether it's the maintenance supervisor or the maintenance foreman or -- they had**

**their own areas to report to. They -- one was maintenance, one was construction, one was operations, and one was drilling.**

Q     Okay. And those are the different specialists within those different areas?

A     Yes, that's right.

Gilbert Depo. at 105, lines 21-25 through 108, lines 1-6 (Exhibit 2)(emphasis added).

APC supports its claim to exemption by asserting that Gilbert "managed schedules," "approved timecards" and "dealt with assignments." (Opposition at 6) The actual testimony reveals this to refer to ancillary duties that took little of Gilbert's workweek, and which were mostly clerical in nature.

Gilbert actually just plugged people's names into an Excel spreadsheet, which became the schedule. There were only 12 persons in the team. Smith decided who worked with whom and when. There was little change because the employees were scheduled for two weeks on / two weeks off or three weeks on / three weeks off schedules. Gilbert estimates that he spent less than an hour a week on the task. (Gilbert Declaration at ¶8)

Gilbert did collect and review the time cards for gross errors before giving them to the accountants. Gilbert estimates that this entailed about 5 to 10 minutes a week. (Gilbert Declaration at ¶9)

APC says: "[Gilbert] provided input on hiring decisions." (Opposition at 6) Examine what Gilbert really said:

Q.     Okay. And would Doug be looking to you to give him your **input as to who would be hired?**

A      **Myself and others, yes.**

Q      **Who would the others be?**

A      **All the safety specialists**.

Gilbert Depo. at 81, lines 7 - 11 (Exhibit 2)(emphasis added).

APC says Gilbert fielded employee complaints. (Opposition at 6)   Gilbert, together with Doug Smith, the Safety Manager, and Gary Buchanan, the project manager, the next man up the line of authority, did receive complaints about the specialists in the field. (Motion at 6) Gilbert Depo. at 83, lines 3 to 23 (Exhibit 2) There is no evidence about how often this occurred or the amount of time required of Gilbert during the workweek.

It was outside of Gilbert's authority to take disciplinary action in response to a complaint.

Q      **Did you have responsibilities to deal with unhappy employees within the department?**

A      **No, I -- Doug handled all that.**

Q      **Well if Doug wasn't there did you just blow them off and say wait until Doug's there or what did you do?**

A      **Pretty much.**

Q      Oh.  Did you ever problem solve with people who were unhappy?

A      Yes, sure.

Q      All right.  It says I've not talked with blank and there's always two sides to the story, would you do the two sides to the story?  Would you investigate?

A    I know what this is all about here.  This is Kim and Amanda were not -- they were butting heads and, you know, **I just deferred all this to Doug.**

Q    **Is that because it wasn't your responsibility or because you just didn't want to deal with the personnel issues in the admin office?**

A    **I don't think it was my responsibility so –**

Gilbert Depo. at 82, lines 1 to 20 (Exhibit 2)  (emphasis added)

APC says that Gilbert interfaced with the client and in this capacity was a spokesperson for APC. (Opposition at 6)  Remember, it is the identification of hazards, accident prevention, and ensuring compliance with safety laws, rules, procedures and policies that APC's safety department sold to the client as its front line product.  APC supplied personnel who were familiar with this body of information. These personnel made sure that the various trades in the filed complied with the requirements.  "Interfacing" with the client is what APC sold to the client, and Gilbert, just like the specialists, "interfaced" with the client to tell them "how to" and "what the client must" do.  Gilbert testified at his deposition as follows:

Q    And how would you work with the client?  Explain that to me.  What were your interfaces?

A    **I might go to a drill pad and meet with one of the client's safety specialists or their super- -- supervisory personnel and walk down a job.**

Q    Meaning walk down a job -- what's that mean?

A    Just walking down for safety issues -- safety problems.

Q    **And what would happen if there were safety issues discovered?**

A      **Put our heads together and come up with a way to mitigate them.**

Q      **Okay.  And you were one of the people that was designated to do this with the client?**

A      **You could say that as well as all the guys in the department, every safety specialist, the manager, the -- everybody was designated to do that to work with the client and provide them with what they needed.**

Gilbert Depo. at 95, lines 18 to 25 and 96, lines 1 to 9 (Exhibit 2) (emphasis added)

APC claims, without a citation to evidence supporting the claim, that Gilbert facilitated staff meetings without apportioning the amount of time spent doing this task and erroneously claims that the "supervisors meetings" were reserved for management. Gilbert testified that specialists might attend these meetings. (Gilbert Depo. at 115, lines 14 to 25 and 116, lines 1 to 12.)(Exhibit 2)

APC suggests that Gilbert "analyzed purchasing of equipment from vendors." (Opposition at 6) Gilbert testified that he asked everyone that they needed and wrote up a list. Gilbert  Depo. at 86, lines 20 to 25 and 87, lines 1 to 2(Exhibit 2)   Gilbert's response to the question whether he could purchase equipment is confusing. Gilbert Depo. at 86 (Exhibit 2): "It may have had authority to opera- -- to authorize the purchase or -- or get it."  Gilbert's Declaration makes it clear that Gilbert never had authority to authorize a purchase.  He would send the request or suggestion up to Doug Smith, the manager, who would likely send it on to Gary Buchanan, the project manager, at an even higher level. (Gilbert Declaration at ¶10).

APC cites Smith's testimony for an "example" of how a specialist and supervisor's work differed. (Opposition at 8)  The example is lead paint disposal.  Gilbert says that everyone except the secretary did this job. The lead paint testing simply involved sending the sample to the lab and comparing the results with reference standards established by the client, OSHA (Occupational Safety and Health Administration), and ACGIH (American Conference of Industrial Hygienists).   For any given result, the client with reference, to OSHA and ACGIH, also prescribed the required action.  The client with reference to OSHA and ACGIH supplied the procedures and standards and no discretion was involved.[4] (Gilbert Declaration at ¶11)

Smith waffles by saying "**not usually**" when asked if the specialist would perform the task as well.  Smith Depo. at 25, line 2 (Exhibit 1)  The best APC can claim from this testimony is that both the person designated "supervisor" and the "specialists" performed the actions APC claims support exempting Gilbert from overtime, but that the "supervisor" *usually* was the one who did the job.  This does not contradict Gilbert's claim that what he did at work was essentially the same as what the specialists did, only from a different location.

APC claims that investigating accidents and recommending changes to prevent accidents was an administrative task. (Opposition at 9)  It is the identification of hazards,

---

[4] APC repeatedly assigns words implying discretion to tasks that require comparison of values. It does not require judgment and skill to decide that where the established reference is "5", a test result of "7" is greater than the reference point.  The lead paint testing simply involved sending the sample to the lab and comparing the result with reference standards established by the client. For any given result, the required action was also prescribed by the client.  (Gilbert Declaration at ¶11)

accident prevention, and compliance with safety laws, rules, procedures and policies that APC's safety department sold to the client. This is precisely what the specialists did every day. Gilbert said at his deposition:

> Q    Well I guess what I'm getting at is **why did they send it to you if safety specialists have already looked at it,** if they didn't need somebody from corporate to look at it, or from whoever was a representative of the department?
>
> A    I think it's to get more eyes on it, personally. I have no good answer for you there. I mean, **why did they send it to the safety specialist?** So it could be the opposite question, so **we had several people involved in all of these investigations so –**

(Gilbert Depo at 77, lines 2 to 11)(Exhibit 2)(emphasis added)

APC suggests that Smith's testimony that Gilbert filled in for him when he was absent from the Slope supports the finding that Gilbert met the requirements of the administrative exception.  (Opposition at 11)  Filling in for Smith was not one of Gilbert's primary duties and consumed little of Gilbert's weekly working time. Examine Smith's testimony about what Gilbert's responsibilities when acting in Smith's absence would have been. Smith could provide no example of a single decision that Gilbert made at a meeting.

> Q    **What kind of decisions might Mr. Gilbert have made as HSE acting manager that he wouldn't have called you about, and he wouldn't have made as safety supervisor?**
>
> A    More – **I think more of it's decisions that might have been discussed or progressed and staff meetings** that I would normally been the primary attendee that in my stead Ron or John would have attended. We had a senior staff meeting that they would attend in my absence, and there was always progress on action items that would need to be relayed or discussed, or some degree of decision making took place in my absence

that normally I would have been the primary attendee to those meetings and been involved with those decisions.

    Q    **Okay. So they'd go to these meetings. They'd disseminate that information, and it's a little unclear about the decision making.** Are you saying decision making within this sphere of those meetings, and the issues that are being discussed there, or do you mean independent of that?

    A    The most – most frequently decisions would have had to have been made to keep things progressed, like at those meetings, and also if other issues came up **I can't think of one specifically, but it could have been an HR-related matter**, could have been someone needing additional time off, shift change, problems with someone's performance in the field of a given day that needed to be addressed or other managerial matters that I would have normally maybe been – been addressing.

Smith Depo. at 28, lines 11 to 25 and 29, lines 1 to 14 (Exhibit 1) (emphasis added)

    The only other duty Smith could describe that Gilbert would take over in Smith's absence was facilitating at some meetings. Smith admitted that a specialist could do this work as well, so long as he was "stepped up" into the "supervisor" role.

    Q    Okay. All right. **And so as far as specific examples of what a safety supervisor, or Mr. Gilbert might have done as safety supervisor, outside of what we've already discussed, do you have any other examples you can give me?**

    A    If I was on shift, **I would normally have been the facilitator on some of the safety meetings. And in my absence, I expected those to continue to be held, and the facilitator role of that fell to the supervisory position.**

    Q    Okay. If there was a – and I don't know if this happened or not, and you can comment in that regard, but **if there was a time when you're not there, and there's no safety supervisor there, then would a safety specialist be the facilitator for the meeting?**

    A    **Only if they're stepped up into that supervisory role.**

Smith Depo. at 30, lines 8 to 23 (Exhibit 1)(emphasis added)

Gilbert explains that these meetings occupied about 3 hours of my time each week, if I had to attend them at all. These meetings were certainly not my primary duty. (Gilbert Declaration at ¶12)

As a final example of what is not evidence that Gilbert was an administrative employee, we examine APC's claim that Gilbert had authority to redirect people. APC cites Smith's testimony. Smith actually testified that he did not know of any specific example of when Gilbert did this. Smith Depo. at 18, lines 20 to 25 and 19, lines 1 to 9 (Exhibit 1) [quoted verbatim at page 12, *supra*.]

Fair reading of this passage supports the conclusion that Smith did not really have personal knowledge about what Gilbert did at all, and that Smith's testimony is incompetent and "conclusory."

### C.     Summary of APC's Propounded Evidence

APC complains that Gilbert offered none of the above evidence. (Opposition at 6) APC does not get it. Gilbert is entitled to overtime unless, and until, APC provides admissible and supportable evidence that it can meet its elevated evidentiary burden to show that it is entitled to the administrative exception at trial. If APC fails to provide this evidence, Gilbert remains entitled to overtime and summary judgment.

APC concludes by saying that all the duties it mischaracterized, or failed to support, and failed to allocate by amount of weekly time spent, were distinct from the specialist's job. Examining Gilbert's actual testimony and explanatory declaration, shows that APC's offered evidence does not contradict Gilbert's and cannot justify a rational

jury finding that APC can prove "beyond a reasonable doubt," or even by "plain and unmistakable evidence" that Gilbert fits within the administrative exception APC claims to justify APC saving large sums of money by denying overtime pay to Gilbert, and who knows how many others.

## V.    Gilbert's Logs

These logs are the best evidence available of what Gilbert did each day. Gilbert has re-examined these logs to estimate the amount of time he spent doing the work a specialist could, and often did, perform.  Based upon this review, Gilbert declares that he spent about 80% of his weekly time doing the work a safety specialist did. (Gilbert Declaration at ¶13) The logs were available to APC when it deposed Mr. Gilbert. APC makes no specific dispute about the content of the logs except to say that they illustrate that Gilbert was an office worker, i.e., "white collar" worker. This issue will be considered when the "primary Duty" test is discussed *infra*.

## VI.    APC's Evidence Is Insufficient

To avoid summary judgment APC must produce admissible evidence to show it can counter Gilbert's evidence.  By trying to use Gilbert's own testimony against him, APC provides an additional forum for Gilbert to support his position.  Nothing in Gilbert's testimony contradicts Gilbert's claim that his primary duties were the same as those of a Safety Specialist.

To avoid summary judgment APC must also show that it is entitled to the administrative exemption by providing evidence that it can prove each, and every, factor

required by the relevant regulation, be it federal or Alaskan.  *Bothell v. Phase Metrics, Inc.,* 299 F. 3d 1120, 1125 (9th Cir. 2002) Failure to provide evidence that APC meets any element of either test is fatal and Gilbert is entitled to summary judgment as a matter of law. Rule 56(c) (both federal and Alaska) mandates the entry of summary judgment, after adequate time for discovery and upon motion, against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial.  *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (U.S. 1986)

APC omits evidence to show what Gilbert's primary duty was and how much time he spent weekly on each of the duties he performed.  The Alaska rule is even more protective of Gilbert. To avoid summary judgment in the Alaska claim, APC must provide evidence that Gilbert did not do "specialist" work for more than 20% of his workweek.

Because APC has presented none of this evidence Gilbert is entitled to judgment without further analysis.

### A.    The Federal Administrative Exception

The federal regulation applicable to this case, described as the "short test," defines an employee employed in a *bona fide* administrative capacity as an employee who:

> a)    is compensated on a salary basis at a rate of at least $250.00 per week;

> b)    whose primary duty consists of the performance of office or non-manual work directly related to management policies or general business

operations of his employer or his employer's customers; and

      c)    whose duties include work requiring the exercise of discretion and independent judgment.

29 CFR § 541.2[5]

## B.    Applying the FLSA Short Test

### 1.    Salary

Gilbert's compensation was a daily salary greater than $250.00 per week.

### 2. Substantial Importance To Managing The Business

Gilbert spent the majority of his day doing, on the telephone and in the field, the same thing that those designated as "safety specialists" did.  (Gilbert Declaration at ¶4) The product that APC sold was consulting about, and ensuring compliance with, the many safety rules, regulations, procedures, guidelines and publications that apply to oil field work and workers. That is what Gilbert primarily did – provide information to the people working in the field to facilitate and ensure compliance with the safety rules.

      APC's briefing does not apportion Gilbert's duties and fails to explain what Gilbert did that a specialist did not do, except for a few ancillary tasks like collecting time cards, attending a few meetings a week, and plugging names into the schedule. APC tries to equate secondary duties with primary duties. FLSA primary duties are usually those performed for more than one-half the employee's time.[6] Gilbert identified hazards and gave advice to the trades about what was required by the laws, rules and procedures

---

[5] Superseded in 2004

[6] 29 CFR §541.206, *citing,* 29 CFR §541.103 (50% is rule of thumb)(superceded in 2004)
*Gilbert v. APC Natchiq, Inc.,* Case No. 03-CV-0174  RRB
Reply to Response in Opposition To Plaintiff's Motion For Partial Summary Judgment re Exemption, filed at Docket Nos. 38 and 87
Page 24 of 34

affecting the trades working on the Slope.  Gilbert did this by applying his skill and knowledge of what the safety regulations and procedures required.

>    a.    ***Bothell v. Phase Metrics*** **Is Controlling Ninth Circuit Precedent**

*Bothell v. Phase Metrics, Inc.,* 299 F. 3d 1120 (9th Cir. 2002) governs this analysis. *Bothell* considered an appeal from summary adjudication against an employee contesting his classification as administratively exempt. A key issue was whether the employee's work was directly related to the management policies or general business operations of the employer.

> *Bothell* discussed the "management policies or general business operations" language, saying that the requirement is met if ". . . the employee engages in 'running the business or determining its overall course or policies,' not just the day-to-day carrying out of the business' affairs."

*Bothell,* 299 F. 3d  at 1125.

*Bothell* discussed the requirement that the primary duty must be of substantial importance to the management or operation of the business or its customer. *Bothell*    was remanded for trial because: "It is impossible to determine whether Bothell's work was exempt under 29 C.F.R. §§ 541.203, 541.205, and 541.206 until the nature of his daily activities is resolved by the factfinder."  *Id.*

APC's evidence supports only a conclusion that, as a result of extensive on-the-job training, Gilbert has become a highly-skilled inspector whose services went to the very heart of APC's marketplace offering -- oil field services -- and that Gilbert had only a small and insubstantial part in the management or operation of the APC's, or its customer's, business.

### 3.    Discretion and Independent Judgment

To withdraw Gilbert from nonexempt status as an administrative employee APC must to show that, in performing his primary duties, Gilbert used discretion and independent judgment. 29 CFR § 541.207(a)

The exercise of discretion must involve the authority to make basic decisions that affect the fundamental operation of the enterprise in question, i.e., the business operations of APC. *Cf., Hashop v. Rockwell Space Operations Company,* 867 F. Supp. 1287, 1298 (S.D. Tex. 1994).

The Ninth Circuit recognized the APC produces no evidence that Gilbert had discretion to deviate at all from carefully proscribed parameters when doing his job as a "safety supervisor."  Gilbert carried on APC's day-to-day business.  Gilbert had nothing to do with running APC and the information that Gilbert transmitted was provided in the course of the daily operation of the business.

APC sells safety compliance and that is what Gilbert's primary duties were. All of APC's evidence, when examined most favorably to Gilbert, points only to the conclusion that Gilbert was, indeed, only a "Glorified Safety Specialist" and that Gilbert did not have discretion or use independent judgment, but instead that Gilbert exercised skill and knowledge when doing his job.

APC's claim that Gilbert was exempt because he collected regulations and then interpreted them, and that Gilbert provided information when asked questions from

outside APC is defeated by a DOL opinion letter about Fire/Life Safety Coordinators and

Soils Specialist Inspectors.

> . . . [O]pinion regarding the application of . . . FLSA to the job classifications of Fire/Life Safety Coordinator, Soils Specialist Inspector...
>
> **Fire/Life Safety Coordinator - develops and updates, as necessary, ordinances for administering the Uniform Fire Code, the State Fireworks law and other fire-related regulations; interprets, inspects and enforces such ordinances; answers public inquiries; and works cooperatively with county fire districts in preventing and investigating fires.**
>
> **Soils Specialist Inspector - processes and analyzes all applications for on-site sewage disposal; consults with private designers and analyzes on-site systems designed by them; and insures that construction procedures and methods of installed systems are in compliance with state and local codes.**
>
> . . . .
>
> . . . [These jobs] . . . do not appear to meet . . . the administrative . . . duties tests because . . **these jobs do not require the consistent exercise of discretion and judgment in making decisions in significant matters in the sense in which such terms are used in the regulations.**
>
> . . .
>
> [T]he employees are merely **applying their knowledge in following prescribed procedures or determining which procedure to follow, or determining what standards are met. This is true even though they may have some leeway in reaching a conclusion or performing their work.**

1998 DOLWH Lexis 31 (1998)(emphasis added).

The description in the DOL Opinion Letter is quite close to what the evidence

demonstrates Gilbert did at work. Absent contrary authority, this Court should analogize

from the DOL interpretation in this opinion to find Gilbert non-exempt.

APC does not meet its burden to demonstrate that Gilbert is exempt from overtime. At best, APC has shown that Gilbert had a few ancillary duties that might qualify as administrative. These duties were not Gilbert's primary duties and occupied only a small amount of his workweek. APC's claim to the federal exemption must fail.

## VI.   ALASKA STATE ARGUMENT

### A.    Alaska's Standard Of Proof

When applying Alaska law to the facts, this Court should use the standard of proof required in the Alaska courts, i.e., proof beyond a reasonable doubt that the employee is exempt. *Fred Meyer of Alaska, Inc. v. Bailey*, 100 P.3d at 884.

### B.    Wage & Hour Act (AWHA)

The AWHA can provide greater protection for employees than the FLSA. *Quinn v. A.S.EA*, 944 P.2d 468, 471 (Alaska 1997); s*ee also, Pacific Merchant Shipping v. Aubry,* 918 F. 2d 1409, 1418-19 (9th Cir. 1990), *cert. den.,* 504 U.S. 979(1992), *sub nom, Tidewater Marine Suc., Inv. v. Aubry,* 504 U.S. 979(1992)(California regulation of seamen overtime). FLSA's savings clause "explicitly permits states to set more stringent overtime provisions than the FLSA." *Aubry,* 918 F. 2d at 1419. AWHA provides exemptions from overtime for persons employed in "bona fide executive, administrative, or professional" positions. A.S. 23.10.055(9).

The Alaska state regulation defining administrative employees is 8 AAC 15.910(a)(1), which in pertinent part requires that

> (1) an "administrative employee" mean an employee

(A) whose primary duty consists of work **directly related to management policies or supervising the general business operation of the employer;**

(B) who **customarily and regularly exercises discretion and independent judgment;**

(C) who performs work **only under general supervision**;

(D) who is paid on a **salary** or fee basis;

(E) who **regularly and directly assists the proprietor or an exempt executive employee** of the employer; **and**

(F) who **performs work along specialized or technical lines** requiring special training, experience or knowledge **and does not devote more than 20 percent**…. of the employee's weekly hours **to activities that are not described** in this paragraph or (7) or (11) of this section [executive or professional employee duties].

8 AAC 15.910(a)(1)(emphasis added).

## C.    Applying Alaska's Test

The Alaska standard for determining if an employee is exempt replicates the federal requirement that "exemptions are to be narrowly construed against the employer. In Alaska, if there is a reasonable doubt as to whether an employee meets the criteria for exemption, the employee should be ruled non-exempt." *Dayhoff v. Temsco Helicopters, Inc.,* 848 P. 2d 1367, 1372 (Alaska 1993)(embedded citation omitted).

The AWHA is derived from the FLSA and interpretations of the FLSA are relevant to interpreting the AWHA. *McGinnis v. Stevens,* 543 P. 2d 1221, 1238-39 (Alaska 1975), *appeal after remand*, 570 P. 2d 735 (Alaska 1977).

Alaska's regulation withholds the exemption if a purported administrative employee spends more than twenty percent (20%) of his or her weekly hours performing non-exempt activities. *See,* 8 AAC 15.910(a)(1)(F). Put another way, if the employee does not devote at least 80% of the employee's weekly hours to administrative activities, the employee is entitled to overtime.

Gilbert contends that a reasonable jury, applying both the presumption of entitlement and the elevated burden of proof, could only decide that Gilbert exercised skill and applied knowledge when performing his primary duties and that Gilbert spent almost all of his time performing non-exempt duties identical to those performed by those with the title of "safety specialist." No reasonable jury can find Gilbert to be exempt when applying these facts to the Alaska regulation.

### 1.     Alaska Discussion

#### a.     Primary Duty In Alaska

Alaska's primary duty analysis creates greater employee protection than the federal requirements for exemption. APC offers no evidence to contradict Gilbert's estimates of what percentage of his time the spent on various tasks.

#### b.     Customarily And Regularly Exercised Discretion And Independent Judgment In Alaska

Alaska requires more of the employer than does the FLSA when assessing whether an employee used sufficient discretion and independent judgment to be exempt. Alaska

requires that the employee use such discretion and judgment "customarily and regularly." 8 AAC 15.910(a)(1)(B) As was discussed in the context of the FLSA, APC has not proved that Gilbert exercised any discretion and/or judgment at all, let alone demonstrating a customary and regular activity.

Gilbert incorporates here his discussion of the federal "skill vs. discretion & judgment" dichotomy. Gilbert also reminds this Court that where a task could demonstrate either "skill" or "discretion," then it must be construed to be a skill and non-exempt. *Fred Meyer of Alaska, Inc. v. Bailey*, 100 P.3d at 884. This is consistent with Alaska's stricter "beyond reasonable doubt" test.

### c.    Salary

Gilbert was paid a daily salary.

### d.    Regularly And Directly Assist An Exempt Executive Employee In Alaska

The evidence APC said demonstrates that Gilbert assisted an exempt executive employee is that Gilbert covered for Smith when Smith was not there. This was not Gilbert's primary duty. The discussion above makes clear that this task did no more than require attendance at a few meetings. Gilbert says this took only a few hours a week. (Gilbert Declaration at ¶14)

### e.    Specialized Or Technical Work Requiring Special Training

Gilbert repeats that where a duty could be either the product of "skill and knowledge" or "discretion and independent judgment," it should be considered a skill. *Fred Meyer,* 100 P.3d at 884. Gilbert was exercising "skill and knowledge" to apply

known standards, or was engaged in specialized or technical work requiring special training. The discussion of the federal counterpart to this sub-section shows that APC cannot meet this test.

Recall that Gilbert's formal education was not specific to oilfield safety. The education he had for the safety job was mostly gained on-the-job. (Declaration at ¶15) Just like those called "specialists," Gilbert collected sources of standards, reviewed established policies and procedures and then explained them to the workers in the field in order to assure safety and compliance. (Discussion *supra.*)

APC provides no evidence to support its claim that Gilbert acted independently in connection with his primary duties.

### f.     Alaska Test: Less Than 20% Non-Exempt Work

Gilbert presents evidence that about 80% of his time was spent doing specialist work. (Gilbert Declaration at ¶13) APC must produce evidence that Gilbert did not spend more than 20% or his weekly hours doing non-exempt work. The only evidence APC offers is Smith's opinion, which was arrived at, without consultation with Gilbert. APC does not meet its burden and, in fact, produced no evidence about how to apportion Gilbert's time.

### VII.   CONCLUSION

Gilbert is entitled to summary judgment unless APC can provide admissible evidence that could permit a rational jury to find, either "beyond a reasonable doubt" or

"clearly and unmistakably," that APC has proven each and every requirement found in the applicable regulations that Gilbert was administratively exempt

Congress, the Alaska legislature, and the courts meant for the burden upon APC to be an onerous. APC's citations to Gilbert's deposition are incomplete and mischaracterized. Fair reading of the quotes supports Gilbert's position that he was a "glorified safety specialist" and he performed the same primary duties as those of a specialist, except that he was "embedded" in the office instead of "embedded" at another place in the oil field.

Smith's testimony does not demonstrate his personal knowledge about the subject or its specific application to Gilbert. APC's complaints that Gilbert's sworn testimony is unsupportable and conclusory does not apply to Gilbert – but it does apply to Smith. Smith's testimony cannot support APC.

The final fatal omission in APC's argument is the failure to apportion primary and ancillary duties, and the amount of time Gilbert spent performing which duties, during his workweek. Without this apportionment, APC cannot meet either the federal or the Alaskan regulatory requirements and cannot claim the benefit of the administrative exemption.

Gilbert is entitled to overtime until APC is proven, beyond a reasonable doubt, to be innocent, i.e., entitled to rely on the administrative exemption to escape liability. Because APC has failed to provide this court with admissible evidence to support each element of the entitlement, Gilbert's motion for summary judgment must be GRANTED.

Respectfully submitted this 13th day of October, 2006 at Fairbanks, Alaska.


LAW OFFICES OF KENNETH L. COVELL
Attorney for John Gilbert


/s/Kenneth L. Covell
Kenneth L. Covell
Attorney Bar #:  8611103
712 8th Ave.
Fairbanks, AK 99701
Phone:  907.452.4377
Fax:  907.451.7802
E-mail:  kcovell@gci.net


**CERTIFICATE OF SERVICE**
This is to certify that a copy of the foregoing has been
Electronically sent to the following attorney(s):

**Patricia Zobel**
**DeLisio Moran Geraghty & Zobel**
**943 W. 6th Ave.**
**Anchorage, AK 99501**

Dated: 10/13/06
By: ___/s/ Emily S. Ervin_____
        Emily S. Ervin for Kenneth L. Covell