Case 3:03-cv-00174-RRB   Document 92-3   Filed 10/13/2006   Page 1 of 10

JOHN GILBERT vs. APC NATCHIQ, INC.
CASE NO. 3:03-CV-00174-RRB

DEPOSITION OF JOHN D. GILBERT
MAY 31, 2006

Page 1

```
 1              IN THE UNITED STATES DISTRICT COURT
 2                   FOR THE DISTRICT OF ALASKA
 3
    JOHN GILBERT,                )
 4                               )
              Plaintiff,         )
 5                               )
    v.                           )
 6                               )
    APC NATCHIQ, INC.,           )
 7                               )
              Defendant.         )
 8  _____)  Case No. 3:03-CV-00174-RRB
 9
                    DEPOSITION OF JOHN D. GILBERT
10                          June 7, 2006
11  APPEARANCES:
12          FOR THE PLAINTIFF:      MR. KENNETH L. COVELL
                                    Attorney at Law
13                                  712 West 8th Avenue
                                    Fairbanks, Alaska  99701
14                                  (907)  452-4377
15
            FOR THE DEFENDANT:      MS. PATRICIA ZOBEL
16                                  DeLisio Moran Geraghty
                                       & Zobel, P.C.
17                                  Attorneys at Law
                                    943 West 6th Avenue
18                                  Anchorage, Alaska  99501
                                    (907)  279-9574
19
            ALSO PRESENT:           MR. DOUGLAS SMITH
20
21                            *  *  *  *
22
23
24
25            Exhibit 2 Page 1 of 21
```

Case 3:03-cv-00174-RRB   Document 92-3   Filed 10/13/2006   Page 2 of 10

JOHN GILBERT vs. APC NATCHIQ, INC.                    DEPOSITION OF JOHN D. GILBERT
CASE NO. 3:03-CV-00174-RRB                                           MAY 31, 2006

Page 18

1    national labs.  Like where I currently work you have to
2    have radiological one and radiological two training in
3    order to work there.
4  Q  And the training teaches you safety and how to deal
5    with it?
6  A  Correct.
7  Q  Okay.  And you had that.....
8  A  Evacuation procedures and so forth.
9  Q  And Geoprobe, what is that?
10 A  That's just a small drilling rig.  It allows you to do
11   subsurface sampling of soil and water.  It's a tract
12   drilling rig is all it is.
13 Q  Okay.  At the time that you came to work with APC as a
14   safety specialist, which would have been back in
15   January of '01, did you believe that you had the
16   qualifications to work as a safety specialist as
17   described by APC?
18 A  I did after they hired me.  Yes -- yes, I did.
19 Q  Okay.  Did you feel competent in carrying out the job
20   in a safe and competent and professional manner?
21 A  Yes.
22 Q  Okay.  And you feel that you had had the prior
23   training, or they provided you with the training
24   necessary in order to do that?
   A  I felt that I probably had enough background to do it

Exhibit 2 Page 2 of 21

Case 3:03-cv-00174-RRB   Document 92-3   Filed 10/13/2006   Page 3 of 10

JOHN GILBERT vs. APC NATCHIQ, INC.                    DEPOSITION OF JOHN D. GILBERT
CASE NO. 3:03-CV-00174-RRB                                           MAY 31, 2006

Page 34

| | | |
|---|---|---|
| 1 | Q | And you had the responsibility to supervise them? |
| 2 | A | Yes, it's a gray area in my opinion, but -- yes. |
| 3 | Q | Okay. Development of site specific polices and procedures? |
| 5 | A | Yes, we all did that. |
| 6 | Q | And risk assessments? |
| 7 | A | Yes. |
| 8 | Q | Incident investigations? |
| 9 | A | Yes. |
| 10 | Q | Audits and monitoring of ongoing activities? |
| 11 | A | Yes, I'm not quite sure what that means. |
| 12 | Q | For example, the activities of safety specialists, were you auditing and monitoring ongoing activities by safety specialties? |
| 15 | A | Auditing and monitoring? |
| 16 | Q | Yes or no? |
| 17 | A | No. |
| 18 | Q | Okay. How about auditing and monitoring of ongoing activities such as the usage safety protocols? |
| 20 | A | Yes. |
| 21 | Q | Okay. Coordination of health surveys? |
| 22 | A | Coordination of health surveys, yes. |
| 23 | Q | Okay. Within this description, let me see if we can establish some base line here. If I understand the way that APC has this put together, the safety specialist |

Exhibit 2 Page 3 of 21

Case 3:03-cv-00174-RRB   Document 92-3   Filed 10/13/2006   Page 4 of 10

JOHN GILBERT vs. APC NATCHIQ, INC.                      DEPOSITION OF JOHN D. GILBERT
CASE NO. 3:03-CV-00174-RRB                                            MAY 31, 2006

Page 35

```
 1        were, a term I'll use is embedded.  They were
 2        specifically assigned to a location facility and
 3        project, is that correct?
 4   A    For the most part, that's correct.
 5   Q    Okay.  So somebody would go every -- you weren't
 6        handing out assignments each time this guy would show
 7        up at work, he'd go and work on pads, for example?
 8   A    Sure, everybody kind of had their assigned area and
 9        then if somebody was absent there'd be fill-in, you
10        know, somebody will go over and fill in.
11   Q    Okay.  All right.  And these guys actually were getting
12        specific -- in addition to working independently and
13        doing monitoring, and you agree with me, they worked
14        independently?
15   A    Yes, oh yes -- definitely.
16   Q    And in addition to working independently they would
17        also respond to whoever was the supervisor within
18        control of that particular construction project or area
19        of maintenance?
20   A    Well they reported to or had direct liaison with --
21        whether it's the maintenance supervisor or the
22        maintenance foreman or -- they had their own areas to
23        report to.  They -- one was maintenance, one was
24        construction, one was operations, and one was drilling.
25   Q    Okay.  And those are the different specialists within
```

Exhibit 2 Page 4 of 21

Case 3:03-cv-00174-RRB   Document 92-3   Filed 10/13/2006   Page 5 of 10

JOHN GILBERT vs. APC NATCHIQ, INC.
CASE NO. 3:03-CV-00174-RRB

DEPOSITION OF JOHN D. GILBERT
MAY 31, 2006

Page 39

```
 1    question, so --
 2              MS. ZOBEL:  All right.
 3    Q    (By Ms. Zobel)  I think your answer was that that did
 4    not happen daily.  It was something that could happen
 5    that you would be called on, but it happened
 6    intermittently, is that.....
 7    A    Correct.
 8    Q    All right.  In general, though your job was not to do
 9    those on site activities but to rather work from the
10    corporate side of the job of health, safety, and
11    environment?
12              MR. COVELL:  Technically that's not a question.
              MS. ZOBEL:  Is that correct?
14              MR. COVELL:  Okay.  Now, that's a question.
15              MS. ZOBEL:  He answers before I get to say, is
16    that correct.
17    A    Okay.  I'll quit.
18              MR. COVELL:  That's all right.
19    Q    (By Ms. Zobel)  Is that correct?
20    A    No.
21    Q    No?  Well --
22    A    I don't quite understand the corporate side.  I mean,
23    the way I look at my job as a safety supervisor, if I
24    may, it was not too much more than a glorified safety
25    specialist.  Somebody had to be in the office to take
```

Exhibit 2 Page 5 of 21

Case 3:03-cv-00174-RRB   Document 92-3   Filed 10/13/2006   Page 6 of 10

JOHN GILBERT vs. APC NATCHIQ, INC.
CASE NO. 3:03-CV-00174-RRB

DEPOSITION OF JOHN D. GILBERT
MAY 31, 2006

Page 77

| | | |
|---|---|---|
| 1 | | last word. |
| 2 | Q | Well I guess what I'm getting at is why did they send |
| 3 | | it to you if safety specialists have already looked at |
| 4 | | it, if they didn't need somebody from corporate to look |
| 5 | | at it, or from whoever was a representative of the |
| 6 | | department? |
| 7 | A | I think it's to get more eyes on it, personally. I |
| 8 | | have no good answer for you there. I mean, why did |
| 9 | | they send it to the safety specialist? So it could be |
| 10 | | the opposite question, so we had several people |
| 11 | | involved in all of these investigations so -- |
| 12 | Q | UA's, urinalysis? |
| 13 | A | Uh-huh (affirmative). |
| 14 | Q | And what was your responsibility there? |
| 15 | A | Let's see, we would bring the employees in for random |
| 16 | | and then scheduled urinalysis and perform the entire |
| 17 | | urinalysis procedure, you know. |
| 18 | Q | What was your role in the urinalysis program? |
| 19 | A | Same as everybody else's. You'd bring them in and |
| 20 | | you'd sit them down. You'd have them fill out the |
| 21 | | initial paperwork. You'd check them for contraband. |
| 22 | | You'd take them in, give them the cup, watch them do |
| 23 | | their thing in the cup, pull it back, make sure that |
| 24 | | the temperature was correct on the cup and everything |
| 25 | | looked okay. Then you would split the sample, load the |

Exhibit 2 Page 6 of 21

JOHN GILBERT vs. APC NATCHIQ, INC.  
CASE NO. 3:03-CV-00174-RRB

DEPOSITION OF JOHN D. GILBERT  
MAY 31, 2006

Page 81

```
 1        we'd all call who we knew and they would send a resume
 2        or some other form of information and we'd all kind of
 3        just look through them and then a final decision would
 4        be made as to -- if they're going to hire them or not.
 5   Q    Who would make the final decision?
 6   A    Doug in this particular instance.
 7   Q    Okay.  And would Doug be looking to you to give him
 8        your input as to who would be hired?
 9   A    Myself and others, yes.
10   Q    Who would the others be?
11   A    All the safety specialists.
12   Q    Okay.  There's another bullet point down here about
13        mid-way through about a Mr. Ken Quinlan who contacted
14        me.  He's an IH who is currently working in Arizona.
15        He's looking for work.
16   A    Uh-huh (affirmative).
17   Q    And then you told him to send the resume to a certain
18        e-mail.  Who's e-mail is that?
19   A    It might have been mine.  It might have been Doug's, I
20        don't know.
21   Q    Does that look like yours?
22   A    I don't recall.
23   Q    All right.  Then back up on this page, on 299 it says
24        blank approached me about a problem she's having with
          her alternate and is unhappy with the amount of work
```

Exhibit 2 Page 7 of 21

METRO COURT REPORTING  
907.276.3876

Case 3:03-cv-00174-RRB   Document 92-3   Filed 10/13/2006   Page 8 of 10

JOHN GILBERT vs. APC NATCHIQ, INC.
CASE NO. 3:03-CV-00174-RRB

DEPOSITION OF JOHN D. GILBERT
MAY 31, 2006

Page 82

```
 1         that's being completed during her hitch.  Did you have
 2         responsibilities to deal with unhappy employees within
 3         the department?
 4    A    No, I -- Doug handled all that.
 5    Q    Well if Doug wasn't there did you just blow them off
 6         and say wait until Doug's there or what did you do?
 7    A    Pretty much.
 8    Q    Oh.  Did you ever problem solve with people who were
 9         unhappy?
10    A    Yes, sure.
11    Q    All right.  It says I've not talked with blank and
12         there's always two sides to the story, would you do the
13         two sides to the story?  Would you investigate?
14    A    I know what this is all about here.  This is Kim and
15         Amanda were not -- they were butting heads and, you
16         know, I just deferred all this to Doug.
17    Q    Is that because it wasn't your responsibility or
18         because you just didn't want to deal with the personnel
19         issues in the admin office?
20    A    I don't think it was my responsibility so --
21    Q    Okay.  What about if there was some lack of
22         attentiveness or work ethic or whatever on the part of
23         the safety specialist?  Would it be your responsibility
24         to call that to their attention and tell them they
           needed to get it straight?
```

Exhibit 2 Page 8 of 21

Case 3:03-cv-00174-RRB   Document 92-3   Filed 10/13/2006   Page 9 of 10

JOHN GILBERT vs. APC NATCHIQ, INC.                                DEPOSITION OF JOHN D. GILBERT
CASE NO. 3:03-CV-00174-RRB                                                            MAY 31, 2006

Page 83

```
 1   A    I can't ever recall that happening, so I don't know how
 2        to answer that.  No.
 3   Q    You never had anybody from any of the different places
 4        where these people were embedded -- the supervisors
 5        calling you and saying we're having trouble with so and
 6        so?
 7   A    Oh, I think there was a lot of that particular type of
 8        stuff going on all the time.  You know, I mean the
 9        safety department is not -- how shall I put this --
10        well liked by either management or employees.
11   Q    Why is that?
12   A    You're the bad guy.  You know, you're always -- you
13        have nothing good to tell management and you're always
14        on the employee's back to make them work safe so nobody
15        likes you.  Yes, you could get a call several times a
16        day complaining about the safety guy.
17   Q    And you're the guy that they would bring those
18        complaints you?
19   A    Yes, myself or Doug or Ron Kirk or.....
20   Q    As your alternate?
21   A    Gary Buchanan or.....
22   Q    Gary over -- what was his position -- over Doug?
23   A    Yes, he's the -- let's see if I can get this right.
24   Q    You don't have to worry about what his.....
     A    I don't know, I can't remember his title.
```

Exhibit 2 Page 9 of 21

JOHN GILBERT vs. APC NATCHIQ, INC.  
CASE NO. 3:03-CV-00174-RRB

DEPOSITION OF JOHN D. GILBERT  
MAY 31, 2006

Page 84

```
 1   Q      Okay.
 2   A      It would be a guess.
 3   Q      Then safety staff meetings: when you hold a safety
 4          staff meeting, would you conduct those meetings?
 5   A      (No audible answer)
 6   Q      It says I basically went over what so and so presented
 7          to the rest of the group the previous Saturday. Also
 8          discussed the modification to the APC PP and G manual.
 9          We're right here.
10   A      Two 99, right here. It looks like I did conduct that
11          one, yes.
12   Q      Okay. Is that some of what you regularly did?
13   A      Well we weren't very good at having regular meetings.
14   Q      When you held meetings, who conducted them?
15   A      It's -- it's possible that I conducted them. It's also
16          possible Doug conducted them or one of the safety
17          specialists if he had something in particular he wanted
18          to talk about he would conduct them. It was pretty
19          informal.
20   Q      Okay. He'd be on the agenda, but somebody else would
21          set the agenda?
22   A      I don't even know if you could go as far as saying
23          there was an agenda.
24   Q      Oh, I've got some agendas.
 2   A      Okay. Good.
```

Exhibit 2 Page 1 of 21